UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) Case No. |
| | ) 09-82322-Civ-ZLOCH |
| Plaintiff, | ) |
| -v- | ) |
| FIRST UNIVERSAL LENDING, LLC, et al., | ) |
| | ) Fort Lauderdale, Florida |
| Defendants. | ) December 8, 2009 |
| | ) 1:38 p.m. |

PM SESSION - Pages 1-113

TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION

BEFORE THE HONORABLE WILLIAM J. ZLOCH

U.S. DISTRICT JUDGE

APPEARANCES: (Previously noted in AM Session)

Reported by: WILLIAM G. ROMANISHIN, RMR, CRR
(305) 523-5558 Official Court Reporter
400 North Miami Avenue
Miami, Florida 33128

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

(Call to order of the Court)

THE COURT: All right. Mr. Liggins, do you want to retake the witness stand.

All right. Mr. Feingold, you may continue, sir.

MR. FEINGOLD: Thank you, sir.

CROSS-EXAMINATION

BY MR. FEINGOLD:

Q. Are you ready, sir?

A. Yes, sir.

Q. Sir, in total, you filed with this Court 16 declarations, not including your own, and approximately six additional declarations and a supplement, correct?

A. Yes. The attorneys filed for this Court.

Q. There were attached to your affidavit a total of approximately 23 declarations, correct?

A. Yes.

Q. Okay. Now, to those 23 declarations, sir, you will acknowledge that all of them are against First Universal Lending, correct?

A. Correct.

Q. Not against First Universal Holdings, correct?

A. Correct.

Q. Nothing against Finley and Bologna, correct?

A. Correct.

Q. Nothing against Stratton and Feinstein, correct.

A. Correct.
Q. Nothing against Abood's law offices, correct?
A. Correct.
Q. Now, on top of that -- and I apologize to this Court. I misspoke. When I asked you about these declarations, I told you that all of them didn't come from the PGA office, and I misspoke. So I'm going to rephrase the question.
Isn't it true, sir, that the declaration of Terry Dadd came from the PGA office, and Mr. Dadd received a reduction in his interest rate from eight percent on his mortgage to five percent and also had $11,000 in delinquencies referred for a total savings of over $111,000 from the services that PGA officer First Universal provided to him.
A. Is that in his declaration?
Q. Isn't it true that that happened, sir?
A. I'm not sure, no.
Q. And isn't it also true that in the only other declaration that you filed regarding work that was done by the PGA office of First Universal Lending, that for Mr. Edward Munoz, his interest rate was reduced from nine percent to six percent and he saved $4,600 per year for a 30-year life of his loan. Isn't that true?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: If you know, sir. Do you know?
THE WITNESS: I have no idea.

BY MR. FEINGOLD:
Q. Sir, let's go through in your supplement that you filed -- and you went through with the Court today -- the complaint starting with Cecilia Munoz, Edward Munoz.
See that complaint?
A. Yes.
Q. So, we've already established you've never spoken to these people, is that correct?
A. That's correct.
Q. And we have also established through my questions you were not aware of the results first obtained by First Universal PGA's office, is that correct?
A. That's correct.
Q. And with regard to the next complaint that you received and you looked at and filed with this Court, an Edward Damond, isn't it a fact that Mr. Damond actually received from Chase Bank a Forebearance Agreement that was procured by First Universal?
A. I have no idea.
Q. And the next complaint, which is Kathryn Reck and Rocky Reck, isn't it a fact that the Recks' complaint was that they had only received two phone calls, right? Do you see that?
A. According to the letter that was filed on your premises, yes.
Q. Yes. That they had only received two phone calls

according to that letter.

Well, isn't it a fact, sir, that on 4-22-09, Ms. Reck e-mailed First Universal and indicated that she had three jobs and she could only be contacted by e-mail, and therefore, she recognized that they were trying to call her by phone but e-mail was her preferred communication? Are you aware of that?

MR. SINASOHN: Objection.

THE WITNESS: I have no idea.

BY MR. FEINGOLD:

Q. Sir, go to the next complaint, Alan Jacobs.

Now, at the end of Mr. Jacobs' letter from June 2009, he indicated that if he didn't get a refund, he would be contacting his legal counsel to file a lawsuit.

Do you see that, sir?

A. Yes.

Q. Isn't it a fact that Mr. Jacobs' legal counsel was provided a complete copy of the sales force file, and after receiving that file over six months ago, or nearly six months ago, no lawsuit has ever been filed? Isn't that a fact?

A. I have no idea.

MR. SINASOHN: Objection. Lacks foundation.

THE COURT: Mr. Liggins, if your lawyer has an objection, let him state it before you answer.

THE WITNESS: Yes, sir.

BY MR. FEINGOLD:
Q. The next letter you submitted to the Court was from a John Casner to an owner Dave at First Universal.
Do you recall testifying about that letter, sir?
A. Yes, sir.
Q. Isn't it a fact that John Casner was a client of an office owned by a man named David Kushner, who owns a franchise office of First Universal?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: If you know, you can answer.
THE WITNESS: I don't know.
BY MR. FEINGOLD:
Q. The next complaint you filed with this Court was of Kathleen Lee.
Do you recognize that? You just testified to that before it lunch.
A. Yes, sir.
Q. Isn't it a fact that Kathleen Lee had a mortgage with Chase Bank and the mortgage payment was reduced from $1,772 a month to $1,202 per month?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: You can answer. Go ahead. If you know.
THE WITNESS: I have no idea.
BY MR. FEINGOLD:

Q. Next you filed the complaint of Brenda Wood.
Do you recognize that? You spoke about it before lunch.
THE COURT: That might be the handwritten.
BY MR. FEINGOLD:
Q. The handwritten.
A. Yes, sir.
Q. Isn't it a fact that First Universal refunded Ms. Wood?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: If you know.
THE WITNESS: I have no idea.
BY MR. FEINGOLD:
Q. So, basically, as you sit here today, you know nothing about these complaints other than what you've read in them, correct?
A. Other than what I read and what I found on your premises, yes, that's correct.
Q. Let's talk about what you found on the premises, sir.
You attached some e-mails to your declaration.
A. Yes.
Q. Those were e-mails you printed off the computers?
A. No.
Q. Where were those e-mails found?
A. These e-mails were already printed out.
Q. You attached two e-mails to your declaration.

Where did you find both of those e-mails, sir?
A. I found printed out versions of the e-mail on the second floor of your premises.
Q. Where did you find an e-mail with regards to Miranda Johnson, sir? Exhibit L, attachment L.
A. I don't recall the exact location. I know it was the second floor of your premises.
Q. Isn't it true it was actually printed out from Ms. Johnston's computer?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: You can answer.
THE WITNESS: I don't believe so, sir, no.
BY MR. FEINGOLD:
Q. Do you know?
A. Yes, sir. This was not printed out. It was printed out, not -- didn't nobody go on the computer and print it out. That's what I'm saying.
Q. Sir, let's talk about Jimmy Robinette.
Jimmy Robinette was someone you testified about before, and my presumption from your testimony was you were trying to assert to this Court that Mr. Robinette was holding multiple jobs at the same time as First Universal by going through these sheets where he had filled out information about people.
Was that the intent of your testimony?

A. Could you rephrase that? I'm sorry.
Q. Was the intent of your testimony regarding James Robinette to represent to this Court that Mr. Robinette was working for First Universal Lending and the law firms and Transcontinental all at the same time?
A. The same period. These have separate dates on them.
Q. Well, let's talk about the chronology of that.
Number one, would you agree with me that First Universal Lending ceased its sales and turned in its lender's license at the end of September 2009?
MR. SINASOHN: Objection. Lacks foundation.
THE COURT: Look, the witness can answer if he knows. All right.
THE WITNESS: I have no idea.
BY MR. FEINGOLD:
Q. Well, if you would look at the first opening pitch sheet you see for James Robinette -- do you see that one, sir? It's real large and it looks like a black highlighter or black magic marker. It says 10-13-09.
THE COURT: Which attachment?
MR. FEINGOLD: Sir, this is his supplemental declaration. The pages are not numbered.
THE COURT: Okay. But it's the first reference to --
MR. FEINGOLD: To James Robinette, sir.

THE COURT: Okay. Thank you.

BY MR. FEINGOLD:

Q. Do you see that, Mr. Liggins?

A. Which one is it?

Q. It's the first reference to James Robinette. It's in really large black magic marker. It says opening pitch at the top. It's written very large.

A. I was a little confused because the first one is Finley and Associates.

Q. Yes. I want to go through this and go through it chronologically.

A. Okay.

Q. Okay. Do you see that, sir?

A. Actually, to be sure, what's the date on it?

Q. It says 10-13-09 with an X through it on the right-hand side.

A. Yes, I have that one.

Q. Do you see that, sir?

A. Yes, sir.

Q. Okay. And that says on the right-hand side.

Did you read on the left-hand side of this exhibit to the Court what that said?

A. It says don't call till October 31st.

Q. Sir, I've asked you if you read it to the Court.

Did you read that to the Court?

A. Yes. I just did.
Q. No, no. Before, when you testified about this.
A. No.
Q. No, you didn't. So let's read it together now.
Does it not say don't call till October 21?
A. That's correct.
Q. Okay. Isn't it a fact that Mr. Robinette was a loan officer for First Universal Lending in September and kept his lead sheets with him throughout the course of his employment, and that's why, in October, he's calling someone back? Isn't that a fact?
A. I have no idea.
Q. Did you ever interview Mr. Robinette?
A. No. He wasn't available.
Q. He wasn't available. How do you know?
A. I don't even know who he is. He wasn't available.
Q. Wait. Sir, how wasn't he available?
A. Well, the day we went in, on November 19th, all the employees left.
Q. All the employees left?
A. Yes.
Q. Was Mr. Robinette even there on the 19th?
A. I'm not sure.
Q. Did you ever try to ask me to get Mr. Robinette so you could interview him?

A. No, sir.
Q. Next page for Mr. Robinette. 10-27-09.
What does it reflect, what company is he working on behalf of?
A. Which one, 10-27-09?
Q. Yes.
A. It says Transcontinental Lending.
Q. Tell me everything you know about Transcontinental Lending and its relationship to First Universal Holdings.
A. I don't have any relationship with First Universal Holdings, but it's a d/b/a of First Universal Lending.
Q. Really? Is that so?
Have you ever heard what a net branch is, sir?
A. No.
Q. You're a financial investigator and you're not familiar with a net branch?
A. I'm a consumer protection investigator.
Q. Do you also investigate mortgage companies?
A. No, sir.
Q. Sir, turn to the next page, open pitch, James Robinette, 10-29-09.
What company does it reflect he is working on behalf of?
A. Transcontinental Lending.
Q. Do you know what he does for Transcontinental Lending?

A. No, sir.
Q. What about the next one, 11-2-09, what company does that reflect?
A. Transcontinental Lending.
Q. What about the next one, 11-2-09, what company does that represent?
A. Transcontinental Lending.
Q. All of these Transcontinental Lending opening sheets being done after First Universal Lending submitted its license, returned it to the State of Florida?
A. I have no idea when that was done.
Q. Let's look at the next one, 11-3-09, Finley and Bologna International.
You see Mr. Robinette's name there, correct?
A. Correct.
Q. Do you know what he was doing on behalf of that company?
A. Other than it says on this sheet opener, no.
Q. Let's look at the next one, 11-11-09. It says Mr. Robinette, Finley and Bologna.
Do you know what he was doing for that company?
A. Other than what's listed on this sheet as closer, no, I don't.
Q. And in fact, let's turn to the next opening sheet dated 10-10-09. This one doesn't say to call back from a previous time period on the left-hand side, does it?

A. No, sir.
Q. No, it doesn't.
And does it reflect, in October, when he doesn't have a reminder for a callback from a previous conversation, does it now reflect that he's involved with First Universal Lending?
A. Not that I could see on this sheet.
Q. No, sir, it does not. Does it?
A. Not that I could see on this sheet, no, sir.
Q. Let's talk about honesty, sir.
Is it your obligation to make sure that the filings made to this Court are honest?
A. What do you mean by "honest"?
Q. Telling the truth.
A. Yes, sir.
Q. Took you a while to think of the answer to that. But, okay. Fine. Let me ask you the next question, then.
Did you actually read what the attorneys for the FTC prepared and filed and gave to this Court?
A. No, sir, not all of it, no.
Q. Okay. So I understand this, you're the investigator that they're relying upon in order to make representations to this Court, and you didn't read everything that they provided to this Court to close down a business?
A. No, sir.

Q. Well, let's talk about that.
The allegation was made that defendants initially contacted consumers by telephoning homeowners.
That's not true, is it?
A. Yes, sir, I believe it is true.
Q. Did you read Denise Gray's affidavit, affidavit declaration number 13, that you filed, paragraph number 5, where she says, I found them on the Internet?
Did you read your own declaration that you filed with this Court?
A. I would need to look at it to refresh my memory.
Q. What about Matt Lavender, affidavit number 10, paragraph 4? He was referred to First Universal from a friend.
Didn't you file that with the Court?
A. Sir, I would need to look at these declarations. I don't know.
Q. What about Christy Frye, affidavit number 5, paragraph 4? She called First Universal directly.
MR. FEINGOLD: Would you like me to stop, Your Honor?
THE COURT: No. Go ahead.
BY MR. FEINGOLD:
Q. What about Christy Frye, declaration number 5, paragraph 4? She found First Universal on the Internet.
That's not First Universal calling her directly, is

it?
A. No, sir, it's not.
Q. What about Terry Dadd, paragraph number 4? He says he learned about First Universal from the television.
That's not First Universal calling him directly, is it?
A. Sir, again, I would have to look at the declarations.
Q. You're the one that filed these to close this business down.
Did you know you were going to be in court today testifying?
A. Of course.
Q. Well, have you heard of preparation? Don't you think you should have prepared?
A. Sir, I can't memorize volumes and volumes of documents.
Q. What about Mr. Garcia, declaration number 6, who in paragraph 4 and 5 he said he learned of First Universal for lowering my bills.
That's not being called directly from a telephone, is it?
A. Sir, do you have his declaration?
Q. I absolutely do.
I don't want to waste the Court's time. So the answer is, you know these things were filed with the Court, these representations, and you know your declarations were

filed. But you never sat down and actually compared what your declarations said as to what these lawyers represented to this Court, did you?
A. No, sir. I don't file the paperwork.
Q. This Court was told that the defendants promised consumers that they will negotiate the consumers with the mortgage lenders and they will substantially reduce payments.
That representation was made to the Court, correct?
A. Sir, I don't know what you're referencing. I need to see.
Q. Paragraph 14 of the complaint for injunctive relief.
Did you read the complaint for injunctive relief?
MR. SINASOHN: Your Honor, may I present the witness with a copy of the complaint?
THE COURT: Do you have any objection?
MR. FEINGOLD: None whatsoever, Your Honor.
THE COURT: Give him a copy.
BY MR. FEINGOLD:
Q. Paragraph 14: Defendants typically promise consumers that they will negotiate with consumers' mortgage lenders to modify consumers' mortgage loans and make their payments substantially more affordable.
Do you see that?
A. Yes, sir.
Q. And that's in fact true. That's exactly what First

Universal does and accomplishes for its clients, isn't it?
A. They did promise that, yes.
Q. And they did accomplish it, didn't they, sir?
A. I'm not sure with every consumer, no.
Q. You're not sure?
A. No.
Q. Paragraph 15, sir: Defendants tell consumers that they will obtain a loan modification within a specified period of time, typically no more than a few months.
That's the representation that was made to the Court, correct?
A. Yes, sir.
Q. Did you read the contract that each one of these people signed with First Universal?
A. I read some contracts, sir. But I was going based on what the consumers stated in their declarations and their complaints.
Q. So you went only based on what the consumers said, correct?
A. That's correct.
Q. Now, the contracts that you reviewed, each and every one of them said there is no guarantee as to how long it will take, correct?
A. That's what the contract says.
Q. And in fact, on top of the contract, each of the

consumers got -- one, two, three, four -- five standard e-mails during the first five weeks of their relationship where they were advised you must continue to pay your loan under the terms of your loan documents and there's no guarantees how long this will take.

The consumers were told that on five separate occasions on top of the contract they signed, isn't that true?

A. Along with what they were told by the salesperson.

Q. Sir, isn't that true what I just said?

A. Yes.

Q. Along with what they were told by the salesperson.

But we already know, sir, that you didn't listen to any of the recordings on the sales force, correct?

A. Not yet, no.

Q. Not yet.

Have you looked in your calendar and planned when you're going to look at these and when you're going to listen to these things?

A. No.

Q. Will it be after this company is completely destroyed and closed down?

A. I don't know, sir.

THE COURT: All right. Mr. Feingold, let me go ahead and interrupt you at this point. Let me take care of the two other matters and let me ask everyone to just check

back here at 2:30 and let's see where we are.

Court's in recess.

(Recessed at 1:58 p.m.)

(Resumed at 3:35 p.m.)

THE COURT: Please be seated.

All right. Mr. Liggins, do you want to retake the witness stand.

All right. Continuing with cross-examination, Mr. Feingold.

MR. FEINGOLD: Thank you, Your Honor.

BY MR. FEINGOLD:

Q. Mr. Liggins, do you have still in front of you the copy of the complaint?

A. No, I do not.

Q. Please have your counsel give it to you, sir.

MR. SINASOHN: May I approach, Your Honor?

THE COURT: Yes. I thought you did that earlier.

BY MR. FEINGOLD:

Q. Sir, paragraph number 21 asserts: In most instances, defendants encourage consumers to stop paying their mortgages.

In fact, sir, that is false, isn't it?

A. No, sir.

Q. It's not?

Well, let's go through this, then, sir.

In fact, five separate e-mails are sent to each and every client advising them to continue to pay their mortgages. Isn't that true?

A. I'm not sure, sir.

Q. In fact, Mr. Frye, at your fifth declaration in paragraph number 5, acknowledged: FUL said legally it could not tell us to not make payments.

Isn't that true?

A. I would have to see the declaration, sir.

Q. Sir, Exhibit 11, Lopez, paragraph 3. Lopez acknowledged they were already behind, correct?

A. No, sir. I would need to see the declaration, sir.

Q. Sir, isn't it a fact that in 95 percent of all of the customers of First Universal Lending, they sign up and they are already behind and haven't made their payments?

A. I wouldn't know, sir.

Q. Sir, did you read declaration number 16, Suave; declaration number 8, Hibbs; declaration number 9, Jacoby; declaration number 2, Buitendorp? Did you read any of those?

A. I read all of the declarations, sir.

Q. Did you compare what they said about what they were told about paying their mortgage with what was represented to this Court? Did you compare that?

A. Compare it to the complaint, sir?

Q. Yes.

A. No, sir.
Q. By the way, do you know how this complaint was actually prepared?
A. No, sir.
Q. Do you know if it was a standard form boilerplate complaint that was used in lots of other cases?
A. I wouldn't know, sir.
Q. Paragraph number 22, you state -- it's stated: In most instances, after homeowners paid defendants, defendants failed to answer or return homeowners' telephone calls.
That, sir, is false, isn't it?
A. No, sir.
Q. It's not?
Did you go through the phone records of First Universal to determine if that's false?
A. No, sir.
Q. Can you tell me, how does First Universal keep track of every single solitary phone call that goes there?
A. I wouldn't know, sir.
THE COURT: You need to slow down for the court reporter.
BY MR. FEINGOLD:
Q. Are you aware that First Universal --
THE COURT: Mr. Feingold, you need to slow down for the court reporter.

MR. FEINGOLD: Yes, sir.
BY MR. FEINGOLD:
Q. Are you aware that First Universal has an outside third-party phone room in the Midwest that receives overflow of every single phone call so that there cannot be an unanswered phone call?
A. No, sir.
Q. You also assert in paragraph number 23: In most instances defendants failed to obtain mortgage loan modifications.
Isn't it a fact you don't even know what percentage of the clients actually received modifications?
A. Sir, I have to correct you on one thing. You said "I assert" in this. I didn't do the complaint.
Q. You are the FTC, aren't you? You work for them?
A. Yes. I'm an investigator with the FTC, not a lawyer.
Q. The FTC is the plaintiff in this case.
A. Yes, sir.
Q. Are you disclaiming responsibility for this action now, sir?
A. Not for the action, sir. I'm an investigator with the FTC. I didn't draft the complaint.
Q. Sir, let's go back to your supplemental declaration.
Do you have that in front of you, sir?
A. Yes, sir.

Q. First of all, if you could turn to the -- these are not numbered -- so one, two, three, four, five, six, seven, eight -- the ninth page, sir, where it says background information.
See that page, sir?
A. Yes, sir.
Q. Okay. You testified that this was the first page of the financial disclosure that was made by First Universal Holdings, correct?
A. Yes, sir.
Q. And that's the financial disclosure that the Court ordered when you got your injunction that we make financial disclosure to you all, correct?
A. Yes, sir.
Q. So you all had a copy of this financial disclosure, correct?
A. Yes, sir.
Q. Okay. Can you explain to me why your attorney stood up in front of the Court yesterday and told this Judge that he had never received a copy of this when you all used it as an exhibit in your filing?
A. No, sir.
Q. Do you believe that attorneys should be truthful to the Court?
A. Of course.

Q. Took you a while to come up with that answer, sir.
A. Well, I had to look at all the attorneys in the room.
Q. Sir, Exhibit C -- and I want to move quickly -- but Exhibit C, that's information that was already covered with Ms. Moscowitz, correct?
A. I believe so.
Q. Yes. So I will not take the time and go through that.
If you could turn forward about 20 pages to attachment D, and there are handwritten notes. And in these handwritten notes -- are you there, sir? I'm sorry.
A. Yes, sir.
Q. In these handwritten notes you refer to the fact that the attorneys indicated or -- describe for me how you, in your own words -- excuse me -- describe for me what you describe this piece of paper to be.
A. It's a handwritten note that was found on the premises of Post-Its, actually, on the left side, and it was handwritten. On the right side it had the wordings.
Do you need me to read them again?
Q. No.
But my point is these are Post-Its that you combined with it and photocopied, correct?
A. Yes, sir.
Q. And it says -- the second Post-It says: Let me look through my database and see which firm was best with your

lender, correct?
A. Yes, sir.
Q. Okay. And then you took the third Post-It and put it together and represented to the Court that, in essence, there was no database; that you just put these two Post-Its together and everyone is being told to go to Stratton and Feinstein, correct?
A. That was the way it was found, sir.
Q. That was the way it was found?
A. Yes, sir.
Q. Well, are you aware of how many law firms First Universal Holdings actually does back office work for?
A. No, sir.
Q. Have you heard of the firm Marucci?
A. Yes, sir.
Q. Have you heard of the firm Finley?
A. Yes, sir.
Q. And you've heard of the firm Stratton?
A. Stratton and Feinstein, yes.
Q. Now, do you know at what point in time and how the actual work to individual law firms was actually doled out?
A. No, sir.
Q. Do you know on any given day and any given week certain firms would or would not be accepting certain cases?
A. I wouldn't know, sir.

Q. Would you agree with me that having the opportunity to work with three firms can be characterized as a database more than simply one firm?
A. If there was a database. I'm not sure if there was even a database.
Q. Because you haven't been on the computers yet, right?
A. That's right, sir.
Q. Now, if you'll turn ahead about four pages, there was a sheet called Transfer Tracking Sheet.
A. Yes, sir.
Q. And how did you describe this sheet to the Court? What did you tell the Court this sheet was?
A. This sheet has the date, the client name, their home phone number, the closer's first name, the closing date, and the amount quoted.
Q. And what did you describe to the Court that this sheet was?
A. It appeared to me that it looks like a sales sheet.
Q. Did you know that lawyers must, under their bar guidelines, have a record of fees quoted when a nonlawyer is quoting fees on behalf of their firm? Are you aware of that?
A. No, sir.
Q. Does this sheet look like something that would keep a record of a fee quoted to a client for a law firm by a nonlawyer?

A. It could.
Q. We already went through attachment E, the complaint.
If you go to attachment F, there's a spiral notebook that you went through. And if you recall -- I'm sorry. Tell me when you get there.
A. I got it.
Q. Okay. And if you recall, I believe you testified to the Court that the SF stood for Stratton and Feinstein.
A. I said I believe it stood for Stratton and Feinstein.
Q. Do you know for sure?
A. No, sir.
Q. What's the name of the computer software program utilized by First Universal Holdings?
A. I don't know the full name.
Q. Have you heard the word Sales Force?
A. Yes, sir.
Q. Do you think maybe SF stands for Sales Force?
A. It could.
Q. Do you think maybe Sales Force has the agreements on it?
A. It could.
Q. Do you think maybe all the information regarding the clients is on Sales Force?
A. It could.
Q. You would agree with me that the best way to determine what these documents say is by interviewing the actual author

of the documents, right?
A. Yes, sir.
Q. But you haven't done that, right? We already know that.
A. Yes, we do.
Q. Now, if you would go to attachment G. This document is entitled "Closing 101."
Do you know which company that this Closing 101 note is for?
A. No, sir.
Q. Well, can you look on the sheet and figure out which company it's for?
A. No, sir.
Q. Well, down here it says: Use the A-plus rating from the Better Business Bureau.
Did you ever to look see which entity had a better rating from the Better Business Bureau and when?
A. No, sir.
Q. Isn't it true that First Universal Lending had an A-plus rating from the Better Business Bureau two years ago?
A. That's a possibility.
Q. Isn't it true that the sheets that you're attaching now presently to this Court representing present business practices, some of them are up to two years old?
A. I wouldn't know, sir.
Q. If you turn ahead to attachment I, there's a fax cover

sheet. I'm sorry, when you get there, let me know.
A. I got it.
Q. You're there?
There's a fax cover sheet dated 11-19-09 from First Universal Lending.
See that?
A. Yes, sir.
Q. What happened on 11-19-09?
A. That's the same day we went into the business.
Q. Did you ever try to figure out why on the same day you went into the business there was a First Universal Lending fax cover sheet that was sent out?
A. No, sir.
Q. Did you ever try to find Areclia Bellamy and Anna Relar?
A. No, sir.
Q. But you attached it as an exhibit to support your testimony of what? Of what?
A. This shows that there was a fax sent out by First Universal Lending on 11-19-09.
Q. But you don't know why.
A. To show that First Universal Lending sent out a fax 11-19-09.
Q. Well, that's what you believe it shows, correct?
A. Yes.
Q. Let's go to attachment J, please.

Diana Paine, do you know what her job was at First Universal?
A. No, sir.
Q. Looking at her schedule, does it appear she is the person that deals with customer service and complaints?
A. It appears, yes, sir.
Q. And wouldn't you expect that a company with thousands upon thousands of clients, that there would be at least one person who would be devoted to customer service and complaints?
A. That would be reasonable.
Q. And, of course, you have not gone on her computer to see her records of --
A. No, sir.
Q. I'm sorry. Let me finish so the record is clear.
A. Okay.
Q. -- of the complaint files and the customer service files.
A. No, sir.
Q. And you seem to point out that she was taking live irate calls on her variable schedule, not every day, but it varied, of up to ten plus, correct?
A. That's what it states in the e-mail, yes, sir.
Q. Yes. Throughout the course and the history of the firm, how many clients have come through the door?

A. I have no idea, sir.
Q. Did you ever read any of the responses by First Universal to any of the Better Business Bureau complaints?
A. A couple of them.
Q. A couple. Meaning two?
A. I'm not sure how many, sir.
Q. And actually you characterized -- there was one of her statements where she said she was working with clients on retractions, and I recall from your testimony you characterized that fairly negatively the way you described it.
Could you describe it for me again what you thought was so negative about retractions?
A. Want me to read it again?
Q. No. Just describe for me.
After you read this, you described -- your testimony to the Court had a negative connotation about retractions, and I'd like you to explain that to me.
A. Okay. I have to go back and read it.
Q. I believe it was between 2:00 p.m. and 5:00 p.m. Says she's working on my tasks, we're still on the phone for retractions.
A. That and contact at 12:30 p.m. to 2:00 p.m., contact AG BBB client; company's client complaints to retract. Sometimes client tends to (unintelligible) 15 to 20 minutes.

Q. Yes.
A. Yes.
Q. Now, isn't it true that the reason she was able to obtain so many retractions was because she would print out the entire Sales Force file to a client of all the work done and send it to them, and after they saw the entire Sales Force file, they would gladly retract their complaints?
A. I wouldn't know, sir.
Q. Attachment K, paychecks.
You pointed out it says David Feingold, general member.
Do you know why it says that?
A. No, sir.
Q. Attachment M, the assignment of accounts, shows that First Universal Lending assigned bank accounts to First Universal Holdings, correct?
A. I believe it was one bank account.
Q. There's actually a second one too, but I guess you guys didn't get that either.
A. No, sir.
Q. No.
Isn't it a fact that the accounts were assigned was because Holdings took over some of the servicing, the back office servicing, for old lending clients to complete their services?

A. I don't know, sir.

MR. FEINGOLD: Thank you.

THE WITNESS: You're welcome.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. SINASOHN:

Q. Mr. Liggins, during the cross-examination there were questions posed to you about your access to the defendant's computer.

Do you recall that?

A. Yes.

Q. Were you ever told by FTC attorneys that Mr. Feingold had claimed a privilege for the information contained on those computers, and because he had claimed that privilege, we did not want to access the information on that computer until it had been decided whether or not it would be appropriate for us to --

MR. FEINGOLD: Objection.

I'm sorry. I want wanted you to finish. I thought you were done.

THE COURT: Basis.

MR. FEINGOLD: I believe he's leading the witness, and he may be consenting to waiving his attorney-client privilege as well.

THE COURT: Refrain from leading the witness.

MR. SINASOHN: Yes, Your Honor.

BY MR. SINASOHN:

Q. What did the attorneys for the FTC tell you about your ability to access information, if anything, on the computers at the First Universal Lending site?

A. We didn't access the computers because there was a subject about the attorney-client privilege.

Q. Do you know who asserted that privilege?

A. Yeah.

Well, who asserted the privilege?

Q. On behalf of the defendants.

Do you know who said, I don't want you to go on to those computers because they might have stuff that belongs to my law firm?

MR. FEINGOLD: Same objection, Your Honor.

THE COURT: I'll permit the question.

Do you know who stated that, sir?

THE WITNESS: I don't think I was present at that time.

THE COURT: All right. Move along.

BY MR. SINASOHN:

Q. Now, do you know if the FTC hires an independent contractor to image those computers for us?

A. Yes.

Q. And do you know if that independent contractor has made

the imaging of those computers available to either yourself or to the attorneys at the FTC?
A. They haven't made them available to the FTC as of yet.
Q. When you get those -- when they're available to you, is it your plan to take a look at the evidence that was discussed by Mr. Feingold today in his cross-examination?
A. And a lot more, yes.
Q. Mr. Feingold at the beginning of his cross-examination, I believe, had a letter to the State of Florida in his hand.
Do you recall him asking you a question about that?
A. I don't know what he had in his hand.
Q. He referred to a letter to the State of Florida and he had a piece of paper in his hand.
Do you remember that?
A. Yes.
Q. Do you know if the facts that he states were in that letter to Florida, do you know if any facts that Mr. Feingold says are true?
A. I have no idea.
Q. In his questions to you on cross-examination, Mr. Feingold talked about a certain percentage or amount of money that is refunded to consumers or customers of First Universal Lending.
Do you have any reason to believe that the facts or the numbers that he gives you about refunds are true?

A. I have no idea whether they're true or not.
Q. Now, Mr. Feingold talked in cross-examination about your access to SalesForce.com documents.
I understand from your testimony earlier that you reviewed some SalesForce.com documents related to the consumer declarants that were part of the Temporary Restraining Order in this case.
A. Yes.
Q. Other than those Sales Force documents, have any Sales Force documents been made available to you?
A. No.
Q. And do you know why?
A. No, I don't.
Q. Have you ever heard that, again, that was because it related to a privilege issue?
A. I know we can't get into the computers.
Q. Now, Mr. Feingold mentioned something to the effect that the privilege was limited to one computer.
Do you know if you have had access to other computers besides one specific computer at the site?
A. Well, he made reference to one computer that was his computer. But what I understand is there's more than one attorney in that office. So that created a problem as well.
Q. Now, in his cross-examination, do you recall Mr. Feingold talking about a number, I think he said something about 7,254

modifications, and he mentioned that didn't that show they were a very efficient company in getting loan modifications? Do you remember that?
A. I remember.
MR. SINASOHN: May I approach the witness, Your Honor?
THE COURT: You may.
BY MR. SINASOHN:
Q. I'm going to hand what we've marked and identified as Exhibit 18, and this was volume 2 to the Temporary Restraining Order motion.
Can you tell the Court what that is, please?
A. This is a declaration of Mr. William P. White, President of the Better Business Bureau of Southeast Florida and the Caribbean.
Q. So, could you slowly and clearly read this declaration from Mr. White, the President of the Better Business Bureau for Southeast Florida?
THE COURT: Well, it's not in evidence.
Are you offering it?
MR. SINASOHN: Yes, Your Honor.
THE COURT: He can't read from a document not in evidence.
MR. SINASOHN: Yes, Your Honor. I'd like to offer Exhibit 18 as evidence.

THE COURT: Any objection?

MR. FEINGOLD: I don't have it in front of me, sir.

THE COURT: Show that to counsel.

MR. FEINGOLD: Can you give it to me, please?

MR. SINASOHN: I'll be happy to give you another. We've served you. It was served on the ECF system.

THE COURT: Well, he's entitled to see the document that's going to go into evidence.

MR. FEINGOLD: No objection.

THE COURT: 18 is in evidence.

(Plaintiff's Exhibit 18 in evidence)

BY MR. SINASOHN:

Q. Mr. Liggins, can you slowly and clearly read Exhibit 18 for the Court?

A. "Declaration of William P. White.

"I, William P. White, have personal knowledge of the following facts and matters discussed in this declaration and, if called as a witness, could and would testify completely to them.

"I am the President of the Better Business Bureau of Southeast Florida and the Caribbean, BBB.

"My office address is 4411 Beacon Circle, Suite 4, West Palm Beach, Florida, 33407.

"The BBB is a nonprofit organization whose purpose is to promote an ethical marketplace by providing information

and services to consumers and businesses.

"The BBB does this by providing reports on businesses and charities offering dispute resolution services, supplying consumer information on topics related to purchasing decisions, promoting truthful and accurate advertising as selling practices, and alerting consumers by reporting unethical marketplace activities.

"BBB members are businesses and firms which meet and agree to maintain certain BBB membership standards, agree to follow the highest principles of business ethics and voluntary self-regulation, and have accepted an invitation from the BBB to join.

"The BBB issues reports to the public regarding both member and nonmember businesses. These reports include general background information, a summary of the complaint history pertaining to the business, and other experiences in the marketplace, and information developed through BBB investigations or relevant Government actions.

"On January 31, 2008, the BBB became aware that First Universal Lending, LLC, First Universal, was interested in BBB membership.

"On February 14, 2008, First Universal sent the BBB an e-mail asking about its rating. First Universal provided the BBB with additional company information which brought First Universal's BBB rating to a B.

"First Universal became a BBB member on February 29, 2008.

"On December 16, 2008, a consumer by the name of Mr. Gabriel forwarded an e-mail to the BBB that he received from First Universal's attorney. The First Universal's letter to Mr. Gabriel -- First Universal's attorney advised Mr. Gabriel that if he didn't withdraw the improper statements made on the BBB's Web site, you have until Friday to make the proper retraction.

"The BBB wrote to First Universal that this is considered by the BBB as a form of blackmail.

"On January 13, 2009, the Minnesota Attorney General's office sought copies of complaints of consumers from Minnesota lodged with the BBB against First Universal.

"On February 24, 2009, First Universal requested a rating review.

"The BBB changed First Universal's rating to an A-plus because the report was changed with the current algorithm.

"First Universal's rating was changed to a D-minus on March 23, 2009. A First Universal representative contacted the BBB to complain of the D-minus rating the company received from the BBB of Central Florida.

"The rating is part of the BBB Reliability Report issued by the BBB regarding First Universal. The BBB

Reliability Report is prepared for each company with which the BBB has dealings and is based upon information obtained by the BBB for consumers and the companies themselves.

"On April 2, 2009, First Universal's owner called the BBB and pretended to be a concerned consumer.

"Based upon review of the BBB's company notes entered on that day, it appears that the BBB representative heard him put down the phone and say he was calling acting like a consumer because he wanted to know why the company rating was an NR.

"He also said that he wanted to do business with First Universal and that a different BBB representative had told him that First Universal had an A rating before its NR rating.

"On April 15, 2009, the BBB sent a revocation letter to First Universal.

"On April 16, 2009, David Feingold left a voice mail message. On that same day, a BBB representative spoke with David Feingold. Mr. Feingold confirmed that he understood that First Universal's BBB membership had been revoked and that he would send and appeal.

"Mr. Feingold told the BBB representative that First Universal was a huge company. Mr. Feingold also said that First Universal had 700,000 customers, gross income of $50 million a year, and 480 employees.

"Based on the new information, First Universal's BBB rating was changed to a B-minus.

"On May 29, 2009, David Feingold called the BBB to appeal First Universal's expulsion from the BBB.

"As of November 12, 2009, First Universal has had 268 consumer complaints lodged against it.

"I am President of the Better Business Bureau of Southeast Florida and the Caribbean. I am familiar with the recordkeeping process employed by the BBB and attest that all of the aforementioned documents have been received, retained, and/or compiled in the course of regularly conducted business activity of the BBB.

"Pursuant to 28 USC 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

"Executed on November 13," I believe, "2009. William P. White, President, Better Business Bureau, Southeast Florida and Caribbean."

Q. Mr. Liggins, did you read that document in the course of your investigation in this case?

A. Yes.

Q. Can you go back to the paragraph that mentions they have 700,000 customers? Do you see that?

A. Yes.

Q. Do you remember in your cross-examination Mr. Feingold said to you that the company has performed 7,254

modifications?
A. Yes.
Q. And he told you that he believed, I think, that the company was the most efficient company in obtaining these types of mortgage loan modifications?
A. Yes.
Q. When you do the math and you say that there are 700,000 consumers, and you perform 7,000 modifications, doesn't that mean that 99 percent of the customers that Mr. Feingold is telling the BBB that he has did not get modifications?
A. According to those figures, yeah.
Q. Of the 7,000 -- let's assume -- and this is just assuming for sake of argument, not that this is a fact in this case -- but assuming that the figure proposed by Mr. Feingold, the 7,254, that those were people that received modifications, do you know how many of those 7,000 were satisfied with the modifications that they might have received?
A. No, I don't.
Q. Have you seen anything, any evidence anywhere that said that there were 7,000 modifications?
A. No.
Q. Have you seen anything that talks about whether those people, if there were those people, were satisfied?
A. No.
Q. If there were not 700,000 but 70,000 consumers and there

were 7,000 consumers who had their loans modified, wouldn't that mean, then, that 90 percent still didn't get their loans modified?
A. I guess, according to the figures, yeah.
Q. Mr. Liggins, do you have a copy of your supplemental declaration with you?
A. Yes.
Q. In the course of the cross-examination, Mr. Feingold looked at page 11 of page 23.
Did they number yours?
A. No.
Q. Exhibit C, attachment C, where it starts with Mr. Robinette, there are several sheets with Mr. Robinette's name.
A. Yes.
Q. Do you remember the cross-examination when there was a discussion about who Mr. Robinette worked for?
A. Yes.
Q. Is it more important in your investigation to know who Mr. Robinette actually worked for or to know whom consumers were led to believe he worked for?
A. To whom he led to believe as far as these scripts.
Q. During the cross-examination, do you remember some discussion about the complaint and discussing that the FTC had made a false assertion, or there was a suggestion that the FTC

had made a false assertion about consumers are contacted by the defendants?
A. Yes, I remember.
Q. And can you look at paragraph 16 of that complaint and just read that paragraph as well?
A. Paragraph 16 in the complaint reads:
Defendants also used the Internet to market their loan modification services and foreclosure relief services. Some consumers found defendant's Web site, www.FirstUniversalLending.com, while searching the Internet for help. Others were corrected by defendants to the Web site. The Web site described services their clients can expect from a typical program. The Web site told consumers that a typical program includes the following."
Do I need to read --
Q. No, you don't, unless you feel it's necessary.
A. No.
Q. There was a discussion during the cross-examination about consumers getting a contract from the defendants.
Do you recall that?
A. Yes.
Q. Do you know if many consumers received a contract only after they paid money to First Universal Lending?
A. As I recall, that's how most of the consumers got the contract.

Q. And there was a discussion about Mr. Terry Dadd, declarant.

Remember that?

A. Yes.

Q. Remember Mr. Feingold was talking about saving him $11,000 over the course of his loan?

A. Yes.

Q. And remember asking to see the document?

A. Yes.

Q. Do you remember that you didn't get to see it?

A. Yes, I remember.

MR. SINASOHN: Your Honor, may I approach the witness?

THE COURT: You may.

BY MR. SINASOHN:

Q. I'm going to show you what's been marked and entered as Exhibit 4. This is Mr. Dadd's.

Could you slowly and clearly read Mr. Dadd's declaration for the Court?

THE COURT: What's that number again?

MR. SINASOHN: Exhibit 4, Your Honor.

MR. FEINGOLD: Your Honor, so the record is clear, I was dealing with the Sales Force record. Because I think he referred to my question, I think it was a misstatement.

THE COURT: Do you object to Plaintiff's 4?

MR. SINASOHN: Actually, Your Honor, I don't know if that has been marked and identified. It needs to be marked and identified and offered as Exhibit 4, yes.

THE COURT: Do you object to Plaintiff's 4?

MR. FEINGOLD: No, sir.

THE COURT: Plaintiff's 4 is in evidence.

(Plaintiff's Exhibit 4 in evidence)

THE COURT: And this is a declaration of whom?

MR. SINASOHN: It is a declaration of a consumer declarant, Your Honor, Terry Dadd, D-a-d-d.

THE COURT: T-e-r-r-y?

THE WITNESS: Yes, Your Honor.

THE COURT: D-a-d-d?

MR. FEINGOLD: Yes, Your Honor.

THE COURT: All right. Go ahead.

THE WITNESS: "I, Terry Dadd, have personal knowledge of the following facts and matters discussed in the declaration and, if called as a witness, could and would testify completely to them.

"I am over 21 years of age. I currently reside in Holland, Michigan.

"In the spring of 2008, my husband's hours at work were significantly cut with the complete loss of overtime pay. I have been unable to work for a number of years due to a disability, so we mainly rely on his income for our living

expenses. Already our family finances were extremely tight and, when his hours were cut, we could only continue making payments on our mortgage for a few more months.

"I was desperate to find help so that we wouldn't lose our home. On TV I saw a First Universal Lending commercial advertising that they could get our mortgage payments reduced and remodify our loans to more affordable terms.

"I decided to call the company to learn more about their services. When I spoke with an FUL representative, he said FUL guarantees that they would save my home. He stated that FUL could definitely work out a deal with Washington Mutual, (WAMU), to modify our mortgage and lower our payments to a manageable level. The FUL representative said that for their services we would have to pay a fee of about $350 per month.

"Because we only have a little money left in our bank account, I asked the representative a number of times how long will it take FUL to negotiate my loan modification, but he couldn't even give me an estimate.

"He said that all the details of the agreement would be sent to me, but I was left with the impression that it wouldn't take that long.

"Over the next six months I called FUL to ask about the status of my account. I spoke with over ten

representatives and managers from two different offices, but no one was of any help. I was repeatedly told that they had contacted WAMU about their situation. But because of the state of the economy, that WAMU -- which is Washington Mutual -- was incredibly busy and had not gotten back to them.

"Furthermore, FUL representatives told me they have a negotiator who is ready to meet with WAMU once they responded.

"About six months after contracting with FUL, I became suspicious since I didn't get any information from FUL. Therefore, I called WAMU directly to check the status of my mortgage. They informed me that they have never had any contact with FUL whatsoever. They also informed me that my home was already in the foreclosure process.

"I was very surprised since I was never contacted by WAMU during those six months. But because I assumed FUL had taken over my dealings with them, I never thought to check up with them.

"I called FUL about my conversation with WAMU. The representative repeated that FUL had tried to contact WAMU, but they hadn't got a response. He insisted that the hold-up was on WAMU's end.

"Also, the representative stated that they knew nothing about the foreclosure because of the lack of

response. I was very upset and immediately cancelled my agreement with FUL.

"I am very angry with how FUL treated me. They took my money for six months but never even contacted WAMU to renegotiate my mortgage. I could have used the money to continue making my mortgage payments, but now I am left in even more dire condition. I feel that I was lied to since I spoke with FUL repeatedly during those six months and was assured that they were doing everything possible to prevent foreclosure. Because of their statements, I never bothered to check with WAMU and, thus, was unable to prevent WAMU from initiating foreclosure proceedings. Had I known that nothing would be done for six months, I would have never signed an agreement with FUL.

"Pursuant to between 28 USC 1746, I hereby declare under penalty of perjury that the foregoing is true and correct, executed on November 11, 2009, Terry Dadd, Holland, Michigan."

Q. Did you read the written part for Mr. Dadd on that document?

A. No.

"Paragraph 11: We were also told to have no contact with WAMU because it would" -- it would -- I believe that's -- "jeopardize," I'm sorry -- "jeopardize all that FUL had been working on. After the foreclosure, little was taped to our --

oh, after the foreclosure letter was taped to our door, I immediately contacted WAMU, and they did work with us. But because of FUL, my house payment was $1,287.92 when it used to be $1,212.74. So, because of FUL and because we got so far behind on our escrow and insurance, the difference was $75.18, which makes making the house payments even more -- even harder.

"Thanks, Terry Dadd."

Q. During cross-examination, Mr. Liggins, Mr. Feingold talked about financial statements that were provided in response to the Court's order, the Temporary Restraining Order.

Do you recall that?

A. Yes.

Q. He mentioned my representations.

Were you here during the opening of this case?

A. Yes.

Q. Did I tell the Court that we did not receive a statement from First Universal Lending or Holdings?

A. I don't think you did.

Q. Did I not say that we've received incomplete statements from them?

A. I believe you did.

Q. And were they in fact incomplete statements?

A. Yes.

Q. And in fact we got no statements from either of the Zausner brothers, correct?
A. That's correct.
Q. And the two things that we got -- one was from a corporate entity and one was from Mr. Feingold -- those are both incomplete, correct?
A. I believe so, yes.
Q. During cross-examination, do you recall Mr. Feingold talking about a Midwest phone room --
A. Yes.
Q. -- in the company?
A. Yes.
Q. Has he ever, to your knowledge, disclosed to you or to anybody at the FTC or to the receiver the existence of this phone room in the Midwest?
A. Honestly, I didn't get to talk about it. He hadn't told me about it.
Q. Are you aware that the Temporary Restraining Order orders the defendants to identify accounts, employees, properties, or other assets or obligations of the receivership defendant?
A. Could you repeat that?
Q. Are you aware that the Temporary Restraining Order orders the defendants to provide information identifying the accounts, employees, properties or other assets or obligations of the receivership defendant?

A. Actually I didn't read the Temporary Restraining Order.

MR. SINASOHN: I have nothing further, Your Honor.

THE COURT: Recross.

MR. FEINGOLD: Yes, sir.

RECROSS-EXAMINATION

BY MR. FEINGOLD:

Q. First of all, the Midwest phone room, does First Universal own that or is that simply a company that outsources to hundreds of companies, like UPS, and answers their phones for them when their phones are too busy and it rolls over?

A. I have no idea.

Q. Is anyone required out of the Court's order to disclose such a service provider as an asset?

A. I hadn't -- like I told Mr. Sinasohn, I hadn't looked at the Temporary Restraining Order.

Q. You testified before that no documents had been made available to you.

Has anyone filed a motion with this Court saying that First Universal has not fully cooperated in providing documents?

A. I wouldn't know, sir.

Q. No.

And in fact, how many times were you at the office of First Universal?

A. Me personally?

Q. Yes.
A. Once.
Q. Once, on the 19th when you guys stormed the offices, correct?
A. When we went into the office, yes, sir.
Q. Correct.
And when did you leave town?
A. I didn't leave town. I had another matter to take care of in Miami.
Q. So it was one time.
Next, First Universal, as you're aware from what you have done in your investigation, deals with people nationwide, correct?
A. That's correct.
Q. Okay. The Better Business Bureau has memberships where the United States is divided into regions, correct?
A. I believe so.
Q. Yes.
And in fact, what you read was the Southeast region of the United States, correct?
A. Yes, the Better Business Bureau of Southeast Florida.
Q. Now, are you familiar with how the Better Business Bureau works?
A. A little bit.
Q. Okay. Isn't it when you initially become a member with

them you start with an A-plus rating?
A. I'm not sure about their rating system. I know it's changed over the years.
Q. Yes.
Did you ever search to see if First Universal had joined Better Business Bureaus in other regions of the country because it operated nationally?
A. No.
Q. And in terms of the representations made to the Better Business Bureau, number one, isn't it true that First Universal's revenues actually have exceeded $50 million?
A. I wouldn't know.
Q. Isn't it also true that First Universal actually has had more than 480 people work for it?
A. I wouldn't know.
Q. And in terms of the 700,000 customers, do you know how many of those customers were loan modification customers?
A. No.
Q. Isn't it a fact, between 2004, 2005 and 2006, First Universal did over $1.5 billion in home loans?
A. I wouldn't know.
Q. Do you know how many consumers $1.5 billion reflects?
A. No.
Q. You testified that most of the people get their contract after they pay.

A. Yes.
Q. That was your testimony to this Court.
A. Yes.
Q. Okay. We know you haven't gone on Sales Force to see the date people got their contracts and the date they paid, correct?
A. Correct.
Q. We know you haven't interviewed every client to figure out the date they got their contracts and the date they paid, correct?
A. That's correct.
Q. We know you haven't gone through First Universal's bank accounts to compare the date of the client contracts to the date money was received, correct?
A. That's correct.
Q. Do you know whether or not First Universal gets E-signatures?
A. I'm not sure.
Q. But, yet, you made the assertion to the Court that in the majority of the cases that First Universal gets the contract after they're paid.
A. Based on the consumers' declarations.
Q. Based on the consumers, all the consumers that you spoke to.
A. And the declarations, yes, sir.

Q. And those 15 declarations.
A. Yes, sir.
Q. You also testified that you hadn't touched computers because there was more than one lawyer in First Universal's offices, right?
A. Yes. That was represented to me on the 19th.
Q. Isn't it a fact that there is a completely separate office suite full of lawyers for Feingold & Kam?
A. I'm not sure, sir. I couldn't tell.
Q. Do you ever work around the building.
A. Walk around the --
Q. Yes. Walk around the entire complex.
A. No.
Q. You know that there's the suite that you went into for First Universal. You're also aware that there's a long breezeway that goes into another building, correct?
A. That's correct.
Q. Did you ever walk into that other building?
A. No, sir.
MR. FEINGOLD: Thank you.
Oh, I'm sorry. I'm sorry. I apologize, Your Honor.
BY MR. FEINGOLD:
Q. With regards to the declaration you just read -- I guess you put in as Exhibit Number 4, Mr. Dall -- you looked at

that. Mr. Dall said over the first six months he had never been contacted by First Universal and they never did anything for him, right?

A. Which paragraph are you referring to?

Q. I'm referring to the testimony where you read out.

A. Okay.

Q. You said for six months he hadn't been contacted and no work had been done, correct?

A. It says: "Over the next six months I called FUL several times to ask about my status of my account. I spoke with over ten representatives and managers from two different offices, but no one was of any help. I was repeatedly told that they have contacted WAMU about our situation, but because of the state of the economy, that WAMU was incredibly busy and had not gotten back to them.

"Furthermore, FUL representatives told me they have a negotiator who was ready to meet with WAMU once they responded."

Q. Sir, isn't it a fact that on September 23, 2008, at 3:08 p.m., Sheronda Kingdom, at First Universal, sent to the complaining party a modification from Washington Mutual where the interest rate on the mortgage was reduced to a yearly rate of five percent?

A. I wouldn't know.

Q. Who actually prepared Mr. Dadd's declaration?

A. I don't know. I couldn't tell you who prepared it.
Q. Well, it was typed up, right?
A. Yes.
Q. So that means someone actually transcribed it and created it, right?
A. Yes.
Q. And all of these declarations that have been filed with the Court appear to have come from the same typewriter, correct?
A. I don't think it was a typewriter, no.
Q. I'm sorry. I'm old school. The same computer, the same printer, correct?
A. That's a possibility.
Q. Yes.
It doesn't look like each one of these individual people on their own came up with the exact same format, living in 16 different cities, of a document that said declaration typed up in the exact same paragraph form, right?
A. Correct.
Q. I mean, you guys are the ones that prepared these declarations, correct? Someone at the FTC did it.
A. Yeah. They were typed up based on interviews with consumers.
Q. Did anyone at the FTC ever ask these people: Can I please see the correspondence; can I please see the mail, the

e-mails, that you received from First Universal, so I can verify what you're saying?
A. I can speak for myself. In most cases when I do talk to consumers, I ask for any supporting documents they might have, if they are available.
Q. Did you file any supporting documentation with this Court with those 16 affidavits?
A. Well, sir, on those particular affidavits --
Q. It's a "yes" or "no" question, sir.
A. I wouldn't know. I didn't.
MR. FEINGOLD: Thank you.
THE WITNESS: You're welcome.
THE COURT: All right. Thank you, Mr. Liggins. You can step down.
(Witness excused)
THE COURT: Call your next witness.
MR. SINASOHN: Your Honor, the FTC has no further witnesses. However, before we rest, we do have the two motions that we had filed.
THE COURT: The motion for protective order?
MR. SINASOHN: That's one of them, Your Honor. And the other one is the motion to admit evidence of consumer declarations in other complaints.
I think we just moved in the complaints.
THE COURT: Are there any objections to any

additional declarations?

MR. FEINGOLD: No, sir.

I think the case law is fairly clear.

THE COURT: All right. What would those exhibit numbers be?

MR. SINASOHN: I'm sorry, Your Honor. I couldn't hear you.

THE COURT: Go ahead and move those declarations into evidence.

MR. SINASOHN: Yes, Your Honor.

Your Honor, the plaintiff offers, marks Exhibits 2 and 3.

Exhibit 2 is the declaration of Byron Buitendorp, B-u-i --

THE COURT: Wait a minute. Byron?

MR. SINASOHN: Byron, B-y-r-o-n.

THE COURT: Go ahead.

MR. SINASOHN: Buitendorp. B-u-i-t-e-n-d-o-r-p.

THE COURT: Okay.

MR. SINASOHN: And those also have attachments, Your Honor, to declaration.

THE COURT: Go ahead.

MR. SINASOHN: Declaration of Carol Cowgill is Exhibit 3.

THE COURT: How do you spell the last name?

MR. SINASOHN: C-o-w-g-i-l-l.

THE COURT: Next.

MR. SINASOHN: Exhibit 5 is the declaration of Christy, C-h-r-i-s-t-y, Frye, F-r-y-e, with attachments.

Exhibit 6, Your Honor, the declaration of Darlene, D-a-r-l-e-n-e, Garcia, G-a-r-c-i-a.

THE COURT: Next.

MR. SINASOHN: Exhibit 7 is the declaration of Patrick George with exhibits per attachment.

THE COURT: How do you spell the last name?

MR. SINASOHN: G-e-o-r-g-e.

Exhibit 8 is the declaration of Patricia Hibbs, H-i-b-b-s.

THE COURT: Next.

MR. SINASOHN: Exhibit 9 is the declaration of Larry Jacoby, J-a-c-o-b-y.

Exhibit 10 --

THE COURT: Just a minute.

All right. Go ahead.

MR. SINASOHN: Exhibit 10 is the declaration of Matthew, spelled M-a-t-t-h-e-w, Lavender, L-a-v-e-n-d-e-r.

THE COURT: Okay.

MR. SINASOHN: Exhibit 11 is the declaration of Edgar, E-d-g-a-r, Lopez, L-o-p-e-z.

THE COURT: Edgar is E-d-j-a-r?

MR. SINASOHN: E-d-g-a-r, Your Honor.
THE COURT: G-a-r.
And what was the last name?
MR. SINASOHN: Lopez, Your Honor.
THE COURT: L-o-p-e-z?
MR. SINASOHN: Yes, sir, L-o-p-e-z.
THE COURT: Next.
MR. SINASOHN: Exhibit 12 is the declaration of Michelle Mazur, M-a-z-u-r.
Michelle is spelled M-i-c-h-e-l-l-e.
THE COURT: All right.
MR. SINASOHN: Exhibit 13 is the declaration of Denise, D-e-n-i-s-e, Neyer, spelled N-e-y-e-r-dash-Gray, G-r-a-y, with attachments.
Exhibit 14 is a declaration of Peter Eric, E-r-i-c, Nilsson, N-i-l-s-s-o-n.
THE COURT: Spell that last name again.
MR. SINASOHN: N-i-l-s-s-o-n.
THE COURT: Thank you.
MR. SINASOHN: Exhibit 15 is the declaration of Michael Preston, spelled P-r-e-s-t-o-n. First name is M-i-c-h-a-e-l.
Exhibit 16 is the declaration of Edwin, spelled E-d-w-i-n, Sauve, S-a-u-v-e, with attachments.
And Exhibit 15 is the declaration of Marshall

Schultz. Marshall is spelled M-a-r-s-h-a-l-l; last name Schultz, S-c-h-u-l-t-z.

THE COURT: All right. Next.

MR. SINASOHN: Your Honor, we just wanted to confirm that we have properly offered into evidence Exhibit 19. That would be Mr. Liggins' first declaration with attachments.

THE COURT: 19 and 37 are in evidence already.

MR. SINASOHN: Thank you, Your Honor.

That's all the declarations, Your Honor, including Mr. White, Mr. White's declaration, which already was moved in, and Mr. Dadd.

THE COURT: Plaintiff's Exhibits 2 and 3 are in evidence, and 5 through and including 17 are in evidence.

MR. SINASOHN: Thank you, Your Honor.

(Plaintiff's Exhibits 2, 3 and 5 through 17 in evidence)

THE COURT: Is the defense still going to seek to call plaintiff's counsel?

MR. FEINGOLD: Not at this time. Potentially tomorrow, since it appears we're going into tomorrow. If the Court will indulge me in doing further research and strategizing on that.

THE COURT: All right. But at this time the FTC rests?

MR. SINASOHN: Yes, Your Honor, we rest.

THE COURT: Is the defense ready?

MR. FEINGOLD: Yes, sir.

THE COURT: All right. Call your first witness.

MR. FEINGOLD: It will be myself, Judge.

THE COURT: All right.

MR. FEINGOLD: So I don't know if you want me to swear me in and testify.

THE COURT: Please take the witness stand.

MR. FEINGOLD: Yes, sir.

THE COURT: Remain standing and raise your right hand.

DAVID JON FEINGOLD, DEFENSE WITNESS, SWORN

THE COURT: Please be seated. Please speak directly into the microphone. State your full legal name for the record and spell your last name for the reporter.

THE WITNESS: My name is David Jon, J-o-n, Feingold, F-e-i-n-g-o-l-d.

THE COURT: All right.

THE WITNESS: I am an attorney in the State of Florida. I have lived in the state of Florida since approximately 1991.

Prior to being an attorney, I went to undergraduate school at Emory University, in Atlanta, Georgia. After attending Emory University in Atlanta, Georgia, undergraduate, I also went to Emory University Law School. I graduated Emory

University Law School in 1991.

Throughout the course of going to law school, I was actually employed full-time as well at a law firm, Macey, Wilensky, Cohen, Whitner and Kessler.

After graduating Emory and working at Macey Wilensky, I then went to the law firm of Broad and Cassel, which is a fairly large -- or at least it was at that point in time -- fairly large law firm throughout the state of Florida.

In approximately 1993 and a half, or thereabouts, I formed the law firm of Feingold & Kam. The law firm of Feingold & Kam is an extraordinarily busy law firm. Right now we have approximately six lawyers.

I have handled some fairly extensive trials. I myself personally have handled approximately 50 trials by myself. In fact, last year I had a trial in Newark, New Jersey, where I had to live in Newark for two and a half months with Robert Kirsch, your former law clerk, sir, as the opposing counsel.

I, in my 50 trials, have handle everything. In fact, pending now I have cases before the Fourth District Court of Appeals here in Florida; federal courts here in South Florida. I represent right now the financial advisors for State of Florida, $6.5 billion Tobacco Trust Fund. I'm handling a securities class action matter in federal court in

New York.

I'm general counsel for a company called Emmett Larkin, which is a 600-broker stock brokerage firm in San Francisco. I represent Royal Palm Developers, Daniel Kodsi. He's one of the largest developers in the state of Florida and, unfortunately, due to the real estate crisis, has several hundred million dollars in litigation going on. I'm handling all of it, taking over all the files from Greenberg Traurig.

I am handling litigation on behalf of First Universal Lending, lots of litigation, everything from class actions on overtime to things like this, FTC matters, to state enforcement matters and everything in between.

I am representing cases. I'm looking through my caseload right now. There's about 30 or 40 cases alone I'm handling in the state of Florida between Dade County, Broward County, Palm Beach County. In addition, my practice has a family law component, where there are approximately 13 adoptions going through now.

I am a father of five: Three biological children, two adopted -- that's how we kind of got to the adoptive end of it -- and have and always hope to be a very active attorney.

In terms of how I got involved with First Universal: In approximately, say about 1998, I met Sean Zausner. At the time, I believe, he was working at Prudential

Securities, and I had had the opportunity to work with many, many brokerage firms. Merrill Lynch -- I represent a lot of Merrill Lynch brokers. In fact, the highest compensated Merrill Lynch broker in South Florida is a client of mine right now. They're trying to take his signing bonus back.

I represent a number of brokerage firms and had met Mr. Zausner. We stayed in contact. And through the course of my acting as an attorney working at Broad and Cassel and being exposed to securities related matters, I've been involved in securitizations, mortgage securitizations, which at the time in the mid-90s was fairly unusual. There were some firms on Wall Street doing it. There were some law firms doing it. But it was not as actively accepted as it is today.

I had undertaken a business where, as a lawyer at my law firm, I was actually purchasing portfolios, repackaging them, and selling the portfolios, and it actually was a fairly good business.

I then contacted the Florida Bar and attempted to get guidance about how to handle such a business based upon the fact that there were very, very significant dollars involved and that there were inherent conflicts being the owner of the portfolios, being the lawyer on the portfolios, dealing with the financing of the portfolios, handling the escrow of the portfolios, and at that point in time -- and this is late '90s, early 2000s -- it hadn't been such a

normalized business practice of law firms taking equity in firms, et cetera, and I had received guidance from the Bar that I really needed to choose how I was going to be handling these transactions.

At that point, being that my first love is trying cases and I consistently do them all the time, I had elected to continue on trying cases as well as structuring financial transactions -- which, by the way, most of my litigation is really commercially related with finance -- and spoke to Mr. Zausner. He was looking to get out of the area in finance where he was. I believe at that time he was managing money.

I spoke to him and advised him that I was leaving that part of the industry; that if he was interested in purchasing the opportunity from me, I'd be more than happy to do that with him.

We negotiated for a while, and he ended up, in essence, taking over the business. Not in essence, he actually did.

Part of our relationship and our deal was that my law firm would stay on and would operate as legal counsel, and it was, quite frankly, a very good relationship for me.

At the time, the business was called National Business Expo, which is kind of a strange name except if you're in the portfolio business, because in the portfolio business everyone was asked, hey, what's your exposure. So

they call it Expo.

People who were in portfolio trading would recognize, but most people who aren't in portfolio trading, the name would seem rather unique and obscure.

Mr. Zausner then approached me probably a year and a half later, indicated to me that he was going to change the name of the business and he was going to focus on retail. He explained to me, which is something that I saw also being involved in the industry from transactionally as well as from litigation, that a lot of the big banks and a lot of the big Wall Street firms had started to get into the mortgage business. This is pre-mortgage boom. This is pre-collapse of the real estate market.

Basically what happened was all these firms, these large financial institutions, they recognized that there was an opportunity to corral in mortgages and package them and securitize them. But they needed sales forces.

One of the ways that they got sales forces was they approached people in the business and offered them incentives: Three percent on a mortgage, five percent on a mortgage. And that was something that, obviously, Mr. Zausner discussed and explained and thought it was actually very attractive.

When I was doing the portfolio business, there was no way we were making three percent, five percent on a

portfolio. Those are huge numbers. They were dealing in bips and, you know, hundredths of a percent, thousandths of a percent.

As he decided to go into the retail model and I was actively practicing law, one of the clients that I actively and aggressively pursued to represent was a firm called Lending Tree.

At the time, in the early 2000s, no one knew who Lending Tree was. In fact, quite admittedly, I thought it was a rather stupid name for a company. But I thought that the guys that owned it were actually fairly unique and interesting, and I spoke with them in attempting to get their legal work, which is something I do quite actively.

I told Mr. Zausner about the opportunity. At the time Lending Tree was looking for people to take up territories. He negotiated with them. It was not well sought after. I never represented them, and in fact I ended up representing Mr. Zausner in negotiating the Lending Tree deal.

And lo and behold, about a year or so later, Lending Tree got funded from Wall Street to the tune of hundreds of millions of dollars. They unleashed an unbelievable television campaign. I would be shocked if anyone didn't know who Lending Tree was.

And what was amazing about it was, as Lending Tree

grew, basically they were an Internet based model where they advertised heavily on TV and radio: "When banks compete, you win."

And you go on their Web site, you fill out the information, and they send those leads to the lender, to Mr. Zausner, to other people with the agreement.

Well, as that business grew, and as they continued and continued to market -- in fact, Barry Diller, who is a fairly well known businessperson, he actually bought the company and continued to fund it more and more -- as that business grew, First Universal grew as a by-product.

I think almost Mr. Zausner was forced into success, because they had no choice. They were sending you not tens, not hundreds, but thousands of clients.

So he, you know, expanded the business rather dramatically. And what is so touching about our relationship is that when he first started, he legitimately started in the conference room of my law office, and I take a lot of pride in that, and there's lots of clients that I do that for.

And, you know, it's fairly moving, because he very easily could have gone and moved on his way. It was basically you gave me my start; you gave me the opportunity; you gave me the office space. I'm sticking with you. You know, your firm is my lawyer, and that's the way it is. And you know, we're like brothers, and I'm first to admit it, we're very, very

close, and it's fairly touching to me, our relationship; and fairly unusual with clients. I can add that.

As his business exploded and grew, my law practice also did fairly well. I was very fortunate and had very good results in trials, and, you know, life seemed pretty darn good, pretty darn good.

As the businesses both expanded, since I was the first person in the office -- and at the time the office space was located at 3300 PGA Boulevard. And 3300 PGA Boulevard for Palm Beach Gardens is fairly unusual. It's like a 14-story building, which in Palm Beach Gardens is considered an office tower. It's the largest office building in Palm Beach Gardens. Merrill Lynch has the entire second floor. We ended up taking the entire fourth floor.

Basically my law offices were there, and it seemed to be that literally every month we went to the landlord and he kept moving the walls out further and further and further.

Blame myself for being a bad lawyer for myself, but the office lease, since it started with Feingold & Kam on it, I was always on the hook for it. Never thought twice about it because, quite frankly, life was great and business was booming.

Well, unfortunatelyly, the mortgage meltdown happened, and the mortgage market collapsed, and as it collapsed, Mr. Zausner's business didn't do too well.

But one thing tried and true that he always did was he always made sure he paid his people. Everyone always got paid. He would have not taken a paycheck, and no one would have known it but him and me, but everyone always got paid. The offices were always open, and everyone always had an opportunity to work and pay their bills.

And when he couldn't make the rent, which was fairly significant -- it was $25,000 a month -- I was fortunate enough to have a really good law practice and I picked up the difference. I picked it up. And when he couldn't pick up the insurance on the place and everything else, I picked it up.

And I carried those expenses, number one, because I was legally obligated, because it was on premises of a law firm which the lease is under my name. It's my responsibility.

But I think we were all morally obligated as well. They're really good people, and the most heart-breaking thing you can see as an attorney is seeing a business shut down. It's horrific. It's horrible. It's like a person dying.

So, for two years I forked out a lot of money paying those bills, and for two years it was coming into the office every day smiling and everyone smiling and just wondering, you know, how we gonna do this.

But we prevailed. It was pretty incredible. We prevailed. He had lots of litigation, because when he was

doing the loan work, and he was doing so much of it, one of the enticing factors was that, as you did all these loans, you could package them together.

So you would have lenders, like first Magnet, and you'd have Goldman Sachs and Bear Stearns and Lehman Brothers, and they would walk into the office and literally want to buy packages: I want a hundred loans; I want 50 loans. And they would actually give you price improvement. They called it the back end and yield spread.

When you sign those contracts and they compensate you well, one of the negatives of those contracts is that if people don't pay their mortgages, if those portfolios are sold, then, guess what, they come back and look to you, look to First Universal and say, hey, these people didn't pay; you you need to make good on it.

And I vividly remember the first time this happened, it was with a lender called Green Point. Sean came to me and showed me a letter. They're like, please send us $23 million. I was like what? What are they talking about?

And lots of lenders started doing that. IndyMac did that. Aurora, which was Lehman Brothers, they did that. And he started to have unbelievable amounts of legal headaches. And I went and I represented him, and there was no way he could afford to pay my legal bills. He's a very proud guy, but I think he'd admit he could not afford to pay me.

And I don't remember at that time if my billing rate was three or four hundred dollars an hour. Whatever it was, it didn't matter. He couldn't afford to pay it. But he paid me what he could, which was a decent, honorable thing to do. And throughout the years, as he started to get back on his feet, he continued to pay me.

Well, he always recognized that the hourly fees that I should have gotten and what I did get were dramatically, dramatically different, and that I had covered the rent and other expenses. You know, we talked as attorney-client, as business people, as brothers, about what's fair to do, what's fair to do with this business and what's fair to do with Feingold & Kam, the law firm, basically providing unlimited legal services to save him for what I thought was absolutely proper and done it for other companies, and I have no regrets.

Even sitting here today being sued of it, because my name showed up in a few places, I don't care. I don't care. I'm proud. I'm absolutely proud that I did it.

But the bottom line is we started to talk about how to compensate me, and it was agreed that, as his business changed -- which I'll explain how that happened -- that basically, what he would do is he would pay me -- when I say "me," the law firm of Feingold & Kam -- he would pay basically whatever he drew out of the business, so that I

always felt like I was getting recompensated for whatever was earned.

So I never felt like, hey, wait a minute, I gave to him all these years and he didn't help me. He said, hey, whatever I make, I'll pay your law firm, because I owe it to you from all the hours and everything. And on top of that, all the past rent and insurance, I'm going to pay you back over time on that. And he's kept his word. He's kept his word to a T.

And what happened -- and he's very, very blessed -- what happened is, as the market fell apart, lenders not only started calling asking First Universal to make good on the loans that people defaulted, but something very, very strange happened. Lenders started calling and asking First Universal to please try to rework the loans. It was basically, hey, we realize you guys don't have money, but can you get involved and rework the loans.

Aquin Financial, which is a fairly large New York Stock Exchange company in West Palm Beach; Bank United, who was down here in South Florida and I believe they were taken over, they approached First Universal and said, listen, rework the deals for us. You guys have a lender's license. You can lend. We'll pay you points on the deal. And it was overnight success.

But when I tell you overnight success, it was Bank

United was calling and saying, here's 3,000 deals, 3,000 names. Get Mr. Jones on the phone, and if you can have him modify his mortgage -- if his mortgage is $300,000 and you can have him modify that mortgage, regardless of what you work out for him, because you don't want it nonperforming, we'll pay you a point.

So, if you do the math we'll quick, you're getting one point on 300 grand. You're getting $3,000 to call Mr. Jones and tell him, hi, I'm calling you to let you know we're going to rework your mortgage.

Not a very difficult business plan. But at the time, for institutions like Aquin and Bank United, it was absolutely critical for them to survive, because they had federal regulators looking at their loan loss reserves, looking at their capital, looking at nonperforming loans, and they needed to prove to the Federal Government that they were working to clear up the mess.

So now it was overnight, First Universal was back. It was incredible. It was unbelievable. Everyone else had gone out of business, everyone. Everyone on PGA Boulevard who was in the mortgage industry was gone.

First Magnus, who was one of the largest lenders in the Midwest and who opened an office directly across the street from First Universal Lending just to buy portfolios from them, they were gone to the tune of billions of dollars.

And here was this new business model and it was astounding. It was unbelievable to see.

And the hiring went rampant, and I can remember sitting in meetings where it's like hire four people a week, hire eight people a week, and it was doing this business for the lenders.

And then what happened was that as the consumers were contacted and they were being told we're going to work to restructure your mortgage, no one called it a loan mod, no one.

In First Universal, anyone that worked there, no one had even heard the term "loan mod." We know now historically we're probably one of the first firms to ever technically do what's now known as a loan mod.

We were restructuring loans, in essence, acting as -- when I practiced law and represented Barnett Bank at Broad and Cassel, they called it special assets department. This, in essence, was special assets department.

Anyways, the loans were being reworked and consumers were saying, hey, not only do I have a first with Aquin, but I have a second with Wells-Fargo, with Chase. I'll pay you if you'll rework my second. Great. No problem.

We started doing that business. When I say "we," First Universal did the business, and Feingold & Kam put the contracts together for it.

And what was amazing was that some of the people can testify and tell that the banks weren't ready for this onslaught. You would contact the banks. They didn't have what they have now called loss mitigation departments. They didn't have anything but a couple people working special assets to get rid of some nonperforming real estate.

So you'd fax them to find out the right person to speak to. They wouldn't even know. I mean, think about how the world has changed right now.

Now, two and three years later after the collapse, every bank has a mitigation department. But back then they didn't. I mean, this was cutting edge. This was new. There were absolutely no laws regarding this whatsoever.

So, First Universal kept going and going, and then the thought -- I met with Mr. Zausner -- the thought was, well, wait a minute. We're doing this for Aquin. We're doing this for Bank United. We have clients who are asking us to do it. Can we contact our existing database? We have thousands upon thousands of people through Lending Tree.

So, as the lawyers, we researched and we found out, yes, you can do that. You can absolutely contact someone you've had a preexisting relationship with and you can absolutely contact them and offer them this service.

Loan restructuring, loan workouts. It was not until 2008 that the Florida legislature actually put into place a

law where they actually referenced loan modification.

Now, what's interesting is when they referenced the term "loan modification," they referenced it and they listed a bunch of exemptions. One exemption was lenders. And it makes sense.

If a lender is working to restructure your mortgage, if a lender is working to take your app to try to get you a different term on your loan, it would be absurd to have a lender in any way regulated by a statute that says you can't charge up-front fees. They're lenders. They're licensed. They post bonds in order to get approval to charge fees. So, lenders were excluded. And what was also interesting was lawyers were excluded.

Now, the law model, as we were talking about with Holdings, happened much later. But what's more important is the firm has always operated within the confines of the statutory language. It's Feingold & Kam's job. It's the law firm's job to do that.

The bottom line was that the contracts that were put together, even though First Universal Lending was a lender, the contracts gave the right of rescission, the right of refund, the notice that you can even do this by yourself for free, even though the statute specifically said if you're a lender you don't have to give those disclosures. It was still done.

That's how paranoid I, as the lawyer, made the company to do the right thing. And in fact, the software system that we've talked about, the Sales Force, which I'll take you through examples -- Sales Force was done --

MR. SINASOHN: Objection, Your Honor. This is just a continuing narrative of his history. I don't know if we're going to hear this for the next several hours or is there some way we can have something that's relevant to the case.

THE COURT: I think that we've had enough lead up at this point. Let's go ahead and get to the issue at heart, Mr. Feingold.

THE WITNESS: Okay.

First Universal Lending itself had its own individual sales force. That individual sales force was mortgage brokers. They were licensed mortgage brokers through the State of Florida.

Those mortgage brokers, when they worked on loans or when they worked on restructuring a loan, would fill out what's called a 1003, which is an application that is recognized by HUD with specific information regarding doing a loan and modifying a loan.

First Universal Lending also used software, such as Kalick's, such as Point, all software related to doing loans, modifying and restructuring loans, using HUD closing statements, using people who are known as processors, which

are the people who collect the documents, review the loan conditions, compare the documents to the loan conditions to determine if the individual borrower meets a restructuring or meets a new loan.

Then they would forward it on to an underwriter, an underwriter, someone like Miranda Johnston, who we spoke about, and she would go and actually have to sign off for liability purposes and prove to the individual at the bank buying the loan that the loan actually met all of the legal guidelines.

There were many different kind of loan products. There was A Paper, All Day Paper, Subprime Paper, completely and utterly different than what First Universal does now, completely different companies.

In fact, First Universal Lending and First Universal Holdings, which Ms. Moscowitz conceded to yesterday, has only overlap of about 25 percent of the work force.

What happened to lead to First Universal Holdings --

MR. SINASOHN: Objection. Misstates the evidence.

THE COURT: Go ahead.

THE WITNESS: What happened to lead to First Universal Holdings was that in 2009, First Universal Lending, keeping track of the loss through the law firm of Feingold & Kam, recognized that in each state, after the collapse of the mortgage market, that the laws had changed.

So now, instead of operating out of one office, a lender had to have an actual, what's called brick and mortar office in every single state; had to have a manager in every single state; and every employee who did a loan in that state had to fly to that state, take a continuing education class, and also pass a separate mortgage brokerage licensing class.

In analyzing the amount of people that worked at First Universal Lending and the amount of money that would need to be spent in order to comply with those laws, it was determined that it didn't make a lot of sense to continue that business model. It didn't make a lot of sense.

And it was also determined to do straight what was called loan modifications didn't make a lot of sense, because it was getting bad publicity, and First Universal Lending was a lender, and there was a lot of controversy out there. So, it was determined that a new business model had to even be looked at or First Universal Lending had to be closed down completely.

And what came about was Mr. Zausner conversing with me about what seemed to be a good industry, a good trend. And the industry, the topic through 2008, the end of '08 and beginning to '09, was outsourcing. That was a really big topic.

You take the cover of Business Week. They were talking about India. They were talking about, in Fortune,

Dell computers and they were sending all their customer service calls to India. And Mr. Zausner spoke to me. And when I say "Mr. Zausner," I mean Sean, because his brother Dave is involved as well, and I'll get to that.

But he spoke to me about, hey, how can I utilize some of these talented people and how can I compete with this idea of India. I understand people aren't happy with it. People feel like there's a language barrier. Maybe I can cake advantage of some of this work force. It kills me. I'm going to have to lay everyone off. We cannot continue as a lender. The business model won't work anymore. It's too expensive.

We went back and forth, and I undertook some research, and I don't know if you want me to break, because I want to get down and get my research book and talk about it.

THE COURT: Go ahead.

THE WITNESS: Thank you.

We talked about outsourcing, and at first Mr. Zausner indicated to me maybe he could utilize some of the people and form a company to do outsourcing for credit card processing company, companies that take in applications. And the margins were looked at. It was investigated and didn't seem like a good idea.

Next it was doing processing for insurance. There's a whole big business about when someone applies for insurance, you have to send a nurse out, take blood samples, et cetera.

It was determined there wasn't enough money in there. It didn't make a lot of sense. It's very expensive to operate a business.

And then Mr. Zausner says to me, well, how about law firms. I know that law firms are going to India. You're a lawyer. You must know a lot of people. What about the law firm model. Law firms charge a lot of money. There's margins there, et cetera.

I said to him, let me have my firm investigate. Let me research, and let's see what's what.

The first thing that we did is that we looked into whether outsourcing was legal, whether it was recognized, whether it was accepted. And we found that the American Bar Association came out with a formal opinion, 08-451, in August 2008, and in that opinion it said a lawyer may outsource legal or nonlegal support services provided the lawyer remains ultimately responsible for rendering competent legal services to the client under the model.

The opinion goes on further to say: There is nothing unethical about a lawyer outsourcing legal and nonlegal services provided the outsourcing lawyer renders legal services to the client with the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The opinion went on further, which is right on point

with what First Universal Holdings does. It says: One lawyer may choose to do all the work herself. Another may delegate tasks to a team of subordinate lawyers and nonlegal staff. Others may decide to outsource tasks to independent service providers that are not within their direct control. Rule 1.1 does not require that tasks be accomplished in any special way.

And this ABA opinion, which was a seminal opinion and received a fair amount of press on Web sites, law.com and the National Law Journal, this was something that Mr. Zausner and I discussed. And I told him, as a lawyer, that I was very confident that outsourcing could be done for law firms, and this seemed to support that basis and that idea.

Continuing on that vein, just because I'm talking about the law, what's really interesting that we have learned since then is that in fact on December 1st of this year, the United States District Court in the District of Columbia, in the case of the American Bar Association versus the Federal Trade Commission, actually held that the FTC doesn't have the right to regulate lawyers and in fact acknowledged that lawyers are left to be regulated by the prerogatives of the states. Lawyers are members of their own bar associations.

In addition, there was an opinion by the Florida Bar on January 18, 2008, where the Florida Bar stated -- and this opinion is also a very critical opinion that we discussed back

then. Obviously, the one that just came out in federal court, we didn't discuss. It didn't exist.

But this Florida Bar opinion, the ABA acknowledges outsourcing cocaine done, and now the Florida Bar, since we're located in Florida, in January 2008, also put out an opinion about outsourcing overseas, outsourcing in the United States, using lawyers, paralegals, and then finally concludes about nonlawyers.

And what the Florida Bar said, first of all, was --

THE COURT: What was that number again?

THE WITNESS: It's opinion 07-2, January 18, 2008.

What the Florida Bar said is, quote: A lawyer is not prohibited from engaging the services of an overseas provider to provide paralegal assistance.

So they acknowledge lawyers can use overseas providers for paralegals.

They go on further to state: Law firms frequently hire contract paralegals to perform services such as legal research and document preparation. It is the Committee's opinion that there is no ethical distinction when hiring an overseas provider of such services versus a local provider, and that contracting for such services does not constitute aiding the unlicensed practice of law.

So now the Bar goes on to say you can actually outsource not only overseas, you can outsource here in the

United States.

Then the Bar goes on to say: Additionally, Florida Ethics Opinion 88-6 and 89-5 provide that nonlawyers, defined as persons who are not members of the Florida Bar, may accomplish certain activities but only under the supervision of a Florida lawyer.

And they go on to acknowledge that basically everything in the First Universal Holdings business model, which I'll get to, is acceptable practice as outsourcing.

There's been some litigation in Florida in the Supreme Court of Florida, as early as 1989, an advisory opinion for nonlawyers preparing contracts: The Bar acknowledged that it's not the unlicensed practice of law for nonlawyers to engage in communications with customers of law firms and of completing contracts and forms for law firms.

In addition, what's fairly interesting is that in 2008, in the case of Goldberg versus Merrill Lynch Credit Corporation, with Mr. Goldberg acting as a class action plaintiff on behalf of all clients of Merrill Lynch, sued Merrill Lynch because Merrill Lynch had put a document preparation fee in its loan documents.

The plaintiff sued claiming that preparing those documents by nonlawyers --

MR. SINASOHN: Objection. Relevance.

THE COURT: Go ahead. Finish.

THE WITNESS: -- was the practice of law that was unlicensed and fees couldn't be charged.

And the Fourth District Court of appeal didn't make a decision. What it did was it threw the case out and it said that the exclusive jurisdiction to regulate lawyers stands with the Florida Bar, stands with the Supreme Court of Florida.

And in fact, the Supreme Court of Florida, through the Florida Bar, as early as February 11, 1976, issued Opinion Number 47941, which states: A lawyer may employ nonlawyers to do any task for him except counsel clients about legal matters and appear in court on behalf of the clients in judicial proceedings; which, as I go through First Universal Holdings, they comply with this to the T.

On top of that, to show you how accepted outsourcing is, back office to law firms, the Florida Bar itself, on November 14, 2008, put out a CLE class -- which is a Continuing Legal Education class -- on the legal process for outsourcing. This is a new and continuing industry, and this is something that First Universal Holdings does.

Well, the sales, as you'll learn, not only from my testimony but from others, how it shut down, but the sales for First Universal Lending is gone, because First Universal Lending is gone. The only thing that's left of it is clients who needed to be serviced, elected to continue to be serviced,

were sent over to Holdings, an outsourcing company, which has provided services to First Universal Lending.

That is one aspect of Holdings' business, which is completing tasks of First Universal Lending clients who became clients under the statute which permitted First Universal Lending to provide the services; and the remaining balance of First Universal Holdings' business, the overwhelming majority of it, is doing all the outsourced back office work for these law firms that we've heard about.

I will talk about the sales process. But the bottom line is the sales have been closed; and I'd like to explain to the Court exactly why the sales were closed and how it came about.

Number one, first and foremost, I am a practicing lawyer. The people that work for me can attest to that, because day in and day out all I'm doing is handling cases in court and damage control, and I've fortunately gotten a lot of experience.

And one of my greatest experiences this last year was working on the receivership of Hess Kennedy, which was a fairly high profile receivership. In fact, I think it was the largest receivership in South Florida, a $100 million receivership where Berger Singerman was receiver's counsel, Rene Harrod there. You had the former Rothstein Rosenfeldt firm representing some of the people from Hess Kennedy; and I

represented Laura Hess.

We settled that receivership with the receiver and with the Attorney General's office, and one of the lessons that I learned from that case, which began a year and a half ago, was that when there are complaints about sales and there are injunctions, the law is fairly straightforward in this area that if the continuing harm, the threat of continuing harm ends, then the necessity for the injunction ends.

And, so, my counseling through Feingold & Kam to First Universal was close all your sales offices irregardless of whether you're doing right or wrong. That's for a later day. That's for a trial. But for right now, if you want to save your business, close all sales immediately.

And the way that I learned about the sales complaint was on November 19, 2009, when the FTC and the receiver and the police entered the offices of First Universal, I showed up a couple hours later. And, no, I was not at the Pompano Beach office clearing it out. I was meeting with clients who I would be glad to bring in here and testify to it.

The bottom line is that I showed up approximately two hours after you all were there, because I am one of these people that when I meet with clients, I believe it's very discourteous to answer your cell phone. That's my pet peeve. I can't stand it. And, so, my phone was ringing, and most people who know me know my phone is on silence all day long,

and I'll look at it when I'm good and ready. And when I looked at it after I finished meeting my clients, I saw about 160 missed calls, and I was amazed. I was shocked. And obviously, I recognized something was wrong. And then I saw about 50 text messages, where are you. It was unbelievable.

And when I finally called, I sensed that there was absolute havoc, and I asked to speak to the receiver on the phone. I don't remember if I spoke to the receiver or the receiver's counsel. But I let them know I am on my way, I'm their lawyer.

Well, as luck would have it, as I got on 95 from Sunrise, it was literally bumper-to-bumper traffic, and you could probably check the newspapers. It was ridiculous. It took me a good hour and 45 minutes, hour and 30 minutes, to get to the office.

When I appeared at the office, I walked in the lobby area.

And I hate to do this to you, Judge, and take exhibits out of order --

THE COURT: That's fine. Go ahead.

THE WITNESS: -- but showing you photographs will probably go a long way to explaining everything.

THE COURT: Show those to counsel.

THE WITNESS: I actually have his set and I have double-tabbed them. And as I speak, I brought them.

Your Honor, here's your set. And what I did was I tabbed them on the side so it's easier to pull them out. Then they're tabbed at the bottom, each exhibit number for the case.

And, Judge, if you look at Exhibit Number 6, so I can explain what the office looks like --

THE COURT: You need to put the case number on your exhibit stickers.

THE WITNESS: Okay.

THE COURT: For the obvious reason.

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

THE WITNESS: Exhibit number -- tab number 6, if you look, 6a is actually the lobby of my law office.

So, when I returned on the 19th, I walked into the lobby to find two news trucks televising live from the offices of Feingold & Kam. I found a process server waiting for me, when I felt was unusual, because I had just told the process server they could certainly serve someone, and I was advised that they were specifically told to stand outside in the lobby, which is actually where the news crews were, and to physically serve me in public.

THE COURT: Just so the record is clear, are you moving these into evidence?

THE WITNESS: Well, I haven't laid -- I will,

Judge. Right now it's for identification purposes only.

THE COURT: I know. But you're going ahead and testifying about them.

THE WITNESS: Yes, sir, I will. Yes, sir. I'll move Exhibit 6 into evidence.

THE COURT: Does the FTC have any objection to any of these photographs?

MR. SINASOHN: Your Honor, the only question we have is as to when these were taken. But otherwise we don't have an objection. I don't know when they are from.

THE COURT: How recent are these photographs?

THE WITNESS: These photographs are approximately six months old.

THE COURT: Any objection?

MR. SINASOHN: No, Your Honor.

THE COURT: All right. Which ones are you offering here?

THE WITNESS: This is Exhibit 6a through e.

THE COURT: 6a through e is in evidence.

THE WITNESS: Thank you.

MR. SINASOHN: Your Honor, may I?

THE COURT: Yes.

MR. SINASOHN: I have a personal issue that I need to take care of in the next ten minutes or so.

THE COURT: All right. Here's what we'll do. We'll

go ahead and recess for the day and let's have everyone return here at 10:30 tomorrow morning.

Court's in recess until 10:30. Have a good evening.

Defendant's 6a through e are in evidence.

(Defendant's Exhibits 6a through 6e in evidence)

(Recessed at 5:26 p.m. until Wednesday, December 9, 2009, at 10:30 a.m.)

I N D E X

WITNESSES PAGE
LIGGINS
CROSS-EXAMINATION BY MR. FEINGOLD........................... 2
REDIRECT EXAMINATION BY MR. SINASOHN...................... 34
RECROSS-EXAMINATION BY MR. FEINGOLD....................... 54
DAVID JON FEINGOLD, DEFENSE WITNESS, SWORN................ 66
EXHIBITS
Plaintiff's Exhibit 18 in evidence........................ 39
Plaintiff's Exhibit 4 in evidence......................... 48
Plaintiff's Exhibits 2, 3 and 5 through 17 in evidence..... 65
Defendant's Exhibits 6a through 6e in evidence............ 97

* * * * * * * * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

January 11, 2010 /s/ William G. Romanishin

A

**ABA** 88:8 89:3
**ability** 35:4
**able** 33:3
**Abood's** 3:2
**above-entitled** 97:24
**absolute** 94:7
**absolutely** 16:22 77:14,19 79:13 81:13,21,23
**absurd** 82:8
**acceptable** 90:9
**accepted** 40:11 69:13 87:13 91:15
**accepting** 26:24
**access** 34:8,15 35:4 35:6 37:3,19
**accomplish** 18:3 90:5
**accomplished** 88:6
**accomplishes** 18:1
**account** 33:17 49:18,25 59:10
**accounts** 33:14,15 33:22 53:19,24 57:13
**accurate** 40:5
**acknowledge** 2:18 89:15 90:7
**acknowledged** 21:6 21:10 88:20 90:13
**acknowledges** 89:3
**acting** 42:8 69:8 80:15 90:18
**action** 23:19,21 67:25 90:18
**actions** 40:18 68:11
**active** 68:21
**actively** 69:13 72:5 72:5,13
**activities** 40:7 90:5
**activity** 43:12
**actual** 26:20 28:25 85:2
**add** 74:2
**addition** 68:16 88:23 90:16
**additional** 2:11 40:24 62:1
**Additionally** 90:2
**address** 39:22
**admit** 61:22 73:25 76:25
**admittedly** 72:9
**adopted** 68:20
**adoptions** 68:18
**adoptive** 68:20
**advantage** 86:9
**advertised** 73:2
**advertising** 40:5 49:6
**advised** 19:3 41:6 70:12 95:19
**advising** 21:2
**advisors** 67:23
**advisory** 90:11
**affidavit** 2:14 15:6 15:6,12,17
**affidavits** 61:7,8
**afford** 76:24,25 77:3
**affordable** 17:22 49:7
**aforementioned** 43:10
**AG** 32:23
**age** 48:20
**aggressively** 72:6
**ago** 5:19,20 29:19 93:5
**agree** 9:8 27:1 28:24 40:9,9
**agreed** 77:21
**agreement** 4:17 49:21 51:2,14 73:6
**agreements** 28:19
**ahead** 6:22 15:21 19:24 27:8 29:25 48:15 62:8,17,22 63:19 83:10 84:20 86:15 90:25 94:20 95:12 96:2 97:1
**aiding** 89:23
**al** 1:6
**Alan** 5:11
**alerting** 40:6
**algorithm** 41:19
**allegation** 15:2
**amazed** 94:3
**amazing** 72:25 81:1
**American** 87:13 88:18
**amount** 27:15 36:21 85:7,8 88:9
**amounts** 76:22
**analyzing** 85:7
**and/or** 43:11
**angry** 51:3
**Anna** 30:14
**answer** 5:24 6:10 6:22 8:11 9:12 14:16 16:24 22:10 25:1 93:23
**answers** 54:9
**anybody** 53:14
**anymore** 86:11
**Anyways** 80:19
**apart** 78:11
**apologize** 3:4 58:21
**app** 82:7
**appeal** 42:21 43:4 91:3
**Appeals** 67:22
**appear** 31:4 60:8 91:12
**APPEARANCES** 1:17
**appeared** 27:18 94:16
**appears** 31:6 42:7 65:20
**application** 83:19
**applications** 86:20
**applies** 86:24
**approach** 20:16 38:5 47:12
**approached** 71:5 71:19 78:21
**appropriate** 34:16
**approval** 82:11
**approximately** 2:11,15 66:21 67:10,13,15 68:17 68:24 93:20 96:12
**April** 42:4,15,17
**Aquin** 78:18 79:12 80:20 81:16
**area** 70:10 93:7 94:17
**Areclia** 30:14
**argument** 44:13
**asked** 3:5 10:24 49:18 70:25 94:7
**asking** 36:10 40:23 47:8 78:12,14 81:17
**aspect** 92:3
**assert** 8:21 23:8,14
**asserted** 35:8,10
**assertion** 45:25 46:1 57:19
**asserts** 20:19
**asset** 54:13
**assets** 53:20,24 80:17,18 81:6
**assigned** 33:15,22
**assignment** 33:14
**assistance** 89:14
**Associates** 10:9
**Association** 87:14 88:18
**associations** 88:22
**assume** 44:12
**assumed** 50:17
**assuming** 44:12,14
**assured** 51:9
**astounding** 80:1
**Atlanta** 66:23,24
**attached** 2:14 7:19 7:25 30:16
**attaching** 29:21
**attachment** 8:5 9:20 25:9 28:2,3 29:5,25 30:25 33:9,14 45:12 63:9
**attachments** 62:20 63:4 64:14,24 65:6
**attempted** 69:18
**attempting** 72:12
**attending** 66:24
**attest** 43:9 92:15
**attorney** 24:18 37:23 41:5,6,12 66:19,22 68:22 69:8 75:18 93:3
**attorneys** 2:13 14:18 24:23 25:2 25:13 34:12 35:3 36:2
**attorney-client** 34:23 35:7 77:10
**attractive** 71:23
**August** 87:14
**Aurora** 76:21
**author** 28:25
**available** 11:14,15 11:16,17 36:1,3,4 37:10 54:17 61:5
**Avenue** 1:24
**aware** 4:11 5:7 22:23 23:3 26:11 27:21 40:19 53:18 53:22 55:11 58:15
**A-plus** 29:13,18 41:18 56:1
**a.m** 97:8

B

**B** 40:25
**back** 11:10 13:24 20:1 23:23 26:12 32:19 33:23 43:21 50:5 59:15 69:5 76:9,13 77:5 78:7 79:18 81:11 86:12 88:25 91:16 92:8
**background** 24:3 40:15
**bad** 74:18 85:14
**balance** 92:6
**bank** 4:17 6:19 33:15,17 49:18 57:12 78:19,25 79:12 80:16 81:11 81:17 84:8
**banks** 71:10 73:2 81:2,3
**bar** 27:19 69:18 70:2 87:13 88:18 88:22,23,24 89:3 89:4,9,12,24 90:2

90:4,12 91:6,9,16
**Barnett** 80:16
**barrier** 86:8
**Barry** 73:8
**based** 18:15,18 42:2,6 43:1 57:22 57:23 60:22 69:19 73:1
**basically** 7:13 71:14 73:1,21 74:15 77:13,23,25 78:15 90:7
**basis** 34:21 88:13
**BBB** 32:24 39:21 39:24 40:2,8,9,11 40:13,17,19,21,22 40:24,25 41:1,4 41:10,11,14,17,22 41:23,24,25,25 42:2,3,5,7,12,15 42:18,20,22 43:1 43:3,4,9,12 44:10
**BBB's** 41:8 42:6
**Beach** 39:23 68:16 74:10,11,12 78:19 93:17
**Beacon** 39:22
**Bear** 76:5
**began** 93:4
**beginning** 36:8 85:22
**behalf** 12:4,22 13:16 27:21 35:11 68:9 90:19 91:12
**behold** 72:20
**believe** 8:12 15:5 24:23 25:6 28:7,9 30:23 32:20 33:17 34:22 36:9,24 43:15 45:21,22 51:23 52:23 53:7 55:17 68:25 70:11 78:20 93:22
**believed** 44:3
**Bellamy** 30:14
**belongs** 35:13
**Berger** 92:23
**best** 25:25 28:24
**better** 29:14,15,16 29:19 32:3 38:14 38:17 39:20 43:7 43:16 55:15,21,22 56:6,9
**big** 71:10,10 85:22 86:24
**billing** 77:1
**billion** 56:20,22 67:24
**billions** 79:25
**bills** 16:18 75:6,21 76:24
**biological** 68:19
**bips** 72:1
**bit** 55:24
**black** 9:18,18 10:6
**blackmail** 41:11
**Blame** 74:18
**blessed** 78:10
**blood** 86:25
**boilerplate** 22:5
**Bologna** 2:23 13:12 13:19
**bonds** 82:11
**bonus** 69:5
**book** 86:14
**boom** 71:12
**booming** 74:22
**borrower** 84:3
**bothered** 51:10
**bottom** 77:20 82:19 92:10 93:20 95:3
**bought** 73:9
**Boulevard** 74:9,9 79:20
**branch** 12:13,16
**break** 86:13
**breezeway** 58:16
**Brenda** 7:1
**brick** 85:2
**bring** 93:19
**Broad** 67:6 69:8 80:17
**broker** 69:4
**brokerage** 68:3 69:2,6 85:6
**brokers** 69:3 83:15 83:15,17
**brother** 86:3
**brothers** 53:2 73:25 76:5,21 77:11
**brought** 40:24 94:25
**Broward** 68:15
**building** 58:10,16 58:18 74:11,12
**Buitendorp** 21:19 62:13,18
**bumper-to-bum...** 94:12
**bunch** 82:4
**Bureau** 29:14,16 29:19 32:3 38:14 38:17 39:20 43:7 43:16 55:15,21,22 56:10
**Bureaus** 56:6
**business** 14:24 16:8 29:14,16,19,22 30:9,11 32:3 38:14,17 39:20 40:10,16 42:11 43:7,11,16 55:15 55:21,22 56:6,10 69:14,17,19 70:1 70:17,22,23,24,25 71:7,12,19,24 73:7,11,15 74:3 74:21,25 75:18 77:11,12,21,25 79:11,20 80:1,5 80:23,24 85:11,16 85:24 86:11,24 87:3 90:8 92:3,7 93:13
**businesses** 40:1,3,8 40:14 74:7
**businessperson** 73:9
**busy** 50:5 54:10 59:14 67:12
**buy** 76:6 79:24
**buying** 84:9
**Byron** 62:13,15,16
**by-product** 73:11
**B-minus** 43:2
**B-u-i** 62:14
**B-u-i-t-e-n-d-o-r-p** 62:18
**B-y-r-o-n** 62:16

**C**

**C** 25:3,4 45:12,12 97:22,22
**cake** 86:8
**calendar** 19:16
**call** 2:1 5:5 10:23 11:5 13:24 22:18 23:5,6 49:9 61:16 65:18 66:3 71:1 79:8
**callback** 14:4
**called** 15:18 16:19 27:9 39:18 42:4 43:3 48:18 49:24 50:12,20 59:9 68:2 70:22 72:6 76:8,17 80:9,17 81:4 83:19 85:2 85:13 94:6
**calling** 11:10 15:25 16:5 42:8 78:12 78:14 79:1,9
**calls** 4:22,25 22:10 31:21 86:2 94:3
**campaign** 72:23
**cancelled** 51:1
**capital** 79:15
**card** 86:19
**care** 19:24 55:8 77:18,18 96:24
**Caribbean** 38:15 39:21 43:8,17
**Carol** 62:23
**carried** 75:12
**case** 1:3 23:17 37:7 43:19 44:13 52:16 62:3 83:8 88:18 90:17 91:4 93:4 95:4,7
**caseload** 68:14
**cases** 22:6 26:24 57:20 61:3 67:21 68:13,14 70:6,7 92:16
**Casner** 6:3,6
**Cassel** 67:6 69:8 80:17
**ceased** 9:9
**Cecilia** 4:4
**cell** 93:23
**Central** 41:23
**certain** 26:23,24 36:21 40:9 90:5
**certainly** 95:19
**certify** 97:23
**cetera** 70:2 86:25 87:8
**change** 71:6
**changed** 41:17,18 41:20 43:2 56:3 77:22 81:9 84:25
**characterized** 27:2 32:7,10
**charge** 82:10,11 87:7
**charged** 91:2
**charities** 40:3
**Chase** 4:16 6:19 80:21
**check** 19:25 50:12 50:18 51:11 94:13
**children** 68:19
**choice** 73:13
**choose** 70:3 88:2
**Christy** 15:17,23 63:4
**chronologically** 10:11
**chronology** 9:7
**Circle** 39:22
**cities** 60:17
**claimed** 34:13,14
**claiming** 90:22
**class** 67:25 68:10 85:5,6 90:18 91:17,18
**CLE** 91:17
**clear** 31:15 47:22 62:3 79:17 95:23
**clearing** 93:18
**clearly** 38:16 39:13 47:18
**clerk** 67:18
**client** 6:6 21:2

27:13,24 32:24,24 32:25 33:5 57:8 57:13 69:4 87:18 87:22
**clients** 18:1 23:12 28:22 31:8,25 32:8 33:24 46:12 72:5 73:14,19 74:2 81:17 90:19 91:11,12,24 92:4 92:5 93:18,22 94:2
**close** 14:24 16:8 74:1 93:10,13
**closed** 19:21 85:17 92:11,12
**closer** 13:21
**closer's** 27:14
**closing** 27:14 29:6 29:7 83:24
**cocaine** 89:4
**Cohen** 67:4
**collapse** 81:10 84:24
**collapsed** 74:24,25
**collect** 84:1
**Columbia** 88:17
**combined** 25:21
**come** 3:6 25:1 31:25 60:8 76:13
**coming** 75:21
**commercial** 49:6
**commercially** 70:9
**Commission** 1:3 88:19
**Committee's** 89:19
**communication** 5:6
**communications** 90:14
**companies** 12:18 42:3 54:9 77:15 84:14 86:20
**company** 12:3,22 13:2,5,16,20 19:20 29:7,11 31:7 38:2 40:24 41:22 42:1,6,9,23 43:25 44:4,4 49:9 53:11 54:8 68:2 72:10 73:10 78:19 83:2 86:19,20 92:1
**company's** 32:24
**compare** 21:21,23 21:24 57:13 84:2
**compared** 17:1
**compensate** 76:10 77:21
**compensated** 69:3
**compete** 73:2 86:6
**competent** 87:17
**compiled** 43:11
**complain** 41:22
**complaining** 59:21
**complaint** 4:4,5,14 4:20,21 5:11 6:13 7:1 17:11,12,14 20:13 21:24 22:2 22:6 23:14,22 28:2 31:17 40:15 45:24 46:4,6 93:14
**complaints** 7:14 18:17 31:5,10 32:3,24 33:7 41:13 43:6 61:23 61:24 93:5
**complete** 5:18 33:24 48:23
**completely** 19:20 39:18 48:19 58:7 84:12,14 85:18
**completing** 90:15 92:4
**complex** 58:12
**comply** 85:9 91:14
**component** 68:17
**computer** 8:9,16 28:12 31:12 34:9 34:15 37:18,20,21 37:22 60:11
**computers** 7:21 27:6 34:14 35:4,6 35:13,23 36:1 37:16,20 58:3 86:1
**conceded** 84:16
**concerned** 42:5
**concludes** 89:7
**condition** 51:7
**conditions** 84:2,2
**conducted** 43:11
**conference** 73:18
**confident** 88:12
**confines** 82:16
**confirm** 65:4
**confirmed** 42:19
**conflicts** 69:21
**confused** 10:8
**connotation** 32:17
**consenting** 34:23
**considered** 41:11 74:11
**consistently** 70:6
**constitute** 89:22
**consumer** 12:17 18:4 37:5 40:4 41:3 42:5,9 43:6 48:9 61:22
**consumers** 15:3 17:6,6,19,20,21 18:7,16,18 19:1,6 20:20 36:22 40:1 40:6 41:13 42:3 44:8,25 45:1,20 46:1,9,13,19,22 46:24 56:22 57:22 57:23,23 60:23 61:4 80:7,19
**contact** 32:23,23 50:14,21 51:22 69:7 81:3,18,21 81:23
**contacted** 5:4 15:3 41:21 46:1 50:3 50:16 51:4 52:2 59:2,7,13 69:18 80:8
**contacting** 5:14
**contained** 34:13
**continue** 2:4 19:3 21:2 49:2 51:6 70:7 85:10 86:10 91:25
**continued** 73:7,8 73:10 77:6
**continuing** 20:8
83:6 85:5 88:14 91:18,19 93:7,7
**contract** 18:13,24 18:25 19:7 46:19 46:22,25 56:24 57:20 89:18
**contracting** 50:10 89:22
**contractor** 35:23 35:25
**contracts** 18:15,21 57:5,9,13 76:10 76:11 80:25 82:19 82:21 90:12,15
**control** 88:5 92:17
**controversy** 85:15
**conversation** 14:4 50:20
**conversing** 85:19
**cooperated** 54:19
**copies** 41:13
**copy** 5:18 17:14,17 20:12 24:15,20 45:5
**corporate** 53:5
**Corporation** 90:18
**corral** 71:16
**correct** 2:12,15,19 2:20,21,22,23,24 2:25 3:1,2,3 4:8,9 4:12,13 7:15,17 11:6 13:14,15 17:8 18:11,19,20 18:23 19:13 21:11 23:13 24:9,13,16 25:5,22 26:1,7 30:23 31:22 33:16 43:14 51:17 53:2 53:3,6 55:4,6,13 55:14,16,20 57:6 57:7,10,11,14,15 58:16,17 59:8 60:9,12,19,21 97:23
**corrected** 46:11
**correspondence** 60:25
**counsel** 5:14,17 20:15 39:3 65:18 67:19 68:2 70:20 91:11 92:23 94:9 94:23
**counseling** 93:9
**country** 56:6
**County** 68:15,16 68:16
**couple** 32:4,5 81:5 93:17
**course** 11:9 16:12 24:25 31:12,24 43:11,18 45:8 47:6 67:2 69:7
**court** 1:1,23 2:1,2 2:10,13 3:4,24 4:3 4:15 5:23 6:2,10 6:13,22 7:4,10 8:11,21 9:3,12,20 9:23 10:1,22,24 10:25 14:12,19,23 14:24 15:10,14,21 16:10,24 17:3,5,8 17:15,17 18:11 19:23 20:5,17 21:23 22:20,20,24 22:25 24:11,19,24 26:4 27:11,12,16 28:8 29:22 32:17 34:4,21,25 35:16 35:20 38:7,12,19 38:22 39:1,3,7,10 39:14 47:14,19,20 47:25 48:4,6,8,11 48:13,15 52:18 54:3,18 57:2,19 60:8 61:6,13,16 61:20,25 62:4,8 62:15,17,19,22,25 63:2,7,10,14,18 63:22,25 64:2,5,7 64:11,17,19 65:3 65:7,12,17,21,23 66:1,3,5,8,10,13 66:18 67:22,25 83:9 84:20 86:15 88:17 89:1,10 90:11,25 91:3,6,8 91:12 92:12,17 94:20,23 95:7,10

95:12,23 96:2,6 96:11,14,16,19,22 96:25
**courts** 67:22
**Court's** 16:23 20:2 52:11 54:12 97:3
**cover** 29:25 30:4,12 85:24
**covered** 25:4 77:9
**Cowgill** 62:23
**created** 37:23 60:4
**credit** 86:19 90:17
**crews** 95:21
**crisis** 68:6
**critical** 79:13 88:25
**cross-examination** 2:6 20:8 34:7 36:6,8,20 37:2,24 43:24 45:8,16,23 46:18 52:9 53:8 97:12
**CRR** 1:23
**current** 41:18
**currently** 48:20
**customer** 31:5,9,17 86:1
**customers** 21:14 36:22 42:24 43:22 44:9 56:16,17,17 90:14
**cut** 48:23 49:2
**cutting** 81:12
**C-h-r-i-s-t-y** 63:4
**C-o-w-g-i-l-l** 63:1

**D**

**D** 25:9 97:9
**Dadd** 3:9,9 16:3 47:1 48:10,16 51:17,19 52:8 65:11
**Dadd's** 47:17,18 59:25
**Dade** 68:15
**Dall** 58:25 59:1
**damage** 92:17
**Damond** 4:15,16
**Daniel** 68:4
**Darlene** 63:5
**darn** 74:5,6
**database** 25:25 26:5 27:2,4,5 81:18
**date** 10:14 27:13,14 57:5,5,9,9,13,14
**dated** 13:23 30:4
**dates** 9:6
**Dave** 6:3 86:4
**David** 6:7 33:10 42:17,19 43:3 66:12,16 97:15
**day** 11:18 26:23 30:9,10 31:21 42:7,18 75:22 84:12 92:16,16 93:12,25 97:1
**deal** 49:12 70:19 72:19 78:23
**dealing** 47:23 69:23 72:1
**dealings** 42:2 50:18
**deals** 31:5 55:12 78:22 79:1
**December** 1:7 41:3 88:16 97:7
**decent** 77:4
**decide** 88:4
**decided** 34:16 49:9 72:4
**decision** 91:4
**decisions** 40:5
**declarant** 47:2 48:10
**declarants** 37:6
**declaration** 3:8,14 3:17 7:19,25 9:22 15:7,9,23 16:16 16:21 21:5,9,12 21:17,18,18,19 23:23 38:13,16 39:15,17 45:6 47:19 48:8,9,18 58:24 59:25 60:17 62:13,21,23 63:3 63:5,8,12,15,20 63:23 64:8,12,15 64:20,23,25 65:6 65:10
**declarations** 2:10 2:12,15,17 3:5 15:15 16:7,25 17:2 18:16 21:20 57:22,25 58:1 60:7,21 61:23 62:1,8 65:9
**declare** 43:13 51:15
**defaulted** 78:13
**defendant** 53:20,25
**defendants** 1:7 15:2 17:5,19 18:7 20:20 22:9,9 23:9 35:11 46:2,7,11 46:19 53:19,23
**defendant's** 34:8 46:9 97:5,6,20
**defense** 65:17 66:1 66:12 97:15
**defined** 90:3
**definitely** 49:12
**delegate** 88:2
**delinquencies** 3:11
**Dell** 86:1
**Denise** 15:6 64:13
**department** 80:17 80:18 81:11
**departments** 81:4
**describe** 25:13,14 25:14 27:11,16 32:12,15
**described** 32:10,16 46:12
**desperate** 49:4
**destroyed** 19:20
**details** 49:21
**determine** 22:15 28:24 84:3
**determined** 85:10 85:12,16 87:1
**developed** 40:17
**developers** 68:4,5
**devoted** 31:9
**Diana** 31:1
**difference** 52:5 75:10
**different** 42:12 50:1 59:11 60:17 77:9 82:8 84:11 84:13,14
**difficult** 79:11
**Diller** 73:8
**dire** 51:7
**direct** 88:5
**directly** 15:18,25 16:5,19 50:12 66:13 79:23
**disability** 48:25
**disclaiming** 23:19
**disclose** 54:12
**disclosed** 53:13
**disclosure** 24:8,11 24:13,15
**disclosures** 82:24
**discourteous** 93:23
**discuss** 89:2
**discussed** 36:5 39:17 48:17 71:22 88:11,25
**discussing** 45:24
**discussion** 45:17,24 46:18 47:1
**dispute** 40:3
**distinction** 89:20
**District** 1:1,1,14 67:21 88:17,17 91:3
**divided** 55:16
**document** 29:5 38:22 39:7 43:18 47:8 51:20 60:17 89:19 90:20
**documentation** 61:6
**documents** 16:15 19:4 28:25 29:1 37:3,5,9,10 43:10 54:16,20 61:4 84:1,2 90:21,23
**doing** 13:16,20 51:9 65:21 69:12 69:12 71:24 76:1 76:1,20 80:5,23 81:16,16 83:20,23 86:23 92:8,16 93:11
**doled** 26:21
**dollars** 68:7 69:20 72:22 77:2 79:25
**door** 31:25 52:1
**double-tabbed** 94:25
**draft** 23:22
**dramatically** 73:16 77:8,9
**drew** 77:25
**due** 48:24 68:6
**dying** 75:19
**D-a-d-d** 48:10,13
**D-a-r-l-e-n-e** 63:6
**D-e-n-i-s-e** 64:13
**D-minus** 41:20,22
**d/b/a** 12:11

**E**

**e** 28:2 96:18,19 97:5,9,22,22
**earlier** 20:17 37:4
**early** 69:25 72:8 90:11 91:9
**earned** 78:2
**easier** 95:2
**easily** 73:21
**ECF** 39:6
**economy** 50:4 59:14
**Edgar** 63:24,25
**edge** 81:12
**education** 85:5 91:18
**Edward** 3:19 4:4 4:15
**Edwin** 64:23
**effect** 37:17
**efficient** 38:2 44:4
**eight** 3:10 24:3 80:5
**either** 33:19 36:1 53:1
**elected** 70:6 91:25
**Emmett** 68:2
**Emory** 66:23,24,25 66:25 67:5
**employ** 91:10
**employed** 43:9 67:3

**employee** 85:4
**employees** 11:19 11:20 42:25 53:19 53:24
**employment** 11:9
**encourage** 20:20
**ended** 70:16 72:17 74:13
**ends** 93:8,8
**enforcement** 68:12
**engage** 90:14
**engaging** 89:13
**entered** 42:7 47:16 93:16
**enticing** 76:2
**entire** 33:4,6 58:12 74:13,14
**entitled** 29:6 39:7
**entity** 29:15 53:5
**equity** 70:1
**Eric** 64:15
**escrow** 52:5 69:24
**essence** 26:4 70:17 70:17 80:15,18
**established** 4:7,10
**estate** 68:6 71:13 81:6
**estimate** 49:20
**et** 1:6 70:2 86:25 87:8
**ethical** 39:25 89:20
**ethics** 40:10 90:3
**evening** 97:4
**evidence** 36:5 38:19,23,25 39:8 39:10,11 44:19 48:6,7 61:22 62:9 65:5,7,13,13,16 84:19 95:24 96:5 96:19 97:5,6,17 97:18,19,20
**exact** 8:6 60:16,18
**exactly** 17:25 92:12
**EXAMINATION** 34:5 97:13
**examples** 83:4
**exceeded** 56:11
**Exchange** 78:19
**excluded** 82:12,13
**exclusive** 91:5
**excuse** 25:14
**excused** 61:15
**executed** 43:15 51:17
**exemption** 82:4
**exemptions** 82:4
**exhibit** 8:5 10:21 21:10 24:21 25:3 25:4 30:16 38:10 38:25 39:11,13 45:12 47:17,21 48:3,7 58:25 62:4 62:13,24 63:3,5,8 63:12,15,17,20,23 64:8,12,15,20,23 64:25 65:5 95:3,5 95:8,13 96:5,18 97:17,18
**exhibits** 62:11 63:9 65:12,15 94:19 97:6,16,19,20
**exist** 89:2
**existence** 53:14
**existing** 81:18
**expanded** 73:15 74:7
**expect** 31:7 46:13
**expenses** 49:1 75:12 77:10
**expensive** 86:11 87:2
**experience** 92:18
**experiences** 40:16 92:19
**explain** 24:18 32:18 77:22 92:11 95:6
**explained** 71:8,22
**explaining** 94:22
**exploded** 74:3
**Expo** 70:23 71:1
**exposed** 69:9
**exposure** 70:25
**expulsion** 43:4
**extensive** 67:14
**extraordinarily** 67:12
**extremely** 49:1
**E-d-g-a-r** 63:24 64:1
**E-d-j-a-r** 63:25
**E-d-w-i-n** 64:24
**e-mail** 5:4,6 8:2,4 31:23 40:23 41:4
**e-mailed** 5:3
**e-mails** 7:19,21,23 7:24,25 8:1 19:2 21:1 61:1
**E-r-i-c** 64:15
**E-signatures** 57:17

**F**

**F** 28:3 97:22
**fact** 4:16,21 5:2,17 5:20 6:6,18 7:8 11:7,11 13:23 17:25 18:25 20:22 21:1,5,13 23:11 25:12 33:22 44:13 52:24 53:1 54:23 55:19 56:19 58:7 59:19 67:16,21 69:3,20 72:9,17 73:8 83:2 84:15 88:16,20 91:8 92:21
**factors** 76:2
**facts** 36:16,17,24 39:17 48:17
**failed** 22:9 23:9
**fair** 77:11,12,12 88:9
**fairly** 32:10 62:3 67:7,8,14 69:11 69:16 72:11 73:9 73:20 74:1,2,4,10 75:7 78:18 90:16 92:21 93:6
**false** 20:22 22:11 22:15 45:25 46:1
**familiar** 12:15 43:8 55:22
**family** 49:1 68:17
**far** 45:22 52:4
**father** 68:19
**fax** 29:25 30:4,11 30:18,21 81:7
**February** 40:22 41:1,15 91:9
**federal** 1:3 67:22 67:25 79:14,16 88:18 89:1
**fee** 27:24 49:15 90:21
**feel** 46:16 51:7 86:8
**fees** 27:20,21 77:7 82:10,11 91:2
**feet** 77:6
**Feingold** 2:4,5,7 4:1 5:10 6:1,12,25 7:5,12 8:13 9:15 9:21,25 10:2 15:19,22 17:16,18 19:23 20:9,10,11 20:18 22:22,24 23:1,2 33:10 34:2 34:12,18,22 35:15 36:6,8,17,21 37:2 37:17,24 39:2,4,9 42:17,19,19,22,23 43:3,24 44:9,14 45:8 47:5,22 48:5 48:14 52:9 53:5,8 54:4,6 58:8,20,23 61:11 62:2 65:19 66:2,4,6,9,12,16 67:11,12 74:19 77:13,24 80:24 82:17 83:11 84:23 93:9 95:17 97:12 97:14,15
**Feinstein** 2:25 26:6 26:19 28:8,9
**fell** 78:11
**felt** 78:1,3 95:18
**fifth** 21:5
**figure** 29:10 30:10 44:14 57:8
**figures** 44:11 45:4
**file** 5:14,18,19 15:14 17:4 33:5,6 61:6
**filed** 2:10,13 3:18 4:3,15,23 5:20 6:13 7:1 14:19 15:7,9 16:8,24 17:1 54:18 60:7 61:19
**files** 31:17,18 68:8
**filing** 24:21
**filings** 14:11
**fill** 73:4 83:18
**filled** 8:23
**finally** 89:7 94:6
**finance** 70:9,10
**finances** 49:1
**financial** 12:15 24:8,11,12,15 52:10 67:23 70:7 71:15 78:18
**financing** 69:23
**find** 8:1,4 30:14 49:4 81:7 95:16
**fine** 14:17 94:20
**finish** 31:15 34:19 90:25
**finished** 94:2
**Finley** 2:23 10:8 13:12,19 26:16
**firm** 25:25 26:14 26:16,18 27:3,21 27:24 31:24 35:14 67:3,6,8,11,11,12 68:3 69:15 70:20 72:6 73:23 75:14 77:13,24 78:5 82:16 84:23 87:7 87:9 92:25
**firms** 9:4 26:11,21 26:24 27:2 40:8 69:2,6,11,12 70:1 70:2 71:11,14 80:13 87:5,5,7 88:12 89:17 90:15 90:15 91:16 92:9
**firm's** 82:18
**first** 1:6 2:18,21 3:13,19 4:11,11 4:17 5:3 6:3,8 7:8 8:22 9:4,8,16,23 10:5,8 11:8 12:9 12:10,11 13:9 14:5 15:13,18,24 15:25 16:4,5,17 17:25 18:14 19:2

21:14 22:14,17,23 23:3 24:1,7,8 26:11 27:14 28:13 29:18 30:4,11,18 30:21 31:1 32:2 33:15,15 35:5 36:22 40:20,20,22 40:23,25 41:1,5,5 41:6,10,14,15,17 41:20,21,25 42:4 42:12,13,16,20,22 42:24 43:1,4,5 46:23 49:5 52:19 54:7,7,19,24 55:11 56:5,10,13 56:19 57:12,16,20 58:4,15 59:1,2,20 61:1 64:21 65:6 66:3 68:9,23 70:5 73:11,17,25 74:8 76:4,14,16 78:12 78:14,21 79:18,22 79:24 80:11,13,20 80:24 81:14 82:20 83:13,22 84:13,15 84:15,18,21,22 85:8,14,17 86:17 87:11 88:1 89:9 90:8 91:13,20,23 91:23 92:2,4,5,7 92:14 93:10,16
**five** 3:11 19:1,2,6 21:1 24:2 59:23 68:19 71:20,25
**floor** 8:3,7 74:13,14
**Florida** 1:1,7,24 13:10 36:9,12,17 38:14,18 39:21,23 41:23 43:8,17 55:21 66:20,20 67:9,22,23,24 68:5,15 69:4,18 78:20 81:25 83:16 88:23,24 89:3,4,5 89:9,12 90:2,4,6 90:10,11 91:6,7,8 91:9,16 92:22
**fly** 85:5
**focus** 71:7
**follow** 40:10
**following** 39:17 46:14 48:17
**force** 5:18 19:13 28:15,17,19,22 33:5,6 37:9,10 47:23 57:4 83:3,4 83:14,14 84:17 86:9
**forced** 73:12
**forces** 71:17,18
**Forebearance** 4:17
**foreclosure** 46:8 50:15,25 51:10,12 51:25 52:1
**foregoing** 43:14 51:16 97:23
**foremost** 92:14
**forked** 75:20
**form** 22:5 41:11 60:18 86:19
**formal** 87:14
**format** 60:16
**formed** 67:11
**former** 67:18 92:24
**forms** 90:15
**Fort** 1:7
**forth** 86:12
**fortunate** 74:4 75:8
**fortunately** 92:17
**Fortune** 85:25
**forward** 25:8 84:5
**forwarded** 41:4
**found** 7:16,18,23 8:2 15:8,24 25:16 26:8,9 46:9 81:20 87:13 95:17
**foundation** 3:23 5:22 6:9,21 7:9 8:10 9:11
**four** 19:1 24:2 27:8 77:2 80:4
**fourth** 67:21 74:14 91:3
**franchise** 6:8
**Francisco** 68:4
**frankly** 70:21 74:21
**free** 82:23
**frequently** 89:17
**Friday** 41:8
**friend** 15:13
**front** 20:12 23:24 24:19 39:2
**Frye** 15:17,23 21:5 63:4
**FTC** 14:18 23:15 23:16,17,22 34:12 35:3,22 36:2,3 45:24,25 53:14 60:21,24 61:17 65:23 68:11 88:19 93:15 96:6
**FUL** 21:6 49:10,11 49:12,14,19,24 50:7,10,12,14,17 50:20,21 51:2,3,8 51:14,24 52:3,4 59:9,16
**full** 28:14 58:8 66:14
**fully** 54:19
**full-time** 67:3
**fund** 67:24 73:10
**funded** 72:21
**further** 54:2 61:17 65:21 74:17,17,17 87:19,25 89:17
**Furthermore** 50:7 59:16
**F-e-i-n-g-o-l-d** 66:17
**F-r-y-e** 63:4

**G**

**G** 1:23 29:5 97:25
**Gabriel** 41:4,6,7
**Garcia** 16:16 63:6
**Gardens** 74:10,11 74:13
**general** 33:10 40:15 68:2
**General's** 41:13 93:3
**George** 63:9
**Georgia** 66:23,24
**getting** 38:2 46:19 78:1 79:7,8 85:14
**give** 17:17 20:15 39:4,5 49:20 76:8 82:24
**given** 26:23,23
**gives** 36:25
**glad** 93:19
**gladly** 33:7
**go** 4:2 5:11 6:22 8:16 10:10,10 15:21 19:23 20:25 22:14 23:23 25:7 26:6 28:3 29:5 30:25 32:19 35:12 39:8 43:21 48:15 62:8,17,22 63:19 72:4 73:4 83:10 84:7,20 86:15 89:17 90:7,25 91:13 94:20,22 95:12 97:1
**goes** 22:18 58:16 87:19 89:24 90:2
**going** 3:7 8:22 16:10 18:15 19:17 19:17 38:9 39:8 47:16 65:17,20 67:2 68:7,18 70:3 71:6,7 78:7 79:10 80:8 81:14,14 83:7 86:9 87:5 96:2
**Goldberg** 90:17,18
**Goldman** 76:5
**gonna** 75:23
**good** 69:17 70:21 74:4,6,6 75:9,17 76:15 78:12 85:20 85:20 86:22 94:1 94:14 97:3
**gotten** 50:5 59:15 77:8 92:17
**Government** 40:18 79:16
**graduated** 66:25
**graduating** 67:5
**grand** 79:8
**Gray's** 15:6
**great** 74:21 80:22
**greatest** 92:19
**Green** 76:17
**Greenberg** 68:8
**grew** 73:1,7,11,11 74:3
**gross** 42:24
**guarantee** 18:22
**guarantees** 19:5 49:11
**guess** 33:18 45:4 58:24 76:13
**guidance** 69:19 70:2
**guidelines** 27:20 84:10
**guy** 76:24
**guys** 33:18 55:3 60:20 72:11 78:16 78:22
**G-a-r** 64:2
**G-a-r-c-i-a** 63:6
**G-e-o-r-g-e** 63:11
**G-r-a-y** 64:14

**H**

**half** 67:10,17 71:6 93:4
**hand** 36:9,11,13 38:9 66:11
**handle** 67:20 69:19
**handled** 67:14,15
**handling** 67:25 68:7,9,15 69:23 70:3 92:16
**handwritten** 7:4,6 25:9,10,12,16,17
**happened** 3:15 30:8 71:14 74:24 76:16 77:22 78:10 78:11,14 80:7 82:15 84:18,21
**happy** 39:5 70:14 86:7
**harder** 52:7
**harm** 93:7,8
**Harrod** 92:24
**hate** 94:18
**havoc** 94:7
**headaches** 76:22
**hear** 62:7 83:7

**heard** 12:13 16:13 26:14,16,18 28:15 37:14 42:8 80:12 92:9
**HEARING** 1:12
**heart** 83:10
**heart-breaking** 75:17
**heavily** 73:2
**held** 88:19
**help** 46:11 49:4 50:2 59:12 78:4
**Hess** 92:20,25 93:1
**hey** 70:25 76:14 78:3,4,15 80:20 86:5
**hi** 79:9
**Hibbs** 21:18 63:12
**high** 92:21
**highest** 40:10 69:3
**highlighter** 9:18
**hire** 80:4,5 89:18
**hires** 35:22
**hiring** 80:3 89:20
**historically** 80:12
**history** 31:24 40:16 83:6
**holding** 8:21
**Holdings** 2:21 12:9 12:11 24:9 26:12 28:13 33:16,23 52:19 82:15 84:16 84:18,22 88:1 90:8 91:13,20 92:1,3,7
**hold-up** 50:22
**Holland** 48:21 51:17
**home** 27:13 49:5,11 50:15 56:20
**homeowners** 15:3 22:9,10
**honest** 14:12,13
**Honestly** 53:16
**honesty** 14:10
**Honor** 15:20 17:13 17:16 20:10,16 35:1,15 38:6,21 38:24 47:12,21,22 48:1,10,12,14 54:2 58:22 61:17 61:21 62:6,10,11 62:21 63:5 64:1,4 65:4,8,9,14,25 83:5 95:1 96:8,15 96:21
**honorable** 1:13 77:4
**hook** 74:20
**hope** 68:21
**horrible** 75:19
**horrific** 75:19
**hour** 77:2 94:14,14
**hourly** 77:7
**hours** 48:22 49:2 78:6 83:7 93:17 93:21
**house** 52:3,6
**HUD** 83:20,24
**huge** 42:23 72:1
**hundred** 68:7 76:7 77:2
**hundreds** 54:9 72:21 73:14
**hundredths** 72:2
**husband's** 48:22
**H-i-b-b-s** 63:13

**I**

**idea** 3:25 4:19 5:9 5:21 6:24 7:11 9:14 11:12 13:11 32:1 36:19 37:1 54:11 86:7,22 88:13
**identification** 96:1
**identified** 38:9 48:2 48:3
**identify** 53:19
**identifying** 53:23
**image** 35:23
**imaging** 36:1
**immediately** 51:1 52:2 93:13
**important** 45:19 82:15
**impression** 49:22
**improper** 41:7
**improvement** 76:8
**incentives** 71:20
**include** 40:14
**includes** 46:14
**including** 2:11 65:9 65:13
**income** 42:24 48:25
**incomplete** 52:21 52:24 53:6
**incredible** 75:24 79:19
**incredibly** 50:5 59:14
**independent** 35:22 35:25 88:4
**India** 85:25 86:2,7 87:5
**indicated** 5:3,13 25:13 71:6 86:18
**individual** 26:21 60:15 83:14,14 84:3,8
**indulge** 65:21
**industry** 70:13 71:9 79:21 85:20 85:21 91:19
**IndyMac** 76:20
**information** 8:23 24:4 25:4 28:21 34:13,15 35:4 39:25 40:4,15,17 40:24 42:2 43:1 50:11 53:23 73:5 83:20
**informed** 50:13,14
**inherent** 69:21
**initially** 15:2 55:25
**initiating** 51:12
**injunction** 1:12 24:12 93:8
**injunctions** 93:6
**injunctive** 17:11,12
**insisted** 50:22
**instances** 20:19 22:9 23:9
**institutions** 71:15 79:12
**insurance** 52:5 75:11 78:7 86:23 86:24
**intent** 8:25 9:2
**interest** 3:10,20 59:22
**interested** 40:20 70:13
**interesting** 72:12 82:2,12 88:15 90:16
**International** 13:13
**Internet** 15:8,24 46:7,10 73:1
**interrupt** 19:24
**interview** 11:13,25
**interviewed** 57:8
**interviewing** 28:25
**interviews** 60:22
**investigate** 12:18 87:9
**investigated** 86:21
**investigation** 43:19 45:19 55:12
**investigations** 40:18
**investigator** 12:15 12:17 14:21 23:16 23:21
**invitation** 40:11
**involved** 14:5 68:23 69:9,21 71:9 78:16 86:4
**irate** 31:20
**irregardless** 93:10
**issue** 37:15 83:10 96:23
**issued** 41:25 91:9
**issues** 40:13

**J**

**J** 1:13 30:25
**Jacobs** 5:11,12,17
**Jacoby** 21:18 63:16
**James** 9:2,17,25 10:5 12:20
**January** 40:19 41:12 88:24 89:5 89:11 97:25
**jeopardize** 51:24 51:24
**Jersey** 67:17
**Jimmy** 8:18,19
**job** 31:1 82:17,18
**jobs** 5:4 8:22
**John** 6:3,6
**Johnson** 8:5
**Johnston** 84:6
**Johnston's** 8:9
**join** 40:12
**joined** 56:6
**Jon** 66:12,16 97:15
**Jones** 79:2,9
**Journal** 88:10
**Judge** 1:14 24:19 66:4 94:18 95:5 96:1
**judicial** 91:12
**June** 5:12
**jurisdiction** 91:5
**J-a-c-o-b-y** 63:16
**J-o-n** 66:16

**K**

**K** 33:9
**Kalick's** 83:23
**Kam** 58:8 67:11,12 74:19 77:13,24 80:24 84:24 93:9 95:17
**Kam's** 82:17
**Kathleen** 6:14,18
**Kathryn** 4:20
**keep** 22:17 27:23
**keeping** 84:23
**Kennedy** 92:20,25
**kept** 11:8 74:17 78:8,8 81:14
**Kessler** 67:4
**kills** 86:9
**kind** 68:20 70:23 84:11
**Kingdom** 59:20
**Kirsch** 67:18
**knew** 50:24 72:8
**know** 3:24,24 6:10 6:11,23 7:10,13 8:6,14 11:15,16 12:8,25 13:16,20

15:16 16:10,24,25 17:9 19:12,22 21:16 22:2,5,7,19 23:11 26:20,23,25 27:19 28:10,14 29:3,7,24 30:1,20 31:1 33:8,12 34:1 35:8,12,17,22,25 36:11,16,17 37:12 37:16,19 42:9 44:16 45:19,20 46:22 48:1 54:21 56:2,12,15,16,21 56:22 57:4,8,12 57:16 58:14 59:24 60:1 61:10 66:6 72:2,23 73:15,20 73:23,24 74:5 75:23 77:10 79:9 80:12 81:8 83:6 86:13 87:5,6 93:25,25 94:9 96:2,10
**knowledge** 39:16 48:16 53:13 87:22
**known** 51:12 73:9 75:4 80:14 83:25
**knows** 9:13
**Kodsi** 68:4
**Kushner** 6:7

**L**

**L** 8:5,5
**lack** 50:25
**Lacks** 3:23 5:22 6:9 6:21 7:9 8:10 9:11
**laid** 95:25
**landlord** 74:16
**language** 82:17 86:8
**large** 9:18 10:6,7 67:7,8 71:15 78:18
**largest** 68:5 74:12 79:22 92:22
**Larkin** 68:3
**Larry** 63:15
**late** 69:25
**Lauderdale** 1:7
**Laura** 93:1
**Lavender** 15:12 63:21
**law** 3:2 9:4 26:11 26:21 27:24 35:14 62:3 66:25 67:1,2 67:3,6,8,11,11,12 67:18 68:17 69:12 69:15 70:1,20 72:5 73:18 74:3 74:15 75:9,13 77:13,24 78:5 80:16 82:1,14,17 84:23 87:4,5,6,7 88:10,12,15 89:17 89:23 90:13,14,15 91:1,16 92:9 93:6 95:14
**laws** 81:13 84:25 85:9
**lawsuit** 5:14,20
**lawyer** 5:23 23:16 58:4 69:14,22 73:24 74:18 83:1 87:6,15,16,20,21 88:1,11 89:12 90:6 91:10 92:15 94:10
**lawyers** 17:2 27:19 58:8 67:13 81:20 82:13 88:3,20,21 88:22 89:7,15 91:5
**law.com** 88:9
**lay** 86:10
**lead** 11:9 83:9 84:18,21
**leading** 34:22,25
**leads** 73:5
**learn** 49:9 91:21
**learned** 16:4,17 88:15 93:4,14
**lease** 74:19 75:14
**leave** 55:7,8
**leaving** 70:12
**led** 45:21,22
**Lee** 6:14,18
**left** 11:19,20 25:17 42:17 49:17,22 51:6 88:21 91:24
**left-hand** 10:21 13:25
**legal** 5:14,17 66:14 70:20 72:13 76:22 76:24 77:14 84:9 87:12,15,17,20,22 87:22 89:18 91:11 91:18,18
**legally** 21:6 75:13
**legislature** 81:25
**legitimately** 73:17
**Lehman** 76:5,21
**lend** 78:23
**lender** 26:1 73:5 76:17 82:6,7,9,20 82:24 85:2,15 86:10
**lenders** 17:7,20 76:4,20 78:11,14 79:22 80:6 82:4 82:10,12
**lender's** 9:9 78:22
**lending** 1:6 2:19 3:19 9:4,9 11:8 12:7,9,11,24,25 13:4,7,8,9 14:6 21:14 29:18 30:5 30:11,19,21 33:15 33:24 35:5 36:23 40:20 46:23 49:5 52:19 68:10 72:7 72:9,15,18,20,24 72:25 79:24 81:19 82:20 83:13,22 84:15,22 85:8,14 85:17 91:23,24 92:2,4,6
**lessons** 93:3
**letter** 4:23 5:1,12 6:2,4 36:9,12,17 41:5 42:15 52:1 76:18
**let's** 4:2 7:18 8:18 9:7 11:4 13:12,18 13:23 14:10 15:1 20:1,25 23:23 30:25 44:12 83:10 87:10 97:1
**level** 49:14
**liability** 84:8
**license** 9:10 13:10 78:22
**licensed** 82:10 83:15
**licensing** 85:6
**lied** 51:7
**life** 3:21 74:5,21
**Liggins** 2:2 5:23 10:3 20:6,12 34:7 39:13 43:18 45:5 52:9 61:13 65:6 97:11
**limited** 37:18
**line** 77:20 82:19 92:11 93:20
**listed** 13:21 82:3
**listen** 19:12,17 78:21
**literally** 74:16 76:6 94:12
**litigation** 68:7,9,10 70:8 71:10 75:25 90:10
**little** 10:8 49:17 51:25 55:24
**live** 31:20 67:17 95:16
**lived** 66:20
**living** 48:25 60:16
**LLC** 1:6 40:20
**lo** 72:20
**loan** 3:21 11:7 18:8 19:3,4 23:9 38:2 44:5 46:8 47:6 49:19 56:17 76:1 79:14 80:9,12,14 81:24,24 82:1,3,8 83:18,21,21 84:1 84:2,4,9,9,11 85:4 85:13 90:21
**loans** 17:21 45:1,2 49:7 56:20 76:2,7 76:7 78:13,15,17 79:15 80:15,19 83:17,23,24
**lobby** 94:16 95:14 95:16,21
**local** 89:21
**located** 74:9 89:5
**location** 8:6
**lodged** 41:14 43:6
**long** 18:22 19:5 49:19,23 58:15 93:25 94:22
**look** 9:12,16 13:12 13:18 15:11,15 16:7 19:17 25:2 25:24 27:23 29:10 29:15 36:5 46:4 60:15 76:13,13 94:1 95:5,14
**looked** 4:15 19:16 45:9 54:14 58:25 85:17 86:21 87:11 94:2
**looking** 31:4 68:13 70:10 72:15 79:14 79:15,15
**looks** 9:18 27:18 95:6
**Lopez** 21:10,10 63:24 64:4
**lose** 49:5
**loss** 48:23 79:14 81:4 84:23
**lot** 36:7 69:2 71:10 71:10 73:18 75:20 85:10,11,13,15 87:2,6,7 92:17
**lots** 22:6 68:10 73:19 75:25 76:20
**love** 70:5
**lower** 49:13
**lowering** 16:18
**luck** 94:11
**lunch** 6:16 7:3
**Lynch** 69:2,3,4 74:13 90:17,19,20 90:20
**L-a-v-e-n-d-e-r** 63:21
**L-o-p-e-z** 63:24 64:5,6

**M**

**M** 33:14
**Macey** 67:3,5
**magic** 9:19 10:6
**Magnet** 76:4
**Magnus** 79:22
**mail** 42:17 60:25
**maintain** 40:9
**majority** 57:20 92:7
**making** 49:2 51:6 52:6 71:25
**man** 6:7
**manageable** 49:14
**manager** 85:3
**managers** 50:1 59:11
**managing** 70:11
**March** 41:21
**margins** 86:21 87:7
**marked** 38:9 47:16 48:2,2
**marker** 9:19 10:6
**market** 46:7 71:13 73:8 74:24 78:11 84:25
**marketplace** 39:25 40:7,17
**marks** 62:11
**Marshall** 64:25 65:1
**Marucci** 26:14
**math** 44:7 79:7
**Matt** 15:12
**matter** 55:8 67:25 77:3 97:24
**matters** 19:25 39:17 48:17 68:11 68:12 69:9 91:11
**Matthew** 63:21
**Mazur** 64:9
**mean** 14:13 44:9 45:2 60:20 81:8 81:12 86:3
**Meaning** 32:5
**means** 60:4
**meet** 40:8 50:8 59:17 93:22
**meeting** 93:18 94:2
**meetings** 80:4
**meets** 84:3,4
**meltdown** 74:23
**member** 33:11 40:14 41:1 55:25
**members** 40:8 88:22 90:4
**membership** 40:9 40:21 42:20
**memberships** 55:15
**memorize** 16:15
**memory** 15:11
**mentioned** 37:17 38:1 52:15
**mentions** 43:21
**Merrill** 69:2,3,4 74:13 90:17,19,20 90:20
**mess** 79:17
**message** 42:18
**messages** 94:5
**met** 68:24 69:6 81:15 84:9
**Miami** 1:24,24 55:9
**Michael** 64:21
**Michelle** 64:9,10
**Michigan** 48:21 51:18
**microphone** 66:14
**Midwest** 23:4 53:9 53:15 54:7 79:23
**mid-90s** 69:11
**million** 42:25 56:11 68:7 76:19 92:22
**millions** 72:22
**mine** 69:4
**Minnesota** 41:12 41:14
**minute** 62:15 63:18 78:3 81:16
**minutes** 32:25 94:14,14 96:24
**Miranda** 8:4 84:6
**missed** 94:3
**misspoke** 3:5,7
**misstatement** 47:24
**Misstates** 84:19
**mitigation** 81:4,11
**mod** 80:9,12,14
**model** 72:4 73:1 80:1 82:14 85:11 85:16 86:11 87:7 87:18 90:8
**modification** 18:8 46:8 49:19 56:17 59:21 82:1,3
**modifications** 23:10,12 38:1,2 44:1,5,8,10,15,17 44:20 85:13
**modified** 45:1,3
**modify** 17:21 49:13 79:3,4
**modifying** 83:21,24
**money** 36:22 46:23 49:17 51:4,5 57:14 70:11 75:20 78:16 85:8 87:1,7
**month** 6:20,20 49:16 74:16 75:8
**months** 5:19,19 18:9 49:3,24 50:10,17 51:4,8 51:13 59:1,7,9 67:18 96:13
**morally** 75:16
**morning** 97:2
**mortar** 85:2
**mortgage** 3:11 6:18 6:19 12:18 17:7 17:20,21 21:22 23:9 44:5 49:3,6 49:13 50:13 51:5 51:6 59:22 69:10 71:11,20,21 74:23 74:24 79:3,3,4,10 79:21 80:9 82:6 83:15,15,17 84:25 85:6
**mortgages** 20:21 21:3 71:16 76:12
**Moscowitz** 25:5 84:16
**motion** 1:12 38:11 54:18 61:20,22
**motions** 61:19
**move** 25:3 35:20 62:8 96:5
**moved** 61:24 65:10 73:21
**moving** 73:20 74:17 95:24
**multiple** 8:22
**Munoz** 3:19 4:4,4
**Mutual** 49:13 50:5 59:21
**M-a-r-s-h-a-l-l** 65:1
**M-a-t-t-h-e-w** 63:21
**M-a-z-u-r** 64:9
**M-i-c-h-a-e-l** 64:22
**M-i-c-h-e-l-l-e** 64:10

**N**

**N** 97:9
**name** 13:14 27:13 27:14 28:12,14 41:3 45:14 62:25 63:10 64:3,17,21 65:1 66:14,15,16 70:23 71:4,7 72:10 75:14 77:18
**named** 6:7
**names** 79:2
**narrative** 83:6
**National** 70:22 88:10
**nationally** 56:7
**nationwide** 55:12
**nearly** 5:19
**necessary** 46:16 87:23
**necessity** 93:8
**need** 15:11,15 17:9 21:12 22:20,24 25:19 46:15 76:15 85:9 95:7 96:23
**needed** 70:3 71:17 79:16 91:25
**needs** 48:2
**negative** 32:13,17
**negatively** 32:10
**negatives** 76:11
**negotiate** 17:6,20 49:19
**negotiated** 70:16 72:16
**negotiating** 72:18
**negotiator** 50:8 59:17
**net** 12:13,16
**never** 4:7 17:1 24:20 50:13,16,18 51:4,10,13 59:1,2 72:17 74:20 78:3
**new** 43:1 67:16 68:1 78:18 80:1 81:12 84:4 85:16 91:19
**Newark** 67:16,17
**news** 95:16,21
**newspapers** 94:13
**Neyer** 64:13
**Nilsson** 64:16
**nine** 3:20
**ninth** 24:3
**nonlawyer** 27:20 27:25
**nonlawyers** 89:8 90:3,12,14,23 91:10
**nonlegal** 87:16,21 88:3
**nonmember** 40:14
**nonperforming** 79:5,15 81:6
**nonprofit** 39:24
**normalized** 70:1
**North** 1:24
**note** 25:16 29:7
**notebook** 28:3
**noted** 1:17
**notes** 25:9,10,12 42:6
**notice** 82:22
**November** 11:18 43:5,15 51:17 91:17 93:15
**NR** 42:10,13
**number** 9:8 15:7,7 15:12,17,23 16:3 16:16 20:19 21:6 21:17,18,18,19

22:8 23:8 27:14 37:25 45:10 47:20 48:24 49:18 56:10 58:25 69:6 75:12 89:10 91:10 92:14 95:3,5,7,13,13
**numbered** 9:22 24:2
**numbers** 36:25 62:5 72:1
**nurse** 86:25
**N-e-y-e-r-dash-G...** 64:13
**N-i-l-s-s-o-n** 64:16 64:18

**O**

**object** 47:25 48:4
**objection** 3:23 5:8 5:22,24 6:9,21 7:9 8:10 9:11 17:15 34:18 35:15 39:1 39:9 83:5 84:19 90:24 96:6,10,14
**objections** 61:25
**obligated** 75:13,16
**obligation** 14:11
**obligations** 53:20 53:24
**obscure** 71:4
**obtain** 18:8 23:9 33:3
**obtained** 4:11 42:2
**obtaining** 44:4
**obvious** 95:10
**obviously** 71:21 89:1 94:4
**occasions** 19:7
**October** 10:23 11:5 11:10 14:3
**offer** 38:24 81:23
**offered** 48:3 65:5 71:19
**offering** 38:20 40:3 96:16
**offers** 62:11
**office** 3:6,9,18 4:12 6:7,8 26:12 33:24 37:23 39:22 41:13 54:23 55:5 58:8 73:18,23 74:8,8 74:11,12,19 75:21 76:6 79:23 85:1,3 91:16 92:8 93:3 93:18 94:15,16 95:6,14
**officer** 3:13 11:8
**offices** 3:2 50:1 55:3 58:5 59:11 74:15 75:5 93:10 93:16 95:16
**Official** 1:23
**oh** 52:1 58:21
**okay** 2:17 9:23 10:1 10:12,13,20 11:7 14:17,21 24:7,18 26:3 28:7 31:16 32:19 55:15,25 57:4 59:6 62:19 63:22 83:12 95:9
**old** 29:23 33:24 60:11 96:13
**once** 50:8 55:2,3 59:17
**ones** 60:20 96:16
**onslaught** 81:3
**open** 12:20 75:5
**opened** 79:23
**opener** 13:17
**opening** 9:16 10:6 13:8,23 52:16
**operate** 70:20 87:2
**operated** 56:7 82:16
**operating** 85:1
**opinion** 87:14,15 87:19,25 88:8,8 88:23,25,25 89:3 89:5,11,20 90:3 90:12 91:9
**opportunity** 27:1 69:1 70:14 71:16 72:14 73:22 75:6
**opposing** 67:19
**order** 2:1 14:22 37:6 38:11 52:11 52:12 53:18,22 54:1,12,15 61:20 82:11 85:9 94:19
**ordered** 24:12
**orders** 53:18,22
**organization** 39:24
**outside** 23:3 95:20
**outsource** 87:15 88:4 89:25,25
**outsourced** 92:8
**outsources** 54:8
**outsourcing** 85:22 86:17,19 87:12,20 87:21 88:12 89:4 89:6,6 90:9 91:15 91:19 92:1
**overflow** 23:4
**overlap** 84:17
**overnight** 78:23,25 79:18
**overseas** 89:6,13,15 89:21,25
**overtime** 48:23 68:11
**overwhelming** 92:7
**owe** 78:5
**owned** 6:7 72:11
**owner** 6:3 42:4 69:22
**owns** 6:7

**P**

**P** 38:13 39:15,16 43:16
**package** 71:16 76:3
**packages** 76:7
**page** 12:2,20 24:3,5 24:7 45:9,9 97:10
**pages** 1:11 9:22 25:8 27:8
**paid** 22:9 46:23 57:5,9,21 75:2,3,4 77:3
**Paine** 31:1
**Palm** 39:23 68:4,16 74:10,11,12 78:19
**paper** 25:15 36:13 84:12,12,12
**paperwork** 17:4
**paragraph** 15:7,12 15:17,23 16:3,17 17:11,19 18:7 20:19 21:5,10 22:8 23:8 43:21 46:4,5,6 51:22 59:4 60:18
**paralegal** 89:14
**paralegals** 89:7,16 89:18
**paranoid** 83:1
**part** 37:6 41:24 51:19 70:13,19
**particular** 61:8
**party** 23:4 59:21
**pass** 85:6
**Patricia** 63:12
**Patrick** 63:9
**pay** 19:3 21:2 48:24 49:15 56:25 75:6 76:12,14,24,25 77:3,6,23,24 78:5 78:7,23 79:5 80:21
**paycheck** 75:3
**paychecks** 33:9
**paying** 20:20 21:22 75:20
**payment** 6:19 52:3
**payments** 17:7,21 21:7,15 49:3,7,13 51:6 52:6
**peeve** 93:23
**penalty** 43:14 51:16
**pending** 67:21
**people** 4:8 8:24 18:13 44:15,23,23 55:12 56:14,24 57:5 60:16,24 71:2,3,19 72:15 73:6 75:2,17 76:12,14 77:11 78:13 80:4,5 81:1 81:5,19 83:25 84:1 85:7 86:6,7,8 86:19 87:6 92:15 92:25 93:22,25
**percent** 3:10,11,20 3:20 21:13 44:9 45:2 59:23 71:20 71:20,25,25 72:2 72:3 84:17
**percentage** 23:11 36:21
**perform** 44:8 89:18
**performed** 43:25
**period** 9:6 13:25 18:8
**perjury** 43:14 51:16
**permit** 35:16
**permitted** 92:5
**person** 31:4,9 74:8 75:19 81:7
**personal** 39:16 48:16 96:23
**personally** 54:25 67:15
**persons** 90:4
**pertaining** 40:16
**pet** 93:23
**Peter** 64:15
**PGA** 3:6,9,13,18 74:9,9 79:20
**PGA's** 4:12
**phone** 4:22,25 5:6 22:14,18 23:4,5,6 27:14 32:21 42:8 53:9,15 54:7 79:2 93:23,24,25 94:8
**phones** 54:9,10
**photocopied** 25:22
**photographs** 94:21 96:7,11,12
**physically** 95:22
**pick** 75:10
**picked** 75:9,10,11
**piece** 25:15 36:13
**pitch** 9:16 10:6 12:20
**place** 75:11 81:25
**places** 77:18
**plaintiff** 1:4 23:17 62:11 90:19,22
**plaintiff's** 39:11 47:25 48:4,6,7 65:12,15,18 97:17 97:18,19
**plan** 36:5 79:11

**planned** 19:16
**please** 20:5,15 30:25 38:12 39:4 60:25,25 66:8,13 66:13 76:18 78:15
**plus** 31:22
**PM** 1:11
**point** 19:24 25:21 26:20 31:20 67:7 69:24 70:5 76:17 79:6,8 83:10,23 87:25
**pointed** 33:10
**points** 78:23
**police** 93:16
**Pompano** 93:17
**portfolio** 70:24,24 71:2,3,24 72:1
**portfolios** 69:15,16 69:22,22,23,24 76:12 79:24
**posed** 34:8
**possibility** 29:20 60:13
**possible** 51:9
**post** 82:11
**Post-It** 25:24 26:3
**Post-Its** 25:17,21 26:5
**Potentially** 65:19
**practice** 68:16 70:1 74:3 75:9 89:23 90:9,13 91:1
**practiced** 80:16
**practices** 29:23 40:6
**practicing** 72:5 92:14
**preexisting** 81:22
**preferred** 5:6
**PRELIMINARY** 1:12
**premises** 4:23 7:16 7:18 8:3,7 25:16 75:13
**preparation** 16:13 87:23 89:19 90:21
**prepared** 14:19 16:14 22:3 42:1 59:25 60:1,20
**preparing** 90:12,22
**prerogatives** 88:21
**present** 17:13 29:22 35:18
**presently** 29:22
**President** 38:13,17 39:20 43:7,16
**press** 88:9
**Preston** 64:21
**presumption** 8:20
**pretended** 42:5
**pretty** 74:5,6 75:24
**prevailed** 75:24,25
**prevent** 51:9,11
**previous** 13:24 14:4
**Previously** 1:17
**pre-collapse** 71:12
**pre-mortgage** 71:12
**price** 76:8
**pride** 73:18
**principles** 40:10
**print** 8:16 33:4
**printed** 7:21,24 8:2 8:8,15,15
**printer** 60:12
**Prior** 66:22
**privilege** 34:13,14 34:24 35:7,8,10 37:15,18
**probably** 71:5 80:13 94:13,22
**problem** 37:23 80:22
**proceedings** 51:12 91:13 97:24
**process** 43:9 50:15 91:18 92:10 95:17 95:18
**processing** 86:20 86:23
**processors** 83:25
**procured** 4:17
**products** 84:11
**profile** 92:21
**program** 28:12 46:13,14
**prohibited** 89:13
**promise** 17:19 18:2
**promised** 17:5
**promote** 39:25
**promoting** 40:5
**proper** 41:9 77:15
**properly** 65:5
**properties** 53:19 53:24
**proposed** 44:14
**protection** 12:17
**protective** 61:20
**proud** 76:24 77:19 77:19
**prove** 79:16 84:8
**provide** 53:23 89:14 90:3 92:6
**provided** 3:13 5:18 14:23 40:23 52:10 87:16,21 92:2
**provider** 54:13 89:14,21,21
**providers** 88:5 89:16
**providing** 39:25 40:2 54:19 77:13
**Prudential** 68:25
**public** 40:13 95:22
**publicity** 85:14
**pull** 95:2
**purchasing** 40:4 69:15 70:14
**purpose** 39:24
**purposes** 84:8 96:1
**Pursuant** 43:13 51:15
**pursued** 72:6
**put** 26:3,5 42:8 58:25 80:24 81:25 82:19 89:5 90:20 91:17 95:7
**P-r-e-s-t-o-n** 64:21
**p.m** 1:8 20:3,4 32:20,20,23,23 59:20 97:7

**Q**

**question** 3:7 14:17 35:16 36:10 47:24 61:9 96:8
**questions** 4:10 34:8 36:20
**quick** 79:7
**quickly** 25:3
**quite** 70:21 72:9,13 74:21
**quote** 89:12
**quoted** 27:15,20,24
**quoting** 27:21

**R**

**R** 97:22
**radio** 73:2
**raise** 66:10
**rampant** 80:3
**rate** 3:10,20 59:22 59:22 77:1
**rating** 29:13,16,19 40:23,25 41:16,17 41:20,22,24 42:10 42:13,14 43:2 56:1,2
**read** 7:14,16 10:21 10:24,25 11:4 14:18,23 15:6,9 17:12 18:13,15 21:17,19,20 25:19 32:2,14,16,19 38:16,22 39:13 43:18 46:5,15 47:18 51:19 54:1 55:19 58:24 59:5
**reads** 46:6
**ready** 2:8 50:8 59:17 66:1 81:2 94:1
**real** 9:18 68:6 71:13 81:6
**realize** 78:16
**really** 10:6 12:12 70:3,9 75:9,17 85:22 88:15
**reason** 33:3 36:24 95:10
**reasonable** 31:11
**reasonably** 87:23
**recall** 6:4 8:6 28:4 28:7 32:9 34:10 36:10 37:24 46:20 46:24 52:13 53:8
**receive** 52:18
**received** 3:9 4:14 4:16,22,25 23:12 24:20 41:4,22 43:10 44:15,17 46:22 52:21 57:14 61:1 70:2 88:9
**receiver** 53:14 93:2 93:15 94:7,8
**receivership** 53:20 53:25 92:20,21,22 92:23 93:2
**receiver's** 92:23 94:9
**receives** 23:4
**receiving** 5:19
**recess** 20:2 97:1,3
**Recessed** 20:3 97:7
**Reck** 4:20,21 5:3
**Recks** 4:21
**recognize** 6:15 7:2 71:3
**recognized** 5:5 71:15 77:7 83:20 84:24 87:12 94:4
**recompensated** 78:1
**record** 27:20,24 31:15 47:22,23 66:15 95:23 97:24
**recordings** 19:13
**recordkeeping** 43:9
**records** 22:14 31:13
**Recross** 54:3
**RECROSS-EXA...** 54:5 97:14
**Redirect** 34:4,5 97:13
**reduce** 17:7
**reduced** 3:20 6:19 49:7 59:22
**reduction** 3:10
**refer** 25:12
**reference** 9:23 10:5 37:21

**referenced** 82:1,2,3
**referencing** 17:9
**referred** 3:12 15:13 36:12 47:24
**referring** 59:4,5
**reflect** 12:3,22 13:3 14:3,5
**reflects** 56:22
**Refrain** 34:25
**refresh** 15:11
**refund** 5:13 82:22
**refunded** 7:8 36:22
**refunds** 36:25
**regard** 4:14
**regarding** 3:18 9:2 28:21 40:13 41:25 81:13 83:20
**regardless** 79:4
**regards** 8:4 58:24
**region** 55:19
**regions** 55:16 56:6
**regrets** 77:16
**regularly** 43:11
**regulate** 88:20 91:5
**regulated** 82:9 88:21
**regulators** 79:14
**Relar** 30:14
**related** 37:5,15 40:4 69:9 70:9 83:23
**relationship** 12:9 12:10 19:2 70:19 70:21 73:16 74:1 81:22
**Relevance** 90:24
**relevant** 40:18 83:8
**Reliability** 41:24 42:1
**relief** 17:11,12 46:8
**rely** 48:25
**relying** 14:22
**Remain** 66:10
**remaining** 92:6
**remains** 87:16
**remember** 36:14 38:3,4 43:24 45:16,23 46:3 47:3,5,8,10,11 76:16 77:1 80:3 94:8
**reminder** 14:4
**remodify** 49:7
**rendering** 87:17
**renders** 87:21
**Rene** 92:24
**renegotiate** 51:5
**rent** 75:7 77:9 78:7
**repackaging** 69:15
**repeat** 53:21
**repeated** 50:21
**repeatedly** 50:2 51:8 59:12
**rephrase** 3:7 9:1
**report** 41:18,24 42:1
**Reported** 1:23
**reporter** 1:23 22:21,25 66:15
**reporting** 40:6
**reports** 40:2,13,14
**represent** 9:3 13:6 67:23 68:4 69:2,6 72:6
**representation** 17:8 18:10 87:24
**representations** 14:22 16:25 52:15 56:9
**representative** 41:21 42:7,12,18 42:22 49:10,14,18 50:21,24
**representatives** 50:1,7 59:11,16
**represented** 17:2 21:22 26:4 58:6 72:17 76:23 80:16 93:1
**representing** 29:22 68:13 72:18 92:25
**requested** 41:15
**require** 88:6
**required** 54:12
**rescission** 82:21
**research** 65:21 86:13,14 87:10 89:19
**researched** 81:20
**reserves** 79:14
**reside** 48:20
**resolution** 40:3
**responded** 50:9 59:18
**response** 50:22 51:1 52:11
**responses** 32:2
**responsibility** 23:19 75:15
**responsible** 87:17
**rest** 61:18 65:25
**Restraining** 37:6 38:10 52:11 53:18 53:22 54:1,15
**restructure** 80:9 82:6
**restructuring** 80:15 81:24 83:18 83:24 84:3
**rests** 65:24
**results** 4:11 74:5
**Resumed** 20:4
**retail** 71:7 72:4
**retained** 43:10
**retake** 2:3 20:6
**retract** 32:24 33:7
**retraction** 41:9
**retractions** 32:9,13 32:17,22 33:4
**return** 22:10 97:1
**returned** 13:10 95:15
**revenues** 56:11
**review** 41:16 42:6 84:1
**reviewed** 18:21 37:5
**revocation** 42:15
**revoked** 42:20
**rework** 78:15,17,21 79:10 80:22
**reworked** 80:19
**rid** 81:6
**ridiculous** 94:13
**right** 2:2,4 4:22 9:13 19:23 20:6,8 25:18 27:6,7 29:1 29:3 35:20 48:15 58:5 59:3 60:2,5 60:18 61:13 62:4 63:19 64:11 65:3 65:23 66:3,5,10 66:18 67:12,23 68:14 69:5 81:7,9 82:21,21 83:2 87:25 88:20 93:11 93:12 96:1,16,25
**right-hand** 10:15 10:20
**ringing** 93:24
**RMR** 1:23
**Robert** 67:18
**Robinette** 8:18,19 8:21 9:3,3,17,25 10:5 11:7,13,22 11:24 12:2,20 13:19 45:13,17,20
**Robinette's** 13:14 45:13
**Rocky** 4:20
**rolls** 54:10
**Romanishin** 1:23 97:25
**room** 23:4 25:2 53:9,15 54:7 73:18
**Rosenfeldt** 92:24
**Rothstein** 92:24
**Royal** 68:4
**Rule** 88:5

**S**

**s** 97:25
**Sachs** 76:5
**sake** 44:13
**sales** 5:18 9:9 19:13 27:18 28:15,17,19 28:22 33:5,6 37:9 37:9 47:23 57:4 71:17,18 83:3,4 83:14,14 91:21,22 92:10,11,12 93:5 93:10,13,14
**SalesForce.com** 37:3,5
**salesperson** 19:8 19:11
**samples** 86:25
**San** 68:3
**sat** 17:1
**satisfied** 44:16,23
**Sauve** 64:24
**save** 49:11 77:14 93:13
**saved** 3:21
**saving** 47:5
**savings** 3:12
**saw** 33:6 49:5 71:8 94:2,4
**saying** 8:17 54:18 61:2 79:1 80:20
**says** 9:19 10:6,15 10:20,23 12:7 13:17,18 15:8 16:3 18:24 24:3 25:24,24 29:13 32:20 33:10,12 36:18 59:9 82:9 87:4 88:1
**schedule** 31:4,21
**school** 60:11 66:23 66:25 67:1,2
**Schultz** 65:1,2
**scripts** 45:22
**Sean** 68:24 76:17 86:3
**search** 56:5
**searching** 46:10
**seated** 20:5 66:13
**second** 8:2,7 25:24 33:18 74:13 80:21 80:22
**securities** 67:25 69:1,9
**securitizations** 69:10,10
**securitize** 71:17
**see** 4:5,22 5:15 9:17 9:17 10:3,13,18 13:14 14:7,9 17:10,23 20:1 21:9,12 24:5 25:25 29:15 30:6 31:12 39:7 43:22 47:8,10 56:5 57:4

60:25,25 75:18 80:2 87:10
**seeing** 75:18
**seek** 65:17
**seen** 44:19,22
**self-regulation** 40:11
**selling** 40:6 69:16
**seminal** 88:8
**send** 33:5 42:21 73:5 76:18 86:25
**sending** 73:13 86:1
**sense** 82:5 85:10,11 85:13 87:2
**sensed** 94:6
**sent** 21:1 30:12,18 30:21 40:22 42:15 49:22 59:20 92:1
**separate** 9:6 19:6 21:1 58:7 85:6
**September** 9:10 11:8 59:19
**serve** 95:19,22
**served** 39:6,6
**server** 95:17,19
**service** 31:5,9,17 54:13 81:23 86:2 88:4
**serviced** 91:25,25
**services** 3:13 33:25 40:1,3 46:8,8,12 49:10,15 77:14 87:16,17,21,22 89:13,18,21,22 92:2,6
**servicing** 33:23,24
**Session** 1:11,17
**set** 94:24 95:1
**settled** 93:2
**seven** 24:2
**SF** 28:8,17
**sheet** 9:16 13:17,21 13:23 14:7,9 27:9 27:9,11,12,13,16 27:18,23 29:10 30:1,4,12
**sheets** 8:23 11:9 13:8 29:21 45:13
**Sheronda** 59:20
**shocked** 72:23 94:3
**show** 30:21 38:1 39:3 47:16 91:15 94:23
**showed** 76:18 77:18 93:16,20
**showing** 94:21
**shows** 30:18,23 33:14
**shut** 75:18 91:22
**side** 10:16,20,21 13:25 25:17,18 95:2
**sign** 21:14 76:10 84:7
**signed** 18:14 19:7 51:13
**significant** 69:20 75:8
**significantly** 48:23
**signing** 69:5
**silence** 93:25
**simply** 27:3 54:8
**Sinasohn** 3:23 5:8 5:22 6:9,21 7:9 8:10 9:11 17:13 20:16 34:6 35:1,2 35:21 38:5,8,21 38:24 39:5,12 47:12,15,21 48:1 48:9 54:2,14 61:17,21 62:6,10 62:16,18,20,23 63:1,3,8,11,15,20 63:23 64:1,4,6,8 64:12,18,20 65:4 65:8,14,25 83:5 84:19 90:24 96:8 96:15,21,23 97:13
**Singerman** 92:23
**single** 22:18 23:5 85:3,4
**sir** 2:4,5,8,9,10,17 3:8,15,24 4:2 5:2 5:11,15,25 6:4,5 6:17 7:7,18 8:1,5 8:12,15,18 9:17 9:21,25 10:13,18 10:19,24 11:17 12:1,13,19,20 13:1 14:1,8,9,10 14:15,20,25 15:5 15:15 16:2,7,15 16:21 17:4,9,24 18:3,7,12,15 19:9 19:12,22 20:15,19 20:22,23,25 21:4 21:9,10,12,12,13 21:16,17,20,24 22:1,4,7,11,12,16 22:19 23:1,7,13 23:18,20,21,23,24 23:25 24:3,5,6,10 24:14,17,22 25:1 25:3,10,11,23 26:2,8,10,13,15 26:17,22,25 27:7 27:10,22 28:11,16 29:2,9,12,17,24 30:7,13,15 31:3,6 31:14,19,23 32:1 32:6 33:8,13,20 34:1 35:17 39:2 48:5 54:4,21 55:5 57:25 58:2,9,19 59:19 61:8,9 62:2 64:6 66:2,9 67:18 95:11 96:4,4
**sit** 7:13
**site** 35:5 37:20 41:8 46:9,12,12,13 73:4
**sites** 88:9
**sitting** 77:17 80:4
**situation** 50:3 59:13
**six** 2:11 3:20 5:19 5:19 24:2 49:24 50:10,17 51:4,8 51:13 59:1,7,9 67:13 96:13
**skill** 87:22
**slow** 22:20,24
**slowly** 38:16 39:13 47:18
**smiling** 75:22,22
**software** 28:12 83:2,22,23
**sold** 76:13
**solitary** 22:18
**sorry** 9:1 25:10 28:4 30:1 31:15 34:19 51:24 58:21 58:21 60:11 62:6
**sought** 41:13 72:16
**South** 67:22 69:4 78:20 92:22
**Southeast** 38:14,18 39:21 43:8,16 55:19,21
**SOUTHERN** 1:1
**space** 73:23 74:8
**speak** 61:3 66:13 81:8 94:7,25
**special** 80:17,18 81:5 88:6
**specific** 37:20 83:20
**specifically** 82:23 95:20
**specified** 18:8
**spell** 62:25 63:10 64:17 66:15
**spelled** 63:21 64:10 64:13,21,23 65:1
**spent** 85:9
**spiral** 28:3
**spoke** 7:2 42:18 49:10,25 51:8 57:23 59:10 70:9 70:12 72:12 84:6 86:2,5 94:8
**spoken** 4:7
**spread** 76:9
**spring** 48:22
**staff** 88:3
**stand** 2:3 20:7 66:8 93:24 95:20
**standard** 19:1 22:5
**standards** 40:9
**standing** 66:10
**stands** 28:17 91:5,6
**start** 56:1 73:22
**started** 71:11 73:17 73:17 74:19 76:20 76:22 77:5,20 78:12,14 80:23
**starting** 4:4
**starts** 45:12
**state** 5:24 13:10 22:8 36:9,12 50:4 59:14 66:14,19,20 67:8,24 68:5,11 68:15 83:16 84:24 85:3,4,4,5 89:17
**stated** 18:16 22:8 35:17 49:11 50:24 88:24
**statement** 52:18
**statements** 32:8 41:7 51:10 52:10 52:21,24 53:1 83:25
**states** 1:1 31:23 36:16 55:16,20 88:17,22 89:6 90:1 91:10
**status** 49:25 50:12 59:10
**statute** 82:9,23 92:5
**statutory** 82:17
**stay** 70:20
**stayed** 69:7
**Stearns** 76:5
**step** 61:14
**stickers** 95:8
**sticking** 73:23
**stock** 68:3 78:19
**stood** 24:18 28:8,9
**stop** 15:19 20:20
**stormed** 55:3
**straight** 85:12
**straightforward** 93:6
**strange** 70:23 78:13
**strategizing** 65:22
**Stratton** 2:25 26:6 26:18,19 28:8,9
**street** 69:12 71:11 72:21 79:24
**structuring** 70:7
**stuff** 35:13
**stupid** 72:10
**Suave** 21:17

**subject** 35:7
**submitted** 6:2 13:9
**subordinate** 88:3
**Subprime** 84:12
**substantially** 17:7 17:22
**success** 73:12 78:24 78:25
**sued** 77:17 90:19 90:22
**suggestion** 45:25
**suite** 39:22 58:8,14
**summary** 40:15
**Sunrise** 94:12
**supervision** 90:5
**supplement** 2:12 4:2
**supplemental** 9:21 23:23 45:5
**supplying** 40:4
**support** 30:16 87:16 88:13
**supporting** 61:4,6
**Supreme** 90:11 91:6,8
**sure** 3:16 10:14 11:23 14:11 18:4 18:5 21:4 27:4 28:10 32:6 56:2 57:18 58:9 75:2
**surprised** 50:16
**survive** 79:13
**suspicious** 50:11
**swear** 66:7
**SWORN** 66:12 97:15
**system** 39:6 56:2 83:3
**S-a-u-v-e** 64:24
**S-c-h-u-l-t-z** 65:2

**T**

**T** 78:9 91:14 97:22 97:22
**tab** 95:13
**tabbed** 95:2,3
**take** 18:23 19:5,24 25:7 36:5 49:19 49:23 55:8 66:8 69:5 72:15 73:18 82:7 83:4 85:5,24 86:20,25 94:18 96:24
**taken** 50:18 75:3 78:20 96:9
**talented** 86:6
**talk** 7:18 8:18 9:7 14:10 15:1 53:16 61:3 77:20 86:14 92:10
**talked** 36:21 37:2 52:10 77:10 83:3 86:17
**talking** 37:25 47:5 53:9 76:19 82:14 85:25,25 88:14
**talks** 44:22
**taped** 51:25 52:1
**task** 91:11
**tasks** 32:21 88:3,4 88:6 92:4
**team** 88:3
**technically** 80:13
**telephone** 16:19 22:10
**telephoning** 15:3
**televising** 95:16
**television** 16:4 72:23
**tell** 12:8 18:7 21:6 22:17 27:12 28:4 35:3 38:12 52:18 58:9 60:1 78:25 79:9 81:2
**telling** 14:14 44:10
**Temporary** 37:6 38:10 52:11 53:18 53:22 54:1,15
**ten** 31:22 49:25 59:11 96:24
**tends** 32:25
**tens** 73:13
**term** 80:12 82:3,8
**terms** 19:4 49:8 56:9,16 68:23
**territories** 72:16
**Terry** 3:8 16:3 47:1 48:10,16 51:17 52:8
**testified** 6:15 8:19 11:2 24:7 28:7 54:16 56:24 58:3
**testify** 39:18 48:19 66:7 81:2 93:19
**testifying** 6:4 16:11 96:3
**testimony** 8:20,25 9:2 30:17 32:9,16 37:4 57:2 59:5 91:22
**text** 94:5
**Thank** 2:5 10:1 20:10 34:2 58:20 61:11,13 64:19 65:8,14 86:16 96:20
**Thanks** 52:8
**thereabouts** 67:10
**thing** 23:13 75:1,17 77:4 83:2 87:11 91:24
**things** 16:24 19:18 53:4 68:11
**think** 14:16 16:13 28:17,19,21 35:18 37:25 44:3 47:23 47:24 52:20 60:10 61:24 62:3 73:12 75:16 76:25 81:8 83:9 92:21
**third** 23:3 26:3
**thoroughness** 87:23
**thought** 20:17 32:12 34:19 50:18 71:22 72:9,10 74:20 77:14 81:15 81:15
**thousands** 31:7,8 73:14 81:18,19
**thousandths** 72:2
**threat** 93:7
**three** 5:4 19:1 24:2 27:2 68:19 71:20 71:25 77:2 81:10
**threw** 91:4
**tight** 49:1
**till** 10:23 11:5
**time** 8:22 9:5 13:25 16:23 18:9 25:7 26:20 35:19 55:10 65:19,23 67:8 68:25 69:10,24 70:6,11,22 72:8 72:15 74:8 76:16 77:1 78:8 79:12
**times** 49:18 54:23 59:10
**Tobacco** 67:24
**today** 4:3 7:13 16:10 36:6 69:13 77:17
**told** 3:5 17:5 19:6,8 19:11 21:21 24:19 26:6 34:12 42:13 42:22 44:3 46:13 50:2,7 51:22 53:16 54:14 59:12 59:16 72:14 80:8 88:11 95:18,20
**tomorrow** 65:20,20 97:2
**top** 3:4 10:7 18:25 19:7 78:6 91:15
**topic** 85:21,23
**topics** 40:4
**total** 2:10,14 3:12
**touched** 58:3
**touching** 73:16 74:1
**tower** 74:12
**town** 55:7,8
**track** 22:17 84:23
**Tracking** 27:9
**Trade** 1:3 88:19
**trading** 71:2,3
**traffic** 94:12
**transactionally** 71:9
**transactions** 70:4,8
**Transcontinental** 9:5 12:7,8,24,25 13:4,7,8
**transcribed** 60:4
**transcript** 1:12 97:23
**Transfer** 27:9
**Traurig** 68:8
**treated** 51:3
**Tree** 72:7,9,15,18 72:21,24,25 81:19
**trend** 85:20
**trial** 67:16 93:12
**trials** 67:14,15,20 74:5
**tried** 50:21 75:1
**trucks** 95:16
**true** 3:8,15,17,22 8:8 15:4,5 17:25 19:7,9 21:3,8 29:18,21 33:3 36:18,25 37:1 43:14 51:16 56:10 56:13 75:1
**Trust** 67:24
**truth** 14:14
**truthful** 24:23 40:5
**try** 11:24 30:10,14 78:15 82:7
**trying** 5:5 8:21 69:5 70:5,7
**tune** 72:21 79:25
**turn** 12:20 13:23 24:1 25:8 27:8 29:25
**turned** 9:9
**TV** 49:5 73:2
**twice** 74:20
**two** 4:22,25 7:25 19:1,25 24:2 26:5 29:19,23 32:5 50:1 53:4 59:11 61:18 67:17 68:20 75:20,21 81:10 93:21 95:16
**typed** 60:2,18,22
**types** 44:5
**typewriter** 60:8,10
**typical** 46:13,14
**typically** 17:19 18:9
**T-e-r-r-y** 48:11

**U**

**ultimately** 87:17

**unable** 48:24 51:11
**unanswered** 23:5
**unbelievable** 72:22 76:22 79:19 80:2 94:5
**undergraduate** 66:22,24
**understand** 14:21 37:4,22 86:7
**understood** 42:19
**undertaken** 69:14
**undertook** 86:12
**underwriter** 84:5,6
**unethical** 40:7 87:20
**unfortunately** 68:6
**unfortunatelyly** 74:23
**unintelligible** 32:25
**unique** 71:4 72:11
**United** 1:1 55:16 55:20 78:19 79:1 79:12 81:17 88:17 89:6 90:1
**Universal** 1:6 2:18 2:21 3:13,19 4:12 4:18 5:3 6:3,8 7:8 8:22 9:4,9 11:8 12:9,10,11 13:9 14:5 15:13,18,24 15:25 16:4,5,17 18:1,14 21:14 22:15,17,23 23:3 24:8 26:11 28:13 29:18 30:5,11,19 30:21 31:2 32:2 33:15,16 35:5 36:23 40:20,20,22 40:23 41:1,10,14 41:15,21,25 42:12 42:13,16,23,24 43:5 46:23 49:5 52:19 54:8,19,24 55:11 56:5,13,20 57:16,20 58:15 59:2,20 61:1 68:10,24 73:11 76:14 78:12,14,21 79:18,24 80:11,24 81:14 82:20 83:13 83:22 84:13,15,15 84:18,22,22 85:8 85:14,17 88:1 90:8 91:13,20,23 91:23 92:2,4,5,7 93:10,16
**Universal's** 40:25 41:5,5,6,17,20 42:4,20 43:1,4 56:11 57:12 58:4
**University** 66:23 66:24,25 67:1
**unleashed** 72:22
**unlicensed** 89:23 90:13 91:2
**unlimited** 77:13
**unusual** 69:11 74:2 74:10 95:18
**UPS** 54:9
**upset** 51:1
**up-front** 82:10
**USC** 43:13 51:15
**use** 29:13 89:15
**utilize** 86:5,18
**utilized** 28:12
**utterly** 84:13
**U.S** 1:14

**V**

**v** 1:5
**variable** 31:21
**varied** 31:21
**vein** 88:14
**verify** 61:2
**versions** 8:2
**versus** 88:18 89:21 90:17
**vividly** 76:16
**voice** 42:17
**volume** 38:10
**volumes** 16:15,15
**voluntary** 40:10

**W**

**wait** 11:17 62:15 78:3 81:16
**waiting** 95:17
**waiving** 34:23
**walk** 58:11,12,18 76:6
**walked** 94:16 95:15
**Wall** 69:12 71:11 72:21
**walls** 74:17
**WAMU** 49:13 50:3 50:4,8,12,17,20 50:21 51:4,11,11 51:23 52:2 59:13 59:14,17
**WAMU's** 50:23
**want** 2:2 10:10 16:23 20:6 25:3 32:14 34:15,19 35:12 66:6 76:6,7 76:7 79:5 86:13 86:14 93:12
**wanted** 34:19 42:9 42:11 65:4
**Washington** 49:12 50:4 59:21
**wasn't** 11:14,15,16 11:17 87:1
**waste** 16:23
**way** 22:2 26:8,9 28:24 32:10 70:8 71:25 73:21,24 76:23 82:9 83:8 88:7 93:14 94:9 94:22
**ways** 71:18
**Web** 41:8 46:9,11 46:12,13 73:4 88:9
**Wednesday** 97:7
**week** 26:23 80:4,5 85:24
**weeks** 19:2
**welcome** 34:3 61:12
**Wells-Fargo** 80:21
**went** 4:3 11:18 18:18 28:2,4 30:9 30:11 55:5 58:14 66:22,25 67:6 74:16 76:23 80:3 86:12 87:25
**weren't** 81:2
**West** 39:23 78:19
**we'll** 78:23 79:5,7 96:25,25
**we're** 32:21 65:20 73:24,25 79:10 80:8,13 81:16,16 83:6 89:4
**we've** 4:7 38:9 39:6 52:21 83:3,9 92:9
**whatsoever** 17:16 50:14 81:13
**White** 38:13,17 39:15,16 43:16 65:10
**White's** 65:10
**Whitner** 67:4
**Wilensky** 67:4,6
**William** 1:13,23 38:13 39:15,16 43:16 97:25
**win** 73:3
**withdraw** 41:7
**witness** 2:3 3:25 5:9,25 6:11,24 7:11 8:12 9:12,14 17:13 20:7 34:3 34:22,25 35:18 38:5 39:18 47:13 48:12,16,18 61:12 61:15,16 66:3,8 66:12,16,19 83:12 84:21 86:16 89:11 91:1 94:21,24 95:9,11,13,25 96:4,12,18,20 97:15
**witnesses** 61:18 97:10
**wondering** 75:22
**Wood** 7:1,8
**word** 28:15 78:8,9
**wordings** 25:18
**words** 25:14
**work** 3:18 23:15 26:12,21 27:2 33:5 48:22,24 49:12 52:2 56:14 58:10 59:8 69:1 72:13 75:6 76:1 79:4 80:8 84:17 86:9,11 88:2 92:8 92:15
**worked** 45:17,20 45:21 80:11 83:17 83:18 85:7
**working** 9:4 12:3 12:22 32:8,21 51:25 67:5 68:25 69:8 79:17 81:5 82:6,7 92:20
**workouts** 81:24
**works** 55:23
**world** 81:9
**wouldn't** 21:16 22:7,19 26:25 29:24 31:7 33:8 45:1 49:4,23 54:21 56:12,15,21 59:24 61:10 81:8
**written** 10:7 51:19
**wrong** 93:11 94:4
**wrote** 41:10
**www.FirstUnive...** 46:10

**X**

**X** 10:15 97:9

**Y**

**yeah** 35:9 44:11 45:4 60:22
**year** 3:21 42:25 67:16 71:5 72:20 88:16 92:19 93:4
**yearly** 59:22
**years** 29:19,23 48:20,24 56:3 75:20,21 77:5 78:4 81:10
**yesterday** 24:19 84:16
**yield** 76:9
**York** 68:1 78:18

**Z**

**Zausner** 53:2 68:25 69:7 70:10 71:5 71:21 72:14,18

73:6,12 81:15 85:19 86:2,3,18 87:4 88:10
**Zausner's** 74:25
**ZLOCH** 1:13

**$**

**$1,202** 6:20
**$1,212.74** 52:4
**$1,287.92** 52:3
**$1,772** 6:19
**$1.5** 56:20,22
**$100** 92:22
**$11,000** 3:11 47:6
**$111,000** 3:12
**$23** 76:19
**$25,000** 75:8
**$3,000** 79:8
**$300,000** 79:3
**$350** 49:15
**$4,600** 3:21
**$50** 42:25 56:11
**$6.5** 67:24
**$75.18** 52:5

**0**

**07-2** 89:11
**08** 85:21
**08-451** 87:14
**09** 85:22
**09-82322-Civ-ZL...** 1:3

**1**

**1st** 88:16
**1-113** 1:11
**1.1** 88:5
**1:38** 1:8
**1:58** 20:3
**10** 15:12 63:17,20
**10-10-09** 13:24
**10-13-09** 9:19 10:15
**10-27-09** 12:2,5
**10-29-09** 12:21
**10:30** 97:2,3,8
**1003** 83:19
**101** 29:6,7
**11** 21:10 45:9 51:17 51:22 63:23 91:9 97:25
**11-11-09** 13:18
**11-19-09** 30:4,8,19 30:22
**11-2-09** 13:2,5
**11-3-09** 13:12
**12** 43:5 64:8
**12:30** 32:23
**13** 15:7 41:12 43:15 64:12 68:17
**14** 17:11,19 40:22 64:15 91:17
**14-story** 74:10
**15** 18:7 32:25 42:15 58:1 64:20,25
**16** 2:10 21:17 41:3 42:17 46:4,6 60:17 61:7 64:23
**160** 94:3
**17** 65:13,15 97:19
**1746** 43:13 51:15
**18** 38:10,25 39:10 39:11,13 88:24 89:11 97:17
**19** 65:5,7 93:15
**19th** 11:18,22 55:3 58:6 95:15
**1976** 91:9
**1989** 90:11
**1991** 66:21 67:1
**1993** 67:10
**1998** 68:24

**2**

**2** 21:19 38:10 42:4 62:11,13 65:12,15 97:12,19
**2:00** 32:20,23
**2:30** 20:1
**20** 25:8 32:25
**2000s** 69:25 72:8
**2004** 56:19
**2005** 56:19
**2006** 56:19
**2008** 40:19,22 41:2 41:3 48:22 59:19 81:25 85:21 87:15 88:24 89:5,11 90:17 91:17
**2009** 1:7 5:13 9:10 41:12,15,21 42:4 42:15,17 43:3,5 43:15 51:17 84:22 93:15 97:8
**2010** 97:25
**21** 11:5 20:19 48:20
**22** 22:8
**23** 2:15,17 23:8 41:21 45:9 59:19
**24** 41:15
**25** 84:17
**268** 43:6
**28** 43:13 51:15
**29** 41:1 43:3

**3**

**3** 21:10 62:12,24 65:12,15 97:19
**3,000** 79:1,1
**3:08** 59:19
**3:35** 20:4
**30** 68:14 94:14
**30-year** 3:21
**300** 79:8
**305** 1:23
**31** 40:19
**31st** 10:23
**3300** 74:9,9
**33128** 1:24
**33407** 39:23
**34** 97:13
**37** 65:7
**39** 97:17

**4**

**4** 15:13,18,24 16:3 16:17 39:22 47:17 47:21,25 48:3,4,6 48:7 58:25 97:18
**4-22-09** 5:2
**40** 68:14
**400** 1:24
**4411** 39:22
**45** 94:14
**47941** 91:10
**48** 97:18
**480** 42:25 56:14

**5**

**5** 15:7,17,23 16:17 21:6 63:3 65:13 65:15 97:19
**5:00** 32:20
**5:26** 97:7
**50** 67:15,20 76:7 94:5
**523-5558** 1:23
**54** 97:14

**6**

**6** 16:16 63:5 95:5 95:13 96:5
**6a** 95:14 96:18,19 97:5,6,20
**6e** 97:6,20
**600-broker** 68:3
**65** 97:19
**66** 97:15

**7**

**7** 63:8
**7,000** 44:8,12,16,20 45:1
**7,254** 37:25 43:25 44:15
**70,000** 44:25
**700,000** 42:24 43:22 44:7,25 56:16

**8**

**8** 1:7 21:18 63:12
**88-6** 90:3
**89-5** 90:3

**9**

**9** 21:18 63:15 97:7
**90** 45:2
**90s** 69:25
**95** 21:13 94:11
**97** 97:20
**99** 44:9