UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE

CASE NO. 09-82322-CIV

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

FORT LAUDERDALE, FLORIDA
DECEMBER 9, 2009

FIRST UNIVERSAL LENDING, LLC,
SEAN ZAUSNER, DAVID ZAUSNER,
AND DAVID J. FEINGOLD,

Defendants.
________________________________/

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE WILLIAM J. ZLOCH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

FEDERAL TRADE COMMISSION
BY: GIDEON E. SINASOHN, ESQ.
HAROLD E. KIRTZ, ESQ.
225 Peachtree Street, Northeast
Atlanta, Georgia 30303

FOR THE DEFENDANTS, AND PRO SE:

FEINGOLD & KAM
BY: DAVID FEINGOLD, ESQ.
5100 PGA Boulevard, 2nd Floor
Palm Beach Gardens, Florida 33418

**FOR THE RECEIVER:**

TAMA BETH KUDMAN, ESQ.
4440 PGA Boulevard, Suite 600
Palm Beach Gardens, Florida 33410

REPORTED BY: NANCY SIEGEL, RMR
Official Reporting Services, LLC
524 South Andrews Avenue, Suite 302N

**ALSO PRESENT:**

Sean Zausner
David Zausner
Michael Liggins, FTC Investigator

I N D E X

**WITNESS:** DAVID FEINGOLD

| EXAMINATION | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MR. SINASOHN | -- | 3 | -- | -- |

P R O C E E D I N G S

- - -

**THE COURT:** Please be seated. We will go straight through until 5:30 and we will break for the day. Mr. Feingold, if you will retake the witness stand, the FTC may continue with its cross-examination.

**MR. SINASOHN:** Thank you, Your Honor.

DAVID FEINGOLD,

was recalled as a witness, having been previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION (Continued.)

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, before the break, I just want to make sure I have your testimony clear for the record, did you testify that Oscar Gonzalez owned the company located in Pompano Beach?

**A.** I don't know what the legal address for his corporation is. I know that his corporation owns the branch. I don't know what the Secretary of State filings say in terms of where he has his registered agent, address, all of those things for that particular office.

**Q.** You are his attorney, right?

**A.** Oscar Gonzalez?

**Q.** Yes.

**A.** He may have used my law firm to incorporate for him, I do not know.

**Q.** But you are not his attorney?

**A.** Am I his personal attorney?

**Q.** Yes.

**A.** I am not his personal attorney.

**Q.** Are you his corporation's attorney?

**A.** If my firm is the registered agent, I don't know, because we are a registered agent for literally hundreds of companies.

**Q.** It's a simple question. Are you or are you not the attorney for the corporation that owned the company in Pompano Beach?

**A.** I don't know if we are the registered agent for them.

**Q.** I didn't ask that question. Mr. Feingold, answer my question, are you the attorney for the corporation that owns the Pompano Beach site?

**A.** What is the name of the corporation, sir?

**Q.** Well, that is coming, too. Do you not know the name of the corporation that owns it?

**A.** I think I testified before in my testimony before the break I do not recall the name of that corporation, would you kindly tell me the name of it?

**Q.** According to the Secretary of State records, the name of the entity that owns -- that is the managing member of First Universal Group, LLC, which is the corporation there in Pompano Beach, is Group Partners, you know who are the partners of Group

Partners, don't you?

**A.** No, that is not correct.

**Q.** You do not know -- Sean and David Zausner are not the partners in Group Partners?

**A.** They are the partners of an entity known as Lending Partners, sir.

**Q.** So who are the partners in Group Partners?

**A.** It is not Sean Zausner or David Zausner.

**Q.** Who is it?

**A.** I have no idea, sir, but I am positive it is not Sean Zausner and David Zausner because I have been doing their legal work for years and I know every entity that they own, and they definitively are not Group Partners.

**Q.** So now that you know the name of the corporation or the partnership, are you the attorney for that partnership?

**A.** I am not the attorney for Group Partners.

**Q.** So you are not the attorney for that partnership. In what capacity did you tell them to shut down that business?

**A.** As we stated before the break, sir, I went to my conference room with my clients, I advised Mr. Zausner to shut down sales, exactly how he followed through and did that I do not know because I then went into my smaller conference room located inside of my office and sat down and had a meeting with you and the receiver and Ms. Kudman. I did not witness his conversation with that branch.

**Q.** Is it your testimony that you have no relationship with First Universal Lending or First Universal Holdings other than as the outside counsel?

**A.** I have testified at length about my relationship. I am outside legal counsel, they also owe me money in which as a course of them owing me money I have a signature on a bank account, I have taken stock as collateral to secure monies owed to me, I am not -- I mean I am sitting here now, that is my relationship.

**Q.** So they owe you money is what you are saying?

**A.** I went through it yesterday, sir, in the opening, I went through it this morning, they utilized the offices, did not pay the rent, I covered the rent and insurance for approximately two years, I think I even testified it was about 25,000 a month, if I recall correctly.

**Q.** How much money do they owe you?

**A.** Somewhere around -- well, it was in total close to $600,000.

**Q.** What do they owe you right now?

**A.** Just about half of that, and if you will notice in the financial records you will see two checks made to Feingold & Kam, the second check, which is drawn weekly to the firm, is reimbursement for that loan, the other check is for the attorney's fees that I already discussed.

**Q.** So you loaned them money, is that what you are saying?

**A.** Sir, I went through this before, I paid the rent and I paid the insurance. The rent was 25,000 a month, the insurance at the time was somewhere, it varied, but somewhere on the average of 8,000 or $9,000 a month at that point in time, and when I say I, my law firm paid that every single month when they could not pay their bills, as I testified before, I, my law firm, was on the hook for that lease.

**Q.** So what was the total amount of the loan that you made to them?

**A.** The total amount of the expenses that I paid --

**Q.** Is that the loan? I want to be clear about my question.

**A.** Yes, sir, and it is technically not a loan, it is technically that I paid their expenses and they are paying me back, it is not like it was a loan with doc stamps and intangible stamps that I filed with the State of Florida.

**Q.** So there is no documents to support any kind of money that they owe you at this time?

**A.** Oh, that is not what I said, there are absolutely documents, there are county records that clearly reflect on their books and mine that this money was paid and it is being paid back, and if you look at their accounting records you will see every week there were two checks drawn to Feingold & Kam.

**Q.** For how much?

**A.** Every week it varied, the one check was $4500 a week,

which was a reimbursement for the expenses, the other check was a breakdown based on the attorney's fees, I made six attorneys available, unlimited amounts, and, as I said before, our fees were fixed fee capped, equating to what Mr. Zausner took from the business dating back to the days when Mr. Zausner and the firm could not pay the straight hourly fee, I already testified to that.

**Q.** The loan that we are discussing, that is in addition to any money you take for your legal services, is that correct?

**A.** Well, absolutely, sir, they are paying back the expenses that I forwarded for them for two years, and I have six lawyers that are on call around the clock that are handling all their legal matters, absolutely.

**Q.** What does First Universal Lending pay you for legal services per month?

**A.** Per month?

**Q.** Yes.

**A.** It varies on what Mr. Zausner takes, sir, as I testified before.

**Q.** What did you earn from First Universal Lending for legal services in October of 2009?

**A.** I know what cumulatively through the year approximately I have been compensated, when I say I, there has never been I, myself, on payroll, it is always paid to the law firm of Feingold & Kam.

**Q.** How much?
**A.** The total payments were approximately $1,800,000 including the attorney fee and the payment back for the rent insurances which were paid.
**Q.** That is 2009, right, 1.8 million including the loan?
**A.** Yes, sir.
**Q.** Can you divide up the loan and can you separate the loan amount that you took from the money that you took for legal services?
**A.** Yes, my estimate, it was probably $1,500,000 for legal fees and approximately $300,000 for the repayment of the rents and insurances.
**Q.** And in 2008 did they still owe you money, were they repaying your loan as well?
**A.** I believe that the repayments may have started at some point in the end of 2008.
**Q.** And how much did they pay you back for the money that you had loaned them in 2008?
**A.** It wasn't loaned in 2008, you recognize that, it was from the prior two years of paying rent and insurance, but it was significantly less than in 2009.
**Q.** Can you give us an estimate?
**A.** I sincerely cannot.
**Q.** How much money did you receive in legal services from First Universal Lending in 2008?

**A.** Sir, I did not receive any legal services from First Universal Lending, I am their lawyer, I provided legal services to them.

**Q.** How much money did you receive for legal services rendered from First Universal Lending in 2008, Mr. Feingold?

**A.** I would estimate, and this is an absolute estimate, of somewhere around maybe $400,000.

**Q.** And your legal services included advising them as to the business model they should be using to comply with different laws and states and federal agencies, is that correct?

**A.** My legal services encompassed, let's see, my firm has handled approximately six overtime class action lawsuits, approximately five state investigations, five consumer lawsuits, 29 employment claims, research every week regarding terminations, Family Medical Leave Act, banking obligations, old lender portfolio issues and threatened suits, two separate due diligence -- excuse me, two separate due diligences where the company was involved in hard-core negotiations for its sale, once with a division of Goldman Sachs and once with a New York hedge fund, that is on top of the unlimited access to all of the lawyers, doing corp. docks, reorganization work, doing vendor renegotiations, dealing with everything from negotiating dated deals, lender contracts, branch agreements, two State Circuit Court lawsuits regarding closed branches, that's just an inkling of the amount of work that we provided for that client.

**Q.** I want you to focus on my question, okay?

**A.** I am answering your question.

**Q.** No, you did not. My question is, did you take money, as part of the money that you took from the Zausners, were you to advise them as to a legal business model for their company to run so that it would be in compliance with state and federal law?

**A.** My law firm was compensated to provide them opinions with regards to proper operation and structuring in conformance with state and federal law.

**Q.** Now, are you -- I would like to --

**MR. SINASOHN:** Your Honor, if I can approach the witness and show him attachment J from exhibit 19.

**BY MR. SINASOHN:**

**Q.** This is the business corporate resolution I believe it is?

**A.** Yes, sir.

**Q.** We are looking at the page and it says David J. Feingold and across from that it says President or right next to it and then there is a signature, is that your signature?

**A.** Let's clarify, not right next to it, there is spaces, where it was typed in it says President, and in between there, yes, sir, is my signature, as well as my signature at the bottom where I wrote legal counsel.

**Q.** Now, is there any difference in the font between where

it says David J. Feingold and Board President, is there a different font there?

**A.** I should think -- I think it is the same, because I think you will find that this was a signature block for a signature card, me signing it, and I think you will find if you contact the bank that they filled that in and typed that in, I am virtually certain you are going to find that.

**Q.** Sir, are you testifying to this court that as an attorney you signed your name on this column where your signature is, you testified your signature is, and there was nothing else on that line, you just signed your name?

**A.** Oh, listen, sir, this is from two years ago, I am not going to profess to you that I have the memory that is going to tell you exactly what that document says.

I will tell you that I personally have never, ever, ever, ever in my life signed a document where I have notated myself as President, and when I saw this document I went ballistic and had a new resolution, if you would like to bring that one up, please, which says David Feingold, legal counsel, so I will tell you emphatically, I have never represented myself as President of the corporation, and if you go through your own exhibits you will see approximately 60 indications of the managing member and President being Sean Zausner and there is nothing anywhere in this world that you will show me otherwise than that one signature which was corrected, and if you bring it

up I will show you.

**Q.** Other than the fact that the font, you thought that the font didn't look different, correct?

**A.** No. Well, now, listen, I am not an expert at it, but I would concede that to me actually it looks a little bit darker, but it appears to be from obviously the same printer, typewriter, whatever it is.

**Q.** How about the spacing between Mr. Zausner's name and his title or position and your name and position, that is about the same as well, right?

**A.** Well, no, because my last name is longer than Zausner, so of course it is not the same.

**Q.** So President is not directly aligned above authorized signor?

**A.** Now, that is the proper question, yes, President is directly aligned above authorized signor.

**Q.** Thank you.

**A.** Yes.

**Q.** Now, Mr. Feingold, you testified that you have weekly compliance meetings of the -- for the sales -- for the back office ladies at the 5100 PGA site, is that correct?

**A.** I testified that I attend the executive committee meeting on Tuesday afternoon, generally it is on Tuesday afternoons, and then I do a back office compliance meeting which generally happens on Fridays.

**Q.** What is the purpose of that compliance meeting, what do you do at those compliance meetings?

**A.** I cover topics that Miranda will meet with me, Miranda Johnson will meet with me before, and she will indicate to me there may be a new issue, a lot of the girls aren't understanding the difference between what a loan modification is and what a financial restructuring is, and can you talk to us about laws in different states, I get questions all the time, what is the difference between a Deed of Trust and foreclosure notice, what is the difference between a Summons and a Complaint.

We take documents, I stand up, I generally, the truth of the matter, I generally tell jokes for about 15 minutes and then I talk for about 45 minutes about the law just so I don't put everyone to sleep.

**Q.** And do you have compliance meetings with the sales staff as well?

**A.** No. I have compliance meetings with the executive committee. The executive committee, there are specific members on that committee, none of whom you have ever spoken to who are responsible for training and overseeing, hiring and firing the salespeople, none of those people have you subpoenaed, have you spoken to, and those are the people responsible for overseeing sales.

When I go to the executive committee meeting, which

you were provided copies of the notes of every committee meeting which happens weekly, there it is raised to me as outside counsel if there is an issue that I need to handle, everything from suing somebody, to whether or not someone should be terminated, to whether or not there needs to be research done that they are asking questions about particular matters, that is where the executive committee gets their access to me, the outside attorney, to raise issues.

**Q.** Who is on the executive committee?

**A.** You have the notes, right now on the committee is Sean Zausner, David Zausner, Douglas Campion, Nicholas Andrews, Matthew Gilbert, Bill Murphy, I think that is it.

**Q.** When is the last time you met this group of people that you just discussed?

**A.** I believe we met, you stormed the offices -- excuse me, you entered the offices on a Thursday and I believe -- I believe that prior Tuesday.

**Q.** And part of what you are discussing with the executive committee is that you wanted to make sure that they are telling accurate information, truthful information to consumers when they sell things, is that correct?

**A.** No, sir, the notes are all there. I sit down in the meeting and they raise the issues, notes are taken, and every single meeting it is documented, the topics, and, in fact, Ms. Moskowitz went over them with me, I don't know if you looked at

them or not, but every single topic, I sit down there and it is their opportunity to speak to the company's lawyer and raise issues.

**Q.** So who is it at the company that is ensuring that the sales staff is making lawful representations to consumers, who is doing that?

**A.** The people on the executive committee who oversee particular salespeople.

**Q.** And they come to you and you advise them, right?

**A.** No, sir. They come to me at the executive committee meeting, at which time whatever topics they choose to discuss with me, and the entire itinerary, years worth of them, were produced to you, it is the only company, one of the few companies I represented that religiously has those meetings and brings topics to me, and if you look at them, in fact, I went over them with Ms. Moskowitz, there was a topic of terminating someone who wasn't showing up and what the risks were, I gave one of my associates to research on that, there was an issue regarding holidays and are certain legal holidays do they have to be given off to people, there was an issue with regards to state licensing, did there need to be certain state licenses, whatever they raised to me, the entire history of it, it is all there in black and white, it is all typed up.

**Q.** So there is no specific person responsible for ensuring that at First Universal Lending or First Universal

Holding the representations being made by sales personnel are lawful?

**A.** That is not what I said. There is a specific executive committee member who oversees a specific group of people.

**Q.** Who is that executive person?

**A.** There is Matthew Gilbert, who does training and oversees his people, there is Bill Murphy, who does training and oversees his people.

**Q.** Why don't you tell us who his people are so we have an understanding.

**A.** I have no idea, sir, I am outside counsel, I couldn't list the names of all of those people.

**Q.** Well, I am going to show you -- we came on the 19th of November, correct?

**A.** You did, sir.

**Q.** And when we saw documents at your site it was from -- because we were there on the 19th of December, right?

**A.** I don't know that to be the case.

**MR. SINASOHN:** Well, can I approach, Your Honor?

**THE COURT:** Yes.

**BY MR. SINASOHN:**

**Q.** I'm going to show you what has been marked as exhibit 24, do you recognize that document?

**THE COURT:** Is this plaintiff's 24?

**MR. SINASOHN:** Yes, Your Honor.

**THE WITNESS:** Yes, I have seen this before.

**BY MR. SINASOHN:**

**Q.** Does it say towards the bottom, guaranty our success no matter how long it takes, legal representation?

**A.** No, incorrect. It says guaranty our services no matter how long it takes, legal representation. Let's go to the contract of legal representation, paragraph number 4, sir, and let's see what that says, because that takes the exact title of that section.

**Q.** But, just for the record --

**A.** No, no, let's be accurate, sir.

**Q.** Mr. Feingold --

**A.** Yes, sir.

**Q.** -- does it say guaranty our services no matter how long it takes, legal representation?

**A.** That is right, and paragraph 4 --

**Q.** That is all, I have nothing further.

**A.** Paragraph 4 of the contract --

**THE COURT:** There is no pending question.

**THE WITNESS:** Okay.

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, did you provide -- I think in your opening statement, did you tell this court that you had provided complete financial statements to the Federal Trade Commission?

**A.** Sir, if your definition of complete is that there's a blank on it, then I guess it was incomplete, but my definition of complete is I listed all the assets, all of the locations, I couldn't list the account numbers, because once you all contacted the institutions all user names and passwords were canceled, so that was virtually impossible for me to do.

I couldn't list every single style of every case, so I merely said see attached list that was filed with the court, but I am pretty comfortable that that is a very, very expansive disclosure, so expansive that the receiver never said a word to me that she felt otherwise, so if you want to point out that there are blanks, I will absolutely acknowledge there are blanks, but I will tell you that all of the material information is there one hundred percent.

**Q.** I'm going to read to you the paragraph 6 from the temporary restraining order, it is financial reports and accounting, it is further ordered that each defendant shall, A, prepare and serve on counsel for plaintiff, that is me, and the temporary receiver within three business days after service of this order completed financial statements fully disclosing the defendant's finances and those of all corporations, partnerships, trusts or other entities that each defendant owns, controls or is associated with in any capacity jointly or individually on the forms attached to this order as attachments A and B, accurate as of the date of service of this order upon

defendants.

B, prepare and serve on counsel for plaintiff and the temporary receiver within three business days after service of this order copies of signed and completed federal and state income tax forms, including all schedules and attachments for the three most recent filing years.

C, provide access to records and documents held by financial institutions outside the territory of the United States by signing the consent to release financial records attached to this order as attachment C immediately upon service -- immediately upon service of this order upon them or within such time as permitted by the temporary receiver or counsel for plaintiff in writing, and, D, provide copies of such other financial statements as the temporary receiver or plaintiff may request in order to monitor defendant's compliance with the provisions of this order.

Mr. Feingold, you did not tell us whether or not you had any safety deposit boxes, correct?

**A.** I don't have a safety deposit box, sir.

**Q.** You did not, Mr. Feingold, list any businesses for which you, your spouse or your dependents are an officer or director, correct?

**A.** I think I listed all of those businesses.

**MR. SINASOHN:** Your Honor, may I approach?

**BY MR. SINASOHN:**

**Q.** I'm going to show you your financial statement, Mr. Feingold, and I am going to point you to item 11. Is there anything marked either not applicable, I don't have any business interests?
**A.** Well, sir, I think --
**Q.** I'm asking you --
**A.** Sir, let me answer the question.
**Q.** Okay, go ahead.
**A.** I identified Feingold & Kam, that is how I earn my living, that is the company I have an interest in. If you want me to put it through the form 30 times for you I am glad to do it, it won't change the fact that is what I own.
**Q.** Mr. Feingold, did you fill out item 11 or not?
**A.** You know what, you are right, you are right, you are right, this should give you an excuse to treat me the way you did, you are right, you are right, you didn't know that Feingold & Kam is my asset, you are right, sir, you are absolutely right.
**Q.** Mr. Feingold, did you tell us how much cash you have on hand?
**A.** Absolutely.
**Q.** You did. Can you look at item 12, please?
**A.** Yes.
**Q.** Is there anything marked in item 12?
**A.** Sir, I guess I didn't add up all of the balances for you, I apologize. I gave you every single balance, but didn't

total it, but you know what, sir, if you had read, just like in this case if you had read, you would have noticed that there was not only this part of the statement, but there was also a balance sheet, and guess what a balance sheet is, it is a total of the assets, look what it says cash on hand, cash in financial institutions, it is right there, sir, the information is on the form, you just need to make the effort and look for it.

**Q.** Are you telling the court that you wrote on here, because I want to just for the court's sake, because you just said something, on this back page there is two entries, right, Mr. Feingold, there is one that says cash on hand --

**THE COURT:** Slow down for the court reporter.

**BY MR. SINASOHN:**

**Q.** There is one entry that says cash on hand?

**A.** Yes.

**Q.** And there is one below it that says cash in financial institutions?

**A.** Correct.

**Q.** And you just mentioned to the court, as if to say that you had answered my question, that you had filled out this form.

**A.** Yes.

**Q.** But, actually, you never filled out even on this page cash on hand, did you?

**A.** You know what, you caught me, 5, 10, 11, 12, 13, 14, 15, 16, I have $17 to my name. Do you want me to put $17 on

there?

**Q.** Mr. Feingold, did you tell the Federal Trade Commission how much cash is held for your benefit pursuant to item 12?

**A.** There is nothing, I gave you a complete balance sheet of what I have got.

**Q.** Did you write zero on there?

**A.** No, sir, I didn't.

**Q.** Did you tell the Federal Trade Commission what accounts you have that are government securities?

**A.** Well, sir, I didn't put anything, which means I don't have government securities, correct?

**Q.** Could you have put there that you don't have anything?

**A.** I surely could have, and could you have acknowledged that we had a settlement which basically stated that I wasn't going to be required to give you an affidavit until after the agreed order was submitted to the court, so basically what you are telling me is we had --

**MR. SINASOHN:** Objection, motion to strike, Your Honor.

**THE WITNESS:** That is fine, I will stop.

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, on item 14 you did not enter anything under item 14 that says publicly traded securities and loans secured by them, is that correct?

**A.** That's correct.

**Q.** And you did not enter any information under item 16, which is monetary judgment or settlements owed to you, your spouse or your dependents, is that correct?

**A.** Yes, what would that tell you if it was left blank, that there are none.

**Q.** It tells me that you are evading.

**A.** Okay.

**Q.** Item --

**A.** It says to me if I leave it blank it is because there is none and that is the way that was answered, sir, there is none, that is why they are blank.

**Q.** Mr. Feingold --

**A.** Yes.

**Q.** -- you did not enter any information under item 17 which says other amounts owed to you, your spouse or your dependents, did you?

**A.** Yes, that's correct.

**Q.** And so you are telling me that every time you leave something blank that means it is zero, right?

**A.** That is right, oh, but the Zausners, they owe you money, wrong.  The company, I paid their expenses, and as I told you, look on their books, it is there, that is not owed to me individually, sir, I see how this is going, but that is fine.

**Q.** Mr. Feingold --

**A.** Yes.

**Q.** -- either you are owed money or you are not, and item 17 is not completed. Tell this court if you are owed money or not.

**A.** It is completely accurate.

**Q.** Are you owed money?

**A.** My law firm Feingold & Kam is owed money from rent and expenses that it paid.

**Q.** You personally are not owed anything?

**A.** No. I am one of the people that works at Feingold & Kam, I wish I got all the revenues and put them in my pocket, but I have people I have to pay and expenses I have to pay. The law firm is owed money, absolutely.

**Q.** In accordance with the order that you are to fill out this financial statement, you also didn't fill out item 19 which says deferred income or interest, is that correct?

**A.** That's right, because I have none. I filled out what is applicable, sir. Would you like me to put zeros through everything else? I am happy to do it now, I will put a zero on every single line.

**Q.** Item 25, judgments or settlements owed, there is nothing there. Are there any judgment or settlements owed?

**A.** No, sir, zero, you have everything.

**Q.** Under item 27, tax returns, it says provide a copy of each signed tax return that was filed during the last three years, Mr. Feingold, there is nothing attached here.

**A.** You are right, sir, and that is the problem with your form. Have you ever filed electronically?

**Q.** Mr. Feingold, is there -- did you attach anything here to indicate --

**A.** No, sir.

**Q.** -- that you filed?

**A.** No, sir, I have to get you the tax transcript, and as you know dealing with the Internal Revenue Service, you cannot get a tax transcript in three days, I am sorry, but the bottom line is, sir, is that your boss, Mr. Elbein, who you weren't even involved in the conversation --

**Q.** Move to strike.

**A.** I should be allowed to explain why this form got filled out.

**THE COURT:** I will permit the answer.

**THE WITNESS:** This form got filled out only for one reason, I came to a settlement with your boss, you all then told me you had to leave because it was your Sabbath, which I am fine with.

When you guys left it was we are creating a new order for the judge to sign which will be what you need to comply with. When that fell apart because of your and I lack of a relationship, then immediately when I spoke to the receiver I told her I guess the old order is in place, she acknowledged that, and within 24 hours, less than that, I think it was within like 15 hours, I emailed her immediately, Jane, here is what I

have, because I don't ever want to be accused of not complying with the court order, and she then took it and it was confirmed forwarded to you.

**Q.** Did you ever contact me or anybody else at the FTC and say look, I know that it is past -- three days past the time that I was supposed to provide this for you, but I am having a difficult time because these are electronically filed, did you ever do that?

**A.** No reason to do it because you guys came in on the 19th, we had a settlement on the 20th, and on the 20th with your boss it was -- in fact, your boss told me, I specifically remember, I am an orthodox Jew, I live nine miles away, I have a very long walk to get home, I can't finish drafting all this stuff now, let's put everything on hold, I know you are traveling on Monday, we will follow-up, and you know what, it is my fault for assuming any of you guys would tell the truth, because I as a lawyer, when another lawyer tells me we are working on a document or agreement, I accept that, and most lawyers stand behind it, you didn't.

**THE COURT:** Mr. Feingold, I want to make sure I understand your position, are you saying that you reached an agreement with counsel's supervisor?

**THE WITNESS:** Absolutely, Your Honor, for a monitor, for the receiver to be removed, for a monitor to be placed in, there was a draft agreement.

**THE COURT:** That is all right, you have answered the question.

**THE WITNESS:** Yes.

**THE COURT:** And that lawyer's name is Mr. Elbein?

**THE WITNESS:** Elbein E-L-B-E-I-N.

**THE COURT:** Elbein?

**THE WITNESS:** Yes.

**THE COURT:** And so why didn't Mr. Elbein go through with the agreement if you had an agreement?

**THE WITNESS:** Because what happened was he was supposed to send me the agreement on Monday, and on Monday when I got into Colorado I was accused of the shredded incident, all the incidents that I testified to before, that the bookkeeper's computer was being hidden, all that stuff, and then it became --

**THE COURT:** Accused by whom?

**THE WITNESS:** By Mr. Sinasohn on the telephone.

**THE COURT:** What did that have to with Mr. Elbein?

**THE WITNESS:** Because what happened was when the relationship broke down, I was then told listen, we need more time.

**THE COURT:** Who told you this?

**THE WITNESS:** Mr. Sinasohn, Ms. Tama Kudman, she was on the telephone, we need to submit an agreed order to the court for an extension, which we did, if you look on the docket, to extend the injunction for 10 days.

**THE COURT:** I'm aware that I extended it.

**THE WITNESS:** It was agreed, it was joint, and we will then rework a new agreement once we are convinced that what you have told us is truthful, absolutely that was fine.

**THE COURT:** You have answered the question, then. Counsel, go ahead.

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, at any time did Mr. Elbein, myself, or anybody from the FTC tell you that in the course of our discussions to provide a monitor, to agree to a monitor, that we did not want you to comply with the court's order?

**A.** Well, the discussion was, we are going to have an order done, the deputy, and please correct me, is her name Lidette?

**Q.** It is Cindy Liebes.

**A.** Cindy Liebes, that she was traveling on the same day as me, and it was represented to me that Ms. Liebes is the assistant branch or deputy --

**Q.** She is the deputy director.

**A.** Yes, and that she was the one drafting the documents and that the earliest I would see them would be late Monday from her and to hold up because once we get those documents we will submit them to the court and those will be the documents we comply with, so why would I possibly look at that order and do anything when I am waiting for the document that we agreed upon

would be complied with.

In the interim, when all that happened, that is when the breakdown between you and I occurred and I then consented to an extension of the receiver, hoping that you would then communicate, investigate, and recognize the mistakes you all had made.

**Q.** Mr. Feingold --

**A.** Let me finish. When I realized that our relationship was done, I spoke to Ms. Moskowitz and she immediately told me, please, within 24 hours do your financial affidavit, she understood what happened, and I did it, and if you look at the email chain you will see I gave it to her in less than 24 hours.

**Q.** Mr. Feingold, item 28 says applications for credit?

**A.** Yes.

**Q.** It is blank?

**A.** Yes.

**Q.** It says list all applications for bank loans or other extensions of credit that you, your spouse or your dependents have submitted within the last two years, provide a copy of each application, including all attachments. Have you not applied for any kind of credit?

**A.** I own my house free and clear, luckily, and I have not applied for a credit card in years, of course now I am going to have to reapply, they have all been taken away. As I sit here, I don't believe that I have applied for credit anywhere in the

last two years.

**Q.** Are all your cars owned by you, Mr. Feingold?

**A.** Are all my cars owned by me? The vehicles that I drive are titled some in my name, some in the firm name, in my wife's name, all over the place, sir.

**Q.** Well, in your item 21 it says that the Porsche 911 is the only car not financed or leased.

**A.** Yes.

**Q.** When did you lease the other cars?

**A.** I believe that the BMW I think is three or four years old, and I think -- I believe that the other vehicle -- I don't think anything is within that time period.

**Q.** But in item 21, which says list your cars, trucks, motorcycles, boats, airplanes and other vehicles, it actually asks you to tell us the lender's name and address.

**A.** Right.

**Q.** But you didn't do that, did you?

**A.** If you say I didn't, if it is blank, then I will accept that that is correct.

**MR. SINASOHN:** Your Honor, may I approach?

**THE COURT:** Yes.

**BY MR. SINASOHN:**

**Q.** This is item 21, do you see where you gave us the address or the name of the lender?

**A.** Oh, I think it says the BMW lease ends February, 2010,

then it is the only car not financed or leased, I mean, okay, do you know what, one says a lease, but I didn't identify who the lease company is, you are correct.

**Q.** Did you identify the original loan amount?

**A.** On a lease there is no loan, sir, it is a lease.

**Q.** Did you identify the monthly payment?

**A.** No, you are correct, I did not.

**Q.** On either vehicle?

**A.** You are correct, I did not.

**Q.** Now, we asked you to tell us --

**A.** But, sir, actually, if you look at my statement of monthly expenses I believe there is a section for car payments there and it is totaled together.

**Q.** You said --

**A.** I believe that there is a statement where you have to put your household expenses.

**Q.** You did mark there is $3,000 a month for cars, that is the total?

**A.** Yes.

**Q.** Okay. You said on your employment information that you work for Feingold & Kam?

**A.** Yes, sir.

**Q.** You were asked to give your income received this year-to-date?

**A.** Yes, sir.

**Q.** You already testified that in 2009 you said you got -- the firm got 1.5 million from the Zausners?

**A.** 1.8 total, it is not from the Zausners, it is from the company paying a law firm.

**Q.** What is the name of that company?

**A.** First Universal.

**Q.** No, First Universal what?

**A.** It depends what point in the year it was, sir, part of the year it was Lending and the other part was Holding.

**Q.** So what you wrote is your income for this year-to-date was plus or minus 500,000; what is your income for this year-to-date?

**A.** Sir, that is me personally taking, okay, that is me personally taking, that has nothing to do with what my firm is paid.

**Q.** I understand.

**A.** And the reason why it is plus or minus is because, quite frankly, I can't figure out which clients are going to pay me with my receivables outstanding and exactly what has been collected because my accounts have been frozen.

**Q.** Well, Mr. Feingold --

**A.** So that is why it says plus or minus 500, because I don't want to be accused of receiving 580 and lying to you or receiving 490 and lying to you.

I can't log onto my banks to see what is even cleared

and I have received. I know what I was expecting, and it could be as high as 700, but I don't know because I can't even see what has been wired into my banks.

**Q.** Because you are not sure what you are going to still get or what might still happen in the future, is that it?

**A.** Well, I am getting an indication of clients firing me, so it may be zero at this point.

**Q.** The question was income received year-to-date.

**A.** Yes, sir.

**Q.** The years before that we asked you to tell us what years you are talking about, you didn't fill in what years, but the year underneath it says two zero and then it is blank.

**A.** I think your form shows the three prior years, sir.

**Q.** It actually asks you to fill in that time, right?

**A.** Yes, well, I think I just went chronologically back, sir.

**Q.** And even for the past years you are not sure plus or minus 300,000, plus or minus 250,000?

**A.** Well, my point is, sir, I would never want to put an exact number, because anyone that would accuse me of being deceitful because I left something blank instead of putting a zero would certainly accuse me if I was off by a couple of thousand, so plus or minus, I put plus or minus because I don't have the exact number to the penny and I don't want to be accused of being misleading.

**Q.** And, Mr. Feingold, finally, let me just read to you the first instruction that is at the very front of the financial statement that you were given.

**A.** Yes.

**Q.** It is right underneath Federal Trade Commission financial statement of individual defendants, it says instructions, number 1, complete all items?

**A.** Yes.

**Q.** Enter, quote, none, unquote, or, quote, N slash A, unquote, parenthesis, not applicable where appropriate, if you cannot fully answer a question explain why, and all the questions that I asked you that where there were blanks you didn't do that, did you?

**A.** No, sir, I didn't.

**Q.** Have you ever worked for or been employed by First Universal Lending?

**A.** I have not, sir.

**Q.** What about First Universal Holdings?

**A.** I have not, sir.

**Q.** What about Finley & Associates?

**A.** I have not, sir.

**Q.** What about Finley & Balogna?

**A.** I have not, sir.

**Q.** What about Stratton & Feinstein?

**A.** I have not, sir.

**Q.** What about the Mariucci law offices?
**A.** No, sir.
**Q.** Do you know how much money was paid to First Universal Lending in 2008 by Finley & Balogna?
**A.** I do not.
**Q.** Who would know that?
**A.** Whoever has access to the accounting records, I know you all downloaded all of them.
**Q.** Who has access to the accounting records in a normal business setting at First Universal Lending?
**A.** The two people I referenced before, Gail Finch and Lisa Janero.
**Q.** Janero?
**A.** Yes.
**Q.** How do you spell that?
**A.** J-A-N-E-R-O.
**Q.** Do you know how much money First Universal Holdings was paid by Finley & Balogna?
**A.** I have no idea, sir.
**Q.** By anybody, do you know how much money was paid to First Universal Holdings by Stratton & Feinstein?
**A.** No, sir.
**Q.** By the law offices of Mariucci or the Mariucci law offices?
**A.** I do not.

**Q.** Now, you discussed in your testimony and in your opening statement that 7,254 consumers had their loans modified, is that correct?

**A.** I think it was 7,245 and it was as of -- the gross, the exact number doesn't make a difference, it was approximately $7,000 as of the date of the letter to the State of Florida.

**Q.** Okay. How many consumers retained First Universal's services to modify their loans?

**A.** That I can't tell you.

**Q.** But you did tell the BBB 700,000, right?

**A.** 700,000 customers through the company, if you have a customer that complains, irregardless of what product they are buying from you, it is indicative of a problem at a firm.

**Q.** What percentage of First Universal's business, let's start with First Universal Lending, of their business was loan modifications?

**A.** I can't answer that.

**Q.** Who could answer that?

**A.** Anyone who has access to the books and records.

**Q.** That is Gail Finch and Lisa Janero?

**A.** And you, who has the access and has had the access.

**Q.** Have you not been told that the FTC actually has refrained from looking at the computer images of your computers because you asserted a privilege?

**A.** No, sir, I am glad you asked me that question, because

that is not what transpired at all. What transpired is if you look at the photograph --

**Q.** I'm asking if you were told, Mr. Feingold.

**A.** No, that is not the way it was said at all.

**Q.** Okay. So is it correct that Gail Finch and Lisa Janero are the people that would be able to discuss the percentage breakdown of what businesses First Universal Lending and First Universal Holdings are engaged in?

**A.** I am not saying that. I am saying they have the access to the information, then anyone with access to the information should be able to cull through it and figure it out.

**Q.** Is there anybody other than those two ladies that can do that?

**A.** I assume you could do it, I could do it and anyone sitting here could do it with just a working knowledge of math and being able to compare records.

**Q.** Now, you are counsel for Mr. Sean Zausner and David Zausner, correct?

**A.** Yes, sir.

**Q.** Now, did you advise them to comply with the court's order to produce financial statements in this case -- strike that. Have they done that in this case?

**A.** They have forwarded to you their attempts at filling out the affidavit, which I am certain you will have the same criticism of theirs as mine.

**Q.** When did they do that?
**A.** I do not know the date.
**Q.** On what basis do you believe they have forwarded me or to the FTC completed financial statements?
**A.** Because I know the emails went out.
**Q.** You know they went out, do you know when they went out?
**A.** I do not.
**Q.** Do you know if they went out this morning?
**A.** I know they didn't go out this morning, sir, they were somewhere contemporaneous with when mine went out, I don't know if it was the same day, a day or two days later, but it was within a fairly short time duration between the time mine went out and theirs went out.
**Q.** And did you send those to me, at my FTC email address, is that what you are saying?
**A.** I do not recall where they went, I know they were circulated and every single person involved in the case got copies, it was confirmed to me that everyone from Ms. Moskowitz to her counsel, to her two counsels, to you, to Mr. Kirtz, everyone received copies, they were circulated, that was confirmed.
**Q.** Who confirmed it?
**A.** I believe I spoke to Michelle Berg, she confirmed to me that they had, in fact, received the financials.

**Q.** She confirmed that I had received them?

**A.** Absolutely, because she had spoken to you about my financials and I got some impressions about comments you had about it.

**Q.** Now, you sent letters to different -- you sent a letter to the office of the Commissioner of Financial Regulation for the State of Maryland, is that correct?

**A.** You are talking about what, at what time period?

**MR. SINASOHN:** Your Honor, may I approach the witness to refresh his recollection?

**THE COURT:** Yes.

**BY MR. SINASOHN:**

**Q.** I am going to show you a letter that has not been marked, but you have talked about it, do you see that letter? The letter also has some scribbles on it from me, but that is your letter, correct?

**A.** Yes, sir.

**Q.** Okay.

**A.** Yes, this is the same letter that went to the State of Florida disclosing information during the operations of First Universal, and we have talked about it fairly at length, it is just a change to the State of Maryland.

**Q.** You sent this letter on May the 7th, 2009, is that correct, sir?

**A.** If that is what it says. I take your word on it, you

don't have to waste your effort. Yes.

**Q.** And it is the same letter that you sent to Florida, correct?

**A.** I don't know if it is the exact same, I would imagine there are some changes in it because the laws in Florida are not the exact same as the laws of that state.

**Q.** On the bottom of the second page of this letter you say, due to the size of the organization the company has stringent compliance requirements, including a back office management structure wherein each phone call is monitored by a manager for legal compliance, correct?

**A.** Yes.

**Q.** That is a true statement?

**A.** Absolutely.

**Q.** Now, that is not -- the back office is not conducting sales, correct, that you are talking about here?

**A.** One hundred percent correct.

**Q.** So, in fact, no sales calls are recorded, correct?

**A.** That is absolutely incorrect.

**Q.** So your sales calls are recorded?

**A.** First of all, they are not mine, okay? First Universal's sales calls are recorded, depending at what period of time would dictate what kind of recordings were done.

**Q.** What percentage of the calls are recorded?

**A.** That I cannot tell you. I will tell you that I

believe that all the confirmations -- and I shouldn't say all, I have not physically, so I will not -- I have not physically gone down and counted up every call.

I do know that on occasion, for example, I was in a meeting and advised that there was a concern about someone, I don't remember who it was, and that they were actually double taping that person because that person had received like two complaints in one week and there they were double taping that person, their conversations and their confirmations, to make sure that that person knew what they were talking about.

**Q.** Mr. Feingold, you told the receiver that sales calls are not recorded, didn't you --

**A.** No, that is not what I said. I said --

**Q.** -- or to her representative?

**A.** I said voice verifications are recorded and some of the sales calls, depending on the instances, are recorded, it depends where the lead came from, what point in time in the existence of the company, et cetera.

**Q.** As you sit here right now, you can't testify as to what percentage that is, or could you give us an estimate?

**A.** No, I cannot, sir.

**Q.** And how long are those recordings maintained?

**A.** Go on Salesforce, just click on the icon.

**Q.** And Salesforce is a fairly accurate software you testified about, right?

**A.** I believe it is a very good software package.

**Q.** And you talked about earlier also the fact that Pompano Beach, you make it a point that it is a separate business than PGA and a separate business than Coral Springs, is that right?

**A.** I didn't make a point, it is, it is.

**Q.** If I am looking at Salesforce and it says account owner, who is David Z?

**A.** Dave Z is David Zausner, and if there is an account that has a technological issue, then he will open it as his own in order to try to understand from a software perspective what happened and why the system didn't work.

The entire system has work flows, so someone may come to him and say hey, Dave, this thing gave me a 10-day reminder and it also gave me a 15-day reminder and we are only supposed to get 10-day reminders, we will then take ownership of that account, because I had that same question when I reviewed this stuff in preparation, and so he will then become the account owner, if someone takes an account to work on it to look at it, they will become an account owner of that account.

**Q.** And what does source location mean?

**A.** Source location would generally show where an account began, however, if someone takes over an account it becomes theirs, so it gets denoted to their particular office.

**Q.** Mr. Zausner, where is he located, his office?

**A.** You have been in his office, sir, his office is at PGA Boulevard in Palm Beach Gardens.

**Q.** It is not in Coral Springs, right?

**A.** It is not, but you will certainly see him as an account owner on Coral Springs accounts, especially after the Coral Springs office was sued by the Palm Beach Gardens office and all of their accounts were taken away from them because they were stealing accounts out of Salesforce, so you will definitely see his name as the account owner, especially after the lawsuit, because he was grabbing the accounts away from them and there was an emergency injunction hearing and there they were shutting them off the computer, so you probably see his name all over Coral Springs because he is the only guy from a tech. end that knew how to grab the account out of their system.

**THE COURT:** Was that lawsuit filed in State or Federal Court?

**THE WITNESS:** State Court, Your Honor.

**BY MR. SINASOHN:**

**Q.** The defendant in that case is Spinder, is that correct?

**A.** Spinder, Cushner, two Spinders, Greg Spinder, his wife, who her name escapes me, but she is a Spinder, and Cushner, who is actually Spinder's brother-in-law, the brother of Mr. Spinder's wife.

**Q.** And Mr. Feingold --

**THE COURT:** Counsel, let me ask you, because I said 5:45, do you have time constraints?

**MR. FEINGOLD:** About 5:20 or so, Your Honor, I have a time constraint, maybe 5:30, something like that.

**THE COURT:** All right.

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, when you were discussing earlier the successes of First Universal obtaining mortgage modifications or stopping a foreclosure and you referred to -- you referred to salesforce.com documents to help support that, correct?

**A.** Yes, sir.

**Q.** If it says officers received from creditors, officers received monthly payment of 1258.72, that is $1,258.72 including escrow, interest rate 8 percent, it has like three little stars and it says stop sale date, three little stars, on 6/3 for 6/15 sale, what does that mean to you, do you see this?

**A.** No, that means to me that they stopped the sale date, they had an offer on the deal, and then if you go to the last page and click the PDFs and open them you should see the modification off of there.

**Q.** So that to you would indicate that this loan was successfully modified?

**A.** No, absolutely not. It would indicate to me that there was a ceasing of a sale, which is a good thing for a client, they can't be unhappy that the sale of their house was

stopped, and it would indicate that the lender agreed also to a modification, the terms of which, the very specific terms you would have to open the PDF.

**Q.** If you saw that on Salesforce you would point and say this is a success?

**A.** No, I said no, you have to -- if you showed that to me and you showed me the PDF offer -- do you have the PDF that goes with it?

**Q.** I don't know, you tell me.

**THE COURT:** Exhibit number?

**MR. SINASOHN:** I'm sorry, Your Honor.

**THE COURT:** Defendant's 5?

**MR. SINASOHN:** It has not been offered, Your Honor.

**THE COURT:** Okay, that is fine.

**THE WITNESS:** Here is something interesting, you all indicated that you haven't had access to Salesforce, yet this was obviously printed out of Salesforce very recently, but lo and behold, besides that, when you printed this out did you hit click here and view and print all these?

**BY MR. SINASOHN:**

**Q.** I didn't print it out, so I don't know the answer to that.

**A.** You didn't print out all the attachments, you have to print out all of the PDFs. That is why with Mr. Gatt I was able to cross-examine because you go to that back page, you hit the

PDF and you print it and that is where the modification offer is.

All that information that you referred to is just a summary, you have no idea whether or not that is an actual modification that has been completed, you are just notated on the system so when you look in it, hey, there was an offer out there, and hey, a sale was stopped. Unless you see the modification document you can't say, you have got to print that out.

**Q.** You testified that based on having this offer received to stop the sale that that had to make the client happy, right?

**A.** Well, I can't imagine a client being unhappy that the foreclosure sale was stopped, and maybe it is an assumption of mine, but in my experience in dealing with this, I have not seen a client that has ever been unhappy that the foreclosure was stopped.

**Q.** Well, this is a salesforce.com that Mr. Liggins testified that he had reviewed as one of the consumer declarants, Mr. Patrick George --

**A.** Sir, let me stop you there. Mr. Liggins testified he never looked at Salesforce.

**Q.** The record will speak for itself.

**A.** It will.

**Q.** But in the Patrick George salesforce.com exhibit he says on August 10th, it is a complaint description posted

8/10/2009 at 12:16:01 p.m., after eight months and $3600 I will be losing my home next week.

Now, the sale that you talked about, the stop sale date that should have made him happy was on June the 3rd for a June 15th sale.

They have told me they stopped the sale, I have the letter, but at no time did this happen. They advised me to stop making payments so they could force negotiations which didn't happen. They have told me they need wife's information, but she has and has never been on my mortgage accounts. These folks are just a sham to take money from people with no deliverance. I have read several other complaints and they are no different from mine, when you have a question and call you never talk to anyone, but have to leave a number so they can call you back, never happens. I have had several different account managers, including the gentleman who signed me up, and they all tell me they are going to finish this up and that the last one didn't do their job, more lies. I received my first modification before they started and it was an increase of payments by 30 percent, I would have been better taking it -- taking it than losing $40,000 in assets.

**A.** Is that a question?

**Q.** I want you to take a look and make sure I read it correctly.

**A.** And, interestingly enough, First Universal put this in

their own books, right, they put it in their own books, they are not hiding it, about what the client said. Now, do we want to go through it and see what the records show?

**Q.** If you would like to tell me, the question is, Mr. Feingold --

**A.** Do you want to go through it and let's look at what the records show.

**THE COURT:** Let counsel ask his questions.

**THE WITNESS:** Yes, sir.

**BY MR. SINASOHN:**

**Q.** Did I read that accurately, Mr. Feingold?

**A.** I believe you did, sir.

**Q.** Thank you. Now, have you ever heard of the expression -- let me ask you this, are these salesforce.com documents, do they correctly reflect all of the information that you have from the consumer?

**A.** Do they correctly reflect? You have to be specific.

**Q.** Do they correctly reflect, for instance, when -- it says here declined, tell me what that means, declined, do you know what that means?

**A.** It means the payment is declined.

**Q.** Does it correctly reflect when a payment was declined?

**A.** It will reflect when the clearing bank, depending upon whether it is a merchant or an ACH has triggered the computer signal to Salesforce to advise the funds didn't clear.

The sending and receiving institution will have two different dates of when either a check bounces, an ACH doesn't go through or a credit card charge does not go through.

**Q.** Now, in your letter again, I am going back to your letter that you sent to Maryland, you said that outside legal counsel is employed to conduct weekly compliance meetings for all employees which are mandatory to attend, correct?

**A.** Yes, sir.

**Q.** Who is that outside counsel?

**A.** That would be the law firm of Feingold & Kam, sir.

**Q.** Who are the principals of Feingold & Kam?

**A.** It would be me, sir.

**Q.** Who is Kam?

**A.** That is my wife's maiden name, sir, we met in law school, and there is also a Justin Kam, there have been a number of Kams throughout the history of the firm, it has been around almost 19 -- 19 years, but right now it is me as the managing member.

**Q.** There is no other -- are there any other partners in the firm besides yourself?

**A.** Well, a limited liability company would not have partners, they would have members and managers, so the answer is no, there are no other partners.

**Q.** Are there any -- who are the employees of Feingold & Kam?

**A.** The lawyers I spoke about before, Adam Schloss, Nick Cerni, Jonathan Jacobson, myself, my wife at times, and in addition you have Trisha Lovejoy, you have Gloria Toth, you have Nancy -- this is terrible, I can't remember Nancy's last name, Nancy Saint something, that is terrible, terrible -- Nancy Saint Jean, Nancy Saint Jean.

**Q.** And this letter to Maryland, this statement, outside legal counsel is employed to conduct weekly compliance meetings --

**A.** Yes, sir.

**Q.** -- for all employees which are mandatory to attend, that is a true statement?

**A.** A hundred percent.

**Q.** And that means for all employees including the sales staff, correct?

**A.** The sales staff are not employees, sir. The sales staff are independent contractors, under the law they are absolutely positively not employees.

**Q.** So there is no weekly compliance meeting for the sales staff?

**A.** There is, sir, but not conducted by the outside law firm of Feingold & Kam. As I explained before, there is an executive committee, those particular executives, from my understanding, actually conduct daily training as well as one big weekly meeting amongst themselves, I have never attended it,

but that is my understanding as to what goes on.

**Q.** Now, this letter was dated May 7th of 2009?

**A.** Yes, sir.

**Q.** And in it you say, in fact, over the last four years the firm has had approximately 500,000 customers, clients with whom it has transacted and received inquiry for services, and a total of less than one percent of refund requests out of all of those?

**A.** It is actually in excess of that, but yes.

**Q.** Because you told the BBB over 700,000, right?

**A.** It is actually, believe it or not, it is in excess of that, and the person I found that out from is David Zausner, it is actually larger than that.

**Q.** When you talk in here about refund, are you talking about refunds given to consumers for all the products that First Universal sells or just loan modifications?

**A.** No, for all the products that First Universal sells.

**Q.** So for all the products all together the refunds have been at least as of this date 4,654?

**A.** Dollars, people, what?

**Q.** Well, it says a refund section has been included, including a listing of 4,654 individuals who have received a total of 1.846 million in refunds.

**A.** So that is correct, the 4,000-plus individuals, correct.

**Q.** That is what it says, is that correct?

**A.** Absolutely, there is documents that back up every dime of it.

**Q.** But you don't know how to break down that total between loan modification, consumers and -- and consumers who retained the company's services for other loan modifications, is that correct?

**A.** No. I know how to break it down. Sitting here today, do I know what that number is, the answer is no, I do not.

**Q.** And what would you need to do that?

**A.** I would need to see their financials and to see their customers and what products they were in and then extrapolate the information.

**Q.** And when you told the court that you had given this letter to me and I didn't comply with it, do you remember that discussion?

**A.** No, I didn't say I gave that letter to you. I had never seen you on November 19th. I got your acknowledgment that you had the letter and that you had all the documents and that you chose not to give a copy of that letter to the court, even though the letter specifically stated that in the event there is court action, please provide a copy of this letter to the court so the court is fully apprised of all of the facts, and you acknowledged to me that you chose not to do that and you were aware of that last paragraph in the letter.

**Q.** Isn't that last paragraph in the letter just you asking -- it says here, I will read it to you, this is a letter written to the State of Maryland, isn't this paragraph -- doesn't this paragraph say, although there has not been any threat or indication of court litigation, you are hereby advised that you are requested to file a copy of this letter and all of the binder exhibit attachments with any court in which you would take legal action so that a judge could be fully advised of all of the disclosures and the extent of the disclosures made to you by F-U-L and the creditibility and veracity of the firm, that is what you wrote, right?

**A.** I said credibility, not creditibility.

**Q.** Actually, it says creditibility.

**A.** The bottom line is, yes, and you acknowledged to me that you had received that letter and read it, but you didn't acknowledge you received the Maryland one, you acknowledged to me you received the Florida letter and that you chose not to give it to the court on an emergency basis for an ex parte TRO.

**Q.** Isn't this paragraph just simply you asking Maryland, requesting that they give it to a judge, is there any way, were you compelling Maryland to disclose this?

**A.** Listen, the letter is not addressed to you, it is clearly addressed to Maryland, you clearly got it, you clearly read it, you clearly as an officer of the court are under an obligation, especially when you represent to a judge that there

is an emergency and that he needs to shut down a company immediately, you are under an absolute ethical obligation to disclose all information to the court, both helpful and harmful to your case, so that the court can make a fair decision with regards to the circumstances, and you did not do that, sir.

**Q.** So it is your legal opinion that attorneys have an obligation to provide self-serving documents to the court?

**A.** Attorneys have an obligation of candor to a court, it is the very beginning preamble to our ethics code, no matter what state you are in, you have an obligation of candor.

If I say something and I misspeak, like yesterday I identified a file that I said was from one office and it was from another, it is my absolute obligation to advise the court that I have misspoken.

Likewise, if I find out that a client is lying, committing a crime and doing anything else nefarious, it is my obligation to deal with the court appropriately on that.

Sir, it is your obligation and there is no doubt in my mind with regard to our ethical rules and canons that you avoided the fact that there was very harmful information that should have been provided to the court to let the court know the full extent of First Universal before shutting it down, a company with so many employees, so many clients, and so many negative affects to now their clients as a result of your actions.

An ex parte action, sir, is one of the most drastic measures, draconian measures that you can take against a company, and every other state that sent a letter and asked for information and reviewed that information, not one of them, not one of them then moved into court on an emergency basis, and we all know why, it is because that information is fairly compelling that this is a very legitimate business that should not have been closed down in this way.

**Q.** Mr. Feingold, who owns -- who are the partners in Lending Partners?

**A.** As I said before, that would be Sean Zausner and David Zausner.

**Q.** And is it true that Lending Partners a hundred percent owns First Universal Lending, LLC?

**A.** That's correct, sir.

**Q.** And you are aware of the different complaints that several, at least -- let me ask you this, how many complaints are you aware of that consumers have made against First Universal Lending?

**A.** I am aware of a couple hundred complaints that were made through the Better Business Bureau, I am also aware of additional complaints, every single complaint being logged into Salesforce that never resulted in any kind of Better Business Bureau complaint, I don't know the absolute number of those complaints, but in comparison to the number of customers and

clients throughout the years, it is so statistically insignificant that, as I have stated to you before, if you were to use the statistics of First Universal and compare them to other companies like a Walmart, based on your logic, you would shut Walmart down, because I am certain their percentages are much worse than First Universal's.

**THE COURT:** Counsel, would this be a convenient point or are you about to finish up?

**MR. SINASOHN:** I could probably finish up in the next four to five minutes.

**THE COURT:** Just let me know when you are finished.

**MR. SINASOHN:** Thank you.

**BY MR. SINASOHN:**

**Q.** Mr. Feingold, you did, in fact, tell either the receiver or the independent contractor hired by the FTC that you were asserting a privilege of attorney-client privilege for the information contained on the computers at First Universal Lending, is that correct?

**A.** That is incorrect. What I told them, if you look on my desk, and you can see it in photographic 6, I think 6-D, that this on my desk is an Apple Computer, I am only one of the people that has an Apple, I replaced my Dell with an Apple. When I replaced my Dell I was literally going to get rid of it.

Vasillios Cristakos or Cristakes, who is the computer gentleman, approached me and asked me since I had a more recent

computer, if it could be utilized by Gail in accounting, that her machine was slow and would I mind swapping it out, which, quite frankly, these computers in this day and age, the value of them pretty well decreases dramatically, I didn't care, I indicated to him that my concern was there is law files on there, at which point I learned that he erased everything, but that someone like Gail just going on a computer you would never see the files, but that if someone was technologically savvy they might be able to pull off information, because you truly never erase anything off a hard disk.

Well, when you all showed up at the office I went and specifically pointed out that computer and said that computer, Gail's computer I have concerns, because previously it had been a computer used in a law office, I would like you all to prepare a privilege log, at which point you stood in my office and Jeffrey stood in my office and we got Tama on the phone at one point and then we got your office on the phone at one point and it was agreed that you all would give me a privilege log with regards to that computer and what you would do is you would print out a listing of all the directories, you would give that to me and I would go down the directories and look and see if any of those directories sounded like law directories, I know the names of my clients, I know the names of the kinds of files that we use, so I would be able to look and say, hey, this looks like a law firm file, stay out of it, that was absolutely

positively agreed, that was the computer we were talking about, one stand-alone computer, and now it has enveloped itself into an excuse for you all to not look at anything, it is just completely and utterly false, it was one computer.

The other issue with privilege was that Ms. Moskowitz went into the file room of the law firm because she wanted First Universal files, which I agreed with her, she steps into the shoes of First Universal, she should be entitled to First Universal files, we stood there and went through the cabinets and each file that said First Universal on it, we pulled it out, we put it into banker's boxes, I remember Ms. Moskowitz walking around with like I think a green magic marker, she told me, hey, I am going to mark these so we know.

In fact, one of the boxes was the lawsuit with the branch, which I pointed out to her, and then, lo and behold, to my utter shock and disgust, after Ms. Moskowitz left and put everything in another room, there I see you walking around in the file room, and my statement to you is what are you doing, and you are like, well, I am back here, these are our offices now, we can do what we want, and it was just extraordinarily uncomfortable the attitude you took towards it.

Now, I will be honest to the extreme and let you know that I did not see you specifically take a file out, but the attitude that I received from you gave me complete discomfort as to your intentions and the fact that you then closed the back

area in my file room, denied me access to it, and then you had my associate Nick move out of his office, leave all of his law documents on his desk, and he was not permitted back in his office, that made me extraordinarily uncomfortable with you and the process.

**Q.** So, Mr. Feingold, just for clarity --

**A.** Yes.

**Q.** -- you are saying now that there is only one computer upon which you have asserted a privilege, is that correct?

**A.** I have always said that, not now, but always, and if you look on my desk you will see why, there is just one Apple there and that Dell that I used to use went over to Gail Finch's area.

**Q.** Is that two computers, then?

**A.** Sir, I have an Apple now, my old Dell went over to Ms. Finch, that is one computer. The computer that I went and took Jeffrey to, I took him to that computer to point out to him this is the computer I have an issue with, and I saw him fill out an evidence tag, a white evidence sheet with black writing on it, and then you, myself and Jeffrey stood in my office having multiple teleconferences about how to deal with this.

Jeffrey got his boss on the phone because he advised me he was an independent contractor hired by you all, I don't remember where he flew in from, but he was from out of town, you were -- you were dealing with it and got your boss on, and I

remember Ms. Kudman got involved as well.

**Q.** So, for clarity, you would not object to us, other than the Dell computer, you have no privilege objection, is that correct?

**A.** As long as you stay out of -- you know where the lawyers sit in the offices now, sir, you know where they are, don't go on the lawyer's computers, don't go on my computer, don't go on Nick Cerni's computer, that is common sense, but any computer that was used by someone at First Universal, that has nothing to do with me, I have no issue with that, other than Gail Finch's computer which was replaced because it was slow, I have absolutely no issue, but you know exactly where all the lawyers are, you know where the separate suite of lawyers are, you know where I sit and you know where Nick Cerni sits, there is no secret to it, stay off those computers.

**Q.** In the Salesforce documents that we are talking about, are there comments in the Salesforce documents regarding the actual sale of the loan modification service in these documents?

**A.** Sir, I have not reviewed every single Salesforce file, so I can't opine to that.

**MR. SINASOHN:** May I approach, Your Honor?

**THE COURT:** Yes.

**BY MR. SINASOHN:**

**Q.** Can you see if in this case, this is Ryan Shiffman, I think you talked about it earlier?

**THE COURT:** Defendant's 5?

**MR. SINASOHN:** Defendant's 5, Your Honor.

**THE WITNESS:** Yes, sir.

**BY MR. SINASOHN:**

**Q.** Is there a discussion of the actual sales comments in that Salesforce document?

**A.** Well, I will tell you something, I don't know how much time you want to take.

**Q.** I just want you to answer the question.

**A.** Well, let me tell you why I can't answer the question. I don't know who these people are, I know who Mr. Shiffman is because obviously he is the client, but I can't tell you if someone's name was a salesperson, like I don't know if Josephine Haley is a salesperson, because if she is involved in sales then there are sales comments and there are other people involved, and I think I told you before, I don't know all of the salespeople, I don't know their names, so this would be difficult for me to tell you, quite frankly, I mean there is -- and there is a lot of different people here, I see now there is a Huntley, there is a Miele.

**Q.** Do you have any information that you can -- could you point out, from any of the Salesforce documents that you have talked about in this case, including the 16 that you pointed to when you talked about the ones you have for the consumer declarants in this case, in any of those 16 documents were there

any sales comments in those?

**A.** It is not what I looked at them for, sir. I looked at them for the fact that you made assertions that no modifications were done and you made assertions that these people were clients of First Universal Lending of PGA and they were not.

**Q.** So as you sit here and you testify, you can't tell the court that salesforce.com contains any reference or discussion of sales comments in them, does it, can you tell it?

**A.** I can't tell you that because I don't know who the salespeople are versus who the back office people are, I know faces, but I don't know everyone's name, sir, I am outside counsel, I deal with very specific committees, and the way I would really get to know an individual is if that individual unfortunately needed to be sued or terminated or something to that effect, but I can't look and tell you that and I never looked for that specific information.

**MR. SINASOHN:** Your Honor, I probably need five more minutes, but I would have to stop if that is okay.

**THE COURT:** That is fine.

**MR. SINASOHN:** Thank you, Your Honor.

**THE COURT:** We will go ahead and recess for the evening, I would like everyone to return here at 9:45 tomorrow morning and we will continue on. The court is in recess until 9:45. Everyone have a nice evening.

**MR. SINASOHN:** Thank you, Your Honor.

**MS. KUDMAN:** Ms. Moskowitz asked me to convey to the court to apologize that she is stuck in traffic and that is why she is not here.

**THE COURT:** Thank you.

(Thereupon, at 5:30 p.m. the hearing concluded.)

C E R T I F I C A T E

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, Nancy Siegel, Registered Merit Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings and that the transcript is a true and correct transcription of my stenotype notes of the proceedings.

Dated this ___day of ____________, 2009.

S/NANCY SIEGEL
NANCY SIEGEL,
Registered Merit Reporter

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.