UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | CASE NUMBER |
| PLAINTIFF, ) | 09-82322-CIV-ZLOCH |
| ) | |
| VS. ) | |
| ) | |
| FIRST UNIVERSAL LENDING, LLC, ) | |
| SEAN ZAUSNER, DAVID ZAUSNER, ) | VOLUME 4 |
| AND DAVID J. FEINGOLD, ) | |
| ) | |
| DEFENDANTS. ) | |
| ______________________________) | |

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING HAD BEFORE THE HONORABLE WILLIAM J. ZLOCH, IN FORT LAUDERDALE, BROWARD COUNTY, FLORIDA, ON THURSDAY, DECEMBER 10, 2009, IN THE ABOVE-STYLED MATTER.

APPEARANCES:

FOR THE PLAINTIFF: GIDEON E. SINASOHN, AND HAROLD E. KIRTZ, ESQS.
FOR THE DEFENDANTS: DAVID J. FEINGOLD, ESQ.

FOR THE RECEIVER: TAMA B. KUDMAN, AND MICHELLE R. BERG, ESQS.

CARL SCHANZLEH

OFFICIAL COURT REPORTER

U. S. COURTHOUSE

299 E. BROWARD BLVD., 202B

FORT LAUDERDALE, FLORIDA 33301

954 769-5488

TABLE OF CONTENTS


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID J. FEINGOLD | 3 | 56 | 65 | |
| TAMA BETH KUDMAN-RICHMAN | 77 | | | |
| DAVID J. FEINGOLD | 86 | | | |
| DAVID J. FEINGOLD | 96 | | | |
| TAMA BETH KUDMAN-RICHMAN | 100 | 130 | 165 | 169 |
| SEAN ZAUSNER | 171 | | | |


INDEX TO EXHIBITS


| EXHIBITS | MARKED FOR IDENTIFICATION | | RECEIVED IN EVIDENCE | |
|---|---|---|---|---|
| DESCRIPTION | PAGE | LINE | PAGE | LINE |
| PLAINTIFF EXHIBIT 38 | | | 73 | 9 |
| PLAINTIFF EXHIBIT 39 | | | 129 | 21 |
| PLAINTIFF EXHIBIT 40 | | | 176 | 10 |

(FORT LAUDERDALE, BROWARD COUNTY, FLORIDA; THURSDAY, DECEMBER 10, 2009, IN OPEN COURT.)

THE COURT: GOOD MORNING. PLEASE BE SEATED.

ALL RIGHT, MR. FEINGOLD, IF YOU WILL RETAKE THE WITNESS STAND, PLEASE.

WE WILL CONTINUE WITH CROSS-EXAMINATION.

COUNSEL.

MR. SINASOHN: THANK YOU, YOUR HONOR.

DAVID J. FEINGOLD,

BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CROSS EXAMINATION

CONTINUED

BY MR. SINASOHN:

Q. MR. FEINGOLD, YOU TESTIFIED YESTERDAY THAT THE ZAUSNERS OWED YOU MONEY. DO YOU REMEMBER THAT?

A. THAT IS NOT WHAT MY TESTIMONY WAS, SIR. MY TESTIMONY WAS THAT THEIR COMPANY, I HAD PAID THE RENT AND I HAD PAID THE INSURANCES UPON WHICH THAT MONEY WAS OWED TO FEINGOLD & KAM, THE LAW FIRM.

Q. WHAT COMPANY?

A. WELL, IT WAS FIRST UNIVERSAL LENDING AT THE TIME THAT WAS IN EXISTENCE WHICH I WAS PAYING THROUGH FEINGOLD & KAM THE RENTS AND THE INSURANCE.

Q. SO WHEN DID THE FIRST UNIVERSAL LENDING START TO OWE -- YOU SAY IT OWES FEINGOLD & KAM OR DAVID FEINGOLD?

A. FEINGOLD & KAM, SIR, WHICH I SAID ALL ALONG. THE LEASE WAS IN THE NAME OF FEINGOLD & KAM THROUGHOUT THE COURSE OF EXISTENCE. WHEN THEY WERE UNABLE TO PAY THEIR PORTION FEINGOLD & KAM CONTINUED TO MAKE THE LEASE PAYMENTS TO THE LANDLORD IN APPROXIMATELY THE AMOUNT OF $25,000 PER MONTH PLUS INSURANCE.

Q. WHEN DID FIRST UNIVERSAL LENDING FIRST START TO OWE FEINGOLD & KAM MONEY?

A. I WOULD ESTIMATE, I DON'T KNOW THE EXACT DATE SITTING HERE, BUT IT WAS AT SOME POINT IN TIME WHEN THE ENTIRE MORTGAGE CRISIS HAPPENED.

Q. CAN YOU BE MORE SPECIFIC? CAN YOU TELL US WHAT YEAR THAT WAS THAT THEY STARTED TO OWE YOU MONEY?

A. I LET ME THINK ABOUT THIS. I HAVE TO THINK ABOUT USING HISTORY. WE ARE IN 2009. I BELIEVE A YEAR AGO, 2008 LEIMAN BROTHERS FAILED. I THINK LEIMAN BROTHERS FAILED AND BERSTEIN FAILED IN SEPTEMBER OF 2008. I RECALL THAT BECAUSE THAT WAS RIGHT AROUND MY BIRTHDAY IN 2008.

I BELIEVE 2007 -- I WOULD SAY -- I THINK THE FINANCIAL CRISIS AND THE MORTGAGE MARKET STARTED IMPLODING IN AROUND 2006 IS WHAT I SEEM TO RECALL.

Q. YOU ANSWERED ABOUT THE FINANCIAL MARKET BUT I'M ASKING YOU A DIFFERENT QUESTION. I'M ASKING YOU WHEN IS THE FIRST TIME YOU OWED -- YOUR COMPANY OWED THE FIRST UNIVERSAL LENDING MONEY?

A. MY COMPANY DOES NOT OWE FIRST UNIVERSAL --
Q. MY MISTAKE. WHEN DID FIRST UNIVERSAL LENDING FIRST START TO OWE FEINGOLD & KAM MONEY?
A. WELL, I'M TRYING TO GIVE YOU A TIME FRAME. THE FINANCIAL CRISIS BEGAN IN AROUND 2006. I KNOW AS THE MORTGAGE MARKETS WERE COLLAPSING THAT'S WHEN THEY WERE HAVING DIFFICULTY PAYING. SO I WOULD SAY IT WAS SOMETIME AROUND THEN.
THE COURT: MR. FEINGOLD, LET ME ASK YOU. YOU SAY THAT THE OPERATION -- I BELIEVE THAT YOUR POSITION IS THAT THE OPERATION IS NOW UNDER FIRST UNIVERSAL HOLDING, IS THAT CORRECT?
THE WITNESS: WELL, A COMPLETELY DIFFERENT BUSINESS. JUST THE NAME -- THE MISUNDERSTANDING HERE IS THAT FIRST UNIVERSAL LENDING AND FIRST UNIVERSAL HOLDINGS ARE VERY DIFFERENT BUSINESSES, AND I THINK IF WE WERE TO CALL HOLDINGS MCDONALD'S HOLDINGS, OR SOMETHING, WE WOULDN'T EVEN BE HERE TODAY ABOUT HOLDINGS. BUT FIRST UNIVERSAL LENDING, THAT COMPANY --
THE COURT: WELL, LET ME REPHRASE MY QUESTION.
THE MORTGAGE REFINANCING SERVICE THAT IS PROVIDED, WHO IS THAT PROVIDED BY?
THE WITNESS: THE MORTGAGE FINANCING, THE LENDING AND THE REFINANCING YOU ARE TALKING ABOUT WERE ALL DONE THROUGH FIRST UNIVERSAL LENDING UNDER THEIR NAME FIRST

UNIVERSAL LENDING.

THE COURT: AND YOU HAVE SAID THAT FIRST UNIVERSAL LENDING IS NO LONGER IN BUSINESS.

THE WITNESS: THAT'S CORRECT. TECHNICALLY THE CORPORATION EXISTS. I DON'T BELIEVE IT HAS BEEN DISSOLVED, BUT THE OPERATIONS DON'T EXIST.

THE COURT: SO IS ANY MORTGAGE REFINANCING SERVICING BEING PROVIDED BY ANYONE?

THE WITNESS: WHAT IS BEING DONE THROUGH HOLDINGS IS THAT HOLDINGS HAD A NET BRANCH WHERE THEY WOULD REFER MORTGAGES TO COMPLETELY AND UTTERLY SEPARATE COMPANIES AS A REFERRAL SERVICE, BECAUSE UNDER FLORIDA LAW THAT IT HAS NOW CHANGED YOU CAN'T EVEN REFER MORTGAGES UNLESS YOU ARE RELATED TO AN ENTERPRISE THAT HAS A LENDER'S LICENSE. IT NEVER USED TO BE THAT WAY. SO THAT'S WHY WE SEE THE NAME TRANSCONTINENTAL LENDING BECAUSE IT USED TO BE ALL YOU HAD TO HAVE WAS A LENDER'S LICENSE AND MORTGAGE BROKERS AND EVERYONE ELSE IN THE OFFICE COULD --

THE COURT: THAT IS ALL RIGHT, YOU HAVE ANSWERED MY QUESTION.

THE WITNESS: OKAY.

THE COURT: LET ME ASK YOU THIS. FIRST UNIVERSAL LENDING, DID IT HAVE A BOOKKEEPING DEPARTMENT?

THE WITNESS: IT DID, SIR, YES.

THE COURT: WHO WAS THE BOOKKEEPER AT FIRST

UNIVERSAL LENDING?

THE WITNESS: AT THAT TIME THERE -- GAIL FINCH WAS ACTING, I GUESS YOU WOULD SAY, AS A BOOKKEEPER, AND THEN THERE WAS ACTUALLY AN ACCOUNTING FIRM. I THINK THERE WERE A COUPLE OF DIFFERENT ACCOUNTING FIRMS THROUGHOUT THE YEARS WHO ACTUALLY DID ACCOUNTING FOR THE FIRM.

THE COURT: WHO PREPARED THE TAX RETURNS ON BEHALF OF FIRST UNIVERSAL LENDING?

THE WITNESS: I BELIEVE IT WAS AN OUTSIDE ACCOUNTING FIRM, A WOMAN NAMED SONIA -- I'M NOT SURE OF HER LAST NAME, BUT HER PRACTICE NOW IS IN WASHINGTON, D.C.

THE COURT: AND WHO WOULD HAVE HER LAST NAME?

THE WITNESS: I COULD FIND THAT --

THE COURT: OKAY.

THE WITNESS: -- FROM THEM, YEAH.

THE COURT: ALL RIGHT. WITH RESPECT TO FIRST UNIVERSAL HOLDING DOES IT HAVE A BOOKKEEPING DEPARTMENT?

THE WITNESS: IT DOES, AND IT'S DIFFERENT.

THE COURT: WHO IS IN CHARGE OF THAT DEPARTMENT?

THE WITNESS: YOU HAVE GAIL FINCH WHO WAS AT FIRST UNIVERSAL LENDING. BUT YOU ALSO HAVE A PERSON NAMED LISA GANARRO, YOU ALSO HAVE A GALE NAMED HOLLIE EFLER, YOU HAVE A GALE NAMED TONIA WILSON, YOU HAVE A GALE NAMED ELISA -- AND I CAN'T REMEMBER ELISA'S LAST NAME, BUT IT'S A VERY DIFFERENT DEPARTMENT SET UP.

THE COURT: AND WHO PREPARES THE TAX RETURNS FOR FIRST UNIVERSAL HOLDING.

THE WITNESS: FIRST UNIVERSAL HOLDING WAS ACTUALLY INTERVIEWING ACCOUNTING FIRMS BECAUSE THIS IS THE INITIAL YEAR OF ITS OPERATIONS, AND HAD NOT RETAINED THE SAME ACCOUNTANT AS FIRST UNIVERSAL LENDING.

THE COURT: DOES -- WELL, LET ME REPHRASE MY QUESTION.

WHO NOW HAS THE RECORDS OF THE ACTIVITIES OF FIRST UNIVERSAL LENDING? WHO IS IN POSSESSION OF THOSE RECORDS?

THE WITNESS: THOSE RECORDS ARE ON QUICK BOOKS, WHICH ARE ON LINE WHICH WERE DOWNLOADED AND IMAGED BY THE FTC AND THEIR COMPUTER TECHNICIANS.

THE COURT: AND IS IT POSSIBLE, THEN, FOR EXAMPLE, TO SEE HOW MANY CUSTOMERS UNIVERSAL LENDING SERVICED, SAY, IN 2008?

THE WITNESS: I DON'T THINK THAT THAT WOULD COME FROM LIKE A QUICK BOOKS BECAUSE THAT'S A FINANCIAL ACCOUNTING PACKAGE. I THINK WHAT YOU WOULD HAVE TO DO IS LOOK AT SALES FORCE AND ALSO LOOK AT THE OTHER SOFTWARE PACKAGE THAT FIRST UNIVERSAL LENDING UTILIZED, WHICH FIRST UNIVERSAL HOLDINGS DOESN'T EVEN COME CLOSE TO UTILIZING AND THAT'S SOMETHING CALLED KALIKS AND POINT.

THE COURT: WOULDN'T THAT BE SOMETHING THAT YOU

WOULD BE INTERESTED IN FOR THE PURPOSES OF THIS HEARING? I MEAN, FOR EXAMPLE, TO SAY TO THE COURT THAT IN 2008 UNIVERSAL LENDING SERVICE -- AND I'M JUST USING FIGURES FOR THE EXAMPLE. BUT THAT FIRST UNIVERSAL LENDING SERVICED 2,000 CUSTOMERS, AND WE WERE SUCCESSFUL IN GETTING EITHER A REDUCTION IN INTEREST RATE AND/OR MONTHLY PAYMENTS IN, YOU KNOW, 1,700 OF THOSE. WOULDN'T YOU BE INTERESTED IN GIVING THAT INFORMATION TO THE COURT?

THE WITNESS: I WOULD, AND I AGREE WITH THAT. I GUESS MY POINT WAS FROM LOOKING AT THE CASE LAW THAT BECAUSE FIRST UNIVERSAL LENDING CEASED OPERATIONS IT'S FAIRLY IRRELEVANT IF THERE IS AN INJUNCTION AGAINST AN ENTERPRISE THAT DOESN'T OPERATE ANYMORE.

WE ARE ARGUING HERE, WE ARE DISCUSSING FILES ABOUT A COMPANY THAT JUST DOESN'T OPERATE, NUMBER ONE; AND, NUMBER TWO, ALL THE FILES THAT WE ARE TALKING ABOUT ARE ACTUALLY FILES OF BRANCH OFFICES THAT ARE COMPLETELY AND INDEPENDENTLY OWNED. SO FROM MY PERSPECTIVE AFTER RESEARCHING THE CASE LAW THE BIG ELEMENT IS AN INJUNCTION IS JUST NOT CONTINUING HARM, AND THERE CAN'T BE ANY CONTINUING HARM IF THE ENTERPRISE DOESN'T EXIST.

THE COURT: BUT THAT WOULD DEPEND ON THE INDIVIDUAL WHO MAKES THE FINAL DETERMINATION AS TO WHAT IS RELEVANT AND NOT RELEVANT, RIGHT?

THE WITNESS: ABSOLUTELY, YOUR HONOR.

THE COURT: GO AHEAD, COUNSEL.

MR. SINASOHN: THANK YOU, YOUR HONOR.

BY MR. SINASOHN:

Q. MR. FEINGOLD, WHAT IS THE PAYMENT ARRANGEMENT THAT YOU -- THAT FIRST UNIVERSAL LENDING, SLASH, HOLDINGS HAS WITH THE LAW OFFICES FOR WHOM THEY PROVIDE BACK OFFICE SUPPORT?

A. MY FIRM IS COMPENSATED AS FOLLOWS, AND I THINK I EXPLAINED THIS WHEN I WENT THROUGH MY DIRECT.

INITIALLY, YEARS AGO WE WERE PAID STRAIGHT HOURLY FEES --

Q. WELL, OBJECTION. MOVE TO STRIKE.

MY QUESTION IS NOT ABOUT YOU. MY QUESTION IS, WHAT IS THE PAYMENT ARRANGEMENT BETWEEN THE CORPORATE DEFENDANT AND THE LAW FIRMS FOR WHOM THEY BACK-UP SUPPORT. ARE YOU SAYING THAT THEY PROVIDE --

A. OH, I APOLOGIZE. I MISUNDERSTOOD YOUR QUESTION. I THOUGHT YOU MEANT FEINGOLD & KAM. YOU ARE TALKING ABOUT THE STRATTON & FEINSTEIN AND --

Q. YES.

A. OKAY. THOSE FIRMS HAVE AN AGREEMENT WITH FIRST UNIVERSAL HOLDINGS WHERE HOLDINGS IS COMPENSATED FOR ITS OVERHEAD PLUS $100 PER FILE, PER MONTH. IN RETURN ALL OF THE BACK OFFICE WORK, INCLUDING COLLECTING MAIL, COLLECTING E-MAILS, COLLECTING FINANCIAL DOCUMENTS, PREPARING FINANCIAL

AFFIDAVITS, PREPARING HARDSHIP LETTERS, RECEIVING ALL COURT FILINGS, DOCKETING THOSE COURT FILINGS, HIRING LOCAL COUNSEL, GETTING APPEARANCE COUNSEL, DRAFTING MEDIATION SUMMARIES, DRAFTING CASE SUMMARIES FOR THE ATTORNEYS IN ORDER TO NEGOTIATE WITH CREDITORS, ALL OF THAT WORK IS ENCOMPASSED BY HOLDINGS. NONE OF THAT HAD EVER BEEN CLOSELY BEEN DONE BY LENDING. LENDING NEVER PROVIDED ANY SERVICES TO LAW FIRMS LIKE THAT.

Q. YOU TESTIFIED, I BELIEVE, THAT FIRST UNIVERSAL MAINTAINED COURT FILINGS FOR THE COMPANIES THAT IT PROVIDED BACK OFFICE SUPPORT FOR, IS THAT CORRECT?

A. YEAH. THE COURT FILINGS COME IN, THE COMPLAINTS COME IN, THE SUMMONSES COME IN. MIRANDA WILL DOCKET THE DEADLINES. SOME STATES YOU HAVE 20 DAYS IN OTHERS YOU HAVE 30. SHE WILL DOCKET THOSE, SHE WILL FORWARD THOSE ELECTRONICALLY TO THE LAWYERS.

THE LAWYERS WILL DRAFT ANSWERS, MOTIONS TO DISMISS, WHATEVER THEY DO. CERTAIN JURISDICTIONS, FOR EXAMPLE, IN FORECLOSURE WILL REQUIRE NOT NECESSARILY AN ANSWER BUT AN APPEARANCE ADHERING. IT WILL COME BACK TO FIRST UNIVERSAL HOLDINGS. THEY WILL ARRANGE AND MAKE SURE THAT THERE IS AN APPEARANCE AT THE HEARING BY AN ATTORNEY.

WHEN THERE IS CREDIT CARD ARBITRATION, CREDIT CARDS UNTIL RECENTLY USED THE TRIPLE A, THE AMERICAN ARBITRATION ASSOCIATION. WHEN THOSE COMPLAINTS WOULD COME

IN A LOT OF TIMES IF THEY WERE SMALLER DENOMINATED VALUE CREDIT CARD BALANCES THERE WOULD BE HEARINGS SET. FIRST UNIVERSAL HOLDINGS WOULD SCHEDULE AND WOULD MAKE SURE THAT THE CLIENT, THAT THEY HAD TO ATTEND THE HEARING, THAT THERE WAS AN ATTORNEY FOR THEM AT THE HEARING, THAT THERE WAS A SUMMARY OF THEIR DEBTS AND OTHER FINANCIAL HARDSHIPS SO THAT THEY COULD GO TO THE HEARING, WHICH A LOT OF THESE HEARINGS HAD MEDIATION AHEAD OF TIME. THAT'S WHAT HOLDINGS DOES. LENDING HAD NOTHING TO DO ANYTHING CLOSE TO THAT.
Q. THE INFORMATION THAT YOU JUST DESCRIBED, IS THAT PLACED IN THE SALES FORCE, IS THAT CORRECT?
A. THAT STUFF IS IMAGED INTO SALES FORCE.
Q. AND SALES FORCE IS REMOTELY ACCESSED BY THE LAW FIRMS, IS THAT CORRECT?
A. THAT'S CORRECT.
Q. AND YOU WOULD AGREE THAT THE LAW FIRMS FOR WHOM YOU PROVIDE BACK OFFICE SUPPORT, THEY HAVE THE ULTIMATE RESPONSIBILITY TO PROTECT THEIR CLIENTS LEGAL INTERESTS, CORRECT?
A. I AGREE. I THINK THAT THE LOG THAT I WENT THROUGH BEFORE ABOUT THE AMERICAN BAR ASSOCIATION AND THE FLORIDA BAR ALL SAY THAT ULTIMATELY THE LAWYERS AS OUTSIDE FIRMS NEED TO OVERSEE THE FILES AND MAKE SURE THAT THE WORK IS DONE COMPETENTLY, AND DILIGENTLY, AND COMPLETELY.
Q. IN YOUR OPENING YOU TOLD THE COURT THAT I SAID TO YOU,

I'LL DO WHAT I WANT. I'M ON THE SAME TEAM AS THE JUDGE," AND, "MY BOSS WON'T SPEAK WITH YOU." DO YOU REMEMBER THAT?
A. ABSOLUTELY.
Q. CAN YOU TELL THE COURT WHEN THESE THINGS WERE SAID, WHO WAS THERE WHEN I SAID THEM, AND WHO ELSE WAS THERE WHEN IT WAS AND WHERE IT WAS.
A. ABSOLUTELY, POSITIVELY, YES.
Q. PLEASE.
A. NUMBER ONE, WHEN I SHOWED UP AT THE OFFICES ON THE 19TH INITIALLY, I INITIALLY MET WITH YOU, MISS MOSCOWITZ, MISS KUDMAN AND MYSELF IN MY SIDE OFFICE -- MY SIDE CONFERENCE ROOM AREA.
WHEN YOU ALL INITIALLY WANTED TO SPEAK TO ME I ADVISED YOU THAT I WANTED TO READ ALL THE DOCUMENTS THAT WERE PROVIDED. I THEN LEFT AND WENT INTO MY LARGE CONFERENCE ROOM, AND I TESTIFIED BEFORE, WITH THE LAWYERS AT MY FIRM, WITH THE ZAUSNERS.
WHEN I CAME BACK, BECAUSE THE UNDERSTANDING WAS WHEN I WAS DONE READING I WOULD FIND YOU ALL TO SIT DOWN WITH YOU ALL. WHEN I CAME BACK I WALKED STRAIGHT AHEAD, AND YOU KNOW THE FOYER AREA, TO THE RIGHT YOU CAN TURN INTO THE LOBBY OF MY LAW OFFICE. STRAIGHT AHEAD IS THE DOOR THAT LEADS TO THE BACK AREA WHERE THE PEOPLE WERE.
WHEN I WALKED IN THERE YOU WERE STANDING THERE, AND THAT'S WHEN WE HAD OUR CONVERSATION, AND THAT'S WHEN I

ADVISED YOU THAT YOU HAD SUED LENDING, IT WAS CLOSED, YOU HAD TAKEN OVER ANOTHER COMPANY CALLED -- ALSO TAKEN OVER, IN ESSENCE, MY LAW FIRM AND THAT'S WHEN YOU RESPONDED TO ME THAT YOU COULD DO WHAT YOU WANTED AND THAT YOU WERE ON THE SAME TEAM AS THE COURT.

I THEN TURNED AROUND AND WALKED AWAY FROM YOU AND SAID, "WELL, GET THE RECEIVER AND EVERYBODY ELSE. I'M, YOU KNOW, BASICALLY DISGUSTED WITH YOU AND YOUR ATTITUDE." TURNED AROUND AND WALKED INTO MY OFFICE, SAT AT MY LARGE TABLE, WHICH YOU CAN SEE ON THE PHOTOGRAPH THAT'S WHERE MY COMPUTER IS, SAT THERE AND APPROXIMATELY FIVE TO 10 MINUTES LATER YOU FILED IN WITH THE REMAINING PARTIES FROM THE RECEIVER AND RECEIVER'S ATTORNEY AND WE SAT BACK DOWN AND BEGAN TALKING.

WHEN YOU TOLD ME THAT I COULDN'T SPEAK TO YOUR BOSS, THAT WAS THE FOLLOWING DAY, SIR, ON THE FRIDAY WHEN YOU WERE IN THE OFFICE. WHEN ULTIMATELY I BEGAN SPEAKING TO YOUR BOSS IN THE AFTERNOON AND THEN YOU CAME TO MY DESK IN THE LATE AFTERNOON RIGHT BEFORE SUNDOWN AND SABBATH, AND WE WERE ON SPEAKING PHONE AND YOU WERE STANDING TO MY RIGHT LEANING OVER MY DESK BECAUSE MY TELEPHONE IS ON MY LEFT-HAND SIDE AND I HAD THE SPEAKER ON AND WE WERE TALKING TO YOUR BOSS.

Q. SO THE EVERYTHING EXCEPT MY BOSS ON THE SPEAKER THAT WAS SAID THE VERY FIRST NIGHT THAT YOU MET ME, IS THAT

CORRECT?
A. YES.
Q. AND YOU WERE DISGUSTED BY THAT.
A. I STILL AM.
Q. DIDN'T YOU TESTIFY YESTERDAY THAT WE HAD A RELATIONSHIP WHERE YOU WERE CALLING ME BY MY FIRST NAME GIDEON AND THAT IT WAS ALL RUINED LATER?
A. YES. AND I DID EXPLAIN, AND I HOLD THIS TRUE WITH THE LITIGATION THAT I DO, THAT IN MY MIND I SAID TO MYSELF, "TRY TO BE AMICABLE. NOBODY WINS FROM THIS STUFF." AND I HAVE SAT, SIR, NOT ONLY WITH YOURSELF BUT IN LOTS OF CASES WHERE PEOPLE HAVE SAID LOTS OF THINGS THAT I DIDN'T REALLY APPRECIATE, BUT I RECOGNIZE FOR THE GREATER GOOD OF THE CLIENT, AND ALSO IN THIS CASE I WAS A DEFENDANT, TRY TO KEEP CALM AND COMPOSED AND TRY TO BE AMICABLE.
AND, IN FACT, IT CERTAINLY HELD TRUE WHEN THE FOLLOWING DAY I HAD MULTIPLE TELECONFERENCES WITH YOUR BOSS MR. ALBINE AND, IN FACT, CAME TO AN AGREEMENT WITH HIM THAT YOU ALL WERE REMOVING THE RECEIVER, THAT IN FACT WITH SALES -- AND I UNDERSTOOD THE LAW PRETTY CLEARLY. WITH ME TELLING HIM NOT ONLY ARE SALES STOPPED BUT THEY ARE DONE FOREVER. AND I SAID TO HIM, I SAID, "I SPOKE TO THE ZAUSNERS. SALES ARE DONE FOREVER, CLOSED, FINISHED. THIS IS A BACK OFFICE COMPANY. JUST PUT A MONITOR IN TO OVERSEE. NO PROBLEM. THIS COMPANY NEEDS TO BE OPERATIONAL. THERE IS LOTS OF

FILES." HE UNDERSTOOD IT PRETTY WELL.

Q. MR. FEINGOLD, ISN'T IT TRUE THAT THE FTC WAS CONSIDERING A MONITORSHIP FOR YOUR COMPANY UNTIL THEY LEARNED OF THE SITES YOU HAD NOT DISCLOSED AND NO LONGER COULD TRUST YOU?

A. NO. AND YOU KNOW WHAT? THAT'S -- FIRST OF ALL, NUMBER ONE, IT'S NOT MY COMPANY, SIR. IT'S NOT MY COMPANY, NUMBER ONE.

Q. WELL, THAT'S YOUR POSITION.

A. NUMBER TWO -- NUMBER TWO, IS THE FACT THAT EVERYTHING WAS WORKED OUT AND FINE UNTIL YOU, SIR, YOU, SIR, ADVISED YOUR BOSS THAT I, AN OUTSIDE LAWYER, HAD HIDDEN OFFICES FROM YOU BECAUSE THE SHREDIT SERVICER HAD SHOWN UP AT THE OFFICES AND WAS EMPTYING BINS AND YOU THOUGHT I WAS OBSTRUCTING JUSTICE AND HAVING EVIDENCE DESTROYED AND YOU THOUGHT LOCATIONS WERE HIDDEN FROM YOU.

WHEN I SAID TO YOU, NUMBER ONE, I SHOWED UP AS WE ALL ACKNOWLEDGED TWO TO THREE HOURS AFTER YOU ALL WERE THERE. I HAD NO IDEA -- TO THIS DAY I HAVE NO IDEA IF YOU ACTUALLY SAT AND TALKED TO ANYONE, IF ANYONE GAVE YOU A TOUR.

THE FIRST OF EVER BUSINESS FOR ME, SIR, WAS NOT TO WALK IN AND SAY, "OH, HELLO, GIDEON. HAS EVERYONE GIVEN YOU A TOUR AND SOME COFFEE? LET'S SHOW YOU AROUND THE PLACE."

IT WAS, I WALKED IN THERE, YOU HAD A PROCESS

SERVER WAITING FOR ME WITH THE PRESS, AND A PROCESS SERVER WAITING TO SERVE ME IN THE LOBBY. I DON'T THINK MY FIRST QUESTION TO WAS, "MAY I SHOW YOU AROUND THE FACILITIES?"

FAR FROM IT. AND WHAT I DID DO WAS WHAT MISS KUDMAN TOLD ME TO DO WAS AFTER IT WAS RECOGNIZED THAT YOU WERE IN A VERY DISTRUSTFUL MODE, TO USE KIND WORDS, SHE SAID TO ME, "HEY, YOU KNOW WHAT? IT'S PROBABLY NOT A BAD IDEA IF YOU MAKE A WHOLE SUMMARY OF THE ENTIRE BUSINESS FOR HIM BECAUSE THIS IS A FAIRLY LARGE OPERATION AND I DON'T THINK ANYONE HAS HEARD EVER IT."

I THEN TYPED FOR YOU, WHICH I ASKED YOU YESTERDAY TO GIVE TO ME BECAUSE I GLADLY READ IT TO THE COURT, A VERY EXTENSIVE, AND I THINK IT'S -- I DON'T KNOW HOW MANY PAGES BUT SINGLE SPACED TYPED ON MY COMPUTER, IT LOOKED LIKE IT WAS LIKE FOUR OR FIVE PAGES MAYBE SIX, I DON'T THINK HOW LONG, BUT A VERY EXTENSIVE SUMMARY OF THE BUSINESS WHICH YOU ACKNOWLEDGED YOU GOT FROM ME AT MIDNIGHT BECAUSE I GOT A RESPONSE FROM YOU.

THEN ON TOP OF THAT TO MAKE SURE YOU UNDERSTOOD THE BUSINESS, THE FOLLOWING NIGHT I THOUGHT OF OTHER THINGS THAT YOU MIGHT NOT KNOW AND I WENT AND SENT YOU A SECOND E-MAIL, WHICH I THINK WAS MAYBE LIKE A PAGE AND A HALF LONG SAYING, "HERE IS ADDITIONAL INFORMATION FOR YOU."

SO SIR, TO THIS DAY I CAN SIT ON THE STAND AND TELL YOU, I DON'T KNOW EVERY SINGLE CORNER OF THE OFFICE YOU

HAVE WALKED THROUGH. I DON'T KNOW. SO IF IT'S MY OBLIGATION TO SHOW YOU EVERY CORNER OF THE OFFICE THEN I FAILED YOU, SIR, BECAUSE I REALLY DON'T KNOW BECAUSE I REALLY THOUGHT THAT THE OBLIGATION IS ON YOU TO INVESTIGATE AND ON YOU TO ASK THE QUESTIONS TO GET THE ANSWERS TO THE INFORMATION YOU NEED TO KNOW.

I AM CERTAIN, SIR, THAT IF I HAD ENTERED THERE AND YOU SAID TO ME, "WILL YOU PLEASE SHOW ME AROUND EVERY SINGLE PLACE," THERE WOULDN'T HAVE BEEN A PROBLEM. AND I KNOW THAT MY CONDUCT PROVES IT BECAUSE WHEN YOUR OWN COMPUTER TECH SAID TO ME, "HEY, I'M LOOKING FOR THE COMPUTERS THAT HOLD THE FINANCIALS ON THEM," I WALKED HIM ACROSS TO THAT OFFICE AND HAD HIM --

Q. MR. FEINGOLD, I THINK YOU ANSWERED THE QUESTION.

A. NO. LET ME FINISH.

I HAD HIM PLUG IN A BOX ON THE COMPUTER, DOWNLOAD ALL THE INFORMATION AND SIGN AN EVIDENCE TAG IN FRONT OF ME. NOW I'M DONE.

Q. NOW, AS FAR AS THE DISCUSSIONS THAT I HAD SUPPOSEDLY, JUST -- I DON'T WANT TO BELABOR THE POINT, BUT I WANT TO KNOW WHO ELSE WAS AROUND BESIDES YOU AND ME THAT HEARD ME SAY THESE THINGS?

A. WE WERE STANDING RIGHT IN THE DOORWAY TO THE ENTRANCE OF THE BACK OFFICE ROOM. I NOTICED IN THE VERY BACK CORNER WAS AN AFRICAN-AMERICAN GENTLEMEN WHO I NOW KNOW THAT TO BE

MR. LIGGINS BECAUSE I YELLED ACROSS THE ROOM BECAUSE NO ONE INTRODUCED ME TO PEOPLE, "EXCUSE ME, SIR. MY NAME IS DAVID FEINGOLD. WHO ARE YOU?"

HE WAS STANDING IN THE VERY BACK LEFT-HAND CORNER NEXT TO THE DOOR YOU GUYS REFER TO A RED ROOM. THERE IS BEYOND THE RED ROOM ANOTHER DOOR AND I VIVIDLY REMEMBER HIM, HE WAS WEARING A TIE, HE WAS BENT OVER AT THE DESK, AND I YELLED OUT TO INTRODUCE MYSELF TO HIM AND HE TURNED AROUND AND WAIVED AND INTRODUCED HIMSELF. SO I KNOW HE WAS IN THE FAR, FAR CORNER OF THE ROOM.

LET ME THINK ABOUT THIS VISUALLY. MR. KIRTZ, OR KIRTZ OR KIRTZMAN, I CAN'T RECALL HIS EXACT LAST NAME, HE WAS SITTING AT A DESK AT THE VERY, VERY, VERY BACK ROW OF THE ROOM SITTING MUCH LIKE HE IS NOW TAKING NOTES, SINCERELY, AND I COULD SEE HIS HEAD AND I COULD SEE HE WAS SITTING AT A DESK BEHIND HIM WHERE THE PHOTOCOPIERS ARE. YOU WERE UP FRONT CLOSE TO ME AND YOU SEEMED TO BE THE POINT PERSON ON THIS BECAUSE THE MAJORITY OF THE CONVERSATIONS THAT I HAD WERE WITH YOU AND YOU WERE STANDING ON THE FRONT END BY THE ENTRANCE DOOR WHERE THE TWO FOYERS CONNECT. THERE IS NOT A DOUBT IN MY MIND, SIR.

Q. ANYBODY ELSE --

A. INDELIBLY IN MY MIND.

Q. SO WERE THESE PEOPLE THEN SHOUTED OUT --

A. NO, SIR. THERE WAS -- SIR, THERE WAS NEVER SHOUTING,

AND YOU KNOW THAT. I WASN'T THERE WHEN EVERYONE ENTERED THE OFFICES WITH THE POLICE SO I CAN'T SPEAK TO THAT --

THE COURT: I THINK WHAT COUNSEL IS ASKING IS, WHO OTHER THAN YOURSELF WOULD HAVE HEARD THESE COMMENTS BY COUNSEL THAT YOU ATTRIBUTED TO HIM.

THE WITNESS: WELL, I DON'T KNOW IF ANYONE OVERHEARD THEM, BUT I KNOW YOU SAW ME TURN MY BACK AND SAY TO YOU, "JUST GET THE RECEIVER AND EVERYONE AND LET'S GO HAVE A MEETING," AT WHICH POINT I TURNED AROUND, WALKED THROUGH MY LOBBY, WENT AND AT SAT DOWN AT MY DESK AND WAITED FOR YOU ALL TO ENTER INTO MY OFFICE AREA AND WE SAT AT MY LITTLE SIDE FACILITY.

BY MR. SINASOHN:

Q. AND WITH REGARD TO THE NEXT DAY YOU SAID A COMMENT, "MY BOSS WON'T SPEAK TO YOU." WOULD ANYBODY HAVE HEARD THAT COMMENT?

A. YOU KNOW WHAT? I THINK -- I THINK THAT IT'S POSSIBLE THAT THE COMPUTER TECH GUY JEFFREY MAY HAVE HEARD THAT BECAUSE WE HAD -- THAT DIDN'T HAPPEN ONCE BY THE WAY, SIR. THAT HAPPENED MULTIPLE TIMES WHERE I ASKED YOU THAT I WANTED TO SPEAK TO YOUR BOSS AND YOU SAID TO ME, "HE WON'T SPEAK TO YOU. HE DOESN'T SPEAK TO LITIGANTS. HE IS MY BOSS. IT'S MY CASE AND I'M HANDLING IT."

IT WASN'T UNTIL THE AFTERNOON -- AND, IN FACT, AT ONE POINT IN TIME YOU WERE ON THE CELLPHONE -- I ACTUALLY

VERY VIVIDLY, YOU WERE ON THE CELLPHONE WITH HIM STANDING IN MY OFFICE SPEAKING TO HIM, AND I SAID, "HEY, LET ME SPEAK TO -- NO. NO. NO. I'VE GOT IT. I'VE GOT IT."

YOU WERE SPEAKING TO HIM. THEN FINALLY THE FIRST CONTACT I HAD WITH HIM, I BELIEVE HE CALLED ME DIRECTLY. I BELIEVE THAT YOU THEN GAVE HIM MY PHONE NUMBER, HE CALLED ME DIRECTLY, I WAS AT MY DESK, AND THEN I ASKED HIM FOR HIS NUMBER SO THAT I COULD FOLLOW UP AND CALL HIM DIRECTLY.

Q. IS THAT -- HAVE YOU FULLY DESCRIBED WHAT YOU CLAIM TO HAVE HEARD ME TELL YOU AT ANY TIME? I MEAN, ARE THERE ANY OTHER COMMENTS THAT I MADE THAT YOU HAVEN'T DISCUSSED?

A. YES. ACTUALLY I FORGOT TO TESTIFY ABOUT THE ACCUSATION THAT WHEN I WENT TO COLORADO I WAS PROBABLY LEAVING TO HIDE MONEY AND YOU KNEW THERE WAS A COLORADO OFFICE.

I BELIEVE MISS KUDMAN AND I DISCUSSED THAT BECAUSE I WAS SO SHOCKED AND OUTRAGED THAT I WAS BEING ACCUSED THAT I WAS GOING TO COLORADO TO HIDE MONEY, AND THERE WAS A COLORADO OFFICE WHEN -- THERE ARE E-MAILS OF ME SAYING, "I'M GOING" -- THERE IS AN E-MAIL FROM ME ON SUNDAY, ON SUNDAY BEFORE I LEFT SAYING, "HERE IS ADDITIONAL TERMS REGARDING THE SETTLEMENT. YOU KNOW, I'LL BE TRAVELING." IT WAS NEVER HIDDEN I WAS TRAVELING, AND YET THEN THERE WAS THIS COMMENT BY YOU ABOUT ME TRAVELING TO COLORADO.

AND NOT ONLY DID YOU MAKE IT TO ME, BUT YOU ACTUALLY MADE IT TO GLORIA TOTE AT MY OFFICE IN THE LOBBY,

AND SHE WAS SITTING RIGHT THERE AND FAIRLY OFFENDED TO HEAR YOU SAY, "OH, HE'S SKIPPED TOWN. HE'S HIDING HIS MONEY."
Q. ANY OTHER COMMENTS THAT I MADE?
A. YOU MADE A LOT OF COMMENTS, SIR, BUT I AM TRYING TO LIST THE ONES THAT ARE JUST CLEARLY THE MOST OUTRAGEOUS.
MR. SINASOHN: YOUR HONOR, MAY I APPROACH THE WITNESS?
THE COURT: YOU MAY.
BY MR. SINASOHN:
Q. I WANT TO HAND YOU SOME DOCUMENTS.
MR. SINASOHN: THEY HAVE NOT BEEN MARKED OR IDENTIFIED, YOUR HONOR.
THE COURT: THAT IS FINE.
BY MR. SINASOHN:
Q. THESE ARE FROM THE --
A. YES, SIR.
Q. YES.
A. YES.
Q. CAN YOU TAKE A LOOK AT THE -- THE FIRST DOCUMENT THERE, IS THAT FROM FIRST UNIVERSAL LENDING?
A. YES, SIR.
Q. AND AS OF THIS MORNING -- SEE WHERE IT'S PRINTED OUT THIS MORNING?
A. ABSOLUTELY. AND I THINK I HAVE TESTIFIED TO THAT. IT HASN'T DISSOLVED. IT HADN'T BEEN ADMINISTRATIVELY

DISSOLVED. ABSOLUTELY.
Q. WHAT WAS THE CUTOFF DATE FOR DOING BUSINESS?
A. THE CUTOFF DATE FOR DOING BUSINESS?
Q. YOU SAID IT STOPPED DOING BUSINESS.
A. YES. WHEN IT TURNED ITS LENDER'S LICENSE IN, IN APPROXIMATELY, I DON'T KNOW, SEPTEMBER 28TH, WHATEVER DATE THAT THE DEPARTMENT OF FINANCIAL REGULATION ACCEPTED THAT -- GIVE ME THE DOCUMENT AND YOU WILL SEE -- THAT'S WHEN IT STOPPED.
Q. THE NEXT DOCUMENT IN THAT PACKET IS ALSO FROM THE FLORIDA DEPARTMENT OF STATE --
A. YES.
Q. -- DIVISION OF CORPORATIONS.
A. YES.
Q. AND IT'S FOR A COMPANY CALLED FIRST UNIVERSAL GROUP, LLC. DO YOU SEE THAT?
A. YES, SIR.
Q. AND THAT'S ALSO ACTIVE, RIGHT?
A. YES, SIR.
Q. AND THAT'S IN THE POMPANO BEACH LOCATION?
A. YES. REGISTERED AGENT -- AND JUST SO WE ARE CLEAR, FIRST UNIVERSAL LENDING, REGISTERED AGENT IS DAVID FEINGOLD OF THE LAW FIRM OF FEINGOLD & KAM. I SEE FIRST UNIVERSAL GROUP IN POMPANO BEACH, REGISTERED AGENT OSCAR GONZALEZ NOT FEINGOLD & KAM. YES.

Q. THAT'S OWNED BY GROUP PARTNERS, CORRECT?
A. IT SAYS IT'S MANAGER IS GROUP PARTNERS. IT DOES NOT SAY WHO OWNS IT, SIR.
Q. ARE YOU FAMILIAR WITH SOMETHING CALLED ZOOMINFO.COM?
A. NO, SIR.
Q. YOU NEVER PUT ON THERE A LITTLE -- A BLURB ABOUT YOURSELF, ABOUT WHAT YOU DO IN YOUR FIRM?
A. NEVER.
Q. CAN YOU TAKE A LOOK AT THE NEXT DOCUMENT, WHICH IS FROM ZOOMINFO.COM.
A. YES.
Q. IT SAYS, "MR. DAVID FEINGOLD, MANAGING MEMBER." IT WAS PRINTED OUT THIS MORNING?
A. YES.
Q. IT SAYS, "MANAGING MEMBER, FEINGOLD & KAM," AND UNDERNEATH THAT IT SAYS, "EMPLOYMENT HISTORY, MANAGING MEMBER, FEINGOLD & KAM, PRINCIPAL, FIRST UNIVERSAL GROUP, INC.
A. YES.
THE COURT: SLOW DOWN.
THE WITNESS: YES.
IT ALSO SAYS I AM A PAST LICENSED ATTORNEY. SIR, I AM A PRESENT LICENSED ATTORNEY. THIS IS INTERESTING. WHAT IS ZOOMINFO THAT YOU NO SO MUCH ABOUT, SIR? I HAVE NO IDEA. I HAVE NEVER SEEN THIS. AND IT APPEARS TO ME THAT

THIS IS A BLOG THAT SOMEONE CAN POST A PROFILE ABOUT SOMEBODY ON. AND I WILL TELL YOU --
Q. THERE IS NO QUESTION PENDING. I'M JUST SHOWING YOU THE ZOOMINFO THAT SAYS THAT YOU ARE THE PRINCIPAL OF THIS COMPANY.
A. YEAH. THAT'S FAIRLY INTERESTING, SIR.
Q. THE NEXT DOCUMENT, MR. FEINGOLD, IS -- BY THE WAY, DO YOU HAVE AN INTEREST IN GROUP PARTNERS?
A. NONE WHATSOEVER. AND I NOTICED THAT THIS ZOOMINFO WAS PRINTED 12-10.
Q. THAT'S TODAY.
A. THAT'S TODAY, YES.
Q. THE NEXT DOCUMENT IS FROM THE FLORIDA DEPARTMENT OF STATE, DIVISION OF CORPORATIONS.
A. YES.
Q. FIRST UNIVERSAL CONSULTING, LLC, CORRECT?
A. YES, SIR.
Q. AND THAT IS A COMPANY THAT IT SAYS IS OWNED -- EXCUSE ME, WHOSE MANAGER IS LENDING PARTNERS, CORRECT?
A. THAT'S CORRECT. AND IT SAYS THE REGISTERED AGENT IS THE LAW FIRM OF FEINGOLD & KAM, CORRECT.
Q. AND AGAIN, LENDING PARTNERS IS THE ZAUSNER BROTHERS, CORRECT?
A. THAT'S CORRECT.
Q. AND THE NEXT DOCUMENT IS FIRST UNIVERSAL GROUP, LLC.

THAT'S THE SAME --
A. THAT'S THE SAME ONE, SIR.
Q. -- WE TALKED ABOUT. OKAY.
NOW, THE NEXT DOCUMENT, IT'S CALLED FOR A COMPANY FIRST UNIVERSAL, INC.?
A. YES, SIR.
Q. AND THIS LOOKS LIKE IT WAS ESTABLISHED APRIL 16TH, 2009.
A. YES, SIR.
Q. YOUR COMPANY IS THE REGISTERED AGENT.
A. ABSOLUTELY.
Q. AND MR. SEAN ZAUSNER, MR. DAVID ZAUSNER, MR. BILLY CHRISTAKOS ARE THE DIRECTORS OF THIS COMPANY.
A. ABSOLUTELY.
Q. AND THIS COMPANY IS A -- IS THIS COMPANY A NONPROFIT COMPANY, ESTABLISHES A 501C3?
A. YES, SIR.
Q. WHAT'S THE PURPOSE OF THAT COMPANY?
A. BECAUSE CERTAIN CORPORATIONS WILL ONLY DEAL WITH CERTAIN LENDERS, WILL ONLY DEAL WITH NONPROFITS IN MODIFYING A MORTGAGE. SO THAT CORPORATION IF YOU LOOK WAS FORMED 4-20-09 --
Q. I SEE 4-16.
A. IT SAYS DATE FILED, 4-20-09 AS A NOT-FOR-PROFIT ORGANIZATION THAT COULD DO MODIFICATIONS, NOT CHARGING

PEOPLE ANYTHING, AND DEALING WITH THE NONPROFIT DIVISIONS OF LENDERS. EVERY LENDER HAS A DIVISION THAT DEALS WITH NONPROFITS WITH REGARDS TO MODIFICATIONS.
Q. THE NEXT DOCUMENT IN THE PACKET IS FROM FIRST UNIVERSAL HOLDINGS, LLC, CORRECT?
A. YES, SIR.
Q. AND THAT SHOWS THAT THE MANAGER IS SEAN ZAUSNER --
A. THAT'S CORRECT.
Q. -- CORRECT?
A. NOT LENDING PARTNERS. BUT SEAN ZAUSNER. DIFFERENT THAN FIRST UNIVERSAL LENDING, COMMA, LLC. MUCH DIFFERENT. AND IT SHOWS THAT IT WAS FILED ON 6-23-09, WHICH IS CONSISTENT WITH MY TESTIMONY WHEREIN I EXPLAINED THAT THIS BUSINESS STARTED RENDITION OF TRYING TO GET UP OPERATING AROUND THE SUMMER IN A FORMALIZED PLACE, AND I THINK JUNE IS THE SUMMER. SO THAT'S CORRECT, SIR.
COUNSEL, THERE IS ANOTHER SHEET.
Q. WHAT IS THAT?
A. IT'S THE DEPARTMENT OF STATE FILING FOR FIRST UNIVERSAL HOLDING.
Q. IT WAS PART OF IT.
A. OKAY.
Q. NOW, THERE WAS SOME DISCUSSION YESTERDAY ABOUT THE FINANCIAL STATEMENT THAT THE CORPORATE DEFENDANT FILLED OUT IN THIS CASE.

A. YES, SIR.
Q. AND YOU REMEMBER THAT THE CORPORATION'S FULL NAME THAT YOUR CLIENT PUT HERE WAS FIRST UNIVERSAL HOLDINGS, LLC, CORRECT?
A. IF YOU SHOW IT TO ME. I MEAN -- BECAUSE I DON'T REMEMBER. I DON'T THINK YOU EVER HANDED THIS TO ME IN MY TESTIMONY YESTERDAY. YES.
Q. AND YOU MADE SURE THAT YOUR CLIENT READ THE INSTRUCTIONS THAT CAME ALONG WITH THE FORM, CORRECT, AS TO HOW TO PUT IN THE CORPORATION'S FULL NAME?
A. NO, SIR. I GAVE THE FORM TO MY CLIENT AND SAID IT NEEDED TO BE FILLED OUT. I DIDN'T SIT THERE AND GO THROUGH IT LINE BY LINE AND ASK THE CLIENT TO READ IT. I JUST HANDED THE CLIENT THE FORM AND ASKED HIM TO FILL IT OUT.
Q. YOU ACTUALLY SENT THE -- ON DECEMBER 1ST YOU SENT FINANCIAL STATEMENTS FOR YOURSELF AND FOR FIRST UNIVERSAL HOLDING TO THE RECEIVER, CORRECT?
A. I DON'T KNOW THE DATE, BUT I DID SEND BY E-MAIL THE FINANCIAL STATEMENTS TO THE RECEIVER, YES.
Q. AND THEN THE NEXT DAY YOU SENT MR. -- THE TWO ZAUSNER BROTHERS FINANCIAL STATEMENTS, OR SOMEONE DID TO THE RECEIVER, CORRECT?
A. I THINK MY TESTIMONY WAS I THOUGHT IT WAS IN THE NEXT DAY, TWO TO THREE DAYS. I'M NOT CERTAIN. I DON'T KNOW IF I WAS THE ONE THAT E-MAILED IT TO THEM.

Q. BUT TO THIS DAY NEITHER YOU, NOR FIRST UNIVERSAL, NOR THE ZAUSNER BROTHERS HAVE SENT THE FINANCIALS TO ME, CORRECT?

A. THAT'S COMPLETELY AND UTTERLY FALSE. I KNOW FOR A FACT THE WAY IT WENT WAS TO THE RECEIVER AND THEN TO YOU.

Q. THAT'S NOT THE QUESTION.

A. OH, DID I PRESS THE E-MAIL BUTTON DIRECTLY TO YOU? NO, SIR. WHAT WE DID WAS CONFIRMED THAT YOU WERE PROVIDED COPIES.

Q. WHEN WAS I PROVIDED COPIES OF THE ZAUSNER BROTHERS FINANCIAL STATEMENTS?

A. THE EXACT DATE AND TIME, SIR, I DON'T KNOW. I DON'T KNOW WHEN YOU OPENED YOUR E-MAIL TO READ THEM.

Q. WHEN DID YOU CONFIRM THAT THEY WERE SENT TO ME?

A. OH, WHEN I SPOKE TO THE RECEIVER'S ATTORNEY, MISS BERG, AND WE -- I SPECIFICALLY SPOKE TO HER BECAUSE I WANTED TO MAKE SURE THAT IF MISS MOSCOWITZ NEEDED ANYTHING FURTHER FROM ME, AND SHE INDICATED TO ME THAT SHE HAD NOT RECEIVED ANY COMMENTS FROM MISS MOSCOWITZ THAT SHE NEEDED ANYTHING FURTHER, AND THAT SHE HAD ALSO CONFIRMED THAT YOU HAD -- YOU ALL HAD RECEIVED COPIES OF THEM.

Q. WHEN?

A. IT WAS PROBABLY THE -- YOU KNOW WHAT? IT WAS THE MORNING THAT I SENT THEM BECAUSE I SAID TO HER, "YOU KNOW, MISS MOSCOWITZ ASKED ME TO SEND THEM TO HER WITHIN 24

HOURS," AND I SAID, "I SENT THEM QUICKER BECAUSE I REALIZE NOW THAT THIS RESOLUTION ISN'T HAPPENING. SO I AM GOING TO GO BACK TO, YOU KNOW, THE STANDING ORDER AND MAKE SURE WE ACT AS RAPIDLY AS POSSIBLE."

Q. AND MISS BERG TOLD YOU THAT THE FINANCIAL STATEMENTS WERE FORWARDED TO ME ON DECEMBER 2ND, IS THAT WHAT YOU SAID?

A. I DID NOT SAY THAT, SIR.

Q. SO WHAT ARE YOU SAYING?

A. I DID NOT SAY THAT. I SAID THAT I HAD A DISCUSSION WITH HER AND CONFIRMED THAT YOU HAD GOTTEN THEM. AND, IN FACT, THAT'S WHERE UNFORTUNATELY I HAD TO STATE THAT OFF THE RECORD SHE HAD INDICATED TO ME THAT, YOU KNOW, SHE FELT LIKE YOU HAD A VENDETTA AGAINST ME. SHE FELT THAT YOU HAD A PROBLEM WITH ME MAKING MONEY.

HER AND I HAD A DISCUSSION AT LENGTH ABOUT, "HEY, DON'T WE STILL LIVE IN AMERICA? ISN'T THERE SOMETHING TO BE SAID FOR BEING SUCCESSFUL?" I RECALL THAT QUITE VIVIDLY. AND THEN AS A MAN OF MY HONOR, BECAUSE SHE SAID TO ME, "YOU KNOW, THIS IS KIND OF OFF THE RECORD. I DON'T WANT TO GET IN THE MIDDLE OF THIS. I DON'T KNOW WHAT HIS PROBLEM IS WITH YOU. HE SPEAKS DOWN TO ME AS WELL. HE TREATS ME LIKE I WORK FOR HIM," AND IT WAS ONE OF THOSE THINGS WHERE IT WAS LIKE VALIDATION FOR THE ISSUES THAT I WAS HAVING WITH YOU.

THE COURT: WHO SAID THIS TO YOU?

THE WITNESS: MISS BERG. IT WAS VALIDATION THAT

THERE IS THIS PERSONALITY ISSUE, AND I -- I AM HAPPY TO ADMIT IT. I HAVE NO PROBLEM IN ADMITTING IT. I THINK THAT HAS POLLUTED A LOT THAT'S GONE ON HERE. A LOT.
Q. MR. FEINGOLD, CAN YOU ANSWER MY QUESTION.
A. YES.
Q. THE QUESTION IS, ON WHAT DATE --
A. YES.
Q. -- DID MISS BERG CONFIRM FOR YOU THAT SHE HAD SENT TO ME, OR SOMEBODY HAD SENT TO ME, OR ANYBODY AT THE FTC THAT FINANCIAL STATEMENTS THAT YOUR CLIENTS WERE ORDERED TO PRODUCE TO ME?
A. SIR, I DON'T KNOW WHAT DATE IT WAS. I CAN TELL YOU THAT NOW. ALL I CAN GIVE YOU IS THE CHRONOLOGY OF DISCUSSIONS I HAD TO TRY TO IDENTIFY IT.
I KNOW FOR A FACT YOU HAVE THEM, SIR. WE ARE STANDING HERE NOW TALKING ABOUT THEM. I KNOW THAT YOU HAVE HAD THEM, SIR. I CAN'T GIVE YOU THE EXACT DATE.
IF YOU WANT TO TELL ME THERE IS A CERTAIN DATE YOU GOT THEM, THAT'S FINE. I DON'T KNOW. BUT THAT -- SIR, THAT HAS NEVER BEEN AN ISSUE IN THIS CASE.
IN FACT, WHEN I WAS DEALING WITH YOUR BOSS, MR. ALBINE, THAT WASN'T EVEN A CONCERN. AND, IN FACT, IF YOU LOOK AT THE ORDER -- THE PREPARED ORDER THAT WE HAD DRAFTED IT WAS AFTER THE JUDGE HAD SIGNED THAT PREPARED ORDER. I THINK WE WOULD HAVE FIVE DAYS FROM THAT DATE TO

ACTUALLY GIVE YOU FINANCIALS.

AS AN ATTORNEY WHO REGULARLY DEALS WITH OTHER LAWYERS IT'S PRETTY MUCH COMMON PRACTICE THAT IF YOU HAVE AN ORDER AND YOU ARE DRAFTING AN AMENDMENT YOU THEN GET THE AMENDMENT SIGNED AND YOU COMPLY WITH THE AMENDMENT.

IT'S ILLOGICAL TO GO HAVE AN ORDER AND COMPLY TO THE LETTER OF THE LAW WHEN YOU ARE ATTEMPTING TO MODIFY IT. YOU CAN'T DO TWO THINGS AT ONCE, SIR. YOU JUST DON'T DO IT THAT WAY.

SO IF YOU WANT TO TELL ME THAT TECHNICALLY I WASN'T IN COMPLIANCE WITH THAT ORDER BECAUSE THE NEW ORDER HADN'T BEEN SIGNED, THAT'S FINE. I WILL ACKNOWLEDGE THAT. I WILL AGREE TO IT. BUT I WILL ALSO TELL YOU THAT STANDARD PRACTICE OF ANYONE WHO PRACTICES LAW, THAT'S WHY YOU DO AMENDMENTS TO ORDERS. SO GO AHEAD, SIR.

Q. MR. FEINGOLD, I'M HANDING THE FINANCIAL STATEMENT FROM FIRST UNIVERSAL HOLDINGS.

A. YES.

Q. CAN YOU TELL WHO'S SIGNATURE IS ON THIS DOCUMENT?

A. THAT APPEARS TO ME TO BE MR. ZAUSNER'S SIGNATURE.

Q. IS THAT SEAN ZAUSNER?

A. YES, SIR.

Q. NOW, YOU TALKED ABOUT CASES AND OPINIONS YESTERDAY. DO YOU RECALL? OR THE DAY BEFORE. IN THE LAST COUPLE OF DAYS, THE CASE LAW? YOU TALKED ABOUT SOME CASES AND ETHICAL

OPINIONS?
A. YES, SIR.
Q. AND THOSE INVOLVED ISSUES OF -- WITH THE RED FLAGS RULE, CORRECT, AND THE OUTSOURCING RESOURCES, CORRECT?
A. SOME OF THOSE CASES DO. THE AMERICAN BAR ASSOCIATION VERSUS THE FEDERAL TRADE COMMISSION DEALT WITH THE RED FLAG ISSUE, WHICH IS WHERE THE FTC ATTEMPTED TO CONTROL BILLING PRACTICES OF LAW FIRMS.
THE FEDERAL DISTRICT COURT CAME OUT WITH AN OPINION ON DECEMBER 1ST, 2009, AND SAID THAT THE FTC DOES NOT HAVE JURISDICTION OVER ATTORNEYS, THAT THAT IS LEFT TO THE STATES.
Q. NOW, WE ALSO TALKED ABOUT --
THE COURT: JUST SO THE RECORD IS CLEAR, MR. FEINGOLD, THAT'S YOUR POSITION IN THIS CASE, CORRECT?
THE WITNESS: WELL, MY POSITION IS, IS THAT HOLDINGS IS A BACK OFFICE OUTSOURCING COMPANY THAT IS ACTING ON BEHALF OF LAW FIRMS THAT --
THE COURT: AND, THEREFORE, THAT THE FTC HAS NO JURISDICTION OVER --
THE WITNESS: WELL, THAT'S ONE OF MY MANY ISSUES, BUT THAT'S JUST ONE OF THE LEGAL PRINCIPLES OUT THERE. I DON'T THINK THAT'S THE MOST INHERENT, THE MOST IMPORTANT ASPECT OF THIS BY ANY MEANS. BUT I THINK THAT INTELLECTUALLY IT'S RATHER INTERESTING THAT THEY ARE

ATTEMPTING NOW TO TAKE YOUR ORDER AND EXTEND IT ON TO HOLDINGS, A COMPLETELY DIFFERENT COMPANY, AND THEY ARE TRYING TO RATIONALIZE THAT IT HAS SOMETHING TO DO WITH WHAT WENT ON AT FIRST UNIVERSAL LENDING, WHICH IS COMPLETELY AND UTTERLY SEPARATE.

BY MR. SINASOHN:

Q. NONE OF THE CASES THAT -- OR OPINIONS THAT YOU DISCUSSED DEAL WITH VIOLATIONS OF SECTION FIVE OF THE TELEMARKETING SALES RULE, CORRECT?

A. WELL, IT'S INTERESTING THAT YOU SAY THAT BECAUSE ACTUALLY IF YOU LOOK AT THAT CASE FAIRLY CLOSELY AND YOU LOOK AT SECTION FIVE AND THE LEGISLATIVE HISTORY YOU WILL SEE IT DOES NOT REGULATE ATTORNEYS AND IT ALSO EXEMPTS FINANCIAL INSTITUTIONS, SIR.

I DON'T KNOW IF YOU REVIEWED THE EXEMPTIONS ON SECTION FIVE. BUT FINANCIAL INSTITUTIONS SUCH AS CORRESPONDENT LENDERS, BROKERS, SAVINGS AND LOANS ASSOCIATIONS, CREDIT UNIONS, WHICH BY THE WAY IF YOU LOOK AT FIRST UNIVERSAL LENDING, FIRST UNIVERSAL LENDING OPERATED AS A CREDIT UNION THROUGH EMORY FEDERAL CREDIT, AS A BANK THROUGH HIGHLAND BANK. ALL THE STUFF THAT WAS GIVEN IN THE LETTER TO THE STATE OF FLORIDA.

IN FACT, IN THE STATE OF FLORIDA IT LISTED ALL THE FEDERAL CREDIT UNIONS, BANKS, SAVINGS AND THRIFTS THAT FIRST UNIVERSAL LENDING OPERATED UNDER, AND THEY ARE ALL LISTED

RIGHT THERE IN THAT LETTER IF YOU HAD LOOKED AT IT.

SO I WOULD SAY THAT THE UNFAIR AND DECEPTIVE TRADE PRACTICES ACT DOES NOT APPLY NOT ONLY TO LENDING INSTITUTIONS BUT IT DOES NOT APPLY TO LAW FIRMS AND LAWYERS, AND I THINK IF YOU LOOK AT THE EXEMPTIONS YOU WILL SEE THAT. BUT THAT'S ONLY ONE OF MY LEGAL GRIPS WITH HOW YOU HAVE HANDLED THIS.

AND AGAIN, I THINK MY BIGGEST -- MY BIGGEST APOLOGY MAYBE TO REPRESENTING FIRST UNIVERSAL LENDING IS THAT WHEN HOLDINGS WAS CREATED THEY SHOULD HAVE JUST CALLED IT OUTSOURCING HOLDINGS, AND NOT USED THE NAME FIRST UNIVERSAL. THEN WE PROBABLY -- YOU CAN LITIGATE WITH FIRST UNIVERSAL LENDING ALL YOU WANT, BUT HOLDINGS AND ALL THE PEOPLE THAT WORKED FOR IT PROBABLY WOULDN'T BE HERE BECAUSE YOU RIGHT NOW, SIR, HAVE SHUT DOWN A BACK OFFICE OUTSOURCING COMPANY FOR LAWYERS.

AND THE REASON WHY I PROVIDED THE LAW REGARDING OUTSOURCING IS TO SHOW THE COURT THAT THIS IS A VERY LEGITIMATE BUSINESS, A VERY SEPARATE BUSINESS, A BUSINESS THAT IS RECOGNIZED NOT ONLY BY THE AMERICAN BAR ASSOCIATION BUT THE FLORIDA BAR, WHICH HAS PUT OUT A CLE COURSE ON IT. AND THAT'S MY INTENT FOR PUTTING ALL OF THAT OUT THERE BECAUSE IT'S, IN ESSENCE, WHAT YOU HAVE DONE IS, YOU GOT A SEARCH WARRANT TO WALK INTO ONE HOUSE AND YOU WENT INTO THE WRONG HOUSE AND YOU SHOT SOMEONE. NOW YOU ARE TRYING TO

EXPLAIN WHY YOU SHOT THEM. SO I'M TRYING TO DESCRIBE WHY THE PERSON THAT YOU SHOT, NOT ONLY ARE THEY COMPLETELY SEPARATE BUT THAT THEIR BUSINESS IS COMPLETELY RECOGNIZED AND ACCEPTED.

Q. YOU ALSO TOLD THE COURT YESTERDAY THAT IT WAS YOUR INTERPRETATION OF SECTION FIVE, I BELIEVE, THAT YOU HAD TO BE INVOLVED IN SALES TO BE LIABLE, IS THAT CORRECT?

A. NO. I NEVER SAID THAT.

Q. OKAY. IN FACT, IN ORDER --

A. LET ME FINISH WHAT I DID SAY.

Q. SURE.

A. WHAT I SAID, SIR, WAS THAT -- I HAVE THE LAW HERE. I DON'T KNOW IF YOU HAVE READ THE CASES, BUT THE LAW SAYS THAT FOR AN UNFAIR AND DECEPTIVE TRADE PRACTICE, AND I'M CITING, JUDGE, THIS IS ACTUALLY TAB NUMBER 11 WHICH IS THE CASE OF THE FEDERAL TRADE COMMISSION VERSUS HOME ASSURE, YOU HAVE TO SHOW ON A SECTION FIVE THERE WAS A REPRESENTATION, THE REPRESENTATION WAS LIKELY TO EXCEED -- MISLEAD AND THAT THE REPRESENTATION WAS MATERIAL.

YOU HAVE TO SHOW WHO DID THE REPRESENTATION. IN EACH ONE OF YOUR EXAMPLES THE PERSON, THE ENTITY THAT DID THE REPRESENTATION WERE THE BRANCHES. SO IT WOULD BE ONE THING IF WE WERE IN THIS COURTROOM AND YOU HAD SUED THE BRANCHES, WHICH WE HAVE ESTABLISHED ARE COMPLETELY AND UTTERLY INDEPENDENTLY OWNED FOR DECEPTIVE SALES BECAUSE

THEY ARE THE ONES THAT DID THE SELLING.

ALL OF THESE AFFIDAVITS THAT YOU FILED, ALL THESE DECLARATIONS, THERE WERE ONLY TWO THAT WERE FROM FIRST UNIVERSAL LENDING, COMMA, LLC, THE PALM BEACH GARDENS OFFICE, AND IN THOSE TWO WE KNOW FROM SALES FORCE THOSE PEOPLE GOT MODIFICATIONS.

ONE FROM MR. MUNOZE, NINE PERCENT DOWN TO SIX PERCENT, AND MR. DADD FROM EIGHT PERCENT DOWN TO FIVE AND A QUARTER PERCENT. WE KNOW THAT FROM SALES FORCE. SO HOW COULD YOU HAVE A LIKELIHOOD SUCCESS ON THOSE TWO MEAGER COMPLAINTS FROM A COMPANY THAT DOESN'T OPERATE WHEN THE ONLY EVIDENCE YOU SHOWED IS FAVORABLE RESULTS FOR THOSE PEOPLE. THAT WAS MY POINT, SIR.

Q. WELL, YOU TALKED ABOUT BRANCHES BEING COMPLETELY SEPARATE.

A. YES, SIR.

Q. ISN'T IT TRUE THAT EVERY CLIENT BROUGHT IN AT ANY BRANCH THAT ALL THOSE CLIENTS ARE SERVICED BY FIRST UNIVERSAL HOLDING AT THE PALM BEACH GARDENS SITE?

A. COMPLETELY AND UTTERLY FALSE. UNBELIEVABLY FALSE. AND IF YOU HAD GONE AND DONE RESEARCH AND FOUND THAT OUT YOU WOULD KNOW THAT THAT IS ABSOLUTELY NOT THE CASE, SIR. COMPLETELY FALSE.

Q. ISN'T IT TRUE THAT FIRST UNIVERSAL HOLDINGS CREATES THE STANDARDS, GIVES THE GUIDANCE, AND HAS ULTIMATE CONTROL TO

MANAGE ALL THE SALESPEOPLE AT ALL THE BRANCHES?
A. ABSOLUTELY AND UTTERLY FALSE. AND FIRST UNIVERSAL HOLDINGS IS A BACK OFFICE COMPANY, SIR. YOU ARE REFERRING TO FIRST UNIVERSAL LENDING. FIRST UNIVERSAL HOLDINGS DOES THE BACK OFFICE FOR LAW FIRMS AND FIRST UNIVERSAL HOLDINGS DOES NOT HAVE THAT.
Q. ISN'T IT TRUE THAT FIRST UNIVERSAL HOLDINGS HAS, AT THIS TIME, HAS DECISION MAKING AUTHORITY FOR ALL OF THE SALESPEOPLE AT ALL THE BRANCHES?
A. ABSOLUTELY, POSITIVELY FALSE, SIR. AND YOU HAVE NOT INTERVIEWED A SINGLE SALESPERSON, NOR HAVE YOU OBVIOUSLY READ THE BRANCH AGREEMENTS TO DETERMINE THAT.
IT HAS THE RIGHT TO TERMINATE A BRANCH RELATIONSHIP, NO DIFFERENT THAN -- AND I GIVE THE MCDONALD'S EXAMPLE BECAUSE IT'S THE BEST. MCDONALD'S CUTTING OFF A FRANCHISE FOR NOT SELLING A BURGER TO ITS STANDARDS.
Q. THERE WAS ALSO SOME DISCUSSION IN THE LAST COUPLE OF DAYS ABOUT FTC'S ABILITY TO ACCESS INFORMATION, AND YOU DESCRIBED YESTERDAY THAT THERE WAS ONE COMPUTER IN THE BACK ROOM, AND THAT THAT WAS A DELL COMPUTER THAT USED TO BE YOUR COMPUTER --
A. IT'S NOT IN THE BACK ROOM, SIR.
Q. IT'S IN ROOM 212, CORRECT?
A. THAT'S NOT THE BACK ROOM. YES, IT'S IN ROOM 212.
Q. THAT'S THE ACROSS THE BREEZEWAY.

A. YES, SIR.

Q. AND, SO THAT'S THE COMPUTER UPON WHICH YOU EXERCISE OR ASSERT THE ATTORNEY/CLIENT PRIVILEGE.

A. THAT'S THE ONE THAT I STOOD THERE WITH JEFFREY IN MY OFFERS AND YOU AND WE TALKED ABOUT HOW WE WERE GOING TO DO THIS AND MISS KUDMAN WAS THERE. I KEEP SAYING KIDMAN OR KUDMAN. I APOLOGIZE, I'M NOT SURE WHICH.

BUT SHE WAS THERE AND THERE WAS A DISCUSSION, AND IT WAS AGREED THAT FOR THAT COMPUTER YOU WOULD PRINT OUT THE INDEX FOR THE DISK DRIVE AND THEN I WOULD CIRCLE ONCE YOU GUYS GAVE ME THE INDEX ANYTHING THAT SOUNDED LIKE A LEGAL FILE IF IT POTENTIALLY WOULD POP UP. THAT'S IT, SIR. THAT'S IT.

Q. NOW, THERE IS ANOTHER -- TO ACCESS THE SALSE FORCE DOCUMENTS WE ALSO NEEDED PASSWORDS AND THINGS LIKE THAT, CORRECT?

A. THAT'S ACTUALLY INCORRECT BECAUSE WE WERE ACTUALLY ARGUING THE OTHER DAY, AND I FOUND OUT, OVER NUANCES. BASICALLY, YOU ARE CORRECT. YOU DIDN'T HAVE A USER NAME AND PASSWORD. WHAT YOU HAD WAS MIRANDA JOHNSTON'S USER NAME AND PASSWORD, WHICH WAS LOGGED IN AND LEFT ON WHICH MISS JOHNSTON WOULD SIT BEGINNING FROM THE DAY YOU GUYS GOT THERE, PRINT THINGS OUT AND WORK THEM THROUGH.

SUBSEQUENTLY APPROXIMATELY A WEEK AND A WEEK LATER, AND MISS BERG WAS GIVEN MIRANDA JOHNSTON'S USER NAME

AND PASSWORD ALSO, BUT THAT WAS NOT IMMEDIATELY. BUT WHAT SHE DID IS SHE LOGGED ON AND LEFT THAT OPEN FOR YOU ALL.

SO TECHNICALLY WHEN YOU SAY, "WELL, WE DIDN'T HAVE A USER NAME AND PASSWORD," YEAH, YOU DIDN'T, BUT IT'S REALLY NOT BEING HONEST, IT'S BEING DECEITFUL BECAUSE THE KEY WORDS IS NOT WHETHER OR NOT YOU HAD THE USER NAME AND PASSWORD, IT'S WHETHER OR NOT YOU HAD ACCESS TO THE COMPUTER. AND YOU'VE ALWAYS HAD UNFETTERED ACCESS TO THE COMPUTER. NOT ONLY YOU HAVE YOU HAD ACCESS BUT YOU HAD MIRANDA SITTING THERE PRINTING EVERYTHING OUT FOR YOU ALL.

Q. SO IF -- SO IF MISS KUDMAN OR THE RECEIVER WERE TO TESTIFY THAT THEY HAD GREAT DIFFICULTY ACCESSING ANYTHING ON THE COMPUTERS, OR THE SALES FORCE DOCUMENTS ON THE COMPUTERS WOULD THAT BE A LIE AS WELL?

A. NO. I THINK THEY WOULD BE QUITE HONEST BECAUSE I DON'T THINK THAT THEY HAD REMOTE ACCESS. I'M PRETTY SURE THEY DIDN'T. SO I THINK IF THEY WANTED TO CHARACTERIZE IT THAT WAY I THINK THAT WOULD BE VERY TRUTH TRUTHFUL.

I THINK ALSO THEY WOULD BE TRUTHFUL TO SAY -- AND I HAVE E-MAILS THAT I CAN PULL OUT PRAISING MIRANDA, WHAT A DOLL SHE IS, THAT THEY WANTED TO PUT HER TO WORK FOR THEM, AND THAT SHE SAT THERE WITH HER COMPUTER OPEN AND PULLED THINGS FOR THEM.

AND TO SHOW YOU THE EXTENT THAT EVERYONE WENT TO HELP YOU ALL OUT, ON SUNDAY, THE DAY BEFORE THIS HEARING

STARTED, MISS BERG CALLED ME IN A PANIC BECAUSE SHE WAS HAVING TROUBLE LOGGING ON TO SALES FORCE AND BILLY CHRISTAKOS FROM THE OFFICE TOOK SUNDAY OFF LITERALLY AND STAYED THERE PRINTING -- NOT ONLY JUST HELPING HER ACCESS BUT HE STAYED THERE, DID NOT GO TO CHURCH WITH HIS FAMILY AND PRINTED OUT EVERYTHING SINGLE CASE FOR HER SO THAT SHE COULD HAVE IT AND TAKE IT DOWN TO MISS MOSCOWITZ'S OFFICE.

IF SOMEONE WERE TRYING TO HIDE THOSE COMPUTERS OR ACCESS, SIR, THEY WOULDN'T DO THAT. AND EVERY TIME ANYONE WAS EVER ASKED -- IN FACT, WHEN I WAS WITH MISS KUDMAN AND MISS BERG, MIRANDA ACTUALLY WENT AND STARTED TO DO A TRAINING FOR THEM. AND I THINK THAT THEY WILL TESTIFY THAT MIRANDA SAT THERE, SHE IS AN ABSOLUTE SWEETHEART, WAS TRAINING THEM.

IT'S A REALLY COMPLICATED SOFTWARE PACKAGE. YOU ARE NOT GOING TO LEARN IT IN FIVE OR 10 MINUTES. I CAN TELL YOU THAT ANY RECEIVER GOING IN THERE NOW IT WOULD TAKE THEM A MONTH OF TRAINING TO FIGURE IT OUT. BUT THAT'S WHY SHE WAS MADE AVAILABLE EVERY DAY PRINTING OUT EVERY SINGLE SOLITARY FILE THAT WAS EVER REQUESTED, ANY INFORMATION THAT WAS REQUESTED.

Q. MR. FEINGOLD, ISN'T IT TRUE THAT MIRANDA HAD ONLY LIMITED ACCESS TO AND SHE COULDN'T GENERATE REPORTS FROM SALESFORCE.COM?

A. THAT'S ABSOLUTELY FALSE. SHE HAD AN ADMINISTRATOR'S

ACCESS THAT -- WHAT WE DID HAVE WAS A PROBLEM BETWEEN THE COMPUTER AND THE PRINTER SERVERS PRINTING THINGS OUT, NOT JUST FOR MIRANDA BUT FOR EVERYBODY IN THE OFFICE.

WHEN YOU HAVE AN OFFICE WITH 150 COMPUTERS, WHATEVER IT IS HOOKED UP, YOU WILL HAVE THOSE ISSUES. AND IT WASN'T JUST FOR YOU ALL, IT WAS FOR EVERYONE AND IT NEVER SEEMED TO BE A BIG PROBLEM BECAUSE THE OTHER THING WAS, WHICH YOU ALL ACKNOWLEDGED, WAS THAT YOU ALL CONTACTED SALES FORCE DIRECTLY AND THEY SENT YOU ALL DISK IMAGES ON CD ROMS OF EVERYTHING.

AND, SO AS I SIT HERE AND I LISTEN TO THIS CONTROVERSY ABOUT, "YOU WOULDN'T GIVE ME ACCESS," THIS AND THAT, I AM JUST APPALLED AT THE EXCUSE BECAUSE YOU KNOW AS WELL AS I DO THAT DAVID ZAUSNER SAT ON THE PHONE WITH THE SALES FORCE REPRESENTATIVE AND INSTRUCTED THEM TO TAKE EVERY SINGLE FILE, BURN IT TO DISK SO THAT YOU ALL COULD HAVE IT IN ATLANTA, GO THROUGH EVERY FILE, WHICH WE CONFIRMED YOU GOT THOSE DISKS.

Q. WHO DID YOU CONFIRM THAT WITH?

A. MISS MOSCOWITZ, WHEN SHE ENTERED THE OFFICE AND WAS TALKING ABOUT SALES FORCE AND SAW PEOPLE WORKING ON IT SHE WAS INTERESTED, ARE THEY WORKING ON IT -- MY CONCERN IS, IF THEY ARE WORKING ON IT AND SOMEONE CAN GO ON AND ALTER A FILE, AND THEN SHE WAS ADVISED, AND I DON'T REMEMBER IF IT WAS MISS KUDMAN OR BERG THAT, "WELL, THEY ALREADY GOT THE

SALES FORCE DISK. EVERYTHING HAS ALREADY BEEN IMAGED," AND I DON'T REMEMBER WHO SAID IT OR HOW.

BUT IT'S IRREFUTABLE, AND WE CAN CONTACT SALES FORCE AND GET THEM ON THE PHONE IF YOU WANT, YOU GUYS GOT EVERY SALES FORCE DISK, AND YOUR COMPUTER TECH WAS ON THE PHONE WITH SALES FORCE THAT DAY ON FRIDAY, THE DAY AFTER YOU GUYS WENT INTO THE OFFICE, WORKING OUT HAVING A DISK PRESS, AND THERE IS NO DOUBT IN MY MIND ABOUT THAT ONE.

Q. DID SOMEBODY AS SALES FORCE TELL YOU IRREFUTABLY?

A. I KNOW FROM DAVID ZAUSNER I CONFIRMED, ABSOLUTELY, POSITIVELY THAT EVERY DISK HAD BEEN PRESSED AND IT HAD BEEN SENT FROM SALES FORCE TO YOU ALL. THERE IS NOT A DOUBT IN MY MIND, SIR, BECAUSE I KNOW AS FACT, BECAUSE WHAT HAPPENED WAS IS, YOU ALL DEMANDED THAT NO ONE GO ON THE COMPUTERS UNTIL YOU HAD CONFIRMED THAT YOU HAD LOCKED DOWN THE DATA AND THAT NO ONE CAN CHANGE ANYTHING, AND YOU WANTED TO MAKE SURE THERE WAS A STATIC SEPARATE COPY OF EVERYTHING SO THAT NO ONE WOULD GO AND IN ANY WAY TRY TO MANIPULATE FILES.

NO ONE COULD GET ON THE COMPUTERS, ANYONE IN THE OFFICE. THEY WERE ALL LOCKED OUT UNTIL YOU ALL HAD CONFIRMED YOU GOT THOSE DISKS. SO I KNOW BEYOND A SHADOW OF A DOUBT YOU ALL HAVE THOSE DISKS, YOU HAVE NO PROBLEM GETTING INFORMATION.

Q. MR. FEINGOLD, CAN SOMEBODY AT SALESFORCE.COM TELL YOU THAT THEY HAD SENT THE FTC THE DISKS?

A. NO, SIR. I SPOKE TO MR. ZAUSNER. I DID NOT SPEAK TO THE INDIVIDUAL DIRECTLY AT SALES FORCE.

Q. DID MR. ZAUSNER TELL YOU WHO HE SPOKE WITH AT SALES FORCE THAT TOLD HIM THEY SENT THE DISKS?

A. ACTUALLY HE DID, AND LET ME THINK ABOUT THIS. LET ME THINK ABOUT THIS, BECAUSE HE ACTUALLY DID BECAUSE I REMEMBER THAT YOU ALL GOT THEIR 800 NUMBER, AND IT'S A WEIRD 800 NUMBER. YOU WERE GIVEN THE NAME OF THE REP. 800 LIKE SALES FOR ME OR -- YOU KNOW WHAT? I WISH I COULD REMEMBER, BUT THERE IS AN 800 NUMBER YOU WERE GIVEN, BECAUSE IT WAS GIVEN TO ME FROM DAVID ZAUSNER, AND THE GUY'S NAME -- OH, I WISH I WEREN'T 43 ANYMORE BECAUSE I WOULD REMEMBER THIS ONE. I WISH I COULD REMEMBER THIS GUY'S NAME.

YES, THERE WAS ONE SPECIFIC GUY AT SALES FORCE THAT YOU DEALT WITH. FIRST UNIVERSAL HAD LIKE A PLATINUM PLAN WITH SALES FORCE WHICH MADE CUSTOMER SERVICE LIKE AVAILABLE 24 HOURS A DAY. YEAH, THERE IS NOT A DOUBT IN MY MIND THAT INFORMATION WAS CONVEYED, NOT A DOUBT.

Q. IF THE RECEIVER WERE TO TELL THE COURT THAT THEY HAD DIFFICULTY GETTING ACCESS BECAUSE THEY NEEDED -- THEY WERE TOLD THAT THEY NEEDED DAVID ZAUSNER, AND DAVID ZAUSNER HAD HEALTH ISSUES FOR MUCH OF THE LAST COUPLE OF WEEKS, WOULD THAT BE AN INACCURATE --

A. NO, THAT'S ABSOLUTELY TRUE. AND AGAIN, THAT'S HOW YOU ARE TRYING TO POLLUTE SOME ISSUES. ONE IS THE RECEIVER, THE

SECOND IS YOU. YOU GOT ALL THE DISKS, SIR. YOU GOT EVERY SINGLE DISK FROM SALES FORCE. THAT'S NUMBER ONE.

NUMBER TWO, THE RECEIVER. YES, I SPECIFICALLY RECALL THAT SITUATION. OVER THE WEEKEND BEFORE THIS HEARING STARTED, THIS HEARING STARTED ON MONDAY, OVER THE WEEKEND YOU ALL, MEANING -- AND I SHOULDN'T SAY, "YOU ALL," THE RECEIVER, NOT THE FTC, THE RECEIVER ASKED TO SEE THE FILES BECAUSE THE RECEIVER HAD NOT REVIEWED THE FILES ON THOSE 16 PEOPLE. TOTALLY SEPARATE FROM YOU.

YOU WERE NOT THE RECEIVER. OKAY? TOTALLY SEPARATE FROM YOU. YOU NEVER MADE THE REQUEST, THE RECEIVER DID. ON FRIDAY WE WENT IN AND THE INTERNET WAS DOWN. EVERYONE ACKNOWLEDGES THAT THE INTERNET WAS DOWN ON FRIDAY. IT WAS NO ONE'S FAULT SO EVERYONE WENT HOME, WORKED FROM HOME. MY LAWYERS WENT, WORKED FROM HOME, ET CETERA.

ON SATURDAY MICHELLE BERG CALLED ME AND SHE HAD TEXTED DAVID ZAUSNER, AND SHE WAS HAVING TROUBLE GETTING IN TOUCH WITH HIM. I DID ADVISE HER THAT IT WAS NOT UNCOMMON FOR DAVE TO NOT ANSWER HIS PHONE, THAT THERE ARE CERTAIN MEDICATION HE IS ON, AND IT'S NO ONE'S BUSINESS, AND THAT THERE WAS A HEALTH ISSUE THERE, WHICH SHE RECOGNIZED, AND I SAID, "LET ME SEE IF I CAN RISE HIM OR GET HIM AROUND." THAT WAS SATURDAY.

SATURDAY EVENING MICHELLE CALLED, ME MISS BERG CALLED ME, ADVISED ME THAT SHE WAS GOING TO EITHER A

WEDDING OR BAR MITZVAH IN BOCA RATON, AND THAT IT WOULD -- IT WOULD HAVE -- NEEDED TO BE DONE ON SUNDAY, AND I ADVISED HER THAT I WOULD FIND SOMEONE TO HELP HER.

I FOUND HER BILLY FOR SATURDAY NIGHT AND SHE ADVISED ME THAT SHE WAS ON HER WEIGH. THIS WAS ABOUT FIVE IN THE EVENING, SHE WAS ON HER WAY TO THE BAR MITZVAH OR WEDDING, AND THEN BILLY WENT SUNDAY TO BE WITH HER.

THAT IS THE ISSUE WITH ACCESS FOR SALES FORCE FOR THE RECEIVER'S LAWYER AND THE RECEIVER WHO WANTED TO SEE CERTAIN FILES. THAT HAS NOTHING TO DO WITH THE PRIOR TWO AND A HALF WEEKS AND THE FACT THAT YOU, SIR, THE FTC, HAD IMAGES ON DISK OF EVERYTHING, NEVER BOTHERED TO LOOK AT THE STUFF, BUT THAT'S A SEPARATE ISSUE.

THERE IS NOT A DOUBT, NOT A DOUBT IN MY MIND YOUR EXPERIENCE AND THE RECEIVERS COULD BE VERY, VERY DIFFERENT BECAUSE YOU GOT THE DISK AND THE RECEIVER DID NOT GET THE DISK, AND THE RECEIVER -- AND I SHOULD SAY THAT WHEN I SAY, "THE RECEIVER," I DON'T NECESSARILY MEAN MISS MOSCOWITZ, BUT THE RECEIVER'S COUNSEL, WHO WAS ACTUALLY AT THE OFFICE MORE THAN MISS MOSCOWITZ. I DON'T FOR A SECOND DOUBT THAT THEY HAD DIFFICULTIES PRINTING WHEN THEY REQUESTED TO SEE THE FILES BECAUSE IT WAS MUCH LATER ON. I DON'T FOR A DOUBT -- I DON'T FOR A SECOND DOUBT ANY OF THEIR STATEMENTS IF THEY HAD DIFFICULTY OVER THAT WEEKEND CONTACTING DAVID ZAUSNER, ABSOLUTELY POSITIVELY. BUT PLEASE DON'T IN ANY

WAY MISLEAD THIS COURT THAT THE EXPERIENCE OF THE RECEIVER'S COUNSEL OVER A WEEKEND HAS ANYTHING TO DO WITH YOUR ACCESS, YOUR UNFETTERED ACCESS THE PRIOR TWO AND A HALF WEEKS. IT'S COMPLETELY AND UTTERLY SEPARATE.

Q. IS IT YOUR TESTIMONY --

THE COURT: COUNSEL, LET ME JUST INTERRUPT YOU FOR ONE QUESTION, AND I APOLOGIZE.

MR. FEINGOLD, YOU SAID EARLIER THAT YOU CITED A CASE THAT YOU SAY SUPPORTS THE PROPOSITION THAT SECTION FIVE DOES NOT APPLY TO LAW FIRMS, CORRECT?

THE WITNESS: WELL, I THINK WHAT THE LAW SAYS IS THAT THE FTC DOESN'T HAVE THE RIGHT TO OVERSEE LAW FIRMS. I DON'T THINK THAT I SAID THAT IT WAS -- THAT THAT CASE DIRECTLY CITED SECTION FIVE WITH REGARDS TO THE FTC, BECAUSE THAT CASE DEALS WITH THE RED FLAG RULE WHICH IS A SEPARATE CONSUMER BILLING LAW. BUT WHAT THE CASE ACKNOWLEDGES, IS THAT REGULATION OF LAWYERS IS LEFT TO THE STATES.

THE COURT: AND, SO IF A LAW FIRM HAD AN OPERATION THAT WAS ENGAGING IN WHAT WOULD OTHERWISE BE CONDUCT THAT VIOLATED SECTION FIVE, IT IS YOUR POSITION THAT THE FTC COULD DO NOTHING ABOUT THAT.

THE WITNESS: WELL, I THINK STATUTORILY UNDER SECTION FIVE, I DON'T THINK THEY HAVE THE POWER TO DO IT. I THINK THAT THEY WOULD HAVE TO GO TO THE STATE AND SPECIFICALLY -- OR SUE UNDER A DIFFERENT LAW. I DON'T THINK

THAT THAT LAW GIVES THEM THE JURISDICTION.

I THINK IT'S REALLY INTERESTING. THAT COURT CASE WHICH GOES INTO RATHER GREAT DETAIL SAYING THAT IF CONGRESS INTENDED FOR THE FTC TO SPECIFICALLY REGULATE LAWYERS, CONGRESS WOULD KNOW BETTER BECAUSE CONGRESS IS MADE OF LAWYERS. THAT'S WHAT THE JUDGE SAID IN THE OPINION, AND THEY WOULD KNOW HOW TO WRITE A STATUTE THAT SAYS THAT, YOU KNOW, HERE IS THE APPLICATION TO THE STATUTE.

FOR ME, THE IMPORTANCE AND SIGNIFICANCE OF ALL OF THIS DEALING WITH THE TRO IS THE FACT THAT IF YOU WANTED TO SAY ANYTHING IS UNFAIR AND DECEPTIVE, IF IT DOESN'T EXIST ANYMORE THEN THE APPLICATION --

THE COURT: I UNDERSTAND THAT. YOU SAID THAT BEFORE.

THE WITNESS: YES, SIR.

THE COURT: I UNDERSTAND.

THE WITNESS: YES.

THE COURT: ALL RIGHT.

COUNSEL, GO AHEAD.

BY MR. SINASOHN:

Q. I DON'T WANT TO BE LABOR THIS POINT BUT I WANT TO MAKE IT CLEAR FOR THE RECORD.

YOU TESTIFIED THAT YOU DON'T KNOW WHO TOLD YOU THAT WE -- THAT THE FTC RECEIVED THESE DISKS. DO YOU KNOW INDEPENDENT OF SOMEONE TELLING YOU FIRSTHAND THAT WE -- THAT

THE FTC RECEIVED THESE DISKS FROM SALES FORCE?

A. LOOK, SIR, I HAVE NOT BEEN TO YOUR OFFICES, I DIDN'T SEE YOU ACTUALLY PICK UP THE DISKS AND RECEIVE THEM. I FEEL VERY COMFORTABLE THAT YOU GOT THOSE DISKS BECAUSE IT WAS VERY EMPHATICALLY STATED THAT NO ONE WOULD BE PERMITTED ON TO SALES FORCE UNTIL IT WAS CONFIRMED THAT YOU ALL GOT COMPLETE, NONCHANGEABLE STATIC COPIES OF ALL OF THE FILES, AND THOSE FILES WERE BEING BURNT ON DISK, AND DAVID ZAUSNER DEALT WITH THE GUY AT SALES FORCE, AND I DON'T KNOW THE GUY'S NAME, BUT WE WAITED UNTIL THE A-OKAY FROM YOU GUYS THAT WE COULD GET BACK ON SALES FORCE.

IF YOU HADN'T GOTTEN THE INFORMATION NO ONE WOULD HAVE BEEN PERMITTED BACK ON SALES FORCE BECAUSE THERE WAS A CONCERN OF PRESERVATION OF EVIDENCE, WHICH RIGHTFULLY SO. THAT MAKES SENSE. DON'T LET ANYONE GO ON THE SYSTEM UNTIL YOU MAKE SURE YOU HAVE A COMPLETELY PHOTOGRAPH OF EVERY SINGLE FILE SO NO ONE CAN CHANGE IT.

SO BY LOGIC I KNOW THAT EITHER, NUMBER ONE, YOU DEFINITELY GOT ALL THOSE DISKS BECAUSE THAT'S WHY YOU LET US ON THE COMPUTER; OR, NUMBER TWO, YOU ARE SO WOEFULLY INEPT THAT YOU LET EVERYONE ON THE COMPUTER WITHOUT PROTECTING AGAINST THE SYSTEM BEING CHANGED, AND I CAN'T BELIEVE -- WELL, ACTUALLY -- I WILL HOLD MY COMMENTS TO MYSELF.

Q. YOU TOLD THE RECEIVER IN THIS CASE, OR HER ATTORNEY, THAT FIRST UNIVERSAL STOPPED RECORDING OPENING AND CLOSING

SALES CALLS SOMETIME AGO, CORRECT?
A. YES.
Q. AND WHEN DID THAT -- WHEN DID FIRST UNIVERSAL STOP RECORDING OPENING AND CLOSING SALES CALLS?
A. I DON'T KNOW THE EXACT DATE OF THAT, BUT I -- SO I'M CLEAR ON THIS. RECORDING OF ALL OPENING AND CLOSING SALES CALLS, I DO NOT BELIEVE HAS EVER HAPPENED. AND I SAY, "OF ALL," UNDERLINING THE WORD "ALL" SO WE ARE CLEAR.
THERE WERE INSTANCES WHERE, FOR EXAMPLE, IF THERE WAS A SALESPERSON AND THERE WAS AN ISSUE THAT THAT PERSON GOT A COMPLAINT, THAT THAT PERSON'S CALLS, ALL OF THEM, ALL OF THEM WOULD BE RECORDED TO MONITOR TO MAKE SURE THEY ARE OKAY. NO DIFFERENT THAN A PARENT WHO THINKS THEY HAVE AN ISSUE WITH THEIR CHILD AND THEY WATCH THEM MORE CLOSELY, AND ONCE THEY ARE COMFORTABLE THERE IS NO ISSUE WITH THEM THEY ARE NOT GOING TO WATCH THEM AS CLOSELY. THAT WAS ONE OF THE PROTECTIVE PARAMETERS THAT THEY HAD.
I CAN'T TELL YOU BECAUSE I THINK I TESTIFIED YESTERDAY I DIDN'T GO THROUGH SALES FORCE AND COUNT UP HOW MANY RECORDINGS THERE ARE FOR EVERY FILE.
THE OTHER THING THAT'S REALLY INTERESTING AND I WANT TO POINT OUT NOW THAT WE ARE ON THIS, IS THAT, YOU KNOW, YOU ARE ACCUSING ME -- YOU HAVE SUED ME, AND I GUESS YOU'VE RECOGNIZED YOU SHOULDN'T HAVE. AND, SO NOW YOU ARE TRYING TO ACCUSE ME OF BEING THE PRESIDENT OF THE COMPANY.

BUT HERE IS WHAT'S REALLY INTERESTING.

IF I'M THE PRESIDENT OF THE COMPANY, AND THE COMPANY RELIES ON SALES FORCE, GO FIND A USER NAME AND PASSWORD FOR ME, AND GO FIND HOW MANY TIME I HAVE EVER LOGGED ON TO THAT SYSTEM OF THIS COMPANY I'M ALLEGEDLY A PRESIDENT OF, SIR, BECAUSE WHAT YOU ARE GOING TO FIND IS THE ANSWER IS NEVER. NEVER. I HAVE NEVER LOGGED ON TO SALES FORCE.

YOU KNOW, AT ONE POINT, WHAT'S INTERESTING, IS THAT DAVID ZAUSNER ASKED ME, "DO YOU WANT A USER NAME AND PASSWORD AS THE LAWYER SO YOU CAN ACCESS AND TAKE A LOOK AT THINGS?" AND MY RESPONSE WAS, "NO. IT'S -- YOU KNOW WHAT? IT'S NOT MY COMPANY. YOU GUYS JUST PRINT STUFF OUT WHEN I NEED IT," AND THIS IS -- THIS IS A YEAR AND A HALF AGO, WHATEVER. TAKE A LOOK. IF YOU ARE SO-CALLED PRESIDENT THAT YOU'RE TRYING TO ACCUSE ME OF, TAKE A LOOK AT MY COMPUTER, MY LOG-INS. YOU HAVEN'T DONE THAT, I'M SURE.

Q. MR. FEINGOLD --

A. YES.

Q. -- SO BY DEFINITION YOU JUST MENTIONED THAT THERE ARE OCCASIONS WHEN AFTER A CONSUMER SPEAKS WITH SOMEONE AT FIRST UNIVERSAL AND HAS A COMPLAINT, THERE ARE TIMES THAT YOU RECORD THE CONVERSATIONS AFTER THAT?

A. LET'S BE CLEAR, AND I'M NOT TRYING TO BE COY WITH YOU BUT BECAUSE IT'S A RECORD. I DON'T RECORD ANYTHING. OKAY?

YOU KEEP SAYING "YOU." I DON'T RECORD ANYTHING.
Q. ARE RECORDED.
A. OKAY.
Q. THAT'S FINE.
A. THERE ARE TIMES -- I HAVE BEEN MADE AWARE OF IT AS OUTSIDE COUNSEL. THERE ARE TIMES WHERE PEOPLE ARE RECORDED, NOT JUST SALES, BUT ONE HUNDRED PERCENT OF WHAT THEY DO.
Q. THAT'S AFTER A COMPLAINT IS WHAT YOU SAID, RIGHT?
A. YES. AND THERE ARE ALSO TIMES WHERE SOME PEOPLE ARE RECORDED ONE HUNDRED PERCENT OF WHAT THEY DO BECAUSE THEY HAVE BEEN HIRED AND THEY HAVE ABSOLUTELY NO EXPERIENCE.
THERE ARE SOMETIMES WHEN PEOPLE ARE RECORDED ONE HUNDRED PERCENT OF TIME OF WHAT THEY DO FOR TRAINING PURPOSES SO THAT PEOPLE CAN SIT IN MEETINGS AND LISTEN TO THOSE RECORDINGS.
I CAN'T TELL YOU ALL THE PARAMETERS BECAUSE I THINK I EXPRESSED TO YOU BEFORE, I GO TO AN EXECUTIVE COMMITTEE MEETING ON A TUESDAY. I DO THINGS ON FRIDAYS, INCLUDING THE COMPLIANCE MEETING FOR THE EMPLOYEES, AND THEN I HAVE ALL THEIR OUTSIDE LEGAL MATTERS WHICH MYSELF AND MY LAWYERS, WHICH BY THE WAY I MISSPOKE YESTERDAY SO I WANT TO CLARIFY, THERE WERE -- IT WAS POINTED OUT TO ME, I THINK THREE OR FOUR OTHER EMPLOYEES OF THE FIRM OF FEINGOLD & KAM, LIZ BERKOWITZ, RANDY GRILLO, DEBBIE BERGER -- I KNOW I'M MISSING SOMEBODY ELSE. BUT THE POINT IS, IS THERE IS LOTS

OF PEOPLE AT FEINGOLD & KAM THAT HELP OUT ON SOME THINGS.
Q. I JUST WANT TO BE CLEAR, MR. FEINGOLD --
A. YES.
Q. -- BECAUSE NOW THE TESTIMONY SEEMS -- I FEEL LIKE IT ITS CLOUDED. DID YOU OR DID YOU NOT TELL THE RECEIVER THAT FIRST UNIVERSAL LENDING HAD STOPPED RECORDING OPENING AND CLOSING SALES CALLS SOME TIME AGO?
A. THAT IT HAD STOPPED RECORDING -- YOU WOULD HAVE TO GIVE ME THE EXACT CONTENTS OF THE ENTIRE STATEMENT, BECAUSE AGAIN JUST LIKE YOUR STATEMENT ABOUT THE DISK AND WHEN YOU RECEIVED THEM. YOU'RE GIVING ME A SNIPPET OF SOMETHING, SIR, AND I'M JUST TELLING YOU EXACTLY HOW IT IS.
I GUESS MY ANSWER TO YOU IS, I DON'T KNOW BASED ON THE WAY YOU ARE TAKING A BLURB INTO A QUESTION.
Q. AND, MR. FEINGOLD, FINALLY, THE CASES AND THE OPINIONS THAT YOU HAVE CITED, AND THE EVIDENCE THAT YOU HAVE INTRODUCED, NONE OF THAT IS RELEVANT TO WHETHER OR NOT THE CORPORATE DEFENDANT IN THIS CASE, AND THE INDIVIDUAL DEFENDANTS IN THIS CASE, VIOLATED SECTION FIVE OF THE FTC AND THE TSR BY PROMISING CONSUMERS TO OBTAIN MORTGAGE LOANS MODIFICATIONS THAT WOULD -- FALSELY PROMISING THE CONSUMERS THAT THEY WOULD OBTAIN FOR THEM MORTGAGE LOAN MODIFICATIONS THAT WOULD SUBSTANTIALLY LOWER CONSUMER'S MORTGAGES, MORTGAGE PAYMENTS IN ALL -- IN VIRTUALLY ALL CIRCUMSTANCES.
A. YOU ARE ABSOLUTELY INCORRECT. AND THE REASON YOU ARE

SO INCORRECT IS THAT, NUMBER ONE, YOU HAVE ALLEGED THERE HAVE BEEN MISSTATEMENTS MADE TO CONSUMERS REGARDING FIRST UNIVERSAL LENDING, LLC. WE HAVE SET FORTH FOR YOU THAT FIRST UNIVERSAL LENDING, LLC, AND THOSE MISSTATEMENTS THAT YOUR ARE ALLEGING THAT, NUMBER ONE, CAME FROM COMPLETELY SEPARATE AND INDEPENDENTLY OWNED BRANCHES.

NUMBER TWO, THAT YOU HAVE ALLEGED MISSTATEMENTS BUT YET WHEN WE HAVE GONE THROUGH WITH THESE PEOPLE -- LIVE WITNESSES THAT YOU BROUGHT ON THE STAND, IN THE END THERE WAS ONE WOMAN WHO WAS BASICALLY LIKE HAD NO COMPLAINT.

SO THE FACT IS TO SAY THAT NONE OF THE EVIDENCE THAT'S BEEN PROVIDED IS COMPLETELY AND UTTERLY FALSE. THE EVIDENCE THAT I HAVE SET FORTH FOR THIS COURT IS BASED ON THE CASE LAW AND THE ELEMENTS THAT NEED TO BE PROVEN.

AND, NUMBER ONE, YOU HAVE TO PROVE A LIKELIHOOD OF SUCCESS ON THE MERITS. WELL, THE PROBLEM WITH THAT IS, IS THAT NONE OF THE COMPLAINTS THAT YOU HAVE FILED SHOW THAT. BUT EVEN IF YOU WANT TO ASSUME THAT YOU MEET THAT ELEMENT, YOU THEN HAVE A BALANCING ACT FOR THE GREATER EQUITIES OF THE HARM.

THE HARM AND THE TESTIMONY THAT HAVE BEEN BROUGHT FORTH IS THE 3,000 PEOPLE BEING SERVICED BY FIRST UNIVERSAL HOLDING, A BACK OFFICE OPERATION, WHO ARE NOT GETTING SERVICED NOW.

SIR, LAST NIGHT MR. CHANDLER FINLEY CALLED ME.

IT'S A DISASTER IN HIS OFFICE BECAUSE HE CAN'T FIELD THE PHONE CALLS, HE DOESN'T KNOW WHEN THE COURT HEARINGS ARE, HE DOESN'T KNOW WHAT THE SETTLEMENT PROPOSALS ARE, WHAT THE STATUS OF THEM IS FOR ALL THESE DIFFERENT FILES. HE DOESN'T KNOW WHEN A PARTICULAR HEARING IS BECAUSE THAT WAS BEING HANDLED BY FIRST UNIVERSAL HOLDINGS.

THE POINT OF THIS EVIDENCE IS, IS THAT, SIR, IF YOU WANT TO SUE FIRST UNIVERSAL LENDING, YOU WANT TO SUE MR. ZAUSNER -- SEAN ZAUSNER, DAVE ZAUSNER, YOU WANT TO SUE ME, THAT'S FINE, BECAUSE THERE WILL BE A JURY AND THERE WILL BE A DAY OF RECKONING FOR THAT.

BUT THE POINT IS, IS TO GO RESTRAIN FIRST UNIVERSAL HOLDING, TO GO RESTRAIN THE LAW FIRM OF FEINGOLD & KAM, TO GO RESTRAIN -- BY THE WAY, THE BIRTH MOTHER THAT I TALKED ABOUT? SHE IS NOW IN THE HOSPITAL THROUGH THE EMERGENCY ROOM, AND I HAVE FROZEN ESCROW ACCOUNTS THAT I CAN'T PAY THIRD PARTIES THEIR MONIES. I HAVE 60-SOME LAWSUITS WITH ASSOCIATES THAT I AM TRYING TO FUND AND PAY FOR. GO EXPLAIN THAT, WHY THAT'S RELEVANT AND APPROPRIATE, ON TOP OF THE FACT THAT EXPLAINING WHY DISCLOSURES WEREN'T MADE TO THE COURT.

WHAT IS SO TROUBLING TO ME, SIR, IS OUR EXCHANGE YESTERDAY WHERE I SAID TO YOU THAT I BELIEVED IT WAS YOUR ETHICAL OBLIGATION TO ADVISE THIS COURT OF THOSE LETTERS THAT WERE SENT TO THE STATES, AND YOU DISAGREED WITH ME

BECAUSE THAT JUST SHOWS THE DIFFERENCE BETWEEN YOU AND I AND THE WAY WE LEAD OUR LIVES.

WE LIVE IN AN ADVERSARIAL SYSTEM, AN ADVERSARIAL COURT SYSTEM WHERE EACH SIDE HAS THE RIGHT TO PROVIDE THEIR STORY, AND YOU WENT INTO THIS COURT AND YOU TOLD THIS JUDGE ABOUT NONE OF THE INFORMATION THAT YOU KNEW ABOUT, DESCRIBING THE COMPANY AS AN ABSOLUTELY EMERGENCY THAT ALL THESE PEOPLE HAD TO BE SHUT DOWN, LOSE THEIR JOBS, NOT EARN A LIVING. BASICALLY, I'M SURE YOU REMEMBER FROM LAW SCHOOL, THE OLD, "IF YOU YELL FIRE IN A CROWDED THEATER," THAT'S WHAT YOU DID, SIR. REMEMBER THE SUPREME COURT TALKED ABOUT THAT, YELLING FIRE? THAT'S WHAT YOU DID, SIR, AND IT'S NOT RIGHT, IT'S NOT FAIR.

MR. SINASOHN: I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT: ALL RIGHT.

ANY REDIRECT, MR. FEINGOLD?

THE WITNESS: VERY, VERY BRIEFLY, JUDGE.

THE COURT: YES.

REDIRECT EXAMINATION

THE WITNESS: NUMBER ONE, MR. SINASOHN SPOKE TO ME ABOUT -- HIS FIRST LINE OF QUESTIONING WAS A TIME LINE AND HOW LONG IT TOOK ME TO GET FROM SUNRISE BOULEVARD UP TO MY OFFICE AND WHAT TIME THE MEETINGS WERE.

I WILL CONCEDE THAT I DON'T KNOW THE EXACT TIMES. I WILL EXPLAIN THAT WHEN A CLIENT CALLS AND THERE ARE PEOPLE

IN THEIR OFFICE AND IT'S AN EMERGENCY THAT, NO, I AM NOT THE PERSON WHO IS STARING AT MAY WATCH WHICH, BY THE WAY, YOU CAN LOOK, HOW MANY WATCHES DO I WEAR? NONE. I AM NOT A BIG FLASHY GUY. SO I'M NOT SITTING THERE LOOKING EVERY FIVE MINUTES TO DOCUMENT HOW LONG IT TOOK ME OR ANYTHING ELSE. I DON'T KNOW WHY THAT LINE OF QUESTIONING WAS BUT I JUST WANTED TO EXPRESS THAT.

NUMBER TWO, I WAS NEXT QUESTIONED ABOUT THE INJUNCTION AND IF I HAD VIOLATED THE INJUNCTION BECAUSE I HAD COUNSELED A CLIENT TO SHUT DOWN SALES.

AND, MR. SINASOHN, BEFORE THE LUNCH BREAK YOU READ PART OF THE JUDGE'S ORDER, BITS AND PIECES, WHERE IT SAID THAT THERE HAD TO BE DISCLOSURES ABOUT BUSINESS, ET CETERA, AND TRYING TO CHARACTERIZE ME AS VIOLATING THE COURT'S ORDER BECAUSE I COUNSELED A CLIENT TO CLOSE THE BUSINESSES.

IF YOU READ THE JUDGE'S ENTIRE ORDER, WHICH IS A RECURRENT THEME IN THIS CASE, READING EVERYTHING, YOU WOULD HAVE NOTICED THAT ON PAGE SIX THERE IS A SECTION CALLED "INJUNCTION," AND IT SAYS, "ALL BUSINESSES ENJOINED," AND WE ALL KNOW FROM OUR FIRST YEAR IN LAW SCHOOL KNOW WHAT INJUNCTION MEANS. THIS WASN'T A MANDATORY INJUNCTION TO DO SOMETHING, THIS WAS AN INJUNCTION TO STOP. THE COURT ORDERED BUSINESS TO CEASE. SO I APOLOGIZE IF I COMPLIED WITH THE JUDGE'S ORDER BUT I DID.

MY POINT WITH REGARDS TO THE SALES, AND THIS IS -- GOES TO MY CONVERSATION WITH YOUR BOSS, MR. ALBINE, IS THAT IF THE CLIENT AGREES THAT SALES ARE FOREVER CLOSED, A CLIENT WILL CONSENT TO A PERMANENT INJUNCTION HERE IN COURT FROM SALES FOREVER. FOREVER. THEN YOU CAN'T HAVE HARM.

LET THEM DO THEIR BACK OFFICE WORK. BOTH ZAUSNERS CONVEYED TO ME, AND THAT'S WHAT I CONVEYED TO YOUR BOSS. THEY WILL AGREE, IF YOU HAVE A PROBLEM WITH SALES THEY DON'T CARE, THIS IS A BACK OFFICE OPERATION, YOU CAN FOREVER ENJOIN THE SALES IS THAT'S YOUR CONCERN, AND THEN LET'S GO TO COURT AND HAVE AT IT WITH A JURY WITH REGARDS TO ALL THIS OTHER STUFF BECAUSE I DOT MY I'S.

THIRDLY, AFTER LUNCH WHEN I CAME BACK YOU SPENT A GREAT DEAL OF TIME ON MY FINANCIAL AFFIDAVIT. I DON'T KNOW IF YOU WERE TRYING TO DO IT TO EMBARRASS ME IN FRONT OF ALL OF THESE PEOPLE HERE AND DISCLOSE PERSONAL THINGS ABOUT ME BECAUSE IT REALLY COULD HAVE BEEN ASKED, "WERE THERE BLANKS? DID YOU HAVE BLANKS?"

YOU WANT TO GO THROUGH NUMBERS? I'M OKAY WITH IT. IT DOESN'T HURT ME. I'M A PRETTY OPEN PERSON. MOST OF THESE PEOPLE KNOW ME. IT DOESN'T BOTHER ME. I'M HAPPY TO DO IT. BUT THE BOTTOM LINE IS, IS THAT YES, SIR, I LEFT BLANKS WHERE MAYBE THERE MAY HAVE BEEN ZEROS. BUT THE DIFFERENCE IS, THE ONLY ZEROS IS -- THE ZERO ON THE FORMS

THAT ARE INSIGNIFICANT.

THE SIGNIFICANT INFORMATION, ALL OF THE MONEY AND HOW IT'S TABULATED AND CALCULATED, IT'S ALL THERE. IT'S ALL THERE. IT WAS MORE IMPORTANT TO ME TO GET EVERYTHING TO THE RECEIVER TO SHOW I'M A MAN OF MY WORD, THAT SHE ASKED ME TO GIVE HER EVERYTHING WITHIN 24 HOURS BECAUSE IT LOOKED LIKE THE SETTLEMENT HAD FALLEN APART. AND, SO THAT'S WHAT I DID. THAT'S EXACTLY WHAT I DID. AND I'VE ALREADY EXPLAINED WHY I DID IT, AND HOW I DID IT, AND THE WAY I PRACTICE WITH LAWYERS AND AMENDING ORDERS.

YOU DID ASK ME SOMETHING THAT CAME ACROSS AS IMPORTANT IN THIS CASE, AND THAT WAS PEOPLE WHO PARTICIPATED IN SALES. AND I AGREE WITH YOU THAT'S A REALLY IMPORTANT ISSUE IN THIS CASE. AND I SAID, AND THIS LENDS TO BE TRUE, EVEN THOUGH SALES IS PERMANENTLY CLOSED, THE CLIENT WILL AGREE TO AN INJUNCTION ON SALES, BUT IT'S REALLY IMPORTANT FOR ME TO CLEAR THIS OUT FOR YOU.

THE LAW IS VERY CLEAR ALSO -- I SHOULD NEVER SAY THE LAW IS VERY CLEAR. THE LAW, I SHOULD SAY, IS ACTUALLY NEVER CLEAR AND THAT'S WHY THERE ARE LAWYERS HERE ARGUING ABOUT IT ALL THE TIME. BUT THERE ARE LEGAL PRINCIPLES THAT HAVE BEEN ESTABLISHED ABOUT CORPORATIONS. AND THEN I'LL CITE TO YOUR OWN CASE, WHICH IS THE FTC VERSUS HOMESHORE -- THIS IS AN INTERESTING CASE BECAUSE IT SAYS THAT THE COURT MUST ALSO ADDRESS WHETHER THE WRONGS ARE ONGOING OR LIKELY

ARE APT TO CONTINUE.

WELL, IF THIS CLIENT HAS AGREED IT IS NEVER DO SALES AGAIN, IT WILL ONLY DO BACK OFFICE, I THINK THAT ISSUE HAS BEEN ADDRESSED.

NEXT, THE COURT GOES ON TO SAY, "ONCE CORPORATE LIABILITY IS ESTABLISHED," AND I DON'T CONSENT IT HAS BEEN ESTABLISHED HERE, BUT EVEN ASSUMING IT HAS, "THE FTC MUST SHOW THAT THE INDIVIDUAL DEFENDANTS PARTICIPATED DIRECTLY IN THE PRACTICES OR ACTS, OR HAD THE AUTHORITY TO CONTROL THEM AND THAT THE INDIVIDUAL DEFENDANTS HAD SOME KNOWLEDGE OF THE PRACTICES."

WELL, THIS IS REALLY INTERESTING, BECAUSE HERE IS WHAT WE DO KNOW. NUMBER ONE, WITH REGARDS TO ME. I AM THEIR OUTSIDE LAWYER. I GO TO AN EXECUTIVE COMMITTEE MEETING ON A TUESDAY. I GO AND DO A COMPLIANCE MEETING ON FRIDAY, AND I HANDLE THEIR OUTSIDE LITIGATION, REGULATORY, CORPORATE, RESTRUCTURING MATTERS. OKAY?

YOU HAVE NEVER BROUGHT ANYONE IN HERE TO SAY, "HEY, DAVID FEINGOLD WAS SELLING. DAVID FEINGOLD IS INVOLVED IN WITH THE SALESMAN." IT WILL NEVER HAPPEN BECAUSE IT'S IMPOSSIBLE BECAUSE IT DOESN'T HAPPEN.

AND, IN FACT, WHEN I WAS TALKING WITH SEAN ZAUSNER THE OTHER DAY I WAS KIND OF CHUCKLING WITH HIM THAT, YOU KNOW, I DON'T THINK I HAVE EVER WALKED INTO THESE SALES ROOMS. AND I -- I THINK THAT'S THE CASE. I DON'T

THINK I -- I THINK THAT THE ONE ON THE THIRD FLOOR, I THINK I WENT UP THERE BEFORE THE LEASE WAS SIGNED. BUT YOU ALL HAVE NEVER SPOKEN THE A SINGLE SALESPERSON SO YOU DON'T KNOW THAT.

WHEN YOU LOOK TO SALES AS I DESCRIBED IT TO YOU, THERE ARE PARTICULAR MEMBERS OF THE EXECUTIVE COMMITTEE WHO ARE RESPONSIBLE FOR OVERSEEING THEIR TEAMS. THEY DO THE HIRING, THEY DO THE FIRING, THEY DO THE TRAINING. THEY HAVE ALL CONTROL OVER THOSE SALESPEOPLE.

I ASKED YOU TO READ THOSE EXECUTIVE COMMITTEE MEMBERS NOTES. I KNOW YOU DIDN'T, BUT IT'S ALL THERE, SIR, YOU WOULD HAVE SEEN IT.

DAVID ZAUSNER? IT'S AS LAUGHABLE ALSO AS SUING ME. HE SITS IN HIS OFFICE WORKING ON THE SALES FORCE PROJECT. THAT'S HIS THING. I THINK IF HE WALKED UP TO A SALESMAN AND TOLD THEM WHAT TO DO THEY MIGHT PUNCH HIM IN THE FACE. AND I'M SORRY, I SHOULDN'T BE SO COY AND SATIRICAL ABOUT THIS, BUT IT'S JUST LIKE IF THE RIGHT QUESTIONS WERE ASKED YOU WOULD HAVE THE ANSWERS --

THE COURT: MR. FEINGOLD, LET ME INTERRUPT YOU, AND I APOLOGIZE. BUT IS IT YOUR POSITION THAT ALL SALES ACTIVITIES HAVE CEASED AT THIS POINT IN TIME?

THE WITNESS: ABSOLUTELY, FOREVER, JUDGE. FOREVER.

THE COURT: WHAT SPECIFICALLY GOES ON IN THE BACK

ROOM?

THE WITNESS: THE BACK ROOM AS THAT PICTURE I SHOWED YOU --

THE COURT: I UNDERSTAND THAT.

THE WITNESS: YES.

THE COURT: I AM ASKING WHAT SPECIFICALLY GOES ON IN THE BACK ROOM.

THE WITNESS: THEY COLLECT THE MAIL FOR THE LAW FIRMS, THEY RESPOND TO THE E-MAILS FOR THE LAW FIRMS, THEY TAKE THE INCOMING PHONE CALLS FOR THE LAW FIRMS, THEY COLLECT CREDIT CARD STATEMENTS, THEY COLLECT TAX RETURNS, THEY PREPARE FINANCIAL AFFIDAVITS, THEY PREPARE THE HARDSHIP LETTERS. THEY LOG IN WHEN THE SUMMONS AND COMPLAINTS COME IN. THEY DOCKET AND LOG IT IN. THEY ARRANGE FOR OUTSIDE COUNSEL, FOR LOCAL COUNSEL, FOR APPEARANCE COUNSEL AT HEARINGS. THEY DO THE MEDIATION SUMMARIES. THEY DO -- WHEN NEGOTIATIONS COME IN FROM CREDITORS THEY RECEIVE THOSE NEGOTIATIONS, PUT IT IN THE SYSTEM SO THAT THE LAWYER CAN LOOK AT IT REMOTELY AND GIVE ADVICE ON IT. IF THERE IS A SETTLEMENT DOCUMENT THEY RECEIVE THE SETTLEMENT DOCUMENTS AND FORWARD IT ON TO THE LAWYER --

THE COURT: SLOW DOWN.

THE WITNESS: I'M SORRY. I APOLOGIZE.

THE COURT: GO AHEAD.

THE WITNESS: EVERYTHING ON AN OUTSOURCING LEVEL TO COLLECT EVERY DOCUMENT FROM THESE THOUSANDS OF CLIENTS IS DONE BY THESE BACK OFFICE LADIES, AND I APOLOGIZE FOR THE --

THE COURT: WITH RESPECT TO THE HOME LOAN MORTGAGE REFINANCING.

THE WITNESS: ALL THE -- AND I THINK WHEN YOU USED REFINANCING MEAN MODIFICATION?

THE COURT: MODIFICATION. YES.

THE WITNESS: YES. IT'S JUST THE SAME THING. THEY ARE JUST COLLECTING DOCUMENTS.

THE COURT: ALL RIGHT. GO AHEAD. I INTERRUPTED YOU.

THE WITNESS: OKAY. SO IN TERMS OF THE LAW, I WENT OVER MYSELF --

THE COURT: WELL, THIS IS NO TIME TO BE ARGUING THE LAW.

THE WITNESS: YOU KNOW WHAT? I DIDN'T KNOW IF I COULD QUALIFY AS AN EXPERT IN FLORIDA, OR A CLOSING THING, AND I APOLOGIZE.

THE COURT: JUST SAVE THAT FOR LATER ARGUMENT.

THE WITNESS: OKAY. SO YOUR NEXT LINE OF QUESTIONING AFTER SPEAKING ABOUT THE ZAUSNERS AND WHAT THEY SPECIFICALLY DO, I BELIEVE YOU WENT INTO WITH TODAY BACK TO THE DIFFERENT CORPORATIONS.

AND, AS I HAVE SAID BEFORE, AND I DON'T MEAN THIS IN ANY OTHER WAY BUT TO BE STRAIGHTFORWARD, I THINK IF THE BACK OFFICE COMPANY WAS CALLED ANYTHING OTHER THAN FIRST UNIVERSAL, I THINK IF THE SIGN ON THE DOOR HAD SAID, "BACK OFFICE HOLDINGS, BACK OFFICE SUPPORT," AND AS YOU WILL NOTICE THE UNFORTUNATE THING IS, THERE WAS -- AND I GUESS IT'S NOT UNFORTUNATE. THERE WAS A BELIEF TO NAME EVERYTHING FIRST UNIVERSAL BECAUSE ULTIMATELY SOME DAY YOU WILL HAVE THIS EMPIRE. AND THIS EMPIRE IS SOMETHING THAT CAN BE TAKEN PUBLIC OR CAN BE SOLD, AND -- AND I HAVE BEEN INVOLVED WITH SITUATIONS WHERE THAT'S HAPPENED AND IT'S WORKED OUT.

AND, SO WHEN YOU HAVE BRANCHES, HAVE THEM USE THE NAME FIRST UNIVERSAL. YES, THE POMPANO BRANCH WAS FIRST UNIVERSAL FINANCIAL GROUP. I GET IT. IT SOUNDS THE SAME.

BUT MY WHOLE POINT, SIR, IS THAT JUST LIKE WE WENT THROUGH THESE SECRETARY STATE DEPARTMENT FILINGS, IF YOU WOULD HAVE LOOKED YOU WOULD HAVE SAID, "WELL, WAIT A MINUTE. DAVID FEINGOLD IS THE REGISTERED AGENT FOR FIRST UNIVERSAL LENDING IN PALM BEACH GARDENS, BUT THEY HAVE A DIFFERENT REGISTERED AGENT IN POMPANO. WHY IS THERE A DIFFERENCE? WHY AREN'T THEY USING THE SAME PERSON," AND THEN IF YOU WOULD HAVE LOOKED AND READ THE BRANCH AGREEMENTS WHEN YOU WENT IN OFFICE YOU WOULD HAVE SAID, "OH, THAT'S TOTALLY SEPARATE."

AND THEN IF YOU WOULD HAVE LOOKED WHEN THEY SUED ONE OF THEIR BRANCHES YOU WOULD HAVE SAID, "WOW, THESE MUST BE SEPARATE, BECAUSE LOGICALLY YOU CAN'T SUE YOURSELF. SO THESE MUST BE TOTALLY SEPARATE," AND THEN YOU WOULD HAVE RECOGNIZED THAT IF YOUR ISSUE WAS UNFAIR AND DECEPTIVE SALES, NUMBER ONE, YOU GOT TO MAKE SURE THAT YOU ARE GOING AFTER THE PERSON THAT'S MAKING THOSE REPRESENTATIONS.

SO, YOU KNOW, I'M -- I HAVE NOTHING MORE TO SAY.

THE COURT: ANY RECROSS?

MR. SINASOHN: YES, YOUR HONOR.

RECROSS EXAMINATION

BY MR. SINASOHN:

Q. MR. FEINGOLD --

MR. SINASOHN: MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT: YES.

BY MR. SINASOHN:

Q. MR. FEINGOLD, I WANT YOU TO TAKE A LOOK AT THIS DIAGRAM AND TELL ME IF THIS SUBSTANTIALLY DEPICTS THE SECOND FLOOR WHERE YOUR OFFICE IS, THAT SIDE OF THE BREEZEWAY WHERE YOUR OFFICE IS AND THE BACK ROOM.

A. I JUST WANT TO SEE -- HERE IS THE FRONT ENTRANCE. SO THIS WOULD BE -- IS THIS THE GLASS DOOR OR IS THIS THE --

Q. WELL, YOUR OFFICE IS, I BELIEVE --

A. SHOW ME WHERE MY OFFICE IS.

Q. -- IS RIGHT HERE.
A. OKAY. THIS IS -- THIS IS THE LOBBY. THIS IS -- OKAY. YES.
Q. SO THAT SUBSTANTIALLY DEPICTS THE --
A. YES, SIR.
Q. OKAY. AND ARE YOU TELLING THIS COURT THAT -- WHEN YOU SAY, "BACK ROOM," ARE YOU TALKING OF THE Q AREA HERE? EXPLAIN TO THE JUDGE WHAT YOU MEAN WHEN YOU SAY, "BACK OFFICE NOT PERFORMING SALES."
A. OKAY. Q, WHICH IS THE WHOLE AREA, JUDGE, AND I APOLOGIZE ON EXHIBIT 6 THAT YOU SEE -- ACTUALLY I DON'T HAVE MY EXHIBITS UP HERE.
THE COURT: GIVE THE PHOTOGRAPHS TO --
MR. SINASOHN: I CAN PUT IT ON THE ELMO IF YOU WANT, YOUR HONOR.
THE COURT: THAT IS FINE.
SET UP THE ELMO FOR COUNSEL.
THE WITNESS: CAN I HAVE THIS SO WHEN I DESCRIBE IT I CAN POINT TO THIS?
BY MR. SINASOHN:
Q. YOU CAN IF THAT'S WHAT YOU WANT.
THE COURT: YOU WANT TO USE THAT ON THE ELMO?
MR. SINASOHN: YES.
THE COURT: FINE.
THE WITNESS: I WANTED TO CROSS-REFERENCE THE

PHOTOS AS WELL.

BY MR. SINASOHN:

Q. SO, MR. FEINGOLD, FOR THE COURT'S BENEFIT COULD YOU GO THROUGH EACH OF THE AREAS THAT ARE MARKED ON THIS DIAGRAM AND JUST EXPLAIN WHAT THOSE OFFICES ARE AND WHAT GOES ON IN THOSE OFFICES.

A. ABSOLUTELY. OKAY.

Q. DO YOU WANT --

A. JUDGE, WHEN I TOUCH THE SCREEN ISN'T THERE A SPECIAL UTENSIL I'M SUPPOSED TO USE?

THE COURT: NO.

THE WITNESS: NO? OKAY.

MR. SINASOHN: IS THAT BIG ENOUGH, YOUR HONOR, TO SEE?

THE COURT: THAT IS FINE.

JUST REFER TO THE NUMBER SO WE KNOW WHICH AREA YOU ARE TALKING ABOUT.

THE WITNESS: YES, SIR.

THE COURT: OR THE LETTER. I'M SORRY.

THE WITNESS: YES, SIR.

OKAY. SO O -- I'M SORRY. IT LOOKS LIKE I WROTE A G. BUT IN THAT CORNER THERE, THAT'S MY OFFICE. AND I DON'T MEAN TO BE FACETIOUS, BUT THIS IS KIND OF IMPORTANT, THESE ARE CLEARLY NOT TO SCALE BECAUSE MY OFFICE IS ONE OF THE LARGEST THINGS AT THE END, AND THAT'S -- SO THAT'S O.

AND IS THAT -- I GUESS THAT'S A P.

Q. WHICH ONE?

A. THAT'S A P NEXT TO MY OFFICE. THAT P IS -- THAT RIGHT NOW IS DAVID ZAUSNER'S OFFICE.

Q. OKAY.

A. N IS SEAN ZAUSNER OFFICE, AND WHERE IT SAYS "RECEPTION" THAT IS THIS.

Q. AND THAT --

A. THAT'S WHERE GLORIA IS.

Q. IS THAT WHAT YOU CALL FEINGOLD & KAM?

A. WELL, AS I EXPLAINED TO YOU, I'M ACTUALLY THE ONLY FEINGOLD & KAM PERSON BESIDES GLORIA BECAUSE ALL THE LAWYERS MOVED ACROSS THE BREEZEWAY TO A COMPLETELY AND SEPARATE OFFICE SUITE.

Q. BUT GLORIA WORKS FOR FEINGOLD & KAM.

A. GLORIA WORKS FOR FEINGOLD & KAM.

OKAY. NOW, WHEN WE WALK IN THROUGH THIS HALLWAY -- SO HERE IS THE DOUBLE DOOR ENTRANCE TO MY OFFICE. WHEN WE WALK INTO THIS ENTRANCEWAY WE HAVE THE BACK OFFICE.

THE COURT: THAT'S IN THE Q.

THE WITNESS: THAT'S Q, YES, SIR.

THE COURT: ALL RIGHT.

THE WITNESS: THAT'S Q. RIGHT.

THE COURT: AND THAT'S REPRESENTED IN PHOTOGRAPH SIX?

THE WITNESS: 6-D.

THE COURT: D.

THE WITNESS: YES, SIR.

THEN WHAT WE HAVE IS INDIVIDUALIZED OFFICES WHERE BACK OFFICE WORKERS WORK AS WELL. HERE IS A PICTURE, 6-D.

THE COURT: THAT IS 6-D IS -- THAT WAS -- NO. NO. NO. THE ONE YOU JUST HANDED UP.

THE WITNESS: THIS IS 6-E.

THE COURT: AND THAT IS WHERE?

THE WITNESS: SO WHAT HAPPENS IS, IS THAT OFFICE A, OFFICE B, AND OFFICE --

THE COURT: C?

THE WITNESS: WELL, OFFICE C IS THE NOTORIOUS RED ROOM.

THE COURT: FORGET THAT.

THE WITNESS: YEAH. NO EXCUSE ME. OFFICE C -- YEAH. OFFICE C IS THE RED ROOM. D. SO, A, B, D -- ACTUALLY THIS IS ACTUALLY NOT CORRECT BECAUSE BETWEEN B AND C THERE IS ONE SLICED OFFICE OF A LAWYER. YOU KNOW THAT.

BY MR. SINASOHN:

Q. THERE IS A SLICED OFFICE --

A. YEAH, NICK CERNEY. SO THIS ACTUALLY ISN'T DRAWN CORRECTLY.

THAT RIGHT THERE, WHICH I WILL PUT -- THAT ROOM RIGHT THERE -- THERE IS ACTUALLY A ROOM THERE, AND THAT

IS --

THE COURT: ANOTHER ROOM.

THE WITNESS: ANOTHER ROOM.

THE COURT: OKAY.

THE WITNESS: RIGHT. THEN YOU HAVE -- THIS ROOM THAT I JUST CIRCLED, I THINK YOU GUYS -- I THINK THAT'S H. THAT'S ANOTHER ROOM OF WHAT I WILL CALL BACK OFFICE GIRLS.

THE COURT: OKAY. H IS ANOTHER ROOM OF BACK OFFICE GIRLS.

THE WITNESS: YES. G IS ANOTHER ROOM OF BACK OFFICE GIRLS. Y WAS SALES, A SALES ROOM. THEN BREAK ROOM IS OBVIOUSLY THE BREAK ROOM FOR LUNCH. SO YOU SEE THAT --

THE COURT: WELL, WHAT'S F AND E?

THE WITNESS: F IS A FILE ROOM.

THE COURT: OKAY.

THE WITNESS: AND E, I APOLOGIZE. E IS ANOTHER ROOM OF BACK OFFICE GIRLS.

THE COURT: OKAY.

THE WITNESS: SO IF YOU LOOK AT THE ENTIRETY OF THE SPACE CUTTING OUT MY LAW OFFICE --

THE COURT: YES.

THE WITNESS: EIGHTY PERCENT OF THE SPACE IS EITHER ROOMS FILLED WITH BACK OFFICE GALS OR THE OPEN AREA WITH BACK OFFICE GALS.

THE COURT: OKAY.

THE WITNESS: AND THAT'S THE WHOLE BACK OFFICE BUSINESS OF FIRST UNIVERSAL HOLDINGS AND THE OUTSOURCING.

BY MR. SINASOHN:

Q. YOU HEARD MISS MOSCOWITZ'S TESTIMONY, CORRECT?

A. CORRECT.

Q. SO ARE YOU TELLING THE COURT THAT IN J, AND G, AND H, ARE YOU TELLING THE COURT THAT NO SALES WERE GOING ON IN THOSE ROOMS?

A. NO. I SAID THERE THOSE WERE THE SALES ROOM, SIR. I CLEARLY SAID --

Q. I THOUGHT THAT WAS THE QUESTION.

A. NO. I SAID THERE WAS A SALES ROOM. I IDENTIFIED IT.

Q. OKAY. SO WHEN YOU SAY "BACK OFFICE" WHERE NO SALES --

THE COURT: JUST SO THAT EVERYONE IS CLEAR. WHAT MR. FEINGOLD JUST DID, HE JUST SIMPLY WENT THROUGH THE DIAGRAM AND STATED WHAT WAS GOING ON IN THOSE OFFICES.

NOW YOU MIGHT BE MOVING INTO A DIFFERENT --

MR. SINASOHN: YES.

THE COURT: -- QUESTION AREA.

BY MR. SINASOHN:

Q. WE KNOW THAT IN Q, THESE ARE THE LADIES THAT ARE DOING BACK OFFICE SUPPORT, CORRECT, FOR THE LAW FIRMS AND ANYBODY ELSE WHO WANTS BACK OFFICE SUPPORT.

A. YES, SIR.

Q. AND IN THE ROOMS ALONG THE EDGES WHERE H, G, J, K -- OR

H, G AND J, THERE ARE SALES GOING ON IN THERE, CORRECT?
A. IN J, YES. IN THE BALANCE OF THE ROOMS AROUND, THEY'RE ROOMS LIKE THIS.
THE COURT: 6-E.
THE WITNESS: YEAH. I'M SORRY. THEY'RE ROOMS LIKE 6-E, AND WHEN YOU GUYS CAME IN IF YOU REALIZED, AND I SAID TO YOU ALL, A CONTRACTOR, GANARRO CONSTRUCTION HAD COME IN AND THEY WERE PULLING A WALL DOWN TO EXPAND SALES.
THE COURT: BUT I THINK WHERE COUNSEL IS HEADING, AND I DON'T MEAN TO SPEAK FOR HIM, BUT WHEN DID THE SALES ACTIVITIES IN THOSE OFFICES CEASE?
THE WITNESS: THEY CEASED THE NIGHT THAT THE FTC CAME IN, AND I THINK I SAID THAT BEFORE. I THINK, JUDGE, YOU HAD ASKED ME THE OTHER DAY WERE SALES ONGOING --
THE COURT: WELL, COUNSEL IS ASKING YOU NOW FOR A CLARIFICATION.
THE WITNESS: YES.
BY MR. SINASOHN:
Q. AND, SO UNTIL FOUR O'CLOCK OR SO ON NOVEMBER 19TH, WHAT YOU HAVE NOW CALLED THE BACK OFFICE, INCLUDING ROOM J, WAS CONDUCTING SALES.
A. ROOM J, YES. THE 80 PERCENT, THE 85 PERCENT OF THE BALANCE OF THE SPACE, ABSOLUTELY, POSITIVELY NOT.
Q. I JUST WANTED TO MAKE THAT CLEAR FOR THE COURT.
MR. SINASOHN: YOUR HONOR, I WOULD LIKE TO MARK,

IDENTIFY, AND ENTER INTO EVIDENCE THIS DOCUMENT AS THE NEXT PLAINTIFF'S EXHIBIT.

THE COURT: THAT WOULD BE, LET'S SEE HERE.

MR. KIRTZ: 38.

THE COURT: 38?

ANY OBJECTION, MR. FEINGOLD.

THE WITNESS: NO, SIR.

THE COURT: 38 BEING A DIAGRAM.

[PLAINTIFF EXHIBIT 38 RECEIVED IN EVIDENCE]

BY MR. SINASOHN:

Q. FINALLY, MR. FEINGOLD, YOU HAVE READ THE TEMPORARY RESTRAINING ORDER.

A. YES, SIR.

Q. AND YOU UNDERSTAND THAT THE TEMPORARY RESTRAINING ORDER DOES NOT ORDER YOUR BUSINESS TO CEASE, CORRECT?

A. SIR, JUST SO WE ARE CLEAR ON THE RECORD BECAUSE IT'S BEING TRANSCRIBED, IT'S NOT MY BUSINESS.

Q. MY MISTAKE. IT DOES NOT ORDER THAT THE CORPORATE DEFENDANT CEASE OPERATIONS, CORRECT?

A. NO. BUT I HAVE GIVEN THEM LEGAL ADVICE BASED ON MY EXPERIENCE WITH THIS, AND I WANT TO CLARIFY ALSO ABOUT SALES SO WE ARE CLEAR ABOUT THE PROGRESSION, TO STOP SALES.

MR. ZAUSNER HAS CONSENTED, BECAUSE IF YOU LOOK AT THAT DIAGRAM 85 PERCENT, IT MAY BE 90 PERCENT OF THAT FLOOR SPACE IS BACK OFFICE PEOPLE DOING OUTSOURCING FOR LAW FIRMS.

SO IT DOESN'T MAKE A DIFFERENCE IF YOU TAKE 15 PERCENT OF THE SPACE AND SAY, "YOU CAN'T DO IT. YOU'RE DONE." ON TOP OF THAT, AND THIS WAS IMPORTANT AND WHY YOU SHOULD UNDERSTAND THAT IT'S NOT A BIG DEAL TO SHUT DOWN SALES AND SHUT IT DOWN FOREVER, IS THAT SALES WAS BEING CONDUCTED BY BRANCHES. THOSE BRANCHES WERE IN THE PROCESS ANYWAY OF BEING SHUTS DOWN.

SO TO AGREE TO AN INJUNCTION AGAINST SALES ISN'T A BIG DEAL BECAUSE IT'S PART OF WHAT WAS GOING ON ANYWAY. IF YOU KNOW FROM THE HISTORY OF THIS, THE CORAL SPRINGS OFFICE WAS SUED. THEY ARE TOTALLY SEPARATE. THEY WERE SUED, AND THAT'S THAT.

YOU WILL ALSO KNOW THAT THE POMPANO OFFICE WAS DOWN TO LIKE FIVE OR EIGHT SALESPEOPLE. THE REASON BEING THAT THE DETERMINATION WAS MADE THAT THE BEST WAY TO OPERATE THE BUSINESS IF YOU GOING TO HAVE ANY SALES IS TO HAVE IT UNDER YOUR OWN ROOF. SO WHEN YOU ALL WALKED IN AND THERE WAS THIS SALES ROOM, AND THERE WAS CLEARLY CONSTRUCTION, THERE WAS A WALL THAT HAD BEEN PULLED OUT, AND I SAID GO ON LOOK ON THE BOOKS, THE CONTRACTOR HAD JUST COME IN --

THE COURT: ALL RIGHT. I THINK YOU HAVE ANSWERED THE QUESTION.

MR. SINASOHN: I DON'T HAVE ANYTHING FURTHER, YOUR HONOR.

THE COURT: ALL RIGHT. THANK YOU, SIR. YOU MAY

STEP DOWN.

MR. FEINGOLD: THANK YOU, JUDGE.

THE COURT: CALL YOUR NEXT WITNESS, PLEASE.

MR. FEINGOLD: WELL, JUDGE, I THINK -- AND I HAD SPOKEN TO MY CLIENTS ON THIS. I THINK THAT THE NECESSITY OF US CALLING OTHER WITNESSES BASED ON WHAT THE LAW IS WOULD BE BEATING THE PROVERBIAL HORSE DEAD, OR HOWEVER IT GOES. I THINK WE WOULD JUST REST AND TALK ABOUT THE CASE LAW AND APPLYING IT TO THE FACTS AND --

THE COURT: ALL RIGHT. SO THE DEFENDANT RESTS?

MR. FEINGOLD: YES, SIR.

THE COURT: ANY REBUTTAL TESTIMONY OR EVIDENCE?

MR. SINASOHN: YES, YOUR HONOR.

MR. FEINGOLD: JUDGE, IF I COULD JUST APPROACH?

THE COURT: GO RIGHT AHEAD.

MR. FEINGOLD: I'M SORRY ABOUT THAT.

THE COURT: YOU HAVE THE ORIGINALS.

MR. FEINGOLD: I IDENTIFICATION YOURS.

THE COURT: BUT YOU KEEP THE ORIGINALS.

MR. FEINGOLD: YES, SIR.

THE COURT: OKAY. FINE.

HOW LONG WILL THIS WITNESS OR WITNESSES BE?

MR. SINASOHN: YOUR HONOR, ANY TIME SOMEONE ASKS ME THAT I ALWAYS GIVE A BAD ESTIMATE, IT'S USUALLY THREE TIMES AS MUCH AS I SAY.

THE COURT: ALL RIGHT. WELL, LET'S GET STARTED THEN.

MR. SINASOHN: MISS KUDMAN, YOUR HONOR.

THE COURT: ALL RIGHT. MISS KUDMAN, IF YOU WILL STEP UP TO THE WITNESS STAND.

THE WITNESS: YES, YOUR HONOR.

THE COURT: PLEASE REMAIN STANDING AND RAISE YOUR RIGHT HAND.

DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY THAT YOU ARE ABOUT TO GIVE SHALL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE WITNESS: I DO, JUDGE.

THE COURT: PLEASE BE SEATED.

PLEASE SPEAK DIRECTLY INTO THE MICROPHONE SO THAT WE WILL BE ABLE TO HEAR YOU.

PLEASE STATE YOUR FULL LEGAL NAME FOR THE RECORD AND SPELL YOUR LAST NAME FOR REPORTER.

THE WITNESS: TAMA BETH KUDMAN-RICHMAN, K-U-D-M-A-N R-I-C-H-M-A-N.

THE COURT: AND THE FIRST NAME, PLEASE?

THE WITNESS: T-A-M-A.

THE COURT: THANK YOU VERY MUCH.

YOU MAY PROCEED.

TAMA BETH KUDMAN-RICHMAN,

BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. SINASOHN:

Q. MISS KUDMAN, CAN YOU JUST TELL THE COURT A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND?

A. YES. I'M A GRADUATE FROM BERNARD COLLEGE, COLUMBIA UNIVERSITY, THAT'S WHERE I DID MY UNDERGRADUATE, AND FOR LAW SCHOOL I WENT TO BENJAMIN AND CARDOVA SCHOOL OF LAW, AND I GRADUATED FROM THERE IN 1995.

Q. OKAY. AND WHEN WERE YOU RETAINED IN THIS CASE?

A. IN THE AFTERNOON OF NOVEMBER 19TH I RECEIVED A PHONE CALL FROM JANE MOSCOWITZ INFORMING ME THAT SHE HAD BEEN APPOINTED TEMPORARY RECEIVER AND ASKING ME WHETHER OR NOT I COULD ACT AS AN ATTORNEY FOR HER IN THAT CAPACITY.

I HAD NEVER ACTED AS SUCH BEFORE. AND, SO SHE EXPLAINED TO ME A LITTLE BIT ABOUT A TEMPORARY RECEIVERSHIP AND WHAT OUR DUTIES MIGHT BE AND I AGREED TO ACT AS SUCH.

Q. AND AS PART -- CAN YOU DESCRIBE FOR THE COURT WHAT YOUR -- WHAT YOUR DUTIES AND RESPONSIBILITIES ARE IN THIS MATTER?

A. WELL, REALLY THE FIRST TIME THAT WE SPOKE, MISS MOSCOWITZ ASKED ME TO ASSIST HER IN CARRYING OUT HER DUTIES AS THE TEMPORARY RECEIVER. AND WHAT SHE EXPLAINED WAS THAT AS TEMPORARY RECEIVER IT WAS HER OBLIGATION TO

ASSIST IN THE RUNNING OF THE COMPANY WHILE IT WAS UNDER THIS EMERGENCY INJUNCTION.

Q. WHAT HAVE YOU DONE AS THE RECEIVER'S ATTORNEY AND THE ASSISTANT TO THE RECEIVER, IF THAT'S THE -- IS THAT THE CORRECT WAY TO DESCRIBE YOU?

A. I WOULD THINK SO. ALSO, WHEN LEGAL ISSUES HAVE COME ABOUT I HAVE ATTEMPTED TO GIVE HER MY BEST LEGAL ADVICE IN INTERPRETING WHAT HER OBLIGATIONS MIGHT BE, OR IN RESOLVING ANY LEGAL ISSUES THAT MIGHT ARISE DURING THE COURSE OF THE RECEIVERSHIP, FOR EXAMPLE, SOME PRIVILEGE ISSUES THAT ARISE. AND, SO IN THAT CAPACITY I WAS ACTING MORE AS COUNSEL -- WELL, AS COUNSEL AND ASSISTING HER TO CARRY OUT HER DUTIES AS WELL.

BUT STARTING ON NOVEMBER 19TH I ENTERED FIRST UNIVERSAL LENDING, OR ACTUALLY IT TURNS OUT IT WAS FIRST UNIVERSAL HOLDING, I SUPPOSE, BUT WE ENTERED THE PREMISES ALONG WITH YOU AND THE POLICE OFFICERS TO ASSUME CONTROL OVER THE FACILITY.

I MEAN, DO YOU WANT ME TO TELL YOU EVERYTHING THAT WE DID --

Q. PLEASE JUST GO THROUGH, AND IF YOU COULD FOR THE COURT, TELL THE COURT STEP BY STEP WHAT YOU HAVE DONE IN THIS CASE.

A. OKAY. WELL, THE FIRST THING WE DID WAS ENTER THE OFFICES. THERE WAS A LOT OF CONFUSION AT THE BEGINNING, YOUR HONOR, BECAUSE WHEN WE FIRST GOT THERE WE WERE TOLD

THAT WE HAD ENTERED A LAW FIRM. WE LOOKED BACK AT THE ADDRESS ON --

Q. WHO TOLD YOU THAT? I'M SORRY.

A. THIS WAS TOLD TO US BY SEVERAL PEOPLE THAT WE FIRST ADDRESSED WHEN WE WALKED IN. I BELIEVE THAT WE ACTUALLY WALKED INTO WHAT HAS BEEN IDENTIFIED AS THE OFFICES OF FEINGOLD & KAM, AND I BELIEVE THAT IT WAS FIRST -- I BELIEVE DAVID ZAUSNER THAT WE SPOKE TO AND WE WERE INFORMED THAT WE HAD ENTERED A LAW FIRM AND THAT THERE WAS NO FIRST UNIVERSAL LENDING THERE --

THE COURT: AND I APOLOGIZE FOR INTERRUPTING, BUT PLAINTIFF'S 38, WOULD THAT ASSIST?

MR. SINASOHN: YES, YOUR HONOR.

THE COURT: OKAY.

THE WITNESS: THANK YOU, JUDGE.

THE COURT: WE CAN PUT IT BACK UP FOR YOU.

BY MR. SINASOHN:

Q. CAN YOU SEE THAT?

A. I DO.

THE COURT: NOW, WHEN YOU ENTERED, GO RIGHT AHEAD AND TRY TO --

THE WITNESS: JUDGE, THERE IS A STAIRWAY. THIS IS SORT OF ONE OF THESE INSIDE, OUTDOOR SORT OF SET-UPS, WHERE WHEN YOU ARE GOING UPSTAIRS TO GO TO THE SECOND FLOOR YOU ARE STILL TECHNICALLY OUTDOORS.

THE COURT: I SEE. ALL RIGHT. GO AHEAD.

THE WITNESS: AND THERE IS SOME -- IS MY FINGER SHOWING UP HERE?

THE COURT: SURE.

THE WITNESS: OKAY. YOU GO THROUGH THE FRONT ENTRANCE INTO A HALLWAY, AND THEN INTO THIS RECEPTION AREA AND THIS IS WHERE THE LAW FIRM'S RECEPTIONIST WOULD SIT.

THE COURT: ALL RIGHT. AND THAT'S WHERE YOU TOLD -- APPROXIMATELY WHERE YOU WERE TOLD THAT YOU WERE ENTERING A LAW FIRM.

THE WITNESS: THERE WAS SOME CONFUSION BECAUSE THERE WERE SO MANY PEOPLE, AND THERE WERE SEVERAL PEOPLE THAT WERE TALKING AT THE TIME AND WE WERE BEING TOLD THAT THIS WAS A LAW FIRM. I WAS OUTSIDE. THERE WERE SEVERAL POLICE OFFICERS. AND AGAIN, THE GENTLEMEN FROM THE FTC WERE THERE AS WELL. AND, SO I WAS NOT STANDING AT THE FOREFRONT, BUT THERE WAS THAT CONVERSATION AND I WAS HEARING THAT.

THE COURT: OKAY.

THE WITNESS: AND THEN I DON'T KNOW WHO --

BY MR. SINASOHN:

Q. WHAT CONVERSATION WAS THAT? I'M SORRY.

A. THAT THIS WAS A LAW FIRM THAT WE HAD ENTERED.

AT SOME POINT THE ROOM HERE TO THE BACK OFFICE HAD BECOME OPENED AND WE SAW ALL OF THESE PEOPLE SITTING IN

THIS ROOM, AND IT BECAME APPARENT THAT THIS WAS MORE THAN JUST A LAW FIRM, THAT WE HAD ACTUALLY FOUND SOME KIND OF A BUSINESS OPERATION GOING ON.

THE COURT: ALL RIGHT. AND JUST SO THE RECORD IS CLEAR, WITH RESPECT TO PLAINTIFF'S 38 YOU ARE NOW REFERRING TO WHAT HAS BEEN MARKED AS AREA Q.

THE WITNESS: YES.

THE COURT: ALL RIGHT.

THE WITNESS: WE ENTERED THAT AREA, AND MISS MOSCOWITZ INFORMED EVERYBODY THAT THE BUSINESS HAD GONE INTO A TEMPORARY RECEIVERSHIP AND ASKED EVERYBODY TO -- ACTUALLY DIRECTED EVERYBODY TO PLEASE STOP WORKING, TO STEP AWAY FROM THE COMPUTERS, TO NOT TAKE ANYTHING THAT BELONGED TO THE BUSINESS AND TO JUST SIT THERE.

THE COURT: DID SHE INSTRUCT EVERYONE IN THE AREA MARKED AS Q TO LIE DOWN FACE DOWN ON THE FLOOR AND PUT THEIR HANDS BEHIND THEIR BACKS?

THE WITNESS: NEVER. NEVER. AND I WAS STANDING RIGHT NEXT TO HER. EVERYBODY WAS, HOWEVER, TOLD TO CEASE WORKING, AND THERE WAS SOME PEOPLE WHO CONTINUED TO WORK ON THEIR COMPUTERS AND THEIR TELEPHONES. I WOULD ASSUME THEY WERE TRYING TO FINISH UP WHATEVER BUSINESS THEY HAD BEEN TENDING TO WHEN WE HAD ENTERED THE FACILITY, BUT THEY WERE TOLD TO PLEASE STOP IMMEDIATELY.

OKAY. EVERYBODY WAS TOLD THAT BUSINESS WAS GOING

TO BE CEASED, AND I -- I BELIEVE EVERYBODY WAS DIRECTED TO LEAVE THE PREMISES AT THE TIME.

BY MR. SINASOHN:

Q. BY WHOM?

A. I BELIEVE AGAIN BY MISS MOSCOWITZ. ACTUALLY NOT BELIEVE, I KNOW IT WAS BY MISS MOSCOWITZ.

WE HAD A NOTE PAD -- SPECIFICALLY I HAD A NOTE PAD OUT AND HOPING TO TAKE THE NAMES OF ALL OF THE EMPLOYEES. DAVID ZAUSNER DIRECTED THE EMPLOYEES THAT THEY DID NOT HAVE TO TALK TO US AND THAT THEY COULD JUST LEAVE, AND THEY DID THAT, THE EMPLOYEES LEFT.

IT TOOK SOME TIME, THERE WAS SOME CONFUSION, PEOPLE WEREN'T SURE WHAT WAS GOING ON. I BELIEVE SOMEBODY ASKED WHETHER THEY WERE UNDER ARREST, AND MISS MOSCOWITZ MADE IT VERY CLEAR THAT THIS WAS NOT A CRIMINAL PROCEEDING AND THAT NOBODY WAS UNDER ARREST, AND THAT THIS WAS CIVIL IN NATURE.

Q. WHAT HAPPENED NEXT?

A. PEOPLE CLEARED OUT, AND I DON'T REMEMBER WHETHER IT WAS DAVID OR SEAN ZAUSNER OR SOMEBODY ELSE, THERE WERE SO MANY PEOPLE THERE, SOMEBODY INFORMED US THAT WE HAD ENTERED INTO A LAW OFFICE AND THAT ALL OF THE WORK BEING DONE THERE WAS BEING DONE ON BEHALF OF LAWYERS AND THAT THERE WERE PRIVILEGE ISSUES AND THAT WE SHOULDN'T LOOK AT ANYTHING.

AS AN ATTORNEY, PARTICULARLY AS A CRIMINAL DEFENSE

ATTORNEY, I'M CONCERNED ABOUT INVASION OF PRIVACY AND INVASION OF PRIVILEGED ISSUES. AND, SO JAN AND I CONFERRED -- I'M SORRY, MISS MOSCOWITZ AND I CONFERRED, AND WE DECIDED IT WOULD BE BEST UNTIL WE CLARIFIED WHAT THE SITUATION WAS NOT TO LOOK AT ANYTHING. AND, SO WE WAITED UNTIL MR. FEINGOLD RETURNED BECAUSE WE WANTED TO BE CLEAR EXACTLY WHAT WE HAD WALKED INTO, WHAT DOCUMENTS WERE THERE, AND WHO HAD POSSESSION AND OWNERSHIP OF THOSE DOCUMENTS. AND, SO EVERYBODY KIND OF STOPPED LOOKING AROUND AT THINGS TO PRESERVE ANY PRIVILEGE ISSUES.

Q. WHEN YOU SAY "EVERYBODY" WHO DO YOU MEAN?

A. MISS MOSCOWITZ, MYSELF, EVERYBODY FROM THE FEDERAL TRADE COMMISSION.

NOW, THERE WERE SOME ITEMS ON THE WALL THAT WERE CLEARLY NOT PRIVILEGE ISSUES, THEY WEREN'T LEGAL DOCUMENTS, THEY WERE DIRECTIVES THAT LOOKED MORE LIKE SALES TYPE DOCUMENTS WITH BULLET POINTS AROUND THE OFFICE THAT SORT OF STATED HOW THEY SHOULD -- HOW I WOULD SUPPOSE THE BACK OFFICE SUPPORT SHOULD HANDLE CERTAIN SITUATIONS. THOSE WERE CLEARLY NOT PRIVILEGED LEGAL DOCUMENTS. WE ALL DID WALK AROUND AND LOOK AT THOSE ITEMS. BUT ANYTHING ELSE THAT LOOKED LIKE IT COULD COME FROM A FILE OR BE PART OF A FILE WAS NOT LOOKED AT.

SEVERAL HOURS LATER MR. FEINGOLD DID COME TO THE PREMISES. AND I DO RECALL BEING SUMMONED INTO HIS OFFICE

SO THAT WE COULD ALL SIT DOWN AND TALK. THE FIRST ISSUE THAT WE ADDRESSED THAT WE WERE CONCERNED ABOUT IS, WHAT IS THIS? IS THIS FIRST UNIVERSAL? IS THIS A LAW FIRM? WHO ARE THOSE PEOPLE? WHAT'S GOING ON?

Q. WHO WAS IN THAT MEETING? I'M SORRY.

A. IT WAS YOU, I BELIEVE THAT MR. FEINGOLD, MISS MOSCOWITZ AND MYSELF, WE WERE IN THAT MEETING. I DON'T RECALL WHETHER OR NOT ANOTHER ATTORNEY FROM MR. FEINGOLD'S OFFICE WAS THERE. I BELIEVE AT SOME POINT SOMEBODY ELSE WAS IN THERE, BUT I DON'T RECALL SPECIFICALLY WHETHER THERE WAS ANOTHER ATTORNEY PRESENT.

WE HAD SOME DISCUSSIONS. MR. FEINGOLD DID STATE THAT THIS WAS NO LONGER FIRST UNIVERSAL LENDING, IT WAS FIRST UNIVERSAL HOLDINGS. THAT THE BUSINESS OF FIRST UNIVERSAL LENDING HAD BEEN CLOSED DOWN, BUT THAT THE CLIENTS WHO HAD BEEN SERVICED BY FIRST UNIVERSAL LENDING WERE NOW BEING SERVICED BY FIRST UNIVERSAL HOLDINGS, SOME OF THE LOAN MODIFICATIONS, THINGS LIKE THAT.

SO WE DECIDED THAT PURSUANT TO THE FACT THAT FIRST UNIVERSAL HOLDINGS HAD TAKEN OVER THAT BUSINESS THAT WE COULD TREAT FIRST UNIVERSAL HOLDINGS AS A SUCCESSOR, OR ASSIGNED. AND WITH REGARD TO THE PRIVILEGE ISSUES, WE HAD AGREED THAT AS TEMPORARY RECEIVER MISS MOSCOWITZ AND ANY OF HER DEPUTIES, INCLUDING MYSELF, HAD IN ESSENCE STEPPED INTO THE SHOES OF FIRST UNIVERSAL HOLDINGS AND COULD LOOK AT ALL

OF THESE DOCUMENTS THAT HAD BEEN ASSIGNED OUT TO THE VARIOUS ATTORNEYS WHO HAD CONTRACTED WITH FIRST UNIVERSAL SO THAT WE WOULD BE ABLE TO LOOK AT THOSE DOCUMENTS AND LOOK AT THOSE FILES AS SUCH. BUT THAT ANY LEGAL DOCUMENTS THAT WERE UNRELATED TO FIRST UNIVERSAL IN ANY CAPACITY, AND THAT WERE SEPARATE LEGAL ISSUES, WE HAD NO ABILITY TO LOOK AT. AND WE WERE VERY DILIGENTLY IN SEPARATING THOSE THINGS OUT. IN FACT, WE WENT BACK TO THE FILE ROOM WITH MR. FEINGOLD TO SPECIFICALLY PARTIAL OUT THOSE FILES.

THE COURT: OKAY.

THE WITNESS: AND THE OTHER DETERMINATION WE MADE WAS THAT NOBODY WAS TO GO INTO MR. FEINGOLD'S OFFICE AND ACCESS HIS COMPUTER BECAUSE THAT CONTAINED PRIVILEGED INFORMATION.

WHAT ELSE DID WE DO THAT NIGHT? ONCE WE DETERMINED WE HAD THE ABILITY TO GO AND LOOK AT --

THE COURT: LET ME ASK YOU THIS.

WOULD THIS BY A CONVENIENT POINT IF WE WERE GOING TO BREAK FOR LUNCH TO BREAK?

THE WITNESS: PROBABLY.

THE COURT: JUST MAKE A MENTAL POINT WHERE YOU ARE.

THE WITNESS: THANK YOU.

THE COURT: WE WILL BREAK FOR LUNCH AT THIS POINT AT THIS TIME. LET'S HAVE EVERYONE BACK HERE AT 1:30

EVERYONE AND WE WILL CONTINUE ON.

HAVE A GREAT LUNCH AND WE WILL SEE YOU AT 1:30.

THE COURT IS IN RECESS. GO RIGHT AHEAD.

MR. FEINGOLD: JUDGE, COULD I INQUIRE A QUESTION?

THE COURT: SURE.

MR. FEINGOLD: DO YOU MAINTAIN COURTROOM RULES WHERE A WITNESS WHO IS UNDER OATH IN BETWEEN TESTIMONY MAY OR MAY NOT SPEAK TO ATTORNEYS?

THE COURT: WELL, IN CRIMINAL CASES THAT IS SOMETIMES AN ISSUE BUT NOT IN CIVIL CASES.

MR. FEINGOLD: I JUST WANT TO KNOW YOUR COURTROOM RULES.

THE WITNESS: THANK YOU, JUDGE.

THE COURT: ALL RIGHT.

[THERE WAS A RECESS FOR THE NOON HOUR]

AFTERNOON SESSION

THE COURT: GOOD AFTERNOON. PLEASE BE SEATED.

MISS KUDMAN, LET ME INTERRUPT YOUR TESTIMONY AND ASK YOU TO STEP DOWN.

THE WITNESS: CERTAINLY, YOUR HONOR.

THE COURT: MR. FEINGOLD, LET ME ASK YOU TO RETAKE THE WITNESS STAND. I HAVE A COUPLE OF QUESTIONS TO ASK JUST YOU FOR CLARIFICATION PURPOSES.

MR. FEINGOLD: SURE.

DAVID J. FEINGOLD,

BEING PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED FURTHER AS FOLLOWS:

EXAMINATION

THE COURT: WITH RESPECT TO WHAT HAS BEEN REFERRED TO AS THE BACK ROOM OPERATIONS NOW -- LET ME SEE HERE.

WELL, WHILE I AM LOOKING, CAN YOU TELL ME HOW A CUSTOMER MAKES CONTACT WITH YOUR BACK ROOM OPERATIONS?

MR. FEINGOLD: I DON'T -- DO YOU MEAN A CUSTOMER AT ONE POINT IN THE RELATIONSHIP WHEN IT --

THE COURT: HOW DOES A POTENTIAL CLIENT, HOW ARE THEY EITHER CONTACTED OR MAKE CONTACT WITH THE OPERATION?

MR. FEINGOLD: WELL, THEY WILL -- FROM THE LAW FIRM THEY WILL BE GIVEN --

THE COURT: I AM TALKING ABOUT WITH RESPECT TO MORTGAGE MODIFICATION.

MR. FEINGOLD: OH, WITH RESPECT TO MORTGAGE MODIFICATIONS?

THE COURT: RIGHT.

MR. FEINGOLD: USUALLY WITH RESPECT TO MORTGAGE MODIFICATIONS, THEY ARE GIVEN THE BACK OFFICE PHONE NUMBER AS THEIR BACK OFFICE PEOPLE THAT ARE DOING DOCUMENT COLLECTION AND WORK OUT SERVICES FOR THEM.

THEY ARE GIVEN AN E-MAIL ADDRESS OF A CUSTOMER SERVICE BACK OFFICE SPECIALIST, THEY ARE GIVEN A PHONE NUMBER TO CALL INTO, GENERALLY I BELIEVE THERE IS AN 800

NUMBER OR A WHOLE BANK OF THEM, AND THEY ARE ASSIGNED A PARTICULAR PERSON THAT WORKS ON THEIR FILE, THEIR PARTICULAR E-MAIL ADDRESS.

IF THAT PERSON IS BUSY THERE ARE ROLLOVER BACK-UP PEOPLE. IF THEY ARE BUSY, THEN IT ROLES OVER TO WHAT I TALKED ABOUT BEFORE WHICH IS, YOU KNOW, AN ANSWERING SERVICE, SLASH, PHONE ROOM IN THE MIDWEST WHICH TAKES THE INFORMATION DOWN FROM THE CLIENT AND THEN WILL INSTANT MESSAGE OR E-MAIL THE BACK OFFICE PERSON LETTING THEM KNOW, "HEY, THIS PERSON JUST CALLED. HERE IS WHAT THEIR QUESTION IS."

THE COURT: ALL RIGHT. HOW WOULD, USING THE EXAMPLE THAT YOU JUST REFERENCED --

MR. FEINGOLD: YES.

THE COURT: -- HOW WOULD A POTENTIAL CLIENT KNOW TO CALL THIS NUMBER? WHERE WOULD THEY GET THE NUMBER FROM? IS IT THE NUMBER OF YOUR LAW FIRM OR WHAT NUMBER IS IT?

MR. FEINGOLD: WELL, IT'S NOT MY LAW FIRM. BUT THAT NUMBER THAT THEY'RE CALLING WHEN IT WAS FIRST UNIVERSAL LENDING, THAT'S FIRST UNIVERSAL LENDING'S 800 NUMBER, AND FIRST UNIVERSAL HOLDINGS, THAT'S THAT COMPANY'S 800 NUMBER.

THE COURT: HOW WOULD THEY FIND THIS NUMBER? IS IT IN THE YELLOW PAGES? IS IT ADVERTISED ON TV? I MEAN, HOW DOES THIS NUMBER EVERY COME INTO --

MR. FEINGOLD: WELL, ALL OF THE ABOVE. I MEAN,

THE GENERAL CLIENTS GET SENT OVER TO THE COMPANY. THERE IS MULTIPLE MEDIA OUTLETS.

NUMBER ONE, THERE ARE EXISTING LENDING TREE CLIENTS THAT PREVIOUSLY EXISTED. THERE ARE PEOPLE THAT FILL OUT ON THE INTERNET, FOR EXAMPLE, LOWER MY BILLS, THAT THEY WANT TO BE CONTACTED. THERE ARE NATIONAL MEDIA COMPANIES THAT YOU'VE PROBABLY SEEN ON LATE NIGHT ON TV, "ARE YOU HAVING A PROBLEM WITH THE YOUR CREDIT OR YOUR CARD COMPANIES? CALL THIS NUMBER."

THEY ARE NOT ADVERTISING ANY PARTICULAR COMPANY, THEY ARE A LATE NIGHT TV ADS FOR LAWYERS. "DO YOU NEED A LAWYER? DO YOU HAVE ISSUES?" THERE ARE LATE NIGHT TV ADS AND THERE ARE RADIO ADS, "DO YOU NEED SOMEONE TO HELP YOU WITH YOUR DEBTS?" SO THE --

THE COURT: AND DOES YOUR COMPANY ENGAGE IN THAT TAPE OF ADVERTISING?

MR. FEINGOLD: THEY HIRE THOSE THIRD PARTIES, THEY ARE --

THE COURT: WHEN YOU SAY "THEY" WHO DO YOU MEAN?

MR. FEINGOLD: WELL, FIRST UNIVERSAL HIRES THOSE COMPANIES, WHICH THEN DO THOSE ADS. AND DEPENDING ON WHAT JURISDICTION YOU HAVE, WHAT REGION YOU HAVE. IF, FOR EXAMPLE, YOU BROUGHT UP THE LEADS IN -- YOU'RE LOCATED IN FLORIDA, AND THEY ALSO HAVE SOMEONE WHO IS IN CALIFORNIA OR NEVADA, THEY WILL SPLIT THOSE LEADS UP BASED ON THE STATE

WHEN THE CONSUMER CALLS IN.

THAT IS ONE ASPECT OF IT. THERE IS THE TV, THERE IS RADIO, THERE IS LENDING TREE, THERE IS LOWER MY BILLS, THERE IS THE EXISTING DATA BASE OF CLIENTS, THERE ARE WEB CITES THAT ASK PEOPLE, YOU KNOW, "DO YOU WANT A MORTGAGE? DO YOU WANT HELP WITH YOUR CREDIT CARDS? DO YOU WANT SOMEONE TO NEGOTIATE FOR YOU?"

THE COURT: ALL RIGHT. SO THEN THE BACK OFFICE EITHER RECEIVES CALLS FROM POTENTIAL CLIENTS OR IT CONTACTS POTENTIAL CLIENTS BASED ON INFORMATION FROM THESE OTHER GATHERING SOURCES.

MR. FEINGOLD: WELL, REMEMBER THE BACK OFFICE JUST WORKS ON IT. THOSE PHONE CALLS THAT COME IN, WOULD COME IN TO SALES, TO THE SALES DEPARTMENT. AND THE SALES DEPARTMENT WOULD SPEAK TO A PERSON TO FIND OUT, YOU KNOW -- IN OTHER WORDS, IF SOMEONE CALLED IN FROM A MORTGAGE AD, PARTICULAR LINES THAT WOULD RING FOR THE MORTGAGE CALL WOULD COME IN, AND THE PERSON WOULD ANSWER BECAUSE THIS IS WHAT THEY NEED, THEY NEED A MORTGAGE REFERRAL.

IF OTHER PEOPLE RESPOND TO AN AD THAT THEY NEED HELP WITH CREDIT, OR WITH CREDIT CARDS, WITH A LAWYER, WITH SOMEONE NEGOTIATING FOR THEM, THOSE WOULD COME IN AND THE PEOPLE WORKING IN SALES WOULD KNOW THE SOURCE WHERE THOSE LEADS COME FROM. IF SOMEONE WHO HAS APPLIED FOR A MORTGAGE, THROUGH LENDING TREE, TO A LOWER MY BILLS, THEY WILL KNOW

HOW THAT PARTICULAR LEAD CAME IN, WHAT THAT PERSON IS LOOKING FOR.

THE COURT: IF A CALL COMES IN FROM A JOHN DOE THAT LIVES IN WESTON AND THEY CALL YOUR NUMBER, WHATEVER THAT NUMBER IS, AND THEY SAY, "I'M STRUGGLING WITH MY HOME MORTGAGE PAYMENTS. CAN YOU HELP ME WITH MORTGAGE MODIFICATION" --

MR. FEINGOLD: AH-HUH.

THE COURT: -- WHAT HAPPENS NEXT?

MR. FEINGOLD: WELL, IF THEY CALL IN SPECIFICALLY ASKING FOR THAT, THEN FOR A MORTGAGE MODIFICATION THEY WOULD BE REFERRED TO A LAW FIRM BECAUSE THEY WOULDN'T BE LOOKING FOR AN OUTSIDE PERSON TO GET THEM AN ACTUAL MORTGAGE LOAN, THEY WANT A MODIFICATION SO THEY WOULD BE REFERRED TO A LAW FIRM.

THE COURT: WHICH LAW FIRM WOULD THEY GO TO?

MR. FEINGOLD: WELL, RIGHT NOW THERE ARE THREE LAW FIRMS. THERE IS FINLEY, THERE IS MARRUCCI, AND THERE IS STRATTON, AND IT WOULD BE ONE OF THOSE THREE LAW FIRMS BASED ON THE CAPACITY THAT THOSE LAW FIRMS HAVE TO HANDLE THE WORK.

THE COURT: WHERE IS THE MARRUCCI LAW FIRM PHYSICALLY LOCATED?

MR. FEINGOLD: HIS MAIN OFFICE IS IN FORT LAUDERDALE.

THE COURT: AND WHAT ABOUT FINLEY?

MR. FEINGOLD: HIS MAIN OFFICE IS IN MIAMI.

THE COURT: AND WOULD THE BACK ROOM PHYSICALLY TRANSFER THE CALL TO ONE OF THOSE LAW FIRMS OR DO THEY GIVE THE NUMBER TO JOHN DOE AND SAY, "HERE IS WHO YOU NEED TO CALL."

MR. FEINGOLD: THEY GIVE THE NUMBER TO JOHN DOE AND THEY ALSO LOG THE INFORMATION IN. THE INFORMATION ALSO GOES IN TO SALES FORCE, TO WHAT'S CALLED A Q. AND A Q -- I GUESS THEY CALL IT A LEAD Q IS INFORMATION OF, "THESE ARE POTENTIAL PEOPLE THAT WANT TO BE CLIENTS AND SIGN ON." AND, SO YOU CAN GET LIKE A LEAD Q REPORT OF PENDING PEOPLE OUT THERE WHO ARE INTERESTED IN THE SERVICES.

THE COURT: ARE THERE ANY LAWYERS THAT WORK IN THE BACK ROOM?

MR. FEINGOLD: THERE ARE NO --

THE COURT: I DON'T MEAN HAVE OFFICES BACK THERE, BUT I MEAN ACTUALLY PHYSICALLY ARE PART OF THE BACK ROOM OPERATION AND THEY COULD TAKE A CALL ON THE SPUR OF THE MOMENT.

MR. FEINGOLD: NO, SIR, THERE ARE NO LAWYERS IN THAT PHYSICAL LOCATION OF THE BACK ROOM. THE LAWYERS ARE LOCATED IN THOSE PRIMARY OFFICES THAT I SPOKE ABOUT. FINLEY, I THINK, HE HAS FOUR OFFICES THROUGHOUT THE STATE.

BUT, NO, THAT BACK OFFICE IS AS THE PICTURE

DEPICTS, IT'S NOT LAWYERS. IT'S JUST BACK OFFICE PEOPLE THAT ARE COLLECTING THE DOCUMENTS, THE PHONE CALLS, THE E-MAILS, ET CETERA. AND THAT IS THE LENGTH THAT ALL OF THE CLIENTS ARE TOLD TO GO THROUGH THAT NUMBER FIRST SO THAT -- AND SEND ALL THEIR MAIL, ALL THEIR SUMMONSES, ALL THEIR COMPLAINTS, ALL THEIR ARBITRATION NOTICES, ALL THEIR COLLECTION NOTICES, EVERYTHING GOES TO THAT BACK OFFICE, AND THEN THE BACK OFFICE LADIES ENTER ALL THAT STUFF INTO SALES FORCE SO THAT THERE IS A GENERAL CENTRAL LOCATION TO SEE THE ENTIRE FILE PAPERLESSLY.

THEN THE LAWYERS LOG ON REMOTELY. AND WHAT THEY ARE ABLE TO DO IS, THEY ARE ABLE TO LOOK INTO THEIR Q EVERY DAY AND SEE EVERY FILE, EVERY DOCUMENT, WHAT'S POSTING.

THEN WHAT HAPPENS IS, IS THAT MIRANDA, SHE ACTUALLY WHAT WE CALL IN THE LEGAL PROFESSION IS LIKE A DOCKETING CLERK. SHE ACTUALLY TAKES EVERYTHING IN THAT HAS A DEADLINE, IF IT'S A RESPONSE TO A COMPLAINT, OR IF THERE IS A HEARING, SOMETHING THAT REQUIRES THE ATTORNEY'S ACTION, SHE WILL LOG THAT INTO THE SYSTEM. SHE WILL ALSO TASK FORCE, SALES FORCE, SHE WILL TASK OVER A DEADLINE OR A REMINDER TO THE LAWYERS TO LET THEM KNOW THAT THERE IS ACTION THE LAWYER NEEDS TO TAKE ON THEIR FILES.

THE COURT: I HAVE PLAINTIFF'S 25. YOU PROBABLY DO NOT HAVE THAT IN FRONT OF YOU.

MR. FEINGOLD: NO, SIR.

THE COURT: I WILL GIVE THIS TO YOU.

THE COURT: BUT I'M JUST CURIOUS ABOUT WHAT IS WRITTEN --

MR. SINASOHN: YOUR HONOR, MAY I APPROACH?

THE COURT: YOU MAY.

MR. FEINGOLD: YES, SIR.

THE COURT: -- AT THE BOTTOM OF THE VERY FIRST PAGE --

MR. FEINGOLD: YES, SIR.

THE COURT: -- WHICH SAYS, "FROM YOUR INFORMATION I CANNOT GET YOU APPROVED FOR FINANCING BUT I DO NOT WANT TO LEAVE YOU WITHOUT ANY HELP."

MR. FEINGOLD: RIGHT.

THE COURT: "AT THIS POINT IT LOOKS LIKE YOU NEED LEGAL HELP TO FIX THE PROBLEM."

MR. FEINGOLD: RIGHT.

THE COURT: "I CAN REFER YOU OVER TO A LAW FIRM THAT WORKS WITH THESE KINDS OF SITUATIONS," AND SO FORTH.

MR. FEINGOLD: YES.

THE COURT: WHERE DID THAT LANGUAGE COME FROM?

MR. FEINGOLD: BECAUSE THIS, I CAN TELL FROM THE TOP OF THIS WHERE IT SAYS, "TRANSCONTINENTAL LENDING," THIS IS SOMEONE WHO HAS COME INTO THE OFFICE LOOKING FOR A LOAN, RESPONDED TO AN AD FOR A LOAN, FOR REFINANCING.

SO THIS IS SOMEONE WHO IS LOOKING FOR A LOAN,

BASED ON THE PARAMETERS OF THEIR FINANCIAL INFORMATION AND THEY'VE PROBABLY GONE AHEAD AND DONE SOMETHING ELSE LIKE PULLING A PERSON'S CREDIT, OR THE PERSON GIVES THEM AN IDEA OF WHAT THEIR CREDIT IS, ET CETERA. IF THAT PERSON'S CREDIT ISN'T GOOD, OR IT APPEARS THAT THEY ARE NOT GOING TO QUALIFY FOR A LOAN BECAUSE THEY HAVE INDIVIDUAL CREDITOR ISSUES, A LOT OF THESE PEOPLE CALL AND SAY, "I DESPERATELY NEED TO REFI.

"WHAT'S GOING IN YOUR HISTORY?

"WELL, I HAVE THREE CREDIT CARDS. I HAVE COLLECTION AGENCIES AFTER ME."

"WELL, IT DOESN'T LOOK LIKE THERE IS ANYTHING OUT THERE FOR YOU. YOU CAN HAVE A LAW FIRM GO AND DEAL WITH THAT AND CLEAR THOSE ISSUES UP FIRST," AND THAT'S HOW, YOU KNOW, I SEE THIS IN THE PROGRESSION.

THE COURT: BUT ONE DOES NOT NEED A LAWYER TO GO AND TO TRY TO RESOLVE THESE TYPES OF PROBLEMS WITH A CREDIT CARD COMPANY OR A LENDING INSTITUTION.

MR. FEINGOLD: AGREED. AND THAT'S ONE EXAMPLE. THERE IS MULTIPLE ISSUES THAT CAN POP UP FOR A CLIENT WITH REGARDS TO THIS, BUT I -- I AGREE WITH YOU ABSOLUTELY ON THAT ASPECT AND, YOU KNOW, QUITE FRANKLY THAT IS WHY THAT SALES IS SEPARATE FROM BACK OFFICE. BUT I AGREE WITH YOU A HUNDRED PERCENT ON THAT POINT.

THE COURT: ALL RIGHT.

COUNSEL, DID YOU HAVE ANY QUESTIONS ON THE COURT'S QUESTIONS?

MR. SINASOHN: I MAY, YOUR HONOR, IF I MAY --

DIRECT EXAMINATION

(CONTINUED)

BY MR. SINASOHN:

Q. IS THE FIRST PERSON THAT THE CONSUMER TALKS TO A SALESPERSON, MR. FEINGOLD?

A. I DON'T KNOW IF THAT'S THE FIRST PERSON BECAUSE, FOR EXAMPLE, IF SOMEONE CALLS IN TO A TV AD, I KNOW THE TV AD GOES TO AN 800 NUMBER WHERE A PERSON THAT IS COMPLETELY AND UTTERLY UNAFFILIATED WITH FIRST UNIVERSAL HAS TO ASK THAT PERSON INITIAL QUESTIONS TO DETERMINE WHO HAS BOUGHT THAT PARTICULAR LEAD AND WHERE IT GETS SENT. SO THAT INITIAL PERSON FROM THOSE THIRD-PARTY COMPANIES, I WOULDN'T CHARACTERIZE AS A SALESPERSON. A LOT OF THESE LEAD AGGREGATORS, AND THAT'S WHAT THEY CALL THEMSELVES, HAVE THESE INITIAL PEOPLE THAT DETERMINE WHERE THE LEAD SHOULD GO TO.

AFTER THE LEAD IS DIRECTED, I THINK VERY EARLY ON IN THE PROCESS IT CERTAINLY GOES TO A SALESPERSON. AS I'VE SAID TO YOU, I DON'T WORK IN THE SALES ROOM AND HAVE NO INVOLVEMENT IN IT. BUT I CAN TELL YOU THAT MY UNDERSTANDING IS, IS DEPENDING IF IT COMES THROUGH AN 800 NUMBER AND IT'S AGGREGATED OVER, OR COMES THROUGH THE

INTERNET ULTIMATELY THE FIRST INITIAL MATERIAL CONVERSATIONS ARE CERTAINLY WITH THE SALESPERSON.
Q. THE SALESPERSON IS ALSO KNOWN AS AN OPENER?
A. WELL, I DON'T KNOW THAT. I MEAN, I KNOW THAT THERE IS REFLECTION OF AN OPENER AND CLOSER, AND THERE IS CERTAINLY -- IT APPEARS THERE IS TWO PEOPLE INVOLVED IN A SALES TRANSACTION. BUT AGAIN, I CAN'T TELL YOU IF THAT'S THE ACTUAL TITLE OR HOW THAT GETS SEGREGATED.
Q. AND DURING THE COURSE OF THAT INITIAL PHONE CALL WITH A SALESPERSON THE CONSUMER IS REFERRED TO A LAW FIRM WHILE THE -- WHILE MAKING THE SALE, IS THAT CORRECT?
A. INCORRECT. IT DEPENDS ON THE PRODUCT AND THE CIRCUMSTANCES OF THE CONSUMER. I CAN TELL YOU, AND THERE ARE NOTEBOOKS AT THE OFFICE WHERE THERE ARE HUNDREDS OF DEALS THAT COME IN FOR TRANSCONTINENTAL LENDING THAT GET REFERRED FOR FULL 1003S TO BE FILLED OUT, AND FULL LOANS TO BE DONE, NOT BY FIRST UNIVERSAL, BUT THERE ARE HUNDREDS OF TRANSACTIONS THAT WAY. SO THAT'S NOT ACCURATE.
Q. WELL, LET'S LIMIT IT TO LOAN MODIFICATIONS.
FOR LOAN MODIFICATIONS WHEN CONSUMERS ARE CALLED IN AND HOOKED UP WITH A SALESPERSON, THAT SALESPERSON REFERS THEM TO A LAW FIRM, CORRECT?
A. WELL, THEY HAVE TO BY LAW, SIR. IF SOMEONE CALLS IN FOR A LOAN MODIFICATION, BY LAW IN ORDER TO SERVICE THE PERSON IN THE FASHION THAT THEY ARE BEING SERVICED HERE, YOU

COULD BE A HOME RESCUE FIRM UNDER THE STATUTE WHICH REQUIRES DIFFERENT CONTRACTUAL DISCLOSURES AND DIFFERENT FEE SCHEDULES. BUT IN ORDER TO CHARGE SOMEONE AN ONGOING MONTHLY FEE, THE SERVICE MAY ONLY BE PROVIDED BY AN ATTORNEY OR BY A LICENSED FINANCIAL INSTITUTION. IT'S IN THE FLORIDA STATUTE.
Q. BUT, MR. FEINGOLD, ISN'T IT TRUE THAT THE LAW FIRM THAT WE ARE TALKING ABOUT DIDN'T SELL ANYTHING TO CONSUME AT THAT POINT, CORRECT?
A. I DON'T UNDERSTAND THE QUESTION. THE LAW FIRM HASN'T -- THE CONSUMER HAS JUST CALLED IN SO NOTHING HAS BEEN SOLD TO THEM. THE CONSUMER IS CALLED, UNDER YOUR QUESTION, AND ASKED, "I NEED HELP WITH A LOAN MODIFICATION," AND I'M TELLING YOU IF A CONSUMER CALLS IN AND ASKS FOR THAT SPECIFICALLY THEY WILL DEFINITELY NOT BE SENT TO A MORTGAGE COMPANY, THEY WILL BE SENT DIRECTLY TO A LAW FIRM FOR A LAWYER TO DO THAT MODIFICATION.
Q. MR. FEINGOLD, ANSWER MY QUESTION.
AT THE POINT THAT THE CONSUMER INITIALLY CONTACTS A COMPANY AND IS PLACED TO A SALESPERSON --
A. YES.
Q. -- NO LAW FIRM HAS SOLD ANYTHING TO THAT CONSUMER, CORRECT?
A. THAT IS CORRECT.
Q. AND ARE YOU TELLING THE COURT THAT THE LAW REQUIRES ANY

TIME THAT SOMEBODY CALLS YOUR COMPANY AND ASKS FOR A LOAN MODIFICATION YOU MUST SEND THEM TO A LAW FIRM?

A. THAT IS NOT WHAT I SAID, SIR. WHAT I SAID IS THAT IF THE CONSUMER CALLS AND ASKS FOR A LOAN MODIFICATION BASED ON THE WAY THE FIRM BILLS THE ONLY WAY THOSE SERVICES CAN BE PERFORMED IS THROUGH A LAWYER. IT'S IN THE FLORIDA STATUTE.

IF THE FIRM DECIDED TO BILL IN A WAY WHICH WAS UNDER THE HOME RESCUE STATUTE NO FEES ARE CHARGED UNTIL ALL SERVICES ARE COMPLETED, THEN THAT WOULD BE ANOTHER SITUATION. BUT IN ORDER TO CHARGE MONTHLY UNDER FLORIDA LAW YOU MUST BE A LAWYER TO DO THAT BECAUSE THAT IS AN EXEMPTION WHICH IS APPLICABLE TO ATTORNEYS AND FINANCIAL INSTITUTIONS. IT'S -- THE STATUTE IS IN MY LAW BOOK THAT I GAVE YOU ALL --

Q. FOR CLARITY, MR. FEINGOLD --

A. YES.

Q. -- THE SALE IS MADE BEFORE ANYONE TALKS TO A LAWYER, CORRECT?

A. THE SERVICES ARE OFFERED TO THE CLIENT AND -- YOU KNOW WHAT? I WILL AGREE WITH YOU ON THAT.

Q. THANK YOU.

A. THE SALE IS MADE BEFORE THE PERSON ACTUALLY SPEAKS TO AN ATTORNEY, YES, SIR.

THE COURT: ALL RIGHT. THANK YOU, MR. FEINGOLD.

MRS. KUDMAN, WATCH YOUR STEP, PLEASE.

THE COURT: THANK YOU.

THE WITNESS: THANK YOU, JUDGE.

THE COURT: ALL RIGHT, COUNSEL, YOU MAY CONTINUE WITH YOUR DIRECT EXAMINATION.

MR. SINASOHN: THANK YOU, YOUR HONOR.

TAMA BETH KUDMAN-RICHMAN,

BEING PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED FURTHER AS FOLLOWS:

DIRECT EXAMINATION

(CONTINUED)

BY MR. SINASOHN:

Q. MISS KUDMAN, YOU WERE IN THE MIDDLE DESCRIBING, I BELIEVE, WHAT WAS GOING ON, ON THE 19TH. IF I'M WRONG, PLEASE TELL ME, BUT I THINK THAT'S WHAT YOU WERE DOING.

A. I THINK THAT'S WHERE WE LEFT OFF. IT OCCURRED TO ME THAT I THINK I LEFT OUT SOMETHING PERTINENT.

BEFORE MR. FEINGOLD HAD RETURNED TO THE OFFICE, FOR LACK OF A BETTER TERM, WE HAD DISCOVERED THAT SEAN ZAUSNER'S OFFICE WAS SORT OF LIKE IN AN ADMINISTRATIVE OFFICE FOR FIRST UNIVERSAL LENDING, SLASH, HOLDINGS. WE FOUND BOXES THAT CONTAINED EMPLOYEE FILES THAT WERE CLEARLY NOT PRIVILEGED MATERIAL. AND, SO WE DID TAKE THE OPPORTUNITY AT THAT TIME TO START GATHERING SOME INFORMATION AND WE DID GO THROUGH THOSE EMPLOYEE FILES.

SO WE DID GET SOME SUBSTANTIVE WORK DONE. WE DID START TO GET A HANDLED ON THE KIND OF PAPERWORK THAT

POTENTIAL EMPLOYEES MIGHT FILL OUT AND THEIR WORK HISTORIES. SO THAT WAS THE FIRST WORK THAT WE DID IN ATTEMPTING TO GET A HANDLE ON THE BUSINESS AND HOW IT OPERATED.

THEN MR. FEINGOLD DID RETURN, AND THAT'S WHEN THE MEETING OCCURRED BETWEEN US THAT I DESCRIBED EARLIER.

Q. DID YOU FULLY DESCRIBED WHAT HAPPENED AT THOSE MEETINGS, OR THAT MEETING?

A. I THINK SO. YOU KNOW, I THINK IT'S BEEN DESCRIBED PRETTY ACCURATELY IN PRIOR TESTIMONY.

Q. DID I SAY ANYTHING AT THE INITIAL MEETING THAT YOU CAN RECALL?

A. NOTHING PARTICULARLY STANDS OUT. WHAT DOES STAND OUT, OF COURSE, IS THE QUESTION OF WHETHER OR NOT FIRST UNIVERSAL HOLDINGS WAS A PROPER SUCCESSOR OR ASSIGNED TO FIRST UNIVERSAL LENDING. BASED UPON OUR UNDERSTANDING OF THE CONTINUITY OF CLIENTS FROM FIRST UNIVERSAL LENDING TO FIRST UNIVERSAL HOLDINGS AND THE CONTINUATION OF THE LOAN MODIFICATIONS FOR THOSE CLIENTS, WE HAD CONCLUDED THAT IT WAS PROPERLY A SUCCESSOR OR ASSIGNED EVEN IF NOT PARTICULARLY UNDER THE DELAWARE BUSINESS MODEL. BUT TECHNICALLY THERE WAS A SUCCESSIVE RELATIONSHIP.

I DON'T RECALL ANYTHING ELSE PARTICULARLY OF NOTE HAPPENING THAT NIGHT OTHER THAN THE FACT THAT WE WENT BACK TO THE FILE ROOM AND TOOK GREAT PAINS OF SEPARATING OUT

NON-FIRST UNIVERSAL FILES FROM THE FIRST UNIVERSAL FILES SO THAT WE WOULD ONLY LOOK AT THOSE DOCUMENTS THAT WEREN'T PRIVILEGED. SO REALLY THE FIRST DAY OUR BIG ISSUE WAS DEALING WITH PRIVILEGE ISSUES.

THE SECOND DAY --

Q. BEFORE THE SECOND DAY, JUST SO I CAN CLEAR UP WITH THE COURT ABOUT THE PRIVILEGE ISSUES.

I THINK YOU WERE SHOWN DURING THE BREAK, ALTHOUGH I'M NOT A HUNDRED PERCENT SURE BY MR. KIRTZ, IF HUGH HEFNER DEALING WITH THE PRIVILEGE INFORMATION?

A. YES. BUT THAT'S NOT FROM THAT TIME FRAME. THAT IS SOMETHING THAT OCCURRED LATER ON.

Q. OKAY. I WILL WAIT THEN UNTIL WE GET TO THAT POINT.

A. YEAH. THAT HAS TO DO WITH THE COMPUTERS WHICH IS AN ISSUE THAT WE REALLY DIDN'T GET INTO UNTIL LATER ON.

Q. OKAY.

A. YOUR HONOR, THERE WERE VARIOUS LEVELS OF PRIVILEGE ISSUES THAT WE WERE DEALING WITH. SO THAT, I THINK, PRETTY MUCH CONCLUDED THURSDAY NIGHT. I THINK WE LEFT, IT WAS EITHER 11:00 OR 11:30 THAT NIGHT, IT WAS VERY LATE.

MISS MOSCOWITZ AND MYSELF RETURNED THE NEXT DAY, THAT WAS A FRIDAY, TO CONTINUE ACQUAINTING OURSELVES WITH THE BUSINESS, TRYING TO UNDERSTAND HOW THE BUSINESS OPERATED, TRYING TO ENSURE THAT THE BUSINESS WASN'T BEING DAMAGED OR, YOU KNOW, WHAT WE COULD DO GOING ON TO SECURE

THE BUSINESS.

OH, AND THURSDAY, I'M SORRY, GOING BACK TO THURSDAY, WE DID HAVE THE LOCKS CHANGED TO ALL AREAS THAT WERE DETERMINED TO BE FIRST UNIVERSAL.

Q. WHAT FLOOR DID YOU HAVE LOCKS CHANGED ON?

A. IT WAS THE SECOND FLOOR. WE WEREN'T AWARE OF THE THIRD FLOOR. WHEN WE FIRST CAME IN, AS I DESCRIBED EARLIER, NOBODY WANTED TO REALLY TELL US THAT FIRST UNIVERSAL WAS EVEN THERE. SO WE DIDN'T GET VERY MUCH COOPERATION FROM ANYBODY AND WE WEREN'T REALLY ABLE TO ASK ANYBODY ANY QUESTIONS OTHER THAN MR. FEINGOLD WHO DID SIT DOWN WITH US.

IT WASN'T UNTIL FRIDAY, THE NEXT DAY, THAT MRS. MOSCOWITZ AND MYSELF REALLY SAT DOWN WITH MR. FEINGOLD, AND WE DID START TO GET AN OVERVIEW OF THE BUSINESS. WE STARTED BY MEETING IN THE RECEPTION AREA OUTSIDE OF HIS OFFICE DISCUSSING HOW FIRST UNIVERSAL RAN, WANTING TO UNDERSTAND HOW SALES WERE MADE, THE PROGRESSION OF SALES INTO THE HANDS OF THE BACK OFFICE PEOPLE WHO ARE ACTUALLY WORKING ON THESE FILES.

I CAN TELL YOU SUBSTANTIVELY WHAT WE HAVE COME TO UNDERSTAND AS THE RUNGS OF THE OPERATION, BUT I HAVE TO DISCLOSE TO THE COURT THAT THERE WERE TWO IN-DEPTH CONVERSATIONS THAT WERE HAD BETWEEN OURSELVES AND MR. FEINGOLD ABOUT HOW THE BUSINESS OPERATED AND I MAY BE MIXING ALL OF THE INFORMATION THAT I ACQUIRED FROM THOSE TWO

CONVERSATIONS.

WHAT WE COME TO UNDERSTAND IS THAT THE -- FIRST UNIVERSAL LENDING ACQUIRED MOST OF THE CLIENTS THROUGH THE METHOD THAT MR. FEINGOLD JUST DESCRIBED WHERE PEOPLE WOULD EITHER CALL IN OR LENDING TREE LEADS, AND THEY WOULD BE CONTACTED BY THE SALES ROOM OR THE CALLS WOULD COME INTO THE SALES ROOM.

AND ALTHOUGH MR. FEINGOLD WAS A LITTLE HESITANT TO CALL THE FIRST SALESPEOPLE OPENERS, WE'VE ALWAYS REFERRED TO THEM AS SUCH IN OUR DISCUSSIONS. SO THERE IS THE FIRST ROUND OF SALES CONTACT THAT'S MADE BETWEEN THESE OPENERS WHO DETERMINE WHAT KIND OF, I GUESS, RELATIONSHIP IS GOING TO BE DEVELOPED, WHETHER THEY ARE LOOKING FOR LOAN MODIFICATION OR ANYTHING ELSE.

I HAVE TO SAY THAT I NEVER SAW ANYTHING OTHER THAN LOAN MODIFICATIONS. ALL OF THE DOCUMENTS THAT I SAW PERTAINED TO CREDIT INFORMATION AND MORTGAGE INFORMATION, AND THAT WAS ON ALL OF THE BACK OFFICE ROOMS. AND THAT INCLUDES, BY THE WAY, FORECLOSURE PROCEEDINGS AND THINGS LIKE THAT. BUT WHAT I SAW RELATED TO THAT.

THE COURT: MORTGAGE ISSUES.

THE WITNESS: YES. WHETHER THERE ARE OTHER SERVICES PROVIDED, I BELIEVE THAT THAT'S PROBABLY TRUE. I JUST DIDN'T SEE THOSE DOCUMENTS.

BUT THOSE FIRST PEOPLE WOULD CALL IN, AND THOSE

CALLS ARE APPARENTLY NOT RECORDED, ALTHOUGH EVERYTHING DONE IN THE BACK OFFICE IS APPARENTLY RECORDED. WE DID INQUIRE AS TO WHY THOSE CALLS ARE NOT RECORDED.

THE COURT: THE INITIAL CALLS.

THE WITNESS: AH-HUH. AND MR. FEINGOLD TOLD US AT ONE TIME THEY HAD BEEN RECORDED AND THAT THERE HAD BEEN PROBLEMS REGARDING TWO-PARTY CONSENT WITH REGARD TO THOSE CALLS AND THEY JUST DECIDED TO STOP RECORDING ALL OF THOSE CALLS.

HE DID SAY THAT SOMETIMES CALLS ARE MONITORED FOR THE REASONS THAT HE TESTIFIED TO EARLIER. IF THERE WAS A PROBLEM WITH THE SALESPERSON AND THEY WANTED TO MONITOR THEM PARTICULARLY, BUT THAT THE VAST MAJORITY OF CALLS WERE NOT RECORDED.

AND THAT THEN THERE WOULD BE A CLOSER WHO WOULD MAKE A FOLLOW-UP CALL WHO WOULD SEAL THE DEAL, SO TO SPEAK. AND I CAN'T RECALL AS I SIT HERE RIGHT NOW WHETHER OR NOT IT WAS THE OPENER OR THE CLOSER HAD DETERMINED WHAT THE PRICE WOULD BE FOR THE SERVICES THAT HAD BEEN AGREED UPON.

I WILL TELL THE COURT THAT WE ATTEMPTED TO INTERVIEW SEAN ZAUSNER, WHO IS ONE OF THE PARTNERS IN THE COMPANY, AND WE WERE TOLD THAT HE IS SORT OF THE HEAD OF THE SALES DEPARTMENT AND HE WOULD BE THE BEST PERSON TO TALK TO ABOUT THE CONDUCT OF THE SALES ROOM.

FIRST MRS. MOSCOWITZ ATTEMPTED TO INTERVIEW HIM

AND HE SIMPLY WOULD NOT GIVE ANY STRAIGHT ANSWERS. WE COULDN'T GET ANY INFORMATION FROM HIM. I TRIED TO FOLLOW UP WITH QUESTIONING AND INDICATED TO HIM THAT WE WERE MUTUAL PARTY ATTEMPTING TO UNDERSTAND THE OPERATION. HE STILL DID NOT WANT TO TALK TO US AT ALL. IT WAS INCREDIBLY FRUSTRATING AND WE FINALLY JUST GAVE UP.

THE MAIN THING THAT WE WERE INTERESTED IN IS HOW DID THEY DETERMINE WHAT THE RATE MIGHT BE FOR EACH PARTICULAR CLIENT BASED ON WHAT SERVICES THEY NEEDED, AND HE JUST WOULD NOT ANSWER. THERE WAS NO BASIS AS FAR AS HE WOULD GIVE US. I MEAN, WE ASKED, YOU KNOW, "IS THERE A CALCULATION? IS IT, YOU KNOW, $500 PER CREDIT LINE THAT NEEDS TO BE MODIFIED?" HE JUST WOULDN'T GO THERE.

LATER WE WERE ABLE TO SPEAK TO MR. FEINGOLD ABOUT IT AND HE SAID THAT THERE WAS GENERALLY A -- THERE WAS AN AVERAGE NUMBER THAT THEY HAD PICKED THAT MOST MODIFICATIONS WOULD BE. I BELIEVE IT WAS EITHER FOUR OR $5,000 FOR THE OVERALL FEE, AND THEN IT WOULD FLUCTUATE BASED ON THE NUMBER OF SERVICES THAT NEEDED TO BE PROVIDED. BUT THAT WOUND UP BEING THE AVERAGE OVERALL.

UNDER FIRST UNIVERSAL LENDING APPARENTLY CLIENTS WERE BEING BILLED ON AN ONGOING MONTHLY BASIS. SO LET'S SAY THIS PARTICULAR CLIENT HAD ONE MORTGAGE SO THEY WOULD PAY $500 A MONTH UNTIL THE COMPLETION OF THAT LOAN MODIFICATION. UNDER THE FIRST UNIVERSAL HOLDINGS MODEL

THERE WOULD BE A FEE THAT WAS, YOU KNOW, THE OVERALL FEE AND IT WOULD BE BROKEN DOWN INTO MONTHS, AND I BELIEVE IT WAS FIVE MONTHS WAS THE PERIOD OF TIME.

THAT SECOND DAY, ASIDE FROM INTERVIEWING MR. FEINGOLD WE ATTEMPTED TO JUST GET THE LAY OF THE LAND, WHERE ARE ALL OF THE DOCUMENTS. WE LEARNED THAT THERE WAS A COMPLIANCE PROGRAM, WE WANTED TO KNOW WHERE THOSE BINDERS WERE. I DID CURSORILY FLIP THROUGH THOSE BINDERS.

WE AGAIN LOOKED AT ALL OF THE NOTATIONS THAT WERE ON THE WALLS AND ALL OF THE MEMOS THAT WERE THERE. WE NOTED THAT EACH LAW FIRM, THE MARRUCCI LAW FIRM, THE FINLEY LAW FIRM, AND THE STRATTON & FEINSTEIN LAW FIRMS, THEY ALL HAD THEIR OWN PHONE NUMBERS AND THEY WERE POSTED BROADLY ON THE WALL SO THAT THE BACK OFFICE COULD SEE WHAT THOSE NUMBERS WERE.

MY UNDERSTANDING IS THAT THOSE ARE THE NUMBERS THAT WOULD RING INTO THE BACK OFFICE GIRLS. SO THE CONSUMER WOULD BE GIVEN, FOR EXAMPLE, ONE 800 FOR THE MARRUCCI NUMBER BUT IT DIDN'T RING AT THE MARRUCCI LAW FIRM, IT WENT IN THE BACK ROOM.

THE COURT: AT PGA BOULEVARD?

THE WITNESS: YES.

MR. SINASOHN: YOUR HONOR CAN I PUT IT ON THE ELMO? BUT I STILL DON'T KNOW HOW TO DO IT.

THE COURT: AFTER ALL THIS TIME?

BY MR. SINASOHN:

Q. IS THIS THE AREA YOU'RE TALKING ABOUT?

A. YES. CORRECT.

THE COURT: LET ME JUST MAKE SURE I AM CLEAR ON WHAT YOU HAVE SAID WAS THE UNDERSTANDING THAT YOU ALL HAD AT THAT POINT IN TIME.

A POTENTIAL CLIENT WOULD BE TALKING WITH SOMEONE IN THE BACK OFFICE.

THE WITNESS: WELL, NO. THEY WOULD BE TALKING WITH THE SALES ROOM, WHICH WE NOW DISCOVERED IS ON THE THIRD FLOOR BUT AT THE TIME ON FRIDAY WE DID NOT KNOW THAT. WE JUST KNEW THERE WERE SALESPEOPLE.

THE COURT: ALL RIGHT. SO THEY WERE TALKING WITH SOMEONE IN THE SALES OFFICE ON THE THIRD FLOOR, THEY WOULD BE GIVEN THE ONE 800 NUMBER FOR, SAY, THE MARRUCCI LAW FIRM.

THE WITNESS: I DON'T KNOW AT WHAT POINT IN TIME THEY WERE GIVEN THAT ONE 800 NUMBER. I KNOW THAT AT SOME POINT ONCE THEY WERE DIRECTED TO BECOME CLIENTS OF THAT FIRM THAT WAS THE NUMBER THAT THEY WERE PROVIDED WITH.

THE COURT: AND WHEN THE CLIENT DIALED THAT NUMBER IT RANG IN THE BACK OFFICE ON THE SECOND FLOOR.

THE WITNESS: CORRECT.

I'M TRYING TO THINK WHAT OTHER PERTINENT INFORMATION --

THE COURT: IF YOU KNOW, WHEN -- THIS IS ASKING

FOR PURE SPECULATION, BUT WERE YOU EVER GIVEN AN EXPLANATION WHAT HAPPENED WHEN THE PHONE CALL WAS ANSWERED BY SOMEONE IN THE BACK OFFICE?

THE WITNESS: WE NEVER GOT AN OPPORTUNITY TO HEAR THAT. MY SPECULATION WOULD BE THAT THE PHONE WAS ANSWERED MARRUCCI, YOU KNOW, IN THE NAME OF THE LAW FIRM.

THE COURT: OKAY.

THE WITNESS: NOW, MY UNDERSTANDING IS THAT ALL OF THE ATTORNEYS AS YOU HAVE HEARD THE FILE WAS PLACED IN A SALES Q, AND THEORETICALLY THOSE LAW FIRMS HAD ACCESS TO THE SALESFORCE.COM INFORMATION, BUT I AM NOT SURE THAT AN ATTORNEY EVER NECESSARILY TOUCHED ANY PARTICULAR FILE.

FOR EXAMPLE, THERE MIGHT BE A LOAN MODIFICATION, AND AS LONG AS THERE WERE NO COURT PROCEEDINGS I'M NOT SURE THAT AN ATTORNEY EVER NECESSARILY GOT INVOLVED, ALTHOUGH I COULD BE WRONG BECAUSE THE OFFICE OF COMPROMISE, OR THE MODIFICATIONS OFFERED MAY HAVE REQUIRED ATTORNEY REVIEW AND SIGNED OFF. SO I'M NOT SURE, IT VERY WELL COULD HAVE BEEN SEEN BY ATTORNEYS.

THE COURT: RIGHT.

THE WITNESS: BUT THE WAY THAT THE OFFICE WAS SET UP I THINK PROBABLY YOU COULD GO THROUGH THE WHOLE PROCESS WITHOUT AN ATTORNEY EVERY LAYING EYES ON THE FILE. AND AGAIN, THIS WAS INFORMATION THAT I GATHERED NOT ONLY ON THAT FRIDAY BUT ALSO OVER THE COURSE OF THE THREE WEEKS.

NOW, I WILL SAY THAT IT WAS THE WEEKEND PRIOR TO THANKSGIVING AND MR. FEINGOLD WAS GOING AWAY ON A FAMILY VACATION, AND WE ALL HAD, YOU KNOW, DIFFICULT SCHEDULES FOR THE FOLLOWING WEEK. AND, SO WE DID NOT GET A LOT OF WORK DONE THAT WEEK PARTLY BECAUSE WE WERE VERY HOPEFUL THAT A COMPROMISE WAS BEING REACHED BETWEEN FIRST UNIVERSAL AND THE FTC.

IT APPEARED THAT THERE WERE -- THAT THERE WAS GOING TO BE A MONITORSHIP AGREED TO RATHER THAN A RECEIVERSHIP. AND, SO WE SORT OF CEASED DOING WHAT WE WERE DOING AT THAT TIME BECAUSE WE WERE REALLY HOPEFUL THAT --

THE COURT: THIS WOULD WORK OUT.

THE WITNESS: EXACTLY. SO BETWEEN MR. FEINGOLD GOING AWAY, THE HOLIDAYS, REALLY NOT THAT MUCH WAS ACCOMPLISHED THAT WEEK.

I WILL TELL YOU THAT MONDAY NIGHT, THAT FOLLOWING MONDAY I LEARNED THAT THERE HAD BEEN A BREAKDOWN IN COMMUNICATIONS AND IT LOOKED LIKE THE DEAL WAS GOING TO FALL APART BECAUSE I GOT A PHONE CALL FROM MR. SINASOHN STATING, "WE FOUND OUT THAT THERE IS A THIRD FLOOR," AND I'M NOT SURE IF IT WAS THE SAME PHONE CALL THAT I LEARNED THERE WAS ALSO A POMPANO LOCATION. IT WAS -- IT WAS AFTER THE WEEKEND THAT WE LEARNED BOTH. I WAS TOLD THAT THERE WOULD BE NO MONITORSHIP, THAT THERE WAS NO TRUST.

AT THAT TIME I CALLED MR. FEINGOLD AND I SAID,

"LOOK, YOU KNOW," AND I BELIEVE THAT HE WAS PRETTY ACCURATE ABOUT THE CONVERSATION THAT WE HAD. I SAID, "YOU KNOW, YOU'VE GOT THE FEDERAL TRADE COMMISSION COMING INTO FIRST UNIVERSAL, THERE IS A LOT OF DISTRUST. THEY FEEL THAT THEY HAVE NOT BEEN INFORMED AS TO EVERYTHING THAT EXISTS IN THIS BUSINESS. AND FRANKLY I THINK YOU NEED TO REPAIR THAT RELATIONSHIP AND YOU NEED TO TRY TO DISCLOSE AS FULLY AS POSSIBLE AS MUCH ABOUT THE BUSINESS AS YOU CAN SO THAT YOU CAN RESUME NEGOTIATIONS FROM HERE. IF THAT'S A GOAL I THINK THAT'S A GOOD WAY TO DO IT.

"IT IS A BIG BUSINESS. I DON'T THINK ANYBODY HAD ANY IDEA WHAT WE WERE WALKING INTO. AND, SO I THINK IT'S IMPORTANT THAT YOU LAY OUT EACH AND EVERY PART OF THIS BUSINESS SO THAT THERE IS A FIRM UNDERSTANDING AND A COMPROMISE CAN BE REACHED," AND THAT WAS DONE.

BUT IN THE MEANTIME WE WERE SCRAMBLING TO SECURE THE THIRD FLOOR LOCATION AND HAVE THOSE LOCKS CHANGED. AND AGAIN, DURING THAT WEEK ALSO TRY TO SECURE THE POMPANO BEACH LOCATION WHERE WE HAD TO GO AND SEE WHAT WAS THERE AND CHANGE THE LOCKS. A LOT OF THIS AGAIN WAS DIFFICULT BECAUSE OF THE HOLIDAY WEEK, BUT WE DID THE BEST WE CAN AND WE GOT TO IT AS TIMELY AS WE COULD.

WHEN WE GOT UP TO THE THIRD FLOOR AND SAW IT FOR THE FIRST TIME, I'M NOT SURE EXACTLY WHAT DAY THAT WAS, BUT WE DID LOOK AT ALL OF THE PAPERS AGAIN THAT WERE ON THE

WALLS AND ON THE DESKS. WE FOUND A GREAT DEAL OF SCRIPTS, MOST OF WHICH YOUR HONOR HAS SEEN TODAY. I DON'T KNOW WHERE THE SCRIPTS WERE GENERATED OR BY WHOM, BUT WHEN WE ATTEMPTED TO QUESTION MR. ZAUSNER ABOUT THAT HE WOULDN'T ANSWER.

THE SCRIPTS WERE EVERYWHERE. AND PART OF OUR CONCERN ONCE WE WENT UP THERE WAS THAT A LOT OF THESE DOCUMENTS REFER TO TRANSCONTINENTAL LENDING BUT WE HAD BEEN INFORMED THAT FIRST UNIVERSAL HAD SEVERED ITS RELATIONSHIP WITH TRANSCONTINENTAL LENDING AT SOMETIME EARLIER, AND THAT FIRST UNIVERSAL LENDING HAD SUCCEEDED ITS LENDING LICENSE. AND, SO THE DOCUMENT THAT YOU REFERRED TO BEFORE, I BELIEVE IT WAS PLAINTIFF'S EXHIBIT 25, WHICH SAYS, "IT SOUNDS LIKE YOU ARE NOT GOING TO QUALIFY FOR A MORTGAGE" -- LET ME -- THANK YOU, YOUR HONOR.

THE COURT: DOWN AT THE BOTTOM.

THE WITNESS: "FROM YOUR INFORMATION I CANNOT GET YOU APPROVED FOR FINANCING." WE WERE CONCERNED ABOUT THIS DOCUMENT BECAUSE WE THOUGHT IT WAS DECEPTIVE TO THE CONSUMER THAT THEY MIGHT HAVE BEEN CALLING IN SEEKING REFINANCING AND INSTEAD BEING REDIRECTED TO A HYPOTHETICAL LAW FIRM WITHOUT FIRST OF ALL BEING DISCLOSED THAT THEY WEREN'T A LENDING INSTITUTION TO BEGIN WITH; AND, SECONDLY, THAT THEY HAVE A REFERRAL RELATIONSHIP WITH THESE LAW FIRMS. SO THAT WAS DEFINITELY CONCERNING.

I ALSO -- THROUGHOUT MUCH OF OUR TIME WITH FIRST UNIVERSAL, AND WHEN I SAY "US," I MEAN MYSELF AND MISS MOSCOWITZ AND MISS BERG. AGAIN, WE WERE ATTEMPTING TO HELP A RESOLUTION COME TO FRUITION, BUT AT THE SAME TIME IF WE WERE GOING TO BE TAKING CARE OF THIS COMPANY IN THE MEANTIME WE WERE CONCERNED THAT PERHAPS THE PEOPLE WE WERE SERVICING WERE THERE FRAUDULENTLY. AND, SO WE WERE CONCERNED ABOUT ALLOWING OPERATIONS TO RESUME BECAUSE WE WEREN'T SURE HOW TO TAKE CARE OF THOSE PEOPLE WHO WERE THERE PERHAPS UNDER FALSE PRETENSES OR WHO HAD BEEN PROMISED RESULTS. WE JUST WEREN'T SURE HOW TO GO ABOUT THAT.

WE WERE ALSO CONCERNED ABOUT GOING FORWARD, HOW WE WERE GOING TO DEAL WITH CLIENTS AND THE CUSTOMERS. AT THE SAME TIME WE WERE TRYING TO MINIMIZE THE DAMAGE THAT WAS BEING DONE TO THESE CONSUMERS WHO, AS MR. FEINGOLD STATED, COULD BE GOING INTO FORECLOSURE.

ONE OF THE THINGS THAT WE DID WAS, I KNOW MISS MOSCOWITZ REACHED OUT FOR AT LEAST TWO OF THE LAW FIRMS TO MAKE SURE THAT THEY WERE IN CONTROL OF THEIR FILES AND THAT THEY KNEW THEY NEEDED TO REACH OUT AND FOLLOW THE DOCKETS AND FOLLOW THEIR CALENDARS.

THE COURT: WHAT WERE THE RESULTS OF THAT INQUIRY?

THE WITNESS: WE DON'T KNOW. WE REALLY DON'T. WE ASKED EVERYBODY TO PLEASE NOTIFY THE LAW FIRMS OF WHAT'S

GOING ON. WE FEEL THAT EVERY LAWYER HAS AN INDEPENDENT OBLIGATION TO MAINTAIN THEIR OWN CALENDARS AND TO MAINTAIN THEIR OWN FILES. AND, SO IN THAT REGARD WE WERE HOPEFUL THAT THAT WAS BEING DONE. CERTAINLY IT WAS THEIR OBLIGATION.

FURTHER, WE WERE VERY EAGER TO TRY TO GET A COUPLE OF THE GIRLS, IF NOT ALL OF THE GIRLS BACK IN. WE DIDN'T THINK THAT IT WAS TENABLE TO HAVE THE ENTIRE BACK OFFICE GROUP COME BACK AT THAT TIME, BUT WE DID WANT SEVERAL PEOPLE TO COME BACK TO OPEN MAIL, TO ANSWER VOICE MAILS SO THAT WE COULD MINIMIZE ANY DAMAGE TO THE BUSINESS WHICH REALLY WAS A PRIMARY CONCERN.

BY MR. SINASOHN:

Q. SO WHAT DATE ARE WE UP TO AS FAR AS --

A. I'M SORT OF LUMPING EVERYTHING TOGETHER BECAUSE THE DAYS ARE SORT OF RUNNING TOGETHER. BUT, YOU KNOW, I THINK THAT IT SOUNDED EARLIER AS THOUGH NOT A LOT HAS BEEN DONE, BUT REALLY A LOT OF THAT WAS BECAUSE THERE WERE NEGOTIATIONS THAT WERE ATTEMPTING TO BE HAD AND WE HAD CONCERNS ABOUT CLIENTS GOING FORWARD.

WE ALSO MET AND WORKED WITH MIRANDA.

AND, MIRANDA, AGAIN LIKE EVERYBODY ELSE I KEEP FORGETTING YOUR LAST NAME.

SHE SHOWED US HOW THE BACK OFFICE WORK IS DONE. SHE TOOK US THROUGH A FILE TO SHOW US HOW THE CALLS ARE --

HOW THE LOAN IS BEING WORKED OUT. SHE SHOWED US ON SALES FORCE ALL THE DIFFERENT NOTATIONS. SHE WAS WONDERFUL. AND I THINK IT BECAME CLEAR THAT THE WOMEN AND GENTLEMEN WHO WORKED IN THE BACK ROOM DO WORK, AND THEY DO ATTEMPT TO OBTAIN LOAN MODIFICATIONS. THAT PART OF THE BUSINESS, YOU KNOW, APPEARS TO RUN THE WAY THAT IT SHOULD.

THE SOFTWARE APPEARS TO -- IT'S PHENOMENAL. BUT AGAIN, THE DATA ENTRY IS ONLY AS GOOD AS THE PERSON ENTERING THE DATA. SO, YOU KNOW, APPARENTLY THERE WAS ONE QUESTION ABOUT ON SALES FORCE. THERE WAS AN INDICATION THAT A FORECLOSURE HAD BEEN STOPPED WHEN IN FACT I GUESS THE FORECLOSURE HAD ACTUALLY OCCURRED.

SO AGAIN, I GUESS THE SAME HUMAN ERROR CAN HAPPEN WITH SALES FORCE AS HAPPENS WITH ANY NOTE TAKING SYSTEM. BUT I THINK THAT IT'S AN INCREDIBLE SYSTEM, AND IT'S CLEARLY IN PLACE TO KEEP ACCURATE NOTES AS TO WHAT'S BEING DONE ON A FILE.

WE WERE INFORMED THAT COMPLIANCE MEETINGS DO OCCUR ON A WEEKLY BASIS AND THAT ISSUES ARE ADDRESSED. IT DID CONCERN US THAT THOSE COMPLIANCE -- THE COMPLIANCE EFFORT DIDN'T SEEM TO BE AS STRONG AS REGARD TO SALES AS IT DID WITH REGARD TO THE ONGOING OPERATIONS OF THE BACK OFFICE. I THINK THAT MORE OVERSIGHT COULD HAVE BEEN PROVIDED THERE.

I THINK THERE IS ALSO AN ISSUE AS TO WHETHER OR

NOT SOME OF THESE SCRIPTS WERE GENERATED BY INDIVIDUAL SALESPEOPLE WHO WORK ON COMMISSION OR AS TO WHETHER OR NOT THEY ARE PROVIDED BY THE CORPORATION, AND THERE WAS NO WAY TO DETERMINE THAT BECAUSE WE JUST COULDN'T GET ANSWERS FROM MR. ZAUSNER. AND, QUITE FRANKLY, THERE WERE NO OTHER SALESPEOPLE AVAILABLE TO US.

THE OTHER ISSUE THAT DID COME UP IN WORKING WITH MIRANDA ON SALES FORCE, SHE HAD HER ACCESS TO EVERY FILE, THAT'S TRUE. FIRST OF ALL, WE HAD NO ABILITY TO ACCESS ANY OF THE SALES FORCE DATA ON OUR OWN. IT'S SIMPLY BEYOND MY TECHNOLOGICAL CAPABILITY. BUT BEYOND THAT SHE DIDN'T HAVE THE ABILITY TO GENERATE REPORTS.

THE PERSON WHO HAD THAT CAPABILITY IS MR. DAVID ZAUSNER AND HE WASN'T AVAILABLE AT ALL DURING THE ENTIRE TWO-WEEK PERIOD. SO THERE WERE REPORTS THAT I WOULD HAVE BEEN INTERESTED IN SEEING.

FOR EXAMPLE, THE NUMBER OF LOAN MODIFICATION CLIENTS AS OPPOSED TO THE NUMBER OF COMPLAINTS. THE NUMBER OF LOAN MODIFICATIONS CLIENTS AS OPPOSED TO OTHER SERVICES THAT MIGHT BE RENDERED BY FIRST UNIVERSAL. WE DIDN'T HAVE ACCESS TO ANY OF THAT INFORMATION.

Q. CAN I INTERRUPT YOU FOR A SECOND?

A. SURE.

Q. DO YOU KNOW IF THE FTC HAD ACCESS TO THOSE DOCUMENTS THAT YOU DIDN'T HAVE ACCESS TO, THE SALES FORCE DOCUMENTS?

A. I DON'T KNOW. WHAT I DO KNOW IS THAT I HAD CALLED SALES FORCE MYSELF ON FRIDAY. THAT WAS ONE OF THE THINGS THAT I DID. AND I CALLED AND SPOKE TO THE ACCOUNT MANAGER IN CHARGE OF FIRST UNIVERSAL'S ACCOUNT.

HE TOLD ME THAT MR. ZAUSNER HAD ORDERED A FULL COPY, A FULL IMPRINT OF THEIR FILE BUT THAT IT HAD BEEN ORDERED TO BE DELIVERED TO FIRST UNIVERSAL. I DON'T KNOW WHETHER HE INTENDED TO TURN IT OVER TO THE FTC, I DON'T KNOW IF IT WAS FOR OUR BENEFIT, BUT THAT'S WHERE THEY HAD BEEN PLANNING ON SENDING IT. I INTERCEDED AND ASKED THEM TO PLEASE SENDS IT TO THE FEDERAL TRADE COMMISSION. SO THAT WAS DONE. I DON'T KNOW IF IT HAS EVER BEEN DELIVERED.

Q. AND, SO LET ME JUST CLARIFY FOR THE COURT THE STATUS OF THAT. DO YOU REMEMBER THAT MR. KIRTZ, I BELIEVE, SHOWED YOU AT LUNCH TIME AN E-MAIL?

A. YES.

Q. OKAY.

MR. SINASOHN: CAN I APPROACH, YOUR HONOR?

THE WITNESS: BUT I BELIEVE THAT THAT E-MAIL DEALS WITH THE ACCOUNTING RECORDS, NOT WITH REGARD TO THE SALES FORCE RECORDS.

BY MR. SINASOHN:

Q. I AM NOT SURE, MAYBE YOU CAN CLEAR IT UP BY LOOKING AT IT.

A. THANK YOU.

Q. I'M SHOWING YOU AN E-MAIL FROM HUGH HEFNER TO ME, AND I WILL JUST FOR THE COURT, HE IS AN I.T. PERSON WITH THE FTC.
JUST TELL THE COURT WHAT IT SAYS.
A. YOUR HONOR, THIS EXHIBIT ACTUALLY REFERS TO A SEPARATE MATTER. THERE IS A COMPUTER THAT IS UTILIZED NOW FOR ACCOUNTING, AND I BELIEVE THIS WAS TESTIFIED TO MORE FULLY BY MR. FEINGOLD EARLIER, THAT HAVE APPARENTLY BEEN USED BY HIS LAW FIRM BEFORE IT BECAME PART OF FIRST UNIVERSAL'S ACCOUNTING.
THE COURT: IS THIS THE DELL COMPUTER THAT WAS REPLACED WITH THE APPLE?
THE WITNESS: YES. I RECEIVED A PHONE CALL THAT INDICATED -- IT WAS I BELIEVE IT WAS FIRST FROM FTC'S TECH GUY SAYING THAT THERE WAS A COMPUTER THAT POTENTIALLY HAVE PRIVILEGED INFORMATION ON IT. "WHAT SHOULD I DO?" AND I --
MR. SINASOHN: IS THAT THE PERSON YOU REFERRED TO EARLIER?
THE WITNESS: YES.
MR. SINASOHN: JUST FOR YOUR HONOR'S SAKE, HE IS AN INDEPENDENT CONTRACTOR. HE DOES NOT WORK FOR THE FTC.
THE WITNESS: AND JEFFREY WAS CONCERNED. HE SAID, "WHAT DO I DO? DO I IMPRINT THE COMPUTER OR NOT?"
SO I SPOKE WITH MR. FEINGOLD, AND WE AGREED THAT A FULL IMPRINT WOULD BE MADE AND I DIRECTED JEFFREY TO THEN

PRINT OUT A FILE LIST ALMOST LIKE A PRIVILEGE LOG, AND THEN GIVE THAT TO MR. FEINGOLD SO THAT HE CAN CIRCLE ANY FILES THAT HE BELIEVED TO BE PRIVILEGED. I THOUGHT THAT WOULD BE A GOOD WAY TO SAFEGUARD THE INFORMATION. SO THAT IS WHAT WAS DIRECTED TO HIM.

THIS LETTER, AND I WILL READ IT TO YOUR HONOR. IT'S FROM HUGH HEFNER. IT'S MONDAY, NOVEMBER 30TH, TO MR. SINASOHN, WITH CC'S TO PASANO, RODNEY, ROBBINS, DAVID, PAPENFUSE AND CHAD.

THE SUBJECT IS RE FIRST UNIVERSAL LENDING, DASH, PRIVILEGED INFORMATION.

IT'S ADDRESSED, "GIDEON, AS REQUESTED HERE IS AN E-MAIL OUTLINING WHAT WE DO FOR PRIVILEGED INFORMATION. WE WILL OBTAIN THE IMAGES TAKEN FROM THE SITE AND PROCESS THEM TO OUR NETWORK AND THEN EXPORT OUT THE DOCUMENTS AS USUAL.

"OUR ELECTRONIC DIGITAL DISCOVERY," AND THEN IN PARENTHESES, EDD, END PARENTHESES, "SPECIALIST WILL THEN RUN A KEY WORD SEARCH BASED ON THE LIST YOU AND THE DEFENSE AGREE UPON.

"ONCE THE KEY WORD SEARCH IS COMPLETE THE EDD SPECIALIST WITH SEGREGATE THE PRIVILEGED DATA AND ALLOW YOU TO ACCESS TO THE REMAINDER OF THE DATA."

I'M SORRY, I JUST MISSPOKE. "AND ALLOW YOU ACCESS TO THE REMAINDER OF THE DATA.

"PLEASE ENSURE THE LIST IS REASONABLE AND DOESN'T

INCLUDE WORDS LIKE LAW, LEGAL, ET CETERA. THIS PROCESS WILL ALSO TAKE TIME, COMMA. ONCE WE HAVE THE IMAGES WE WILL HAVE A CONFERENCE CALL WITH YOU AND THE EDD TEAM TO TALK ABOUT A PLAN.

"THANKS HUGH."

BY MR. SINASOHN:

Q. THANK YOU.

A. SO IT APPEARS FROM THAT DOCUMENT THAT THEY HAD DIFFERENT MECHANISMS FOR DEALING WITH IT, BUT THE AGREED UPON MECHANISM WAS GOING TO BE TO PROVIDE A PRIVILEGED LOG.

Q. ARE YOU AWARE WHETHER OR NOT THERE WAS ANY CONFUSION BETWEEN THE DEFENDANTS AND MYSELF ABOUT WHAT WAS PRIVILEGED AND WHAT WASN'T PRIVILEGED, WHETHER OR NOT THE SALESFORCE.COM DOCUMENTS WAS ALSO SOMETHING THEY DIDN'T WANT ME TO LOOK AT?

A. IT APPEARS THAT THERE MAY HAVE BEEN SOME CONFUSION. I BELIEVE BASED ON MY CONVERSATIONS WITH YOU IT APPEARS THAT YOU THOUGHT THAT THE ASSERTION WAS THAT IT WAS ALL PRIVILEGE AND YOU SHOULDN'T BE LOOKING AT IT. AND WHEN I SAY "YOU" I MEAN THE FTC. BUT THAT CERTAINLY WASN'T NECESSARILY WHAT WAS REPRESENTED TO ME IN ANY EVENT.

Q. AND I INTERRUPTED YOU. IF YOU COULD GO BACK, I THINK YOU WERE IN THE MIDDLE OF DESCRIBING -- YOU HAD MENTIONED PRIVILEGED DOCUMENTS AND THAT'S WHEN I INTERRUPTED YOU.

A. I'M SORRY, YOU HAVE TO REFRESH ME, I'M A LITTLE TIRED,

TO ACTUALLY WHERE YOU WANT ME TO PICK UP.
Q. YOU WERE DESCRIBING THE OPERATIONS OF THE BUSINESS, I BELIEVE, AND YOU HAD DISCUSSED THAT MR. ZAUSNER, DAVID ZAUSNER, WAS NOT AVAILABLE FOR THE TWO WEEKS.
A. YES. SO AGAIN WITH REGARD TO SALES FORCE, IT'S A PHENOMENAL DATABASE AND CAN PROBABLY ANSWER A LOT OF QUESTIONS. UNFORTUNATELY I DIDN'T HAVE THE -- EITHER TECHNOLOGICAL SAVVY OR THE -- THE PASSWORDS APPARENTLY TO ACCESS THE INFORMATION THAT I REALLY ULTIMATELY WOULD HAVE LIKED TO HAVE SEEN.
Q. DID YOU FORM AN IMPRESSION AS TO THE RELATIONSHIP BETWEEN THE PALM BEACH SITE, AND THAT INCLUDES THE SECOND AND THE THIRD FLOOR, AND ANY PARTS ACROSS THE BREEZEWAY THAT MIGHT OR MIGHT NOT BE CONNECTED AND THE POMPANO BEACH SITE?
A. YES. THROUGH MY DISCUSSIONS, AGAIN WITH MR. FEINGOLD, WHAT BECAME CLEAR TO ME IS THAT WHETHER OR NOT THEY WERE AN INDEPENDENT OFFICE, INDEPENDENTLY RUN, AND I WANT TO CLARIFY. I BELIEVE THAT ALL SALES IS TECHNICALLY INDEPENDENT OF THE MAIN BRANCH OF F.U.C. -- F.U.H. BECAUSE EVERYBODY WORKS ON A COMMISSION, IS MY UNDERSTANDING, OR MOST OF THE SALES FORCE WORKS ON COMMISSION. SO TECHNICALLY THEY WOULD BE INDEPENDENT CONTRACTORS. BUT I THINK THAT THOSE OFFICES, EVEN IF THEY WERE RUN INDEPENDENTLY, IF NOT ALL THEN A VAST MAJORITY, OR AT LEAST MY UNDERSTANDING WAS THAT A VAST MAJORITY OF THE CLIENTS THAT WERE GENERATED

THROUGH THOSE OFFICES WERE THEN REFERRED BACK INTO THE BACK ROOM OPERATIONS TO BE SERVICED.

Q. AT PGA.

A. AT PGA, RIGHT. SO THEORETICALLY THEY COULD BE A SALES ROOM THAT'S PAID AS AN INDEPENDENT CONTRACTOR, BUT AT THE SAME TIME THEY ARE CLEARLY GENERATING CLIENTS FOR THE MAIN BRANCH.

Q. WHO CREATED THE STANDARDS AND THE GUIDELINES AND HAD ULTIMATE CONTROL OF THE POMPANO SITE, DO YOU KNOW?

A. YOU KNOW, I WANT TO COME MAKE TO THE MCDONALD'S MODEL. YOU KNOW, ULTIMATELY YOU MAY HAVE AN INDEPENDENT OWNER WHO HAS CONTROLLED OVER THEIR RESTAURANT, BUT THE MAIN FRANCHISOR HAS THE OPPORTUNITY TO CLOSE DOWN THAT FRANCHISEE IF THEY ARE NOT RUNNING UP TO STANDARDS.

AND, SO I WOULD KIND OF LIKEN IT TO THAT WHERE THEORETICALLY THE MAIN OFFICE HELD ULTIMATE CONTROL BECAUSE IF THAT SALES OFFICE IS NOT RUNNING ITSELF ACCORDING TO THE STANDARDS THAT F.U.H. MIGHT DETERMINE WERE APPROPRIATE THEY COULD BE CLOSED DOWN, AND I WOULD THINK THAT THAT IS A PRETTY GOOD METAPHOR.

Q. WHAT WAS YOUR IMPRESSION OF DAVID FEINGOLD'S ROLE IN THE BUSINESS?

A. WELL, HE'S CLEARLY OUTSIDE COUNSEL. THE ONLY -- THE ONLY QUESTION THAT I HAVE IS BASED ON THE WAY THAT HIS LEGAL SERVICES ARE PAID. HE ALMOST SOUNDS LIKE A PROFIT PARTNER

IN THE BUSINESS BECAUSE THERE IS NO HOURLY RATE, THERE IS -- THE SERVICE FEE, FOR LACK OF A BETTER TERM, IS CAPPED AT AN EVEN AMOUNT WITH THE OTHER PARTNERS OF THE BUSINESS.

SO IT SOUNDS LIKE THEY ARE ALL -- IT'S LIKE SUITE EQUITY INTO A PROFIT PARTNERSHIP WHERE, YOU KNOW, EVERYBODY IS MAKING ONE THIRD. THAT WAS WHAT WAS EXPLAINED TO ME, AND THOSE TERMS WERE NEVER USED. HE'S ALWAYS MAINTAINED TO BE OUTSIDE COUNSEL. I HAVE NO REASON TO DOUBT THAT, BUT THE PAYMENT STRUCTURE SEEMS TO BE THAT, YOU KNOW, HIS TAKE WOULD BE BASED ON THE PROFITS OF THE CORPORATION.

Q. ARE YOU FAMILIAR WITH ANY OTHER OUTSIDE COUNSEL GETTING PAID LIKE THAT?

A. I MEAN, NOT PARTICULARLY NOW BUT I DON'T THINK THAT THERE IS A PROHIBITION AGAINST THAT.

Q. WHAT ABOUT SEAN ZAUSNER'S ROLE, WHAT IS YOUR IMPRESSION OF HIS ROLE?

A. PRESIDENT.

Q. DO YOU KNOW WHAT HIS DUTIES AND RESPONSIBILITIES ARE?

A. HE SEEMS TO BE REALLY THE MANAGING PARTNER OF THE COMPANY. HE SEEMS TO BE, YOU KNOW, IN CHARGE OF ALL OF THE MAJOR DECISIONS. BUT AGAIN, YOU KNOW, THERE IS THAT EXECUTIVE COMMITTEE AND IT SEEMS LIKE RESPONSIBILITIES FOR VARIOUS PORTIONS OF THE BUSINESS MIGHT BE PLACED IN DIFFERENT INDIVIDUAL'S HANDS IN TERMS OF MANAGING THIS PARTICULAR, BUT HE'S CLEARLY THE OWNER OF THE COMPANY.

Q. THE EXECUTIVE COMMITTEE, IS IT YOUR IMPRESSION THAT THEY AS A COLLECTIVE CONTROL THE COMPANY?
A. NO. IT'S CLEAR TO ME THAT THE EXECUTIVE COMMITTEE IS RESPONSIBLE FOR THE MANAGEMENT OF THE COMPANY AND FOR OVERSIGHT OF VARIOUS PARTS OF THE COMPANY AND FOR MAKING SUGGESTIONS ABOUT PROBLEMS WITH THOSE PARTS OF THE COMPANY AND IMPLEMENTING CHANGES FOR THOSE PARTS OF THE COMPANY.
Q. ARE ALL THREE OF THE INDIVIDUAL DEFENDANTS MEMBERS OF THAT EXECUTIVE COMMITTEE?
A. YES.
Q. AND WHAT IS YOUR IMPRESSION DAVID ZAUSNER'S ROLE IN THE COMPANY?
A. HE IS CLEARLY THE COMPLIANCE OFFICER. HE IS CLEARLY OUTSIDE COUNSEL.
Q. DAVID ZAUSNER?
A. I'M SORRY. I'M SORRY. DAVID ZAUSNER. I APOLOGIZE.
HE IS CLEARLY IN CHARGE OF THE TECHNOLOGY, AND BEYOND THAT I'M NOT SURE OF ANY OF HIS OTHER RESPONSIBILITIES. BUT I KNOW THAT HE WAS RESPONSIBLE FOR PUTTING IN PLACE SALES FORCE.
Q. AND HAVE YOU FULLY DESCRIBED WHAT YOU KNOW ABOUT SALES GOING ON, ON THE THIRD FLOOR?
A. I CAN ONLY TELL YOU WHAT I SAW UP ON THE THIRD FLOOR. WE DID SEE ALL OF THOSE SALES PITCHES, CLEARLY SCRIPTS. AND AGAIN, WE DON'T KNOW WHERE THEY WERE GENERATED FROM. WE

WERE NOT ABLE TO ACCESS ALL OF THE COMPUTERS THERE, AND I WOULD SAY THERE IS WERE SEVEN OR EIGHT COMPUTERS, MAYBE MORE UP THERE. WE DID NOT HAVE ACCESS TO THEM BECAUSE THERE WAS -- WE WERE NEVER ABLE TO OBTAIN THE PASSWORDS.

AND AGAIN, THOSE PASSWORDS WERE REQUESTED LATE IN THE PROCESS BECAUSE OF ALL OF WHAT PRECEDED IT. BUT WE STILL HAVEN'T GAINED ACCESS TO MOST OF THOSE COMPUTERS.

Q. HAD YOU ASKED FOR ACCESS?

A. YES. WE ASKED FOR THAT ACCESS, I BELIEVE ON WEDNESDAY OR THURSDAY TO SEAN ZAUSNER AND WE NEVER GOT THOSE PASSWORDS.

Q. WEDNESDAY OR THURSDAY?

A. OF LAST WEEK.

Q. NOT YESTERDAY.

A. NO. NO. NO. THE WEEK BEFORE.

WE FOUND A LOT OF DOCUMENTS FROM TRANSCONTINENTAL LENDING.

Q. IS THAT A D/B/A FOR FIRST UNIVERSAL LENDING?

A. IT IS, BUT WHEN WE ASKED MR. FEINGOLD ABOUT IT WE WERE TOLD THAT THAT BUSINESS WAS CLOSED. SO WE FOUND IT ODD BASED ON THAT, THAT THERE WERE SO MANY FORMS AROUND FROM TRANSCONTINENTAL AND NOT JUST THE -- I BELIEVE THEY ARE CALLED 1020 -- I FORGET WHAT THOSE FORMS ARE, BUT THEY ARE THE FINANCIAL DISCLOSURE FORMS.

NOT JUST THOSE, WHICH ARE PROBABLY GOOD FORMS FOR

THEM TO CONTINUE USING TO GET INFORMATION ON SO THEY MAY HAVE CONTINUED TO REPRINT IT, BUT ALSO THINGS LIKE THIS THAT CONTAINED SALES PITCHES AND THINGS LIKE THAT, THAT MAKE REFERENCE TO TRANSCONTINENTAL.

MR. SINASOHN: MAY I HAVE ONE MINUTE, YOUR HONOR?

THE COURT: TAKE YOUR TIME.

BY MR. SINASOHN:

Q. MISS KUDMAN, DID YOU -- DO YOU HAVE ANY INFORMATION ABOUT THE POMPANO BEACH SITE AND WHAT WAS GOING ON THERE?

A. WHEN YOU SAY "INFORMATION" I MEAN, I WILL TELL YOU EVERYTHING THAT I KNOW.

FROM WHAT I UNDERSTAND THE -- WE WERE TOLD THAT THE OFFICE CLOSED ON THE 19TH WHEN WE ENTERED. I DID NOT PERSONALLY GET INTO THE SITE BECAUSE THE ONE DAY THAT I WENT TO THE SITE WE HADN'T ARRANGED FOR A KEY OR A LOCKSMITH AND WE WERE HAVING PROBLEMS THE LOCKSMITH COULDN'T COME UNTIL LATER IN THE DAY, AND BECAUSE MY WHOLE FAMILY HAD FLOWN IN FOR THE HOLIDAYS I WASN'T ABLE TO STAY.

I WAS INFORMED BY MISS BERG THAT SHE DID GO INTO THE SITE, THAT SHE FOUND SEVERAL COMPUTERS, THAT IT LOOKED LIKE THERE WERE ABOUT FIVE TO EIGHT ACTIVE DESKS. THERE WAS ONE PIECE OF PAPER THAT WAS IDENTIFIED THAT HAD THE MARRUCCI LAW FIRM'S HEADING ON IT.

Q. WHAT WAS THE ADDRESS ON THAT, DO YOU KNOW?

A. NO, I DON'T. BUT IT WAS -- YOU KNOW, IT WAS A PRETTY

CLEARED OUT SPACE. THERE WAS REALLY NOTHING AROUND. THERE WERE SOME STATIONS THAT CLEARLY HAD SOME PENCILS AND THINGS THAT WORK HAD BEEN DONE THERE, BUT IT WAS PRETTY TIDY AND THERE WEREN'T MANY PAPERS AT ALL. IT LOOKED PRETTY CLEARED UP.

Q. DID MISS BERG EVER TELL YOU THAT SHE PUT IN THE COMPUTER AND SAW A COMPLAINT THAT HAD THE 5100 PGA BOULEVARD ON IT?

A. YES. I'M SORRY, YOU HAVE REFRESHED MY RECOLLECTION. YES, SHE DID.

Q. AND DID IT SAY, "MARRUCCI LAW FIRM," ABOVE IT?

A. I BELIEVE SO, YES.

Q. YOU MENTIONED EARLIER THAT EITHER OPENERS OR CLOSERS SET RATES. WHAT DID YOU MEAN BY THAT? I THINK YOU SAID THAT.

A. MEANING THAT IT WAS THE SALESPERSON WHO DETERMINED WHAT THE RATE CHARGE PER CLIENT WOULD BE. NOW, I DO UNDERSTAND THAT THERE WAS ALSO A CONFIRMATION PHONE CALL THAT WENT OUT, AND THAT THOSE PHONE CALLS WERE RECORDED AND THAT CONFIRMATION PHONE CALL DID GO OVER AGAIN THE DETAILS OF THE RELATIONSHIP, THE CONTRACT PRICE FOR, YOU KNOW, ENGAGING THE SERVICES OF THE LAW FIRM THAT KIND OF STUFF, AND I BELIEVE THAT THAT WAS RECORDED AND APPENDED TO THE SALES FORCE.

NOW, I DON'T KNOW IF THAT CALL WOULD BE CONSIDERED THE CLOSING CALL OR IF THAT WAS A THIRD CALL. I'M A LITTLE

BIT CONFUSED ON THAT, BUT I KNOW THAT THERE WAS A CONFIRMATION DONE.
Q. HAVE YOU EVER HEARD OF THE EXPRESSION OF CALL VERIFICATION CALL?
A. YES.
Q. OR SALES VERIFICATION CALL?
A. YES. AND I'M AWARE THAT THOSE WERE MADE.
Q. AND IS THAT WHAT YOU ARE REFERRING TO?
A. YES.
Q. OKAY.
A. WE ALSO DISCUSSED AT VARYING POINTS DURING THE WEEK WHAT THE RESOLUTION PROCESS WAS WHEN COMPLAINTS CAME INTO THE COMPANY.
MR. FEINGOLD TOLD ME THAT FIRST THE ACTUAL BACK OFFICE SUPPORT PERSON WHO IS HANDLING THAT FILE WOULD DEAL WITH ANY COMPLAINTS, AND IF THAT COULDN'T BE RESOLVED THEN IT WENT I BELIEVE TO SEAN ZAUSNER. I KNOW IT WENT TO ANOTHER PERSON TO TRY TO RESOLVE IT. IT MAY HAVE BEEN MIRANDA FIRST, BUT THERE WERE SEVERAL LEVELS OF INDIVIDUALS THAT WOULD WORK UP A CHAIN ATTEMPTING TO RESOLVE IT.
ULTIMATELY IT WENT TO AN INDEPENDENT GROUP OF PEOPLE WHO DID NOT WORK ON COMMISSION, WHO WERE JUST SALARIED EMPLOYEES WHOSE JOB IT WAS TO DETERMINE WHETHER OR NOT REFUNDS WOULD BE MADE TO PEOPLE. AND, SO THAT WAS THE RESOLUTION PROCESS AS I WAS TOLD IT.

MR. SINASOHN: I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT: ALL RIGHT. LET'S TAKE A SHORT BREAK AND THEN WE WILL GO INTO CROSS-EXAMINATION.

LET'S HAVE EVERYONE BACK IN HERE AT FIVE OF.

THE COURT IS IN RECESS.

[WHEREUPON, THERE WAS A BRIEF RECESS]

THE COURT: PLEASE BE SEATED.

ALL RIGHT, CROSS-EXAMINATION.

MR. SINASOHN: YOUR HONOR, BEFORE --

THE COURT: GO RIGHT AHEAD.

MR. SINASOHN: YOUR HONOR, I WANTED TO MOVE INTO EVIDENCE, IT HAS ALREADY BEEN ENTERED ON THE DOCKET, AS EXHIBIT -- DOCUMENT EXHIBIT 39, BUT FOR THE CONVENIENCE OF THE COURT THIS IS THE RECEIVER'S REPORT. I WANTED TO MAKE THIS EXHIBIT 39, PLAINTIFF'S EXHIBIT 39, AND MARK, IDENTIFIED, AND OFFERED AS EVIDENCE.

THE COURT: ANY OBJECTION?

MR. FEINGOLD: NO, SIR.

THE COURT: 39 IS IN EVIDENCE.

[PLAINTIFF EXHIBIT 39 RECEIVED IN EVIDENCE]

MR. FEINGOLD: MAY I PROCEED?

THE COURT: GO RIGHT AHEAD, COUNSEL.

THANK YOU.

MR. FEINGOLD: THANK YOU.

CROSS EXAMINATION

BY MR. FEINGOLD:
Q. MA'AM, I'M GOING TO JUMP AROUND IN YOUR TESTIMONY A BIT. OKAY?
A. OKAY.
Q. I'M GOING TO START WITH A QUESTION THAT THE JUDGE ASKED YOU ABOUT THE PHONE NUMBERS SO WE CLARIFY THIS ISSUE.
NUMBER ONE, FROM YOUR EXPERIENCE IN DEALING WITH THE BACK OFFICE YOU HAVE NOTICED THAT A LOT OF THESE DIFFERENT LADIES ARE ASSIGNED TO DIFFERENT LAW OFFICES, CORRECT?
A. YES.
Q. AND, IN FACT, YOU MAY HAVE A GROUP OF 10 YOUNG LADIES THAT WILL WORK ON MARRUCCI FILES, 15 LADIES WORKING ON STRATTON FILES, AND 15 LADIES WORKING ON FINLEY FILES, CORRECT?
A. SURE. YES.
Q. AND YOU KNOW THAT THESE YOUNG LADIES --
THE COURT: LET ME MAKE SURE I UNDERSTAND, BECAUSE THE -- MISS KUDMAN AND YOU OBVIOUSLY KNOW FAR MORE ABOUT THE FACTS THAN I DO, BUT YOU MEAN IN THE BACK ROOM THERE ARE THESE GROUPS OF THESE THREE DIFFERENT LAW FIRMS.
MR. FEINGOLD: YES, SIR.
THE COURT: EVEN THOUGH THE LAW FIRMS ARE NOT PHYSICALLY AT THAT FACILITY.
MR. FEINGOLD: THAT'S CORRECT. THAT'S FIRST

UNIVERSAL HOLDINGS FACILITY, BUT THE BACK OFFICE LADIES ARE DIVIDED INTO GROUPS DEPENDING ON WHICH LAW FIRM THEY WORK ON BEHALF OF DOING THAT.

THE COURT: ARE THEY PHYSICALLY EMPLOYED BY THAT PARTICULAR LAW FIRM?

MR. FEINGOLD: NO. THEY ARE OUTSOURCES OF THEM. IT'S THE SERVICES ARE CONTRACTED FROM THE LAW FIRMS, THE FIRST UNIVERSAL HOLDINGS, AND THEN THE LADIES ARE DIVIDED INTO GROUPS, INTO TEAMS BASED ON WHICH LAW FIRM THAT THEY'RE WORKING ON BEHALF OF.

THE COURT: OKAY. I SEE WHAT YOU ARE SAYING.

THANK YOU VERY MUCH.

MR. FEINGOLD: OKAY.

BY MR. FEINGOLD:

Q. SO WE KNOW THAT BASED ON THESE TEAMS, WHEN A PERSON WHO IS IN SAY, FOR EXAMPLE, THE MARRUCCI TEAM THEY WOULD WANT THE CLIENTS OF MARRUCCI TO BE ABLE TO CONTACT ONLY THOSE GALS THAT WERE ON THE MARRUCCI TEAM, CORRECT?

A. YES. THAT MAKES SENSE.

Q. IT MAKES PERFECT SENSE.

AND, IN FACT, THE REASON THAT WE HAVE SPECIFIC PHONE NUMBERS FOR THE DIFFERENT LAW FIRMS IS BECAUSE THOSE NUMBERS RING INTO THOSE GROUPS SO THAT THOSE GALS THAT WORK ON THOSE FILES GET THOSE PHONE CALLS, CORRECT?

A. CORRECT.

Q. OKAY.

MR. FEINGOLD: AND, JUDGE, I THINK -- HOPEFULLY I HAVE CLARIFIED THAT.

THE COURT: YES.

MR. FEINGOLD: OKAY. GOOD.

THE COURT: I UNDERSTAND.

MR. FEINGOLD: OKAY.

BY MR. FEINGOLD:

Q. AND NEXT, AND I KNOW THIS IS VERY -- YOU AND I ARE COLLEAGUES, WE KNOW THAT, WE ARE KIND OF SMILING, WE SOMEWHAT KNOW EACH OTHER INDIRECTLY IN PRACTICING LAW --

A. THROUGH SIMILAR ATTORNEYS THAT WE --

Q. YES. AND MY POINT IS, WE CERTAINLY KNOW A NUMBER OF COMMON COLLEAGUES, CORRECT?

A. CORRECT. YES.

Q. I PRACTICE, IN FACT, WITH A CLOSE COLLEAGUE OF YOURS, JACK GOLDBERGER.

A. YES.

Q. THE FORMER U.S. ATTORNEY?

A. YES.

Q. BRUCE REINHART.

A. YES.

Q. HIS WIFE?

A. YES.

Q. HIS WIFE, I HAD A TRIAL WITH HER?

A. YES.
Q. YOU HAVE NO REASON TO DOUBT THAT I AM A LAWYER, I OPERATE AS A LAWYER, AND I THAT'S WHAT I DO FOR A LIVING.
A. NO REASON TO DOUBT THAT AT ALL.
Q. YES. BUT YOU DID SAY SOMETHING ABOUT THE UNUSUAL WAY UPON WHICH MY LAW FIRM IS PAID.
A. I DON'T BELIEVE I SAID IT WAS UNUSUAL.
Q. I KNOW, AND I -- IT'S JUST MAYBE THE WAY I HEARD YOU SAY IT AND I WANT TO CLARIFY IT.
ISN'T IT TRUE THAT MY LAW FIRM ISN'T PAID BASED ON THE PROFITABILITY OF FIRST UNIVERSAL BUT MERELY MY FEES FROM MY FIRM ARE CAPPED AT WHATEVER SEAN ZAUSNER HIMSELF TAKES OUT OF THE FIRM.
A. I THINK THAT'S SEMANTICS, BUT YOU CAN ONLY GET PAID SO MUCH. THERE ARE PROFITS AND PROFITS BEING TAKEN OUT. SO ALTHOUGH YOU CAN CALL IT A CAP, IT IS BASED ON THE PROFITS OF THE CORPORATION. BUT, YES, I MEAN, IT'S FAIR TO SAY IT'S BASED ON A CAP.
Q. AND YOU WOULD ALSO AGREE WITH ME THAT BASED ON THE NUMBER OF CASES AND MATTERS THAT MY LAW FIRM HANDLED JUST FOR FIRST UNIVERSAL, WHICH I TESTIFIED TO, THAT I THINK YOU AND I SPOKE ABOUT THIS IN BETWEEN THE LUNCH BREAK, MY LAW FIRM'S FEES SEEMED FAIRLY CONSISTENT WITH WHAT WOULD HAVE BEEN EARNED.
YOU KNOW, I HAVE A DIFFERENT PRACTICE. MY

BROTHER IS A CORPORATE LAWYER. I DO KNOW THAT BASED ON MATTERS THAT HE HANDLES THE FEES CAN BE EXORBITANT OR SMALL, DEPENDING ON WHAT'S GOING ON PARTICULARLY IN A MONTH. AND I AM AWARE THAT CORPORATE FIRMS SOMETIMES HAVE A FLAT MONTHLY FEE FOR TAKING CARE OF ALL SERVICES FOR A CORPORATION. I WOULD NEVER COMMENT ON ANOTHER ATTORNEY'S FEE ARRANGEMENTS. IN FACT, I HAVE NEVER SEEN THE RETAINER ARRANGEMENT. I'VE ALREADY TESTIFIED AS TO WHAT YOU --
Q. AND YOU WOULD AGREE WITH ME, BEING AT MY OFFICE, THAT BESIDES MYSELF I THINK THERE IS SIX LAWYERS, AND I THINK I SAID YESTERDAY THERE WAS LIKE SUPPORT, AND I WAS KIND OF CHASTISED --
A. YOU CLEARLY HAVE A SIGNIFICANTLY SIZED FIRM, AND YOU CLEARLY HAVE OTHER MATTERS BEYOND FIRST UNIVERSAL.
Q. THANK YOU.
NOW, IN TERMS OF THE PRICE YOU TALKED ABOUT AND MR. ZAUSNER, I WANT TO SEE IF YOU RECALL THIS. ISN'T IT TRUE, MA'AM, THAT YOU AND MISS MOSCOWITZ MET WITH MR. ZAUSNER WITHOUT ME PRESENT, CORRECT?
A. YES. HE CAME UPSTAIRS TO ME WITH US.
Q. TO MEET WITH YOU ALL.
A. YES.
Q. AND, IN FACT, FOR WHATEVER REASON THE EXCHANGE BETWEEN YOURSELF, MR. ZAUSNER, AND MISS MOSCOWITZ LASTED A VERY BRIEF PERIOD OF TIME AND WAS NOT VERY PRODUCTIVE.

A. IT WAS NOT PRODUCTIVE AT ALL. I WOULDN'T CALL IT VERY BRIEF. WE REALLY TRIED TO ASK SUBSTANTIVE QUESTIONS, AND WE EVEN TRIED TO RESTATE THEM IN EASIER WAYS.

I MADE IT CLEAR TO HIM THAT THIS WAS NOT THE INQUISITION, THAT WE WERE JUST REALLY TRYING TO UNDERSTAND THE BUSINESS, AND ACTUALLY IT WAS IN HIS INTEREST TO UNDERSTAND IT BECAUSE I THINK IT WOULD HAVE HELPED TOWARD A RESOLUTION. BUT, YEAH, IT WAS NOT PRODUCTIVE.

Q. ABSOLUTELY. AND, IN FACT, AFTER THAT EXCHANGE HAPPENED YOU ALL WENT DOWNSTAIRS AND CAME INTO MY OFFICE. I DON'T RECALL IF YOU WERE STANDING OR SITTING, BUT I KNOW MR. ZAUSNER WAS SITTING DOWN AND --

A. I BELIEVE I WAS SITTING.

Q. YOU WERE SITTING.

A. YEAH.

Q. I THINK YOU WERE SITTING. THAT'S RIGHT. AND WE TRIED TO RECONVENE THE SAME DISCUSSION, CORRECT?

A. WELL, PARTLY. I MEAN, WE DIDN'T GET INTO THE SAME DETAILS BUT THERE WERE CERTAIN BITS OF INFORMATION THAT I DID ASK YOU AND YOU WERE VERY FORTHCOMING.

Q. YES. AND AGAIN, JUST SO IT'S CLEAR. WE HAVE NEVER HAD A PROBLEM COMMUNICATING --

A. NO, NOT AT ALL.

Q. EVERYTHING YOU EVER ASKED I THINK I HAVE GONE OUT OF MY WAY TO MAKE SURE THAT I CAN DO WHATEVER I HAVE THE ABILITY

TO DO FOR YOU.
A. I THINK THAT'S ABSOLUTELY TRUE.
Q. YES.
A. BUT, YOU KNOW, THERE STILL HAVE BEEN ITEMS OF INFORMATION THAT WE HAVE NEVER BEEN ABLE TO GET A HOLD OF. YOU KNOW, I DON'T KNOW WHAT THE SITUATION HAS BEEN, BUT HAVING ACCESS TO MR. DAVID ZAUSNER WOULD HAVE CERTAINLY BEEN IMPORTANT THIS WEEK.
Q. ABSOLUTELY. I AGREE WITH YOU. WE WILL GET TO THAT. I WANT TO FOCUS ON MR. ZAUSNER NOW SO WE CAN GO THROUGH THIS.
AFTER YOU ALL ATTEMPTED TO SPEAK TO HIM, AND I WASN'T THERE, I DON'T KNOW ALL THE TOPICS, BUT YOU CERTAINLY DID COME DOWNSTAIRS TO MY OFFICE, YOU SAT DOWN, I WAS SITTING, MR. ZAUSNER WAS SITTING, AND YOU DID INDICATE TO ME, "HEY, I WANT TO TRY TO UNDERSTAND THE PRICING MODEL," CORRECT?
A. YES.
Q. AND AT THAT POINT IN TIME, I BELIEVE, SINCE I DON'T THINK I'M VERY SHY ABOUT SPEAKING THAT I WENT INTO A DISCOURSE WITH YOU ABOUT HOW THERE WAS A REPORT THAT SHOWED YOU BASED ON THE DEMOGRAPHICS OF THE CLIENTELE THERE WAS KIND OF A STATISTICAL MEAN TO SHOW THAT THE CLIENTELE GENERALLY COULD AFFORD ABOUT $500 PER MONTH. DO YOU RECALL THAT CONVERSATION?
A. YES, I DO.

Q. AND, IN FACT, THEN I WENT INTO FURTHER DETAIL AND EXPLAINED THE BASIC PRICING MODEL WAS $500 A MONTH FOR ONE OR TWO CREDIT SERVICING BEING A MORTGAGE OR CREDIT CARD, AND BETWEEN 500 AND 1,000 FOR BETWEEN TWO TO FOUR CREDITORS; DO YOU RECALL THAT?

A. IT WASN'T QUITE THAT MATHEMATICAL. IT WAS THAT THE AVERAGE WOULD BE 500, BUT THAT FOR MORE THAN THOSE SERVICES IT WOULD GO UP SOMEWHAT, IT WOULD GO DOWN SOMEWHAT. IT WASN'T QUITE BROKEN DOWN INTO ONE TO TWO, AND TWO TO FOUR. BUT, YES, THE GENERAL IDEA WAS THAT.

Q. AND I GAVE YOU RANGES, CORRECT?

A. CORRECT.

Q. OKAY. AND AFTER THAT DISCUSSION, WHICH HAPPENED VERY QUICKLY, YOU AND I AS LAWYERS SPEAK FAIRLY QUICKLY TO ONE ANOTHER, I THINK -- DIDN'T YOU LOOK AT MR. ZAUSNER AND SAY, "NOW, THAT WASN'T SO DIFFICULT, WAS IT," OR SOMETHING TO THAT EFFECT.

A. YES, I DID.

Q. AND MR. ZAUSNER'S RESPONSE TO YOU IN HIS FAIRLY DEEP --

THE COURT: JUST TRY TO SLOW DOWN BECAUSE EVERY NOW AND THEN THE TWO OF YOU TALK OVER EACH AND THE COURT REPORTER CANNOT TAKE BOTH OF YOU.

BY MR. FEINGOLD:

Q. AND MR. ZAUSNER'S RESPONSE TO YOU IN FAIRLY DEEP BROKEN STYLE NEW YORK ACCENT WAS, "YOU KNOW, YOU GUYS CAME INTO MY

OFFICE WITH POLICE AND EVERYTHING. IT'S LIKE I'M NOT REALLY MOST COMFORTABLE GUY TALKING. I'M SORRY. I WAS JUST KIND OF FREAKED OUT," SOMETHING TO THAT EFFECT?
A. NOT QUITE AS ELOQUENTLY AS YOU JUST PUT IT, BUT -- I APOLOGIZE.
Q. YES, THAT'S KIND OF MY POINT.
A. BUT, YES, HE CLEARLY EXPRESSED HIS DISCOMFORT. BUT THAT BEING SAID, THE INFORMATION THAT WE WERE REQUESTING WAS VERY SIMPLE LIKE, "WHERE DID THE SCRIPTS COME FROM?" YOU KNOW, "WAS THAT GENERATED BY MANAGEMENT OR IS IT INDIVIDUALS WITHIN THE COMPANY, OR INDIVIDUAL SALESPEOPLE GENERATE THESE SCRIPTS?" WE WEREN'T ASKING TERRIBLY --
Q. MA'AM --
A. -- COMPLEX QUESTIONS.
Q. -- I DON'T -- IN FACT, ISN'T IT TRUE QUESTIONS YOU WERE ASKING HIM WERE NOT VERY COMPLEX AT ALL.
A. YEP.
Q. BUT ISN'T IT ALSO TRUE FROM THE TIME THAT YOU SPENT WITH HIM, HE LEGITIMATELY, TRYING TO SAY -- I'M SO ARTFUL, AND HE'S INARTFUL, BUT ISN'T HE LEGITIMATELY NOT THE GREATEST ORATOR THAT ONE WOULD EVER COME ACROSS?
A. BASED UPON PRIOR EXPERIENCE WOULD I SAY THAT'S A TRUE STATEMENT.
Q. YES. AND, IN FACT, ISN'T IT TRUE -- I HATE TO DO THIS, BY THE WAY. ISN'T IT TRUE THAT, IN FACT, I AS HIS LAWYER

PERMITTED HIM TO MEET WITH YOU ALL ALONE WITHOUT MY PRESENCE, CORRECT?
A. I'M NOT PRIVY TO ANY CONVERSATION YOU HAD BEFORE HIM COMING UPSTAIRS, BUT I WOULD PRESUME THAT THAT IS TRUE AND AS CORPORATE COUNSEL YOU WOULD GIVE HIM ADVICE AS TO WHETHER OR NOT TO SPEAK TO ME. BUT THAT NOTWITHSTANDING, YOU KNOW, IT HAS BEEN FRUSTRATING BECAUSE THERE IS INFORMATION THAT WOULD BE HELPFUL TO HAVE.
Q. YES.
A. THAT ONLY HE COULD PROVIDE BECAUSE HE'S APPARENTLY IN CHARGE OF SALE AND YOU ARE NOT PRIVY TO, APPARENTLY, THE GOINGS ON WITHIN THE SALES DEPARTMENT.
Q. I DON'T DISPUTE WITH YOU. I'M JUST AGAIN TRYING TO RECOGNIZE THE FACT THAT HOW ONE PERSON MAY BE PERCEIVED -- BEING PERCEIVED AS BEING AN OBSTRUCTIONIST MAY IN FACT BE NERVES AND AN INABILITY TO COMMUNICATE AS ELOQUENTLY AS MAYBE YOU OR I COULD COMMUNICATE.
A. IN ALL FAIRNESS I THINK THAT THAT IS TRUE. BUT THERE WAS CLEARLY AN EFFORT TO NOT COMMUNICATE WHEN WE ASKED HIM QUESTIONS. IT WASN'T JUST THAT HE WASN'T ANSWERING THE QUESTIONS OR SAID, "NO, I DON'T WANT TO ANSWER THAT." IT WAS DOUBLE SPEAK AND IT -- IT WAS NOT A COMFORTABLE CONVERSATION.
Q. WELL, LET'S TALK ABOUT THE PRECURSOR TO YOUR RELATIONSHIP WITH HIM. UNDERSTAND THERE ARE SOME OTHER

ISSUES. NUMBER ONE, ON THE 19TH WHEN YOU ALL CAME IN WE ALL ESTABLISHED THAT I WAS NOT THERE, CORRECT?
A. CORRECT.
Q. OKAY. AND WHEN YOU ALL SHOWED UP MY UNDERSTANDING IS THERE WERE FOUR POLICE OFFICERS, YOURSELF, THE FTC, JUST --
A. THERE WERE ACTUALLY TWO POLICE OFFICERS. AND, BY THE WAY, I HAVE NO DOUBT THAT IT MUST HAVE BEEN A VERY CONFUSING SITUATION FOR EVERYBODY WHO WAS IN THAT OFFICE. YOU KNOW, IT WAS LIKE THERE WERE A LOT OF PEOPLE WALKING IN. SO I HAVE NO DOUBT THAT IT WAS AN INTIMIDATING SITUATION.
BUT WHEN I SAT DOWN WITH MR. ZAUSNER IT WAS ALMOST TWO WEEKS LATER AND OUR RELATIONSHIP HAD BEEN VERY AMICABLE DURING THAT PERIOD. IT WAS VERY CLEAR THAT WE WERE TRYING TO HELP WITH THE RESOLUTION. SO ANY INTIMIDATION THAT MAY HAVE OCCURRED AT THE INCEPTION OF OUR RELATIONSHIP I WOULD THINK OR WOULD HAVE HOPED WOULD HAVE BEEN RESOLVED BY THAT TIME.
Q. I'M NOT SAYING YOU INTIMIDATED HIM. I'M JUST TRYING TO JUST TRYING --
A. I AM NOT INTIMIDATING.
Q. I'M SORRY. ANYWAY, YOU ALL SHOWED UP, AND I BELIEVE MISS MOSCOWITZ SAID IT WAS FOUR OFFICERS. I MAY BE WRONG, IT MAY BE TWO, I WAS NOT THERE.
A. I BELIEVE IT WAS TWO.
Q. OKAY. I THOUGHT YOU SAID TWO POLICE OFFICERS AND TWO

DETECTIVES.
A. THAT MAY BE TRUE. THEY MAY HAVE BEEN IN PLAIN CLOTHES.
Q. YES. I THINK SHE SAID THERE WERE FOUR IN TOTAL.
A. THAT MAY BE TRUE.
Q. THEY WEREN'T WALKING INTO MY OFFICE. AT THE TIME YOU TESTIFIED YOU WERE IN THE HALLWAY AS DENOTED, CORRECT, AND THE DOOR OPENED TO WHERE THE WHOLE BACK OFFICE PEOPLE ARE.
A. THAT WAS -- YOU KNOW, AS I SAID, I WAS PART OF THAT GROUP AND I KIND OF WALKED TOWARD THE BACK OF IT. WE LET THE POLICE OFFICERS LEAD AND THE FEDERAL TRADE COMMISSION LED. SO I'M NOT SURE HOW THAT BACK OFFICE --
Q. SO YOU WANTED THE POLICE OFFICERS TO GET HURT FIRST, THEN THE FEDERAL TRADE --
A. ABSOLUTELY. THAT'S HIS JOB.
Q. OKAY.
A. SO I WAS SORT OF IN THE BACK. I'M NOT SURE HOW THAT ROOM GOT OPENED. I JUST HEARD SOMEBODY SAY, "HEY, WHERE DID YOU COME FROM?" AND THEN ALL OF A SUDDEN IT WAS LIKE THIS WHOLE WORLD OPENED UP.
Q. YEAH. AND IT'S PRETTY OVERWHELMING WHEN YOU OPEN THAT DOOR TO SEE ALL THOSE PEOPLE THERE.
A. WELL, ESPECIALLY BECAUSE WE WERE CONSISTENTLY BEING TOLD THAT THERE WAS NO SUCH OFFICE THERE, AND THEN ALL OF A SUDDEN IT WAS LIKE WALKING INTO, YOU KNOW, A SWEAT SHOP. IT WAS LIKE ALL OF A SUDDEN THERE WAS THIS WHOLE OTHER WORLD,

AND I'M NOT LIKING THE BACK ROOM TO A SWEAT SHOP. I'M JUST SAYING THAT --
Q. I UNDERSTAND. YOU GO INTO THE --
A. IT'S A --
Q. AND I MEAN THIS SINCERELY. YOU ARE IN THE SERENITY OF THE RECEPTION AREA OF MY LAW FIRM AND IT'S A TOTALLY SEPARATE OFFICE FROM THE FIRST UNIVERSAL OFFICE.
A. THERE IS A DOOR THAT LEADS INTO IT.
Q. YEAH.
A. BUT, YES --
Q. RIGHT.
A. -- IT IS SEPARATED BY A DOOR.
Q. RIGHT. AND THEN WHEN YOU COME FROM THIS HALLWAY AREA YOU OPEN THIS DOOR AND SEE ALL THESE PEOPLE --
A. YES.
Q. -- AND YOU -- YOU ALL, THE WHOLE GROUP, THE OFFICERS, THE FTC, EVERYONE COMES IN. YOU DIDN'T NECESSARILY SEE THE REACTION OF EVERY SINGLE PERSON, A HUNDRED PLUS PEOPLE AS THERE WAS --
A. WELL, AS I WALKING IN I DID SEE THEIR AND EVERYBODY DID LOOK -- WHEN I DID WALK IN, YOU KNOW, IT WAS PRETTY IMMEDIATE AFTER THE INITIAL ENTRY AND EVERYBODY DID LOOK VERY SURPRISED AND CONCERNED, ANNOYED, PRETTY INDIGNANT ABOUT WHAT WAS GOING ON. SO THERE WERE A VARIETY OF REACTIONS. NOBODY SEEMED PARTICULARLY INTIMIDATED BY US,

THOUGH, AS THEY WERE PUSHING OUT OF THE OFFICE AND REFUSED TO SIGN MY SIGN-UP SHEET.
Q. DO YOU KNOW IF ANY OF THE LADIES IN THE SIDE OFFICES, THE BACK OFFICES, THE SIDE OFFICES WHERE SOME OF THEM PEEKING, HIDING, SOME ACTUALLY ON THE GROUND?
A. OH, I DIDN'T SEE THAT, NO.
Q. OKAY.
A. AND I ALSO SAW A LOT OF PEOPLE GOING INTO -- LET ME SEE IF I CAN DESCRIBE THIS, WHAT WOULD BE MARKED AS ROOM E.
Q. E. WHERE IS E?
A. RIGHT HERE. NO, THAT'S D. I'M SHOWING YOU RIGHT --
Q. YES.
A. DO YOU SEE --
Q. YES.
A. I DON'T KNOW WHY, BUT THERE WAS A LINE-UP OUTSIDE OF THAT ROOM. SO I'M NOT SURE WHO WAS SITTING IN THAT ROOM, BUT IT SEEMS THAT A LOT OF THE WOMEN WERE TURNING TO WHOEVER SAT IN THAT ROOM FOR DIRECTION AS TO WHAT TO DO.
Q. YEAH. IS THAT KIND OF NEAR WHERE MIRANDA SITS WHO IS THE MANAGER OF THE WHOLE BACK AREA?
A. WELL, MIRANDA SITS AT A DISK OUTSIDE OF E --
Q. RIGHT.
A. -- SORT OF IN THIS LITTLE NICK HERE.
Q. RIGHT.
A. IT LOOKS LIKE WOMEN WERE ACTUALLY GOING INTO E LIKE --

Q. INTO E.
A. -- THERE WAS A LINE-UP OUT OF THERE. SO I DON'T KNOW IF MIRANDA WENT IN THERE.
THE COURT: JUST SO THE RECORD IS CLEAR, ARE YOU SAYING THE ROOM THAT IS DESIGNATED D OR E?
THE WITNESS: E. AND I KEEP TRYING TO MAKE A MARK ON E, YOUR HONOR, BUT IT'S NOT.
THE COURT: THAT'S FINE.
THE WITNESS: SO I DON'T KNOW WHAT WAS GOING ON BACK THERE, BUT FOR A LONG TIME PEOPLE WERE IGNORING OUR REQUEST FOR THEM TO LEAVE.
BY MR. FEINGOLD:
Q. RIGHT.
A. AND THEN FINALLY WHEN WE STARTED SAYING, YOU KNOW, "WOULD YOU PLEASE SIGN THE SIGN-IN SHEET OR SIGN-OUT SHEET," SEAN -- NO, IT WAS DAVID ZAUSNER SAID, "ARE WE" -- YOU KNOW, "ARE WE UNDER ARREST," OR, "ARE THEY BEING CHARGES PRESSED AGAINST THEM?" AND WE MADE IT ABSOLUTELY CLEAR THAT THIS WAS NOT A CRIMINAL PROCEEDING, THIS IS A CIVIL LAWSUIT --
Q. I WANT TO STOP YOU THERE BECAUSE I WANT TO ASK YOU A QUESTION BECAUSE I HEARD THINGS AND I WASN'T THERE OBVIOUSLY. BUT WAS THERE AN ANNOUNCEMENT MADE RATHER LOUDLY THAT YOU ARE NOT UNDER ARREST, SOMETHING TO THAT EFFECT, VERY LOUDLY THROUGHOUT THE ENTIRE ROOM?
A. SOMEBODY ASKED US IF THEY WERE UNDER ARREST, AND WE

RESPONDED VERY LOUDLY, "YOU ARE NOT UNDER ARREST." WE WANTED EVERYBODY TO BE A HUNDRED PERCENT CLEAR.
Q. YEAH. AND, SO MY RENDITION WHAT I HEARD SO THE WORD "ARREST" WAS YELLED OUT FAIRLY LOUDLY, AND WITH THE COMMOTION OF A HUNDRED PEOPLE --
A. IN RESPONSE TO A QUESTION, YES.
Q. I UNDERSTAND THAT.
A. AND DID SOMEBODY HEAR JUST "ARREST?" IT'S POSSIBLE.
Q. RIGHT.
A. I MEAN, IT WAS CERTAINLY NOT INTENDED TO FRIGHTEN ANYBODY. IT WAS ACTUALLY INTENDED TO MAKE EVERYBODY FEEL RELIEVED THAT THIS WAS NOT --
Q. RIGHT. AND YOU ARE NOT CERTAIN HOW SOME OF THESE LADIES REACTED WHEN THEY HEARD THE WORD "ARREST" YELLED AND WHAT THEIR REACTION WAS.
A. I WOULD IMAGINE HOW I WOULD REACT.
Q. OKAY. ALL RIGHT. NOW, CONTINUING ON.
YOU SAID THAT SOMEONE CAME OUT TO YOU WHEN YOU WERE BACK THERE AND SAID THAT THERE IS PRIVILEGE ISSUES, PRIVILEGE FILES, ET CETERA, CORRECT?
A. YES.
Q. THAT WAS NOT ME. I WASN'T THERE AT THE TIME.
A. NO. NO.
Q. OKAY. I JUST WANT TO BE CLEAR.
A. AND I BELIEVE THAT IT WAS MR. DAVID ZAUSNER. HE KEPT

SAYING, "THESE ARE ATTORNEY FILES," AND I THINK ALSO SEAN ZAUSNER, AND THERE WAS NICK -- NICK --
Q. NICK CERNEY WHO WORKS FOR ME?
A. NICK ALSO WAS CONCERNED AND HE WAS ASKING SOME QUESTIONS.
Q. RIGHT.
A. WE TRIED TO MAKE IT VERY CLEAR, BECAUSE AGAIN THEY KEPT ASKING US, "IS THIS CIVIL OR CRIMINAL? ARE WE UNDER ARREST?" AND I KNOW THAT I PERSONALLY KEPT SAYING EVERYBODY, "THIS IS CIVIL. THIS IS NOT -- NOBODY IS UNDER ARREST." JANE -- MISS MOSCOWITZ MADE IT VERY CLEAR.
Q. RIGHT.
A. THEY WANTED TO KNOW, YOU KNOW, "DOES ANYBODY HAVE TO SIGN YOUR SIGN-IN SHEET OR TALK TO YOU?" WE WERE LIKE, "WE WOULD LIKE THE TALK TO PEOPLE" --
Q. RIGHT.
A. -- AND WE SAID NO. AND DAVID ZAUSNER SCREAMED OUT TO EVERYBODY, "YOU DON'T HAVE TO TALK TO THEM. EVERYBODY JUST LEAVE."
Q. OKAY. AND I ASSUME THEN EVERYONE PRETTY MUCH LEFT.
A. YES. IT CLEARED OUT.
Q. OKAY.
A. EXCEPT I HAVE TO SAY ALL OF THE ATTORNEYS DID STAY. THE ATTORNEYS FROM YOUR OFFICE AND --
Q. YES.

A. -- THEY ALL STAYED IN YOUR RECEPTION AREA AND OUT IN THE HALLWAY, AND THAT WOULD BE ROOM M, AND HERE IN THE HALLWAY.
Q. OUTSIDE OF THE -- WHAT I CALL THE BACK OFFICE AREA.
A. RIGHT. AND THEY WERE MONITORING VERY CLOSELY WHAT WE LOOKED AT AND WHERE WE WENT.
Q. AND THEN YOU GOT TO THE POINT WHERE I ARRIVED, AND FOR THE FIRST TIME I WALKED IN AND TALKED TO EVERYBODY.
A. CORRECT.
Q. AND DO YOU RECALL, AS I TESTIFIED, THAT I INDICATED THAT I WANTED TO READ ALL THE PAPERS BEFORE WE SPOKE EXTENSIVELY, AND I TOOK A STACK OF DOCUMENTS I WAS SERVED AND LEFT WITH THE LAWYERS THAT WORK FOR ME.
A. I WAS INFORMED OF THAT. I DIDN'T HEAR YOU SAY THAT.
Q. OKAY. SO YOU DO KNOW, AS I TESTIFIED, THAT I ACTUALLY TOOK THE ENTIRE STACK OF DOCUMENTS AND LEFT BECAUSE I WANTED THE REVIEW THEM.
A. YES, I DO KNOW THAT.
Q. AND, FOR THE RECORD, IT'S CLEAR WHEN I REFER TO "DOCUMENTS" I MEAN THE COMPLAINT, THE SUMMONS, THE MOTION FOR ENTRY OF RECEIVER, AND TEMPORARY RESTRAINING ORDER, AND THE COURT'S ORDER.
AND THEN YOU DO KNOW, AS YOU TESTIFIED, THAT ONCE I CAME BACK FROM REVIEWING EVERYTHING, I KNOW YOU TESTIFIED YOU WEREN'T SURE IF IT WAS FOUR OR FIVE PEOPLE BUT

CONSIDERING MY SITTING AREA ONLY HAS FOUR SEATS, IT WAS FOUR OF US SITTING DOWN TALKING, AT WHICH POINT I SAID, "YOU BUYS ARE IN HERE AND HAVE SUED FIRST UNIVERSAL LENDING. THESE ARE THE OFFICES OF FIRST UNIVERSAL HOLDINGS."
A. YES.
Q. YES. OKAY. AND, SO WHAT I HAD TOLD TO THE COURT SO I DON'T WASTE A LOT OF TIME IS CONSISTENT WITH YOUR RECOLLECTION?
A. YES. ABSOLUTELY.
Q. OKAY. AND THEN WE GET TO FRIDAY. AND FRIDAY YOU AND MISS MOSCOWITZ ARE THERE AND YOU WERE WORKING AWAY. MR. SINASOHN WAS THERE AND OTHER MEMBERS FROM THE FTC, CORRECT?
A. YES. CORRECT. AND THERE IS SOMETHING I WOULD LIKE TO STATE JUST TO CLARIFY THE RECORD.
ONE OTHER THING THAT I DID DO WAS TAKE PHOTOGRAPHS OF THE OFFICES. I FORGOT TO STATE THAT EARLIER. I HAVE NOT YET PRINTED THE PHOTOS THAT WAS IN MY DIGITAL CAMERA AND IF THE COURT WISHES ME TO I CAN EASILY PRINT THOSE UP.
Q. I ACTUALLY RECALL. IT WAS LIKE --
A. A NICON. BUT THE SAME IDEA.
Q. OKAY. THEN WE GET TO FRIDAY. ON FRIDAY YOU AND I DIDN'T INTERACT TERRIBLY MUCH. YOU WERE ACTUALLY, AS YOU TESTIFIED BEFORE, YOU WERE ACTUALLY MIXING SOME OF OUR

MEETINGS TOGETHER.
A. YES. AND I KNOW I'M MIXING TOGETHER. I'M JUST HAVING TROUBLE WITH CHRONOLOGY.
Q. IT'S IMMATERIAL. BUT YOU WERE THERE ON FRIDAY, AND FROM THURSDAY AFTERNOON TO FRIDAY AFTERNOON THAT WAS THE FIRST 24 HOURS OF THE RECEIVERSHIP, CORRECT?
A. YES.
Q. AND YOU LEARNED WITHIN 24 HOURS OF THAT RECEIVERSHIP THAT ACTUALLY I HAD BEEN ON THE PHONE WITH THE FTC IN GEORGIA, CORRECT?
A. YES. CORRECT.
Q. AND THAT IT APPEARED THAT EVERYTHING WAS GOING TO BE RESOLVED RATHER QUICKLY AND THAT WE WERE GOING TO NEED TO FIND A FEDERAL MONITOR.
A. YES. AND I BELIEVE I ADMITTED THAT IN MY DIRECT AS WELL. IT WAS ACTUALLY -- I TOOK IT UPON MYSELF TO FIND SOMEBODY WHO COULD ACT AS A MONITOR, AND I WAS AWARE OF MISS BERG BECAUSE WE LIVE IN THE SAME COMMUNITY, WE BECOME FRIENDLY OVER THE YEARS, AND I KNEW OF HER LAW BACKGROUND. SHE IS VERY BRIGHT AND HAS A GOOD BACKGROUND IN REAL ESTATE. AND, SO I THOUGHT THAT SHE WOULD BE A VERY APPROPRIATE PERSON TO ACT AS MONITOR, ESPECIALLY BECAUSE SHE SORT OF -- SHE HAD BEEN MOMMY TRACKED FOR A WHILE --
Q. RIGHT.
A. -- AND SHE HAD THE TIME TO DEVOTE TO BEING A MONITOR.

Q. AND SHE AS AN ETHICAL ATTORNEY MADE THE DISCLOSURE TO EVERYONE THAT SHE IN FACT KNEW MY WIFE WHO IS AN ATTORNEY --
A. YES.
Q. -- CORRECT?
A. YES.
Q. AND MADE SURE THAT SHE DISCLOSED THAT TO MISS MOSCOWITZ AND YOURSELF, CORRECT?
A. YES.
Q. AND ACTUALLY TALKED TO THEM ABOUT OTHER LEGAL BUSINESS TOTALLY OUTSIDE OF THIS, BUT SHE MADE SURE EVERYONE KNEW THAT.
A. CORRECT.
Q. YES. AND THEN YOU WENT ON AND TALKED ABOUT SALES FORCE, AND I AGREE WITH YOUR STATEMENT IT'S FEE NOMINAL.
A. OH, IT'S A GREAT SOFTWARE.
Q. AND YOU ALSO TALKED ABOUT THE BACK OFFICE AND YOU SAID, QUOTE, IT WORKS. I MEAN, THEY WORK BACK THERE --
A. THEY APPEAR TO VERY HARD, YES.
Q. ONE OF THE THINGS THAT YOU ALSO SET OUT WAS, YOU WEREN'T CERTAIN IF THE ATTORNEYS ACTUALLY TOUCHED THE FILES, THOUGH, CORRECT?
A. WHAT I SAID, AND I JUST WANT TO BE CLEAR IS, IT'S VERY CONCEIVABLE THAT AN ATTORNEY COULD NEVER TOUCH A FILE, AND I AM NOT POSITIVE THAT ALL FILES ARE TOUCHED BY ANY ATTORNEYS, ALTHOUGH I WOULD HOPE THAT THEY WOULD APPROVE OF ANY

ULTIMATE DECISIONS REGARDING A LOAN MODIFICATION AND REVIEW THE TERMS BEFORE THEY ARE ENTERED INTO.

Q. AND I SET FORTH THE CASE LAW AND THE GUIDELINES TO THE COURT ABOUT ULTIMATELY THESE ATTORNEYS WHEN THEY USE OUTSOURCING FIRMS, THEY ARE RESPONSIBLE TO MONITOR AND MAKE SURE THAT THE WORK IS DONE IN COMPLIANCE WITH THE LAW AND COMPETENTLY, CORRECT?

A. WE ARE ALL AS ATTORNEYS ULTIMATELY HELD RESPONSIBLE FOR WHAT GOES ON WITH OUR FILES. AND ALTHOUGH I HAVE NOT LOOKED VERY DEEPLY INTO THE ISSUE OF OUTSOURCING BECAUSE FROM MY PRACTICE IT'S CERTAINLY NOT AN ISSUE, NO MATTER WHAT -- BACK OFFICE SUPPORT COULD DO FOR A FIRM ULTIMATELY THE ATTORNEY IS RESPONSIBLE FOR WHAT GOES ON.

Q. AND WE DO KNOW THAT IF A PERSON HAS A WORKING KNOWLEDGE OF SALES FORCE THEY COULD CERTAINLY CULL THE INFORMATION NECESSARY TO MONITOR AND OVERSEE THE FILE.

A. CERTAINLY.

Q. AND WE DO KNOW -- WELL, DO YOU KNOW THAT THE ATTORNEYS LOG ON THROUGH SALES FORCE AND MONITOR THE FILES THAT WAY?

A. I HAVE BEEN TOLD THAT THEY HAVE ACCESS TO SALES FORCE. I HAVE NEVER CONFIRMED THAT WITH THE ATTORNEYS. I DID SEE, I BELIEVE IT WAS MR. FINLEY THE OTHER DAY AFTER COURT --

Q. YES.

A. -- AND WE DID APPROACH HIM AND SPEAK TO HIM, AND WE SAID, "YOU KNOW, OBVIOUSLY YOU HAVE ACCESS TO ALL OF THESE

FILES," AND, YOU KNOW, HE JUST SAID THAT THERE ARE SO MANY FILES THAT HE'S REALLY IN TROUBLE HERE, HE NEEDS THE SUPPORT.
Q. AND THAT WAS MY NEXT POINT. I HAD HEARD YOU AND MR. FINALLY. MR. FINLEY WAS SUBPOENAED BY MR. SINASOHN AND STOOD OUTSIDE ALL DAY AND WAS NEVER CALLED IN, CORRECT?
A. I NEVER KNEW THAT ACTUALLY. I JUST KNEW THAT HE WAS HERE.
Q. AND, IN FACT, MR. FINLEY TOLD YOU IN THE PARKING LOT THAT UTILIZING THE SERVICES OF THESE LADIES WAS ABSOLUTE -- WAS ABSOLUTELY INSTRUMENTAL, AND I'M NOT QUOTING HIM BECAUSE I WASN'T THERE, BUT IT WAS CRITICAL THAT THIS SERVICE BE UP SO THAT HE COULD PROPERLY SERVICE THE CLIENTS.
A. HE DIDN'T ACTUALLY SAY IT IN THAT WAY. HE DID SAY THAT RIGHT NOW HE IS HAVING A LOT OF DIFFICULTY, THAT HE IS REALLY SWEATING IT OUT BECAUSE I THINK THAT WHEN YOUR OFFICE IS SET UP IN A CERTAIN WAY AND THEN ALL OF A SUDDEN THAT'S CHANGED OBVIOUSLY IT'S DIFFICULT TO ADJUST.
Q. AND DID HE INDICATE TO YOU THAT HE HAD SOME CONCERNS THAT THERE WERE ACTUALLY UPCOMING HEARINGS -- I KNOW YOU HAD A NUMBER OF CONVERSATIONS WHERE THERE WAS A NUMBER OF HEARINGS AND HE WAS VERY CONCERNED ABOUT --
A. HE DID STATE SOMETHING TO THAT EFFECT.
Q. AND HE WAS VERY CONCERNED ABOUT HIS CLIENTS AND THEIR WELL-BEING --

A. WELL, AGAIN THAT MAY BE TRUE. BUT THE ADVANTAGE TO HAVING SUCH PHENOMENAL TECHNOLOGY AS SALES FORCE IS THAT EVERYTHING IS THERE, AND EVERYTHING IS CALENDARED, AND EVERYTHING IS DOCKETED. IF HE IS APPROPRIATELY MONITORING HIS CASES THEN HE SHOULD ABSOLUTELY HAVE NO PROBLEM GETTING TO THOSE HEARINGS AND ANSWERING THOSE PAPERS.
Q. BUT ISN'T THAT ASSUMING THAT ALL THE PHONE CALLS THAT COME IN FROM HIS CLIENTS, AND ALL THE MAIL THAT COMES FROM HIS CLIENTS, AND ALL THAT THE E-MAILS BEING DIRECTED TO THE BACK OFFICE LADIES, ISN'T THAT ASSUMING WHAT YOU'RE SAYING IS CORRECT IF THESE PEOPLE ARE WORKING COLLECTING THE INFORMATION, PUTTING IT INTO SALES FORCE SO THAT HE CAN SEE IT?
A. THAT IS TRUE. AND WE DID HAVE, I BELIEVE IT WAS THREE INDIVIDUALS INCLUDING MIRANDA, WORKING FOR A COUPLE OF DAYS TRYING TO INPUT -- ACTUALLY SUCCESSFULLY INPUTTING ALL OF THE INFORMATION THAT HAD ACCRUED.
Q. AND WHAT DID WE LEARN ABOUT WHEN THESE GALS HADN'T WORK CONSISTENTLY EVERY SINGLE DAY, WHAT WAS THE EFFECT ON THE CONSUMERS WHEN THEY WEREN'T ABLE TO GET THE MAIL, GET THE E-MAILS, GET THE PHONE CALLS AND FORWARD IT TO THE ATTORNEYS?
A. YOU KNOW, I KNOW WHERE YOU ARE TRYING TO GET ME TO GO, BUT I'M NOT SURE THAT THAT'S THE PROPER CONCLUSION. YOU HAVE TESTIFIED THERE WERE LIKE 50 FORECLOSES SINCE --

Q. FIFTY SALES. YES, MA'AM.
A. I WOULD HAVE TO BELIEVE THAT THERE WERE FORECLOSURE NOTICES THAT WELL PREDATED THE ACTUAL FORECLOSURE SALES AND THAT THOSE --
Q. DO YOU KNOW IF --
A. LET ME FINISH MY TESTIMONY.
Q. I'M SO SORRY.
A. AND THAT THERE WERE SOME PROCEEDINGS PRIOR TO THE SALE ITSELF. I WOULD HAVE TO BELIEVE THOSE NOTICES, AND WHATEVER PRELIMINARY FILINGS WOULD HAVE BEEN IN THE SYSTEM FOR THE ATTORNEYS TO BE ABLE TO ACCESS PRIOR TO THE ACTUAL SALE OCCURRING.
AND, SO I FIND IT HARD TO BELIEVE THAT THOSE SALES WERE THE RESULTS OF THAT -- THIS SHORT PERIOD OF TIME THAT THE GIRLS WERE NOT ABLE TO INPUT THAT INFORMATION.
Q. WELL, THAT'S WHAT HAPPENS IN THE STATE OF FLORIDA, MA'AM, WHEN SOMEONE IS SERVED A SUMMONS WITH A 20-DAY NOTICE, WHAT YOU'RE DESCRIBING, CORRECT?
A. AGAIN, THAT'S NOT MY AREA OF LAW SO I COULDN'T EVEN BEGIN TO TESTIFIED ABOUT THAT.
Q. THAT WAS MY NEXT POINT.
ISN'T IT TRUE IN THE MAJORITY OF STATES THERE IS A DIFFERENCE BETWEEN A LIEN THEORY AND TITLE THEORY FORECLOSURES AND, IN FACT, YOU DON'T GET SERVED A SUMMONS AND HAVE AN OPPORTUNITY TO HAVE AN ANSWER, YOU GET A SINGLE

NOTICE WITH A SALE DATE.
A. I COULDN'T BEGIN TO ANSWER THAT QUESTION, ESPECIALLY SINCE I DON'T -- I MEAN, I PRACTICE IN NEW YORK, NEW JERSEY, AND FLORIDA, AND I HAVE NEVER DONE REAL ESTATE IN ANY OF THOSE STATES.
Q. SO BASED ON WHAT I TOLD YOU THEN, AND UNDERSTANDING THAT THESE LADIES ARE RECEIVING ALL OF THE E-MAILS, ALL OF THE FAXES, ALL OF THE PHONE CALLS, ALL OF THE NOTIFICATIONS, AND THOSE KIND OF DEADLINES ARE APPROACHING, YOU WOULD THEN AGREE WITH ME THAT HAVING THEM WORK WOULD BE CRITICAL TO PROVIDING SERVICES TO THESE CLIENTS.
A. NO. BECAUSE AGAIN, I BELIEVE THAT ANY PERSON WHO CON TRACK WITH AN ATTORNEY WOULD -- SHOULD HAVE ACCESS TO A DIRECT PHONE NUMBER FOR THAT ATTORNEY. AND IF THERE IS AN EMERGENCY MATTER LIKE A FORECLOSURE SALE COMING UP AND NOBODY HAS REACHED OUT TO THAT CLIENT, I WOULD THINK THAT THE CLIENT WOULD THEN CALL THE DIRECT NUMBER TO THE LAW FIRM.
SO I'M STILL NOT WILLING TO STATE THAT'S WHAT HAPPENED OVER THE LAST COUPLE OF WEEKS IS RESPONSIBLE FOR THESE 56 HOMES BEING SOLD. I JUST -- ULTIMATELY EVERY CLIENT IN EVERY LAW FIRM SHOULD HAVE A DIRECT RELATIONSHIP THAT SHOULD BE ABLE TO PROVIDE THE METHODOLOGY NECESSARY TO PREVENT THESE KINDS OF HARMS.
THE COURT: COUNSEL, LET ME INTERRUPT YOU.

MISS MOSCOWITZ, WOULD YOU LIKE TO COME AND JOIN US?

MS. MOSCOWITZ: THANK YOU.

THE COURT: TAKE YOUR TIME. WATCH YOUR STEP.

MS. MOSCOWITZ: IT'S DANGEROUS IN HERE.

THE COURT: SAFER THAN HOUSTON.

GO AHEAD, COUNSEL.

MR. FEINGOLD: THANK YOU.

BY MR. FEINGOLD:

Q. NEXT, MA'AM, WITH REGARDS TO OUR CONVERSATIONS ON THE MONDAY BEFORE THANKSGIVING, IF YOU WILL RECALL, AND ISN'T IT A FACT THAT YOU CONTACTED ME AND INDICATED THAT THE FTC HAD A CONCERN BECAUSE THEY SAW A SHRED-IT TRUCK OR A SHRED-IT REPRESENTATIVE WALKING AROUND?

A. NO. I NEVER CONTACTED YOU ABOUT THAT. I WAS INFORMED AFTER THAT ISSUE HAD ARISEN BETWEEN YOU TWO.

Q. AND YOU ARE RIGHT. I APOLOGIZE. I MISSPOKE.

ON MONDAY BEFORE THANKSGIVING YOU LEARNED OF AN ISSUE THAT HAD ARISEN BETWEEN MYSELF AND THE FTC INVOLVING SHRED-IT SHOWING UP AT THE OFFICES, CORRECT?

A. WHAT I WAS INFORMED WAS THAT THERE WAS A FALLING OUT BETWEEN THE PARTIES BECAUSE A THIRD FLOOR SALES OFFICE HAD BEEN DISCOVERED THAT HAD NOT PREVIOUSLY BEEN DISCLOSED.

Q. AND THAT'S WHAT I WANT TO GET TO, NOT BEEN DISCLOSED.

NOW, WE JUST WENT THROUGH THE CHRONOLOGY OF HOW

THIS ALL CAME ABOUT. AND WE KNOW FROM THE CHRONOLOGY THAT I WAS NOT THERE INITIALLY WHEN YOU ALL ARRIVED, CORRECT?
A. CORRECT.
Q. WE KNOW THAT BASED ON YOUR OWN TESTIMONY THERE WASN'T A WHOLE LOT OF INTERVIEWING GOING ON AT THE TIME THAT YOU ALL ENTERED, CORRECT?
A. CORRECT.
Q. YOU WERE BASICALLY SECURING THE PREMISES, CORRECT?
A. ABSOLUTELY. YES.
Q. OKAY. WHEN I SHOWED UP SEVERAL HOURS LATER ONE OF THE FIRST STEPS THAT I TOOK WAS TO BASICALLY ADVISE YOU ALL THAT I WANTED TO READ ALL THE PAPERS AND GO SIT IN MY CONFERENCE ROOM BEFORE I MET YOU ALL, CORRECT?
A. CORRECT.
Q. OKAY. THEN WHEN I CAME BACK, AND YOU WERE IN THAT MEETING. DID ANYONE SIT DOWN AND TELL ME, "HEY, MR. FEINGOLD, WE NEED A TOUR OF THE ENTIRE PREMISES."
A. NO, THAT DID NOT HAPPEN.
Q. THAT DIDN'T HAPPEN. DID ANYONE TELL ME, "HEY, MR. FEINGOLD, WE TRIED TO ASK MR. ZAUSNER, DAVID ZAUSNER OR SEAN ZAUSNER TO GIVE US A LAY OF THE LAND."
A. NO.
Q. OKAY. SO THIS SO-CALLED UNDISCLOSED ROOM WAS IN FACT A ROOM THAT NO ONE HAD EVER ASKED FOR A TOUR OF THE FACILITY, CORRECT?

A. THAT'S CORRECT. BUT, MR. FEINGOLD, IN ALL FAIRNESS NOBODY WOULD EVEN DISCLOSE TO US THAT FIRST UNIVERSAL EXISTED IN THE LOCATION AT ALL WHEN WE FIRST WALKED IN --

Q. ABSOLUTELY.

A. -- NOBODY WAS BEING PARTICULARLY COOPERATIVE.

Q. MA'AM, IT'S -- ISN'T IT A FACT THAT WITH YOU ALL ENTERING AN OFFICE WITH TWO TO FOUR POLICE OFFICERS, THE WORD "ARREST" BEING YELLED AND PEOPLE FILING OUT, ISN'T IT EXPECTED THAT NONLAWYERS MIGHT REACT IN A FASHION THAT THEY WOULDN'T NECESSARILY BE COOPERATIVE WITH YOU?

A. I WOULD TAKE OBJECTION TO YOUR CHARACTERIZATION OF WHAT HAPPENED. AGAIN, NOBODY YELLED, "ARREST." IN RESPONSE TO THE QUESTION, "ARE WE UNDER ARREST?" EVERYBODY WAS CLEARLY TOLD, "YOU ARE NOT UNDER ARREST. THIS IS CIVIL, NOT CRIMINAL."

AND AGAIN, IF SOMEBODY ONLY HEARD PART OF THAT, I CAN'T TESTIFY WHETHER OR NOT SOMEBODY MISHEARD WHAT WAS SAID. BUT I JUST WANT THE RECORD TO BE CLEAR, NOBODY SCREAMED OUT THE WORD "ARREST." AND WE REALLY PAINSTAKINGLY TOOK EFFORTS TO LET EVERYBODY KNOW THEY HAD NO REASON TO BE FRIGHTENED, THEY WEREN'T UNDER ARREST, THIS WAS A CIVIL MATTER.

Q. OKAY. GETTING BACK, MOVING AHEAD IN THE CHRONOLOGY, YOU ALREADY ACKNOWLEDGED THAT NO ONE EVER ASKED FOR A TOUR.

HAVE YOU EVER SEEN AN ORDER BY THE COURT THAT

REQUIRED MYSELF AS THE LEGAL COUNSEL, OR THE ZAUSNERS AS DEFENDANTS, OR MYSELF AS A DEFENDANT TO DO ANYTHING BEYOND -- ACTUALLY THIS IS A VERY BAD QUESTION BECAUSE IT'S -- BUT DID YOU SEE ME ACT UNCOOPERATIVELY TOWARDS YOU WHEN I FIRST SAT DOWN AFTER I HAD READ THE COMPLAINT?
A.   NO.
Q.   I MEAN, DID I IN ANY WAY EVER INDICATE TO YOU THAT ACCESS TO EVERYTHING YOU WANTED WOULD NOT BE GRANTED?
A.   NO.
Q.   NO.  NEVER.  SO THIS SO-CALLED HIDDEN ROOM, IS IT POSSIBLE THAT THAT WAS A MISUNDERSTANDING BASED UPON THE FACT THAT I HAD NO KNOWLEDGE OF THE FULL EXTENT OF A TOUR, OR LACK OF TOUR THAT HAD BEEN GIVEN TO YOU ALL?
A.   I THINK THAT THERE WAS CLEARLY BLAME BEING PLACED ON YOU FOR EVERYBODY ELSE'S LACK OF COOPERATION.  YOU HAVE TO UNDERSTAND AGAIN WHEN WE WALKED INTO THE OFFICES NOBODY WAS COOPERATING, NOBODY WOULD ANSWER US STRAIGHT.  AND, SO WHEN MY INDEPENDENT OBSERVANCE OF THE BREAKDOWN OF COMMUNICATION IS THAT IT WAS PART OF THE REST OF THE LACK OF COMMUNICATION WITH EVERYBODY ELSE INVOLVED.
Q.   DID YOU ALSO LEARN ABOUT A SPIRAL NOTEBOOK OR BINDER NOTEBOOK THAT CONTAINED A LISTING OF ALL OF THE FILES THAT WERE HELD OFF SITE?
A.   YES.  I WAS THERE.
Q.   AND, IN FACT, WAS I NOT ACCUSED OF MAKING, OBTAINING

FILES DIFFICULT BECAUSE THE NAME OF THE COMPANY ON THE OUTSIDE OF THE BINDER BOOK WAS A PHONE NUMBER THAT WAS DISCONNECTED?
A. I DON'T THINK THAT YOU WERE ACCUSED OF TRYING TO CONCEAL. IT WAS FRUSTRATING BECAUSE, ONCE AGAIN, IT WAS INFORMATION THAT WE COULDN'T GET AT. THERE WAS A NUMBER ON THE BINDER THAT WAS TO A CLOSED BUSINESS. YOU DID THEN PROVIDE FOR US THE INFORMATION REGARDING IRON MOUNTAIN.
Q. IMMEDIATELY. IMMEDIATELY. AS SOON AS YOU CALLED ME AND ADVISED ME DID I NOT IMMEDIATELY SAY TO YOU, "LET ME CALL AND FIND OUT WHAT THE STORY IS?" I DIDN'T EVEN KNOW, AND LET ME --
A. YES, YOU DID DEAL WITH IT RATHER QUICKLY.
Q. AND LET ME CALL YOU BACK, AND I ADVISED YOU THAT MR. ZAUSNER LIKED THE NOTEBOOK FOR WHATEVER REASON AND IT WAS STERLING --
A. YES.
Q. -- AND IRON MOUNTAIN BROUGHT THEM OUT AND YOU GOT THE NUMBER IMMEDIATELY --
A. YES.
Q. -- AS SOON AS I COULD?
A. YES.
Q. AND THEN ALSO WHEN MR. SINASOHN SAID THAT THIS OFFICE WAS HIDDEN, YOU AND I WERE ON THE TELEPHONE, AND DIDN'T I INDICATE IF THE OFFICES WERE BEING HIDDEN TO HIM IT WOULD BE

A PRETTY STUPID THING TO DO CONSIDERING SALES FORCE IDENTIFY SOURCE OFFICES, THERE IS COMPLIANCE LOGS THAT SHOW OFFICES, AND YOU ALL HAD BEEN GIVEN ABSOLUTE FREE ACCESS TO THE FACILITY. DIDN'T I SAY THAT TO YOU OR SOMETHING --
A. YOU DID --
Q. -- TO THAT EFFECT?
A. -- SAY THAT, YES.
Q. AND YOU WERE VERY UNDERSTANDING AND COMPASSIONATE TO WHAT I WAS SAYING, CORRECT?
A. YES.
Q. AND, IN FACT, YOU THEN SAID TO ME, "LISTEN, DAVID, I'M NOT YOUR LAWYER BUT IT SEEMS THAT THERE IS A LOT OF CONFUSION GOING ON," CORRECT?
A. YES.
Q. YOU RECALL THAT? AND YOU SAID TO ME, "LISTEN, YOU HAVE TO UNDERSTAND FROM GIDEON'S END MOST OF THE TIME HE WALKS INTO THESE BUSINESSES AND THEY ARE UNETHICAL BUSINESSES AND BASICALLY CROOKS," CORRECT?
A. YES.
Q. AND THAT MAYBE IT WOULD BE HELPFUL IF YOU GAVE HIM SOME KIND OF DISCLOSURE OR SUMMARY SO IS THAT HE CAN COULD GET A BETTER GRASP OF THE BUSINESS. DIDN'T YOU TELL ME THAT?
A. YES. AND WHAT I BELIEVE THAT I ELABORATED WAS THAT IT SEEMS TO ME THAT IF YOU ARE TRYING TO SHOW THAT YOUR BUSINESS IS A LEGITIMATE BUSINESS DOING THINGS THE RIGHT

WAY, THEN THE MORE DISCLOSURE THAT YOU ARE ABLE TO PROVIDE AND THE MORE OPEN THAT YOU ARE ABLE TO BE ABOUT YOUR BUSINESS -- NOT YOUR BUSINESS MODEL, BUT ABOUT FIRST UNIVERSAL'S BUSINESS MODEL AND ANY INFORMATION THE BETTER.
Q. RIGHT. AND THEN DID I NOT SAY TO YOU, "I AM GOING TO GO TO MY COMPUTER AND I'M GOING TO TYPE UP A SUMMARY AND I WILL SEND YOU A COPY."
A. YES.
Q. AND, IN FACT, THAT EVENING DID I NOT TYPE UP A VERY LONG SUMMARY OF THE ENTIRE BUSINESS AND SEND YOU A COPY AND MR. SINASOHN AND --
A. YES.
Q. -- I BELIEVE MISS MOSCOWITZ. YES.
AND, IN FACT, DIDN'T I THE FOLLOWING DAY DO A SUPPLEMENT TO THAT SUMMARY, AGAIN ADDING ADDITIONAL INFORMATION WITH AN E-MAIL INDICATING I DON'T KNOW -- "BASICALLY I DON'T KNOW IF YOU ARE INTERESTED IN THIS BUT I WANT TO KEEP TRYING TO EDUCATE YOU ALL ABOUT THE BUSINESS."
A. YES, YOU DID. HOWEVER, I WOULD LIKE TO BRING YOU BACK JUST TO ANOTHER ISSUE.
Q. YES, MA'AM.
A. I THINK THE FRUSTRATION WAS NOT JUST WITH YOU PERSONALLY, IT WAS WITH THE BUSINESS. AND THE BUSINESS IS MORE -- WELL, YOU'RE OUTSIDE COUNSEL, AS YOU ARE STATING TO THE BUSINESS --

Q. RIGHT.
A. -- AND IT'S NOT NECESSARILY YOUR OBLIGATION TO BE FORTHCOMING WITH THE INFORMATION ABOUT THE BUSINESS SO MUCH AS IT'S THE RESPONSIBILITY OF THE PRESIDENT AND THE MANAGING MEMBERS OF THE BUSINESS. AND TO THE EXTENT THAT THEY WEREN'T BEING COMPLIANT THAT WAS A GREAT SOURCE OF FRUSTRATION FOR THE FTC AND FOR THE TEMPORARY RECEIVER AS WELL.
Q. BUT YOU ALL DID RECOGNIZE THAT EVEN THOUGH I AM A DEFENDANT IN THIS ACTION I WAS ALSO ACTING AS LEGAL COUNSEL FOR THE OTHER DEFENDANTS, CORRECT?
A. YES, YOU WERE. BUT I THINK THAT THE FRUSTRATION WAS CUMULATIVE.
Q. AND YOU TESTIFIED BEFORE ABOUT THE INDEPENDENT BRANCHES. ARE YOU FAMILIAR WITH CORPORATE LAW AND CORPORATE LIABILITIES AND THE DIFFERENCE BETWEEN A SUCCESSOR AND AN ASSIGN AND A CORPORATELY STRUCTURING IN A MERGER?
A. VERY LOOSELY. FROM A PAST LIFE WHERE I KIND OF CLERKED FOR MY BROTHER'S FIRM WHEN I WAS IN LAW SCHOOL.
Q. WHEN IS THE LAST TIME THAT YOU REVIEWED EITHER THE FLORIDA OR THE DELAWARE MODEL BUSINESS CORPORATE ACT?
THE COURT: WELL, WHAT IS THE RELEVANCE?
MR. FEINGOLD: BECAUSE SHE GAVE AN OPINION, YOUR HONOR, THAT THE BRANCHES WERE THE SAME, OR SOMETHING TO THAT EFFECT.

THE WITNESS: NO, I DID NOT GIVE THAT CONCLUSION.
THE COURT: LET'S MOVE ON.
THE WITNESS: I BELIEVE THAT I --
THE COURT: NO. NO. NO. LET'S MOVE ON.
BY MR. FEINGOLD:
Q. YOU TESTIFIED ALSO BEFORE ABOUT DAVID ZAUSNER, AND YOU DON'T DENY THAT HIS BASIC JOB IS IN CHARGE OF TECHNOLOGY, CORRECT?
A. THAT'S BEEN MADE CLEAR TO US, YES.
Q. AND YOU TESTIFIED ABOUT THE EXECUTIVE COMMITTEE. ISN'T IT A FACT THAT MY PARTICIPATION IN THE COMMITTEE WAS MERELY ATTENDANCE AT AS OUTSIDE COUNSEL?
A. I CAN'T TESTIFY TO THAT BECAUSE I'M NOT SURE ABOUT THE INNER WORKINGS OF THE EXECUTIVE COMMITTEE. I CAN TELL YOU THAT YOU TOLD US THAT YOU WERE ALWAYS PRESENT AT THOSE MEETINGS AND THAT YOU FIELDED ANY PARTICULAR QUESTIONS THAT MIGHT ARISE THAT WERE OF A LEGAL NATURE I BELIEVE.
Q. AND ISN'T IT A FACT THAT THROUGH TESTIMONY YOU HAVE HEARD, AND YOU HAVE NO EVIDENCE TO DENY THE FACT, THAT THERE ARE VERY PARTICULAR MEMBERS OF THE EXECUTIVE COMMITTEE WHO ARE ACTUALLY RESPONSIBLE FOR OVERSEEING SALES.
A. THAT IS WHAT HAS BEEN EXPRESSED TO US, YES.
Q. AND YOU HAVE NOT RECEIVED ANY EVIDENCE THAT WOULD CONTRADICT ANY OF THOSE -- THAT TESTIMONY.
A. NO.

Q. ALL RIGHT. AND I GUESS FINALLY -- WELL, AT THE LUNCH BREAK YOU AND I HAD AN OPPORTUNITY TO SPEAK. AND IT'S TRUE THAT YOU AGREED WITH ME THAT IF NO SALES ARE TAKING PLACE AND SALES IS CLOSED FOREVER THAT THERE WOULD BE NO NEED FOR A RECEIVERSHIP.

A. I THINK THAT'S TRUE TO -- AND I JUST WANT TO QUALIFY IT BECAUSE AN ISSUE HAS OCCURRED TO ME, AND THAT IS THE SERVICING OF THOSE CLIENTS THAT WERE BROUGHT IN UNDER THE PREVIOUS SALES AND WHAT THEIR BELIEFS ARE WITH REGARD TO THE SERVICES THAT THEY ARE RECEIVING, THEIR PAY STRUCTURES, THAT MIGHT BE AN ISSUE THAT WOULD HAVE TO BE ADDRESSED. BUT WITH REGARD TO THE WORK THAT THESE WOMEN AND ONE MAN PROVIDE, I DON'T TAKE ISSUE. THEY CLEARLY WORK HARD AND THEY CLEARLY TRY TO DO A GOOD JOB.

MR. FEINGOLD: THANK YOU.

THE COURT: ANY REDIRECT?

MR. SINASOHN: JUST A LITTLE, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. SINASOHN:

Q. I JUST WANT TO GO OVER A FEW THINGS.

MISS KUDMAN, HAS THE -- AS FAR AS YOU KNOW HAS THE FTC NAMED EITHER THE MARRUCCI LAW FIRM, STRATTON & FEINSTEIN, OR THE FINLEY LAW FIRM AS DEFENDANTS IN THIS CASE?

A. NO.

Q. AND YOU WERE DISCUSSING THE SEPARATION BETWEEN FEINGOLD & KAM LAW OFFICES AND THE REST OF THE OFFICE. JUST FOR -- BECAUSE IT WAS MENTIONED, CAN YOU POINT OUT WHAT YOU PERCEIVE TO BE THE FEINGOLD & KAM LAW FIRM BY IDENTIFYING THE LETTERS ON THE ROOMS?

A. WELL, IF YOU LOOK AT M AND O, M IS THE RECEPTION ROOM FOR FEINGOLD & JAM. O WOULD BE MR. FEINGOLD'S OFFICE. THEN ACROSS THE HALLWAY -- IF YOU ARE IN THE OUTSIDE BREEZEWAY, DOWN ON THE OTHER SIDE OF THE BUILDING WOULD BE THE REMAINING OFFICES.

Q. WHAT IS -- THE RECEPTION ROOM IS IN FRONT OF O, N AND P, RIGHT?

A. CORRECT.

Q. AND THAT'S ALL PART OF WHAT YOU ARE CALLING FEINGOLD & KAM?

A. NO, BECAUSE OFFICES D AND M --

Q. P. I THINK IT'S P?

A. IS IT P? I'M SORRY. I APOLOGIZE. THAT MAKES SENSE. P AND N WOULD BE BOTH OF THE ZAUSNERS OFFICES. N WOULD BE SEAN ZAUSNER'S OFFICE AND P WOULD BE DAVID ZAUSNER'S OFFICES.

Q. ARE EITHER OF THE ZAUSNERS LAWYERS AS FAR AS YOU KNOW?

A. NO, THEY ARE NOT.

Q. NOW, AFTER AN INITIAL SALES CALL, DOES FIRST UNIVERSAL TELL CONSUMERS WHEN THEY REFER THEM TO A LAW FIRM THAT THEY

WILL NEXT BE SPEAKING WITH ANOTHER EMPLOYEE OF FIRST UNIVERSAL WHO IS DOING OUTSOURCING FOR THE LAW FIRM OR DO THEY TELL THEM THAT THEY ARE GOING TO BE SPEAKING WITH SOMEBODY FROM A LAW FIRM?

A. IT'S MY UNDERSTANDING THAT THEY ARE BEING REFERRED TO THE LAW FIRM. NOW AGAIN, I HAVE NEVER HEARD ONE OF THESE SALES CALLS, BUT AS IT WAS EXPLAINED TO ME IT WAS BEING REFERRED TO A LAW FIRM.

THE COURT: AND ALL THAT YOU HAVE SEEN IS WHAT HAS BEEN REFERRED TO AS THE SCRIPT.

THE WITNESS: CORRECT. I HAVE ALSO SEEN SOME OF THOSE CONTRACTS THAT HAVE DISCLOSURES, BUT I'M NOT SURE WHAT THE CONSUMER IS TOLD WHEN ON THE PHONE.

BY MR. SINASOHN:

Q. AND DO YOU KNOW IF THEY GET THOSE CONTRACTS AFTER THEY HAVE SPOKEN, AFTER THE SALES CALL?

A. IT WOULD BE AFTER.

Q. AND JUST --

A. BUT I WANT TO CLARIFY. I'M NOT SURE IF IT WAS BEFORE. BUT I WOULD THINK IT WAS ALSO AFTER THE VERIFICATION CALL, I BELIEVE, BUT I'M NOT SURE.

Q. AND BECAUSE THERE WAS SOME DISCUSSION ABOUT THE FACT THAT A TOUR WASN'T GIVEN OF THE SIGHT.

MR. SINASOHN: I WOULD LIKE TO APPROACH, YOUR HONOR, AND JUST SHOW THE WITNESS --

BY MR. SINASOHN:
Q. AND MAYBE YOU COULD READ JUST A PORTION OF THIS TRO, THIS ORDER, ORDERED BY THE COURT. MAYBE YOU COULD JUST READ PARAGRAPH 13, JUST A AND E.
THE COURT: JUST READ IT TO YOURSELF.
THE WITNESS: YES.
BY MR. SINASOHN:
Q. HAVING READ THE ORDER, ISN'T IT TRUE THAT THE DEFENDANTS WERE ORDERED TO IMMEDIATELY, UPON SERVICE OF THIS ORDER, TO TELL -- TO TELL THE TEMPORARY RECEIVER IN WRITING WHERE FUNDS, ASSETS, AND PROPERTY OF THE RECEIVERSHIP DEFENDANT WERE?
A. THAT'S CLEARLY AN OBLIGATION UNDER THE ORDER.
Q. AND WEREN'T THEY ALSO ORDERED BY THIS COURT TO DELIVER TO THE TEMPORARY RECEIVER POSSESSION AND CUSTODY OF ALL INFORMATION IDENTIFYING THE ACCOUNTS, EMPLOYEES, PROPERTIES, OR OTHER ASSETS OR OBLIGATIONS OF THE RECEIVERSHIP DEFENDANT?
A. YES.
Q. AND WEREN'T THEY ALSO ORDERED TO PRODUCE ALL KEYS AND COMPUTERS AND ANOTHER PASSWORDS, ENTRY CODES, COMBINATIONS TO LOCKS TO GAIN ACCESS TO PROPERTY?
A. YES.
Q. AND WASN'T THE THIRD FLOOR SITE WHEN YOU WENT UP THERE AND YOU SAW, WASN'T IT ONE OF THE MAIN PLACES YOU SAW SALES

HAPPENING?
A. I NEVER SAW SALES HAPPENING, PERIOD, BUT CERTAINLY IT WAS CLEARLY A SALES ROOM.
Q. AND THAT'S THE ONE -- THAT IS THE PLACE THAT WE -- WHERE THEY WERE ORDERED -- THE DEFENDANTS WERE ORDERED TO TELL US ABOUT, CORRECT?
A. YES.
Q. AND THEY DIDN'T DO THAT, DID THEY.
A. NO.
MR. SINASOHN: NOTHING FURTHER, YOUR HONOR.
THE COURT: RECROSS?
MR. FEINGOLD: YES.

RECROSS EXAMINATION

BY MR. FEINGOLD:
Q. I KNOW THIS MAY BE BELABORING IT, BUT I HAD NO IDEA WHAT WAS TOLD, GIVEN TO, OR HAPPENED AT THE OFFICES BEFORE I GOT THERE. NO ONE --
A. THAT'S NOT A FAIR QUESTION BECAUSE I WAS NOT PRIVY TO YOUR CONVERSATIONS DURING THAT HOUR AND A HALF YOU WERE --
Q. YOU'RE RIGHT. YOU'RE RIGHT.
A. IN MY PRESENCE YOU WEREN'T.
Q. BUT THE INITIAL MEETING THAT I HAD WITH YOU ALL WHERE WE HAD AN EXTENSIVE INTERVIEW WITH ME, NO ONE INDICATED THAT THEY HADN'T RECEIVED THE KEYS, THE COMPUTERS, THE ACCOUNT LOCATIONS, CORRECT?

A. THAT'S CORRECT.
Q. AND, IN FACT, YOU ALL DIDN'T NEED KEYS BECAUSE YOU HAD A LOCKSMITH THERE RIGHT THEN AND THERE WHO HAD CHANGED THE LOCKS ON EVERYTHING, CORRECT?
A. THAT'S CORRECT. BUT WE ALSO DIDN'T HAVE A KEY TO THE THIRD FLOOR. AND AGAIN, MR. FEINGOLD, YOU WEREN'T THERE BUT NOBODY WAS GIVING US A TOUR OF ANYTHING. NOBODY WAS LETTING US KNOW WHAT SPACES EXISTED.
Q. AND ISN'T IT ALSO TRUE THAT NOT A SINGLE CLIENT OF FIRST UNIVERSAL HOLDINGS FOR THE LAW FIRMS IS EVER CHARGED A DIME UNTIL THEY HAVE RETURNED A FULLY EXECUTED CONTRACT WITH THE LAW FIRM.
A. I'M ACTUALLY NOT AWARE OF THAT.
MR. FEINGOLD: THANK YOU.
THE COURT: THANK YOU, MISS KUDMAN.
YOU MAY STEP DOWN.
WATCH YOUR STEP, PLEASE. JUST LEAVE THAT EXHIBIT UP HERE.
ALL RIGHT, CALL YOUR NEXT WITNESS.
MR. KIRTZ: SEAN ZAUSNER, YOUR HONOR.
THE COURT: MR. SEAN ZAUSNER.
PLEASE STEP UP TO THE WITNESS STAND.
PLEASE REMAIN STANDING AND RAISE YOUR RIGHT HAND.
DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY THAT YOU ARE ABOUT TO GIVE SHALL BE THE TRUTH, THE WHOLE TRUTH AND

NOTHING BUT THE TRUTH, SO HELP YOU GOD?
THE WITNESS: YEAH.
THE COURT: PLEASE BE SEATED.
PLEASE SPEAK DIRECTLY INTO THAT MICROPHONE SO THAT WE WILL BE ABLE TO HEAR YOU.
PLEASE STATE YOUR FULL LEGAL NAME FOR THE RECORD AND SPELL YOUR LAST NAME FOR THE REPORTER.
THE WITNESS: SEAN ZAUSNER, Z-A-U-S-N-E-R.
THE COURT: YOU ARE SPEAKING OVER THAT MICROPHONE. JUST RAISE IT UP A LITTLE BIT.
THE WITNESS: YES, SIR.
THE COURT: GO AHEAD.
MR. KIRTZ: THANK YOU, YOUR HONOR.

SEAN ZAUSNER,

BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. KIRTZ:
Q. MR. ZAUSNER, WHAT IS YOUR POSITION WITH FIRST UNIVERSAL HOLDING?
A. I AM THE OWNER.
Q. DO YOU HAVE ANY OTHER TITLE IN THE FIRM?
A. PRESIDENT.
Q. ANY OTHER TITLE?
A. MAYBE THE LLC, MANAGER.
Q. ANY OTHER TITLE?

A. I DON'T KNOW WHAT ELSE I WOULD HAVE.
Q. WHAT WERE YOUR TITLES AND POSITIONS WITH FIRST UNIVERSAL LENDING?
A. THE OWNER, PRESIDENT.
Q. ANYTHING ELSE?
A. MAYBE MANAGER. I'M NOT TOO SURE. I DIDN'T REALLY USE A LOT OF TITLES. I JUST KNOW I'M THE OWNER.
Q. AND WHY DIDN'T YOU USE A LOT OF TITLES?
A. I DON'T REALLY COMMUNICATE WITH A TITLE THROUGHOUT THE DAY.
Q. WHAT IS LENDING PARTNERS?
A. IT'S THE COMPANY THAT OWNS FIRST UNIVERSAL LENDING. IT'S MADE UP OF MY BROTHER AND MYSELF.
Q. AND WHAT'S THE OWNERSHIP OF LENDING PARTNERS?
A. WE ARE 50, 50 PARTNERS.
Q. HAS THE PERCENTAGE CHANGED OVER TIME?
A. IT HAS.
Q. WHAT HAS THE PERCENTAGE BEEN BEFORE?
A. IT'S BEEN VARIOUS DIFFERENT THINGS. I COULDN'T EVEN RECALL HOW MANY.
Q. DO YOU RECALL WHAT THE FIRST PERCENTAGE BREAKDOWN WAS?
A. NO.
Q. WHO ESTABLISHED LENDING PARTNERS?
A. I DID.
Q. AND YOUR BROTHER?

A. WHAT'S THAT?
Q. AND YOUR BROTHER?
A. NO, I DID AND I BROUGHT MY BROTHER ON.
Q. AS PRESIDENT, AND OWNER, AND PARTNERSHIP MANAGER FOR FIRST UNIVERSAL HOLDINGS, WHAT ARE YOUR DUTIES AND RESPONSIBILITIES?
A. I GO THROUGH THE SALES FORCE RECORDS TO MAKE SURE THAT WORK IS GETTING DONE.
Q. ANYTHING ELSE?
A. I HANDLE ANY OF THE -- ANY OF THE VENDOR BILLS THAT MIGHT COME IN, DISTRIBUTE IT TO THE RIGHT PEOPLE. IF THERE ARE ANY PERSONNEL ISSUES THAT AREN'T BEING HANDLED BY THE APPROPRIATE MANAGEMENT IT WOULD COME TO ME, LISTEN TO THE EXECUTIVE COMMITTEE, ANY CHANGES IN PROPOSALS THEY MIGHT HAVE.
Q. AND LISTEN TO THE EXECUTIVE COMMITTEE. WHAT WAS YOUR ROLE DURING THE EXECUTIVE COMMITTEE MEETINGS?
A. I WOULD HEAR WHAT THEY WOULD HAVE TO SAY ABOUT ANY LEGAL ISSUES THAT THEY MIGHT HAVE, ANY QUESTIONS THAT THEY MIGHT HAVE, ANY PROPOSALS THAT THEY MIGHT HAVE.
Q. AND WHEN YOU SAY "THEY" WHO DO YOU MEAN?
A. IT'S THE FIVE EXECUTIVE COMMITTEE, MAT GILBERT, DOUG CAMPION, BILL MURPHY, NICK ANDREWS AND NOEL RIVERA.
Q. AND WHAT POSITIONS DID THESE GENTLEMEN HAVE AT FIRST UNIVERSAL HOLDINGS?

A. THEY DID THE TRAINING OF SALES, THEY DID THE HIRING AND FIRING OF SALES.
Q. AND WHO WAS THEIR DIRECT SUPERVISOR?
A. THEY KIND OF DID IT THEMSELVES. THAT'S THEIR POSITION. THEY IF THEY HAD AN ISSUE THEY WOULD BRING IT UP IN THE EXECUTIVE COMMITTEE AND IT WOULD JUST BE DISCUSSED.
Q. WELL, WASN'T THERE SOMEONE ABOVE THEM?
A. NO. IT WAS BASICALLY THEIR DECISION TO RUN -- THEY WERE BASICALLY RUNNING SALES.
THE COURT: THE EXECUTIVE COMMITTEE RAN SALES.
THE WITNESS: WELL, THEY DID ALL THE TRAINING IN SALES AND THE HIRING AND THE FIRING.
THE COURT: WELL, HOW WAS A DECISION EVER MADE AMONGST THOSE INDIVIDUALS?
THE WITNESS: THEY BASICALLY MADE A DECISION AMONGST THEMSELVES ON WHAT THEY WERE DOING. IF IT FELL WITHIN THE -- IF I HAD AN ISSUE I WASN'T SURE I WAS COMPLIANT OR NOT, THE LEGALITIES OF IT I WOULD BRING IT UP WITH OUTSIDE COUNSEL.
THE COURT: WELL, WHAT IF THERE WAS A SPLIT AS TO HOW A DECISION SHOULD GO, WHO WOULD MAKE THE FINAL DECISION?
THE WITNESS: THAT'S WHY WE HAVE FIVE PEOPLE SO THERE NEVER REALLY WAS THAT ISSUE.
THE COURT: INCLUDING YOURSELF.
THE WITNESS: NO, SIR.

THE COURT: WELL, DID YOU VOTE?

THE WITNESS: NO, SIR.

THE COURT: DID YOU HAVE THE ABILITY TO VOTE?

THE WITNESS: NO. IT WAS BASICALLY FIVE PEOPLE ON THE EXECUTIVE COMMITTEE.

THE COURT: WERE YOU A MEMBER OF THE EXECUTIVE COMMITTEE.

THE WITNESS: NO, SIR.

THE COURT: GO AHEAD.

MR. KIRTZ: THANK YOU, YOUR HONOR.

BY MR. KIRTZ:

Q. I WANT TO REFER TO A DOCUMENT THAT WAS AT LEAST IDENTIFIED OR MENTIONED TO THE COURT AS DEFENDANT'S EXHIBIT 6.

MR. KIRTZ: I AM NOT SURE, YOUR HONOR, WHETHER THAT WAS PLACED INTO EVIDENCE OR NOT.

THE COURT: THE PHOTOGRAPHS?

MR. KIRTZ: NO. THESE WERE --

THE COURT: 6-A THROUGH E, DEFENDANTS?

MR. KIRTZ: DEFENDANTS'.

THE COURT: DEFENDANTS' 6-A THROUGH E ARE PHOTOGRAPHS.

MR. KIRTZ: I AM GOING TO MARK THEN, YOUR HONOR, AS PX 40.

THE COURT: PLAINTIFF'S 40.

MR. KIRTZ: PLAINTIFF'S EXHIBIT 40, A GROUP OF EXECUTIVE COMMITTEE MINUTES THAT WERE PART OF THE PACKAGE THAT MR. FEINGOLD HAD IN COURT HERE, AND I THOUGHT THAT HE HAD IDENTIFIED IT AS A DEFENDANTS' EXHIBIT BUT I'M GOING TO GO AHEAD AND MARK THIS AS A PLAINTIFF'S EXHIBIT 40.

THE COURT: ANY OBJECTION?

MR. FEINGOLD: NO, SIR.

THE COURT: 40 IS IN EVIDENCE.

[PLAINTIFF EXHIBIT 40 RECEIVED IN EVIDENCE]

THE COURT: I AM JUST CURIOUS ABOUT ONE THING, MR. ZAUSNER.

THE EXECUTIVE COMMITTEE, WAS THERE A WRITTEN DOCUMENT THAT CREATED IT?

THE WITNESS: I'M NOT SURE, SIR. THERE MIGHT BE.

THE COURT: WELL, YOU WERE THE PRESIDENT OF THE CORPORATION, CORRECT?

THE WITNESS: CORRECT. I ACTUALLY HAD AN EXECUTIVE COMMITTEE MEET FOR MAYBE FIVE PLUS YEARS. IT'S CHANGED THROUGHOUT TIME. SO I'M NOT SURE WHAT DOCUMENTS ARE ACTUALLY HELD. I DON'T WANT TO MISSPEAK.

THE COURT: IN OTHER WORDS, YOU DON'T KNOW WHETHER OR NOT THE -- WAS THERE A WRITTEN -- A FILING WITH THE SECRETARY OF STATE, CORPORATE DIVISION?

THE WITNESS: NO, SIR.

THE COURT: THAT CREATED YOU AS THE -- OR

DESIGNATED YOU AS PRESIDENT?

THE WITNESS: OF WHAT COMPANY, SIR?

THE COURT: OF LENDING PARTNERS.

THE WITNESS: THERE IS A FILING WITH LENDING PARTNERS. I DON'T HAVE -- I AM NOT EXACTLY SURE HOW IT'S LISTED, BUT I DO KNOW I HAVE A -- I DO HAVE PAPERWORK THAT STATES THAT MYSELF AND MY BROTHER ARE THE OWNERS OF LENDING PARTNERS.

THE COURT: WHAT ABOUT FIRST UNIVERSAL HOLDINGS?

THE WITNESS: ALSO REGISTERED AS MYSELF AS THE OWNER.

THE COURT: GO AHEAD.

MR. KIRTZ: THANK YOU, YOUR HONOR.

BY MR. KIRTZ:

Q. BEFORE WE MOVE TO PLAINTIFF'S EXHIBIT 40, ARE THERE ANY OTHER CORPORATIONS OR ENTITIES THAT YOU ARE A -- AN OFFICER, DIRECTOR, OR MEMBER OF THAT YOU HAVEN'T MENTIONED TODAY?

A. I BELIEVE WE DISCUSSED FIRST UNIVERSAL, FIRST UNIVERSAL LENDING AND LENDING PARTNERS.

Q. ARE THERE ANY OTHERS?

A. AND FIRST UNIVERSAL HOLDINGS.

Q. WELL, FIRST UNIVERSAL -- FIRST UNIVERSAL, THAT FIRST ONE YOU NAMED, THAT'S DIFFERENT FROM FIRST UNIVERSAL LENDING AND FIRST UNIVERSAL HOLDINGS, IS THAT RIGHT?

A. I BELIEVE THAT WAS A NONPROFIT. THAT WAS -- THAT

MR. FEINGOLD TESTIFIED TO EARLIER.
Q. OKAY.
THE COURT: SIR, LET ME JUST MAKE SURE THE RECORD IS CLEAR ON ONE THING.
WITH RESPECT TO FIRST UNIVERSAL HOLDINGS, YOU SAY THAT BASICALLY THE EXECUTIVE COMMITTEE HANDLES THE SALES ASPECT?
THE WITNESS: CORRECT. THE FIVE GUYS THAT I DESIGNATED.
THE COURT: RIGHT. AND THAT WOULD BE THE EXECUTIVE COMMITTEE OF FIRST UNIVERSAL HOLDINGS.
THE WITNESS: CORRECT, SIR. I ALSO HAD AN EXECUTIVE COMMITTEE FOR FIRST UNIVERSAL LENDING.
THE COURT: BUT THE EXECUTIVE COMMITTEE OF UNIVERSAL LENDING, DID THAT EXECUTIVE -- WAS THAT THE SAME MAKE-UP THAT CARRIED OVER TO FIRST UNIVERSAL HOLDINGS?
THE WITNESS: IN TERMS OF THE PEOPLE THAT WERE ON IT?
THE COURT: YES.
THE WITNESS: IT'S CHANGED THROUGHOUT TIME WITH FIRST UNIVERSAL LENDING HAD AN AMOUNT OF PEOPLE ON THAT COMMITTEE.
THE COURT: DID FIRST UNIVERSAL HOLDINGS -- LET ME REPHRASE MY QUESTION.
DID FIRST UNIVERSAL LENDING CEASE TO EXIST OR WAS

IT ACQUIRED BY FIRST UNIVERSAL HOLDINGS?

THE WITNESS: NO. FIRST UNIVERSAL SURRENDERED ITS LENDER'S LICENSE IN SEPTEMBER, SIR.

THE COURT: ALL RIGHT. GO AHEAD, COUNSEL.

MR. KIRTZ: THANK YOU.

BY MR. KIRTZ:

Q. NOW, THE EXECUTIVE COMMITTEE FOR FIRST UNIVERSAL LENDING HAD THE SAME FUNCTION AS THE EXECUTIVE COMMITTEE FOR FIRST UNIVERSAL HOLDING, IS THAT RIGHT?

A. THEY DID THE HIRING, FIRING AND TRAINING SALES, YES.

Q. SO WHAT THE EXECUTIVE COMMITTEE DID FOR BOTH FIRST UNIVERSAL LENDING AND FIRST UNIVERSAL HOLDINGS WAS THE SAME, CORRECT?

A. WELL, THE ISSUES ARE MUCH DIFFERENT, SIR. WITH FIRST UNIVERSAL LENDING IT WAS PROCESSING, UNDERWRITING, PORTFOLIO. MOST OF IT HAD TO DO WITH REFINANCING AND RESTRUCTURE MORTGAGES, COULD BE VERIFICATION OF INCOME ISSUES, VERIFICATION OF DEPOSIT ISSUES, SURVEY ISSUES, IT COULD BE PROPERTY ISSUES. MOSTLY ISSUES RELATING TO LENDER GUIDELINES ON SINGLE FAMILY MULTI-PROPERTIES. IT COULD BE AN INVESTMENT PROPERTY, A SECOND HOME. THOSE WERE THE MAJORITY OF THE ISSUES DISCUSSED WITH FIRST UNIVERSAL LENDING.

THE COURT: JUST EXPANDING ON COUNSEL'S QUESTION, WHO WAS RESPONSIBLE, FOR EXAMPLE, FOR SALARIES? WAS THAT

THE EXECUTIVE COMMITTEE? DETERMINING SALARIES.

THE WITNESS: THE SALARIES FOR THE -- ARE YOU TALKING ABOUT FIRST UNIVERSAL LENDING?

THE COURT: EMPLOYEES AT FIRST UNIVERSAL HOLDINGS.

THE WITNESS: WELL, THE EMPLOYEES OF FIRST UNIVERSAL HOLDINGS, THAT HAD NOTHING TO DO WITH THE -- I'M TALKING ABOUT THE BACK OFFICE GIRLS, OR ARE YOU TALKING SALES? SALESMEN WERE PAID ON COMMISSION.

THE COURT: WHAT DIFFERENCE DOES IT MAKE?

THE WITNESS: WELL, THE SALARIES THAT WASN'T THEIR DECISION, SIR.

THE COURT: PARDON?

THE WITNESS: THE SALARIES WERE NOT THE EXECUTIVE COMMITTEE'S DECISION.

THE COURT: WITH RESPECT TO ANYBODY AT FIRST UNIVERSAL HOLDINGS.

THE WITNESS: THAT WASN'T AN EXECUTIVE COMMITTEE DECISION.

THE COURT: WHO MADE THAT DECISION?

THE WITNESS: MIRANDA JOHNSTON MADE THE DECISION BECAUSE SHE MANAGED THE GIRLS IN THE BACK, THE BACK OFFICE ADMINISTRATION GIRLS.

THE COURT: WELL, FOR EXAMPLE, YOURSELF, DID YOU TAKE A SALARY OR DID YOU TAKE A DRAW?

THE WITNESS: I TOOK A SMALL SALARY, SIR.

THE COURT: WHO DETERMINED THAT SALARY?

THE WITNESS: IN THAT INSTANCE I PROBABLY DETERMINED THAT.

THE COURT: YOU DID.

THE WITNESS: CORRECT.

THE COURT: OKAY. GO AHEAD.

BY MR. KIRTZ:

Q. AND WHO DETERMINED DAVE ZAUSNER'S SALARY?

A. I DON'T BELIEVE DAVID ZAUSNER WAS ON A SALARY, SIR.

Q. WHAT KIND OF COMPENSATION DID HE HAVE?

A. HE WAS COMPENSATED AS I WAS COMPENSATED, MONTHLY.

Q. AND WHO DETERMINED THAT?

A. DAVID ZAUSNER AND MYSELF.

THE COURT: AND JUST THE RECORD IS CLEAR. YOU ASKED A QUESTION OF THE COURT WHEN YOU SAID -- YOU ASKED THE COURT IF THE COURT WERE TALKING ABOUT THE SALES PERSONNEL OR THE BACK OFFICE.

EVERYONE IN THE BACK OFFICE IS AN EMPLOYEE OF FIRST UNIVERSAL HOLDINGS, CORRECT?

THE WITNESS: YES, SIR.

THE COURT: GO AHEAD.

BY MR. KIRTZ:

Q. AND THAT INCLUDES EVERYONE WHO IS IN THE SALES OFFICE ON THE EDGE OF THE BACK ROOM, ISN'T THAT CORRECT?

A. NO, SIR.

Q. NO? WHOSE EMPLOYEES ARE THEY?
A. THEY ARE INDEPENDENT CONTRACTORS.
Q. WHO PAYS THEM?
A. FIRST UNIVERSAL HOLDINGS.
Q. AND THEY ARE PAID BASED ON COMMISSIONS?
A. YES, SIR.
Q. NOW, YOU WERE DESCRIBING WHAT FIRST UNIVERSAL LENDING DID, AND THAT SOUNDED TO BE THE TYPES OF THINGS THAT YOU WOULD DO IF YOU WERE LENDING MONEY.
A. YES, SIR.
Q. BUT IN JANUARY OF 2008, FIRST UNIVERSAL LENDING STARTED DOING A SUBSTANTIAL BUSINESS IN LOAN MODIFICATIONS, ISN'T THAT CORRECT?
A. NO.
Q. WHEN DID THEY BEGIN DOING LOAN MODIFICATIONS?
A. WELL, FIRST UNIVERSAL NEVER REALLY DID LOAN MODIFICATIONS. WE HELPED RESTRUCTURED LOANS FOR BANK UNITED AND GOT PAID TO DO IT. AS WELL AS WE WERE CONSTANTLY IN THE LENDING BUSINESS WITH 1003S AND TRYING TO GET STUFF DONE THROUGH FHA PROGRAMS, GOVERNMENT PROGRAMS UP UNTIL PROBABLY CLOSE TO AROUND THE TIME THAT WE SURRENDERED THE LICENSING IN SEPTEMBER OF 2009.
Q. SO YOU WERE NOT TELLING CONSUMERS STARTING IN JANUARY OF 2008 AND GOING THROUGH 2008 AND 2009 THAT YOU WOULD HELP THEM GET THEIR MORTGAGE LOANS MODIFIED.

A. WE WOULD HELP RESTRUCTURE A LOT OF THE EXISTING BUSINESS THAT WE HAD. WE WOULD HELP RESTRUCTURE A LOT OF THE PORTFOLIOS THAT WERE GIVEN TO US BY BANK UNITED, AND I BELIEVE ACQANELSA HAD GIVEN US PORTFOLIOS TO REWORK AND RESTRUCTURE, AND THAT WAS SOMEWHERE IN THE NEIGHBORHOOD OF 2008 PROBABLY.
Q. WELL, WHEN YOU SAY "RESTRUCTURE" YOU ARE TALKING ABOUT MODIFYING MORTGAGE LOANS?
A. WELL, IT COULD ACTUALLY JUST BE REWORKING THE LOAN. IT COULD ACTUALLY BE THE LENDER LENDING THEM UP IN TERMS OF THEY HAVEN'T PAID THEIR MORTGAGE, BUT THEN THE LENDER SAYS, "WE WILL FORGIVE MAYBE WHAT WAS OUTSTANDING AND LET YOU START FRESH."
I DON'T REALLY USE THE WORD MODIFICATION. IT WAS JUST REWORKING THE LOANS IS HOW IT WAS PRESENTED WHEN BANK UNITED CAME TO US.
Q. HAVE YOU EVER USED THE WORD MODIFICATION?
A. I JUST DID, BUT I DON'T TYPICALLY USE IT.
THE COURT: COUNSEL, YOU HAVE THE ORIGINALS, CORRECT?
MR. KIRTZ: I HAVE -- THAT IS THE THAT WILL BE THE ORIGINAL, YOUR HONOR.
THE COURT: LET YOU HOLD ON TO THE ORIGINAL.
MR. KIRTZ: OKAY.
MR. KIRTZ: I WILL PROVIDE ANOTHER COPY, YOUR

HONOR.

THE COURT: THANK YOU.

MR. KIRTZ: MAY I APPROACH?

THE COURT: ABSOLUTELY.

BY MR. KIRTZ:

Q. MR. ZAUSNER, I'M SHOWING YOU WHAT'S BEEN MARKED AS PLAINTIFF'S EXHIBIT NUMBER 40. CAN YOU IDENTIFY THAT DOCUMENT?

A. IT SAYS, "FROM EXECUTIVE COMMITTEE OF FIRST UNIVERSAL LENDING."

Q. AND WHAT IS THIS DOCUMENT? WHAT'S THE FIRST PAGE?

A. WELL, IT SAYS "NOTES." DO YOU WANT ME TO JUST EXPLAIN OR DO YOU WANT ME TO --

Q. EXPLAIN WHAT THE DOCUMENT IS.

A. IT'S NOTES FROM THE EXECUTIVE COMMITTEE OF FIRST UNIVERSAL LENDING.

Q. OKAY. AND THIS IS EXECUTIVE COMMITTEE THAT YOU HAVE BEEN DESCRIBING THIS AFTERNOON, ISN'T THAT RIGHT?

A. I'M SORRY?

Q. THIS REFERS TO THE EXECUTIVE COMMITTEE THAT YOU HAVE BEEN DESCRIBING THIS AFTERNOON, IS THAT CORRECT?

A. WELL, I DESCRIBED FIRST UNIVERSAL HOLDINGS AND FIRST UNIVERSAL LENDING, CORRECT. IT'S ONE OF THE EXECUTIVE COMMITTEES, CORRECT.

Q. THANK YOU.

THE COURT: I THINK WHAT COUNSEL IS ASKING YOU, MR. ZAUSNER, DO YOU AGREE THAT THESE ARE -- THESE DOCUMENTS ARE ACCURATE NOTES OF VARIOUS EXECUTIVE COMMITTEE MEETINGS OF FIRST UNIVERSAL LENDING?

THE WITNESS: YES, YOUR HONOR. THEY APPEAR TO BE NOTES FROM THE EXECUTIVE COMMITTEE.

THE COURT: GO AHEAD, COUNSEL.

BY MR. KIRTZ:

Q. NOW, THE FIRST PAGE IS FROM THE EXECUTIVE COMMITTEE MEETING OF APRIL THE 8TH, 2008, IS THAT CORRECT?

A. CORRECT.

Q. AND THIS LOOKS TO BE A SET OF NOTES THAT COME OUT OF THE LAW FIRM OF FEINGOLD & KAM, IS THAT CORRECT?

A. CORRECT.

Q. WHO KEEPS THE NOTES OF THE EXECUTIVE COMMITTEE AND HOW DO THEY GET TYPED UP?

A. SOMEONE IN THE OFFICE TYPES THEM, BUT THAT'S WHY I HAVE -- I BELIEVE THEY ARE HELD AT THE LAW FIRM OF FEINGOLD & KAM.

Q. DO YOU KNOW WHO KEEP THE NOTES --

A. NO.

Q. -- AS THE MEETING TAKES PLACE?

A. WHO KEEPS THEM?

Q. YES. WHO TAKES THE NOTES DURING THE MEETINGS?

A. I HAVE TAKEN NOTES, I'M SURE COUNSEL HAS TAKEN NOTES,

I'M SURE MY BROTHER HAS TAKEN NOTES, AND EVERYBODY ELSE THERE IS KEEPING NOTES AS WELL.
Q. AND WHOSE NOTES ARE THEN TURNED IN TO THE TYPED MEETING NOTES?
A. IT COULD BE ONE OF ANY OF THE PEOPLE THAT WERE ACTUALLY AT THE MEETING. I TRY TO COLLECT AS MUCH AS I CAN.
Q. WHO TRIES TO COLLECT?
A. I LOOKED AT NOTES, I HAVE HAD COUNSEL LOOK AT NOTES, I HAVE HAD MY BROTHER LOOK AT NOTES.
Q. WHO COLLECTS THE NOTES AND THEN TURNS THEM OVER TO THE SECRETARY TO BE TYPED?
A. IT'S BEEN DIFFERENT AT NUMEROUS TIMES, SIR.
Q. NOW, IN THE EXECUTIVE COMMITTEE MEETING THERE IS AN ATTENDANCE LIST AT THE BOTTOM, AND THIS LISTS DAVID FEINGOLD, SEAN ZAUSNER, DAVID ZAUSNER, DOUG CAMPION, NICK ANDREWS, ALEX CELIS, NOEL RIVERA, AND SETH DONAHOE. WHO IS DOUG CAMPION?
A. HE IS ON THE EXECUTIVE COMMITTEE.
Q. AND WHAT IS HIS POSITION AT FIRST UNIVERSAL LENDING?
A. HE WAS A MORTGAGE BROKER.
Q. DID HE TAKE SALES CALLS?
A. WELL, HE WAS A MORTGAGE BROKER. HE WORKED WITH LENDINGTREE AND I GUESS THAT WOULD BE CONSIDERED SALES, YES.
Q. SO IN APRIL OF 2008, MR. CAMPION WAS TAKING SALES CALLS FROM CONSUMERS, IS THAT RIGHT?

A. I KNOW THAT HE WAS WORKING WITH LENDINGTREE, CORRECT. I DON'T KNOW IF HE WAS TAKING A CALL. I KNOW THAT HE WAS ACTIVELY USING LENDINGTREE.COM.
Q. HOW ABOUT NICK ANDREWS, WHAT WAS HIS POSITION WITH THE --
A. MORTGAGE BROKER.
Q. WAS HE TAKING SALES CALLS?
A. WAS HE TAKING SALES CALLS?
Q. YES.
A. I COULDN'T TELL YOU IF HE WAS TAKING SALES CALLS, BUT I KNOW THAT THEY WERE ACTIVELY AGAIN WORKING WITH LENDINGTREE.COM AT THE TIME.
Q. HOW ABOUT ALEX CELIS, WHAT WAS HIS POSITION?
A. MORTGAGE BROKER.
Q. WAS HE TAKING SALES CALLS?
A. HE WAS WORKING WITH LENDINGTREE.COM.
Q. WAS HE TAKING SALES CALLS WITH THE CONSUMERS?
A. I WOULDN'T KNOW THAT. I WOULD JUST KNOW THAT WE WERE WORKING WITH LENDINGTREE.COM. SO IT'S NOT A MATTER OF THEM CALLING IN.
Q. WHAT ABOUT NOEL RIVERA, WHAT WAS HIS POSITION?
A. MORTGAGE BROKER.
Q. WAS HE TAKING SALES CALLS FROM CONSUMERS?
A. HE WAS AGAIN WORKING WITH LENDINGTREE.COM.
Q. WAS HE TAKING SALES CALLS FROM CONSUMERS?

A. HE WAS WORKING WITH LENDINGTREE.COM. IT'S AN INTERNET BASE.
Q. SETH DONAHOE, WHAT WAS HIS POSITION?
A. MORNING BROKER.
Q. AND WAS HE TAKING SALES CALLS WITH CONSUMERS?
A. HE WAS DOING THE SAME THING, LENDINGTREE.COM, SIR.
Q. WEREN'T DOUG CAMPION AND NICK ANDREWS, ALEX CELIS, NOEL RIVERA, AND SETH DONAHOE CLOSERS FOR FIRST UNIVERSAL LENDING?
A. THEY WERE MORTGAGE BROKERS, SIR.
Q. ONE OF THE ITEMS FROM THIS MEETING IS NUMBER THREE ENTITLED CLOSERS.
A. AH-HUH.
Q. AND THIS SAYS EACH CLOSER WAS ADVISED THAT THEY MUST KEEP TRACK OF THE STATUS AND PAYMENT DATES OF EACH OF THEIR CLIENTS, AND IF THEY HAVE AN INQUIRY IT SHOULD TAKE PLACE AT THE EXECUTIVE COMMITTEE MEETING, IS THAT CORRECT?
A. CORRECT.
Q. LET ME ASK YOU AGAIN. WERE THESE FIVE GENTLEMEN SOME OF THE CLOSERS AT FIRST UNIVERSAL LENDING?
A. IF YOU ARE REFERRING TO THE WORD "CLOSER," SIR, THAT'S THE WAY LENDINGTREE.COM DEEMED IT ON THEIR WEB SITE. THAT'S HOW THEY TERMED IT AS CLOSERS WHEN WE GOT THE LEAD, SIR.
Q. AND BY "CLIENTS" THESE WERE HOME OWNERS?
A. I DON'T KNOW WHAT WAS COMING THROUGH THE

LENDINGTREE.COM AND WHAT WAS ACTUALLY COMING THROUGH THERE.
Q. WELL, YOU WERE THE PRESIDENT, SIR, WEREN'T YOU?
A. RIGHT. BUT WE HAVE GOTTEN HUNDREDS OF THOUSANDS OF LEADS THROUGH THEM. SO I DON'T KNOW EXACTLY WHAT ISSUE EACH CLIENT HAD WITH LENDINGTREE.COM WHEN THEY LOGGED IN.
Q. AND THESE CLOSERS WERE TALKING WITH HOMEOWNERS AND CONSUMERS, CORRECT?
A. WHATEVER THE LEAD SOURCE COMING THROUGH LENDINGTREE.COM SIR, YES.
Q. WELL, THE LEAD SOURCE WOULD BE GIVING YOU THE NAMES OF CONSUMERS, ISN'T THAT CORRECT, HOME OWNERS?
A. PEOPLE WHO HAVE OPTED IN TO LENDINGTREE.COM, YES, IT WOULD.
Q. AND THESE WERE HOMEOWNERS?
A. NO, SIR. SOME OF THEM MIGHT BE LOOKING TO PURCHASE A HOME.
Q. BUT THESE WOULD ALL BE CONSUMERS EITHER LOOKING TO PURCHASE A HOME OR WHO WERE ALREADY HOMEOWNERS, CORRECT?
A. I DON'T KNOW. LENDINGTREE.COM ADVERTISES FOR MULTIPLE DIFFERENT THINGS, SIR.
Q. ISN'T IT TRUE THAT A SUBSTANTIAL PART OF THE BUSINESS OF FIRST UNIVERSAL LENDING IN 2008 AND 2009 WAS SELLING SERVICES FOR MORTGAGE LOAN MODIFICATIONS?
A. A LOT OF THE BUSINESS CAME FROM BANK UNITED AND ACQUA MORTGAGE DURING THAT TIME.

MR. KIRTZ: I'M SORRY, WOULD THE REPORTER REPEAT THAT ANSWER, PLEASE?

THE COURT: MR. REPORTER, READ BAG THE LAST ANSWER.

(RECORD READ AS REQUESTED)

BY MR. KIRTZ:

Q. AND THIS BUSINESS WAS FROM HOMEOWNERS WHO HAD MORTGAGES, CORRECT?

A. IT WAS BUSINESS THAT CAME FROM BANK UNITED WHO HAD, I GUESS, PREVIOUSLY HAD MORTGAGES WITH BANK UNITED, OR ACTUALLY HAD MORTGAGES CURRENTLY WITH BANK UNITED.

Q. NOW, HOW WAS DOUG CAMPION COMPENSATED?

A. COMMISSION.

Q. AND HOW WAS NICK ANDREWS COMPENSATED?

A. COMMISSION.

Q. AND HOW WAS ALEX CELIS COMPENSATED?

A. COMMISSION.

Q. AND HOW WAS NOEL RIVERA COMPENSATED?

A. COMMISSION.

Q. AND HOW WAS SETH DONAHOE COMPENSATED?

A. COMMISSION.

Q. AND THE COMMISSION WOULD BE WHAT AMOUNT OF MONEY COMING IN TO FIRST UNIVERSAL LENDING?

A. IT DEPENDS ON THE SIZE OF THE DEAL. IF THEY GOT PAID REAL SPREAD ON A DEAL MAYBE IT WOULD BE 40 OR 50 PERCENT

DEPENDING ON THE STRUCTURE. A LOT OF TIMES THE LENDER WOULD PAY REAL SPREAD PREMIUM. LIKE BANK UNITED WOULD PAY, I BELIEVE IT WAS ABOUT ONE POINT ON THE FACE VALUE OF THE LOAN. SO TO GIVE YOU AN EXAMPLE, IF WE WORKED ON A $300,000 LOAN THE FEE WOULD BE 3,000, SIR.

Q. LET'S TURN TO THE SECOND PAGE OF THE NOTES FROM APRIL 30TH, 2008. AND THE ATTENDANCE OF THE MEETING IS THE SAME PEOPLE, IS THAT CORRECT?

A. YES, SIR.

Q. AND THE FIRST ITEM ON THE -- OF THE DISCUSSIONS IS ON COMPLAINT HANDLING, CORRECT?

A. CORRECT.

Q. AND THIS SAYS, QUOTE, "A DISCUSSION WAS HELD REGARDING THE COMPLAINT HANDLING PROCESS AND REVIEWED THAT COMPLAINTS ARE INITIALLY HANDLED BY BACK OFFICE PERSONNEL, AND THEN IF THEY CANNOT BE RESOLVED THEY WERE FORWARD TO THE INDIVIDUAL SALESPERSON. IF THAT MATTER STILL CANNOT BE RESOLVED IT IS FORWARDED TO DAVE Z FOR ULTIMATE RESOLUTION."

SO YOU HAD COMPLAINTS COMING IN TO BACK OFFICE PERSONNEL, CORRECT?

A. AT THAT TIME BACK OFFICE PERSONNEL WAS PROCESSORS, UNDERWRITERS, I MIGHT HAVE HAD A CLIENT THAT WAS UPSET ABOUT THEIR INTEREST RATE, THAT MAYBE THAT THEY HAD GOTTEN A REQUEST FROM LENDINGTREE THAT SAID SIX PERCENT, WHEN INCOME DOCUMENTS MAYBE WERE DISCLOSED AND THEY WERE VERY UPSET SO

IT WOULD GO TO THE PROCESSOR OR UNDERWRITER TO BASICALLY EXPLAIN WHY MAYBE THAT INTEREST RATE HAD CHANGED.

Q. AND THE COMPLAINT WOULD BE COMING IN FROM A HOME OWNER, CORRECT?

A. NO, SIR. IT MIGHT HAVE BEEN COMING IN FROM SOMEONE THAT WAS LOOKING TO PURCHASE A HOME AT THE TIME. I DON'T KNOW WHAT COMPLAINT THAT WE ARE DISCUSSING, BUT IT COULD BE AGAIN --

Q. AND IT COULD ALSO BE SOMEONE WHO ALREADY HAD A MORTGAGE.

A. IT COULD BE.

Q. AND THEN THEY WERE FORWARDED TO THE INDIVIDUAL SALESPERSON, AND WHERE WERE THESE INDIVIDUAL SALESPEOPLE? WEREN'T THEY ON THE LOCATION OF FIRST UNIVERSAL LENDING?

A. YES.

Q. AND WHO WERE -- AT THIS TIME IN APRIL OF 2008 WHO WERE THE SALESPEOPLE AT FIRST UNIVERSAL LENDING?

A. HONESTLY I WOULD HAVE NO IDEA.

Q. WELL, WASN'T DOUG CAMPION ONE OF THE SALESPEOPLE?

A. AT LEAST THE FIVE PEOPLE THAT YOU MENTIONED ON THE BOTTOM DOUG CAMPION, NICK ANDREWS, ALEX CELIS.

Q. THAT SALESPEOPLE THIS IS REFERRING TO, CORRECT?

A. THEY WERE MORTGAGE BROKER, YES.

Q. AND THEY MEANS THEY WERE INDIVIDUAL SALESPEOPLE.

A. IT JUST MEANS THAT THEY WERE MORTGAGE BROKERS WORKING

WITH LENDINGTREE.
Q. WELL, WHO ELSE -- WHO ELSE WERE SALESPEOPLE AT FIRST UNIVERSAL LENDING?
A. IN APRIL OF 2008, I -- I COULD GET YOU THAT LOG. I COULDN'T REALLY RATTLE IT OFF HERE AT THIS TIME.
Q. AND THESE FIVE GENTLEMEN AT THE BOTTOM OF THE PAGE ARE INCLUDED IN THOSE SALESPEOPLE, CORRECT?
A. WELL, THEY WERE MORTGAGE BROKERS, SIR.
Q. AND THE MORTGAGE BROKERS WERE SELLING SERVICES OF FIRST UNIVERSAL LENDING, IS THAT RIGHT?
A. THEY WERE WORKING WITH LENDINGTREE.COM, SIR.
Q. WERE THEY MAKING SALES OF SERVICES TO CONSUMERS?
A. THEY WERE DEALING WITH LENDINGTREE.COM, AND WHATEVER THE ISSUES WITH LENDINGTREE.COM WERE THAT'S WHAT THEY WERE WORKING ON.
Q. WELL, DO YOU KNOW WHETHER THEY WERE MARKING SALES TO CONSUMERS AND HOMEOWNERS.
A. I KNOW THAT THEY WERE WORKING LENDINGTREE.COM AT THE TIME, SIR.
THE COURT: BUT YOU HAVE NO IDEA WHAT THEY WERE DOING SPECIFICALLY.
THE WITNESS: LENDINGTREE.COM IS AN INTERNET BASE SERVICE WERE SOMEONE OPTS IN WITH A POSSIBLE REQUEST AND THERE ARE CERTAIN THINGS THAT LENDINGTREE REQUIRES THE INTERNET BASE TO REPLY BACK TO THE CLIENT. THERE ARE

CERTAIN BUTTONS THAT NEED TO BE PRESSED, CERTAIN THINGS TO BE FILLED IN BASED ON THEIR COMPLIANCE, SIR.

THE COURT: BUT YOU DO NOT KNOW WHAT THESE INDIVIDUALS ON YOUR EXECUTIVE COMMITTEE WERE DOING WITH LENDINGTREE.COM.

THE WITNESS: OUTSIDE OF GOING THROUGH THE STANDARD REPLY THROUGH LENDINGTREE.COM, NO, SIR.

THE COURT: WHAT INDIVIDUAL WOULD HAVE THE MOST INFORMATION AS TO -- WELL, NEVER MIND.

GO AHEAD.

BY MR. KIRTZ:

Q. THAT'S AN INTERESTING QUESTION, YOUR HONOR.

WHO WOULD HAVE MORE INFORMATION ABOUT WHAT THESE INDIVIDUALS WERE DOING ON A DAY-TO-DAY BASIS?

A. THE PEOPLE THAT YOU MENTIONED?

Q. YES.

A. THEY WOULD.

Q. THEY WOULD THEMSELVES.

A. CORRECT.

Q. AND THEY WOULD REPORT TO YOU AT THE EXECUTIVE COMMITTEE MEETINGS, IS THAT RIGHT?

A. THEY WOULDN'T REPORT TO ME. THEY WOULD COME TO THE EXECUTIVE COMMITTEE AND IF THEY HAD ANY ISSUES THEY WOULD BE DISCUSSED.

Q. WELL, YOU WERE PRESIDENT OF THE COMPANY. WEREN'T THEY

REPORTING TO YOU?
A. NOT SO MUCH REPORTING TO ME AS DISCUSSING ANY ISSUES THAT THEY MIGHT HAVE, ANY ISSUES THAT LENDER GUIDELINES THAT MIGHT HAVE CHANGED, ANY ISSUES WITH LENDINGTREE THAT THEY MIGHT BE HAVING. THAT WAS A VERY BIG PART OF OUR BUSINESS.
THE COURT: IF NO ONE OTHER THAN THESE INDIVIDUALS KNEW WHAT THEY WERE DOING, OTHER THAN THESE INDIVIDUALS THEMSELVES, IF NO ONE ELSE REALLY KNEW WHAT THEY WERE DOING, HOW DID THEY DRAW A SALARY OR HOW WERE THEY PAID FOR THEIR EFFORTS?
THE WITNESS: AGAIN THEY WERE PAID ON COMMISSIONS BASED ON THE SIZE OF THE DEAL, AND I'M ABLE TO SEE THE SIZE OF THE DEAL THROUGH LENDINGTREE'S REPORTING SYSTEM.
THE COURT: YOU WERE ABLE TO SEE THE SIZE OF THE DEAL.
THE WITNESS: YES.
THE COURT: SO YOU KNEW WHAT THEY WERE DOING.
THE WITNESS: WELL, AGAIN, THROUGH THEIR -- THROUGH LENDINGTREE, YES, EVERYTHING IS -- THEY HAVE THEIR OWN PROPRIETARY SOFTWARE THAT ANYONE COULD LOG IN AND SEE ALL OF THE NOTES.
THE COURT: GO AHEAD, COUNSEL.
BY MR. KIRTZ:
Q. YOU WERE HEAD OF THE SALES DEPARTMENT AT FIRST UNIVERSAL LENDING?

A. NO, SIR.
Q. OR FIRST UNIVERSAL HOLDINGS?
A. NO, SIR.
Q. NO ONE HAS MADE THE CLAIM THAT YOU HAVE BEEN HEAD OF SALES -- HEAD OF THE SALES DEPARTMENT, IS THAT RIGHT?
A. I DON'T KNOW WHAT ANYBODY ELSE HAS CLAIMED, BUT I HAVE NEVER BEEN THE HEAD OF THE SALES DEPARTMENT.
Q. WHO IS HEAD OF THE SALES DEPARTMENT?
A. THAT'S THE EXECUTIVE COMMITTEE WHO I HAD JUST MENTIONED.
Q. WAS THERE ONE PERSON WHO WAS MORE IN CHARGE THAN ANOTHER?
A. NO, SIR.
Q. WELL, HOW DID YOU GET REPORTS TO MAKE SURE THAT THINGS WERE BEING UNDERTAKEN PROPERLY OF THE FIRM THAT YOU WERE PRESIDENT AND OWNER OF?
A. WELL, IF THERE WERE ANY COMPLAINT ISSUES THAT MIGHT HAVE COME IN IT WOULD BE DISCUSSED ON WHAT ISSUES I WOULD SIT WITH MIRANDA ON WEEKLY MEETINGS, AND SHE WOULD DISCUSS ANY ISSUES THAT WE MIGHT HAVE WITH EXISTING CLIENTS. AND IF IT WAS A SALES RELATED, SOMETHING THAT MIGHT HAVE HAPPENED IN THE SALES END THAT MAYBE SOMEBODY -- THERE WAS AN ISSUE ON THAT PART I WOULD LEARN ABOUT IT THAT WAY.
Q. SO MIRANDA WAS ALSO INVOLVED IN SALES? I THOUGHT WE HEARD THAT SHE WAS IN CHARGE OF THE BACK OFFICE PERSONNEL.

A. NO, SIR. ANY EXISTING CLIENT MIGHT HAVE COMPLAINED ABOUT A DISCREPANCY, THAT'S HOW SHE WOULD BE NOTIFIED.
Q. AND AT SOME POINT YOU WOULD HAVE TO TALK TO A SALESPERSON ABOUT THAT, WOULDN'T YOU?
A. NO. I WOULD HAVE MIRANDA CALL THE CLIENT DIRECTLY.
Q. AND WOULD MIRANDA BE IN TOUCH WITH THE SALESPEOPLE THAT WERE SITTING JUST ACROSS THE DOORWAY?
A. NO, SIR.
Q. WHO WOULD BE SUPERVISING THE PEOPLE THAT ARE IN ROOMS J AND H?
A. THE EXECUTIVE COMMITTEE, SIR.
Q. AND SALES --
THE COURT: MR. ZAUSNER, LET ME ASK YOU, AND I AM JUST CURIOUS. FIRST OF ALL, WHO WAS RESPONSIBLE -- THE STRUCTURE THAT YOU HAVE BEEN TELLING US ABOUT WITH RESPECT TO FIRST UNIVERSAL HOLDINGS, WHO WAS RESPONSIBLE FOR PUTTING THAT TOGETHER?
THE WITNESS: STRUCTURED ON --
THE COURT: WELL, NO. YOU HAVE THE EXECUTIVE COMMITTEE THAT IS DOING THIS, DOING THAT, AND SO FORTH. WHO LAID IT OUT THAT WAY? WHOSE IDEA? WHERE DID THE GENESIS COME FROM?
THE WITNESS: FROM MY BROTHER AND MYSELF PUT TOGETHER IDEAS, AND THEN OBVIOUSLY WE -- WE WENT TO COUNSEL TO MAKE SURE EVERYTHING WAS COMPLIANT.

THE COURT: AND WAS THERE ANY PARTICULAR REASON WHY THERE WERE NOT BRIGHT LINES OF AUTHORIZATION AND AUTHORITY, AND SO FORTH, AS OPPOSED TO THIS VAGUE, THIS OPAQUE STRUCTURE OF GOVERNMENTS, AND SO FORTH? WAS THAT AN INTENTIONAL DECISION?

THE WITNESS: IN REGARDS TO HOLDING, SIR, SALES IN MY MIND REALLY ISN'T A BIG PART OF THAT BUSINESS JUST BECAUSE I BELIEVE --

THE COURT: NO. THAT WAS NOT MY QUESTION.

THE WITNESS: I'M SORRY.

THE COURT: MY QUESTION WAS, THE OVERALL RUNNING OF HOLDINGS. YOU HAVE DESCRIBED FOR US THIS VERY -- THIS VERY RELAXED, THIS VERY VAGUE, NO ONE REALLY IS QUITE SURE, WELL, THEY WOULD AGREE IF THERE WAS A PROBLEM MAYBE THEY WOULD CALL ME. WELL, NO. NO. SHE WAS ALSO PART OF IT, AS OPPOSED TO BRIGHT LINE PATHS OF AUTHORITY AND AVENUES OF STRUCTURE, WAS THAT AN INTENTIONAL DECISION TO HAVE THIS SET UP RUN IN THAT FASHION?

THE WITNESS: NO, SIR.

THE COURT: IT JUST, WHAT, IT JUST HAPPENED THAT WAY?

THE WITNESS: WELL, I HAD AN EXECUTIVE COMMITTEE. SOME OF THEM HAVE BEEN THERE A WHILE, SOME OF THEM HAVE MOVED FROM DIFFERENT INDUSTRIES THAT I FELT COMFORTABLE WITH, WITH THAT POSITION TO HANDLE THAT.

THE COURT: GO AHEAD, COUNSEL.
MR. KIRTZ: THANK YOU.
BY MR. KIRTZ:
Q. LET'S TAKE AN EXECUTIVE COMMITTEE MEETING FOR FIRST UNIVERSAL LENDING. WHAT TIME WOULD THE MEETING BE HELD?
A. MAYBE IN THE AFTERNOON.
Q. WHAT DAY OF THE WEEK?
A. TYPICALLY TUESDAY.
Q. THE EXECUTIVE COMMITTEE ON TUESDAY, IS THAT RIGHT?
A. SOMETIMES TUESDAY, SOMETIMES WEDNESDAY.
Q. AND WHOSE OFFICE WOULD THE EXECUTIVE COMMITTEE MEET IN?
A. TYPICALLY THE EAST CONFERENCE ROOM.
Q. AND WHERE IS THE CONFERENCE ROOM?
A. THE CONFERENCE ROOM WOULD BE LOCATED ON THE OTHER SIDE OF THE BREEZEWAY.
Q. IN THE LAW OFFICE OF FEINGOLD & KAM?
A. TYPICALLY IN ALL ISSUES I USUALLY WANTED COUNSEL AT THE MEETING JUST IN CASE ANY LEGAL ISSUES CAME UP.
Q. AND IT'S IN THE LAW OFFICE OF FEINGOLD & KAM, IS THAT WHERE THE CONFERENCE ROOM IS?
A. CORRECT.
Q. AND WHO DECIDED WHEN THE MEETINGS WOULD BE HELD?
A. BASICALLY ON THE AVAILABILITY OF THE PEOPLE WITHIN THE EXECUTIVE COMMITTEE, BUT WE TYPICALLY LIKE TO HAVE IT TUESDAYS AND/OR WEDNESDAYS.

Q. IF IT WAS ON A TUESDAY WHAT TIME ON A TUESDAY WOULD IT BE?
A. DEPENDING IF MY DAUGHTER HAD SOCCER PRACTICE IT WOULD MAYBE BE AT TWO IT MAY BE AT FOUR. IT DEPENDS ON PEOPLES' SCHEDULES.
Q. SO EVERYBODY GATHERED IN THE CONFERENCE ROOM FOR THE EXECUTIVE COMMITTEE MEETING. WHO CALLED THE MEETING TO ORDER?
A. IT WASN'T FORMALIZED WITH A GAVEL OR ANYTHING LIKE THAT, BUT WHEN WE ALL GOT THERE I GUESS THE MEETING BEGAN.
Q. AND WHO TYPICALLY BEGAN THE MEETING?
A. WHOEVER HAD AN ISSUE OF THE DAY. HONESTLY IT COULD HAVE BEEN ANY ONE OF THE PEOPLE THAT WERE SITTING AT THE TABLE. THERE WASN'T A STRUCTURE OF, "I'M GOING TO START THE MEETING," OR, "DAVID ZAUSNER IS GOING TO START THE MEETING."
SOMETIMES A GENTLEMAN CAME IN WITH ISSUES AND THEY WANTED TO SPEAK AND GO OVER WHATEVER ISSUES THAT THEY MIGHT HAVE.
Q. WELL, AS PRESIDENT OF THE COMPANY DID YOU CALL REGULAR MEETINGS OF ANYONE AT FIRST UNIVERSAL LENDING?
A. YEAH, I WOULD HAVE A MEETING EVERY FRIDAY WITH MIRANDA. I WOULD HAVE A MEETING WITH OUTSIDE COUNSEL. I WOULD HAVE MEETING WITH ACCOUNTING. ON TUESDAY I WOULD HAVE AN EXECUTIVE MEETING.
THE COURT: WHY WOULD YOU MEET WITH MIRANDA?

THE WITNESS: BECAUSE SHE WAS -- SHE KIND OF MANAGED THE BACK OFFICE ADMINISTRATIVE STAFF, AND SHE BASICALLY -- ANY OF THE PROBLEMS THAT ANY OF THE GIRLS MIGHT BE HAVING SHE WOULD ADDRESS WITH ME AT THAT MEETING.

THE COURT: WELL, WHY WOULDN'T THAT COME UP AT THE EXECUTIVE COMMITTEE MEETING?

THE WITNESS: SHE IS NOT ON THE EXECUTIVE COMMITTEE, SIR.

THE COURT: SO WHAT? SHE COULD TELL IT TO ANY ONE OF THE MEMBERS, RIGHT? BRING THOSE PROBLEMS TO THE ATTENTION OF ANY ONE OF THE MEMBERS.

THE WITNESS: SHE COULD.

THE COURT: WELL, WHY WASN'T IT SET UP THAT WAY?

THE WITNESS: I DON'T HAVE AN ANSWER FOR THAT, SIR.

THE COURT: WELL, THE BACK ROOM WAS AN IMPORTANT ASPECT OF THE OPERATION, WASN'T IT?

THE WITNESS: FOR FIRST UNIVERSAL HOLDINGS IT IS SIR. FOR FIRST UNIVERSAL LENDING IT WAS MOSTLY PROCESSING UNDERWRITING, MORTGAGE BROKERS. SO IT JUST -- IT'S GETTING CLARITY WITH --

THE COURT: BUT IT WAS STILL AN IMPORTANT ASPECT OF THE OVERALL OPERATION, WASN'T IT?

THE WITNESS: IF MIRANDA HIRED SOMEBODY OR FIRED SOMEBODY, PERSONALLY MAYBE I WAS WRONG, I DIDN'T THINK IT

WAS A CRITICAL ISSUE THAT NEEDED TO BE DISCUSSED AT THE EXECUTE COMMITTEE SO I WOULD JUST MEET WITH HER FRIDAY ON THOSE PERSONNEL ISSUES SO OTHER ISSUES COULD BE DISCUSSED AT THE EXECUTIVE COMMITTEE.

THE COURT: ALL RIGHT.

GO AHEAD, COUNSEL.

BY MR. KIRTZ:

Q. SO YOU MET WITH MIRANDA ON A REGULAR BASIS EVERY WEEK REGARDING THE ROOM Q, IS THAT RIGHT, ROOM Q?

THE COURT: IS THAT WHAT YOU ARE REFERRING TO AS THE BACK ROOM OPERATION UNDER LENDING?

THE WITNESS: UNDER -- WELL, IT'S CHANGED MANY TIMES UNDER LENDING, SIR. THIS WOULD BE A DIFFERENT STRUCTURE. BUT THIS DIAGRAM WOULDN'T FIT. IT WAS SET UP DIFFERENTLY.

THE COURT: WELL, WAS IT SIMILAR?

THE WITNESS: SIMILAR -- WHAT I'M ATTESTING TO FOR THE BACK OFFICE FOR HOLDINGS, TO CLARIFY FOR THE COURT --

THE COURT: IS Q UNDER HOLDINGS.

THE WITNESS: Q, AS WELL AS A, B, C, D, E, F, G AND K.

THE COURT: ALL RIGHT. WHAT WAS IT UNDER LENDING?

THE WITNESS: THE WALLS AND STUFF HAD BEEN KNOCKED DOWN SO THE DIAGRAM WOULD BE TOTALLY DIFFERENT.

THE COURT: BUT IT WAS IN THE BACK AREA.

THE WITNESS: CORRECT, SIR.

THE COURT: ALL RIGHT.

BY MR. KIRTZ:

Q. WELL, IF YOU HAD A REGULAR WEEKLY MEETINGS WITH MIRANDA ABOUT THE BACK OFFICE PERSONNEL, WHEN WAS YOUR REGULAR MEETING WITH THE SALES PERSONNEL?

A. WELL, WE WOULD DISCUSS -- I WOULD HAVE AN EXECUTIVE MEETING, AND IF THERE WAS A SALES ISSUE IT MIGHT HAVE BEEN BROUGHT UP DURING THE EXECUTIVE COMMITTEE.

Q. SO THE SALES ISSUES WERE BROUGHT UP IN THE EXECUTIVE COMMITTEE, IS THAT RIGHT?

A. IT MIGHT HAVE BEEN.

Q. WERE THERE ANY OTHER PLACES WHERE SALES ISSUES WOULD COME UP?

A. WELL, THEY WOULD REPORT TO THE EXECUTIVE COMMITTEE, SIR. SO I'M SURE DAILY IF THERE WERE ANY SALES ISSUES IT WOULD BE REPORTED TO ANY OF THE FIVE PEOPLE I SPOKE ABOUT IN THE EXECUTIVE COMMITTEE. THAT'S WHO HANDLED SALES.

Q. SO THESE FIVE PEOPLE THAT YOU TALKED ABOUT, OTHER THAN YOURSELF AND YOUR BROTHER AND MR. FEINGOLD, WERE IN CHARGE OF THE SALES DEPARTMENT, IS THAT WHAT YOU'RE TELLING US?

A. YES, SIR.

Q. AND YOU WERE THE OVERALL SUPERVISOR FOR THESE FIVE, IS THAT CORRECT?

A. I AM THE PRESIDENT OF THE COMPANY. I DON'T KNOW IF THAT --
Q. SO THAT WOULD MAKE YOU THE SUPERVISOR FOR THESE FIVE PEOPLE WHO SUPERVISE THE SALES DEPARTMENT, IS THAT CORRECT?
A. WELL, I LOOK AT IT, AND BY NO MEANS AM I COMPARING MYSELF TO BANK OF AMERICA, BUT I KNOW THE OWNER OF THE BANK AMERICA DOESN'T KNOW WHAT SALES ARE GOING ON WITH THE TELLER AT THE DESK, BUT HE DOES HAVE PEOPLE THAT ARE IN A POSITION THAT THEY REPORT TO AND EVENTUALLY IT DOES GET DOWN TO HIM.
Q. WELL, SINCE YOU ARE NOT BANK OF AMERICA, AND SINCE YOU ARE 30 FEET FROM YOUR SALESPEOPLE, 50 FEET FROM YOUR SALESPEOPLE, YOU DON'T KNOW WHAT'S HAPPENING WITH THEM?
A. I WASN'T SITTING IN THAT LOCATION, SIR, IN APRIL OF 2008.
Q. WHAT LOCATION WERE YOU SITTING IN?
A. LET ME SEE WHERE I WAS IN APRIL, SIR. I WAS ACTUALLY WITHIN THE Q SECTION.
Q. SO YOU WERE SITTING EVEN CLOSER TO THE SALESPEOPLE IN APRIL OF 2008, ISN'T THAT RIGHT?
A. IT DEPENDS WHERE IN THAT SECTION, BUT I'M SURE IT'S RELATIVELY THE SAME.
Q. WELL, AS OF NOVEMBER 18TH, YOU WERE IN OFFICE N ON THE CHART OF PLAINTIFF'S EXHIBIT 38, CORRECT?
A. YES, SIR.
Q. SO BEFORE THAT YOU WERE SITTING IN THE Q AREA, WHICH

WAS EVEN CLOSER TO THE SALESPEOPLE, IS THAT RIGHT?
A. WELL, NOT PARTICULARLY. I WAS IN A DIFFERENT SECTION OF Q. BUT AGAIN FOR THE COURT'S -- I DON'T WANTED TO WASTE ANYBODY'S TIME, IT'S RELATIVELY CLOSE.
THE COURT: BECAUSE IT'S DIFFERENT THAN IT APPEARS ON PLAINTIFF'S 38. IT WAS DIFFERENT BACK THEN.
THE WITNESS: YES, SIR.
THE COURT: WALLS WERE IN DIFFERENT PLACES, AND SO FORTH.
THE WITNESS: YES, SIR.
THE COURT: OKAY.
BY MR. KIRTZ:
Q. AND WHERE WERE THE SALESPEOPLE SITTING IN APRIL 2008 WHILE YOU WERE IN SOME PART OF Q?
A. I WANT TO SAY MAYBE CLOSE TO WHERE K IS AT THIS POINT. I REALLY COULDN'T TELL YOU THE EXACT LOCATION.
Q. BUT THAT'S APPROXIMATELY, IS THAT RIGHT? IS THAT RIGHT?
A. YES, SIR.
Q. LET'S MOVE ON FOR A MINUTE TO THE THIRD PAGE OF PX 40, AND THAT IS FROM JUNE 12TH, 2008.
IS THAT ANOTHER SET OF NOTES FROM AN EXECUTIVE MEETING COMMITTEE MEETING OF FIRST UNIVERSAL LENDING?
A. YES, SIR.
Q. AND ARE THE SAME PEOPLE IN ATTENDANCE AT THIS MEETING?

A. YES, SIR.
Q. AND ONE OF THE TOPICS OF DISCUSSION WAS A BETTER BUSINESS BUREAU COMPLAINT, IS THAT RIGHT?
A. YES, SIR.
Q. SO WERE THESE COMPLAINTS OFTEN DISCUSSED AT THE EXECUTIVE COMMITTEE MEETINGS?
A. NOT PARTICULARLY.
Q. NOT PARTICULARLY?
A. NO.
Q. WHERE WOULD THEY BE DISCUSSED?
A. IF A BETTER BUSINESS COMPLAINT CAME IN TO THE PERSON THAT IT WAS ADDRESSED TO. I DON'T KNOW WHAT COMPLAINT THAT WOULD BE TALKING ABOUT. IS IT A COMPLAINT ON WHO -- A COMPLAINT ON WHAT COMPANY?
Q. WELL, AS PRESIDENT OF THE COMPANY WOULD THESE LETTERS BE ADDRESSED TO YOU SOMETIMES?
A. IN THE BETTER BUSINESS BUREAU IT ACTUALLY WASN'T ADDRESSED TO ME BUT I WOULD SEE THE LETTERS, YES, SIR.
Q. AND WHO WOULD SHOW YOU THE LETTERS?
A. THE PERSON WHOEVER DROPPED THE MAIL OFF BY MY DESK WOULD BRING THE LETTER IN, SIR.
Q. AND WHO TYPICALLY WAS THAT?
A. WHOEVER WOULD BE SITTING OUT FRONT.
Q. SO WHEN THE COMPLAINTS CAME IN THEY WOULD BE DROPPED OFF AT YOUR DISK, IS THAT CORRECT?

A. AT TIMES, YES, SIR, OR THEY WOULD -- OR THEY WOULD POSSIBLY BE DROPPED BY MIRANDA'S DESK.

Q. AND IF MIRANDA GOT IT WOULD SHE BRING THAT TO YOUR ATTENTION?

A. AT TIMES, SIR. YES, SIR.

Q. WOULD SHE BRING IT TO ANYBODY ELSE'S ATTENTION AT TIMES?

A. IF IT WAS A LEGAL ISSUE WITH THE BETTER BUSINESS BUREAU, I'M SURE SHE BROUGHT IT TO COUNSEL.

Q. SHE BROUGHT IT TO COUNSEL.

A. SHE WOULD GIVE IT TO MYSELF OR LEAVE IT OUTSIDE IN COUNSEL'S BOX. NO ONE WOULD EVER WENT INTO COUNSEL'S SO SHE WOULD USUALLY GIVE IT TO ME OR I WOULD JUST DROP IT IN THE BOX.

Q. NOW, ALSO AT THE EXECUTIVE COMMITTEE MEETING, THE SECOND TOPIC AT THIS PARTICULAR MEETING OF JUNE 12TH IS ORGANIZATION.

THE THIRD IS LENGTH OF CLIENT SERVICE.

THE FOURTH IS DECLINES AND CHARGE-OFFS.

AND THE FIFTH IS NEW RECRUITING SCHEDULE.

NOW, DID SOME OF THESE THINGS -- DID ALL OF THESE THINGS HAVE TO DO WITH SALES?

A. I DON'T REMEMBER JUNE 12TH, SIR. I'M JUST GOING OFF WHAT YOU'RE WRITING HERE.

Q. IT LOOKS LIKE THE EXECUTIVE COMMITTEE DISCUSSES ALL

SORTS OF THINGS WITHIN THE COMPANY, ISN'T THAT RIGHT?
A. YES.
Q. AND, SO BETWEEN YOU AND COUNSEL, AND YOUR BROTHER, AND THESE FIVE SALESPEOPLE THEY WANT TO MAKE SURE THAT EVERYTHING COMES THROUGH THEM THAT'S HAPPENING IN THE COMPANY, IS THAT CORRECT?
A. NOT SALES, SIR. THEY DISCUSS SALES AMONGST THEMSELVES. IF THERE WAS AN ISSUE THEY HANDLE IT THEMSELVES. IF THERE WAS SOMEONE THAT GOT FIRED FOR A CERTAIN REASON THEY MIGHT BRING THAT UP JUST BECAUSE WE WANTED TO MAKE SURE IT WAS COMPLIANT AND WE DON'T HAVE ANY ISSUES WITH FIRING SOMEONE OR POSSIBLY HIRING SOMEONE.
Q. WELL, IF YOU GO BACK TO THE APRIL 8TH MEETING ON THE FIRST PAGE THERE IS A DISCUSSION ABOUT CLOSERS. THAT IS CERTAINLY RELATED TO SALES, ISN'T IT?
A. AGAIN, THAT'S HOW IT'S LABELED ON LENDINGTREE.COM WHEN YOU LOG ON TO THAT SOFTWARE IT'S AUTOMATICALLY LABELED AS CLOSERS. THAT'S THEIR DEFINITION.
Q. I'M TALKING ABOUT KEEPING TRACK OF STATUS AND PAYMENT OF EACH OF THE CLIENTS, IS THAT RIGHT? YOU'RE TALKING ABOUT SALES, ISN'T THAT RIGHT?
A. IT'S KEEPING TRACK OF THE STATUS AND PAYMENT DATES, AND YOU NEED TO DO THAT IN ORDER TO BE IN COMPLIANT WITH THEIR SYSTEM. THEY HAVE CERTAIN GUIDELINES.
Q. WHAT GUIDELINES DO YOU HAVE AT FIRST UNIVERSAL LENDING

RELATED TO SALES AND THE DISCUSSION OF SALES AND WHO IS SUPERVISING SALES.
A. THE EXECUTIVE COMMITTEE, SIR.
Q. AND THAT INCLUDES YOU AND YOUR BROTHER AND MR. FEINGOLD, IS THAT CORRECT?
A. NO, SIR. THAT JUST SAYS WE WERE ATTENDANCE IN THOSE MEETINGS, THE EXECUTIVE COMMITTEE, WERE THESE FIVE PEOPLE THAT I HAVE MENTIONED.
Q. BUT YOU ALWAYS ATTENDED THE EXECUTIVE COMMITTEE MEETINGS, IS THAT CORRECT?
A. IF I MISSED A MEETING DUE TO ONE OF MY KIDS, I MIGHT HAVE MISSED ONE.
Q. BY GENERALLY YOU WERE THERE.
A. YES, SIR.
Q. AND GENERALLY YOUR BROTHER WAS THERE.
A. YES, SIR.
Q. AND GENERALLY MR. FEINGOLD WAS THERE.
A. YES, SIR.
Q. LET'S TURN TO JANUARY 14TH, 2009.
NOW, THESE ARE EXECUTIVE COMMITTEE NOTES FROM CERTAIN OF THE EXECUTIVE COMMITTEE MEETINGS. BUT APPARENTLY THE EXECUTIVE COMMITTEE MET EVERY WEEK, OR ALMOST EVERY WEEK, IS THAT RIGHT?
A. YES, SIR.
Q. AND WHERE WOULD THESE EXECUTIVE COMMITTEE MEETING NOTES

BE KEPT? AFTER THE MEETINGS THEY WERE GATHERED AND TYPED UP, WHERE WOULD THEY BE KEPT?
A. I BELIEVE I TURNED THEM INTO COUNSEL'S SECRETARY TO HOLD.
Q. ARE THOSE THE NOTES YOU'RE TALKING ABOUT OR IS THAT AFTER THE NOTES WERE GATHERED AND TYPED UP AND YOU HAD A TYPE SET OF NOTES, YOU THEN GIVE THEM TO COUNSEL'S SECRETARY?
A. NO. I BELIEVE OUTSIDE COUNSEL'S SECRETARY WOULD TYPE THEM UP FOR ME.
Q. SHE WOULD TYPE THEM UP. AND WHO WOULD KEEP THEM? WHOSE FILES WOULD THEY BE IN?
A. I BELIEVE I LEFT ALL OF THOSE COMPLIANCE -- I BELIEVE LEFT THEM WITH COUNSEL. I'M NOT CERTAIN, SIR.
Q. WELL, YOU SAY "COMPLIANCE." WHAT ARE YOU TALKING ABOUT?
A. I JUST MEAN THE EXECUTIVE COMMITTEE, SIR.
Q. AND THE EXECUTIVE COMMITTEE LOOKS LIKE IT'S LOOKING AT A LOT OF DIFFERENT THINGS, NOT JUST COMPLIANCE, AREN'T THEY?
A. IT'S DEALING WITH ANY ISSUES THAT MIGHT COME UP, SIR.
Q. ANY ISSUE IN THE COMPANY, IS THAT RIGHT?
A. OUTSIDE OF SALES.
Q. OUTSIDE OF SALES.
A. THE SALES ISSUES THEY KIND OF DISCUSSED AMONGST THEMSELVES. IF THEY HAD AN ISSUE IT WAS --

Q. WELL, HOW DO YOU KNOW THEY TALKED ABOUT IT AMONG THEMSELVES IF YOU WEREN'T THERE?
A. BECAUSE I TRUSTED THEM TO DO THAT, SIR.
Q. SO YOU GAVE THEM THE AUTHORITY TO RUN THE SALES DEPARTMENT, ISN'T THAT RIGHT?
A. NO, SIR.
Q. YOU GAVE THEM THE AUTHORITY TO RUN THE SALES DEPARTMENT, ISN'T THAT RIGHT?
A. NO, SIR.
Q. WHO GAVE THEM THE AUTHORITY TO RUN THE SALES DEPARTMENT?
A. NO ONE GAVE THEM AUTHORITY. THEY DID THE HIRING, THE FIRING, THE TRAINING.
Q. WHO GAVE THEM THE AUTHORITY TO DO THAT?
A. WELL, IF WE ELECTED AS A COMPANY THE -- AT THE TIME WHEN I WAS ACTUALLY -- WHEN WE DID THE EXECUTIVE COMMITTEE IT WAS MAYBE AGAIN SIX YEARS AGO, AND AS A COMPANY WE KIND OF VOTED FOR THAT. IT WAS HUNDREDS OF PEOPLE AT THE TIME AND WE ORIGINALLY VOTED FOR THESE FIVE PEOPLE AS THE COMPANY TO DO IT.
I DON'T -- I'M SORRY ABOUT THAT. I DON'T KNOW IF THESE WERE THE ORIGINAL FIVE, BUT THERE WERE FIVE ORIGINALLY THAT WERE PICKED AND IT'S CHANGED OVER TIME, SIR.
Q. BUT YOU HAVE ALWAYS BEEN IN ATTENDANCE AT THESE MEETINGS, WHETHER THESE FIVE INDIVIDUALS HAVE CHANGED OR

NOT, ISN'T THAT CORRECT?
A. I HAVE BEEN IN A LOT OF THE MEETINGS, SIR. YES.
Q. SO WHO GAVE THEM THE AUTHORITY TO RUN THE SALES DEPARTMENT?
A. THE EMPLOYEES THAT WERE AT FIRST UNIVERSAL LENDING VOTED ON IT. I DIDN'T HAVE ANY VOTING WITHIN THE EXECUTIVE COMMITTEE, SIR.
Q. WHO AUTHORIZED THE VOTE?
A. THE EMPLOYEES AT FIRST UNIVERSAL AT THE TIME, SIR.
Q. SO YOU ARE SAYING THAT FIRST UNIVERSAL WAS RUN BY ITS EMPLOYEES AND NOT BY YOU AS PRESIDENT, IS THAT RIGHT?
A. NO. I'M JUST SAYING THAT WE VOTED -- THEY VOTED FOR THE EXECUTIVE COMMITTEE AMONGST THEMSELVES, SIR.
Q. WELL, YOU STARTED TO SAY, "WE VOTED." WHAT DOES THAT MEAN?
A. JUST THE COMPANY IN GENERAL, SIR. I DON'T HAVE VOTING POWER WITHIN THE EXECUTIVE COMMITTEE. BUT --
Q. WHO SET UP THE EXECUTIVE COMMITTEE?
A. IT WAS IDEAS THAT WERE PRESENTED FROM EVERYONE WITHIN THE COMPANY. I ALWAYS LIKE TO TAKE IDEAS, THE ORIGINAL IDEAS THAT WERE PRESENTED AND THEN --
Q. WHO SET UP THE EXECUTIVE COMMITTEE?
A. I'M TRYING TO FINISH.
AFTER THINKING ABOUT THE IDEA IT MADE SENSE AND THEN I PRESENTED IT TO OUTSIDE COUNSEL JUST TO SAY IF THERE

IS ANY LEGAL STRUCTURES THAT WOULD NEED TO BE SET UP.
Q. AND WHAT DID OUTSIDE COUNSEL SAY?
A. WELL, I KNOW WE HAVE AN EXECUTIVE COMMITTEE NOW. TO THIS DAY I'M NOT EXACTLY SURE WHAT WAS SAID. IT'S BEEN SIX YEARS, SIR.
Q. DID THE EXECUTIVE COMMITTEE VOTE YOU OUT AS PRESIDENT OF THE COMPANY?
A. COULD THEY VOTE ME OUT AS PRESIDENT OF THE COMPANY? I WOULD DOUBT THAT. I WOULD HAVE TO LOOK AT ANY DOCUMENTS THAT ARE OUT THERE. I WOULD DOUBT THAT.
Q. DO YOU THINK THERE IS ANY DOCUMENT THAT GIVES THE EXECUTIVE COMMITTEE TO VOTE YOU OUT AS PRESIDENT?
A. I WOULD HAVE TO LOOK. I TRULY DON'T KNOW.
Q. AS PRESIDENT YOU DON'T KNOW IF SUCH A DOCUMENT EXISTS.
A. SITTING HERE IN FRONT OF THE JUDGE AND THE COURT I DON'T WANT TO SAY THE WRONG THING. I TRULY DON'T KNOW THE ANSWER TO THAT, NO.
Q. AS PRESIDENT YOU DON'T KNOW THE ANSWER, IS THAT WHAT YOU'RE TELLING US?
A. I DON'T KNOW. I DON'T WANT TO GIVE THE WRONG ANSWER. I DON'T KNOW. IF YOU HAVE THE DOCUMENT WE CAN GO THROUGH IT.
Q. WHERE WOULD THAT DOCUMENT BE?
A. IF I HAVE IT I WOULD PROBABLY HAVE IT AT MY OFFICE.
Q. IF YOU HAVE IT. DO YOU KNOW WHETHER YOU HAVE IT?

A. IF IT'S A DOCUMENT IT WOULD PROBABLY SOMEWHERE MAYBE WITHIN LEGAL, OR MYSELF, OR MY LEGAL FILES. BUT I WASN'T ALLOWED TO GO THROUGH THEM FOR THE TRIAL.
Q. HAS THE EXECUTIVE COMMITTEE EVER TRIED TO VOTE YOU OUT AS PRESIDENT?
A. TO MY KNOWLEDGE, NO.
Q. HAVE THEY EVER EVEN CONSIDERED THAT?
A. TO MY KNOWLEDGE, NO.
THE COURT: IS THERE WHAT IS COMMONLY REFERRED TO AS A CORPORATE BOOK, OR A CORPORATION BOOK ON BEHALF OF FIRST UNIVERSAL LENDING?
THE WITNESS: I BELIEVE I HAVE A CORPORATE BOOK. I BELIEVE THAT THEY HAVE THE CORPORATE BOOK. WHEN I SAY "THEY" I MEAN THE FTC. I'M SORRY.
THE COURT: GO AHEAD, COUNSEL.
BY MR. KIRTZ:
Q. ARE THERE CORPORATE MINUTES?
A. WITHIN THE BOOK THERE MIGHT BE, SIR. I KNOW THAT YOU HAVE THE BOOK BECAUSE IT WAS LOCKED IN THE OFFICE THAT WAS LOCKED UP. I HAD ASKED MISS BERG ABOUT THAT. SHE JUST SAID NOT TO TOUCH ANYTHING. SO I KNOW THAT THERE SHOULD BE A BOOK, BUT I'M NOT SURE. I KNOW IT'S WITHIN THE CORPORATE BOOK.
Q. SO ARE THERE ALSO MEETINGS OF THE CORPORATION, SOMETHING DIFFERENT FROM THE EXECUTIVE COMMITTEE MEETINGS?

A. NOT TO MY KNOWLEDGE, SIR.
THE COURT: YOU DON'T HAVE AN ANNUAL CORPORATE MEETING?
THE WITNESS: WELL, WE MEET -- MY BROTHER AND I MEET ANNUALLY AMONGST OURSELVES, AND I BELIEVE SOMETHING MIGHT BE DOCUMENTED WITH OUTSIDE COUNSEL. IT'S NOTHING FORMAL.
THE COURT: OKAY.
BY MR. KIRTZ:
Q. LET'S TURN TO -- I THINK WE -- I'M SORRY, LET'S TURN TO THE FOURTH PAGE, WHICH IS JANUARY 14, 2009, NOTES FROM EXECUTIVE COMMITTEE OF FIRST UNIVERSAL LENDING.
HERE WE JUST HAVE THREE PEOPLE, DOUG CAMPION, NICK ANDREWS AND NOEL RIVERA WHO ARE AT THIS MATING ALONG YOU AND YOUR BROTHER AND MR. FEINGOLD, IS THAT RIGHT?
A. YES, SIR.
Q. AND ITEM NUMBER FIVE TALKS ABOUT NEW COMMITTEE MEMBERS, AND IT STATES, QUOTE, "MAT AND BILL WERE BROUGHT INTO THE EXECUTIVE COMMITTEE AFTER IT WAS DETERMINED THAT THEY HAD MET THE GOALS PROVIDED TO THEM," CLOSE QUOTE. WHO IS MAT?
A. I DON'T WANT TO MISSPEAK, BUT I BELIEVE THAT'S MAT GILBRITH AT THAT TIME. I WAS JUST TRYING TO PUT THE TIME FRAME TOGETHER, SIR.
THE COURT: WHO IS BILL?
THE WITNESS: I WANT TO SAY THAT WAS BILL MILMAN

AT THIS TIME.
BY MR. KIRTZ:
Q. WELL, IF YOU LOOK AT THE NEXT SET OF MINUTES, JANUARY 21ST, IF YOU LOOK AT THE ATTENDANCE LIST, WHICH IS ON THE SECONDS PAGE OF THAT SET OF NOTES, IT'S MAT GILBERT AND BILL MURPHY.
A. BILL MURPHY. I'M SORRY, SIR.
Q. NOW, THIS SAYS THEY WERE BROUGHT INTO THE EXECUTIVE COMMITTEE AS NEW MEMBERS AFTER IT WAS DETERMINED THAT THEY HAD MET THE GOALS PROVIDED TO THEM. WHAT WERE THE GOALS PROVIDED TO THEM?
A. THAT WAS AMONGST THE EXECUTIVE COMMITTEE, SIR, THE OTHER MEMBERS THAT WERE IN THERE. THEY VOTED ON THEM ON WHATEVER THEY THOUGHT THEIR GOALS WERE.
Q. WHAT WERE THE GOALS?
A. YOU WOULD HAVE TO ASK THEM. I DON'T KNOW WHAT THEIR GOALS WERE AT THAT TIME. I DON'T REMEMBER THE JANUARY 21ST MEETING WHAT THE GOALS WERE.
Q. WHEN IT SAYS "GOALS" WHAT DOES IT REFER TO, SALES GOALS?
A. NO, SIR. I COULDN'T GIVE YOU THAT ANSWER. I WAS NOT THE ONE THAT VOTED THEM IN. I DON'T KNOW.
Q. SO YOU'RE SITTING IN THIS MEETING AS PRESIDENT OF THE COMPANY, TWO NEW MEMBERS OF THE COMMITTEE ARE BEING BROUGHT IN AND YOU DON'T KNOW WHY THEY WERE BROUGHT IN?

A. AT THIS DAY? NO, SIR.
Q. DID YOU KNOW AT THE TIME ON JANUARY 14TH WHY THEY WERE BROUGHT IN?
A. AT THAT TIME I'M MIGHT HAVE. I'M SURE SOMEONE MIGHT HAVE SAID SOMETHING. I DON'T REMEMBER WHAT IT WAS.
Q. WELL, ON -- GO BACK TO THE JANUARY 14TH SET OF MINUTES.
THE FIRST ITEM DISCUSSED THAT'S PRINTED IN THE NOTES IS SOFTWARE MONITORING SALESPEOPLE, AND THE SECOND ONE IS FORMER CLIENTS REFERRALS. AREN'T THEY RELATED TO THE SALES DEPARTMENT OF FIRST UNIVERSAL LENDING, THESE ISSUES?
A. WELL, THESE SOFTWARE MONITORING SALESPEOPLE WAS ACTUALLY DEVELOPED BY LENDINGTREE, THAT WE NEEDED TO ACTUALLY MONITOR THEM THROUGH THEIR SYSTEM FOR CUSTOMER SERVICE BECAUSE AT THAT TIME THEY WERE GETTING A LOT OF COMPLAINTS FROM CUSTOMERS.
LOOKING AT THE DATES I KNOW THAT'S WHEN THE MORTGAGE MARKET WAS KIND OF FALLING APART AND A LOT OF OUR CLIENTS WERE COMPLAINING TO THEM DIRECTLY, AND THEY ACTUALLY CAME OUT WITH THEIR OWN REFERRAL PROGRAM THAT THEY INPUTTED INTO THEIR SYSTEM THAT WE WERE THINKING ABOUT POSSIBLY JOINING.
Q. WELL, YOU SAID CUSTOMER SERVICE, BUT THIS NUMBER ONE ITEM REFERS TO SALESPEOPLE.
A. WELL --

Q. DON'T THE CLIENTS HAVE TO BE SOLD ON YOUR SERVICE BEFORE CUSTOMER SERVICE STARTS HAPPENING?
A. WELL, CUSTOMER SERVICE IS HOW IT'S ACTUALLY DEEMED IN LENDINGTREE. LENDINGTREE CUSTOMER SERVICE, THAT'S THE SOFTWARE WHEN YOU LOG ON. THAT'S HOW IT SAYS IT WHEN YOU LOG ON TO THEIR SYSTEM.
Q. WELL, "FORMER CLIENTS REFERRALS." WHAT DOES THAT CONCERN?
A. THAT'S LENDINGTREE, SOMETHING THAT THEY ACTUALLY CAME OUT WITH ON THEIR SYSTEM THAT IF YOU HAD -- ANSWERING ONE OF THEIR LEAD SHEETS THEY HAD THEIR OWN PROGRAM OUTSIDE OF FIRST UNIVERSAL THAT WOULD -- I DON'T KNOW WHAT THEY WOULD GIVE, A GIFT CERTIFICATE OF MAYBE 25 OR $50 TO THE PERSON THAT REFERRED THEM INTO THE SYSTEM HAVING NOT TO DO WITH FIRST UNIVERSAL, BUT WE GOT A LOT OF INFORMATION FROM LENDINGTREE AT THE TIME ABOUT IT.
Q. WELL, LENDINGTREE WOULD PROVIDE YOU WITH THE LEADS, IS THAT RIGHT?
A. YES, SIR.
Q. AND WHERE WOULD THESE LEADS, OR TO WHOM WOULD THESE LEADS COME TO AT FIRST UNIVERSAL?
A. TO WHOEVER WAS ON THEIR SYSTEM AT THE TIME.
Q. AND THAT WOULD BE THE SALESPEOPLE THAT WERE SITTING AT THEIR DESK AT FIRST UNIVERSAL LENDING, IS THAT RIGHT?
A. NO, SIR. IT COULD BE ANYONE THAT HAD PROCESSORS AND

UNDERWRITERS THAT NEEDED TO ACTUALLY LOOK AT LENDINGTREE CONSISTENTLY.
Q. WHAT DOES IT MEAN BY LEADS? THOSE WERE LEADS FOR THE PEOPLE WHO WERE DESIROUS OF SOME SORT OF SERVICE?
A. WELL, I'M NOT EXACTLY SURE HOW LENDINGTREE ADVERTISED IT, BUT I DO KNOW THAT WHEN WE LOGGED ON TO THE SYSTEM THERE WAS LOTS OF NOTES AND INSTRUCTIONS AT THE TIME.
Q. NOTES AND INSTRUCTIONS ABOUT WHAT?
A. ON LENDINGTREE. BASICALLY IF I NEEDED TO RESPOND BACK INTO THEIR SYSTEM. WHEN YOU LOG ON TO LENDINGTREE THERE ARE CERTAIN THINGS AND FIELDS THAT ACTUALLY NEED TO BE DISCLOSED TO THE CLIENT, AND THAT'S JUST FOLLOWING THEIR GUIDELINES. THERE ARE CERTAIN BUTTONS THAT NEED TO BE PRESSED TO SATISFY I GUESS WHATEVER THE CLIENT WAS GOING TO LENDINGTREE FOR.
Q. SO SOMEONE AT -- AT FIRST UNIVERSAL LENDING WOULD TAKE THE LEAD FROM LENDINGTREE OR OTHER SOURCES I ASSUME, RIGHT?
A. WELL, IT WAS AN AUTOMATED SYSTEM, SIR. SO A LOT OF THAT ACTUALLY WENT TO THE CLIENT, AND THE CLIENT WOULD THEN -- OR THE POTENTIAL A LOT OF TIMES SOMEONE WOULD CALL IN.
Q. SO THE FIRST -- WHO WAS THE FIRST CLIENT -- WHO WAS THE FIRST POINT OF CONTACT WITH THE CONSUMER OR HOME OWNER HAD AT FIRST UNIVERSAL LENDING?
A. I WOULDN'T BE ABLE TO ANSWER THAT ONLY BECAUSE LENDINGTREE ACTUALLY ROUND ROBIN WHO THEY SEND IT TO AT THE TIME. WE DON'T PICK AND CHOOSE. LENDINGTREE ACTUALLY SENDS

IT AND A PERSON WOULD CONTACT THEM DIRECTLY.
Q. I'M ASKING THAT WHEN THE LEAD FROM LENDINGTREE, WHO IS A CONSUMER OR HOME OWNER, WHAT WOULD THAT CONSUMER OR HOME OWNER FIRST CONTACT BE, OR WHO WOULD THAT CONSUMER OR HOME OWNER CONTACT BE AT FIRST UNIVERSAL LENDING?
A. WHOMEVER THEY CALLED, SIR. THEY HAD THEY ACTUALLY WOULD CALL IN, SIR.
THE COURT: MR. ZAUSNER, LET ME ASK YOU THIS, BECAUSE APPARENTLY IT IS NOT YOU.
THEREFORE, WHO WOULD BE THE PERSON WHO WOULD BE MOST FAMILIAR WITH AN HAVE THE MOST INFORMATION REGARDING THE OPERATION OF FIRST UNIVERSAL LENDING, BECAUSE IT IS OBVIOUSLY NOT YOU. WHO WOULD THAT BE? THAT IS THE PERSON WE PROBABLY WANT TO TALK TO. SO WHO WOULD IT BE?
THE WITNESS: WELL, ON THE SALES END, SIR, I CAN GIVE YOU THE PEOPLE --
THE COURT: WHO IS THE PERSON THAT WOULD HAVE THE MOST INFORMATION AND BE MOST -- THE MOST FAMILIAR WITH THE OVERALL OPERATION OF FIRST UNIVERSAL LENDING? WHO WOULD THAT BE?
THE WITNESS: WELL, FROM BEING IN THE MEETINGS AND BEING TO ARTICULATE, AND BEING ABLE TO ARTICULATE PROBABLY MUCH BETTER THAN I WOULD, I WOULD SAY OUTSIDE COUNSEL WOULD BE ABLE TO ARTICULATE --
THE COURT: WHO WOULD THAT BE?

THE WITNESS: THE LAW FIRM OF FEINGOLD & KAM.

THE COURT: WHO WOULD THAT BE? GIVE ME THE NAME OF THAT INDIVIDUAL.

THE WITNESS: I BELIEVE DAVID FEINGOLD.

THE COURT: GO AHEAD, COUNSEL.

I AM CURIOUS ABOUT ONE THING. HOW IS IT THAT MR. FEINGOLD WOULD HAVE GREATER KNOWLEDGE THAN YOU WHEN HE IS A LAWYER OPERATING, RUNNING HIS OWN LAW FIRM, TRYING CASES, PREPARING FOR CASES, HANDLING DEPOSITIONS, GOING HERE, GOING THERE, AND SO FORTH, AND SO FORTH, JUST TO TAKE CARE OF HIS LAW FIRM'S BUSINESS, HOW WOULD HE BE THE INDIVIDUAL WHO WOULD HAVE THE MOST INFORMATION AND BE MOST FAMILIAR WITH THE OVERALL OPERATION OF FIRST UNIVERSAL LENDING? HOW IS IT THAT HE WOULD BE IN THAT POSITION? I AM JUST CURIOUS ABOUT THAT.

THE WITNESS: I WOULDN'T SAY IT'S THE MOST KNOWLEDGE, BUT HE IS DEFINITELY MUCH MORE ARTICULATE THAN I AM --

THE COURT: WELL, I DID NOT ASK YOU ABOUT ANYONE WHO HAD A GREATER COMMAND OF THE ENGLISH LANGUAGE.

THE WITNESS: THEN KNOWLEDGE. THEN I ACTUALLY DO HAVE A LOT OF KNOWLEDGE ON THIS. I APOLOGIZE. I THOUGHT YOU MEANT -- WERE TALKING ABOUT TO ARTICULATE --

THE COURT: IS THERE ANYTHING MYSTERIOUS ABOUT MY QUESTION?

THE WITNESS: NO, SIR.

THE COURT: IS THERE ANYTHING COMPLEX ABOUT IT?

THE WITNESS: NO, SIR.

THE COURT: IS THERE ANYTHING YOU DO NOT UNDERSTAND ABOUT MY QUESTION?

THE WITNESS: NO, SIR.

THE COURT: ALL RIGHT. THEN I WILL ASK YOU FOR THE THIRD TIME.

GIVE ME THE NAME OF THE INDIVIDUAL WHO IS MOST FAMILIAR WITH AND WHO HAS THE MOST KNOWLEDGE OF THE OVERALL OPERATION OF FIRST UNIVERSAL LENDING.

THE WITNESS: THAT WOULD BE MYSELF, SIR, SEAN ZAUSNER.

THE COURT: NOW, I AM GETTING A BETTER UNDERSTANDING OF WHAT THE RECEIVER WENT THROUGH ON THE NIGHT OF NOVEMBER THE 19TH.

GO AHEAD, SIR.

MR. KIRTZ: THANK YOU, YOUR HONOR.

BY MR. KIRTZ:

Q. LET'S TURN TO THE NEXT PAGE OF PLAINTIFF'S EXHIBIT 40, WHICH IS NOTES FROM THE EXECUTIVE COMMITTEE, FIRST UNIVERSAL LENDING FROM JANUARY 21ST, 2009.

A. I'M SORRY, WHAT DATE?

Q. JANUARY 21ST.

A. OKAY.

THE COURT: YOU UNDERSTAND, MR. ZAUSNER, THAT YOU HAVE -- WHEN YOU LOOK BACK AT THIS RECORD, IF YOU WERE TO READ A TRANSCRIPT OF YOUR TESTIMONY SO FAR, YOU UNDERSTAND THAT YOU HAVE HARDLY ANSWERED ANY QUESTION DIRECTLY. YOU UNDERSTAND THAT?

THE WITNESS: I UNDERSTAND WHAT YOU ARE SAYING, SIR. YES.

THE COURT: GO AHEAD.

MR. KIRTZ: THANK YOU, YOUR HONOR.

BY MR. KIRTZ:

Q. WELL, IN ATTENDANCE AT THE JANUARY 21ST MEETING WHO WAS THERE?

A. DAVID FEINGOLD, SEAN ZAUSNER, DAVE ZAUSNER, DOUG CAMPION, NICK ANDREWS, NOEL RIVERA, MAT GILBERT, BILL MURPHY.

THE COURT: AND JUST SO THE RECORD IS CLEAR, I MEAN, YOU HAVE ANSWERED QUESTIONS LIKE THAT DIRECTLY. I'M TALKING ABOUT MORE SUBSTANTIVE QUESTIONS.

COUNSEL, WHEN UP REACH A CONVENIENT POINT LET ME KNOW. I THINK WE HAVE HAD ENOUGH FOR THE DAY.

MR. KIRTZ: YOUR HONOR, I CAN CONTINUE IN THE MORNING.

THE COURT: BEFORE THIS BECOMES -- WELL, THAT IS ALL RIGHT.

ALL RIGHT. WE WILL GO HEAD AND -- YES.

MR. SINASOHN: FOR TOMORROW, YOUR HONOR, IF YOUR HONOR IS INCLINED TO ORDER US TO BE HERE THROUGH THE END OF THE DAY, IS THERE A WAY WE CAN KNOW NOW? OTHERWISE I WOULD NEED TO BE ON A PLANE NO LATER THAN 23:20 TO 1:00 TOMORROW.

SO IF YOU ARE GOING TO -- IF YOU ARE GOING TO WANT US TO GO PAST -- YOU KNOW, PAST PROBABLY 11:30 OR SO I WOULD JUST NEED TO KNOW IF THAT'S POSSIBLE.

THE COURT: WELL, I DO NOT WANT TO INCONVENIENCE ANY PLANS THAT YOU HAVE.

MR. SINASOHN: NO PLANS, YOUR HONOR. JUST I DON'T TRAVEL ON FRIDAY AFTERNOONS. SO I'M NOT GOING -- I JUST WANTED YOU TO KNOW THAT NOW.

THE COURT: WELL, I MEAN, WHAT WOULD YOU DO?

MR. SINASOHN: I WOULD STAY IN A HOTEL. IF YOU WANTED TO CONTINUE THIS I WOULD STAY HERE.

THE COURT: ALL RIGHT. I UNDERSTAND. I UNDERSTAND WHAT YOU ARE SAYING. OKAY.

WELL, I WOULD LIKE TO FINISH THE HEARING IF POSSIBLE, I DO NOT KNOW THAT THAT IS POSSIBLE, BY TOMORROW.

MR. SINASOHN: YES, YOUR HONOR.

THE COURT: LET ME SEE HERE.

MR. SINASOHN: ACTUALLY, IF I COULD, IT'S THE FIRST NIGHT OF HANUKKAH TOMORROW. I WOULD LIKE TO GET HOME TO MY FAMILY IF I COULD.

THE COURT: ALL RIGHT. LET ME JUST CHECK ON ONE

THING HERE FOR A MINUTE.

MR. KIRTZ: YOUR HONOR, I CAN ALSO GO ANOTHER 15 OR 20 MINUTES NOW IF YOU WANT TO ADDRESS AT LEAST A LITTLE MORE TODAY. THAT WOULD BE OKAY WITH ME TOO.

THE COURT: NO. YOU CAN STEP DOWN, MR. ZAUSNER.

ARE YOU FLYING OUT OF FORT LAUDERDALE?

MR. SINASOHN: YES, YOUR HONOR.

THE COURT: WHAT TIME DOES YOUR FLIGHT LEAVE?

MR. SINASOHN: I ASKED TO HAVE IT -- I DON'T HAVE IT YET, BUT I ASKED NATIONAL TRAVEL TO SCHEDULE IT FOR AROUND THE NOONISH TIME, BUT IT CAN BE MOVED IF YOUR HONOR SAYS WE NEED TO MOVE IT. THE LATEST THAT I COULD PROBABLY GO ON A PLANE IS PROBABLY AROUND ONE.

THE COURT: OKAY. HOW MUCH LONGER DO YOU THINK YOU WILL HAVE, PROBABLY ANOTHER HOUR?

MR. SINASOHN: I WOULD THINK SO. AT LEAST, YOUR HONOR. YES, SIR.

THE COURT: AT LEAST.

MR. SINASOHN: AT LEAST. AND THEN WE EXPECT TO ALSO CALL DAVID ZAUSNER TO THE STAND.

THE COURT: ALL RIGHT. SO THIS WILL TAKE ANOTHER WEEK. LET'S SEE HERE.

WELL, THEN, LET'S HAVE EVERYONE RETURN HERE TOMORROW AT 9:15 AND LET ME KNOW TOMORROW WHEN YOUR FLIGHT IS.

MR. SINASOHN: YES, YOUR HONOR.

THE COURT: AND THEN WE WILL BREAK IN PLENTY OF TIME FOR THAT.

MR. SINASOHN: THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT. THE COURT IS IN RECESS.

WE WILL SEE EVERYONE AT 9:15 TOMORROW MORNING.

(WHEREUPON, THE FOREGOING PROCEEDINGS WERE ADJOURNED TO RECONVENE AT 9:15 ON FRIDAY, DECEMBER 11, 2009.)

C E R T I F I C A T E

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF FLORIDA

I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 226 PAGES CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN THE CITY OF FORT LAUDERDALE, FLORIDA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 11TH DAY OF JANUARY 2010.

/S/CARL SCHANZLEH
CARL SCHANZLEH, RPR-CM
OFFICIAL FEDERAL COURT REPORTER
299 EAST BROWARD BLVD., 202B
FORT LAUDERDALE, FL 33301
TELEPHONE 954/769-5488

**A**

**ABILITY** 38:18 85:6,16 116:9,12 135:25 175:3
**ABLE** 76:15 85:3 93:12,12 103:10 106:14 125:1,4 126:18 131:17 136:5 153:20 154:11,15 155:23 162:1,2 171:5 195:12,14 219:23 220:22,24
**ABOVE-STYLED** 1:11
**ABSOLUTE** 41:13 152:10 161:3
**ABSOLUTELY** 9:25 13:3,7 22:24 23:1 26:11,14 37:22 38:2,10 41:25 43:10 44:24 46:25 52:11 53:25 56:7 61:23 67:7 72:23 95:21 135:9 136:2,9 141:14 144:18 148:10 152:11 153:5 157:9 158:4 184:4
**ACCENT** 137:25
**ACCEPTED** 23:7 36:4
**ACCESS** 38:18 39:14 40:7,8,9,16 41:4,9,23 42:1,12 44:20 46:8 47:3,3 51:11 85:13 109:10 116:8 116:9,21,24,25 119:22,24 121:9 125:1,3,7,8,9 136:7 151:20,25 154:11 155:13 159:8 161:3 168:22
**ACCESSED** 12:13
**ACCESSING** 40:12
**ACCOMPLISHED** 110:15
**ACCOUNT** 117:3,4 169:24
**ACCOUNTANT** 8:6
**ACCOUNTING** 7:4,5,6,10 8:4,20 117:20 118:6,9 200:23
**ACCOUNTS** 55:16 168:16
**ACCRUED** 153:17
**ACCURATE** 97:18 111:1 115:16 185:3
**ACCURATELY** 101:10
**ACCUSATION** 21:12
**ACCUSE** 50:25 51:16
**ACCUSED** 21:16 159:25 160:4
**ACCUSING** 50:23
**ACKNOWLEDGE** 32:12
**ACKNOWLEDGED** 16:18 17:17 42:8 158:24
**ACKNOWLEDGES** 45:13 47:16
**ACQANELSA** 183:4
**ACQUA** 189:24
**ACQUAINTING** 102:22
**ACQUIRED** 103:25 104:3 179:1
**ACT** 30:4 35:3 54:19 77:15,18 149:17,22 159:4 163:21
**ACTED** 77:16
**ACTING** 7:3 33:17 78:11 163:10
**ACTION** 93:18,22 163:10
**ACTIVE** 23:18 126:21
**ACTIVELY** 187:3,11
**ACTIVITIES** 8:9 61:22 72:11
**ACTS** 60:9
**ACTUAL** 91:13 97:8 128:14 154:3 154:11
**AD** 90:16,20 94:24 96:10,10
**ADDING** 162:15
**ADDITIONAL** 17:23 21:20 162:15
**ADDRESS** 59:25 79:2 87:23 88:3 126:24 201:4 225:3
**ADDRESSED** 60:4 79:5 84:2 115:19 119:12 165:11 206:12,16 206:18
**ADHERING** 11:20
**ADJOURNED** 226:7
**ADJUST** 152:18
**ADMINISTRATION** 180:22
**ADMINISTRATIVE** 100:18 201:2
**ADMINISTRATIVELY** 22:25
**ADMINISTRATOR'S** 41:25
**ADMIT** 31:2
**ADMITTED** 149:15
**ADMITTING** 31:2
**ADS** 89:11,12,13,21
**ADVANTAGE** 153:1
**ADVERSARIAL** 56:3,3
**ADVERTISED** 88:23 219:5
**ADVERTISES** 189:19
**ADVERTISING** 89:10,16
**ADVICE** 62:20 73:20 78:7 139:5
**ADVISE** 45:18 55:24 157:11
**ADVISED** 13:14 14:1 16:11 42:24 45:25 46:2,5 160:10,14 188:14
**AFFIDAVIT** 58:15
**AFFIDAVITS** 11:1 37:2 62:12
**AFFORD** 136:23
**AFRICAN-AMERICAN** 18:25
**AFTERNOON** 14:18,19 20:24 77:12 86:16,17 149:5,5 184:18 184:21 199:6
**AFTERNOONS** 224:11
**AGENCIES** 95:11
**AGENT** 23:21,22,24 25:20 26:10 64:19,21
**AGGREGATED** 96:25
**AGGREGATORS** 96:17
**AGO** 4:15 10:10 50:1 51:14 53:7 211:17
**AGREE** 9:9 12:16,20 32:13 58:9 59:13,16 74:8 95:21,23 99:19 119:19 133:19 134:9 136:9 150:14 155:10 185:2 198:14
**AGREED** 39:9 60:2 77:18 84:23 95:19 105:19 110:9 118:24 120:9 165:3
**AGREEMENT** 10:21 15:18
**AGREEMENTS** 38:12 64:24
**AGREES** 58:3
**AHEAD** 10:1 12:8 13:20,22 32:15 48:19 62:25 63:12 75:15 79:20 80:1 86:3 95:2 129:10,22 156:7 158:23 171:12 175:9 176:5 177:12 179:4 181:6,21 185:7 194:10 195:22 199:1 202:6 214:15 221:5 222:17 223:8
**AH-HUH** 91:8 105:5 188:13
**ALBINE** 15:18 31:22 58:2
**ALEX** 186:16 187:13 188:7 190:16 192:21
**ALLEGED** 54:1,7
**ALLEGEDLY** 51:5
**ALLEGING** 54:5
**ALLOW** 119:21,23
**ALLOWED** 214:3
**ALLOWING** 113:8
**ALTER** 42:23
**AMENDING** 59:10
**AMENDMENT** 32:4,5,5
**AMENDMENTS** 32:15
**AMERICA** 30:16 204:6,7,10 227:6
**AMERICAN** 11:24 12:21 33:5 35:20
**AMICABLE** 15:10,15 140:12
**AMOUNT** 4:5 123:3 178:21 190:22
**ANDREWS** 173:23 186:16 187:4 188:7 190:14 192:21 215:14 223:14
**AND/OR** 9:6 199:25
**ANNOUNCEMENT** 144:22
**ANNOYED** 142:23
**ANNUAL** 215:2
**ANNUALLY** 215:5
**ANSWER** 11:20 31:4 45:19 51:7 53:13 90:18 98:18 106:10 112:5 114:10 121:6 139:21 154:25 155:2 159:17 190:2,4 201:14 213:17,18,20 216:21 219:23
**ANSWERED** 4:22 6:19 18:14 74:21 109:2,5 223:4,17
**ANSWERING** 88:6 139:20 153:6 218:10
**ANSWERS** 11:17 18:5 61:19 106:1 116:4
**ANYBODY** 19:22 20:15 31:9 71:22 103:10,10 111:11 145:11 146:13 180:15 196:6 207:6
**ANYBODY'S** 205:4
**ANYMORE** 9:13 44:12 48:12
**ANYWAY** 74:7,9 140:21
**APART** 59:7 110:19 217:18
**APOLOGIZE** 10:17 39:7 47:7 57:24 61:21 62:24 63:3,20 66:11 70:16 79:11 124:16 138:5 156:17 166:18 221:22
**APOLOGY** 35:9
**APPALLED** 42:13
**APPARENT** 81:1
**APPARENTLY** 105:1,2 106:21 115:9 118:7 121:8 139:10,11 209:21 220:9
**APPEAR** 150:18 185:5
**APPEARANCE** 11:3,20,22 62:16
**APPEARANCES** 1:12
**APPEARED** 110:8 149:12
**APPEARS** 24:25 32:20 95:5 97:6 115:6,7 120:8,16,17 205:5
**APPENDED** 127:23
**APPLE** 118:11
**APPLICABLE** 99:12
**APPLICATION** 48:8,12
**APPLIED** 90:24
**APPLY** 35:3,4 47:10
**APPLYING** 75:9
**APPOINTED** 77:14
**APPRECIATE** 15:13
**APPROACH** 22:6 65:14 75:14 94:4 117:18 151:24 167:24 184:3
**APPROACHING** 155:9
**APPROPRIATE** 55:19 122:18 149:21 173:13
**APPROPRIATELY** 153:4
**APPROVE** 150:25
**APPROVED** 94:11 112:18
**APPROXIMATELY** 4:5 14:11 23:6 39:24 80:9 205:17
**APRIL** 26:7 185:10 186:24 191:6 192:16 193:4 204:13,16,19 205:13 208:13
**APT** 60:1
**ARBITRATION** 11:23,25 93:6
**AREA** 13:12,21,23 20:11 66:7,10 67:16 70:23 71:19 80:6 81:6,9 81:15 103:15 108:2 142:6,13 143:20 147:1,4 148:1 154:19 203:1 204:25
**AREAS** 67:4 103:3
**AREN'T** 64:22 173:12 210:19 217:9
**ARGUING** 9:14 39:18 59:20 63:16
**ARGUMENT** 63:21
**ARISEN** 156:16,19
**ARRANGE** 11:21 62:15
**ARRANGED** 126:15
**ARRANGEMENT** 10:4,14 134:8
**ARRANGEMENTS** 134:7
**ARREST** 82:14,16 144:17,23,25 145:1,4,8,14 146:9,11 158:8,12 158:13,14,19,21
**ARRIVED** 147:7 157:2
**ARTFUL** 138:19
**ARTICULATE** 220:22,22,24 221:17 221:23
**ASIDE** 107:4
**ASKED** 17:11 20:20 21:7 28:14 29:25 41:10 45:7 51:10 58:18 59:6 61:10,19 72:14 77:23 81:11 82:14 98:13 106:11 113:25 117:10 125:8,9,19 130:5 135:24 139:19 144:25 157:24 158:24 181:15,15 214:20 225:9,10
**ASKING** 4:22,23 20:3 62:6 72:15 77:14 91:11 108:25 138:12,16 146:4,8 185:1 220:2
**ASKS** 75:23 98:14 99:1,4
**ASPECT** 33:24 90:2 95:22 178:7 201:17,22
**ASSERT** 39:3
**ASSERTION** 120:18
**ASSETS** 168:11,17
**ASSIGN** 163:17
**ASSIGNED** 84:22 85:1 88:1 101:15 101:20 130:9
**ASSIST** 77:23 78:1 79:12
**ASSISTANT** 78:4
**ASSISTING** 78:12
**ASSOCIATES** 55:18
**ASSOCIATION** 11:25 12:21 33:5 35:20
**ASSOCIATIONS** 34:18
**ASSUME** 54:18 78:17 81:21 146:20 219:16
**ASSUMING** 60:7 153:7,10
**ASSURE** 36:16
**ATLANTA** 42:17
**ATTEMPT** 115:4
**ATTEMPTED** 33:7 78:7 105:20,25 107:5 112:4 136:11
**ATTEMPTING** 32:7 34:1 101:3 106:4 113:3 114:19 128:20
**ATTEND** 12:4
**ATTENDANCE** 164:12 186:14 191:7 205:25 209:6 211:24 216:4 223:11
**ATTENDED** 209:9
**ATTENTION** 201:11 207:4,6
**ATTESTING** 202:17
**ATTITUDE** 14:8
**ATTORNEY** 11:22 12:5 14:13 24:22,23 29:15 32:2 49:24 77:15 78:3 82:25 83:1 84:8,11 98:4 99:22 109:12,15,17,23 132:19 146:1 150:1,2,23 151:12 155:13 155:14
**ATTORNEYS** 11:4 33:11 34:13 85:2 86:8 99:12 109:9,19 132:12 146:23,24 150:20,24 151:4,8,18 151:21 153:22 154:11
**ATTORNEY'S** 93:18 134:6
**ATTORNEY/CLIENT** 39:3
**ATTRIBUTED** 20:5
**AUTHORITY** 38:8 60:9 198:3,16 211:4,7,10,12,14 212:3
**AUTHORIZATION** 198:2
**AUTHORIZED** 212:8
**AUTOMATED** 219:17
**AUTOMATICALLY** 208:17
**AVAILABILITY** 199:23
**AVAILABLE** 41:19 44:17 116:6,14 121:4
**AVENUES** 198:16
**AVERAGE** 106:16,20 137:7
**AWARE** 52:5 103:6 120:11 128:7 134:4 149:17 170:13
**A-OKAY** 49:10

**B**

**B** 1:15 69:11,17,18 202:21
**BACKGROUND** 77:6 149:19,20
**BACKS** 81:17
**BACK-UP** 10:15 88:4
**BAD** 17:7 75:24 159:3
**BAG** 190:3
**BALANCE** 72:2,23
**BALANCES** 12:2
**BALANCING** 54:19
**BANK** 34:20,21 88:1 182:17 183:3 183:15 189:24 190:9,10,11 191:2 204:6,6,10
**BANKS** 34:24
**BAR** 12:21,22 33:5 35:20,21 46:1,6
**BASE** 90:4 188:2 193:22,25
**BASED** 53:13 54:13 73:20 75:6 89:25 90:10 91:19 95:1 99:4 101:16 106:9,18 119:18 120:17 122:24 123:10 125:21 131:9,15 133:10,16,18,19 134:1 136:21 138:22 155:6 157:4 159:11 182:5 194:2 195:12
**BASIC** 137:2 164:7
**BASICALLY** 14:8 39:19 54:10 56:9 157:8,11 161:18 162:17 174:8,9 174:15 175:4 178:6 192:1 199:23 201:3 219:9
**BASIS** 106:10,22 115:19 194:14 202:8
**BEACH** 23:20,24 37:4,19 64:20 111:19 121:12,14 126:9
**BEATING** 75:7
**BEGAN** 5:5 14:14,17 200:10,11
**BEGINNING** 39:22 78:24
**BEHALF** 7:7 33:18 82:23 131:3,10 214:10
**BELABOR** 18:20
**BELABORING** 169:15
**BELIEF** 64:7
**BELIEFS** 165:9
**BELIEVE** 4:15,19 5:10 6:5 7:9 11:9 21:5,6,15 36:6 49:22 50:7 63:24 65:24 79:5,7,7 82:1,5,6,13 84:6 84:9 87:25 100:12 104:23 106:17 107:2 111:1 112:12 117:14,19 118:6,13 120:17 121:3,18 125:9,22 127:12,22 128:17 133:7 135:13 136:18 140:21,24 145:25 149:15 151:22 153:14 154:2,9,13 155:12 161:23 162:13 164:3,17 167:21 177:18,25 181:9 183:4 185:18 191:3 198:8 210:3,9,13,13 214:12,13 215:5,21 221:4
**BELIEVED** 55:23 119:3
**BELONGED** 81:13
**BENEFIT** 67:3 117:9
**BENJAMIN** 77:9
**BENT** 19:7
**BERG** 1:16 29:15 30:5,25 31:8 39:25 41:1,11 42:25 45:16,24 113:3 126:19 127:6 149:18 214:20
**BERGER** 52:24
**BERKOWITZ** 52:24
**BERNARD** 77:7
**BERSTEIN** 4:17
**BEST** 38:15 74:15 78:7 83:4

105:23 111:21
**BETH** 2:5,8 76:18 77:1 100:5
**BETTER** 48:5 100:17 123:2 161:22 162:4 206:2,11,17 207:8 220:23 222:14
**BEYOND** 19:6 43:21 116:10,11 124:18 134:14 159:2
**BIG** 9:19 42:7 57:3 67:13 74:4,9 102:3 111:11 195:5 198:7
**BIGGEST** 35:8,8
**BILL** 99:7 173:23 215:18,24,25 216:5,7 223:14
**BILLED** 106:22
**BILLING** 33:7 47:16
**BILLS** 89:5 90:3,25 99:5 173:10
**BILLY** 26:12 41:2 46:4,7
**BINDER** 159:21 160:2,7
**BINDERS** 107:7,8
**BINS** 16:14
**BIRTH** 55:14
**BIRTHDAY** 4:18
**BIT** 77:5,17 128:1 130:3 171:10
**BITS** 57:12 135:19
**BLAME** 159:14
**BLANKS** 58:19,19,24
**BLOG** 25:1
**BLURB** 24:6 53:14
**BLVD** 1:22 227:20
**BOCA** 46:1
**BOOK** 99:13 160:2 214:10,10,12 214:13,18,19,22,23
**BOOKKEEPER** 6:25 7:3
**BOOKKEEPING** 6:23 7:17
**BOOKS** 8:12,19 74:20
**BOSS** 13:2 14:16,18,23,24 15:17 16:12 20:15,21,22 31:21 58:2,9
**BOTHER** 58:22
**BOTHERED** 46:12
**BOTTOM** 58:23 94:7 112:16 186:14 192:21 193:6
**BOUGHT** 96:13
**BOULEVARD** 56:22 107:21 127:7
**BOX** 18:16 207:12,14
**BOXES** 100:20
**BRANCH** 6:10 9:17 37:18 38:12,13 64:14,23 121:19 122:7
**BRANCHES** 36:22,24 37:14 38:1,9 54:6 64:13 65:2 74:6,6 163:15 163:24
**BREAK** 57:11 70:11,12 85:19,19 85:24 102:8 129:2 133:22 165:2 226:2
**BREAKDOWN** 110:17 159:18 172:21
**BREEZEWAY** 38:25 65:20 68:13 121:13 166:8 199:15
**BRIEF** 129:6 134:25 135:2
**BRIEFLY** 56:17
**BRIGHT** 149:20 198:2,16
**BRING** 162:19 174:5,18 201:10 206:21 207:3,6 208:10
**BROADLY** 107:13
**BROKEN** 107:2 137:9,24
**BROKER** 186:20,22 187:6,14,22 188:4 192:23
**BROKERS** 6:17 34:17 188:10 192:25 193:8,9 201:20
**BROTHER** 134:1 172:13,25 173:2 173:3 177:7 186:1,9 197:23 203:21 208:3 209:4,15 215:4,15
**BROTHERS** 4:16,16 25:22 28:21 29:2,10
**BROTHER'S** 163:19
**BROUGHT** 37:17 54:9,21 60:18 89:23 160:18 165:8 173:3 203:10,11 207:9,10 215:18 216:8,24,25 217:3
**BROWARD** 1:10,22 3:1 227:20
**BRUCE** 132:21
**BUILDING** 166:9
**BULLET** 83:17
**BUREAU** 206:3,17 207:9
**BURGER** 38:16
**BURN** 42:16
**BURNT** 49:8
**BUSINESS** 5:14 6:3 16:22 17:8,16 17:20 23:2,3,4 27:14 35:19,19 35:19 36:3 45:20 57:13,24 71:2 73:15,17 74:16 81:3,10,14,22,25 84:14,20 101:3,21 102:23,23,24 103:1,14,24 111:6,8,11,14 114:11 115:5 121:2 122:22 123:1,3,23 125:20 135:6 150:9 160:7 161:22,25,25 162:3,3,4,10 162:18,23,23,25 163:3,5,21 182:12,19 183:2 189:21,24 190:7,9 195:5 198:7 206:3,11,17 207:8 221:11
**BUSINESSES** 5:16 57:16,20 161:17,17
**BUSY** 88:4,5
**BUTTON** 29:7
**BUTTONS** 194:1 219:13
**BUYS** 148:3

**C**

**C** 69:12,13,16,17,19 202:21 227:3 227:3
**CALCULATED** 59:3
**CALCULATION** 106:12
**CALENDARED** 153:3
**CALENDARS** 113:22 114:2
**CALIFORNIA** 89:24
**CALL** 5:17 21:8 68:10 70:7 75:3 77:13 87:25 88:16 89:9 90:17 91:3,4,10 92:4,6,10,19 93:15 95:7 96:17 97:9 104:5,9,25 105:16 109:2 110:19,21 118:12 120:3 127:18,20,24,25,25 128:3 128:4,6 133:16 135:1 147:4 155:17 160:11,14 166:24 167:16 167:20 170:19 187:2 197:5 198:15 200:19 219:19 220:7 225:20
**CALLED** 8:24 14:2 21:5,6 23:15 24:4 26:4 35:10 41:1 45:16,24 45:25 54:25 57:19 64:3 72:20 88:10 90:16 92:9 97:20 98:11,12 110:25 117:1,3 125:23 152:6 160:9 200:7 220:6
**CALLING** 15:6 75:6 88:19 112:20 166:14 187:20
**CALLS** 50:1,4,7,11 53:7 55:2 56:25 62:10 90:1,9,13 93:2 96:10 97:23 98:14 99:1,4 104:6 105:1 105:3,4,8,9,10,13 114:25 127:19 131:24 153:7,21 155:8 167:7 186:21,24 187:7,8,10,15,17,23 187:25 188:5
**CALM** 15:15
**CAMERA** 148:19
**CAMPION** 173:23 186:15,17,24 188:7 190:12 192:19,21 215:13 223:14
**CAN'T** 6:13 7:24 9:20 19:12 20:2 31:17 32:8 49:22 50:18 52:16 55:1,17 58:5 65:3 74:2 97:7 105:17 158:17 164:13
**CAP** 133:16,18
**CAPABILITY** 116:11,13
**CAPACITY** 77:15 78:11 85:5 91:20
**CAPPED** 123:2 133:12
**CARD** 11:23 12:2 62:11 89:8 95:18 137:3
**CARDOVA** 77:9
**CARDS** 11:24 90:6,21 95:10
**CARE** 58:10 113:5,9 134:5 221:11
**CARL** 1:19 227:10,19
**CARRIED** 178:16
**CARRY** 78:12
**CARRYING** 77:23
**CASE** 1:3 9:10,19 11:4 15:14 20:23 27:25 31:20 32:25 33:15 34:11 36:15 37:22 41:6 47:9,13,15,16 48:2 49:24 53:18,19 54:14 57:18 59:12,14,23,24 60:25 75:8 77:11 78:22 151:3 165:24 199:18
**CASES** 15:11 32:23,25 33:5 34:7 36:13 53:15 86:9,10 133:20 153:5 221:9,9
**CC'S** 119:8
**CD** 42:9
**CEASE** 57:24 72:11 73:15,19 81:19 178:25
**CEASED** 9:11 61:22 72:12 82:1 110:10
**CELIS** 186:16 187:13 188:7 190:16 192:21
**CELLPHONE** 20:25 21:1
**CENTRAL** 93:9
**CERNEY** 69:22 146:3
**CERTAIN** 11:18 18:7 26:19,20 28:24 31:18 45:19 46:10 83:19 135:19 145:13 150:20 152:17 193:24 194:1,1 208:9,24 209:21 210:14 219:11,13
**CERTAINLY** 15:16 86:20 96:21 97:2,6 114:4 120:20 132:13 136:7,12 145:10 151:11,15,17 169:2 208:15
**CERTIFICATE** 218:13
**CERTIFY** 227:12
**CETERA** 45:15 57:14 93:3 95:4 120:1 145:20
**CHAD** 119:9
**CHAIN** 128:20
**CHANDLER** 54:25
**CHANGE** 43:16 49:17 111:20
**CHANGED** 6:13 49:22 103:3,5 111:17 152:18 170:3 172:16 176:19 178:20 192:2 195:4 202:12 211:23,25
**CHANGES** 124:7 173:14
**CHARACTERIZATION** 158:11
**CHARACTERIZE** 40:17 57:14 96:16
**CHARGE** 7:19 98:3 99:10 117:4 123:20 124:17 127:17 139:11 164:7 196:11,25 203:21
**CHARGED** 99:8 170:10
**CHARGES** 144:17
**CHARGE-OFFS** 207:19
**CHARGING** 26:25
**CHART** 204:23
**CHASTISED** 134:12
**CHECK** 224:25
**CHILD** 50:14
**CHOOSE** 219:25
**CHRISTAKOS** 26:13 41:3
**CHRONOLOGY** 31:13 149:3 156:25 157:1 158:23
**CHUCKLING** 60:23
**CHURCH** 41:5
**CIRCLE** 39:10 119:2
**CIRCLED** 70:6
**CIRCUMSTANCES** 53:24 97:13
**CITE** 59:23
**CITED** 47:8,14 53:16
**CITES** 90:5
**CITING** 36:14
**CITY** 227:14
**CIVIL** 82:16 86:10 144:19 146:8,10 158:14,21
**CLAIM** 21:9 196:4
**CLAIMED** 196:6
**CLARIFICATION** 72:16 86:23
**CLARIFIED** 83:4 132:3
**CLARIFY** 52:22 73:21 117:13 121:18 130:6 133:9 148:16 167:19 202:18
**CLARITY** 99:14 201:21
**CLE** 35:21
**CLEAR** 23:21 33:14 48:22 50:6,8 51:24 53:2 59:17,18,19,20 71:14 72:24 73:16,22 81:5 82:15 83:6 95:14 102:6 108:4 115:3 117:23 121:16 124:3 135:4,21 140:13 144:4,18 145:2,24 146:7,11 147:19 150:22 158:18 164:9 178:4 181:14 223:16
**CLEARED** 82:19 127:1,4 146:21
**CLEARLY** 15:20 22:5 67:24 71:10 74:18 83:15,20 100:20 115:15 122:6,23 123:25 124:13,13,17 124:24 127:2 134:13,14 138:7 139:19 158:13 159:14 165:13,13 168:13 169:3
**CLERK** 93:16
**CLERKED** 163:18
**CLIENT** 12:4 15:14 28:3,8,11,13,14 37:17 56:25 57:10,15 58:3,4 59:16 60:2 87:10 88:8,15 95:20 99:18 106:9,23 108:7,20 127:17 155:16,17,22 170:9 189:5 191:22 193:25 197:1,5 207:18 219:12,14,18,18,20
**CLIENTELE** 136:21,22
**CLIENTS** 12:18 31:10 37:18 63:2 75:5 84:15 89:1,4 90:4,9,10 92:11 93:4 101:17,19 104:3 106:21 108:18 113:14 114:20 116:18,19 121:25 122:6 131:17 152:13,24 153:8,9 155:11 165:8 188:16,24 196:20 208:20 217:9 217:19 218:1,7
**CLOSE** 8:23 12:9 19:17 57:15 122:13 132:16 182:21 205:4,15 215:20
**CLOSED** 14:1 15:23 58:3 59:15 84:15 122:19 125:20 126:13 160:7 165:4
**CLOSELY** 11:6 34:11 50:14,16 147:5
**CLOSER** 97:5 105:15,18 188:14,21 204:18 205:1
**CLOSERS** 127:13 188:8,12,20,23 189:6 208:14,18
**CLOSING** 49:25 50:4,6 53:7 63:19 127:25
**CLOTHES** 141:2
**CLOUDED** 53:5
**CODES** 168:21
**COFFEE** 16:24
**COLLAPSING** 5:6
**COLLEAGUE** 132:16
**COLLEAGUES** 132:10,14
**COLLECT** 62:8,11,11 63:2 186:6,7
**COLLECTING** 10:24,24,25 63:11 93:2 153:11
**COLLECTION** 87:22 93:7 95:11
**COLLECTIVE** 124:2
**COLLECTS** 186:10
**COLLEGE** 77:7
**COLORADO** 21:13,14,17,18,23
**COLUMBIA** 77:7
**COMBINATIONS** 168:21
**COME** 8:18,23 11:12,12,13,20,25 62:14,17 72:8 74:20 78:6 83:22 83:24 88:24 90:13,13,17,22,24 94:20,23 97:15 103:20 104:2,6 113:4 114:9,10 116:7 122:10 126:17 136:13 138:9,21 141:18 142:13 153:8 156:1 173:11,13 185:12 194:22 196:18 197:22 201:5 203:15 210:20 218:21
**COMES** 91:3 96:24,25 142:17 153:8 208:5
**COMFORTABLE** 49:4 50:15 138:2 139:22 198:24
**COMING** 111:3 139:4 155:15 188:25 189:1,8 190:22 191:19 192:3,5
**COMMA** 27:11 37:4 120:2
**COMMAND** 221:20
**COMMENT** 20:14,16 21:22 134:6
**COMMENTS** 20:4 21:11 22:3,4 29:19 49:23
**COMMISSION** 1:2 33:6 36:16 83:13 111:3 116:2 117:11 121:20,21 128:22 141:10 180:8 190:13,15,17,19,21,22
**COMMISSIONS** 182:5 195:11
**COMMITTEE** 52:18 60:14 61:6,10 123:22 124:1,3,9 164:10,11,14 164:20 173:14,16,17,22 174:6 174:10 175:5,7 176:2,12,18 178:6,11,13,14,22 179:7,8,11 180:1,17 184:9,15,17,20 185:3,6 185:9,15 186:13,18 188:17 194:4,20,23 196:9 197:11,20 198:22 199:4,9,11,24 200:7 201:6,8 202:2,4 203:10,12,16,19 205:23 206:6 207:15,25 209:3,7 209:9,20,21,22,25 210:17,18 211:16 212:7,13,17,18,22 213:3 213:6,12 214:4,25 215:12,17,19 216:9,12,24 222:21
**COMMITTEES** 184:24
**COMMITTEE'S** 180:14
**COMMON** 32:3 132:14
**COMMONLY** 214:9
**COMMOTION** 145:5
**COMMUNICATE** 139:16,17,19 172:9
**COMMUNICATING** 135:22
**COMMUNICATION** 159:18,19
**COMMUNICATIONS** 110:18
**COMMUNITY** 149:18
**COMPANIES** 6:11 11:10 89:6,9,21 96:15
**COMPANY** 3:17,20 4:24 5:1,19 9:15 14:2 15:24,25 16:3,7,7 23:15 25:5,18 26:4,10,13,15,15 26:16,18 33:17 34:2 35:16 37:11 38:3 50:25 51:2,3,5,13 56:7 64:3 78:1 89:1,10,15 95:18 98:16,20 99:1 105:22 113:5 123:20,25 124:2,4,5,6,7,12 128:13 138:11

160:1 172:12 177:2 194:25 200:19 204:1 206:14,15 208:1,6 210:21 211:15,17,19 212:16,20 213:7,8 216:24
**COMPANY'S** 88:21
**COMPARING** 204:5
**COMPASSIONATE** 161:8
**COMPENSATED** 10:8,22 181:11 181:11 190:12,14,16,18,20
**COMPENSATION** 181:10
**COMPETENTLY** 12:24 151:7
**COMPLAINED** 197:1
**COMPLAINING** 217:19
**COMPLAINT** 50:11 51:22 52:8 54:10 93:17 127:7 147:20 159:5 191:11,14 192:3,7 196:17 206:3 206:11,12,13,14
**COMPLAINTS** 11:12,25 37:11 54:17 62:14 93:6 116:18 128:12 128:16 191:14,19 206:5,24 217:16
**COMPLETE** 49:7 119:20
**COMPLETED** 99:9
**COMPLETELY** 5:13 6:11 9:17 12:24 29:4 34:2,4 36:2,3,24 37:14,20,23 47:4 49:16 54:5,12 68:13 96:11
**COMPLETION** 106:24
**COMPLEX** 138:14,16 222:2
**COMPLIANCE** 32:11 52:19 60:15 107:7 115:18,20,20 124:13 151:6 161:2 194:2 210:13,15,19
**COMPLIANT** 163:6 174:18 197:25 208:11,23
**COMPLICATED** 41:15
**COMPLIED** 57:24
**COMPLY** 32:5,6
**COMPOSED** 15:15
**COMPROMISE** 109:16 110:6 111:15
**COMPUTER** 8:14 14:11 17:14 18:10,16 20:18 38:19,20,21 39:2 39:9 40:7,8,22 42:2 43:5 49:20 49:21 51:16 85:13 118:5,10,14 118:23 127:7 162:6
**COMPUTERS** 18:11 40:13,13 41:8 42:4 43:14,19 81:13,21 102:14 125:1,2,7 126:20 168:21 169:24
**CON** 155:12
**CONCEAL** 160:5
**CONCEDE** 56:24
**CONCEIVABLE** 150:23
**CONCERN** 31:22 42:22 49:14 58:11 112:7 114:12 115:20 156:13 218:8
**CONCERNED** 83:1 84:2 112:18 113:6,8,13 118:22 142:23 146:4 152:22,24
**CONCERNING** 112:25
**CONCERNS** 114:19 152:19
**CONCLUDED** 101:19 102:19
**CONCLUSION** 153:24 164:1
**CONDUCT** 18:10 47:19 105:24
**CONDUCTED** 74:6
**CONDUCTING** 72:21
**CONFERENCE** 13:12,16 120:3 157:12 199:12,13,14,20 200:6
**CONFERRED** 83:2,3
**CONFIRM** 29:14 31:8 42:19
**CONFIRMATION** 127:18,20 128:2
**CONFIRMED** 29:8,20 30:10 42:17 43:10,15,21 49:6 151:21
**CONFUSED** 128:1
**CONFUSING** 140:7
**CONFUSION** 78:24 80:11 82:12 120:11,16 161:13
**CONGRESS** 48:3,5,5
**CONNECT** 19:20
**CONNECTED** 121:14
**CONSENT** 58:4 60:6 105:7
**CONSENTED** 73:23
**CONSIDERED** 127:24 186:23 214:7
**CONSIDERING** 16:3 148:1 161:1
**CONSISTENT** 27:13 133:23 148:8
**CONSISTENTLY** 141:22 153:19 219:2
**CONSTANTLY** 182:18
**CONSTITUTE** 227:13
**CONSTRUCTION** 72:7 74:18
**CONSULTING** 25:16
**CONSUME** 98:8
**CONSUMER** 47:16 51:21 90:1 96:7 97:10,13 98:11,12,14,19,22 99:4 107:18 112:19 167:13 219:21 220:3,3,4
**CONSUMERS** 53:20,21 54:2 97:20 113:16 153:20 166:25 182:23 186:25 187:17,23,25 188:5 189:7,11,17 193:12,17
**CONSUMER'S** 53:23
**CONTACT** 21:5 43:3 87:7,11 104:11 131:17 219:21 220:1,4,5
**CONTACTED** 42:8 87:11 89:6 104:6 156:12,15
**CONTACTING** 46:24
**CONTACTS** 90:9 98:19
**CONTAINED** 85:13 100:20 126:3 159:22
**CONTENTS** 2:2 53:9
**CONTINUATION** 101:18
**CONTINUE** 3:6 60:1 86:1 100:2 102:22 126:1 223:21 224:15
**CONTINUED** 3:12 4:4 81:20 96:5 100:9 126:2
**CONTINUING** 9:20,20 145:17
**CONTINUITY** 101:17
**CONTRACT** 127:21 170:11
**CONTRACTED** 85:2 131:7
**CONTRACTOR** 72:7 74:20 118:21 122:5
**CONTRACTORS** 121:22 182:2
**CONTRACTS** 167:12,15
**CONTRACTUAL** 98:2
**CONTRADICT** 164:24
**CONTROL** 33:7 37:25 60:9 61:9 78:17 113:20 122:9,16 124:2
**CONTROLLED** 122:12
**CONTROVERSY** 42:12
**CONVENIENCE** 129:13
**CONVENIENT** 85:18 223:19
**CONVERSATION** 13:25 58:2 80:17 80:22 111:2 136:24 139:3,23
**CONVERSATIONS** 19:18 51:23 97:2 103:23 104:1 120:17 152:21 156:10 169:19
**CONVEYED** 44:18 58:8,8
**COOPERATING** 159:17
**COOPERATION** 103:9 159:15
**COOPERATIVE** 158:5,10
**COPIES** 29:9,10,21 49:7
**COPY** 43:17 117:6 162:7,10 183:25
**CORAL** 74:10
**CORNER** 17:25 18:2,24 19:4,10 67:22
**CORPORATE** 10:14 27:24 53:18 60:5,17 73:18 134:1,4 139:5 163:15,15,21 176:23 214:10,12 214:13,17,22 215:2
**CORPORATELY** 163:17
**CORPORATION** 6:5 26:21 116:3 123:10 133:17 134:6 176:16 214:10,24
**CORPORATIONS** 23:13 25:14 26:19 59:22 63:25 177:16
**CORPORATION'S** 28:2,10
**CORRECTLY** 69:23
**CORRESPONDENT** 34:17
**COULDN'T** 14:15 41:23 106:2 116:4 126:17 128:16 154:19 155:2 160:6 172:19 187:10 193:5 205:16 216:21
**COUNSEL** 3:7 10:1 11:3,3 20:3,5 27:17 46:19 47:2,6 48:19 52:6 62:15,15,16 66:17 72:9,15 78:11 78:12 96:1 100:2 122:23 123:8 123:11 124:14 129:22 139:5 155:25 156:7 159:1 162:24 163:10 164:12 174:19 179:4 183:19 185:1,7,25 186:8 195:22 197:24 199:1,17 200:22 202:6 207:9,10 208:3 210:14 212:25 213:2 214:15 215:6 220:23 221:5 223:19
**COUNSELED** 57:10,15
**COUNSEL'S** 179:24 207:12,12 210:3,7,9
**COUNT** 50:19
**COUNTY** 1:10 3:1
**COUPLE** 7:5 32:24 38:17 44:22 86:22 114:7 153:15 155:20
**COURSE** 4:2 35:21 78:9 97:9 101:14 109:25
**COURTHOUSE** 1:21
**COURTROOM** 36:23 86:6,11
**COURT'S** 57:15 67:3 96:1 147:22 205:3
**COY** 51:24 61:17
**CREATED** 35:10 122:8 176:13,25
**CREATES** 37:24
**CREDIT** 11:23,23 12:2 34:18,20,20 34:24 62:11 89:8 90:6,21,21 95:3,4,5,10,17 104:17 106:12 137:3,3
**CREDITOR** 95:6
**CREDITORS** 11:5 62:18 137:4
**CRIMINAL** 82:15,25 86:9 144:19 146:8 158:15
**CRISIS** 4:11,20 5:5
**CRITICAL** 152:12 155:10 202:1
**CROOKS** 161:18
**CROSS** 2:3 3:11 129:25
**CROSS-EXAMINATION** 3:6 129:3 129:8
**CROSS-REFERENCE** 66:25
**CROWDED** 56:10
**CULL** 151:15
**CUMULATIVE** 163:13
**CURIOUS** 94:2 176:10 197:14 221:6,15
**CURRENTLY** 190:11
**CURSORILY** 107:8
**CUSTODY** 168:15
**CUSTOMER** 44:16 87:7,8,23 217:14,23 218:2,3,4
**CUSTOMERS** 8:16 9:5 113:14 217:16
**CUTOFF** 23:2,3
**CUTTING** 38:15 70:20

**D**

**D** 69:2,17,17 143:11 144:5 166:16 202:21
**DADD** 37:8
**DAILY** 203:17
**DAMAGE** 113:15 114:11
**DAMAGED** 102:25
**DANGEROUS** 156:5
**DASH** 119:10
**DATA** 43:15 90:4 115:8,9 116:10 119:21,22,24
**DATABASE** 121:6
**DATE** 4:9 23:2,3,6 26:24 28:18 29:12 31:6,12,17,18,25 50:5 114:14 155:1 222:23
**DATES** 188:15 208:22 217:17
**DAUGHTER** 200:3
**DAVE** 45:19 55:9 181:8 191:18 223:13
**DAVID** 1:6,6,14 2:4,6,7 3:9,25 19:2 23:22 24:12 26:12 42:14 43:10 44:11,21,21 45:17 46:24 49:8 51:10 60:19,19 61:13 64:19 68:4 79:8 82:9,20 86:25 116:13 119:8 121:3 122:21 124:11,15,16 136:7 144:16 145:25 146:17 157:20 161:11 164:6 166:20 181:9,13 186:14,15 200:15 221:4 223:13 225:20
**DAY** 14:16 15:17 16:19 17:24 20:14 28:20,24 29:1 32:24 39:18 39:22 40:25 41:19 43:6,6 44:17 55:11 60:23 64:8 72:14 93:13 102:3,5,6,21 103:12 107:4 111:24 126:14,17 151:22 152:6 153:19 162:14 172:10 199:7 200:12 213:4 217:1 223:20 224:3 227:17
**DAYS** 11:14 28:24 31:25 32:24 38:18 114:16 153:15
**DAY-TO-DAY** 194:14
**DEAD** 75:7
**DEADLINE** 93:17,20
**DEADLINES** 11:14 155:9
**DEAL** 26:19,20 34:8 58:15 74:4,9 95:13 105:16 110:18 112:1 113:14 128:15 160:13 190:24,25 195:12,13,15
**DEALING** 27:1 31:21 48:10 102:4 102:10,18 120:9 130:7 193:13 210:20
**DEALS** 27:2 32:2 47:15 97:15 117:20
**DEALT** 33:6 44:15 49:9
**DEBBIE** 52:24
**DEBTS** 12:6 89:14
**DECEITFUL** 40:5
**DECEMBER** 1:10 3:2 28:15 30:6 33:10 226:8
**DECEPTIVE** 35:2 36:14,25 48:11 65:5 112:19
**DECIDED** 83:3 84:19 99:7 105:8 199:22
**DECISION** 38:8 174:8,13,15,21,21 180:11,14,18,19,20 198:5,17
**DECISIONS** 123:21 151:1
**DECLARATIONS** 37:3
**DECLINES** 207:19
**DEEMED** 188:22 218:3
**DEEP** 137:19,24
**DEEPLY** 151:10
**DEFENDANT** 10:15 15:14 27:24 53:18 73:19 75:10 159:2 163:10 168:12,18
**DEFENDANTS** 1:7,14 53:19 60:8 60:10 120:12 124:8 159:2 163:11 165:23 168:9 169:5 175:19,20,21 176:4
**DEFENDANT'S** 175:13
**DEFENSE** 82:25 119:18
**DEFINITELY** 49:19 98:15 112:25 221:17
**DEFINITION** 51:20 208:18
**DELAWARE** 101:21 163:21
**DELIVER** 168:14
**DELIVERED** 117:7,12
**DELL** 38:20 118:10
**DEMANDED** 43:14
**DEMOGRAPHICS** 136:21
**DENOMINATED** 12:1
**DENOTED** 141:6
**DENY** 164:7,19
**DEPARTMENT** 6:23 7:17,19,25 23:7,11 25:13 27:19 64:17 90:14 90:14 105:23 139:12 195:24 196:5,7,8 203:22 204:4 211:5,8 211:11 212:4 217:10
**DEPEND** 9:22
**DEPENDING** 89:21 96:24 131:2 134:3 191:1 200:3
**DEPENDS** 97:12 190:24 200:4 204:20
**DEPICTS** 65:19 66:4 93:1
**DEPOSIT** 179:18
**DEPOSITIONS** 221:9
**DEPUTIES** 84:24
**DESCRIBE** 36:1 66:18 77:19 78:5 143:9
**DESCRIBED** 12:10 21:9 38:19 61:5 101:6,7,9 103:7 104:4 124:21 184:22 198:12
**DESCRIBING** 56:7 100:11 120:23 121:2 154:18 182:7 184:18,21
**DESCRIPTION** 2:13
**DESIGNATED** 144:5 177:1 178:9
**DESIROUS** 219:4
**DESK** 14:18,21 19:7,13,16 20:10 21:7 204:8 206:20 207:2 218:24
**DESKS** 112:1 126:21
**DESPERATELY** 95:7
**DESTROYED** 16:15
**DETAIL** 48:3 137:1
**DETAILS** 127:20 135:19
**DETECTIVES** 141:1
**DETERMINATION** 9:23 74:15 85:11
**DETERMINE** 38:12 96:13,18 104:12 106:8 116:4 122:18 128:23
**DETERMINED** 85:16 103:4 105:18 127:16 181:1,3,8,12 215:19 216:9
**DETERMINING** 180:1
**DEVELOPED** 104:13 217:13
**DEVOTE** 149:25
**DIAGRAM** 65:18 67:4 71:16 73:8 73:24 202:14,25
**DIALED** 108:20
**DIDN'T** 15:5,12 20:19 28:12 39:19 40:3,4,17 49:2 50:19 61:11 63:18 98:8 102:15 103:9 104:24 107:19 114:8 115:21 116:11,20 116:25 120:14 121:7 135:18 137:15 142:17 143:6 147:14 148:24 152:14 157:19 160:11,24 161:4,22 162:14 169:8 170:2,5 172:6,8 201:25 212:6
**DIFFERENCE** 56:1 58:25 64:22

74:1 154:23 163:16 180:9
**DIFFERENT** 4:23 5:13,16 7:5,18,25 27:10,11 34:2 38:14 46:15 47:25 50:13 55:4 63:25 64:21 71:17 98:2,2 115:2 120:9 123:24 130:9 130:9,21 131:22 133:25 172:19 177:23 179:14 186:12 189:20 198:24 202:13,25 205:2,5,6,8 210:19 214:25
**DIFFERENTLY** 202:15
**DIFFICULT** 110:3 111:20 137:16 152:18 160:1
**DIFFICULTIES** 46:21
**DIFFICULTY** 5:7 40:12 44:20 46:24 152:15
**DIGITAL** 119:16 148:19
**DILIGENTLY** 12:24 85:7
**DIME** 170:11
**DIRECT** 2:3 10:9 77:3 96:4 100:3,8 149:15 155:14,17,22 171:16 174:3
**DIRECTED** 81:12 82:1,9 96:20 108:18 118:25 119:5 153:9
**DIRECTION** 143:18
**DIRECTIVES** 83:16
**DIRECTLY** 21:5,7,8 29:7 42:9 44:2 47:14 60:8 76:14 98:16 171:4 197:5 217:19 220:1 223:4,17
**DIRECTOR** 177:17
**DIRECTORS** 26:13
**DISAGREED** 55:25
**DISASTER** 55:1
**DISCLOSE** 58:17 103:22 111:7 158:2
**DISCLOSED** 16:4 112:22 150:6 156:23,24 191:25 219:11
**DISCLOSURE** 125:24 150:1 161:21 162:1
**DISCLOSURES** 55:20 57:13 98:2 167:12
**DISCOMFORT** 138:7
**DISCONNECTED** 160:3
**DISCOURSE** 136:20
**DISCOVERED** 100:17 108:10 156:23
**DISCOVERY** 119:16
**DISCREPANCY** 197:2
**DISCUSS** 196:19 203:8 208:7
**DISCUSSED** 21:11,15 34:8 121:3 128:11 174:6 177:18 179:22 194:24 196:18 202:1,3 206:5,10 210:24 217:7
**DISCUSSES** 207:25
**DISCUSSING** 9:14 103:16 166:1 192:7 195:2
**DISCUSSION** 27:23 30:9,15 38:17 39:8 135:17 137:13 167:22 191:13 206:2 208:14 209:1
**DISCUSSIONS** 18:19 31:14 84:12 104:10 121:15 191:10
**DISGUSTED** 14:8 15:3
**DISK** 39:10 42:9,16 43:1,5,7,11 45:2 46:12,16,17 49:8 53:10 143:21 206:25
**DISKS** 42:18 43:21,22,25 44:4 45:1 48:24 49:1,3,4,19
**DISMISS** 11:18
**DISPUTE** 139:13
**DISSOLVED** 6:5 22:25 23:1
**DISTRIBUTE** 173:11
**DISTRICT** 1:1,1 33:9 227:7,11,11
**DISTRUST** 111:4
**DISTRUSTFUL** 17:6
**DIVIDED** 131:2,8
**DIVISION** 23:13 25:14 27:2 176:23
**DIVISIONS** 27:1
**DOCKET** 11:13,15 62:14 129:12
**DOCKETED** 153:4
**DOCKETING** 11:2 93:16
**DOCKETS** 113:22
**DOCUMENT** 22:19 23:8,10 24:9 25:7,13,25 26:4 27:4 32:19 57:5 62:20 63:2 73:1 87:21 93:13 112:12,19 120:8 129:13 175:12 176:13 184:8,11,14 213:11,14 213:21,23 214:1
**DOCUMENTED** 215:6
**DOCUMENTS** 10:25 13:14 22:10 39:15 40:13 62:21 63:11 83:7,8 83:15,17,20 85:1,3,4 93:2 102:2 104:16,24 107:6 112:8 116:24 116:25 119:15 120:14,24 125:16
147:12,16,20 176:19 185:2 191:25 213:9
**DOE** 91:3 92:5,7
**DOESN'T** 8:23 9:13,15,21 20:22 37:11 47:12 48:11 55:2,3,4 58:21,22 60:21 74:1 95:12 119:25 204:7
**DOING** 23:2,3,4 71:21 73:25 87:21 100:13 110:10,11 131:3 161:25 167:2 174:16 182:12,15 188:6 193:21 194:4,14 195:7,8,17 197:20,20
**DOLL** 40:21
**DONAHOE** 186:16 188:3,8 190:20
**DOOR** 13:22 19:5,6,20 64:4 65:23 68:18 141:7,21 142:8,12,14
**DOORWAY** 18:23 197:7
**DOT** 58:13
**DOUBLE** 68:18 139:22
**DOUBT** 19:21 43:8,12,22 44:17,18 46:14,14,20,23,23 123:8 133:2,4 140:7,10 213:9,10
**DOUG** 173:22 186:15,17 188:7 190:12 192:19,21 215:13 223:13
**DOWNLOAD** 18:16
**DOWNLOADED** 8:13
**DOWNSTAIRS** 135:10 136:13
**DRAFT** 11:17
**DRAFTED** 31:24
**DRAFTING** 11:3,4 32:4
**DRAW** 180:24 195:9
**DRAWN** 69:22
**DRIVE** 39:10
**DROP** 207:13
**DROPPED** 206:20,24 207:2
**DUE** 209:11
**DULY** 3:10 77:2 87:1 100:6 171:15
**DUTIES** 77:18,20,24 78:12 123:18 173:5
**D.C** 7:11
**D/B/A** 125:18

**E**

**E** 1:13,14,22 70:13,16,16 143:9,10 143:10,21,25 144:1,5,6,7 168:4 175:19,21 202:21 227:3,3
**EAGER** 114:6
**EARLIER** 47:8 101:6 103:7 105:11 112:10 114:17 118:7,18 127:13 148:18 178:1
**EARLY** 96:20
**EARN** 56:8
**EARNED** 133:24
**EASIER** 135:3
**EASILY** 148:20
**EAST** 199:12 227:20
**EDD** 119:17,20 120:3
**EDGE** 181:24
**EDGES** 71:25
**EDUCATE** 162:18
**EDUCATIONAL** 77:6
**EFFECT** 137:17 138:3 144:23 152:23 153:19 161:6 163:25
**EFFORT** 115:21 139:19
**EFFORTS** 158:20 195:10
**EFLER** 7:22
**EIGHT** 37:8 74:14 125:2 126:21
**EIGHTY** 70:22
**EITHER** 9:5 45:25 49:18 70:23 87:11 90:9 102:20 104:5 106:17 121:7 127:13 163:20 165:22 166:22 189:17
**ELABORATED** 161:23
**ELECTED** 211:15
**ELECTRONIC** 119:16
**ELECTRONICALLY** 11:16
**ELEMENT** 9:19 54:18
**ELEMENTS** 54:14
**ELISA** 7:23
**ELISA'S** 7:24
**ELMO** 66:14,17,22 107:24
**ELOQUENTLY** 138:4 139:16
**ELSE'S** 159:15 207:6
**EMBARRASS** 58:16
**EMERGENCY** 55:16 56:7 57:1 78:2 155:15
**EMORY** 34:20
**EMPHATICALLY** 49:5
**EMPIRE** 64:9,9
**EMPLOYED** 131:4
**EMPLOYEE** 100:20,23 167:1 181:18
**EMPLOYEES** 52:19,23 82:9,9,11 101:1 128:23 168:16 180:4,5 182:1 212:5,9,11
**EMPLOYMENT** 24:16
**EMPTYING** 16:14
**ENCOMPASSED** 11:6
**ENGAGE** 89:15
**ENGAGING** 47:19 127:21
**ENGLISH** 221:20
**ENJOIN** 58:11
**ENJOINED** 57:20
**ENSURE** 102:24 119:25
**ENTER** 20:11 73:1 78:23 93:8
**ENTERED** 18:7 20:1 42:20 78:14 78:16 79:1,9,20 80:23 81:9,23 82:21 126:13 129:12 151:2 157:6
**ENTERING** 80:9 115:8 158:7
**ENTERPRISE** 6:14 9:12,21
**ENTIRE** 4:10 17:8 53:9 57:17 93:10 114:8 116:14 144:24 147:16 157:17 162:10
**ENTIRETY** 70:19
**ENTITIES** 177:16
**ENTITLED** 188:12
**ENTITY** 36:21
**ENTRANCE** 18:23 19:20 65:22 68:18 80:6
**ENTRANCEWAY** 68:19
**ENTRY** 115:8 142:22 147:21 168:21
**EQUITIES** 54:19
**EQUITY** 123:5
**ERROR** 115:13
**ESCROW** 55:16
**ESPECIALLY** 141:22 149:22 155:2
**ESQ** 1:14
**ESQS** 1:14,16
**ESSENCE** 14:3 35:23 84:24
**ESTABLISHED** 26:7 36:24 59:22 60:6,7 140:2 172:23
**ESTABLISHES** 26:16
**ESTATE** 149:20 155:4
**ESTIMATE** 4:9 75:24
**ET** 45:15 57:14 93:3 95:4 120:1 145:20
**ETHICAL** 32:25 55:24 150:1
**EVENING** 45:24 46:6 162:9
**EVENT** 120:21
**EVENTUALLY** 204:9
**EVERYBODY** 14:7 42:3 81:10,11 81:12,19,25 82:1 83:9,11,12 113:25 114:22 121:20 123:5 140:8 142:20,22 145:2,11 146:10,18,18 147:8 158:13,20 159:15,20 186:1 200:6
**EVIDENCE** 2:12 16:15 18:17 37:12 49:14 53:16 54:11,13 55:7 73:1 73:9 75:12 129:12,16,19,20 164:19,23 175:16 176:8,9
**EXACT** 4:9 19:12 29:12 31:17 50:5 53:9 56:24 205:16
**EXACTLY** 53:12 59:8 83:6 110:13 111:24 177:5 189:4 213:4 219:5
**EXAMINATION** 3:11 56:19 65:11 77:3 87:3 96:4 100:3,8 129:25 165:18 169:13 171:16
**EXAMINED** 3:10 77:2 87:1 100:6 171:15
**EXAMPLE** 8:15 9:2,4 11:19 38:15 50:9 78:10 88:13 89:5,23 95:19 96:10 107:18 109:13 116:17 131:16 179:25 180:23 191:4
**EXAMPLES** 36:21
**EXCEED** 36:18
**EXCHANGE** 55:22 134:23 135:9
**EXCUSE** 19:2 25:18 42:13 69:16
**EXECUTE** 202:2
**EXECUTED** 170:11
**EXECUTIVE** 52:17 60:14 61:6,10 123:22 124:1,3,9 164:10,14,20 173:14,16,17,22 174:6,10 175:5 175:6 176:2,12,18 178:6,11,13 178:14,15 179:7,8,11 180:1,13 180:17 184:9,15,17,20,23 185:3 185:6,9,15 186:13,18 188:17 194:4,20,23 196:9 197:11,19 198:22 199:4,9,11,24 200:7,24 201:6,7 202:4 203:8,10,11,16,19 205:22 206:2 207:15,25 209:3,7 209:9,20,21,22,25 210:17,18 211:16 212:6,13,17,18,22 213:3
213:6,12 214:4,25 215:12,19 216:8,12 222:21
**EXEMPTION** 99:11
**EXEMPTIONS** 34:15 35:5
**EXEMPTS** 34:13
**EXERCISE** 39:2
**EXHIBIT** 2:14,15,16 66:11 73:2,9 112:13 118:4 129:13,13,15,15 129:20 170:17 175:13 176:1,4,5 176:9 177:15 184:7 204:23 222:20
**EXHIBITS** 2:11,12 66:12
**EXIST** 6:6 9:21 48:11 178:25
**EXISTED** 89:4 158:3 170:8
**EXISTENCE** 3:22 4:3
**EXISTING** 89:3 90:4 183:1 196:20 197:1
**EXISTS** 6:5 111:5 213:14
**EXORBITANT** 134:2
**EXPAND** 72:8
**EXPANDING** 179:24
**EXPECT** 225:19
**EXPECTED** 158:9
**EXPERIENCE** 46:15 47:1 52:11 73:21 130:7 138:22
**EXPERT** 63:19
**EXPLAIN** 15:8 36:1 55:19 56:25 66:8 67:5 184:12,14 192:2
**EXPLAINED** 10:9 27:13 59:9 68:11 77:17,24 123:6 137:2 167:7
**EXPLAINING** 55:20
**EXPLANATION** 109:1
**EXPORT** 119:15
**EXPRESS** 57:7
**EXPRESSED** 52:17 138:7 164:22
**EXPRESSION** 128:3
**EXTEND** 34:1
**EXTENSIVE** 17:13,16 169:23
**EXTENSIVELY** 147:12
**EXTENT** 40:24 159:12 163:5
**EYES** 109:23
**E-MAIL** 17:22 21:19 28:18 29:7,13 87:23 88:3,9 117:15,19 118:1 119:13 162:16
**E-MAILED** 28:25
**E-MAILS** 10:25 21:18 40:20 62:9 93:3 153:9,21 155:7

**F**

**F** 70:13,14 202:21 227:3
**FACE** 61:17 81:16 191:3
**FACETIOUS** 67:23
**FACILITIES** 17:3
**FACILITY** 20:12 78:18 81:23 130:24 131:1 157:24 161:4
**FACT** 15:16,18,19 16:10 20:24 29:4 30:11 31:15,21,22 34:23 36:9 41:10 43:13 46:11 48:10 54:11 55:20 60:22 84:19 85:8 101:24 115:11 130:12 131:21 132:16 134:7,23 135:9 137:1 138:15,24,25 139:14,15 150:2 152:9 154:24 156:12 157:23 158:6 159:12,25 161:11 162:9 162:14 164:11,18,19 167:22 170:2
**FACTS** 75:9 130:20
**FAILED** 4:16,16,17 18:3
**FAIR** 56:13 133:17 169:18
**FAIRLY** 9:11 17:9 22:1 25:6 34:11 133:23 137:14,19,24 145:4
**FAIRNESS** 139:18 158:1
**FALL** 110:19
**FALLEN** 59:7
**FALLING** 156:21 217:18
**FALSE** 29:4 37:20,20,23 38:2,10 41:25 54:12 113:10
**FALSELY** 53:21
**FAMILIAR** 24:4 123:11 163:15 220:11,18 221:13 222:10
**FAMILY** 41:5 110:2 126:18 179:20 224:24
**FAR** 17:4 18:19 19:10,10 106:10 114:14 130:19 165:21 166:22 223:3
**FASHION** 97:25 158:9 198:18
**FAULT** 45:14
**FAVORABLE** 37:12
**FAXES** 155:8
**FEDERAL** 1:2 33:6,9 34:20,24 36:16 83:12 111:3 117:11 141:10,13 149:14 227:20

**FEE** 98:2,4 106:18 107:1,1 123:2 134:5,7 150:14 191:5
**FEEL** 49:3 53:4 111:4 114:1 145:11
**FEES** 10:11 99:8 133:11,23 134:2
**FEET** 204:11,11
**FEINGOLD'S** 84:8 85:12 122:21 166:7
**FEINSTEIN** 10:19 107:12 165:23
**FELL** 174:16
**FELT** 30:12,13 198:24
**FHA** 182:20
**FIELD** 55:1
**FIELDED** 164:16
**FIELDS** 219:11
**FIFTH** 207:20
**FIFTY** 154:1
**FIGURE** 41:18
**FIGURES** 9:3
**FILE** 10:23 39:12 41:20 42:16,17 42:24 49:17 50:20 70:14 83:22 83:23 85:8 88:2 93:10,13 101:25 109:9,12,23 114:25 115:17 116:8 117:6 119:1 128:15 150:23 151:16
**FILED** 14:12 26:24 27:12 37:2 54:17
**FILES** 9:14,16,17 12:23 16:1 43:18 45:7,8 46:10,22 49:7,8 55:4 85:4 85:9 93:22 100:20,23 102:1,1 103:19 113:20 114:3 119:2 130:13,14,14 131:24 145:20 146:1 150:20,24 151:9,19 152:1 152:2 159:22 160:1 210:12 214:2
**FILING** 27:19 158:8 176:22 177:4
**FILINGS** 11:2,2,10,12 64:17 154:10
**FILL** 28:14 89:4 101:1
**FILLED** 27:24 28:12 70:23 97:16 194:2
**FINAL** 9:23 174:21
**FINALLY** 21:4 53:15 73:11 106:6 144:14 152:5 165:1
**FINANCIAL** 4:20,22 5:5 8:19 10:25 10:25 12:6 23:7 27:24 28:16,19 28:21 29:11 30:5 31:10 32:16 34:14,16 58:15 62:12 64:15 95:1 98:5 99:12 125:24
**FINANCIALS** 18:12 29:2 32:1
**FINANCING** 5:23 94:11 112:18
**FINCH** 7:2,20
**FIND** 7:13 13:19 46:3 51:3,4,6 88:22 90:15 149:14,16 154:13 160:11
**FINE** 16:11 22:13 31:19 32:12 52:4 55:10 66:16,24 67:15 75:21 144:8
**FINGER** 80:2
**FINISH** 18:15 36:10 81:22 154:6 212:23 224:18
**FINISHED** 15:23
**FINLEY** 54:25 91:18 92:1,24 107:11 130:14 151:22 152:5,9 165:23
**FIRE** 56:10,12
**FIRED** 201:24 208:9
**FIRING** 61:8 174:2,12 179:10 208:11 211:13
**FIRM** 3:19 7:4,6,10 10:8 13:17 14:3 23:23 24:7 25:21 47:18 52:23 55:13 79:1,9 80:10,14,23 81:2 84:3 87:13 88:17,18 91:12,15,16 91:22 94:17 95:13 97:10,22 98:1 98:7,10,16,22 99:2,5,7 107:11 107:11,12,20 108:15,19 109:6 111:14 112:21 118:8 127:11,22 131:2,5,9 133:6,10,12,13,20 134:13 142:6 151:12 155:18,22 163:19 165:22,23 166:4,25 167:2,4,6,8 170:12 171:21 185:13,18 196:15 221:1,8
**FIRMS** 7:5 8:4 10:15,21 11:8 12:13 12:16,22 33:8,18 35:4 38:5 47:10,12 62:9,9,10 71:22 73:25 91:18,19,20 92:4 107:12 109:10 112:24 113:20,25 130:21,23 131:7,22 134:4 151:5 170:10
**FIRM'S** 80:7 126:23 133:23 221:11
**FIRSTHAND** 48:25
**FIT** 202:14
**FIVE** 14:11 17:15 31:25 34:8,12,16 36:6,17 37:8 41:16 46:5 47:10 47:14,20,23 53:19 57:4 74:14 107:3 126:21 129:4 147:25 173:22 174:22 175:4 176:18 178:8 188:19 192:20 193:6 203:18,20,24 204:3 208:4 209:7 211:19,22,22,25 215:17
**FIX** 94:15
**FL** 227:21
**FLAG** 33:6 47:15
**FLAGS** 33:3
**FLASHY** 57:4
**FLAT** 134:5
**FLIGHT** 225:8,24
**FLIP** 107:8
**FLOOR** 61:1 65:19 73:24 79:24 81:16 103:5,6,7 108:11,14,21 110:20 111:17,23 121:13 124:22 124:23 156:22 168:24 170:6
**FLORIDA** 1:1,10,23 3:1 6:12 12:21 23:11 25:13 34:22,23 35:21 63:19 89:24 98:5 99:6,10 154:16 155:4 163:21 227:7,12,14
**FLOWN** 126:18
**FLUCTUATE** 106:18
**FLYING** 225:6
**FOCUS** 136:10
**FOLLOW** 21:8 106:2 113:21,22
**FOLLOWING** 14:16 15:17 17:20 110:4,16 162:14 219:12
**FOLLOWS** 3:10 10:8 77:2 87:2 100:7 171:15
**FOLLOW-UP** 105:16
**FORCE** 8:21 12:11,12,13 37:5,9 39:14 40:13 41:2 42:9,15,21 43:1,4,5,6,9,12 44:2,4,14,16 45:2 46:8 49:1,6,9,11,13 50:19 51:3,8 61:14 92:9 93:9,20,20 115:2,10,14 116:8,10,25 117:2 117:21 121:5,21 124:20 127:23 150:14 151:15,19,20 153:2,12 161:1 173:7
**FORECLOSES** 153:25
**FORECLOSURE** 11:19 104:19 113:17 115:11,12 154:2,3 155:15
**FORECLOSURES** 154:24
**FOREFRONT** 80:17
**FOREGOING** 226:7 227:12
**FOREVER** 15:21,23 58:3,5,5,11 61:23,24 74:5 165:4
**FORGET** 69:15 125:23
**FORGETTING** 114:23
**FORGIVE** 183:12
**FORGOT** 21:12 148:18
**FORM** 28:9,11,14 121:11
**FORMAL** 215:7
**FORMALIZED** 27:15 200:9
**FORMED** 26:21
**FORMER** 132:19 217:9 218:7
**FORMS** 58:25 125:21,23,24,25
**FORT** 1:10,23 3:1 91:25 225:6 227:14,21
**FORTH** 54:3,13,22 94:18 151:3 197:20 198:3,4 205:9 221:10,10
**FORTHCOMING** 135:20 163:3
**FORWARD** 11:15 62:21 113:13 114:20 153:21 191:16
**FORWARDED** 30:6 191:18 192:12
**FOUND** 37:21 39:18 46:4 81:2 100:20 110:20 112:1 125:16,20 126:20
**FOUR** 17:15 52:23 72:19 92:24 106:17 137:4,9 140:5,22 141:3 147:25 148:1,2 158:7 200:4
**FOURTH** 207:19 215:11
**FOYER** 13:21
**FOYERS** 19:20
**FRAME** 5:4 102:11 215:23
**FRANCHISE** 38:16
**FRANCHISEE** 122:13
**FRANCHISOR** 122:13
**FRANKLY** 95:22 111:6 116:5
**FRAUDULENTLY** 113:7
**FREAKED** 138:3
**FREE** 161:3
**FRESH** 183:13
**FRIDAY** 14:16 43:6 45:12,13 60:16 102:22 103:12 108:11 109:25 117:2 148:11,11,23,23 149:4,5 200:21 202:2 224:11 226:8
**FRIDAYS** 52:18
**FRIENDLY** 149:19
**FRIGHTEN** 145:10
**FRIGHTENED** 158:21
**FRONT** 18:17 19:17,19 58:16 65:22 80:5 93:24 166:11 206:23 213:15
**FROZEN** 55:16
**FRUITION** 113:4
**FRUSTRATING** 106:6 139:7 160:5
**FRUSTRATION** 162:22 163:7,12
**FTC** 8:14 16:2 31:9 33:7,10,19 43:25 45:7 46:11 47:12,14,20 48:4,24 49:1 53:19 59:23 60:7 72:12 80:15 110:7 116:24 117:8 118:2,21 120:20 140:5 142:17 148:13 149:9 156:12,19 163:7 165:22 214:14
**FTC'S** 38:18 118:13
**FULL** 28:2,10 76:16 97:16,16 117:5 117:6 118:25 159:12 171:6
**FULLY** 21:9 101:7 111:7 118:6 124:21 170:11
**FUNCTION** 179:8
**FUND** 55:18
**FUNDS** 168:11
**FURTHER** 29:17,20 56:14 74:23 87:2 100:7 114:6 129:1 137:1 169:10
**F.U.C** 121:19
**F.U.H** 121:19 122:18

G

**G** 67:22 70:10 71:6,25 72:1 202:21
**GAIL** 7:2,20
**GAIN** 168:22
**GAINED** 125:7
**GALE** 7:22,23,23
**GALS** 70:23,24 131:18,23 153:18
**GANARRO** 7:22 72:7
**GARDENS** 37:4,19 64:20
**GATHERED** 109:24 200:6 210:1,6
**GATHERING** 90:11 100:22
**GAVEL** 200:9
**GENERAL** 89:1 93:9 137:10 212:16
**GENERALLY** 87:25 106:15 136:23 209:13,15,17
**GENERATE** 41:23 116:12 138:11
**GENERATED** 112:3 116:1 121:25 124:25 138:10
**GENERATING** 122:6
**GENESIS** 197:21
**GENTLEMAN** 200:16
**GENTLEMEN** 18:25 80:15 115:3 173:24 188:19 193:6
**GEORGIA** 149:10
**GETTING** 9:5 11:3 43:23 44:20 45:17 54:23 123:11 153:5 158:23 173:8 201:20 217:15 222:14
**GIDEON** 1:13 15:6 16:23 119:12
**GIDEON'S** 161:16
**GIFT** 218:13
**GILBERT** 173:22 216:5 223:14
**GILBRITH** 215:22
**GIRLS** 70:7,9,11,17 107:17 114:7,7 154:15 180:7,21,22 201:3
**GIVE** 5:4 17:12 23:8 31:13,17 32:1 38:14 42:12 53:8 59:6 62:19 66:13 75:24 76:10 78:7 92:4,7 94:1 106:1,11 119:2 139:5 157:21 164:1 170:25 191:4 207:11,13 210:7 213:20 216:21 218:13 220:16 221:2 222:9
**GIVEN** 16:23 34:21 39:25 44:8,10 44:10 73:20 87:13,20,23,24 107:18 108:15,17 109:1 159:13 161:3 167:23 169:16 183:3,4
**GIVES** 37:25 48:1 95:3 213:11
**GIVING** 9:7 53:11 170:7 189:10
**GLADLY** 17:12
**GLASS** 65:23
**GLORIA** 21:25 68:9,12,15,16
**GO** 10:1 12:7 20:8 28:12 30:3 32:6 32:15 41:5 42:17,23 43:14,18 47:24 48:19 49:15 50:19 51:3,4 52:17 55:12,13,14,19 58:12,20 60:14,15 62:25 63:12 67:3 74:19 75:15 78:21 79:20,24 80:1,5 85:12,16 86:3 91:16 93:4 95:13 95:16 96:18 100:23 106:13 109:22 111:19 113:11 120:22 126:19 127:20 129:3,10,22 136:10 137:8,8 142:3 153:23 156:7 157:12 162:6 165:20 171:12 173:7 174:21 175:9 176:5 177:12 179:4 181:6,21 185:7 192:1 194:10 195:22 199:1 200:17 202:6 208:13 213:21 214:3,15 217:6 221:5 222:17 223:8,25 224:6 225:2,13
**GOAL** 111:9
**GOALS** 215:20 216:10,10,14,15,17 216:18,19,20
**GOD** 76:11 171:1
**GOES** 48:3 58:2 60:5 61:25 62:6 67:5 75:7 92:9 93:7 96:11,21 151:9,13
**GOING** 21:17,19 30:2 39:5 41:16 41:17 45:25 50:16 51:6 65:6 71:7,16 72:1 74:9,16 79:24 81:3 81:25 82:13 84:4 85:18 95:5,9 100:12 102:25 103:2 104:13 110:2,9,14,18 112:14 113:5,13 113:14,17 114:1,20 120:10 124:22 126:9 130:2,5 134:3 142:24 143:8,25 144:9 149:12 149:13 157:5 161:13 162:5,6 167:3 175:23 176:4 182:24 194:6 200:14,15 204:7 207:23 219:14 221:9,10 224:5,5,11
**GOINGS** 139:12
**GOLDBERGER** 132:17
**GONZALEZ** 23:24
**GOOD** 3:3 15:13 86:17 95:5 111:10 115:8 119:4 122:20 125:25 132:5 149:20 165:14
**GOTTEN** 30:10 49:12 189:3 191:23
**GOVERNMENT** 182:20
**GOVERNMENTS** 198:4
**GRADUATE** 77:7
**GRADUATED** 77:10
**GRANTED** 159:8
**GRASP** 161:22
**GREAT** 40:12 48:3 58:15 86:2 101:25 112:1 150:15 163:6
**GREATER** 15:13 54:19 221:7,20
**GREATEST** 138:21
**GRILLO** 52:24
**GRIPS** 35:6
**GROUND** 143:5
**GROUP** 23:15,24 24:1,2,17 25:8,25 64:15 114:9 128:21 130:12 141:9 142:16 176:1
**GROUPS** 130:21 131:2,9,23
**GUESS** 7:3 9:10 50:23 53:13 64:6 68:1 92:10 104:12 115:11,13 165:1 186:23 190:10 200:10 219:14
**GUIDANCE** 37:25
**GUIDELINES** 122:8 151:3 179:20 195:3 208:24,25 219:12
**GUY** 20:18 44:14 49:9 57:4 118:14 138:2
**GUYS** 19:5 39:11,22 43:4,7 49:10 51:13 70:6 72:6 137:25 178:8
**GUY'S** 44:11,13 49:10

H

**H** 70:6,8 71:6,25 72:1 197:10
**HADN'T** 22:25 32:12 49:12 126:15 153:18 169:24
**HALF** 17:22 46:11 47:4 51:14 169:19
**HALLWAY** 68:17 80:6 141:6 142:13 147:2,3 166:8
**HAND** 22:10 76:8 170:23 227:16
**HANDED** 28:6,14 69:7
**HANDING** 32:16
**HANDLE** 60:16 83:19 91:20 101:3 173:10 198:25 208:8
**HANDLED** 35:7 55:6 100:25 133:20 173:12 191:15 203:19
**HANDLES** 134:2 178:6
**HANDLING** 20:23 128:15 191:11 191:14 221:9
**HANDS** 81:17 103:18 123:24
**HANUKKAH** 224:23
**HAPPEN** 20:19 60:20,21 115:13 157:18,19
**HAPPENED** 4:11 20:20 43:13 50:7 64:11 82:18 101:7 109:2 135:9 137:13 155:20 158:12 169:16 196:21 198:20
**HAPPENING** 30:2 101:24 169:1,2 204:12 208:5 218:2

**HAPPENS** 69:10 91:9 93:14 115:14 154:16
**HAPPY** 31:1 58:22
**HARD** 150:18 154:13 165:13
**HARDSHIP** 11:1 62:13
**HARDSHIPS** 12:6
**HARM** 9:20,21 54:20,21 58:6
**HARMS** 155:24
**HAROLD** 1:14
**HASN'T** 22:25 98:11
**HATE** 138:24
**HAVEN'T** 21:11 51:17 125:7 177:17 183:11
**HEAD** 19:15 105:22 195:24 196:4,5 196:7,8 223:25
**HEADING** 72:9 126:23
**HEALTH** 44:22 45:21
**HEAR** 22:1 76:15 109:4 145:8 147:14 171:5 173:18
**HEARD** 17:10 18:21 20:4,15,18 21:10 71:4 109:9 128:3 133:8 141:17 144:21 145:3,14 152:4 158:16 164:19 167:6 196:25
**HEARING** 1:9 9:1 11:22 12:4,5,7 40:25 45:4,5 55:5 80:18 93:18 224:18
**HEARINGS** 12:2,7 55:2 62:16 152:20,22 153:6
**HEFNER** 102:9 118:1 119:7
**HELD** 15:16 122:16 151:8 159:23 176:20 185:18 191:13 199:5,22 227:14
**HELLO** 16:23
**HELP** 40:25 46:3 53:1 76:11 89:13 90:6,21 91:6 94:12,15 98:13 113:4 140:14 171:1 182:24 183:1,2
**HELPED** 135:7 182:17
**HELPFUL** 139:8 161:20
**HELPING** 41:4
**HEREUNTO** 227:16
**HESITANT** 104:8
**HEY** 17:7 18:11 21:2 30:15 60:19 88:10 136:15 141:17 157:16,19
**HE'S** 22:2,2 122:23 123:7,25 138:20 139:10 152:2
**HIDDEN** 16:12,16 21:22 159:10 160:24,25
**HIDE** 21:13,17 41:8
**HIDING** 22:2 143:5
**HIGHLAND** 34:21
**HIRE** 89:17
**HIRED** 52:11 201:24
**HIRES** 89:20
**HIRING** 11:2 61:8 174:1,12 179:10 208:12 211:12
**HISTORIES** 101:2
**HISTORY** 4:15 24:16 34:12 74:10 95:9
**HOLD** 15:8 18:11 49:23 136:5 183:23 210:4
**HOLDING** 5:11 7:17 8:2,3 27:20 28:17 37:19 54:23 55:13 78:16 171:19 179:9 198:6
**HOLDINGS** 5:15,17,17,18 6:9,10 8:23 10:5,22,22 11:6,21 12:3,8 27:5 28:3 32:17 33:17 34:2 35:10,11,13 37:24 38:3,4,5,7 55:6 64:5 71:2 84:14,17,20,21 84:25 88:21 100:19 101:15,18 106:25 131:1,8 148:5 170:10 173:5,25 177:9,21,24 178:5,11 178:16,23 179:1,12 180:4,6,16 181:19 182:4 184:22 196:2 197:16 198:12 201:18 202:18,20
**HOLIDAY** 111:21
**HOLIDAYS** 110:14 126:18
**HOLLIE** 7:22
**HOME** 36:16 45:14,15,15 63:5 91:5 98:1 99:8 179:21 188:24 189:11 189:16,18 192:3,6 219:21 220:3 220:3,4 224:23
**HOMEOWNERS** 189:6,14,18 190:7 193:17
**HOMES** 155:21
**HOMESHORE** 59:23
**HONEST** 40:5,15
**HONESTLY** 192:18 200:12
**HONOR** 3:8 9:25 10:2 22:6,12 30:18 56:14 65:10,15 66:15 67:13 72:25 74:24 75:13,23 76:3 76:6 78:25 79:13 86:20 94:4 96:3 100:4 102:17 107:23 112:2 112:15 117:18 118:4 119:6 126:5 129:1,9,11 144:7 163:24 165:17 167:25 169:10 170:20 171:13 175:10,15,23 177:13 183:22 184:1 185:5 194:12 222:18 223:9,21 224:1,2,10,20 225:2,7,11,17 226:1,4
**HONORABLE** 1:10
**HONOR'S** 118:20
**HOOKED** 42:5 97:21
**HOPE** 150:25
**HOPED** 140:16
**HOPEFUL** 110:5,11 114:3
**HOPEFULLY** 132:2
**HOPING** 82:8
**HORSE** 75:7
**HOSPITAL** 55:15
**HOTEL** 224:14
**HOUR** 86:15 169:19 225:15
**HOURLY** 10:10 123:1
**HOURS** 16:18 30:1 44:17 59:6 83:24 149:6,8 157:10
**HOUSE** 35:24,25
**HOUSTON** 156:6
**HUGH** 102:9 118:1 119:7 120:5
**HUMAN** 115:13
**HUNDRED** 52:7,10,13 95:24 102:9 142:18 145:2,5
**HUNDREDS** 97:14,17 189:3 211:18
**HURT** 58:21 141:12
**HYPOTHETICAL** 112:21

**I**

**IDEA** 16:19,19 17:8 24:25 95:3 111:12 137:10 148:22 169:15 192:18 193:20 197:21 212:24
**IDEAS** 197:24 212:19,20,21
**IDENTIFICATION** 2:12 75:18
**IDENTIFIED** 22:12 71:12 79:6 126:22 129:16 175:13 176:4
**IDENTIFY** 31:14 73:1 161:1 184:7
**IDENTIFYING** 166:4 168:16
**IGNORING** 144:10
**ILLOGICAL** 32:6
**IMAGED** 8:13 12:12 43:1
**IMAGES** 42:9 46:12 119:14 120:2
**IMAGINE** 145:16
**IMMATERIAL** 149:4
**IMMEDIATE** 142:22
**IMMEDIATELY** 40:1 81:24 160:9,9 160:10,19 168:9
**IMPLEMENTING** 124:7
**IMPLODING** 4:20
**IMPORTANCE** 48:9
**IMPORTANT** 33:23 59:4,12,14,17 67:23 74:3 111:13 136:8 201:16 201:22
**IMPOSSIBLE** 60:21
**IMPRESSION** 121:11 122:21 123:15 124:1,11
**IMPRINT** 117:6 118:23,25
**INABILITY** 139:16
**INACCURATE** 44:23
**INARTFUL** 138:20
**INCEPTION** 140:15
**INCLINED** 224:2
**INCLUDE** 120:1
**INCLUDED** 193:7
**INCLUDES** 104:19 121:12 181:23 209:4
**INCLUDING** 10:24 52:19 72:20 84:24 153:15 174:24
**INCOME** 179:17 191:24
**INCOMING** 62:10
**INCONVENIENCE** 224:8
**INCORRECT** 39:17 53:25 54:1 97:12
**INCREDIBLE** 115:15
**INCREDIBLY** 106:5
**INDELIBLY** 19:23
**INDEPENDENT** 48:25 114:1 118:21 121:17,19,22 122:5,11 128:21 159:18 163:14 182:2
**INDEPENDENTLY** 9:18 36:25 54:6 121:17,23
**INDEX** 2:11 39:10,11
**INDICATE** 136:14 152:19 159:7 160:25
**INDICATED** 29:18 30:12 106:3 118:13 147:10 156:12 169:23
**INDICATING** 162:16
**INDICATION** 115:10
**INDIGNANT** 142:23
**INDIRECTLY** 132:11
**INDIVIDUAL** 9:23 44:2 53:18 60:8 60:10 95:6 116:1 124:8 138:11 191:16 192:12,13,24 194:8 221:3,12 222:9
**INDIVIDUALIZED** 69:4
**INDIVIDUALS** 128:19 138:10 153:15 174:14 194:4,14 195:6,7 211:25
**INDIVIDUAL'S** 123:24
**INDUSTRIES** 198:24
**INEPT** 49:20
**INFORMATION** 9:8 12:10 17:23 18:6,17 38:18 41:20 43:23 44:18 49:12 56:6 59:2 85:14 88:8 90:10 92:8,8,10 94:10 95:1 100:22 102:10 103:25 104:17,17 106:2 108:24 109:11,24 112:17 116:21 118:15 119:4,11,13 121:9 126:1,8,10 135:19 136:5 138:8 139:7 151:15 153:12,17 154:15 160:6,8 162:4,16 163:3 168:16 194:9,13 218:15 220:11 220:18 221:12
**INFORMED** 79:8 81:10 82:21 111:5 112:9 115:18 126:19 147:14 156:15,21
**INFORMING** 77:13
**INHERENT** 33:23
**INITIAL** 8:5 96:13,14,18 97:1,9 101:11 105:4 142:22 166:24 169:22
**INITIALLY** 10:10 13:10,10,13 98:19 157:2 191:15
**INJUNCTION** 1:9 9:12,19 57:9,9,20 57:22,22,23 58:4 59:16 74:8 78:2
**INNER** 164:14
**INPUT** 153:16 154:15
**INPUTTED** 217:20
**INPUTTING** 153:16
**INQUIRE** 86:4 105:2
**INQUIRY** 113:23 188:16
**INQUISITION** 135:5
**INSIDE** 79:23
**INSIGNIFICANT** 59:1
**INSTANCE** 181:2
**INSTANCES** 50:9
**INSTANT** 88:8
**INSTITUTION** 95:18 98:5 112:23
**INSTITUTIONS** 34:14,16 35:4 99:12
**INSTRUCT** 81:15
**INSTRUCTED** 42:15
**INSTRUCTIONS** 28:9 219:7,8
**INSTRUMENTAL** 152:11
**INSURANCE** 3:23 4:6
**INSURANCES** 3:18
**INTELLECTUALLY** 33:25
**INTENDED** 48:4 117:8 145:10,11
**INTENT** 35:22
**INTENTIONAL** 198:5,17
**INTERACT** 148:24
**INTERCEDED** 117:10
**INTEREST** 9:6 25:8 135:6 191:23 192:2
**INTERESTED** 9:1,7 42:22 92:13 106:7 116:16 162:17
**INTERESTING** 24:23 25:6 33:25 34:10 48:2 50:21 51:1,9 59:24 60:12 194:12
**INTERESTS** 12:18
**INTERNET** 45:12,13 89:5 97:1 188:1 193:22,25
**INTERPRETATION** 36:6
**INTERPRETING** 78:8
**INTERRUPT** 47:6 61:20 86:18 116:22 155:25
**INTERRUPTED** 63:12 120:22,24
**INTERRUPTING** 79:11
**INTERVIEW** 105:21,25 169:23
**INTERVIEWED** 38:11
**INTERVIEWING** 8:4 107:4 157:5
**INTIMIDATED** 140:18 142:25
**INTIMIDATING** 140:10,20
**INTIMIDATION** 140:14
**INTRODUCE** 19:8
**INTRODUCED** 19:2,9 53:17
**INVASION** 83:1,2
**INVESTIGATE** 18:4
**INVESTMENT** 179:21
**INVOLVED** 33:3 36:7 60:20 64:11 97:6 109:15 159:20 196:24
**INVOLVEMENT** 96:23
**INVOLVING** 156:19
**IN-DEPTH** 103:22
**IRON** 160:8,18
**IRREFUTABLE** 43:3
**IRREFUTABLY** 43:9
**IRRELEVANT** 9:12
**ISN'T** 16:2 30:2,16 37:17,24 38:7 41:22 67:9 69:22 74:8 95:5 98:7 133:10,10 134:17 138:15,18,20 138:24,25 153:7,10 154:22 156:11 158:6,8 164:10,18 168:8 170:9 181:24 182:12 184:18 189:11,21 198:7 204:19 208:1 208:15,21 211:5,8 212:1
**ISSUE** 31:1,20 33:7 45:21 46:8,13 50:10,14,15 59:14 60:4 65:5 84:1 86:10 102:3,15 115:25 116:7 130:6 151:10,11 156:16 156:19 162:20 165:7,11,13 174:5,17,23 189:4 196:22 200:12 202:1 203:9 207:8 208:8 210:21,25
**ISSUES** 30:23 33:3,21 42:5 44:22 44:25 78:6,9,10 82:24 83:2,10 83:15 84:22 85:6 89:12 95:7,14 95:20 102:4,7,18 104:21 115:19 140:1 145:19 173:12,19 179:14 179:18,18,18,19,19,22 193:14 194:23 195:2,3,4 196:17,18,20 199:17,18 200:16,17 202:3,3 203:11,14,17 208:11 210:20,24 217:11
**ITEM** 191:10 215:17 217:7,24
**ITEMS** 83:14,21 136:4 188:11
**I'LL** 13:1 21:21 59:22
**I'S** 58:13
**I'VE** 21:3,3 59:8 96:21 134:8
**I.T** 118:2

**J**

**J** 1:6,10,14 2:4,6,7 3:9 71:6,25 72:1 72:2,20,22 86:25 197:9
**JACK** 132:17
**JAM** 166:7
**JAN** 83:2
**JANE** 77:13 146:11
**JANUARY** 182:11,23 209:19 215:11 216:3,17 217:2,6 222:22 222:24 223:11 227:17
**JEFFREY** 20:18 39:4 118:22,25
**JERSEY** 155:3
**JOB** 128:23 141:14 164:7 165:14
**JOBS** 56:8
**JOHN** 91:3 92:5,7
**JOHNSTON** 39:22 180:20
**JOHNSTON'S** 39:20,25
**JOIN** 156:1
**JOINING** 217:22
**JUDGE** 13:1 31:24 36:15 48:6 56:5 56:17 61:23 66:8,10 67:9 72:13 75:2,4,14 76:12 79:15,22 86:4 86:13 100:1 130:5 132:2 213:15
**JUDGE'S** 57:12,17,25
**JUMP** 130:2
**JUNE** 27:15 205:21 207:16,23
**JURISDICTION** 33:11,20 48:1 89:22
**JURISDICTIONS** 11:18
**JURY** 55:10 58:12
**JUSTICE** 16:15

**K**

**K** 71:25 202:22 205:15
**KALIKS** 8:24
**KAM** 3:19,22,25 4:1,2,4,8 5:3 10:18 23:23,25 24:15,17 25:21 52:23 53:1 55:14 68:10,12,15,16 79:7 166:2,4,15 185:13,19 199:16,19 221:1
**KEEP** 15:14 39:6 52:1 75:19 114:22 115:16 144:6 162:18 185:20 188:15 210:11
**KEEPING** 186:2 208:19,22
**KEEPS** 185:15,23
**KEPT** 145:25 146:7,9 210:1,2
**KEY** 40:5 119:18,20 126:15 170:5

**KEYS** 168:20 169:24 170:2
**KIDMAN** 39:6
**KIDS** 209:11
**KIND** 17:6 30:19 60:23 67:23 81:2 83:9 100:25 104:12 122:15 127:22 132:10 134:11 136:22 138:2,6 141:9 143:19 155:9 161:21 163:18 174:4 181:10 201:1 210:24 211:17 217:18
**KINDS** 94:18 155:24
**KIRTZ** 1:14 19:11,12 73:4 102:9 117:14 170:20 171:13,17 175:10 175:11,15,18,20,23 176:1 177:13,14 179:5,6 181:7,22 183:21,24,25 184:3,5 185:8 190:1,6 194:11 195:23 199:2,3 202:7 203:4 205:12 214:16 215:9 216:2 222:18,19 223:9,10 223:21 225:2
**KIRTZMAN** 19:12
**KNEW** 21:14 56:6 108:12 113:21 149:19 150:2,10 152:7,7 195:7,8 195:17
**KNOCKED** 202:25
**KNOWLEDGE** 60:10 151:14 159:12 214:6,8 215:1 221:7,17 221:21,22 222:10
**KNOWN** 97:3
**KUDMAN** 1:15 13:11 17:5 21:15 39:6,7 40:11 41:10 42:25 76:3,4 77:5 86:18 99:24 100:11 126:8 130:19 165:21 170:15
**KUDMAN-RICHMAN** 2:5,9 76:18 77:1 100:5
**K-U-D-M-A-N** 76:19

**L**

**LABELED** 208:16,17
**LABOR** 48:21
**LACK** 100:17 123:2 159:13,15,19
**LADIES** 63:3 71:21 93:8 130:9,12 130:13,14,17 131:1,8 143:3 145:14 152:10 153:10 155:7
**LAID** 197:21
**LAND** 107:5 157:21
**LANDLORD** 4:5
**LANGUAGE** 94:20 221:20
**LARGE** 13:15 14:9 17:9
**LARGEST** 67:25
**LASTED** 134:24
**LATE** 14:19 89:7,11,12 102:20 125:5
**LATEST** 225:12
**LAUDERDALE** 1:10,23 3:1 91:25 225:6 227:14,21
**LAUGHABLE** 61:13
**LAWSUIT** 144:19
**LAWSUITS** 55:18
**LAWYER** 16:12 46:9 51:11 60:14 62:19,22 69:19 89:12 90:21 93:22 95:16 98:17 99:6,11,16 114:1 133:2,3 134:1 138:25 161:12 221:8
**LAWYERS** 11:16,17 12:22 13:16 32:3 35:4,16 45:15 47:17 48:4,6 52:21 59:10,20 68:12 82:23 89:11 92:14,21,22 93:1,11,21 134:10 137:14 147:13 166:22
**LAY** 107:5 111:13 157:21
**LAYING** 109:23
**LEAD** 56:2 91:1 92:10,12 96:14,16 96:18,20 141:10 188:23 189:8 189:10 218:11 219:16 220:2
**LEADS** 13:23 89:23,25 90:24 104:5 142:8 189:4 218:17,20,21 219:3 219:3
**LEANING** 14:21
**LEARN** 41:16 153:18 159:21 196:23
**LEARNED** 16:4 107:6 110:17,21,23 149:8 156:18
**LEASE** 4:1,4 61:2
**LEAVE** 82:2,10 94:12 144:11 146:19 170:17 207:11 225:8
**LEAVING** 21:13
**LED** 141:11
**LEFT** 13:15 21:20 33:11 39:21 40:2 47:17 58:23 82:11 100:14,15 102:19 146:20 147:13,16 210:13 210:14
**LEFT-HAND** 14:22 19:4
**LEGAL** 12:18 33:22 35:6 39:11 52:20 59:21 73:20 76:16 78:6,7 78:9 83:15,20 85:4,6 93:15 94:15 120:1 122:24 150:9 159:1 163:10 164:17 171:6 173:19 199:18 207:8 213:1 214:2,2
**LEGALITIES** 174:18
**LEGISLATIVE** 34:12
**LEGITIMATE** 35:19 161:25
**LEGITIMATELY** 138:19,20
**LEIMAN** 4:15,16
**LENDER** 27:2 179:19 183:10,11 191:1 195:3
**LENDERS** 26:20 27:2 34:17
**LENDER'S** 6:14,17 23:5 179:3
**LENDINGTREE** 186:23 187:1 191:24 193:1,24 195:4,19 217:13 218:4,4,9,16,17 219:1,5 219:9,10,14,16,24,25 220:2
**LENDINGTREE'S** 195:13
**LENDINGTREE.COM** 187:3,12,16 187:19,24 188:1,6,22 189:1,5,8 189:12,19 193:11,13,14,18,22 194:5,7 208:16
**LENDING'S** 88:20
**LENDS** 59:15
**LENGTH** 30:15 93:3 207:18
**LETTER** 32:7 34:22 35:1 67:19 119:6 206:21
**LETTERS** 11:1 55:24 62:13 166:5 206:15,18,19
**LETTING** 88:9 170:7
**LET'S** 16:24 20:8 51:24 58:12 73:3 76:1 85:25 97:19 106:22 129:2,4 139:24 164:2,4 191:6 199:4 205:20 209:19 215:10,10 222:20 225:22,23
**LEVEL** 63:1
**LEVELS** 102:17 128:19
**LIABILITIES** 163:16
**LIABILITY** 60:6
**LIABLE** 36:7
**LICENSE** 6:14,17 23:5 112:11 179:3
**LICENSED** 24:22,23 98:5
**LICENSING** 182:21
**LIE** 40:14 81:16
**LIEN** 154:23
**LIFE** 163:18
**LIGGINS** 19:1
**LIKED** 121:10 160:15
**LIKELIHOOD** 37:10 54:15
**LIKEN** 122:15
**LIKING** 142:1
**LIMIT** 97:19
**LIMITED** 41:23
**LINE** 2:13,13 8:13 28:13,13 56:21 56:21 57:6 58:23 63:22 106:12 198:16
**LINES** 90:17 198:2
**LINE-UP** 143:15 144:2
**LISA** 7:22
**LIST** 22:5 119:1,18,25 186:14 216:4
**LISTED** 34:23,25 177:6
**LISTEN** 42:11 52:14 161:11,15 173:13,16
**LISTING** 159:22
**LISTS** 186:14
**LITERALLY** 41:3
**LITIGANTS** 20:22
**LITIGATE** 35:12
**LITIGATION** 15:9 60:16
**LITTLE** 20:12 24:6 77:5,17 104:8 120:25 127:25 143:23 165:17 171:10 225:3
**LIVE** 30:16 54:8 56:3 149:18
**LIVES** 56:2 91:4
**LIVING** 56:9 133:3
**LIZ** 52:24
**LLC** 1:5 23:16 25:16,25 27:5,11 28:3 37:4 54:3,4 171:24
**LOAN** 53:22 63:5 84:17 91:13 94:23,24,25 95:6 97:19,20,24 98:13 99:1,4 101:18 104:13,16 106:24 109:13 115:1,5 116:17 116:19 151:1 182:12,15,16 183:9 189:23 191:4,5
**LOANS** 34:17 53:20 97:16 182:17 182:25 183:8,15
**LOBBY** 13:22 17:2 20:10 21:25 66:2
**LOCAL** 11:2 62:15
**LOCATED** 89:23 91:23 92:23 199:14
**LOCATION** 23:20 92:22 93:9 110:22 111:17,19 158:3 192:14 204:13,15 205:16
**LOCATIONS** 16:16 169:25
**LOCKED** 43:15,20 214:19,20
**LOCKS** 103:3,5 111:17,20 168:22 170:4
**LOCKSMITH** 126:16,16 170:3
**LOG** 12:20 62:13,14 92:8 93:11,19 119:1 120:10 151:19 193:4 195:20 208:17 218:5,6 219:10
**LOGGED** 39:21 40:2 51:5,7 189:5 219:6
**LOGGING** 41:2
**LOGIC** 49:18
**LOGICALLY** 65:3
**LOGS** 161:2
**LOG-INS** 51:17
**LONG** 17:16,22 56:22 57:5 75:22 109:14 144:10 162:10
**LONGER** 6:3 16:4 84:13 225:14
**LOOK** 8:21,21 22:19 24:9 26:21 31:23 34:11,12,18 35:5 46:12 49:2 51:11,15,16 57:3 61:5 62:19 65:18 70:19 73:23 74:20 82:24 83:5,21 84:25 85:3,3,6,16 93:12 95:12 102:2 111:1,25 120:15 137:15 142:21,22 166:6 186:8,9 204:5 213:9,13 216:3,4 219:1 223:2
**LOOKED** 17:14 35:1 59:7 64:18,23 65:1 79:1 83:16,22,23 107:9 110:18 126:20 127:4 147:6 151:9 186:8
**LOOKING** 9:10 18:11 57:4 83:9 87:6 91:2,12 94:23,25 104:13 117:23 120:19 189:15,17 192:6 210:18 217:17
**LOOKS** 26:7 67:21 94:14 143:25 185:12 207:25 210:18
**LOOSELY** 163:18
**LOSE** 56:8
**LOT** 12:1,7 22:4 31:3,3 78:24 95:7 96:16 110:4 111:4,20 112:7 114:17,18 121:6 125:16 130:8 140:9 143:8,17 148:8 152:9,15 157:5 161:12 172:7,8 183:1,2 189:24 191:1 210:19 212:2 217:15,18 218:15 219:17,19 221:22
**LOTS** 15:11,12,25 52:25 219:7
**LOUDLY** 144:22,24 145:1,4
**LOWER** 53:23 89:5 90:3,25
**LUMPING** 114:15
**LUNCH** 57:11 58:14 70:12 85:19 85:24 86:2 117:15 133:22 165:1

**M**

**M** 147:2 166:6,6,16
**MAIL** 10:24 62:8 93:5 114:10 153:8 153:20 206:20
**MAILS** 114:11
**MAIN** 91:24 92:2 106:7 121:19 122:6,12,16 168:25
**MAINTAIN** 86:6 114:2,2
**MAINTAINED** 11:10 123:7
**MAJOR** 123:21
**MAJORITY** 19:18 105:13 121:24 121:25 154:22 179:22
**MAKE-UP** 178:16
**MAKING** 30:14 38:8 65:7 97:11 123:6 124:5 159:25 193:12
**MAN** 30:18 59:5 165:12
**MANAGE** 38:1
**MANAGED** 180:21 201:2
**MANAGEMENT** 124:4 138:10 173:13
**MANAGER** 24:2 25:19 27:7 117:3 143:20 171:24 172:6 173:4
**MANAGING** 24:12,15,16 123:19,24 163:4
**MANDATORY** 57:22
**MANIPULATE** 43:18
**MARK** 72:25 129:15 144:7 175:23 176:5
**MARKED** 2:12 22:11 67:4 81:6,16 143:9 184:6
**MARKET** 4:20,22 217:18
**MARKETS** 5:6
**MARKING** 193:16
**MARRUCCI** 91:18,22 107:11,19,19 108:15 109:6 126:23 127:11 130:13 131:16,17,18 165:22
**MAT** 173:22 215:18,20,21 216:5 223:14
**MATERIAL** 36:19 97:1 100:21
**MATHEMATICAL** 137:6
**MATING** 215:14
**MATTER** 1:11 77:21 118:5 151:11 155:15 158:22 187:19 191:17 227:15
**MATTERS** 52:20 60:17 133:20 134:2,14
**MA'AM** 130:2 134:18 138:13 154:1 154:17 156:10 158:6 162:21
**MCDONALD'S** 5:17 38:14,15 122:10
**MEAGER** 37:10
**MEAN** 9:2 21:10 28:5 46:18 63:8 64:1 66:8 67:23 72:10 78:19 83:11 87:8 88:23,25 89:19 92:17 92:18 97:4 106:11 113:2 120:20 123:13 126:10 127:14 130:20 133:17 135:18 136:22 142:5 145:10 147:20 150:17 155:3 159:7 173:21 210:17 212:15 214:14 219:3 223:17 224:13
**MEANING** 45:6 127:16
**MEANS** 33:24 57:22 192:24,25 204:5
**MEANT** 10:18 221:23
**MECHANISM** 120:10
**MECHANISMS** 120:9
**MEDIA** 89:2,6
**MEDIATION** 11:3 12:8 62:16
**MEDICATION** 45:20
**MEET** 54:18 134:21 139:1 176:18 199:11 200:25 202:2 215:4,5
**MEETING** 20:9 52:18,19 60:15,15 84:5,7 101:6,8,11 103:15 157:16 169:22 185:10,22 186:3,6,13 188:11,17 191:7 199:4,5,18 200:7,7,10,11,15,15,21,22,23,24 201:4,6 203:7,9 205:23,23,25 207:15,16 208:13 209:11,25 215:3 216:18,23 223:11
**MEETINGS** 52:14 56:23 101:8 115:18 149:1 164:16 173:17 185:3,24 194:21 196:19 199:22 200:20 203:5 206:6 209:7,10,21 210:1 211:25 212:2 214:24,25 220:21
**MEMBER** 24:12,15,17 175:6 177:17
**MEMBERS** 61:6,11 124:8 148:13 163:5 164:20 201:10,11 215:17 216:9,13,24
**MEMOS** 107:10
**MENTAL** 85:21
**MENTIONED** 51:20 120:23 127:13 166:3 175:13 177:17 192:20 194:15 196:10 209:8
**MERELY** 133:11 164:11
**MERGER** 163:17
**MERITS** 54:16
**MESSAGE** 88:9
**MET** 13:10 14:25 114:21 134:18 157:13 202:8 209:22 215:20 216:10
**METAPHOR** 122:20
**METHOD** 104:4
**METHODOLOGY** 155:23
**MIAMI** 92:2
**MICHELLE** 1:16 45:16,24
**MICROPHONE** 76:14 171:4,9
**MIDDLE** 30:20 100:11 120:23
**MIDNIGHT** 17:17
**MIDWEST** 88:7
**MILMAN** 215:25
**MIND** 15:9 19:21,23 43:8,13 44:18 46:14 194:9 198:7
**MINIMIZE** 113:15 114:11
**MINUTE** 64:19 126:5 205:20 225:1
**MINUTES** 14:11 41:16 57:5 176:2 214:17 216:3 217:6 225:3
**MIRANDA** 11:13 39:20,25 40:9,20 41:11,13,22 42:3 93:14 114:21 114:22 116:8 128:19 143:19,21 144:3 153:15 180:20 196:19,24 197:5,6 200:21,25 201:24 202:8 203:5 207:3
**MIRANDA'S** 207:2

**MISHEARD** 158:17
**MISLEAD** 36:18 47:1
**MISSED** 209:11,12
**MISSING** 52:25
**MISSPEAK** 176:20 215:21
**MISSPOKE** 52:21 119:23 156:17
**MISSTATEMENTS** 54:2,4,7
**MISTAKE** 5:2 73:18
**MISUNDERSTANDING** 5:14 159:11
**MISUNDERSTOOD** 10:17
**MITZVAH** 46:1,6
**MIXING** 103:25 148:25 149:2
**MODE** 17:6
**MODEL** 101:21 106:25 122:10 136:15 137:2 162:3,4 163:21
**MODIFICATION** 63:8,9 87:15 91:7 91:11,14 97:24 98:13,17 99:2,4 104:14 106:25 109:13 116:17 151:1 183:14,17
**MODIFICATIONS** 26:25 27:3 37:6 53:21,22 84:18 87:17,20 97:19 97:20 101:19 104:16 106:16 109:17 115:5 116:19 182:12,15 182:17 189:23
**MODIFIED** 106:13 182:25
**MODIFY** 32:7
**MODIFYING** 26:20 183:8
**MOMENT** 92:20
**MOMMY** 149:23
**MONDAY** 45:5 110:16,17 119:7 156:11,18
**MONEY** 3:15,18 4:8,13,25 5:3 21:14,17 22:2 30:14 59:2 182:9 190:22
**MONIES** 55:17
**MONITOR** 15:24 50:12 105:12 149:14,17,22,25 151:5,16,19 217:14
**MONITORED** 105:10
**MONITORING** 147:5 153:4 217:8 217:12
**MONITORSHIP** 16:3 110:9,24
**MONTH** 4:5 10:23 41:18 106:24 134:4 136:23 137:2
**MONTHLY** 9:6 98:4 99:10 106:22 134:5 181:11
**MONTHS** 107:2,3
**MORNING** 3:3 22:22,23 24:13 29:24 188:4 223:22 226:6
**MORTGAGE** 4:11,20 5:6,21,23 6:7 6:17 26:21 53:20,22,24 63:5 87:15,16,19 90:5,16,17,19,24 91:6,6,11,13 98:15 104:17,21 106:23 112:14 137:3 182:25 183:8,11 186:20,22 187:6,14,22 188:10 189:23,25 192:10,23,25 193:8,9 201:20 217:18
**MORTGAGES** 6:11,13 53:23 179:17 190:8,10,11
**MOSCOWITZ** 13:10 29:17,19,25 42:20 46:18,20 77:13,23 81:10 82:5,6,14 83:3,12 84:6,23 102:21 103:13 105:25 113:3,19 134:18,24 140:22 146:11 148:12 150:6 156:1,3,5 162:13
**MOSCOWITZ'S** 41:7 71:4
**MOTHER** 55:14
**MOTION** 147:20
**MOTIONS** 11:17
**MOUNTAIN** 160:8,18
**MOVE** 10:12 129:11 164:2,4 177:15 205:20 225:12
**MOVED** 68:13 198:24 225:11
**MOVING** 71:17 158:23
**MULTIPLE** 15:17 20:20 89:2 95:20 189:19
**MULTI-PROPERTIES** 179:20
**MUNOZE** 37:7
**MURPHY** 173:23 216:6,7 223:15
**MUTUAL** 106:4
**MYSTERIOUS** 221:24

**N**

**N** 68:6 166:11,19,19 204:22
**NAME** 4:2 5:14,25 6:15 7:11,12,24 15:6 19:2,12 28:2,10 35:11 39:19,20,25 40:4,6 44:8,11,13 49:10 51:3,10 64:7,14 76:16,17 76:20 109:6 114:23 160:1 171:6 171:7 221:2 222:9
**NAMED** 7:10,21,22,23,23 165:22 177:23
**NAMES** 82:8 189:10
**NATIONAL** 89:6 225:10
**NATURE** 82:17 164:17
**NEAR** 143:19
**NECESSARILY** 11:19 46:18 109:12,15 120:20 142:17 158:10 163:2
**NECESSARY** 151:16 155:23
**NECESSITY** 75:5
**NEED** 12:23 18:6 51:14 54:14 89:11,13 90:18,19,20 92:5 94:14 95:8,16 98:13 111:6,7 149:13 157:17 165:4 170:2 194:1 208:23 213:1 219:11,13 224:4,7 225:12
**NEEDED** 28:12 29:17,19 39:15 44:20,21 46:2 106:9,19 113:21 202:1 217:13 219:1,9
**NEEDS** 15:25 93:22 106:13 152:2
**NEGOTIATE** 11:5 90:7
**NEGOTIATING** 90:22
**NEGOTIATIONS** 62:17,18 111:9 114:18
**NEIGHBORHOOD** 183:5
**NEITHER** 29:1
**NERVES** 139:16
**NET** 6:10
**NETWORK** 119:15
**NEVADA** 89:25
**NEVER** 6:15 11:7 19:25 21:21 24:6 24:8,25 31:20 36:8 42:6 45:11 46:12 51:7,7,7 59:18,20 60:2,18 60:20 61:3 77:16 81:18,18 104:15 109:4 123:7 125:4,10 134:6,7 135:21 136:5 150:23 151:21 152:6,7 155:4 156:15 159:10 167:6 169:2 174:23 182:16 194:9 196:7
**NEW** 32:11 137:25 155:3,3 207:20 215:17 216:9,24
**NICK** 69:22 143:23 146:2,2,3,4 173:23 186:15 187:4 188:7 190:14 192:21 215:13 223:14
**NICON** 148:22
**NIGHT** 14:25 17:20 46:4 54:25 72:12 85:15 89:7,11,12 101:24 102:19,20 110:16 222:15 224:23
**NINE** 37:7
**NOEL** 173:23 186:16 187:21 188:7 190:18 215:14 223:14
**NOMINAL** 150:14
**NONCHANGEABLE** 49:7
**NONLAWYERS** 158:9
**NONPROFIT** 26:15 27:1 177:25
**NONPROFITS** 26:20 27:3
**NON-FIRST** 102:1
**NOON** 86:15
**NOONISH** 225:11
**NOTATIONS** 107:9 115:2
**NOTE** 82:7,7 101:23 115:14
**NOTEBOOK** 159:21,22 160:15
**NOTEBOOKS** 97:14
**NOTED** 107:11
**NOTES** 19:14 61:11 115:16 184:12 184:15 185:3,6,12,15,20,24,25 185:25 186:1,2,3,4,8,8,9,10 191:6 195:21 205:22 209:20,25 210:5,6,7 215:11 216:5 217:8 219:7,8 222:21
**NOTICE** 64:6 154:18 155:1
**NOTICED** 18:24 25:9 57:19 130:8
**NOTICES** 93:6,7 154:3,9
**NOTIFICATIONS** 155:8
**NOTIFIED** 197:2
**NOTIFY** 113:25
**NOTORIOUS** 69:13
**NOTWITHSTANDING** 139:6
**NOT-FOR-PROFIT** 26:24
**NOVEMBER** 72:19 77:12 78:14 119:7 204:22 222:16
**NUANCES** 39:18
**NUMBER** 1:3 9:15,15 13:9 16:6,7 16:10,10,17 21:6,8 36:15 44:7,8 44:10 45:2,3 49:18,20 54:1,5,7 54:15 56:20 57:8 60:13 65:6 67:16 87:20,25 88:1,16,16,17,17 88:19,20,21,22,24 89:3,9 91:4,5 92:5,7 93:4 96:11,25 106:16,19 107:19 108:15,17,19,20 116:17 116:18,18 130:7 132:13 133:20 140:1 152:21,21 155:14,17 160:2,6,19 184:7 188:11 215:17 217:23
**NUMBERS** 58:20 107:13,15,16 130:6 131:22,23
**NUMEROUS** 186:12

**O**

**O** 67:21,25 166:6,7,11
**OATH** 86:7
**OBJECTION** 10:12 73:6 129:17 158:11 176:6
**OBLIGATION** 18:2,4 55:24 77:25 114:2,5 163:2 168:13
**OBLIGATIONS** 78:8 168:17
**OBSERVANCE** 159:18
**OBSTRUCTING** 16:14
**OBSTRUCTIONIST** 139:15
**OBTAIN** 53:20,22 115:5 119:14 125:4
**OBTAINING** 159:25
**OBVIOUSLY** 38:11 70:12 130:19 144:22 151:25 152:18 197:24 220:13
**OCCASIONS** 51:21
**OCCUR** 115:19
**OCCURRED** 100:14 101:6 102:12 115:12 140:15 165:7
**OCCURRING** 154:12
**ODD** 125:20
**OFFENDED** 22:1
**OFFERED** 99:18 109:17 129:16
**OFFERS** 39:5
**OFFICER** 124:13 177:16
**OFFICERS** 78:17 80:15 140:5,6,22 140:25 141:10,12 142:16 158:7
**OFFICES** 9:17 10:6 13:9 16:12,13 20:2 49:2 67:5,6 69:4 71:16 72:11 78:24 79:6 92:17,23,24 121:23 122:1 130:9 143:3,4,4 148:4,18 156:20 159:16 160:25 161:2,2 166:2,10,16,19,21 169:16
**OFFICIAL** 1:20 227:10,20
**OH** 10:17 16:23 22:2 29:7,15 44:11 64:25 87:16 103:2 143:6 150:15
**OKAY** 6:21 7:14 10:21 26:3 27:22 36:9 45:10 50:13 51:25 52:3 58:20 60:17 63:14,22 66:2,2,6 66:10 67:7,12,21 68:5,17 70:4,8 70:15,18,25 71:13 75:21 77:11 78:23 79:14 80:5,19 81:25 85:10 102:13,16 109:7 117:17 128:10 130:3,4 131:11,13 132:1,5,7 137:13 140:4,25 141:15 143:7 145:17,24 146:20,22 147:15 148:7,11,23 157:10,15,23 158:23 178:2 181:6 183:24 184:17 205:11 215:8 222:25 224:17 225:4,14
**OLD** 56:10
**ONCE** 20:19 32:8 39:10 50:15 60:5 85:15 108:18 112:7 119:20 120:2 147:23 160:5
**ONES** 22:5 37:1
**ONE'S** 45:14,20
**ONGOING** 59:25 72:14 98:3 106:22 115:22
**OPAQUE** 198:4
**OPEN** 3:2 40:2,22 58:21 70:23 114:10 141:20 142:14 162:2
**OPENED** 29:13 80:25 141:7,17,19
**OPENER** 97:3,5 105:18
**OPENERS** 104:9,12 127:13
**OPENING** 12:25 49:25 50:4,6 53:6
**OPERATE** 9:13,15 37:11 74:15 133:3
**OPERATED** 34:19,25 101:4 102:24 103:24
**OPERATING** 27:14 221:8
**OPERATION** 5:10,11 17:9 47:18 54:23 58:10 81:3 87:11 92:19 103:21 106:4 201:17,23 202:11 220:12,19 221:13 222:11
**OPERATIONAL** 15:25
**OPERATIONS** 6:6 8:5 9:11 73:19 87:5,7 113:8 115:22 121:2 122:2
**OPINION** 33:10 48:6 163:23
**OPINIONS** 32:23 33:1 34:7 53:15
**OPPORTUNITY** 100:22 109:4 122:13 154:25 165:2
**OPPOSED** 116:18,19 198:3,16
**OPTED** 189:12
**OPTS** 193:23
**ORATOR** 138:21
**ORDER** 11:5 30:3 31:23,23,25 32:4 32:6,11,11 34:1 36:9 57:12,15 57:17,25 73:12,14,15,18 97:24 98:3 99:10 147:21,22 158:25 168:3,8,10,13 200:8 208:23 224:2
**ORDERED** 31:10 57:24 117:5,7 168:3,9,14,20 169:5,5
**ORDERS** 32:15 59:10
**ORGANIZATION** 26:25 207:17
**ORIGINAL** 183:22,23 211:22 212:20
**ORIGINALLY** 211:19,22
**ORIGINALS** 75:17,19 183:19
**OSCAR** 23:24
**OUTDOOR** 79:23
**OUTDOORS** 79:25
**OUTLETS** 89:2
**OUTLINING** 119:13
**OUTRAGED** 21:16
**OUTRAGEOUS** 22:5
**OUTSIDE** 7:9 12:22 16:12 52:6,20 60:14,16 62:15 80:14 91:13 103:15 122:23 123:8,11 124:14 143:15,21 147:4 150:10 152:6 160:2 162:24 164:12 166:8 174:19 194:6 200:22 207:11 210:9,22,23 212:25 213:2 215:6 218:11 220:23
**OUTSOURCES** 131:6
**OUTSOURCING** 33:4,17 35:11,15 35:18 63:1 71:2 73:25 151:5,10 167:2
**OUTSTANDING** 183:12
**OVERALL** 106:18,20 107:1 198:11 201:23 203:24 220:19 221:13 222:10
**OVERHEAD** 10:23
**OVERHEARD** 20:7
**OVERSEE** 12:23 15:24 47:12 151:16
**OVERSEEING** 61:7 164:21
**OVERSIGHT** 115:23 124:5
**OVERVIEW** 103:14
**OVERWHELMING** 141:20
**OWE** 3:24 4:7,13 5:1,3
**OWED** 3:15,18 4:24,24
**OWES** 3:25
**OWNED** 9:18 24:1 25:18 36:25 54:6
**OWNER** 122:11 123:25 171:20 172:4,7 173:4 177:11 192:3 196:16 204:6 219:21 220:3,4,5
**OWNERS** 177:7 188:24 189:11
**OWNERSHIP** 83:8 172:14
**OWNS** 24:3 172:12
**O'CLOCK** 72:19

**P**

**P** 68:1,3,3 166:12,17,17,18,19,20
**PACKAGE** 8:20,22 41:15 176:2
**PACKET** 23:10 27:4
**PAD** 82:7,8
**PAGE** 2:13,13 17:22 57:19 94:8 184:11 185:9 191:6 193:6 205:20 208:14 215:11 216:5 222:20
**PAGES** 17:13,15 88:23 227:12
**PAID** 3:17,17 10:10 122:5,25 123:12 133:6,10,14 180:8 182:5 182:18 183:11 190:24 195:9,11
**PAINS** 101:25
**PAINSTAKINGLY** 158:19
**PALM** 37:4,19 64:20 121:12
**PANIC** 41:1
**PAPENFUSE** 119:9
**PAPER** 126:22
**PAPERLESSLY** 93:10
**PAPERS** 111:25 127:4 147:11 153:6 157:12
**PAPERWORK** 100:25 177:6
**PARAGRAPH** 168:4
**PARAMETERS** 50:17 52:16 95:1
**PARDON** 180:12
**PARENT** 50:13
**PARENTHESES** 119:17,17
**PARKING** 152:9
**PART** 27:21 57:12 74:9 77:19 83:22 92:18 111:13 112:6 115:5 118:8 141:8 158:16 159:19

166:14 176:2 189:21 195:5 196:23 198:7,15 205:14
**PARTIAL** 85:9
**PARTICIPATED** 59:13 60:8
**PARTICIPATION** 164:11
**PARTICULAR** 55:5 61:6 88:2,2 89:10 90:16 91:1 96:14 106:9,23 109:12 123:25 131:5 164:16,20 198:1 207:16
**PARTICULARLY** 82:25 101:13,21 101:23 105:13 123:13 134:3 142:25 158:5 205:2 206:7,8
**PARTIES** 14:12 55:17 89:17 156:22
**PARTLY** 110:5 135:18
**PARTNER** 122:25 123:19
**PARTNERS** 24:1,2 25:8,19,22 27:10 105:21 123:3 172:11,14 172:15,23 177:3,5,8,19
**PARTNERSHIP** 123:5 173:4
**PARTS** 121:13 124:5,6,7
**PARTY** 106:4
**PASANO** 119:8
**PASSWORD** 39:20,21 40:1,4,6 51:4,11
**PASSWORDS** 39:15 121:8 125:4,5 125:11 168:21
**PATHS** 198:16
**PAY** 4:3 55:17,18 106:24 165:10 191:2,2
**PAYING** 3:22 5:7
**PAYMENT** 10:4,14 123:9 188:15 208:19,22
**PAYMENTS** 4:4 9:6 53:24 91:6
**PAYS** 182:3
**PEEKING** 143:5
**PENCILS** 127:2
**PENDING** 25:3 92:12
**PEOPLE** 13:23 15:12 19:2,24 27:1 35:14 37:6,13 42:21 45:9 52:6,9 52:12,14 53:1 54:8,22 56:8,25 58:17,22 59:12 73:25 79:4 80:12 80:12,25 81:20 82:13,19,21 84:4 87:21 88:5 89:4 90:5,20,23 92:11,12 93:1 95:7 96:18 97:6 103:18 104:4,25 113:6,9 114:10 128:22,24 140:9 141:7,21 142:14,18 143:8 144:10 145:5 146:15 147:25 153:11 158:8 173:11 174:22 175:4 178:17,21 186:5 189:12 191:8 192:20 194:15 197:9 199:23 200:13 203:18,20 204:4,8 205:25 209:7 211:18,19 215:13 219:4 220:16
**PEOPLES** 200:4
**PERCEIVE** 166:4
**PERCEIVED** 139:14,15
**PERCENT** 37:7,8,8,9 52:7,10,13 70:22 72:22,22 73:24,24 74:2 95:24 102:9 145:2 190:25 191:24
**PERCENTAGE** 172:16,18,21
**PERFECT** 131:20
**PERFORMED** 99:6
**PERFORMING** 66:9
**PERIOD** 107:3 116:15 134:25 140:13 154:14 169:2
**PERMANENT** 58:4
**PERMANENTLY** 59:15
**PERMITTED** 49:5,13 139:1
**PERSON** 7:21 19:18 36:2,21 50:10 57:2 58:21 64:22 65:7 68:12 88:2,4,9,10 90:15,18 91:1,13 95:3 96:7,9,11,13,15 97:25 99:21 105:23 115:8 116:13 118:2,17 128:15,18 131:15 139:14 142:18 149:22 151:14 155:12 196:11 206:11,20 218:13 220:1,10,13,17
**PERSONAL** 58:17
**PERSONALITY** 31:1
**PERSONALLY** 126:14 146:9 162:23 201:25
**PERSONNEL** 173:12 181:16 191:15,20,21 196:25 202:3 203:6,7
**PERSON'S** 50:11 95:3,4
**PERSPECTIVE** 9:18
**PERTAINED** 104:17
**PERTINENT** 100:15 108:23
**PGA** 107:21 122:3,4 127:7
**PHENOMENAL** 115:7 121:6 153:2
**PHONE** 14:20 21:6 42:14 43:4,6 45:19 55:2 62:10 77:12 87:20,24 88:7 90:13 93:2 97:9 107:13 109:2,5 110:19,21 118:12 127:18,19,20 130:6 131:22,24 149:9 153:7,21 155:8,14 160:2 167:13
**PHOTOCOPIERS** 19:16
**PHOTOGRAPH** 14:10 49:16 68:24
**PHOTOGRAPHS** 66:13 148:17 175:17,22
**PHOTOS** 67:1 148:19
**PHYSICAL** 92:22
**PHYSICALLY** 91:23 92:3,18 130:24 131:4
**PICK** 49:3 121:1 219:25
**PICKED** 106:16 211:23
**PICTURE** 62:2 69:5 92:25
**PIECE** 126:22
**PIECES** 57:12
**PITCHES** 124:24 126:3
**PLACE** 16:24 18:9 27:15 115:16 124:20 165:3 169:4 185:22 188:16
**PLACED** 12:10 98:20 109:9 123:23 159:14 175:16
**PLACES** 168:25 203:14 205:8
**PLAIN** 141:2
**PLAINTIFF** 1:3,13 2:14,15,16 73:9 129:20 176:9
**PLAINTIFF'S** 73:2 79:12 81:5 93:23 112:13 129:15 175:25 176:1,5 177:15 184:7 204:23 205:6 222:20
**PLAN** 44:16 120:4
**PLANE** 224:4 225:13
**PLANNING** 117:10
**PLANS** 224:9,10
**PLATINUM** 44:15
**PLEASE** 3:3,5 13:8 18:8 46:25 75:3 76:7,13,14,16,20 78:21 81:12,24 86:17 99:24 100:13 113:25 117:11 119:25 129:7 144:15 170:17,22,23 171:3,4,6 190:2
**PLENTY** 226:2
**PLUG** 18:16
**PLUS** 4:6 10:23 142:18 176:18
**POINT** 4:10 8:24 9:10 18:20 19:17 20:9,25 37:13 48:21 50:22 51:9 52:25 55:7,12 58:1 61:22 64:16 66:19 80:24 84:9 85:18,21,24 87:9 94:14 95:24 98:9,19 102:13 108:6,16,18 132:13 136:18 138:6 147:7 148:2 152:4 154:21 166:3 191:3 197:3 205:15 219:21 223:19
**POINTED** 52:22
**POINTS** 83:17 128:11
**POLICE** 20:2 78:17 80:15 138:1 140:5,6,25 141:10,12 158:7
**POLLUTE** 44:25
**POLLUTED** 31:3
**POMPANO** 23:20,24 64:14,21 74:13 110:22 111:18 121:14 122:9 126:9
**POP** 39:12 95:20
**PORTFOLIO** 179:16
**PORTFOLIOS** 183:3,4
**PORTION** 4:3 168:2
**PORTIONS** 123:23
**POSITION** 5:10 16:9 33:15,16 47:20 61:21 171:18 174:4 186:19 187:4,13,21 188:3 198:25 204:8 221:14
**POSITIONS** 172:2 173:24
**POSITIVE** 150:24
**POSITIVELY** 13:7 38:10 43:11 46:25 72:23
**POSSESSION** 8:10 83:8 168:15
**POSSIBLE** 8:15 20:17 30:4 111:8 145:8 159:11 193:23 224:7,19 224:19
**POSSIBLY** 207:2 208:12 217:21
**POST** 25:1
**POSTED** 107:13
**POSTING** 93:13
**POTENTIAL** 87:10 88:15 90:9,10 92:11 101:1 108:7 219:19
**POTENTIALLY** 39:12 118:14
**POWER** 47:23 212:17
**PRACTICE** 7:11 32:3,14 36:14 59:10 132:16 133:25 151:11 155:3 200:3
**PRACTICES** 32:14 33:8 35:3 60:9 60:11
**PRACTICING** 132:11
**PRAISING** 40:20
**PRECEDED** 125:6
**PRECURSOR** 139:24
**PREDATED** 154:3
**PRELIMINARY** 1:9 154:10
**PREMISES** 78:16 82:2 83:25 157:8 157:17
**PREMIUM** 191:2
**PREPARE** 62:12,12
**PREPARED** 7:7 31:23,24
**PREPARES** 8:1
**PREPARING** 10:25 11:1 221:9
**PRESENCE** 139:2 169:21
**PRESENT** 24:23 84:11 134:19 164:15
**PRESENTED** 183:15 212:19,21,25
**PRESERVATION** 49:14
**PRESERVE** 83:10
**PRESIDENT** 50:25 51:2,6,15 123:17 163:4 171:22 172:4 173:4 176:15 177:1 189:2 194:25 196:16 200:19 204:1 206:15 212:11 213:6,8,12,14,18 214:5 216:23
**PRESS** 17:1 29:7 43:7
**PRESSED** 43:11 144:17 194:1 219:13
**PRESUME** 139:4
**PRETENSES** 113:10
**PRETTY** 15:20 16:1 32:3 40:16 58:21 101:10 102:18 111:1 122:20 126:25 127:3,4 141:20 142:21,23 146:20 161:1
**PREVENT** 155:24
**PREVIOUS** 165:9
**PREVIOUSLY** 87:1 89:4 100:6 156:23 190:10
**PRICE** 105:19 127:21 134:16
**PRICING** 136:15 137:2
**PRIMARY** 92:23 114:12
**PRINCIPAL** 24:17 25:4
**PRINCIPLES** 33:22 59:21
**PRINT** 39:9,23 51:13 119:1 148:20
**PRINTED** 22:22 24:13 25:10 41:6 148:19 217:7
**PRINTER** 42:2
**PRINTING** 40:10 41:4,19 42:2 46:21
**PRIOR** 46:10 47:3 101:10 110:1 138:22 154:8,11
**PRIVACY** 83:1
**PRIVILEGE** 39:3 78:10 82:24 83:10 83:15 84:22 102:4,7,10,17 119:1 120:18 145:19,20
**PRIVILEGED** 83:2,20 85:13 100:21 102:3 118:15 119:3,11,13,21 120:10,12,13,24
**PRIVY** 139:3,11 169:18
**PROBABLY** 17:7 21:13 29:23 35:12,14 85:20 89:7 93:23 95:2 104:23 109:22 121:6 125:25 181:2 182:20 183:6 213:24 214:1 220:14,22 224:6 225:12 225:13,15
**PROBLEM** 15:24 18:9 30:14,20 31:2 42:1,7 43:22 54:16 58:9 89:8 94:15 105:12 135:22 153:5 198:14
**PROBLEMS** 95:17 105:7 124:6 126:16 201:3,10
**PROCEED** 76:23 129:21
**PROCEEDING** 82:15 144:19
**PROCEEDINGS** 104:19 109:14 154:8 226:7 227:13
**PROCESS** 16:25 17:1 74:6 96:21 109:22 119:14 120:1 125:6 128:12,25 191:14
**PROCESSING** 179:15 201:19
**PROCESSOR** 192:1
**PROCESSORS** 191:21 218:25
**PRODUCE** 31:11 168:20
**PRODUCT** 97:12
**PRODUCTIVE** 134:25 135:1,8
**PROFESSION** 93:15
**PROFILE** 25:1
**PROFIT** 122:25 123:5
**PROFITABILITY** 133:11
**PROFITS** 123:10 133:15,15,16
**PROGRAM** 107:7 217:20 218:11
**PROGRAMS** 182:20,20
**PROGRESSION** 73:22 95:15 103:17
**PROHIBITION** 123:14
**PROJECT** 61:15
**PROMISED** 113:11
**PROMISING** 53:20,21
**PROPER** 101:15 153:24
**PROPERLY** 101:20 152:13 196:15
**PROPERTIES** 168:16
**PROPERTY** 168:11,22 179:19,21
**PROPOSALS** 55:3 173:14,20
**PROPOSITION** 47:9
**PROPRIETARY** 195:20
**PROTECT** 12:18
**PROTECTING** 49:21
**PROTECTIVE** 50:17
**PROVE** 54:15
**PROVEN** 54:14
**PROVERBIAL** 75:7
**PROVES** 18:10
**PROVIDE** 10:6,16 12:17 56:4 120:10 139:10 155:23 160:8 162:1 165:12 183:25 218:17
**PROVIDED** 5:21,22 6:8 11:7,10 13:15 29:8,10 35:17 54:12 98:4 104:23 106:19 108:19 115:24 116:3 215:20 216:10,11
**PROVIDING** 155:11
**PUBLIC** 64:10
**PULL** 40:20
**PULLED** 40:22 74:19
**PULLING** 72:8 95:3
**PUNCH** 61:16
**PURCHASE** 189:15,18 192:6
**PURE** 109:1
**PURPOSE** 26:18
**PURPOSES** 9:1 52:14 86:23
**PURSUANT** 84:19
**PUSHING** 143:1
**PUT** 15:24 24:6 28:3,10 35:21 40:21 62:18 66:14 69:24 79:16 81:16 107:23 127:6 138:4 197:23 215:22
**PUTTING** 35:22 124:20 153:12 197:16
**PX** 175:24 205:20

**Q**

**QUALIFY** 63:19 95:6 112:14 165:6
**QUARTER** 37:9
**QUESTION** 4:23 5:20 6:20 8:8 10:13,13,17 17:3 18:14 25:3 29:6 31:4,6 47:7 53:14 71:11,19 74:22 86:4 88:10 98:10,13,18 101:14 112:4 115:9 122:24 130:5 144:21 145:6 155:2 158:13 159:3 169:18 178:24 179:24 181:15 194:12 198:9,11 221:25 222:5 223:4
**QUESTIONED** 57:8
**QUESTIONING** 56:21 57:6 63:23 106:3
**QUESTIONS** 18:5 61:19 86:22 96:1 96:2,13 103:11 121:7 135:2 138:14,15 139:20,21 146:5 164:16 173:19 223:17,18
**QUICK** 8:12,19
**QUICKER** 30:1
**QUICKLY** 137:14,14 149:13 160:13
**QUITE** 30:17 40:15 95:22 116:5 137:6,9 138:4 198:13
**QUOTE** 150:17 191:13 215:18,20
**QUOTING** 152:11

**R**

**R** 1:16 227:3
**RADIO** 89:13 90:3
**RAISE** 76:7 170:23 171:10
**RAN** 103:16 174:10
**RANDY** 52:24
**RANG** 108:21
**RANGES** 137:11
**RAPIDLY** 30:4
**RATE** 9:6 106:8 123:1 127:17 191:23 192:2
**RATES** 127:14
**RATIONALIZE** 34:3
**RATON** 46:1
**RATTLE** 193:5
**REACH** 113:21 223:19

**REACHED** 110:6 111:15 113:19 155:16
**REACT** 145:16 158:9
**REACTED** 145:14
**REACTION** 142:18 145:15
**REACTIONS** 142:25
**READ** 13:14 17:12 28:8,13 29:13 36:13 38:12 57:12,17 61:10 64:23 73:11 119:6 147:11 157:12 159:5 168:2,3,5,8 190:3 190:5 223:3
**READING** 13:19 57:18
**REAL** 149:20 155:4 190:25 191:2
**REALIZE** 30:1
**REALIZED** 72:6
**REALLY** 15:12 18:3,4 40:4 41:15 48:2 50:21 51:1 58:18 59:14,17 60:12 77:22 102:3,15 103:8,10 103:13 110:11,14 113:24 114:12 114:18 121:9 123:19 127:1 135:2,5 138:1 152:2,16 158:19 172:6,9 174:23 182:16 183:14 193:5 195:8 198:7,13 205:16
**REASON** 35:17 53:25 74:14 123:8 131:21 133:2,4 134:23 158:20 160:15 198:1 208:9
**REASONABLE** 119:25
**REASONS** 105:11
**REBUTTAL** 75:12
**RECALL** 4:17,21 19:12 30:17 32:24 45:4 83:25 84:7,10 101:12 101:23 105:17 134:17 135:11 136:23 137:5 147:10 148:21 156:11 161:15 172:20,21
**RECEIVE** 49:3 62:18,21
**RECEIVED** 2:12 29:18,21 48:24 49:1 53:11 73:9 77:12 118:12 129:20 164:23 169:24 176:9
**RECEIVER** 1:15 14:7,13 15:19 20:8 28:17,19,22 29:5 40:11 41:17 44:19,25 45:3,7,7,8,10,11 46:9 46:16,17,18 49:24 53:5 59:5 77:14,24,25 78:4 84:23 147:21 163:7 168:10,15 222:15
**RECEIVERS** 46:15
**RECEIVERSHIP** 77:17 78:10 81:11 110:10 149:6,8 165:5 168:11,17
**RECEIVER'S** 14:13 29:15 46:9,19 47:2 78:3 129:14
**RECEIVES** 90:9
**RECEIVING** 11:1 155:7 165:10
**RECEPTION** 68:6 80:6 103:15 142:6 147:1 166:6,11
**RECEPTIONIST** 80:7
**RECESS** 86:3,15 129:5,6 226:5
**RECKONING** 55:11
**RECOGNIZE** 15:13 139:14 163:9
**RECOGNIZED** 17:5 35:20 36:3 45:21 50:24 65:5
**RECOLLECTION** 127:9 148:9
**RECONVENE** 135:17 226:8
**RECORD** 30:12,19 33:14 48:22 51:23,25,25 52:1 73:16 76:16 81:4 144:4 147:19 148:16 158:18 171:6 178:3 181:14 190:5 223:2,16
**RECORDED** 50:12 52:2,6,10,12 105:1,2,3,6,14 127:19,23
**RECORDING** 49:25 50:4,6 53:6,8 105:8
**RECORDINGS** 50:20 52:15
**RECORDS** 8:9,11,12 117:20,21 173:7
**RECROSS** 2:3 65:9,11 169:11,13
**RECRUITING** 207:20
**RECURRENT** 57:18
**RED** 19:5,6 33:3,6 47:15 69:13,17
**REDIRECT** 2:3 56:16,19 165:16,18
**REDIRECTED** 112:21
**REDUCTION** 9:6
**REFER** 6:10,13 19:5 67:16 94:17 112:8 147:19 166:25 175:12 216:19
**REFERENCE** 126:4
**REFERENCED** 88:13
**REFERRAL** 6:12 90:19 112:24 217:20
**REFERRALS** 217:9 218:7
**REFERRED** 87:4 91:12,14 97:10 97:16 104:10 112:12 118:17 122:1 167:5,8,10 214:9 218:14
**REFERRING** 38:3 81:5 128:8 188:21 192:22 202:10
**REFERS** 97:21 118:4 184:20 217:24
**REFI** 95:8
**REFINANCING** 5:21,24 6:7 63:6,8 94:24 112:20 179:16
**REFLECTION** 97:5
**REFRESH** 120:25
**REFRESHED** 127:9
**REFUNDS** 128:24
**REFUSED** 143:1
**REGARD** 20:14 84:22 105:7 114:3 115:21,22 117:20 121:5 165:9 165:12
**REGARDING** 21:20 35:17 54:2 105:7 151:1 160:8 191:13 202:9 220:11
**REGARDS** 27:3 47:14 58:1,12 60:13 95:21 156:10 198:6
**REGION** 89:22
**REGISTERED** 23:21,22,24 25:20 26:10 64:19,21 177:10
**REGULAR** 200:19 202:8 203:5,6
**REGULARLY** 32:2
**REGULATE** 34:13 48:4
**REGULATION** 23:7 47:17
**REGULATORY** 60:16
**REINHART** 132:21
**RELATED** 6:14 104:20 196:21 208:15 209:1 217:9
**RELATING** 179:19
**RELATIONSHIP** 15:5 38:14 87:9 101:22 104:12 111:7 112:9,24 121:11 127:21 139:25 140:12,15 155:22
**RELATIVELY** 204:21 205:4
**RELAXED** 198:13
**RELEVANCE** 163:22
**RELEVANT** 9:24,24 53:17 55:19
**RELIES** 51:3
**RELIEVED** 145:12
**REMAIN** 76:7 170:23
**REMAINDER** 119:22,24
**REMAINING** 14:12 166:10
**REMEMBER** 3:15 7:24 13:2 19:6 28:2,6 42:24 43:2 44:6,9,12,13 56:9,11 82:19 90:12 117:14 207:23 216:17 217:5
**REMINDER** 93:21
**REMOTE** 40:16
**REMOTELY** 12:13 62:19 93:11
**REMOVING** 15:19
**RENDERED** 116:20
**RENDITION** 27:14 145:3
**RENT** 3:17
**RENTS** 3:23
**REP** 44:8
**REPAIR** 111:6
**REPEAT** 190:1
**REPHRASE** 5:20 8:7 178:24
**REPLACED** 118:11
**REPLY** 193:25 194:7
**REPORT** 92:12 129:14 136:20 194:20,22 203:16 204:9
**REPORTED** 203:18
**REPORTER** 1:20 76:17 137:22 171:7 190:1,3 227:10,20
**REPORTING** 195:1,2,13
**REPORTS** 41:23 116:12,15 196:14
**REPRESENTATION** 36:17,18,19 36:20,22
**REPRESENTATIONS** 65:7
**REPRESENTATIVE** 42:15 156:14
**REPRESENTED** 68:24 120:21
**REPRESENTING** 35:9
**REPRINT** 126:2
**REQUEST** 45:11 144:11 191:24 193:23
**REQUESTED** 41:20,21 46:21 119:12 125:5 190:5
**REQUESTING** 138:8
**REQUIRE** 11:19
**REQUIRED** 109:17 159:1
**REQUIRES** 93:18 98:1,25 193:24
**RESCUE** 98:1 99:8
**RESEARCH** 37:21
**RESEARCHING** 9:19
**RESOLUTION** 30:2 113:4 128:12 128:25 135:8 140:14 191:18
**RESOLVE** 95:17 128:18,20
**RESOLVED** 128:16 140:16 149:13 191:16,17
**RESOLVING** 78:8
**RESOURCES** 33:4
**RESPECT** 7:16 63:5 81:5 87:4,14 87:16,19 178:5 180:15 197:15
**RESPOND** 62:9 90:20 219:9
**RESPONDED** 14:3 94:24 145:1
**RESPONSE** 17:18 51:12 93:17 137:19,24 145:6 158:12
**RESPONSIBILITIES** 77:20 123:18 123:22 124:19 173:6
**RESPONSIBILITY** 12:18 163:4
**RESPONSIBLE** 61:7 124:4,19 151:5,8,13 155:20 164:21 179:25 197:14,16
**REST** 75:8 159:19 166:2
**RESTATE** 135:3
**RESTAURANT** 122:12
**RESTRAIN** 55:12,13,14
**RESTRAINING** 73:12,14 147:21
**RESTRUCTURE** 179:17 183:1,2,5 183:7
**RESTRUCTURED** 182:17
**RESTRUCTURING** 60:17
**RESTS** 75:10
**RESULTS** 37:12 113:11,23 154:14
**RESUME** 111:9 113:8
**RETAINED** 8:5 77:11
**RETAINER** 134:7
**RETAKE** 3:4 86:21
**RETURN** 10:23 101:5 225:23
**RETURNED** 83:6 100:16 102:21 170:11
**RETURNS** 7:7 8:1 62:11
**REVIEW** 109:17 147:17 151:1
**REVIEWED** 34:15 45:8 163:20 191:14
**REVIEWING** 147:24
**REWORK** 183:4
**REWORKING** 183:9,15
**RIGHTFULLY** 49:14
**RING** 90:17 107:17,19 131:23
**RISE** 45:22
**RIVERA** 173:23 186:16 187:21 188:8 190:18 215:14 223:14
**ROBBINS** 119:8
**ROBIN** 219:24
**RODNEY** 119:8
**ROLE** 122:21 123:15,16 124:11 173:17
**ROLES** 88:5
**ROLLOVER** 88:4
**ROMS** 42:9
**ROOF** 74:17
**ROOM** 13:12,16 18:24 19:1,5,6,10 19:14 38:20,22,23,24,24 55:16 62:1,2,7 65:21 66:7 69:14,17,24 69:25 70:2,3,5,7,8,10,11,11,12 70:14,17 71:9,12 72:20,22 74:18 80:24 81:1 85:8 87:5,7 88:7 92:3 92:15,18,22 96:22 101:25 104:6 104:7 105:24 107:20 108:10 115:4 122:2,5 130:20 141:17 142:1 143:9,16,16,18 144:5,24 147:2 157:13,23,24 159:10 166:6,11 169:3 181:24 199:12 199:13,14,20 200:6 201:16 202:9,9,11
**ROOMS** 60:25 70:23 71:8,25 72:2 72:3,5 104:18 166:5 197:9
**ROUND** 104:11 219:24
**ROW** 19:13
**RPR-CM** 227:19
**RUINED** 15:7
**RULE** 33:4 34:9 47:15
**RULES** 86:6,12
**RUN** 115:6 119:18 121:17,23 174:8 198:18 211:4,7,10 212:3,10
**RUNGS** 103:21
**RUNNING** 78:1 114:16 122:14,17 174:9 198:11 221:8
**R-I-C-H-M-A-N** 76:19

**S**

**S** 1:21
**SABBATH** 14:19
**SAFEGUARD** 119:4
**SAFER** 156:6
**SAKE** 118:20
**SALARIED** 128:23
**SALARIES** 179:25 180:1,2,10,13
**SALARY** 180:24,25 181:1,8,9 195:9
**SALE** 97:11 99:16,21 139:11 154:8 154:11 155:1,15
**SALESFORCE.COM** 41:24 43:24 109:11 120:14
**SALESMAN** 60:20 61:16
**SALESMEN** 180:8
**SALESPEOPLE** 38:1,9 61:9 74:14 104:9 108:12 116:2,6 138:11 192:13,17,19,22,24 193:2,7 197:6 204:11,12,18 205:1,13 208:4 217:8,12,24 218:23
**SALESPERSON** 38:11 50:10 61:3 96:8,16,21 97:2,3,10,21,21 98:20 105:12 127:16 191:17 192:13 197:4
**SALSE** 39:14
**SAT** 14:9,11,13 15:11 16:20 20:10 20:11 40:22 41:13 42:14 103:13 136:13 140:11 143:18 159:5
**SATIRICAL** 61:18
**SATISFY** 219:13
**SATURDAY** 45:16,23,24 46:4
**SAVE** 63:21
**SAVINGS** 34:17,24
**SAVVY** 121:8
**SAW** 20:7 42:21 80:25 104:15,16 104:20 111:23 124:23 127:7 143:8 156:13 168:25,25 169:2
**SAYING** 10:16 17:23 21:18,20 30:8 39:6 48:3 52:1 118:14 131:11 140:18 142:2 144:5,14 146:1,9 153:10 161:9 212:10,12 223:6 224:17
**SAYS** 24:2,12,15,16,22 25:4,18,20 26:24 36:13 47:11 48:7 57:20 59:24 68:6 94:10,22 112:13 118:3 183:11 184:9,12 188:14 191:13 209:6 216:8,19 218:5 225:12
**SCALE** 67:24
**SCHANZLEH** 1:19 227:10,19,19
**SCHEDULE** 12:3 207:20 225:10
**SCHEDULES** 98:3 110:3 200:5
**SCHOOL** 56:9 57:21 77:9,9 163:19
**SCRAMBLING** 111:16
**SCREAMED** 146:17 158:19
**SCREEN** 67:9
**SCRIPT** 167:10
**SCRIPTS** 112:1,3,6 116:1 124:24 138:9,12
**SEAL** 105:16
**SEAN** 1:6 2:10 26:12 27:7,10 32:21 55:9 60:22 68:6 82:20 100:17 105:21 123:15 125:10 128:17 133:12 144:16 146:1 157:21 166:20 170:20,21 171:8,14 186:15 222:12 223:13
**SEARCH** 35:24 119:18,20
**SEATED** 3:3 76:13 86:17 129:7 171:3
**SEATS** 148:1
**SECOND** 17:21 45:1 46:20,23 65:19 79:24 102:5,6 103:6 107:4 108:21 116:22 121:12 179:21 191:6 207:16 217:8
**SECONDLY** 112:23
**SECONDS** 216:5
**SECRETARY** 64:17 176:23 186:11 210:3,8,9
**SECTION** 34:8,12,16 36:6,17 47:9 47:14,20,23 53:19 57:19 204:17 204:20 205:2
**SECURE** 102:25 111:16,18
**SECURING** 157:8
**SEE** 6:15 8:16 14:10 19:15,15 22:22 23:8,16,23 26:23 34:13 35:5 45:7,22 46:9,21 49:3 65:22 66:11 67:14 70:12 73:3 79:18 80:1 86:2 87:5 93:9,13 95:15 104:24 107:14 111:19 124:24 131:11 134:17 141:21 142:14,17 142:20 143:6,8,13 151:21 153:12 159:4 195:12,14,20 204:16 206:18 224:21 225:22 226:6
**SEEING** 116:16
**SEEKING** 112:20
**SEEN** 24:25 61:12 89:7 109:19 112:2 121:10 134:7 158:25 167:9,11
**SEGREGATE** 119:21
**SEGREGATED** 97:8

SELL 98:8
SELLING 37:1 38:16 60:19 189:22 193:9
SEMANTICS 133:14
SEND 28:18 29:25 93:5 99:2 162:7 162:10 219:24
SENDING 117:10
SENDS 117:11 219:25
SENSE 49:15 131:19,20 166:18 212:24
SENT 17:21 28:15,15,20 29:2,14 29:24 30:1 31:8,9 42:9 43:12,25 44:4 55:25 89:1 96:14 98:15,16
SEPARATE 6:11 34:5 35:19 36:3 37:15 43:17 45:9,11 46:13 47:4 47:15 54:6 64:25 65:3,4 68:13 74:11 85:6 95:23 118:4 142:7
SEPARATED 142:12
SEPARATING 85:7 101:25
SEPARATION 166:1
SEPTEMBER 4:17 23:6 179:3 182:22
SERENITY 142:5
SERVE 17:2
SERVED 147:12 154:17,24
SERVER 17:1,1
SERVERS 42:2
SERVICE 5:21 6:12 9:3 44:16 87:24 88:7 97:24 98:4 123:2 152:12,13 168:9 193:23 207:18 217:15,23 218:1,2,3,4 219:4
SERVICED 8:16 9:4 37:18 54:22,24 84:16,17 97:25 122:2
SERVICER 16:13
SERVICES 11:7 87:22 92:13 99:5,9 99:18 104:23 105:19 106:9,19 116:19 122:25 127:22 131:7 134:5 137:7 152:10 155:11 165:10 189:23 193:9,12
SERVICING 6:8 113:7 137:3 165:8
SESSION 86:16
SET 7:25 12:2 54:3,13 66:17 109:21 127:14 150:19 151:3 152:17 185:12 198:17 201:13 202:14 205:22 210:7 212:18,22 213:1 216:3,5 217:6 227:16
SETH 186:16 188:3,8 190:20
SETTLEMENT 21:21 55:3 59:7 62:20,21
SET-UPS 79:23
SEVEN 125:2
SEVERED 112:9
SHADOW 43:21
SHEET 27:17 143:2 144:15,15 146:14
SHEETS 218:11
SHOCKED 21:16
SHOES 84:25
SHOP 141:24 142:1
SHORT 129:2 154:14
SHOT 35:25 36:1,2
SHOULDN'T 45:6 50:24 61:17 82:24 120:19
SHOUTED 19:24
SHOUTING 19:25
SHOW 16:24 17:3 18:2,8 28:5 35:18 36:17,20 40:24 54:17 59:5 60:8 65:25 114:25 136:22 161:2 161:24 167:25 206:19
SHOWED 13:9 16:17 37:12 62:3 114:24 115:1 117:14 136:20 140:4,21 157:10
SHOWING 25:3 80:3 118:1 143:11 156:20 184:6
SHOWN 16:13 102:8
SHOWS 27:7,12 56:1
SHREDIT 16:13
SHRED-IT 156:13,13,20
SHUT 35:15 56:8 57:10 74:4,5
SHUTS 74:7
SHY 136:19
SIDE 13:11,11 14:22 20:12 56:4 65:20 143:3,4 166:9 199:14
SIGHT 167:23
SIGN 18:17 64:4 92:11 143:2 144:15 146:14
SIGNATURE 32:19,20
SIGNED 31:24 32:5,12 61:2 109:18
SIGNIFICANCE 48:9
SIGNIFICANT 59:2
SIGNIFICANTLY 134:13
SIGN-IN 144:15 146:14
SIGN-OUT 144:15
SIGN-UP 143:2
SIMILAR 132:12 202:16,17
SIMPLE 138:9
SIMPLY 71:15 106:1 116:10
SINASOHN 1:13 3:8,13 10:2,3 20:13 22:6,9,11,14 34:6 48:20 56:14,20 57:11 65:10,12,14,17 66:14,20,23 67:2,13 69:20 71:3 71:18,20 72:18,25 73:10 74:23 75:13,23 76:3 77:4 79:13,17 80:21 82:3 94:4 96:3,6 100:4,10 107:23 108:1 110:19 114:13 117:18,22 118:17,20 119:8 120:6 126:5,7 129:1,9,11 148:13 152:5 160:23 162:11 165:17,19 167:14,24 168:1,7 169:10 224:1 224:10,14,20,22 225:7,9,16,19 226:1,4
SINCERELY 19:15 142:5
SINGLE 17:14,25 18:8 38:11 41:6 41:19 42:16 45:2 49:17 61:3 142:18 153:19 154:25 170:9 179:20
SIT 13:19 17:24 28:12 39:22 42:11 52:14 80:7 81:14 84:1 103:11 105:17 157:12,16 196:19
SITE 37:19 119:14 121:12,14 122:9 126:9,14,15,20 159:23 168:24 188:22
SITES 16:4
SITS 61:14 143:19,21
SITTING 4:9 19:13,14,16 22:1 40:9 57:4 80:25 135:11,12,13,14,16 136:14,14 143:16 148:1,2 197:7 200:13 204:13,15,18,25 205:13 206:23 213:15 216:23 218:23
SITUATION 45:4 83:4 99:10 136:6 140:8,10
SITUATIONS 64:11 83:19 94:18
SIX 17:15 37:7 57:19 68:25 134:10 191:24 211:17 213:4
SIZE 190:24 195:12,12,14
SIZED 134:13
SKIPPED 22:2
SLASH 10:5 88:7 100:19
SLICED 69:19,21
SLOW 24:20 62:23 137:20
SMALL 134:3 180:25
SMALLER 12:1
SMILING 132:10
SNIPPET 53:11
SOCCER 200:3
SOFTWARE 8:21 41:15 115:7 150:15 195:20 208:17 217:8,12 218:5
SOLD 64:10 98:12,22 155:21 218:1
SOLEMNLY 76:9 170:24
SOLITARY 41:20
SOMEBODY 25:2 31:9 43:9,24 52:25 82:13,20,21 84:9 99:1 141:17 144:25 145:8 149:17 158:16,17 167:4 196:22 201:24 201:25
SOMEWHAT 132:11 137:8,8
SONIA 7:10
SOON 160:9,21
SORRY 61:17 62:24 67:19,21 72:5 75:16 79:3 80:22 83:3 84:5 103:2 119:23 120:25 124:16,16 127:9 138:2 140:21 154:7 166:18 184:19 190:1 198:10 211:21 214:14 215:10 216:7 222:23
SORT 79:23,23 83:17 100:18 105:22 110:10 114:15,16 141:16 143:23 149:22 219:4
SORTS 208:1
SOUNDED 39:11 114:17 182:8
SOUNDS 64:15 112:13 122:25 123:4
SOURCE 90:23 161:2 163:6 189:8 189:10
SOURCES 90:11 219:16
SOUTHERN 1:1 227:7,11
SO-CALLED 51:15 157:23 159:10
SPACE 70:20,22 72:23 73:25 74:2 127:1
SPACED 17:14
SPACES 170:8
SPEAK 13:2,13 14:15 20:2,15,21 20:21,22 21:2 44:1 72:10 76:14 86:8 90:15 105:16 106:14 136:11 137:14 139:6,22 151:24 165:2 171:4 200:17
SPEAKER 14:22,24
SPEAKING 14:17,20 21:2,4 63:23 136:19 167:1,3 171:9
SPEAKS 30:21 51:21 99:21
SPECIAL 67:9
SPECIALIST 87:24 119:17,21
SPECIFIC 4:12 44:14 131:21
SPECIFICALLY 29:16 45:3 47:25 48:4 61:25 62:6 63:24 82:7 84:10 85:9 91:10 98:15 193:21
SPECULATION 109:1,5
SPELL 76:17 171:7
SPENT 58:14 138:18
SPIRAL 159:21
SPLIT 89:25 174:20
SPOKE 15:22 29:15,16 44:1,3 56:20 77:22 79:8 92:23 117:3 118:24 133:22 147:11 203:18
SPOKEN 61:3 75:5 167:16
SPREAD 190:25 191:2
SPRINGS 74:10
SPUR 92:19
STACK 147:12,16
STAFF 201:2
STAIRWAY 79:22
STAND 3:5 17:24 54:9 76:5 86:22 101:13 170:22 225:20
STANDARD 32:13 194:7
STANDARDS 37:25 38:16 122:8,14 122:18
STANDING 13:24 14:20 18:23 19:4 19:19 21:1 30:3 31:16 76:7 80:16 81:18 135:11 170:23
STANDS 101:13
STARING 57:2
START 3:24 4:7 5:3 100:22,25 103:14 130:5 183:13 200:14,15
STARTED 4:13,20 27:14 41:1,11 45:5,5 76:1 103:15 144:14 182:11 212:14
STARTING 78:14 182:23
STARTS 218:2
STATE 23:11 25:14 27:19 30:11 34:22,23 47:24 64:17 76:16 84:12 89:25 92:24 148:16,18 152:23 154:16 155:19 171:6 176:23
STATED 49:5 71:16 83:18 113:17 227:15
STATEMENT 27:24 32:16 53:9,10 138:23 150:14
STATEMENTS 28:16,19,21 29:11 30:5 31:10 46:23 62:11
STATES 1:1 11:14 33:12 47:17 55:25 154:22 155:5 177:7 215:18 227:6,11
STATIC 43:17 49:7
STATING 110:20 162:24
STATIONS 127:2
STATISTICAL 136:22
STATUS 55:4 117:13 188:15 208:19,22
STATUTE 48:7,8 98:1,6 99:6,8,13
STATUTORILY 47:22
STAY 126:18 146:23 224:14,15
STAYED 41:4,5 147:1
STEP 75:1 76:5 78:22,22 81:12 86:19 99:24 156:4 170:16,17,22 225:5
STEPPED 84:24
STEPS 157:11
STERLING 160:16
STOOD 39:4 152:6
STOP 50:3 57:23 73:22 81:12,24 105:8 144:20
STOPPED 15:21 23:4,9 49:25 53:6 53:8 83:9 115:11
STORY 56:5 160:11
STRAIGHT 10:10 13:20,22 106:1 159:17
STRAIGHTFORWARD 64:2
STRATTON 10:19 91:19 107:12 130:14 165:22
STRIKE 10:12
STRONG 115:21
STRUCTURE 123:9 191:1 197:15 198:4,17 200:14 202:14
STRUCTURED 197:18
STRUCTURES 165:10 213:1
STRUCTURING 163:17
STRUGGLING 91:5
STUFF 12:12 15:10 34:21 46:13 51:13 58:13 93:8 127:22 182:19 202:24
STUPID 161:1
STYLE 137:25
SUBJECT 119:10
SUBPOENAED 152:5
SUBSEQUENTLY 39:24
SUBSTANTIAL 182:12 189:21
SUBSTANTIALLY 53:23 65:19 66:4
SUBSTANTIVE 100:24 135:2 223:18
SUBSTANTIVELY 103:20
SUCCEEDED 112:11
SUCCESS 37:10 54:16
SUCCESSFUL 9:5 30:17
SUCCESSFULLY 153:16
SUCCESSIVE 101:22
SUCCESSOR 84:21 101:15,20 163:16
SUDDEN 141:18,24,25 152:17
SUE 47:25 55:8,8,9 65:3
SUED 14:1 36:23 50:23 65:1 74:11 74:11 148:3
SUGGESTIONS 124:6
SUING 61:13
SUITE 68:14 123:4
SUMMARIES 11:4,4 62:17
SUMMARY 12:6 17:8,16 161:21 162:6,10,15
SUMMER 27:15,16
SUMMONED 83:25
SUMMONS 62:13 147:20 154:17 154:24
SUMMONSES 11:13 93:5
SUNDAY 21:19,19 40:25 41:3 46:2 46:7
SUNDOWN 14:19
SUNRISE 56:22
SUPERVISE 204:4
SUPERVISING 197:9 209:2
SUPERVISOR 174:3 203:24 204:3
SUPPLEMENT 162:15
SUPPORT 10:7,15 11:11 12:17 64:5 71:22,23 83:19 128:15 134:11 151:12 152:3
SUPPORTS 47:9
SUPPOSE 78:16 83:18
SUPPOSED 67:10
SUPPOSEDLY 18:19
SUPREME 56:11
SURE 7:10 11:21 12:3,23 17:19 28:8 29:17 30:3 36:11 39:7 40:16 43:17 49:16 50:12 51:17 56:9 65:6 80:4 82:13 86:5,24 102:9 108:4 109:11,14,18 110:21 111:24 113:9,11,20 116:23 117:23 124:18 130:16,18 135:25 141:11,16 143:16 147:25 150:6,10 151:6 153:24 164:13 167:12,19,21 172:6 173:7 174:17 175:15 176:14,19 177:5 178:3 185:25 186:1 196:14 197:25 198:13 203:17 204:20 207:9 208:4,10 213:4 214:22 217:4 219:5
SURPRISED 142:23
SURRENDERED 179:2 182:21
SURVEY 179:18
SWEAR 76:9 170:24
SWEAT 141:24 142:1
SWEATING 152:16
SWEETHEART 41:13
SWORN 3:10 77:2 87:1 100:6 171:15
SYSTEM 49:15,22 51:5 56:3,4 62:19 93:19 115:14,15 154:10 195:13 208:24 217:14,21 218:6 218:10,14,22 219:6,10,17
S/CARL 227:19

T

T 227:3,3
TAB 36:15
TABLE 2:2 14:10 200:14
TABULATED 59:3
TAG 18:17
TAKE 22:19 24:9 34:1 41:7,17 42:15 51:11,15,16 62:10 65:18

74:1 81:13 82:8 92:19 93:22 100:21 113:9 120:2 123:9 126:6 129:2 137:22 148:17 156:4 158:11 165:13 180:24,24 186:21 188:16 199:4 212:20 219:15 221:10 225:21
**TAKEN** 14:2,2 64:10 84:20 119:14 133:15 185:25,25 186:1
**TAKES** 88:7 93:16 133:13 185:22 185:24
**TALK** 75:8 82:10 84:1 105:24 106:5 120:4 137:21 139:24 146:14,15,18 197:3 220:14
**TALKED** 16:20 26:3 32:23,25 33:13 37:14 39:5 55:15 56:11 88:6 134:16 147:8 150:9,13,16 203:20 211:1
**TALKING** 5:24 9:16 10:18 14:14,22 31:16 42:21 60:22 66:7 67:17 80:13 87:14 98:8 108:2,7,9,13 138:2 148:2 180:3,7,7 181:16 183:7 189:6 206:13 208:19,20 210:5,15 221:23 223:18
**TALKS** 96:7 99:16 215:17
**TAMA** 1:15 2:5,8 76:18 77:1 100:5
**TAPE** 89:16
**TASK** 93:19,20
**TAX** 7:7 8:1 62:11
**TEAM** 13:1 14:5 120:3 131:16,18
**TEAMS** 61:7 131:9,15
**TECH** 18:10 20:18 43:5 118:13
**TECHNICALLY** 6:4 32:10 40:3 79:25 101:22 121:18,21
**TECHNICIANS** 8:14
**TECHNOLOGICAL** 116:11 121:8
**TECHNOLOGY** 124:17 153:2 164:7
**TELECONFERENCES** 15:17
**TELEMARKETING** 34:9
**TELEPHONE** 14:21 160:24 227:21
**TELEPHONES** 81:21
**TELL** 4:12 13:4 17:25 21:10 25:2 31:12,18 32:10,13,19 41:16 43:9 43:24 44:3,19 50:18 52:16 53:5 65:19 77:5 78:19,22 87:6 94:21 96:23 97:7,13 100:13 103:8,20 105:20 110:16 118:3 124:23 126:10 127:6 157:16,19 161:22 164:14 166:25 167:3 168:10,10 169:6 187:10 201:9 205:16
**TELLER** 204:7
**TELLING** 15:20 48:25 53:12 66:6 71:6,7 98:14,25 182:23 197:15 203:22 213:19
**TEMPORARY** 73:11,14 77:14,17 77:24,25 81:11 84:23 147:21 163:7 168:10,15
**TENABLE** 114:8
**TENDING** 81:23
**TERM** 100:17 123:2
**TERMED** 188:23
**TERMINATE** 38:13
**TERMS** 21:20 63:14 123:7,24 134:16 151:2 178:17 183:10
**TERRIBLY** 138:12 148:24
**TESTIFIED** 3:10,14 11:9 13:16 22:24 48:23 50:18 77:2 87:1 100:6 105:11 118:6 133:21 134:8 141:6 147:10,15,23,24 148:25 153:25 154:20 163:14 164:6,10 171:15 178:1
**TESTIFY** 15:5 21:12 40:12 41:12 158:17 164:13
**TESTIMONY** 3:16,16 27:13 28:7,23 47:5 53:4 54:21 71:4 75:12 76:9 86:7,18 101:10 130:2 154:6 157:4 164:18,24 170:24 223:3 227:16
**TEXTED** 45:17
**THANK** 3:8 10:2 74:25 75:2 76:22 79:15 85:23 86:13 99:20,23,25 100:1,4 112:15 117:25 120:7 129:23,24 131:12 134:15 156:3 156:8 165:15 170:14,15 171:13 175:10 177:13 179:5 184:2,25 199:2 222:18 223:9 226:4
**THANKS** 120:5
**THANKSGIVING** 110:2 156:11,18
**THEATER** 56:10
**THEME** 57:18
**THEORETICALLY** 109:10 122:4,16
**THEORY** 154:23,23
**THEY'RE** 72:2,5 88:19 131:9
**THEY'VE** 95:2
**THING** 36:23 42:7 50:21 61:15 63:10,19 64:6 78:23 106:7 148:17 161:1 176:10 178:4 188:6 213:16 221:6 225:1
**THINGS** 13:4 15:12 17:20 18:22 30:22 32:8 39:15,23 40:23 42:2 51:12 52:18 53:1 58:17 67:25 83:9 84:18 85:7 104:19 113:18 117:2 126:2,3 127:2 144:21 150:19 161:25 165:20 172:19 182:8 189:20 193:24 194:1 196:14 207:21,22 208:1 210:19 219:11
**THINKING** 212:24 217:21
**THINKS** 50:13
**THIRD** 55:17 61:1 89:17 103:6 108:11,14 110:20 111:17,23 121:13 123:6 124:22,23 127:25 156:22 168:24 170:6 205:20 207:18 222:8
**THIRDLY** 58:14
**THIRD-PARTY** 96:15
**THOUGHT** 10:18 16:14,15 17:20 18:4 28:23 71:11 112:19 119:3 120:18 140:25 149:21 176:3 196:24 216:14 221:22
**THOUSANDS** 63:2 189:3
**THREE** 16:18 28:24 52:23 75:24 91:17,19 95:10 109:25 124:8 130:21 153:14 188:11 215:13
**THRIFTS** 34:24
**THURSDAY** 1:10 3:1 102:19 103:2 103:3 125:10,12 149:5
**TIDY** 127:3
**TIE** 19:7
**TIME** 3:21 4:10,24 5:4 7:2 12:8 20:25 21:10 29:12 38:8 41:9 51:4 52:13 53:7 56:21,23 58:15 59:21 61:22 63:16 75:23 77:22 80:13 82:2,12 85:25 99:1 100:22 102:11 105:6 107:3,25 108:6,11 108:16 110:11,25 111:24 113:1 113:4,15 114:9 117:15 120:2 122:6 126:6 134:25 136:18 138:18 140:17 141:5 144:10 145:22 147:8 148:8 149:25 154:14 156:4 157:5 161:16 163:20 172:16 176:19 178:20 182:21 187:12 189:25 191:21 192:6,16 193:5,19 199:5 200:1 205:4 211:15,18,23 212:9 215:22,22 216:1,17 217:2,4,15 218:16,22 219:7,25 222:8 225:8 225:11 226:3
**TIMELY** 111:22
**TIMES** 12:1 20:20 51:22 52:5,6,9 56:24 75:25 186:12 191:1 202:13 207:1,5,7 219:19
**TIRED** 120:25
**TITLE** 97:8 154:23 171:21,23,25 172:9
**TITLES** 172:2,7,8
**TODAY** 5:18 25:11,12 63:24 112:2 177:17 225:4
**TOLD** 12:25 14:15 17:5 30:5 36:5 44:4,21 48:23 49:24 56:5 61:16 78:25 79:3,4 80:8,9,13 81:19,24 81:25 93:4 105:5,22 110:23 117:5 125:20 126:12 128:14,25 141:23 148:7 151:20 152:9 155:6 158:14 164:15 167:13 169:16
**TOMORROW** 224:1,4,19,23 225:24 225:24 226:6
**TONIA** 7:23
**TOP** 17:19 55:20 74:3 94:22
**TOPIC** 207:16
**TOPICS** 136:12 206:2
**TOTAL** 141:3
**TOTALLY** 45:9,10 64:25 65:4 74:11 142:6 150:10 202:25
**TOTE** 21:25
**TOUCH** 45:18 67:9 150:23 197:6 214:21
**TOUCHED** 109:12 150:20,24
**TOUR** 16:21,24 157:17,24 158:24 159:12,13 167:23 170:7
**TOWN** 22:2
**TRACK** 155:13 188:15 208:19,22
**TRACKED** 149:23
**TRADE** 1:2 33:6 35:2 36:14,16 83:13 111:3 117:11 141:10,13
**TRAINING** 41:12,14,18 52:13 61:8 174:1,11 179:10 211:13
**TRANSACTION** 97:7
**TRANSACTIONS** 97:18
**TRANSCONTINENTAL** 6:16 94:22 97:15 112:8,10 125:16,22 126:4
**TRANSCRIBED** 73:17
**TRANSCRIPT** 1:9 223:3 227:13
**TRANSFER** 92:4
**TRAVEL** 224:11 225:10
**TRAVELING** 21:21,22,23
**TREAT** 84:21
**TREATS** 30:21
**TREE** 89:3 90:3,25 104:5
**TRIAL** 132:25 214:3
**TRIED** 106:2 135:2,3,16 146:7 157:20 214:4
**TRIES** 186:7
**TRIPLE** 11:24
**TRO** 48:10 168:2
**TROUBLE** 41:2 45:17 149:3 152:2
**TROUBLING** 55:22
**TRUCK** 156:13
**TRUE** 15:8,16 16:2 37:17,24 38:7 41:22 44:24 59:15 98:7 104:23 116:9 133:10 134:18 136:2 138:15,18,22,24,25 139:4,18 141:2,4 153:1,14 154:22 165:2,6 168:8 170:9 189:21 227:13
**TRULY** 213:13,16
**TRUST** 16:5 110:24
**TRUSTED** 211:3
**TRUTH** 40:18 76:10,10,11 170:25 170:25 171:1
**TRUTHFUL** 40:18,19
**TRY** 15:9,14,15 31:14 43:18 79:21 95:17 111:7,18 114:6 128:18 136:15 137:20 165:14 186:6
**TRYING** 5:4 22:4 27:14 34:3 35:25 36:1 41:8 44:25 50:25 51:16,24 55:18 57:14 58:16 81:22 102:23 102:24 108:23 113:15 135:5 138:19 139:13 140:13,18,19 144:6 153:16,23 160:4 161:24 162:18 182:19 212:23 215:22 221:8
**TSR** 53:20
**TUESDAY** 52:18 60:15 199:8,9,10 200:1,1,23
**TUESDAYS** 199:25
**TURN** 13:21 20:7 117:8 191:6 209:19 215:10,10 222:20
**TURNED** 14:6,9 19:8 20:9 23:5 186:3 210:3
**TURNING** 143:17
**TURNS** 78:15 186:10
**TV** 88:23 89:7,11,12 90:2 96:10,10
**TWO** 9:16 16:10,10,18 19:20 28:20 28:24 32:8 37:3,5,10 45:3 46:10 47:3 49:20 54:7 57:8 97:6 103:22,25 113:19 121:4 137:3,4 137:9,9,21 140:6,12,23,24,25,25 156:16 158:7 200:4 216:24
**TWO-PARTY** 105:7
**TWO-WEEK** 116:15
**TYPE** 83:16 162:6,9 210:7,9,11
**TYPED** 17:11,14 185:16 186:3,11 210:1,6
**TYPES** 95:17 182:8 185:17
**TYPICALLY** 183:18 199:8,12,17,24 200:11 206:22
**T-A-M-A** 76:21

U

**U** 1:21
**ULTIMATE** 12:17 37:25 122:9,16 151:1 191:18
**ULTIMATELY** 12:22 14:17 64:8 97:1 121:9 122:11 128:21 151:4 151:8,12 155:21
**UNABLE** 4:3
**UNAFFILIATED** 96:12
**UNBELIEVABLY** 37:20
**UNCOMMON** 45:18
**UNCOOPERATIVELY** 159:4
**UNDERGRADUATE** 77:8
**UNDERLINING** 50:8
**UNDERNEATH** 24:16
**UNDERSTAND** 48:13,16 62:4 73:14 74:4 98:10 102:23 103:17 103:21 104:2 106:4 126:12 127:17 130:18 132:6 135:5,7 136:15 139:25 142:3 145:7 159:16 161:16 222:5 223:1,3,5,6 224:16,17
**UNDERSTANDING** 13:18 96:24 101:16 107:16 108:5 109:8 111:14 121:20,24 140:4 155:6 161:8 167:5 222:15
**UNDERSTOOD** 15:20 16:1 17:19
**UNDERTAKEN** 196:15
**UNDERWRITER** 192:1
**UNDERWRITERS** 191:22 219:1
**UNDERWRITING** 179:15 201:20
**UNDISCLOSED** 157:23
**UNETHICAL** 161:17
**UNFAIR** 35:2 36:14 48:11 65:5
**UNFETTERED** 40:8 47:3
**UNFORTUNATE** 64:6,7
**UNFORTUNATELY** 30:11 121:7
**UNION** 34:20
**UNIONS** 34:18,24
**UNITED** 1:1 182:17 183:3,16 189:24 190:9,10,11 191:2 227:6 227:11
**UNIVERSAL'S** 117:4 118:8 162:4
**UNIVERSITY** 77:8
**UNRELATED** 85:5
**UNUSUAL** 133:5,7
**UPCOMING** 152:20
**UPSET** 191:22,25
**UPSTAIRS** 79:24 134:20 139:4
**USE** 17:6 64:13 66:22 67:10 151:4 172:6,8 183:14,18
**USER** 39:19,20,25 40:4,6 51:3,10
**USUAL** 119:15
**USUALLY** 75:24 87:19 199:17 207:13
**UTENSIL** 67:10
**UTILIZED** 8:22 118:5
**UTILIZING** 8:23 152:10
**UTTERLY** 6:11 29:4 34:5 36:25 37:20 38:2 47:4 54:12 96:12
**U.S** 132:19

V

**VACATION** 110:3
**VAGUE** 198:3,13
**VALIDATION** 30:23,25
**VALUE** 12:1 191:3
**VARIETY** 142:24
**VARIOUS** 85:1 102:17 123:23 124:5 172:19 185:3
**VARYING** 128:11
**VAST** 105:13 121:24,25
**VENDETTA** 30:13
**VENDOR** 173:10
**VERIFICATION** 128:4,6 167:20 179:17,18
**VERSUS** 33:6 36:16 59:23
**VIOLATED** 47:20 53:19 57:9
**VIOLATING** 57:14
**VIOLATIONS** 34:8
**VIRTUALLY** 53:24
**VISUALLY** 19:11
**VIVIDLY** 19:6 21:1 30:17
**VOICE** 114:10
**VOLUME** 1:6
**VOTE** 175:1,3 212:8 213:6,8,12 214:4
**VOTED** 211:18,19 212:6,12,12,14 216:13,22
**VOTING** 212:6,16
**VS** 1:4

W

**WAIT** 64:18 102:13
**WAITED** 20:11 49:10 83:5
**WAITING** 17:1,2
**WAIVED** 19:9
**WALK** 16:23 35:24 68:17,19 83:21 142:21
**WALKED** 13:20,24 14:6,9 16:25 18:1,12 20:9 60:24 61:15 74:17 79:5,6 83:7 141:9 147:8 158:3 159:16
**WALKING** 111:12 140:9 141:5,24 142:20 156:14
**WALKS** 161:16
**WALL** 72:8 74:19 83:14 107:14
**WALLS** 107:10 112:1 202:24 205:8

**WANT** 13:1 18:20,20 22:10 30:19 31:18 32:10 35:13 43:4 48:21,21 50:22 51:10 52:21 53:2 54:18 55:8,8,9 58:20 65:18,22 66:15 66:21,22 67:8 73:21 78:19 86:11 89:6 90:5,6,6 91:14 92:11 94:11 106:5 114:9 120:14 121:1,17 122:10 131:16 133:9 134:17 136:10,15 139:21 144:20,20 145:24 150:22 156:24 158:18 162:18 165:6,20 167:19 175:12 176:20 184:12,13 205:15 208:4 213:16,20 215:21,25 220:14 224:5,8 225:3
**WANTED** 13:13,14 14:4 20:20 29:16 40:17,21 43:16 46:9 48:10 57:7 66:25 72:24 83:6 103:8 105:12 107:7 129:11,14 141:12 145:2 146:13 147:11,16 157:12 159:8 199:17 200:17 205:3 208:10 224:12,15
**WANTING** 103:16
**WANTS** 71:23
**WARRANT** 35:24
**WASHINGTON** 7:11
**WASN'T** 20:1,24 31:22 32:11 42:6 57:22 102:24 103:12 116:14 120:13,20 126:18 136:12 137:6 137:9,16 139:20,20 144:21 145:22 152:12 157:4 167:23 168:24,25 174:7,17 180:10,17 192:19 200:9,14 201:13,17,23 204:13 206:17 214:2
**WASTE** 148:8 205:3
**WATCH** 50:14,16 57:2 99:24 156:4 170:17
**WATCHES** 57:3
**WAY** 6:15 20:19 25:7 29:5 32:9 34:18 40:18 43:18 46:6 47:1 52:21 53:14 55:14 56:2 57:2 59:10 64:2 74:15 78:5 97:18 99:5,5,7 104:19 109:21 111:10 115:6 116:3 119:4 122:24 133:5 133:8 135:25 138:25 140:7 151:19 152:14,17 159:7 162:1 188:22 196:23 197:21 198:21 201:13 224:3
**WAYS** 135:3
**WEAR** 57:3
**WEARING** 19:7
**WEB** 90:4 188:22
**WEDDING** 46:1,7
**WEDNESDAY** 125:9,12 199:10
**WEDNESDAYS** 199:25
**WEEK** 39:24,24 110:4,5,15 111:18 111:21 125:13,15 128:11 136:8 199:7 202:8 209:22,23 225:22
**WEEKEND** 45:4,5 46:24 47:2 110:1 110:23
**WEEKLY** 115:19 196:19 203:5
**WEEKS** 44:22 46:11 47:4 109:25 121:4 140:12 155:20
**WEIGH** 46:5
**WEIRD** 44:7
**WELL-BEING** 152:25
**WENT** 10:9 12:20 13:15 17:21 20:10 21:13 29:5 34:4 35:24 40:24 41:11 43:7 45:12,14,15 46:7 56:5 61:2 63:15,24 64:17 64:24 71:15 77:9 85:8 101:24 107:20 112:7 126:15 127:18 128:17,17,21 135:10 136:19 137:1 144:3 147:6 150:13 156:25 168:24 197:24 207:12 219:18 222:15
**WEREN'T** 44:12 55:20 82:13 83:15 102:2 103:6,10 112:22 113:9,11 127:4 138:12 141:5 147:25 150:20 153:20 158:21 163:6 168:14,20 169:21 170:6 188:7 189:2 192:14 194:25 211:2
**WESTON** 91:4
**WE'VE** 104:9
**WHATSOEVER** 25:9
**WHAT'S** 26:18 51:1,9 70:13 84:4 92:9 93:13 95:9 113:25 115:16 134:3 172:14 173:1 184:6,11 204:12
**WHEREOF** 227:16
**WHO'S** 32:19
**WIFE** 132:23,25 150:2
**WILLIAM** 1:10
**WILLING** 155:19
**WILSON** 7:23
**WINS** 15:10
**WISH** 44:9,11,13
**WISHES** 148:20
**WITNESSES** 2:3 54:9 75:6,22
**WOEFULLY** 49:20
**WOMAN** 7:10 54:10
**WOMEN** 115:3 143:17,25 165:12
**WONDERFUL** 115:2
**WON'T** 13:2 20:15,21
**WORD** 50:8 59:5 119:18,20 145:3 145:14 158:8,19 183:14,17 188:21
**WORDS** 17:6 40:5 90:16 120:1 176:21
**WORK** 10:24 11:5 12:23 30:22 39:23 40:21 58:7 69:5 81:20 82:22 87:22 91:21 92:14 96:22 100:24 101:1,2 110:4,12 114:24 115:4 116:2 118:21 127:3 128:20,22 130:13 131:2,23 147:13 150:17 151:6 153:18 155:10 165:12,13 173:8
**WORKED** 16:11 35:14 45:14,15 64:12 114:21 115:1,4 186:22 191:4
**WORKERS** 69:5
**WORKING** 42:21,22,23 43:7 61:14 81:12,20 90:23 103:19 116:7 130:13,14 131:10 148:12 151:14 153:11,15 187:1,11,16,19,24 188:1 192:25 193:11,15,18
**WORKINGS** 164:14
**WORKS** 68:15,16 88:2 90:13 94:18 121:20,21 146:3 150:17
**WORLD** 141:19,25
**WOULDN'T** 5:17 8:25 9:7 18:9 35:14 41:9 42:12 91:12 96:15 106:13 112:4 135:1 158:10 187:18 194:22 197:4 201:5 202:14 219:23 221:16
**WOUND** 106:20
**WOW** 65:2
**WRITE** 48:7
**WRITING** 168:10 207:24
**WRITTEN** 94:3 176:12,22
**WRONG** 35:25 100:12 109:16 140:22 201:25 213:16,20
**WRONGS** 59:25
**WROTE** 67:21

**Y**

**Y** 70:11
**YEAH** 7:15 11:12 25:6 40:4 44:17 69:16,17,22 72:5 102:14 135:8 135:15 141:20 142:9 143:19 145:3 171:2 200:21
**YEAR** 4:12,15 8:5 51:14 57:21
**YEARS** 7:5 10:10 149:19 176:18 211:17 213:5
**YELL** 56:10
**YELLED** 19:1,8 145:4,14 158:8,12
**YELLING** 56:12
**YELLOW** 88:23
**YEP** 138:17
**YESTERDAY** 3:14 15:5 17:11 27:23 28:7 32:23 36:5 38:19 50:19 52:21 55:23 125:14 134:11
**YORK** 137:25 155:3
**YOUNG** 130:12,17
**YOU'RE** 51:16 53:11 74:2 89:23 108:2 153:10 154:18 162:24 169:20,20 203:22 207:24 208:20 210:5 213:19 216:23
**YOU'VE** 40:8 50:24 89:7 111:3

**Z**

**Z** 191:18
**ZAUSNER** 1:6,6 2:10 25:22 26:12 26:12 27:7,10 28:20 29:2,10 32:21 42:14 43:10 44:1,3,11,21 44:21 45:17 46:25 49:8 51:10 55:9,9,9 60:23 61:13 68:6 73:23 79:8 82:9,20 105:21 112:4 116:5 116:14 117:5 121:3,4 124:15,16 125:10 128:17 133:12 134:17,19 134:24 135:12 136:7,10,14 137:15 140:11 144:16 145:25 146:2,17 157:20,20,21 160:15 164:6 170:20,21 171:8,14,18 176:11 181:9,13 184:6 185:2 186:15,15 197:13 200:15 220:8 222:13 223:1,13,13 225:5,20
**ZAUSNERS** 3:14 13:17 15:22 58:8 63:23 159:1 166:19,22
**ZAUSNER'S** 32:20 68:4 100:18 123:15 124:11 137:19,24 166:20 166:20 181:8
**ZERO** 58:25
**ZEROS** 58:24,25
**ZLOCH** 1:10
**ZOOMINFO** 24:24 25:4,9
**ZOOMINFO.COM** 24:4,10
**Z-A-U-S-N-E-R** 171:8

**$**

**$100** 10:23
**$25,000** 4:5
**$300,000** 191:4
**$5,000** 106:17
**$50** 218:13
**$500** 106:12,24 136:23 137:2

**0**

**09-82322-CIV-ZLOCH** 1:3

**1**

**1ST** 28:15 33:10
**1,000** 137:4
**1,700** 9:7
**1:00** 224:4
**1:30** 85:25 86:2
**10** 1:10 2:16 3:2 14:11 41:16 130:12
**100** 2:8
**1003S** 97:16 182:19
**1020** 125:23
**11** 36:15 226:8
**11TH** 227:17
**11:00** 102:20
**11:30** 102:20 224:6
**12TH** 205:21 207:16,23
**12-10** 25:10
**129** 2:15
**13** 168:4
**130** 2:8
**14** 215:11
**14TH** 209:19 217:2,6
**15** 74:1 130:13,14 225:2
**150** 42:4
**16** 45:8
**16TH** 26:7
**165** 2:8
**169** 2:8
**171** 2:10
**176** 2:16
**18TH** 204:22
**19TH** 13:9 72:19 77:12 78:14 100:12 126:13 140:1 222:16
**1995** 77:10

**2**

**2ND** 30:6
**2,000** 9:5
**20** 11:14 225:3
**20-DAY** 154:17
**2006** 4:21 5:5
**2007** 4:19
**2008** 4:15,17,18 8:17 9:2 182:11,24 182:24 183:6 185:10 186:24 189:22 191:7 192:16 193:4 204:14,19 205:13,21
**2009** 1:10 3:2 4:15 26:8 33:10 182:22,24 189:22 209:19 215:11 222:22 226:8
**2010** 227:17
**202B** 1:22 227:20
**21** 2:15
**21ST** 216:4,17 222:22,24 223:11
**212** 38:23,24
**226** 227:12
**23:20** 224:4
**24** 29:25 44:17 59:6 149:6,8
**25** 93:23 112:13 218:13
**28TH** 23:6
**299** 1:22 227:20

**3**

**3** 2:4
**3,000** 54:22 191:5
**30** 11:15 204:11
**30TH** 119:7 191:7
**33301** 1:23 227:21
**38** 2:14 73:4,5,8,9 79:12 81:5 204:23 205:6
**39** 2:15 129:13,15,15,19,20

**4**

**4** 1:6
**4-16** 26:23
**4-20-09** 26:22,24
**40** 2:16 175:24,25 176:1,5,8,9 177:15 184:7 190:25 205:20 222:20
**43** 44:12

**5**

**50** 153:25 172:15,15 190:25 204:11
**500** 137:4,7
**501C3** 26:16
**5100** 127:7
**56** 2:4 155:21

**6**

**6** 66:11 175:14
**6-A** 175:19,21
**6-D** 69:1,5,6
**6-E** 69:8 72:4,6
**6-23-09** 27:12
**60-SOME** 55:17
**65** 2:4

**7**

**73** 2:14
**769-5488** 1:24
**77** 2:5

**8**

**8TH** 185:10 208:13
**80** 72:22
**800** 44:7,7,8,10 87:25 88:20,21 96:11,24 107:18 108:15,17
**85** 72:22 73:24
**86** 2:6

**9**

**9** 2:14
**9:15** 225:24 226:6,8
**90** 73:24
**954** 1:24
**954/769-5488** 227:21
**96** 2:7