# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-82322-CIV-ZLOCH/ROSENBAUM

**FEDERAL TRADE COMMISSION,**

      **Plaintiff,**

**v.**

**FIRST UNIVERSAL LENDING, LLC,**
**a limited liability company;**
**SEAN ZAUSNER, individually and**
**as owner, officer, or manager of**
**First Universal Lending, LLC;**
**DAVID ZAUSNER, individually and**
**as owner, officer, or manager of**
**First Universal Lending, LLC; and**
**DAVID J. FEINGOLD, individually and**
**as officer or manager of First Universal**
**Lending, LLC,**

      **Defendants.**

_____/

## **ORDER**

This matter is before the Court upon Defendants' Motion to Enjoin Prosecution [D.E. 170].

The Court has carefully reviewed Defendants' Motion [D.E. 170], Plaintiff's Response [D.E. 177],

Defendants' Reply [D.E. 182], and the record.  In addition, the Court held a four-day evidentiary

hearing regarding the matters Defendants raised in their Motion.  After thorough review of the record

and careful consideration of the evidence, the Court now denies Defendants' Motion for the reasons

set forth below.

## *I.  Background*

A.  The Parties

This matter is a civil enforcement action by Plaintiff Federal Trade Commission ("FTC") against Defendants First Universal Lending, LLC ("FUL"), Sean Zausner, David Zausner, and David Feingold (collectively, "Defendants").  As the Honorable William J. Zloch has previously found, Defendant FUL was a Florida limited liability company that held a lender's license, performed loan originations, and, towards the end of its existence, sold loan modification services in interstate commerce. D.E. 65 at 3.  Following an inquiry by the Florida Attorney General into FUL's business and as part of a consent agreement, FUL agreed to surrender its lender's license in August 2009.[1] D.E. 197 at 179; D.E. 208-3 at 40-47.

Meanwhile, in June 2009, First Universal Holdings, LLC ("FUH"), was created.  *See* D.E. 76 at 27.  FUH had the same ownership structure as FUL, received an assignment of FUL's bank accounts, operated out of the same offices as FUL, serviced FUL's customers, and used the same telephone numbers as FUL.  D.E. 73 at 169; D.E. 75 at 68; D.E. 76 at 88, 101.  Defendant Feingold has described FUH's work as legal outsourcing, where lawyers contracted with FUH to provide non-lawyer services to the lawyer clients' customers on behalf of the lawyer clients, although he has acknowledged that FUH also "complet[ed] tasks of [FUL] clients."[2]  D.E. 67 at 85-92 (quotation on

---

[1]According to Defendants, they agreed to relinquish FUL's lender's license because the law had changed in 2008, and, as a result, many states required mortgage originators to have physical presences in states where they sold their products, and these states also imposed additional prohibitively expensive requirements on lenders.  Consequently, Defendants explained, it was not worth the effort to contest the Florida Attorney General's action since, regardless, Defendants would not be able to continue their nationwide loan origination business.

[2]Where this Order refers collectively to FUL and FUH, it employs the term "First Universal."

p. 92); *see also* D.E. 167-1 at 94 (Miranda Johnston's testimony that FUL loan modification clients were subsequently serviced by FUH).  The FTC, on the other hand, contends that FUH simply picked up where FUL left off and continued FUL's loan modification business.

Defendant Sean Zausner was a 50% owner and a managing member of Defendant FUL.  *Id.*  In addition, Sean Zausner held himself out as president of Defendant FUL.  *Id.*

Defendant David Zausner, Sean Zausner's brother, was also a 50% owner and a managing member of Defendant FUL.  *Id.*  David Zausner represented himself to be the company's Vice President of Marketing.  *Id.*  Besides this role, David Zausner also supervised First Universal's technology department.  D.E. 197 at 138.

Defendant David Feingold is a lawyer who practices with the law firm of Feingold & Kam.  D.E. 67 at 67:10 - 68:18.  Through Defendant Feingold, Feingold & Kam represents itself to serve as outside counsel to First Universal.  D.E. 199 at 6:23 - 7:13.  The FTC, however, disputes Defendant Feingold's characterization of his role in First Universal, asserting that Defendant Feingold served as an owner of the companies and that he controlled and directed aspects of the business.[3]

---

[3]On various documents filed with credit companies and banks, Defendant Feingold appears to have identified himself as the "primary owner/office/partner" of Defendant FUL, D.E. 208 at 59-61; the "business principal/officer" and "owner" of Defendant FUL, D.E. 208 at 62-65; and the "ownership 1/partner/officer," "principal or corporate officer," and "owner" of Defendant FUL, 208-1 at 2.  In addition, in 2008, Defendants Feingold, Sean Zausner, and David Zausner split Defendant FUL's profits of $4 million three ways.  D.E. 77 at 40.  Defendant Feingold testified that despite these facts, he was neither an owner nor an officer of FUL or FUH, but rather, had effectively lent FUL money in approximately 2006 and 2007 by covering FUL's rent, payroll, and other expenses when FUL was having financial difficulties.  Thus, Defendant Feingold explained, he signed the various documents to protect his investment, and he drew monies from FUL as repayment for these loans and as payment for legal services rendered.  No written agreement exists, however, evidencing the alleged loans.  D.E. 83 at 8-9.

B.  The Relevant Procedural History

On November 18, 2009, the FTC filed its Complaint and its *ex parte* Motions for Temporary

Restraining Order ("TRO") and to Appoint Temporary Receiver.  *See* D.E. 3, D.E. 5 - D.E. 11.  In

its papers, the FTC alleged in Count 1 of the Complaint that since at least 2008, Defendants had

violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by

engaging in an unfair or deceptive act or practice in or affecting commerce, more specifically, by

representing, directly or indirectly,

> [i]n numerous instances in connection with the advertising,
> marketing, promotion, offering for sale, or sale of mortgage loan
> modification or foreclosure relief services, . . . that Defendants
> [would] obtain for consumers mortgage loan modifications, in all or
> virtually all instances, that [would] make their mortgage payments
> substantially more affordable, [when,] [i]n truth and in fact,
> Defendants [did] not obtain for consumers mortgage loan
> modifications, in all or virtually all instances, that [would] make their
> mortgage payments substantially more affordable.

D.E. 3 at ¶¶ 26-28.  The FTC asserted in Count 2 that since at least 2008, Defendants had acted in

violation of the Telemarketing Sales Rule by misrepresenting, directly or indirectly,

> [i]n numerous instances, in the course of telemarketing loan
> modification or foreclosure relief services, material aspects of the
> performance, efficacy, nature, or central characteristics of the loan
> modification and foreclosure relief services they [sold], including that
> Defendants [would] obtain for consumers mortgage loan
> modifications, in all or virtually all instances, that [would] make their
> mortgage payments substantially more affordable.

D.E. 3 at ¶¶ 33-34.  As relief, the FTC sought, among other things, a temporary restraining order

against Defendants, prohibiting them from making misrepresentations of material fact in connection

with the marketing and selling of loan modification and foreclosure relief services and freezing

Defendants' assets.  *See id.* at D.E. 5.  In addition, the FTC requested that the Court appoint a

Temporary Receiver for FUL and its successors and assigns. *Id.* at 2. In support of its Motions for TRO and Temporary Receiver, among other items, the FTC filed declarations of FTC investigator Michael Liggins, seventeen alleged victims of Defendants, and William P. White, the president of the Better Business Bureau ("BBB") of Southeast Florida and the Caribbean. *See* D.E. 9 - D.E. 11. Appended to White's declaration were 268 consumer complaints regarding FUL. *See* D.E. 10.

Upon consideration of the FTC's filings, the Court issued a TRO against Defendants and appointed a Temporary Receiver for FUL on November 19, 2009. *See* D.E. 14. Pursuant to the Court's Order, the Temporary Receiver, accompanied by the FTC, entered the West Palm Beach offices of Defendants on November 19, 2009, and took control of the premises.

A few weeks later, beginning on December 7, 2009, the Court held a hearing to consider whether to convert the TRO into a preliminary injunction. During that five-day hearing, a number of individuals testified, including, among others, Defendants Feingold and Sean Zausner. *See* D.E. 71, D.E. 73 - D.E. 78.

After considering the evidence, the Court announced on December 11, 2009, that it would grant the FTC's request for a preliminary injunction and, accordingly, subsequently issued a Preliminary Injunction in this case [D.E. 53]. Among other functions, the Preliminary Injunction, under a heading entitled "Preservation of Records and Tangible Things," prohibited Defendants from "destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any documents or records that relate to the business practices, or business or personal finances, of Defendants, or other entity directly or indirectly under the control of Defendants." *Id.* at 25. Another provision of the Preliminary Injunction, entitled "Prohibition on Disclosing Customer Information," barred Defendants from engaging in the following activities:

> A.   disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card bank account, or other financial account), or any person which any Defendant obtained prior to entry of this Order in connection with mortgage loan modification or debt negotiation services; and
>
> B.   failing to dispose of such customer information in all forms in their possession, custody, or control within thirty (30) days after entry of this Order.  Disposal shall be by means that protect against unauthorized access to the customer information, such as by burning, pulverizing, or shredding any papers, and by erasing or destroying any electronic media, to ensure that the customer information cannot practicably be read or reconstructed.
>
> *Provided, however,* that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by a law, regulation, or court order .
> . . .

D.E. 53 at 26-27 (emphasis in original).  In addition, the Court made the Temporary Receiver the Receiver.

Following the issuance of the Preliminary Injunction, the litigation in this case continued. During the course of discovery, on December 9, 2010, Defendants filed their pending Motion to Enjoin Prosecution, and/or, in the Alternative, Motion for Dismissal of Case Due to Plaintiff's Spoliation of Evidence [D.E. 170].  In this Motion, Defendants assert that the FTC either destroyed or caused to be destroyed computer evidence that "would prove all of the Defendants' defenses . . . against the FTC."[4]  D.E. 170 at 2.  They further claim that the FTC did so in bad faith.  *See, e.g.,*

---

[4]The Motion further contends that the lost evidence would also prove Defendants' proposed counterclaims against the FTC.  This aspect of the Motion may be moot at this time. More specifically, Defendants filed a Motion for Leave to Add a Counterclaim [D.E. 151].  Upon consideration of Defendants' proposed Counterclaim, I respectfully recommended that the Court

*id.* at 30.  Thus, Defendants argue, the Court should dismiss with prejudice the FTC's claims against Defendants, as Defendants' ability to defend themselves has allegedly been irreparably damaged. *See id.* at 26, 30.  In this respect, Defendants contend that their computer program called Calyx Point has been completely destroyed, along with all data stored in the program, and much of the data maintained in Defendants' Salesforce program has likewise been obliterated.

In response, the FTC contends that Defendants destroyed their own computer system in violation of the Court's Preliminary Injunction.  *See* D.E. 177.  As a result, the FTC suggests, the Court should deny Defendants' pending Motion.

Based on a review of the parties' filings, including supporting materials, the Court concluded that material issues of fact existed regarding the contents of the missing records and the circumstances under which the information was destroyed.  Accordingly, the Court issued an Order scheduling an evidentiary hearing on Defendants' Motion and setting forth various issues of fact for the parties to address at that hearing.

Beginning on January 25, 2011, and ending on January 31, 2011, the Court conducted four days of an evidentiary hearing regarding the nature of the information that was destroyed and the circumstances under which the destruction occurred.  During the course of the hearing, the Court heard testimony from Defendants Feingold and Sean Zausner, as well as from Michael Liggins, Jeff Maglore, James Compton, Receiver Jane Moscowitz, Tama Kudman-Richman, Michelle North-Berg, Vasilios "Billy" Christakos, and Miranda Johnston.  In addition, the Court received in evidence Defendants' Exhibits 1 through 25 and 27 through 41 and Plaintiff's Exhibits 1 through 7, 9 through

---

deny Defendants' Motion because various deficiencies in the proposed Counterclaim would render its filing futile.  *See* D.E. 190.  Defendants then filed a Notice of Non-Objection to the Report and Recommendation.  *See* D.E. 191.

17, and 19 through 25.  After careful consideration of all of the evidence presented, as well as of the other evidence of record in this case, the Court makes the following findings of fact.

## *II.  Findings of Fact*

A.  Defendants' Software Systems

When FUL first began operating, it relied upon the software system called Calyx Point.  D.E. 199 at 8.  According to Feingold, Calyx Point was the "virtual leader in . . . data storage and software-related functions for a mortgage finance company. . . . [It] was the industry standard and . . the program that stored the data and also converted the data into functional reports."  *Id.*  Feingold further explained that Calyx Point held bank records, pay stubs, tax returns, employment history, wage sources, credit bills, student loans, tax lien records, and other similar information.  *Id.* at 10. As Feingold described the software, Calyx Point could electronically communicate with the lenders and could generate reports that would show the total number of mortgages that had been modified, a comparison of a client's loans, the number of people whose interest rates or principal balances had been changed, and other useful facts.  *Id.*  Calyx Point was installed on the servers of FUL, and all of the information entered into the program resided on the servers at FUL.  D.E. 197 at 139-41.

In 2008, Feingold began negotiating with Calyx Point regarding continued use of the software program.  D.E. 199 at 9.  Based on his discussions with Calyx Point, Feingold became concerned that Calyx Point was experiencing significant financial difficulties that caused Feingold to question Calyx Point's future viability.  *Id.*  As a result, FUL considered alternatives to Calyx Point.  *Id.* at 10.

Because FUL could find no other software packages that had been standardized for the express purpose of addressing the specific needs of the mortgage and finance industry, FUL turned

to a different type of software package called Salesforce. *Id.* During the evidentiary hearing on Defendants' pending Motion, Feingold described Salesforce as a "customer relations management software package . . . [that] was utilized to keep track of customer and client contacts. . . . [E]verything else that you would want Salesforce to do would have to be customized." D.E. 199 at 11. Accordingly, FUL customized Salesforce, paying a total of more than $1 million. *See* D.E. 75 at 6-7, 18. In addition, First Universal incurred a monthly charge of $30,000 from Salesforce for the use of its program and storage space. *See* D.E. 83 at 2.

In discussing Salesforce's functionality, Feingold testified in January 2011 that Salesforce "did not keep in a database format the tax returns, the pay stubs, the changes in mortgage terms, the changes in principal or interest, all of the kinds of records that you would generate to show successes in mortgage modifications and mortgages. Salesforce does not do that." *Id.* at 11. In expounding upon the differences between what Calyx Point and Salesforce did, Feingold explained,

> [W]hen you do a mortgage modification, there is a document, the modification document. Those documents are sent by U.S. mail or by Federal Express. They either come from the bank, like Bank of America sends them – mails them, directly from the lender to the client. That is not a Salesforce interaction. Or they come through the automated underwriting into Calyx Point where the original is mailed to the client.
>
> Calyx Point keeps track of that underwriting, those modifications. Salesforce keeps track of your discussions, your talks with client[s], or if a client e-mails you or attaches a .pdf. But you won't have the complete file, and, you know, being involved in this industry, you prove that the modification was done by having the modification document, by having the electronic underwriting discussions through Calyx Point with the lender, by having the original documents.

*Id.* at 42-43. Feingold further identified the relative shortcomings of Salesforce as follows:

> . . . Calyx Point . . . keep[s] an entire trail of every document in the

mortgage and the mortgage modification process so you can prove that you did the work, you can prove what the results were, and you can prove if you got a modification for the client.  This is only in Calyx Point, not in Salesforce.

. . .

[M]ail comes in.  There is a high-speed scanner.  That stuff is getting scanned.  That stuff is put in Calyx Point.

Whether or not that gets put into Salesforce is a complete coin toss, and it was a huge point of contention.  My file is not complete.  You know, the client says they mailed it, and I can't see it in Salesforce.

So the point is, is that if you had Salesforce and you had Calyx Point, you have a hundred percent of everything.  No question.  If you have what we have now, Salesforce, it's like someone giving you a bank statement where you have been to the bank for eight years, and they give you one line entry of a money machine withdrawal from Publix, and you're supposed to say that that reflects my entire relationship.  It's impossible.

*Id.* at 21, 45-46.  In other words, Feingold represented Salesforce and its functionality as essentially being used to perform the same tasks as a glorified answering service and Rolodex.

But at the Preliminary Injunction hearing held a year earlier, in December 2009, Feingold described Salesforce and its capabilities rather differently – indeed, in almost Orwellian terms:

[W]hat you can . . . see from the first page of Salesforce is what happens is you get general personalized information on a client.  You'll get their name, you get their address, you will get the name of who initially contacted them, who's e-mailed them, what their payment price is, when they hire[d] the firm.

The next page will show you a summary like, for example, in this particular case, we know that this client actually accepted a modification, and it tells us the terms of it.  At the bottom of the page starts transactions.

What's interesting about transactions is, is that it tells you everything time [sic] a client has paid, and it actually gives you a bank reference

-10-

number. . . . [T]he other genius part of Salesforce is that it interacts with your bank account, it interacts with your credit card account.  It is actually customized. . . .

It will tell you how many times an e-mail is opened.

What's incredible about this program is that this protects against a client lying. . . .  As soon as [a client] opens their e-mail, automatically, without their knowledge, First Universal's own computer system through Salesforce is then notified that on 3:53 p.m., this person opened e-mail.

What's interesting is the person opened e-mail three times. . . .  The genius of Salesforce is, is that if a client didn't open an e-mail, it prompts you to call the client to discuss with the client, "Hey, we sent you an e-mail.  You didn't open it."

. . .

Then you go down to activity history.  It will tell you every single person who has touched the file.  Every single person.  Anyone from back office, from bookkeeping, from accounting, from sales – anyone who has touched this file, they cannot view it without Salesforce identifying who they are and what they're doing.

So here you see the account activity there is actually notes.  And what's interesting is, if you see down each account activity, there is a little box that says "task" and it's clicked.  And what's incredible about that in Salesforce is, it prompts you to follow up and complete what's been notated. . . .

As we continue down, and you will see there are pages and pages of notes in this particular file.  ***This is the way that we are able to keep track of everything that has gone on, not only from a legal end for me in terms of defending the firm but from a managerial end for the officers and directors of the company in order to know what's going on they can generate a report***. . . .

[W]hat's also interesting about Salesforce is that ***everything, not only that's e-mailed, not only that every phone call that happens, but every document that is sent to First Universal automatically comes and gets loaded into Salesforce.  It gets loaded in as a .pdf.***

If a client faxes in to First Universal, that document actually goes to

. . . an area where an individual sits there all day and directs the documents to the particular client. Every single document, every single day is logged in to our client. That way we know the date and time a client has sent a document, and that way we know exactly what has been received from the client.

In addition, besides doing all of this, there is a note section. The note section is for the people working on the file to actually leave notes. . . . For example, . . . if you go to like the last three pages [of this particular file,] you will see there are pages, and they say all .pdf. *This shows every single document that's been received, and it also keeps track of what has been faxed out so when lenders say, "Hey, we never got anything," which is a very common statement . . . , we can see when something has gone back and forth to various lenders*.

Then the last three pages show the person's account history. It shows you every user who has ever touched the file. . . .

*Every single client has a Salesforce file* . . . .

D.E. 75 at 8-16 (emphasis added).

Nor was Feingold content to stop with simply singing the praises of Salesforce. Instead, he went on to demonstrate Salesforce's capabilities by using the Salesforce files of alleged First Universal victims that the FTC presented at the Preliminary Injunction hearing, to cross-examine these witnesses. *See, e.g.*, D.E. 73 at 39-40, 94-99, 115-23, 185-203. Among other questions Feingold based on the Salesforce files during cross examination were the following:

. . . Isn't it fact that [FUL] actually got you a modification from Chase, but a condition of the modification was for you to provide a doctor's note proving that you were on disability?

. . . Your wife . . . disclosed on her financial affidavit that she made $4,800 a month acting as a nurse, correct?

. . . [Y]ou hired [FUL], and [FUL] got a modification for you where on $157,000 principal balance, your interest rate was reduced from 13.24 percent to 5.25 percent, isn't that true?

-12-

. . . [I]sn't it a fact . . . that after [FUL] reduced your interest payment nearly eight percent on $157,000, or $12,000 a year over the li[f]e of a 30-year loan, which is hundreds of thousands of dollars, that you in fact were quite happy with the results but that you, after they got you that modification, then fell behind on that[?]

. . . First Universal got you a modification where your interest rate was reduced significantly from [13.24] percent down to 5.25 percent, correct?

. . . You had a 6.75 percent adjustable rate mortgage when you first got your mortgage. Then every quarter the interest rate went up, and at the time you hired First Universal, the interest rate was 13.24 percent, correct?

. . . [A]fter you hired [First Universal], they negotiated that interest rate down with your lender HFC to 5.25 percent, saving you $12,000 a year in interest[?]

. . . And your combined savings with the blended rates was a savings of roughly eight percent annualized interest rate on the outstanding combined balance of $157,000, correct?

D.E. 73 at 96-97, 115-18. As Feingold explained, "[E]very single one of my questions on cross-examination . . . was based on facts gathered from Salesforce . . . [;] it was based on me looking at Salesforce and seeing exactly what went on and opening the documents that were attached in .pdf." D.E. 75 at 16, 18-19.

Similarly, Miranda Johnston, the manager of First Universal's back office, where First Universal's employees conducted the loan modification work, agreed in her deposition that "[e]verything is stored in [Salesforce]. If [clients] sent any originals during the time, then originals get mailed back to the client, but everything is copied and saved into the system." D.E. 167-1 at 29; *see also id.* at 97. Johnston's deposition testimony regarding Calyx Point also contradicted Feingold's January 2011 testimony. While, as noted above, Feingold stated that all documents were

-13-

scanned into Calyx Point, Johnston, who trained and managed the people who were actually performing the work on the files, said the opposite, reporting that Calyx Point

> [b]asically . . . stored the information that you put into it.  It didn't – I never used it to attach documents.  I don't even know if it did.  Like what I used it for was putting in the client's information, the interest rate.  It would determine the debt-to-income ratio, your loan-to-value.  You could put information in there as the title company's information, the Realtor's information – kind of like an address book kind of thing.  It printed the 1003, the RESPA documents, the good-faith estimates.  Everything else was stored in like a physical file, like a physical hard file in a manila folder.

D.E. 167-1 at 54-55.

Finally, as described in more detail below, *see infra* at Sections II.B. and I.D., following November 19, 2009, when the Receiver and the FTC entered First Universal's premises, Defendants Feingold, Sean Zausner, and David Zausner, as well as First Universal employee Miranda Johnston, repeatedly advised the Receiver or the FTC that everything that First Universal did was on Salesforce.  Based on (1) the capabilities of Salesforce that Feingold himself demonstrated during the Preliminary Injunction hearing, (2) the consistent Preliminary Injunction hearing testimony of Feingold and the deposition testimony of Johnston – both of which occurred before Defendants became aware that some computer evidence in this case had been destroyed and before Defendants had a motive to minimize Salesforce's capabilities, (3) the statements of Feingold, both Zausners, and Johnson to the Receiver or the FTC that "everything" was on Salesforce, (4) the amount of money Defendants expended on Salesforce initially, to customize it, and monthly, and (5) the inconsistencies in Feingold's January 2011 testimony (some of which are highlighted below in these Findings of Fact), the Court finds that Feingold's Preliminary Injunction hearing testimony and Johnston's deposition testimony set forth an accurate description of Salesforce's capabilities and

-14-

content and does not find Feingold's January 2011 testimony minimizing Salesforce's capabilities and contents to be credible.

Testimony regarding the time frame within which Defendants employed Salesforce also differs. At the January 2011 hearing, Feingold related that although FUL licensed Salesforce in 2008 and began testing it during that year, Salesforce was used "primarily the last six months of the business in 2009 – from the summer of 2009 until when the FTC walked in." D.E. 199 at 18. According to Feingold's January 2011 testimony, the business continued to rely significantly on Calyx Point even while it was testing and using Salesforce. Thus, Feingold explained, the company used both Calyx Point and Salesforce to conduct the loan modification business, with the bulk of the company's records being stored on the Calyx Point program.

Likewise, during the 2011 hearing, Johnston, who currently works for Feingold's law firm, insisted that Defendants used Calyx Point for loan modifications until the summer of 2009, when they started using Salesforce. Yet at her deposition, which occurred in February 2010, Johnston took a contrary position, recalling that "before [Defendants] started doing loan modification, they created the Salesforce system for [Defendants' employees] to start inputting . . . information into it from the beginning." D.E. 167-1 at 66. Indeed, Johnston explained that "[a]t the very beginning," Defendants were "tracking [their] loan modification files [t]hrough Salesforce." *Id.*

Adding to the confusion, in the course of testifying at the December 2009 Preliminary Injunction hearing, Feingold responded to a question of the Court in which Judge Zloch asked whether it was possible for Defendants to determine from their computer systems how many customers FUL had serviced in a given year, "I think what you would have to do is look at Salesforce and also look at the other software package that First Universal Lending utilized, which First

-15-

Universal Holdings doesn't even come close to utilizing, and that's something called Calyx . . . Point." D.E. 76 at 8. This response indicates that (1) FUL used both Salesforce and Calyx Point, and (2) FUH used only Salesforce. From other testimony, however, we know that FUL conducted loan modifications towards the latter part of its existence only, and FUH prepared loan modifications from its beginning – facts that support the conclusion that although Defendants may have used Calyx Point initially to track loan modifications, they soon relied primarily, if not exclusively, on Salesforce. *See* D.E. 65 at 3; D.E. 67 at 85-92; D.E. 167-1 at 94, 106, 120.

As for where Salesforce resided, unlike Calyx Point, Salesforce "was not a program that . . . stored the data on the servers of [Defendants]." D.E. 199 at 11. Instead, Salesforce was a so-called cloud-computing company, and information was stored on the servers of Salesforce. *Id.*

B. The Imaging of Defendants' Computers

On November 19, 2009, pursuant to the TRO, the Receiver entered First Universal's second-floor business premises, accompanied by, among others, counsel for the FTC and Michael Liggins, the FTC's lead investigator on the case. D.E. 200 at 114. The main office consisted of what Defendants have referred to as the "back office," where a number of employees sat at computers and performed their work. *See id.* at 115. Ringing the back office were various other offices where the Zausners and lawyers from Feingold & Kam, including Feingold, worked. *See id.*; *see also* D.E. 197 at 38. The Receiver took possession of Defendants' premises and changed the locks. On November 19, 2009, when the FTC entered with the Receiver, the FTC did not deal with the computers that it found at First Universal's offices. *See*, *e.g.*, D.E. 197 at 12-13.

The following day, an FTC attorney returned to First Universal's offices along with Jeffrey Maglore, a forensic computer analyst for CACI, an independent contractor that the FTC had hired

to image Defendants' computers.  D.E. 197 at 31-32.  Maglore had not been present with the Receiver and the FTC on November 19, 2009, when the Receiver entered Defendants' premises. *See id.*  When Maglore visited First Universal's offices for the first time on November 20, 2009, FTC investigator Liggins, who had been at First Universal's offices the previous day, was not there. *Id.* at 12-13.  Nor did Liggins participate in any decision regarding which of Defendants' computers the FTC should image. *See id.*  Liggins was similarly not present at any time when CACI contractors considered which of Defendants' computers to image.  *See id.*; *see also id.* at 109-10.  In other words, Liggins has no personal knowledge regarding which of Defendants' computers CACI contractors had imaged at the direction of the FTC.

After Maglore arrived, he spoke with David Zausner, who advised Maglore that he was First Universal's information technology person. D.E. 197 at 38, 64.  David Zausner further offered that "none of the data [was] on [the] computers.  Everything that [was done was] on Salesforce." *Id.* at 38; *see also id.* at 43.  In response, Maglore asked, "Then where are all your servers?" *Id.* at 38. David Zausner replied that Salesforce was not at Defendants' offices, but rather, was "on the cloud." *Id.*  Nevertheless, David Zausner continued, Defendants did have a server in David Zausner's office, and that server "used to be [Defendants'] old Salesforce server." *Id.*

Under FTC protocol, which Maglore testified that he followed in imaging Defendants' computers, all servers at the location must be imaged.  *Id.*  That requirement motivated Maglore's inquiry to David Zausner regarding the location of all of Defendants' servers.  *Id.*  Besides all servers, FTC protocol also demands the imaging of all business principals' computers.  *Id.*  As a result, Maglore imaged David Zausner's computers (including the server in his office) and that of Feingold.  *Id.* at 38-39.

With respect to the remaining computers in the back office, Maglore engaged in a process he referred to as "triage."  Through this process, Maglore essentially sampled the computers in the back office to see whether, consistent with what David Zausner had indicated, they lacked substantive information.  *Id.* at 40.  In performing this process, Maglore selected approximately ten of the at least 25 computers[5] in the back office and connected a machine known as a "write blocker."  *Id.* at 40, 42.  When the write blocker was connected with a computer's hard drive, Maglore could view all of the program structures on the hard drive.  *Id.*  After excluding from consideration standard programs that Maglore described as usually bundled with the Windows XP installation, the only application that Maglore saw on these back-office computers was the link to Salesforce.  *Id.*  Maglore reported this information to the FTC attorney onsite.  *Id.* at 46.  The FTC attorney then made the determination of which, if any, computers that Maglore triaged should be imaged.  *Id.*

Other computers in the back-office area were not imaged.  Among those computers that were not imaged and apparently not write-blocked were four computers that, in fact, were servers that were stored under desks in the back office.  *See* D.E. 197 at 148-49, 168, 191-94.  According to Vasilios "Billy" Christakos, an onsite information technology specialist for First Universal, the four servers in the back office housed the Calyx Point software and data.  *See id.* at 168.

Maglore did not image these servers because he did not know about them.  *See id.* at 38-80.  This circumstance resulted from Defendant David Zausner's lack of candor in his discussion with Maglore regarding First Universal's servers.  Indeed, as noted above, after identifying himself as the

_____

[5]Other estimates have varied.  The Receiver, for example, testified that the back office contained approximately 40 computers, and Michelle North-Berg counted a total of 64 computers on the entire second floor, including the back office and second-floor office space other than that of David Zausner.  D.E. 200 at 115; D.E. 170-1 at 9.

head of information technology for First Universal, David Zausner affirmatively advised Maglore of only one server in response to Maglore's direct question to David Zausner, "Where are all your servers?" *See id.* at 74, 83-84.

In addition to Maglore's work in the back office and in David Zausner's office, during the time that Maglore was present at Defendants' office space, he observed some of Defendants' employees accessing a separate area on the second floor. *Id.* at 61. Upon seeing this, Maglore notified the FTC attorney, who, in turn, met with Feingold regarding this separate area. *Id.* Feingold then took Maglore to this other area on the second floor, and Maglore imaged computers there. *Id.* at 62.

Several days later, the Receiver became aware that Defendants maintained other premises, including office space on the third floor of the building that the Receiver and the FTC had entered in West Palm Beach on November 19, 2009, and office space in Pompano Beach. D.E. 200 at 115. The Receiver later learned that Defendants used these other locations for sales. *Id.* at 116.

Consequently, the FTC arranged for CACI to send James Compton, a forensic computer analyst, to visit these other locations to obtain information regarding what kinds of technology was there and to determine whether the locations housed any servers. D.E. 197 at 108-09. Because Compton was not accompanied by a case team when he went to the other premises, Compton decided to image all machines that he found at each location. *Id.* at 109. Additionally, he prepared a sketch of each space, identifying the particular location where each computer he imaged was located. *Id.* at 111-12; *see also* D.E. 208-2 at 26. Of the computers that Compton imaged on the third floor of First Universal's offices, subsequent analysis by Christakos revealed that one such computer held a file entitled "Calyx Software," although the contents were not accessible because,

Christakos reasoned, the data must have been stored on one of the destroyed servers.  Christakos testified that this particular computer had previously been located in the back office, and, thus, Feingold opined, it proved that the back-office computers used Calyx Point.

When Compton arrived at the Pompano Beach office, he found a large, open area with tables that looked like work stations.  D.E. 197 at 121.  Off to the sides of the space were some rooms, including a locked closet that Compton believed to be a server room, based on, among other things, the fact that the closet was locked (indicating an attempt to secure the system against sabotage) and Compton's observation of a telephone line and network cables running into the ceiling of the closet. *Id.*  Consequently, Compton advised the Receiver, who arranged for a locksmith to open the closet door.  *Id.* at 121-22.  Once the door was opened, Compton saw a rack, telephone connections, network connections, and computer switches, but he did not find a server in the room, although Compton opined that space for a server existed in the room.  *Id.* at 122-23.

C.  The 2009 Preliminary Injunction Hearing

> 1.  *Evidence Regarding the Contents of Defendants' Computers and Alternative Sources of Information*

In an Order to Show Cause issued on November 19, 2009, Judge Zloch set this matter for a Preliminary Injunction hearing.  *See* D.E. 13.  Following the parties' filing of a joint motion seeking a continuance of the Preliminary Injunction hearing, Judge Zloch reset the hearing for December 7, 2009.  *See* D.E. 15, D.E. 16.  From December 7, 2009, through December 11, 2009, the Honorable William J. Zloch held a hearing on the FTC's Motion for Preliminary Injunction.  *See* D.E. 42, D.E. 44, D.E. 47 - D.E. 49.

In anticipation of the hearing, the Receiver advised Defendants that they could have access

to anything that they wanted from First Universal's premises in order to prepare for the Preliminary Injunction hearing.   D.E. 200 at 118.   In accordance with this offer, Defendants downloaded documents from the computers for the hearing.   *Id.* at 119; *see also* D.E. 75 at 6-19.   These documents included the Salesforce files that Defendants used to cross-examine alleged victims during the Preliminary Injunction hearing.

During the hearing, Judge Zloch asked Feingold, "[I]s it possible, . . . for example, to see how many customers [FUL] serviced, say, in 2008?" D.E. 76 at 8.  Feingold responded, " . . . I think what you would have to do is look at Salesforce and also look at the other software package that [FUL] utilized, which [FUH] doesn't even come close to utilizing, and that's something called Calyx . . . Point." *Id.* Judge Zloch then followed up, "Wouldn't that be something that you would be interested in for the purposes of this hearing?  I mean, for example, to say to the Court that in 2008, [FUL] serviced – and I'm just using figures for the example.  But that [FUL] serviced 2,000 customers, and we were successful in getting either a reduction in interest rate and/or monthly payments in, you know, 1,700 of those.  Wouldn't you be interested in giving that information to the Court?" *Id.* at 8-9.  Feingold answered, "I would, and I agree with that." *Id.* at 9.  He then opined, however, that the information would be "fairly irrelevant" in the context of the Preliminary Injunction hearing if FUL no longer operated. *Id.*  Although this exchange occurred on December 10, 2009, and the hearing resumed the following day, Feingold did not choose to bring with him to the December 11, 2009, proceedings the information that Judge Zloch had discussed.

Nevertheless, Feingold did note in the Preliminary Injunction hearing that five states'

attorneys general had opened inquiries into FUL.[6]  *See* D.E. 75 at 61-62.  These included inquiries

by South Carolina, which Defendants settled for approximately $2,800; Iowa, which Defendants

settled for about the same amount; Pennsylvania, which the state dropped; Maryland; and Florida.

*See id.*  In response to these states' inquiries, Feingold explained, Defendants had provided the states

with approximately 50,000 documents, arranged in 36 binders, housed in 20 bankers' boxes, to

show, basically, the information that Judge Zloch described during the Preliminary Injunction

hearing.  *See* D.E. 75 at 21-22; *see also, e.g.*, D.E 203 at 27; D.E. 200 at 47.  More specifically,

according to the May 7, 2009, letter that Feingold sent in response to the State of Maryland's inquiry

into FUL,[7] Binders 7 through 35 held "a complete list of the consumer/client[]s with whom FUL has

maintained an index to show nearly 500,000 consumers have interacted with FUL for services. . .

.  Binder #36 contain[ed] approximately 7,254 modification offers made to FUL clients. . . ."  D.E.

203 at 32.

    In fact, during the Preliminary Injunction hearing, Feingold embraced this number, asking

Liggins, "Were you aware that the point in time that you all went into the offices of [FUL] that there

had been a total of in excess of 7, 254 modifications?"  D.E. 74 at 43.  On cross-examination of

Liggins by the FTC, however, the FTC pointed out that 7,254 modifications out of all of First

Universal's clients amounted to a very small success ratio.  *See* D.E. 75 at 43-44.  Following this

exchange, Feingold did not bring up the 7, 254 modifications again.

    Returning to FUL's letter to the State of Maryland and significant for purposes of the pending

_____

    [6]Other evidence in the record suggests that the Minnesota Attorney General's office also
inquired into FUL.  *See* D.E. 10 at 4, ¶ 9.

    [7]Feingold testified during the January 2011 hearing that he sent similar such letters to
other states in response to their inquiries.  *See* D.E. 199 at 24.

Motion to Enjoin Prosecution, the letter includes a telling footnote regarding the reason for First Universal's production of binders containing hard copies.  It provides, in pertinent part, "The records have been produced in paper format rather than in CD-ROM because FUL's original data storage server failed to perform and in fact, was the subject of a lawsuit filed by FUL . . . , wherein FUL asserted that Integrated Data installed a faulty server which has caused FUL to hold a significant amount of its data in paper format. . . ."  *Id.*  In other words, as late as May 2009, FUL had chosen to defend itself by producing paper documents, which it apparently deemed sufficient to establish a defense, because FUL's server was not reliable.

> 2.   *Evidence Regarding What the FTC Had Imaged of Defendants' Computers*

Also during the Preliminary Injunction hearing, the following exchange occurred between Feingold and Liggins, who had not been present at all when the CACI analysts imaged Defendants' computers:

| | |
|---|---|
| Feingold: | Isn't it true that a gentleman named Jeffrey was hired by the FTC and appeared at the offices of First Universal on November 19th, 2009, and was led around and downloaded the data off every single computer in the office? |
| Liggins: | That's correct. |
| Feingold: | But you haven't had the chance after you downloaded every single computer in the office and you knew this hearing was coming three weeks, for three weeks you have known, you didn't have the chance to look and see if these allegations were true? |
| Liggins: | Well, Sir, there was some issue about attorney/client privilege. |

. . .

> Feingold:  So you're telling me that you have not reviewed any documents because of concern about the attorney/client privilege?
>
> Liggins:   Not the documents, Sir.  I'm speaking of the downloaded information, the image that was made of all you guys' computers.  That's what I'm speaking of.

D.E. 74 at 38, 43.  Thus, Liggins's[8] testimony created the incorrect impression that the FTC had imaged all of the computers at Defendants' offices.  Liggins subsequently stated during the 2011 hearing, however, that he was never under the impression that all of the computers at FUL had been imaged, D.E. 197 at 18, and that his responses above suggesting otherwise had resulted solely from the compound nature of the questions that Feingold asked Liggins during the Preliminary Injunction hearing.  *See id.* at 18.  The problem with Liggins's explanation stems from the fact that the third response of his quoted above does not simply agree with one premise among many set forth by Feingold that the FTC imaged all of Defendants' computers; rather, Liggins himself offered his understanding that an image was made of "all you guys' computers."  *See* D.E. 74 at 3.  As a result, the Court finds that Liggins, at least at some point, mistakenly believed that the FTC had arranged for all of Defendants' computers to be imaged.  No evidence was presented, however, to indicate how Liggins came to hold this misunderstanding,[9] and the Court has seen no evidence to suggest that the FTC did, in fact, image all of First Universal's computers.  On the contrary, as set forth above, the evidence shows the opposite – that the FTC, through CACI, made a specific choice not to image

---

[8]*See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

[9]The Court recognizes that it is possible that after listening to Feingold's questions of Liggins on Liggins's direct examination at the Preliminary Injunction hearing, Liggins unconsciously assumed that all of the computers had been imaged.  In any case, the Court finds no intended deceit or malice in Liggins's testimony in this regard.

-24-

all of First Universal's computers.

Regardless of what Liggins may have believed, however, what he said during the Preliminary Injunction hearing certainly incorrectly suggested that the FTC had imaged all of Defendants' computers.  Significantly, as explained below, *see infra* at Section II.D., present in the courtroom during Liggins's testimony was Michelle North-Berg, an agent of the Receiver who was not involved in the FTC's computer-imaging decisions or process.  *See* D.E. 74 and D.E. 75 at 1 (Appearances for the Receiver); D.E. 197 at 33-80; D.E. 200 at 139-40.  Apparently, as a result of hearing this testimony, North-Berg developed the impression that the FTC had imaged all of First Universal's computers.[10]

D.  The Destruction of Defendants' Computers

Following the decision to shut down the operations of Defendants, the Receiver, her attorney Tama Beth Kudman-Richman, and her agent Michelle North-Berg sat down with Feingold at First Universal's offices and went over with him a balance sheet of the business's assets and liabilities. D.E. 200 at 81, 122.  No one ever mentioned servers to the Receiver or her agents, and the Receiver and her agents did not have any knowledge of First Universal's servers.  *See id.* at 124, 147.

During the course of performing their duties, the Receiver and Kudman-Richman spot-checked many of the computers in the back office to see what was on them.  *Id.* at 125, 133-34, 136-37.  Neither the Receiver nor Kudman-Richman saw "much" on the computers.  *Id.* at 125.  This did

_____

[10]North-Berg never explained why she was under the impression that the FTC had imaged all of First Universal's computers.  Based on North-Berg's testimony that no one at the FTC directly told her that the FTC had imaged all of the computers and on the other evidence of record, however, the Court independently draws the conclusion that North-Berg must have arrived at this impression at least in part as a result of having heard Liggins's Preliminary Injunction hearing testimony.

not surprise the Receiver or her agents, as Defendants had repeatedly advised the Receiver and her agents that information was not kept on the back-office computers; instead, Defendants had informed the Receiver and her agents, First Universal maintained all information on Salesforce, which, in turn, was a cloud-computing company that separately safeguarded FUL's computer information. *See id.* at 117, 125, 135, 147-49 (Kudman-Richman's testimony that Feingold, Johnston, and Sean Zausner all advised the Receiver and her agents that everything was on Salesforce); *id.* at 83 (North-Berg's testimony that David Zausner informed the Receiver and her agents that everything was on Salesforce).  Indeed, David Zausner described Salesforce as the "backbone" of the business.  *Id.* at 83.  Similarly, Feingold told the Receiver that every interaction between FUL and the banks was logged and saved on Salesforce, as was all of the administrative information for FUL.  *Id.* at 129, 135.  And the back-office support employees left Kudman-Richman with the understanding that "everything from the initial client contract to hardship letters, any documents that they produced, a mortgage package, mortgage modification application, anything like that would be stored in Salesforce."  *Id.* at 87-88.

When the Receiver engaged in these communications directly with Defendants, no one ever mentioned Calyx Point.  *Id.* at 117.  Rather, the only times that the Receiver or her agents heard about Calyx Point included (1) Feingold's brief references to the program at the Preliminary Injunction hearing; and (2) Johnston's statement in her deposition testimony that First Universal used Calyx Point for loan origination and relied on Salesforce for loan modification.  *Id.* at 117-18.

As for other tasks that the Receiver completed, North-Berg reviewed certain contracts pertaining to First Universal.  Among these, North-Berg observed a lease between Dell Financial as the lessor and Feingold & Kam as the lessee.  *Id.* at 82.  This lease pertained to a number of the

computers at First Universal. *Id.*; *see also id.* at 123. The lease did not regard the administrative computers that First Universal used, however. *Id.* at 124. Because the Dell lease involved an ongoing cost for which FUL appeared to pay Feingold & Kam, who held the lease in its name, in winding down First Universal's business following the Preliminary Injunction hearing, the Receiver determined that it made sense to return the computers to Feingold & Kam to stop First Universal's payments on the computer lease. *See id.* at 123-25, 82.

Once Feingold & Kam received the computers, the Receiver intended, Feingold & Kam could choose what it wished to do with them. *Id.* Consistent with FTC policy and this Court's Preliminary Injunction Order, however, the Receiver required that Feingold & Kam scrub the computers of personally identifiable information before transferring them to a third party. *Id.* at 125; D.E. 199 at 65.

North-Berg actually arranged for the computers to be turned over to Feingold as a representative of Feingold & Kam. D.E. 200 at 82. At the time, although no one from the FTC advised North-Berg that the FTC had imaged all of Defendants' computers, North-Berg, who had heard Liggins's incorrect Preliminary Injunction hearing testimony suggesting that the FTC had imaged all of Defendants' computers, was under the impression that the FTC had imaged everything and Feingold & Kam "was free to do what [it] wanted with the computers," as long as it scrubbed them of confidential personal information before transferring them to third parties. *Id.* at 82-83; *see also* D.E. 170-1 at 4. Berg advised Feingold of this requirement.

Subsequently, in December 2009, Feingold arranged for Christakos to contact North-Berg to accomplish the required "scrubbing." *See* D.E. 170-1 at 4; D.E. 197 at 153; D.E. 199 at 66. Scrubbing cannot occur selectively, so scrubbing any part of a computer results in obliterating all

of the computer's data.[11]  *See* D.E. 197 at 157.  When Christakos and North-Berg met, North-Berg advised Christakos that the computers needed to be scrubbed before they could be transferred to a third party.  *See* D.E. 197 at 155.  Christakos responded, "You realize [that] once the data is gone, it's gone?"  *Id.* at 156.  North-Berg then replied that the FTC had copied everything so "it wasn't an issue."  *Id.*  Following this discussion, Christakos wiped the hard drives, took them apart, and separately sold their parts.  *See id.* at 156-57.

A few months later, in May 2010, Kudman-Richman inquired of Defendants regarding the Dell-leased computers.  *See* D.E. 170-1 at 4.  Christakos responded to Kudman-Richman,

> Tama, I was forwarded a message from Feingold that you are seeking First Universal computers.  Approximately December of last year the entire office was packed up and all equipment was liquidated including the computers which were sold on craigs list and to various jobbers who literally took parts.  I do know that the FTC imaged all of the computers and whatever you are looking for is on the FTC imaging.  Dismantling of the office was done at your and Berg's direction and oversight.

D.E. 1701-1 at 4.  In her reply, Kudman-Richman, under the same incorrect impression as North-Berg, confirmed, "No problem.  All of the data is saved as you described. . . ."  *Id.*

On June 20, 2010, North-Berg then wrote to Christakos,

> I'm sorry to drag this on, but can you please send me another email stating that, at the Receiver's instruction, the computers were scrubbed before they were sold.  I believe this is what you've communicated in your prior emails but we need it clear in one email.

D.E. 203-1 at 20.  Christakos responded, "I did not speak to receiver Mos[c]owitz about this[;] I spoke to you."  *Id.*  In reply, North-Berg e-mailed the following day, "I am an agent of the Receiver.

---

[11]Presumably, however, if a party who wished to scrub a computer desired to maintain some of the information kept on that computer, that party could copy the requisite information from the computer before scrubbing the hard drive.

That's fine, please send me an email stating that I spoke to you and that at my direction the computers were wiped clean before selling them." *Id.* Later that same day, North-Berg inquired of Feingold,

> I'm not sure if you're still away but wanted to run this through you. Billy has been helpful in confirming the scrubbing and disposition of the former FUL computers, but we now need something in writing, such as "This letter shall confirm our understanding that, at the direction of the Receiver's agent, Michelle Berg, the computers formerly used by FUL were scrubbed clean prior to being sold or dismantled." . . .

D.E. 203-1 at 21. Feingold later sent the requested letter. *See* D.E. 203-1 at 23.

E.  The Lost Data

As a result of the events described above, the only electronic data remaining includes the images of Defendants' computers that CACI analysts made and the information stored on Salesforce's servers. Because Calyx Point was neither stored on Salesforce's servers nor on David Zausner's server, but instead resided on at least one of the four back-office servers that CACI analysts did not image and Defendants subsequently scrubbed, all Calyx Point data has been lost.

As for Salesforce data, the FTC has obtained a copy of all First Universal information contained on Salesforce's servers. Based on Defendants' repeated statements to the Receiver and the FTC that the Salesforce server contained everything, the fact that the FTC has acquired a copy of all First Universal information included on Salesforce's servers suggests that all Salesforce data remains.

During the January 2011 hearing, however, Feingold testified that that was not the case. Rather, Feingold stated that neither the Salesforce servers nor any other sources contained the customizations of Salesforce that Defendants had purchased, and, as a result, Salesforce reports

-29-

could not be replicated, and documents saved to Salesforce were not on Salesforce's servers.[12]

Moreover, Feingold claimed that even the programmers who created the customizations did not

retain their work, as they had performed it directly on First Universal's computer system – even

though several of the programmers were not onsite, and, in fact, were located in places as distant as

India and Scotland and worked virtually.  *See* D.E. 197 at 138 (Christakos's testimony regarding

FUL's information technology department).  According to Feingold, a provision in the contract

between FUL and the programmers precluded the programmers from keeping a copy of their work.

Yet Feingold could not produce a copy of the alleged contract.

Feingold's testimony in these regards contrasts starkly with his testimony from the

Preliminary Injunction hearing, where Feingold extolled the virtues of using Salesforce's third-party

servers:

> . . . [T]he way the software package works is, it's completely Internet
> based.  One of the great advantages that I as a lawyer, one of the
> reasons I like this software package for a client is because an
> individual working at a company cannot change the records because
> they are in [a] third-party server.
>
> So that way, anything they enter, if they later try to change records, it
> will be reflected.  And it's also very protective for purposes of First
> Universal because no one can accuse them ahead of time of trying to
> manufacture records and create work that never happened.
> Everything is date and time stamped.  Everything is kept on a third-
> party server with duplicate servers in case of any kind of weather
> catastrophe or anything like that.

D.E. 75 at 8.  Guarding against the hazards of a "weather catastrophe or anything like that" by storing

_____

[12]Because, as of the time of the issuance of this Order, no party appears to have ordered
the transcript for the fourth day of the January 2011 hearing (other than the FTC's rebuttal
closing, *see* D.E. 209), this Order does not contain citations to testimony from the fourth day.
Instead, the Court has relied upon its notes of the proceedings in describing the events of the
fourth day of the January 2011 hearing.

Salesforce data on a third-party server, as Feingold suggested was a reason for employing Salesforce, would be useless if much of the data entered into Salesforce disappeared with Defendants' customization of the system when their local computer equipment was destroyed; the entire purpose of storing information on a third-party server would be defeated.  In short, in light of the stated purpose behind using a third-party server system such as Salesforce, it seems incomprehensible that the information stored on Salesforce's servers is, as Feingold suggests, not really useful.

F.  Alternative Sources of Information

In view of the destruction of the four servers, the Court also inquired at the January 2011 hearing as to whether alternative sources of information exist.  Upon hearing from the witnesses, the Court finds that they do.  While the information currently available may not be as complete or as easily manipulated as information contained on Defendants' original servers, sufficient evidence still remains to enable Defendants to present a defense (and, if the Counterclaim is permitted to proceed as drafted, to prosecute the Counterclaim).

First, information from the computers that the FTC did image exists.  Among others, these images include one of Defendant David Zausner's server.

Second, data saved on Salesforce's servers remains.  While the Court cannot be certain of the precise contours of the information that was stored on Salesforce's servers due to Feingold's inconsistent and contradictory testimony at the Preliminary Injunction and January 2011 hearings, based on the evidence of record previously discussed, this Court finds that (1) at least at some point in time, Salesforce held all material information regarding FUL's, and subsequently, FUH's loan modification business, and (2) at least some universe of significant information from this database is still available through the materials obtained from Salesforce.  While turning the raw information

-31-

contained in Salesforce into compilation-type reports may not be as easy as it might have been prior to the scrubbing of Defendants' computers, the evidence indicates that this may still be accomplished. And, contrary to Defendants' suggestion at the January 2011 hearing, it would not necessarily require the calling of 500,000 witnesses. Rather, just as Salesforce-produced summary reports of First Universal's business records would have been eligible for admission into evidence if Defendants met all of the requirements of Rule 1006, Fed. R. Evid., human-produced compilations would be as well.

Third, although during his January 2011 testimony Feingold attempted to minimize the value of any hard documents in existence, the evidence – including Feingold's own words – demonstrates the opposite. Specifically, as discussed previously, Feingold relied in the Preliminary Injunction hearing on a letter he had sent to the State of Maryland and to other states that had opened investigations into FUL. That letter, in turn, referenced 36 binders that Feingold had sent to each of the inquiring states – binders that still exist. Of the 36 binders, 29 contain "a complete list of the consumer/client[]s with whom FUL has maintained an index to show nearly 500,000 consumers have interacted with FUL for services," and Binder 36 identifies "approximately 7,254 modification offers made to FUL clients. . . ." D.E. 203 at 32. As Feingold described this number, as of May 2009, it represented the "total" number of modifications that First Universal made. *See* D.E. 74 at 43. At the December 2009 Preliminary Injunction hearing, Feingold refined this number only by saying that the total number of modifications was in excess of 7,254. Thus, contrary to Defendants' contentions at the January 2011 hearing, they do know both the approximate total number of modification offers First Universal made and the complete universe of First Universal customers.

-32-

Fourth, Johnston pointed out in her deposition testimony and Feingold essentially confirmed in the footnote in the letter to the State of Maryland that First Universal maintained a fair amount of paper underlying documents in hard files.  In short, while the current state of the evidence presents additional challenges for the parties in mounting their respective case and defense, these obstacles are not insurmountable.

### III.  Discussion of Legal Issues

Defendants argue that the Court should dismiss the FTC's case against Defendants as a sanction for what Defendants describe as the FTC's bad-faith destruction of Defendants' computer systems.  Before the Court considers the legal framework for evaluating Defendants' position, the Court pauses briefly to note that, notwithstanding Defendants' puzzling contention in their brief in support of their Motion to Enjoin Prosecution that "where[] the Plaintiff's action was initiated pursuant to 28 U.S.C. § 1331 . . . , federal question jurisdiction, **the Eleventh Circuit has determined that state law . . . must be applied by this Court in its determination as to the imposition of sanctions for failure to preserve evidence**"[13] *see* D.E. 170 at 13-14 (emphasis in original), federal law, of course, governs spoliation sanctions in a case premised on federal-question

---

[13]In support of this proposition, Defendants cite *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), but *Flury* is a diversity-jurisdiction case where the Eleventh Circuit held that even in diversity cases in the Eleventh Circuit, federal law applies, as spoliation sanctions constitute an evidentiary matter, and "in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in federal courts." *Id.* (citation and quotation marks omitted).  Some courts have cited *Flury* for the proposition that, because federal law does not set forth specific guidelines on spoliation, courts may choose to look to state law for guidance. *See, e.g., FTC v. Nationwide Connections, Inc.*, 2007 WL 4482607, *1 (S.D. Fla. Dec. 19, 2007) (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citation omitted)).  But this Court is not aware of any case that *requires* a district court in a federal-question jurisdiction to apply state law to spoliation claims.

jurisdiction. *Martinez v. Brink's, Inc.*, 171 F. App'x 263, 268 n.7 (11th Cir. 2006).[14]

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence, usu. a document." *Black's Law Dictionary* 1437 (8th ed. 1999); *see also Green Leaf Nursery v. E.I. Dupont de Nemours and Co.,* 341 F.3d 1292, 1308 (11th Cir. 2003) (citing *Aldrich v. Roche Biomedical Labs., Inc.*, 737 So. 2d 1124, 1125 (Fla. 5th DCA 1999) (quoting *Black's Law Dictionary* 1401 (6th ed. 1990))). Here, Defendants contend that the FTC engaged in spoliation of First Universal's computer evidence. This Court does not agree.

Federal courts possess certain implied powers that are "necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citing *United States v. Hudson*, 7 Cranch 32, 34 (1812), and *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (citing *Hudson*)). "These powers are 'governed not by rule of statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). A court's "inherent power extends to a full range of litigation abuses." *Chambers,* 501 U.S. at 46. Among these powers, federal district courts have the authority to regulate litigation and to sanction litigants for abusive practices. *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. at 765).

To manage these responsibilities, the court may impose a broad spectrum of sanctions, including the application of an adverse inference against a party, among other possible sanctions, where the court finds that the party has engaged in spoliation of evidence. *Brink's, Inc.*, 171 F.

---

[14]The Eleventh Circuit did not elect to publish this decision in the Federal Reporter. Consequently, under Rule 36-2, 11th Cir., the opinion does not constitute binding authority. Nevertheless, it may be cited as persuasive authority. *See* 11th Cir. R. 36-2.

App'x at 268 n.7.  The adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party engaging in the misconduct.  "The key to unlocking a court's inherent power requires a finding of bad faith."  *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998); *see also Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) ("A jury instruction on spoliation of evidence is required 'only when the absence of that evidence is predicated on bad faith.") (citing *Bashir v. Amtrak*, 119 F.3d 929 (11th Cir. 1997)).

By way of example regarding the meaning of "bad faith" necessary to justify imposition of an adverse inference, in *Telectron, Inc.*, 116 F.R.D. at 133-34, Judge Marcus held that entry of default judgment as to the defendant corporation's liability in a complex antitrust case was an appropriate sanction for active and willful destruction of documents requested by the plaintiff.  In his ruling, Judge Marcus found bad faith where the evidence demonstrated that the "[d]efendant's actions were unequivocally motivated by the flagrant bad faith of [the defendant's] in-house counsel and corporate secretary, who explicitly and urgently called for the destruction of records in a category directly related to the opposing party's claims on the very date that he became aware of those claims." *Id.*  Indeed, Judge Marcus concluded that the defendant's counsel's active directive to destroy documents upon his receipt of the plaintiff's complaint and request for documents was "specifically designed and intended to obscure [the defendant's] history of anticompetitive endeavor, and to impede and obstruct Telectron's right to an honest and open discovery process." *Id* at 110.  Judge Marcus concluded that based on the evidence, this was a "willful and premeditated scheme" indicating bad faith and that it "warrant[ed] the inference that the destroyed documents would have been harmful to [the defendant], had they been produced." *Id.* at 134.

Similarly, in *Flury*, 427 F.3d at 944-45, the court found evidence of bad faith in the active

and knowing destruction of the allegedly defective vehicle in a motorist's suit against the manufacturer. In *Flury*, the evidence demonstrated that the plaintiff "knew the location and condition of the subject vehicle following the accident, . . . was fully aware that defendant wished to examine the vehicle, . . . . [and] [k]nowing this, the plaintiff ignored the defendant's request and allowed the vehicle to be sold to salvage without notification to defendant . . . ." *Id.* The court held that the "plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case." *Id.* Consequently, the court upheld the district court's instruction to the jury to apply a rebuttable presumption that the evidence not preserved was unfavorable to the party responsible for the spoliation.

However, "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Bashir*, 119 F.3d at 931 (internal citations omitted). "Court[s] should not infer that the missing evidence was unfavorable unless the circumstances surrounding the evidence's absence indicate bad faith." *Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422 (M.D. Fla. Nov. 7, 2006), at * 8 (citing *Bashir*, 119 F.3d at 931). For example, in *Bashir*, 119 F.3d at 931, the court held that the unexplained absence of the defendant corporation's (appellee's) train's speed tape in a wrongful death suit did not warrant an adverse inference that the train was traveling at excess speed when it struck the pedestrian. In its analysis, the court noted that it would "not infer that the missing speed tape contained evidence unfavorable to appellees unless the circumstances surrounding the tape's absence indicate[d] bad faith, e.g., that appellees tampered with the evidence." *Id.* The court held that with "no probative evidence" that "appellees purposely lost or destroyed the relevant portion of the speed tape," it could not infer bad faith. *Id.*

-36-

The court also declined to find bad faith for mere negligence in *Slattery v. Precision Response Corp.*, 167 F. App'x 139, 141 (11th Cir. 2006). In *Slattery*, the court held that an employer's failure to produce documents did not warrant an adverse inference in an employment discrimination case because the plaintiff had demonstrated "no evidence that [the defendant] withheld or tampered with any of the documents in bad faith." *Id.*

Likewise, in *Penalty Kick Management, Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293-94 (11th Cir. 2003), among other bases, the plaintiff sued Coca Cola for allegedly disclosing the plaintiff's trade secrets to a third party. During the course of business negotiations in which Coca Cola investigated the possibility of obtaining exclusivity to use the plaintiff's label design, the plaintiff disclosed certain trade secrets to Coca Cola regarding the label design. Coca Cola agreed not to disclose the trade secrets to others. While Coca Cola was in discussions with the plaintiff regarding the possible business deal, Coca Cola also was in contact with a third party, which it asked to design a label for it. The plaintiff alleged that the label design developed by the third party demonstrated that Coca Cola had revealed the plaintiff's trade secrets to the third party. While Coca Cola claimed that it did not disclose any of the plaintiff's trade secrets to the third party, the evidence showed that Coca Cola had, nonetheless, prepared a "mock-up" of the label type it envisioned, which incorporated some of the features of the plaintiff's label system. In discovery, the plaintiff sought a copy of the mock-up that Coca Cola provided to the third party. When Coca Cola could not produce the label, the plaintiff sought an adverse inference that the mock-up would have demonstrated that Coca Cola had disclosed the plaintiff's trade secrets to the third party. The court denied the request, explaining that the absence in the record of any indication of bad faith by Coca Cola in losing the label at issue precluded the award of the adverse inference. *Id.* at 1294; *see also*

*Perdue v. Union City*, 2006 WL 2523094, *10 n.6 (N.D. Ga., Aug. 28, 2006) (declining to find bad faith to infer adverse inference for loss of videotape by defendant where "no evidence that any defendant destroyed or tampered with tape").

Taken together, these cases demonstrate that a court may find bad faith based on direct evidence or on circumstantial evidence where certain factors converge. More specifically, where no direct evidence of bad intent exists, in this Circuit, bad faith may be found on circumstantial evidence where all of the following hallmarks are present: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

Here, the record is devoid of direct evidence of bad faith, and Defendants have similarly failed to establish bad faith by circumstantial evidence. First and foremost, as in *Perdue*, Defendants have not even made the necessary prerequisite showing that the FTC was the spoliator in this case. Indeed, the FTC did not destroy Defendants' computer system; Defendants did. And, while Defendants suggest that the destruction should not be attributed to Defendants because the Receiver's agent instructed Defendants to scrub the computer system, even assuming, *arguendo*, that Defendants decimated their hard drives solely because the Receiver's agent directed them to do so,[15]

---

[15]In view of the e-mail communications between the Receiver's agent and Defendants, the Court is not comfortable at this time laying blame for the destruction at Defendants' feet. The Court does have concerns, however, about Defendants' responsibility for the destruction of the evidence at issue. In this regard, the Court notes that Defendant Feingold, who is representing Defendants in this matter, is a seasoned attorney. Indeed, he described himself to this Court as

such a circumstance would not change the fact that neither the Receiver nor any of her agents is the FTC. Rather, "[a] receiver is a neutral court officer appointed by the court . . . ." *Sterling v. Stewart*, 158 F.3d 1199, 1201 (11th Cir. 1998) (citing 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2981, at 5 (1973)); *N. Am. Broad., LLC v. United States*, 306 F. App'x 371, 373 (9th Cir. 2008); *Crites, Inc. v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414 (1944). Consequently, sanctioning the FTC is not appropriate.

Furthermore, to the extent that Defendants' position can be construed to seek to attribute blame to the FTC for the Receiver's direction to scrub the computers based apparently on Liggins's misstatement at the Preliminary Injunction hearing that the FTC had imaged all of Defendants' computers, Defendants fare no better. Nothing in the record even hints at a malicious motive on the part of Liggins. In fact, it was not Liggins who originally suggested that the FTC had imaged all of Defendants' computers. On the contrary, Feingold first (and second) suggested in questioning

---

having (1) graduated from Emory University and Emory University Law School; (2) been a member of the Florida Bar since 1991; (3) worked for well-known law firms such as Broad and Cassel; (4) started in 1993 his own law firm, which has grown to six attorneys; (5) handled "some fairly extensive trials," including having tried approximately 50 cases by himself; (6) represented clients with more than a billion dollars in net worth; (7) handled complex litigation such as a securities class action in federal court; (8) served as general counsel for a 600-broker stock brokerage firm; and (9) represented a company defending itself in a receivership case. *See* D.E. 67 at 65-68; D.E. 199 at 113. In view of Feingold's experience, it is difficult to conceive that he truly believed that Defendants were required to destroy all electronic evidence in their possession without so much as asking whether they could first make a copy, even taking into consideration the e-mails from the Receiver's agent. Compounding the Court's concern is the fact that conveniently lost is the Calyx Point data Defendants used to determine that they had obtained 7,254 modification offers and that they had approximately 500,000 customers (a success rate of roughly 1 ½%). Finally, as a side note, the reason why the FTC did not copy the four servers in the back-office room – and therefore, the parties do not have access at this time to the information contained on these servers – is attributable to Defendants' failure to advise the FTC of the servers' existence, even in the face of a direct request by Maglore for David Zausner to show Maglore all of the servers.

Liggins that the FTC had imaged all of Defendants' computers.  At worst, the evidence may support the conclusion that Liggins's limited reference to "all [First Universal's] computers" during his Preliminary Injunction hearing testimony was negligent.  But, as noted above, negligence does not suffice to justify the imposition of spoliation sanctions in the Eleventh Circuit.

Nor have Defendants demonstrated that the absence of the missing evidence deals a fatal blow to their defense in this case.  As discussed in the Findings of Fact, *supra*, alternative sources of information exist that should allow Defendants to present a defense in this case.

Finally, Defendants cannot succeed on their request for spoliation sanctions for the independent reason that the FTC was under no obligation to preserve Defendants' computers.[16] Indeed, the FTC never possessed Defendants' computers; up until the computers were returned to Defendants, the Receiver exercised dominion and control over the computers.  And nothing required the FTC to image all of Defendants' computers.  As a result, the Court has no basis for imposing sanctions against the FTC for the destruction of Defendants' computer system.

### *IV.  Conclusion*

For the foregoing reasons, Defendants' Motion to Enjoin Prosecution [D.E. 170] is hereby **DENIED**.

**DONE AND ORDERED** this 17th day of February 2011.

ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

cc:    Hon. William J. Zloch
       Counsel of Record

---

[16]Instead, the FTC had an obligation to preserve the evidence that it had in its custody, such as the images that the FTC made of certain of Defendants' computers.

-40-